G5BKGOMH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          15 CR 348 (PGG)

JORGE GOMEZ, SANDY GOMEZ,

            Defendants.

------------------------------x

                                        New York, N.Y.
                                        May 11, 2016
                                        10:15 a.m.

Before:

                    HON. PAUL G. GARDEPHE,

                                        District Judge

                    APPEARANCES

PREET BHARARA,
     United States Attorney for the
     Southern District of New York
SHAWN GEOVJIAN CROWLEY
RICHARD ALAN COOPER
     Assistant United States Attorney

MICHAEL SPORN
     Attorney for Defendant Jorge Gomez

NATALI TODD
     Attorney for Defendant Sandy Gomez

ALSO PRESENT:

BRANDON DeSHIELDS, United States Attorney's Office Paralegal

G5BKGOMH

1          THE DEPUTY CLERK:  Call the case of United States of

2     America versus Jorge Gomez and Sandy Gomez.

3          Is the government ready?

4          MS. CROWLEY:  Yes.

5          Good morning, your Honor.  Shawn Crowley and Richard

6     Cooper, for the government.  Joining us at counsel table is

7     Special Agent Joseph Dill, from the DEA, and Brandon DeShields,

8     who is a paralegal in our office.

9          MR. COOPER:  Good morning, your Honor.

10          AGENT DILL:  Good morning, your Honor.

11          THE COURT:  Are the defendants ready?

12          MS. TODD:  Yes.  Good morning, your Honor.  Natali

13     Todd for Sandy Gomez, who is present to my left.

14          MR. SPORN:  Good morning, your Honor.  Michael Sporn,

15     for Jorge Gomez, who is seated to my left.

16          THE COURT:  All right.  The Gomezes have moved to

17     suppress evidence that was obtained as the result of an

18     automobile search, so we're here for purposes of conducting a

19     hearing on the motion to suppress.

20          Is the government prepared to proceed?

21          MS. CROWLEY:  We are, your Honor.  Just one quick

22     matter before we call our first witness:  As the Court is

23     aware, Sandy Gomez filed a motion and two briefs in support of

24     the motion to suppress.  Jorge Gomez filed a one-sentence

25     letter saying that he joins with Sandy Gomez's motion.  In our

1    opposition, we responded to Jorge's motion, arguing that we

2    don't see how he could possibly have standing to move to

3    suppress that.  I didn't know if your Honor intended to rule on

4    that before we begin in order to streamline the --

5         THE COURT:  I don't know that I have enough facts

6    before me to rule on it.  I think the issue would turn on

7    whether -- as I understand it, Jorge Gomez rented the vehicle;

8    is that right?

9         MS. CROWLEY:  That's correct, your Honor.

10        THE COURT:  Just so the record is clear -- and, again,

11   my knowledge of the facts, obviously, is limited at this

12   point -- but as I understand it, the vehicle in question was

13   actually a DEA-owned vehicle, right?

14        MS. CROWLEY:  That's correct.

15        THE COURT:  So it was a DEA-owned vehicle that had a

16   hidden compartment in it, and a confidential informant

17   allegedly had discussions with Jorge Gomez and another

18   conspirator about using the vehicle to transport drugs.

19        MS. CROWLEY:  Correct.

20        THE COURT:  I guess the legal issue would be -- and

21   that vehicle was provided, and the government alleges that

22   Sandy Gomez and another conspirator drove down to New Orleans

23   for purposes of picking up drugs and then were on their way

24   back to New York with the drugs when the vehicle stop took

25   place.

G5BKGOMH

1          So the question would be -- the legal question would

2    be whether the fact that Jorge Gomez rented the vehicle,

3    whether that gives him any rights with respect to objecting to

4    the search.  Has there been any briefing on that?  If there is,

5    I'm not aware of it.

6          MS. CROWLEY:  There has not, your Honor.  The reason

7    that we didn't address it in our brief is because Jorge Gomez

8    didn't put in any sort of affidavit or anything claiming that

9    he had any interest in the car whatsoever.

10          THE COURT:  Well, that may be true, but it's your

11    position that he had an interest in the vehicle, it's your

12    position that he rented the vehicle.  So, given that that's the

13    government's theory here, I understand he hasn't put in

14    anything saying that he rented it, but that's actually your

15    theory.  It's your theory that he rented the vehicle, isn't it?

16          MS. CROWLEY:  It is.

17          THE COURT:  Okay.  So my question to you is:  Do you

18    know, or do you have authority on the issue of whether when

19    someone rents a vehicle, that gives them an expectation of

20    privacy?  For example, I go to Hertz, I rent a vehicle from

21    them, and I'm stopped on the highway.  I believe I would have a

22    right to object to the police search of the car because I have

23    custody and control over the vehicle as a result of the rental

24    agreement.  Now, this is a very informal situation, obviously,

25    there's nothing in writing in which Mr. Gomez -- Jorge Gomez, I

1   should say, rented the vehicle.  But my question to you is

2   whether, given that it's the government's position that he

3   rented the vehicle, Jorge Gomez rented the vehicle, whether

4   that gives him any rights to object to the search.  That's my

5   question.

6          I guess my assumption, coming to today's proceeding,

7   was that it does give him some right to object to it because

8   the government's theory is that he rented the vehicle.

9          What's your theory, Mr. Sporn, on why your client

10  would have any right to object to the search here?

11         MR. SPORN:  Well, I'm not sure I can say it any better

12  than your Honor already has.

13         THE COURT:  You think I've made the argument for you

14  pretty good?

15         MR. SPORN:  Yes.  And I haven't put in anything

16  because I took it for granted that we would have the

17  evidentiary hearing before your Honor made that kind of

18  determination, and obviously our position is that there was an

19  expectation of privacy here, and the government has, out of

20  kindness, I suppose, articulated in full flower exactly what

21  that privacy interest is, your Honor.

22         THE COURT:  Well, let me say that obviously the

23  predicate for conducting an evidentiary hearing is, generally

24  speaking, an affidavit from the defendant that creates a

25  factual issue.  Here, though, it seemed to me that, given that

1    the government has laid out in some detail its view that Jorge

2    Gomez rented the vehicle, I'm just wondering why that doesn't

3    provide a sufficient predicate for him to object to the search.

4              MS. CROWLEY:  Your Honor, I think under the

5    hypothetical that your Honor posed in which your Honor rents a

6    car, your Honor is driving it, it's pulled over, we do not

7    contest the fact that you would have standing to challenge the

8    search and any fruits of the search.  Obviously, this is

9    different.  Under our theory, Jorge Gomez rented the vehicle

10   and then gave it to his brother.  I don't think that that fact

11   was contested by Sandy Gomez.  In fact, I think in their moving

12   papers, Ms. Todd admitted that fact.

13             If Sandy Gomez had not put in a motion, Jorge Gomez,

14   if he wanted to challenge the search, would have had to and

15   would have had to put in an affidavit creating some disputed

16   fact that was necessary for a hearing.

17             THE COURT:  Well, I think that much is true.  I mean,

18   to modify my hypothetical, I rent a car from Hertz, I'm on the

19   road with my wife, and I ask her to run out with the car to

20   pick up a quart of milk, and she's stopped by the police and a

21   search takes place.  Certainly my wife would have the right, I

22   suppose, to object to the search because she was given custody

23   and control over the car, but I think I would also have the

24   right to object to it as the renter of the vehicle.  I just

25   don't see Mr. Jorge Gomez in a different posture.

1          Now, I might say, I'm not making any finding here, I'm

2    not making any ruling, and I may well later conclude that

3    Mr. Jorge Gomez lacks standing, but what I'm telling you is,

4    I'm going to need to see briefing on that before I can make

5    that determination, and I have an open mind about it, but we

6    have it down for a hearing today, and I am going to allow

7    Mr. Sporn to participate, and to question witnesses, and put on

8    testimony, if he deems that appropriate, and I will decide the

9    standing issue down the road with respect to Jorge Gomez.

10          MS. CROWLEY:  Thank you, your Honor.

11          THE COURT:  All right.

12          You want to call your first witness?

13          MS. CROWLEY:  Yes.  The government calls Special Agent

14   Joseph Dill.

15    JOSEPH DILL,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18          THE DEPUTY CLERK:  Please state your full name and

19   spell it for the record.

20          THE WITNESS:  Joseph Dill.  Last name is spelled dill,

21   D-I-L-L.

22          THE COURT:  PLEASE proceed.

23          MS. CROWLEY:  Thank you, your Honor.

24   DIRECT EXAMINATION

25   BY MS. CROWLEY:

G5BKGOMH                          Dill - direct

1   Q.  Good morning.

2   A.  Good morning.

3   Q.  Who is your current employer?

4   A.  The Drug Enforcement Administration.

5   Q.  What is your current title?

6   A.  Special agent.

7   Q.  How long have you been a special agent with the DEA?

8   A.  Approximately 13 years.

9   Q.  Which group or division are you in?

10  A.  I'm in the New Jersey field division out of the Newark

11  office, and I'm in group five, task force one.

12  Q.  Could you please briefly describe your duties and

13  responsibilities as a special agent with the DEA?

14  A.  I conduct investigation into narcotic traffickers who are

15  violating federal and state laws.

16  Q.  Special Agent Dill, did there come a time when you became

17  involved in an investigation of an individual named Jorge

18  Gomez?

19  A.  Yes.

20  Q.  When was that?

21  A.  Approximately November/December of 2014.

22  Q.  What was Jorge Gomez being investigated for?

23  A.  Narcotic trafficking.  I had developed information from

24  phone records that a phone that we later identified being used

25  by Jorge Gomez was in contact with a suspected narcotic

G5BKGOMH                        Dill - direct

1   trafficker.

2   Q.   Did there come a time when a cooperating witness became

3   involved in the investigation of Jorge Gomez?

4   A.   Yes.   I also had received information from a confidential

5   source that Jorge Gomez was involved in narcotic trafficking,

6   and he was trying to obtain a car with a hidden compartment,

7   also referred to as a trap, for the purpose of using it to pick

8   up a shipment of narcotics.

9   Q.   Was a cooperating witness involved in this investigation?

10  A.   Yes.

11  Q.   Has the cooperating witness been charged with federal

12  narcotics crimes?

13  A.   Yes.

14  Q.   And has the CW pled guilty to those crimes?

15  A.   Yes.

16  Q.   Why was he cooperating at the time?

17  A.   For hope of getting leniency at sentencing.

18  Q.   Has he since been sentenced?

19  A.   Yes.   He had time served.

20  Q.   Has information provided by the CW proven reliable?

21  A.   Yes, it has.

22  Q.   Has it been corroborated by independent evidence?

23  A.   Yes.   We've made numerous arrests, drug and money seizures,

24  and conducted multiple surveillances and Title 3 investigations

25  based on his information.

G5BKGOMH                          Dill - direct

1   Q.  Why did the cooperating witness become involved in the

2   investigation of Jorge Gomez?

3   A.  We had heard that Jorge was interested in renting a car

4   with a trap, and --

5            THE COURT:  So was that from a different person?

6            THE WITNESS:  Yes, your Honor.

7            THE COURT:  So two different people, you had a

8   confidential informant who initially told you that Jorge Gomez

9   was interested in getting a car with a trap, and then you also

10  had a cooperating witness involved as well?

11           THE WITNESS:  A source of information.

12           THE COURT:  Yes.

13           All right.  Go ahead.

14           THE WITNESS:  So we arranged for the cooperating

15  defendant to call Jorge Gomez and to offer his services; that

16  is, providing the car with the trap.

17  BY MS. CROWLEY:

18  Q.  Did the cooperating witness, in fact, call Jorge Gomez?

19  A.  Yes.

20  Q.  Did you have a conversation with the cooperating witness

21  before he made that call?

22  A.  I did.

23  Q.  What did you tell him?

24  A.  I instructed him to tell Jorge that he could provide the

25  car with the hidden compartment, and that he would bring the

1    car over to meet with Jorge, so he could look at the car and

2    negotiate terms.

3    Q.   Approximately when was this call made?

4    A.   The original conversations happened in the beginning of

5    December, and then the meeting occurred on December 3rd.

6    Q.   Just stepping back, after the first call that the

7    cooperating witness had with Jorge Gomez, did you have a

8    conversation with the cooperating witness about that call?

9    A.   Yes.

10   Q.   And what, in sum and substance, did the cooperating witness

11   tell you about that conversation?

12   A.   That Jorge had agreed to what we asked, to meet with him,

13   so that he could check out the car in terms of -- because he

14   wanted to rent the car.

15   Q.   Now, you mentioned that the cooperating witness met with

16   Jorge Gomez.  When was that?

17   A.   That was on December 3rd.

18   Q.   Of what year?

19   A.   2014.

20   Q.   And did you speak with the cooperating witness before that

21   meeting?

22   A.   Yes.  I met with him and spoke with him on the phone.

23   Q.   Where did you meet with him?

24   A.   In Passaic County, New Jersey.

25   Q.   And what happened at that meeting?

G5BKGOMH                              Dill - direct

1   A.  At that meeting, myself and other agents showed him a Yukon

2   that had the hidden compartment in it, we gave him the keys, we

3   explained to him how to open the hidden compartment, we

4   searched the vehicle, we searched the cooperating witness, we

5   then provided him with a recording device, and had him place a

6   call to confirm the meet location to go meet with Jorge.

7   Q.  You mentioned that you provided him with a Yukon.  Who

8   owned the Yukon?

9   A.  The DEA.

10  Q.  You said the Yukon had a secret compartment in it.  Where

11  was that?

12  A.  In the back seat.

13  Q.  Did you instruct the CW how to open the secret compartment?

14  A.  I was present when he was instructed on the sequence.

15  Q.  By another agent?

16  A.  Yes.

17  Q.  What happened after your meeting with the CW?

18  A.  I followed the CW to the area of Market and Madison in

19  Paterson, New Jersey, and he then met with Jorge Gomez and

20  followed Jorge to the area of 28th Street in Paterson, where

21  Mr. Gomez was living.

22  Q.  You mentioned that you were following him.  Were you able

23  to observe Jorge Gomez and the CW meeting?

24  A.  Yes.  I didn't watch the whole meeting, I saw parts of the

25  meeting.  They were meeting in a parking lot.  During the

G5BKGOMH                        Dill - direct

1   meeting, the CW provided Gomez with the keys to the vehicle and

2   showed him how to use the compartment.

3   Q.   Okay.  So was the meeting between the CW and Jorge Gomez

4   recorded?

5   A.   It was.

6   Q.   Did you have a conversation with the CW after the meeting?

7   A.   Yes.

8   Q.   What, in sum and substance, did the CW tell you occurred at

9   the meeting?

10   A.   He told me that Jorge Gomez agreed to rent the car, that he

11   paid him $1,500, $500 a day, he expected to use the car for

12   three days, and that he instructed Gomez on how to open the

13   trap.  They discussed it could hold about 25 to 30 kilograms of

14   narcotics, and that Jorge told him that he would be interested

15   in a car that could hold more kilos than that, that he had a

16   steady drug supply somewhere that he would be using the cars to

17   go pick up shipments of narcotics.

18   Q.   Did the CW tell you that he discussed the quantity of

19   narcotics that Jorge --

20             MS. TODD:  Objection; leading.

21             THE COURT:  Sustained.

22   Q.   What, if anything, did the CW tell you about whether they

23   discussed a quantity of narcotics?

24   A.   Again, when the CW met with him, he showed him the hidden

25   compartment, and they talked about how it could hold 25 to 30

1    kilos of cocaine, and Jorge said that the shipment they were

2    going to get was around 25 kilos.

3    Q.  You mentioned that the meeting was recorded.  Was the

4    entire meeting recorded?

5    A.  Yes.

6    Q.  Have you reviewed that recording?

7    A.  I have.

8    Q.  Was the meeting transcribed?

9    A.  It was.

10   Q.  In what language was the meeting conducted?

11   A.  Spanish.

12   Q.  Was the transcription translated from Spanish to English?

13   A.  It was.

14   Q.  Have you reviewed that transcription?

15   A.  I have.

16   Q.  And, generally speaking, was the transcript of the meeting

17   consistent with what the CW told you happened at the meeting?

18   A.  It was.

19          MS. CROWLEY:  May I approach, your Honor?

20          THE COURT:  Yes.

21   Q.  I'm handing you what's been marked Government Exhibits 18

22   and 18T.

23   A.  Okay.

24   Q.  Do you recognize Government Exhibit 18?

25   A.  I do.

1    Q.   What is it?

2    A.   This is a CD that I reviewed earlier.  It has my initials

3    on it and some other markings on it, and when I reviewed it, it

4    was an audio file that matched with 18T, which is the

5    transcript that I discussed earlier.

6              MS. CROWLEY:  Your Honor, the government offers

7    Government Exhibits 18 and 18T.

8              MS. TODD:  No objection.

9              MR. SPORN:  No objection.

10             THE COURT:  18 and 18T are received.

11             (Government's Exhibits 18 and 18T received in

12   evidence)

13   BY MS. CROWLEY:

14   Q.   Was anyone else present at the meeting besides the

15   cooperating witness and Jorge Gomez?

16   A.   Yes.

17   Q.   Who?

18   A.   Carolina Baez.  That's Jorge's girlfriend.

19   Q.   I'm sorry, Jorge's?

20   A.   Girlfriend.

21   Q.   What happened after the CW and Jorge Gomez agreed on the

22   car rental?

23   A.   Jorge paid the CW approximately $1,500.  They went into his

24   apartment where they gave -- he got the money and gave it to

25   the CW.  They then -- the CW then got a ride from Carolina back

1   to the area that he had originally met Jorge.

2   Q.  And did the CW leave the vehicle at Jorge Gomez's house?

3   A.  Yes.  That's why Carolina drove.

4   Q.  What happened after the meeting?

5   A.  I met with the CW, we retrieved the recording device and

6   searched him again, and we discussed about what we talked about

7   on the transcript.  I then instructed the CW to contact Jorge

8   on December 4th, because the vehicle hadn't left Paterson yet,

9   and to start putting some pressure on Jorge to see if they were

10  going to use the vehicle or not.  The CW then had a

11  conversation with Sandy Gomez and Jorge Gomez, talking about

12  the -- if they were going to use the vehicle for the trip to

13  pick up the drugs.

14  Q.  So you mentioned that the CW had a conversation with Sandy

15  Gomez.  When was that?

16  A.  That was on December 4th.

17  Q.  Was that a conversation on the phone or in person?

18  A.  That was on the phone.

19  Q.  Was that conversation recorded?

20  A.  It was.

21  Q.  What language was that conversation in?

22  A.  That was also in Spanish.

23  Q.  Was a transcript prepared of that conversation?

24  A.  It was.

25  Q.  And did you review that transcript?

G5BKGOMH                              Dill - direct

1    A.  I did.

2    Q.  Did you have a conversation with the cooperating witness

3    after the phone call that he had with Sandy Gomez?

4    A.  I did.

5    Q.  What did the CW tell you about what was discussed on that

6    call?

7    A.  The CW said that Sandy was a little nervous about using the

8    vehicle with the compartment, that he didn't like the way it

9    looked, and that the CW told me that he reassured him that the

10   vehicle had been used for numerous trips before to pick up

11   drugs, and that the registration is good on the car, and that

12   it's a good car to use.  Sandy then put Jorge on the phone to

13   do that conversation.

14   Q.  I'm sorry, you said that he didn't like the way the secret

15   compartment looked.  Who do you mean by "he"?

16   A.  Sandy.

17            MS. CROWLEY:  May I approach, your Honor?

18            THE COURT:  Yes.

19   Q.  I'm handing you what's been marked Government Exhibits 15

20   and 15T.

21            Do you recognize these?

22   A.  I do.

23   Q.  What are they?

24   A.  15 is a CD that I reviewed earlier, that I wrote my

25   initials and other markings on, that was of the call that I

1   just discussed.  And then 15T is a Spanish-and-English

2   transcription of the call on disk 15.

3           MS. CROWLEY:  Your Honor, the government moves

4   Government Exhibits 15 and 15T.

5           MS. TODD:  Without objection, your Honor.

6           MR. SPORN:  No objection.

7           THE COURT:  Government Exhibits 15 and 15T are

8   received.

9           (Government's Exhibits 15 and 15T received in

10  evidence)

11  BY MS. CROWLEY:

12  Q.  Now, Special Agent Dill, have you reviewed the transcript,

13  the English language transcript, of the call that took place on

14  December 4th; that is, 15T?

15  A.  Yes, I did.

16  Q.  Was that generally consistent with what the CW told you

17  occurred on that call?

18  A.  Yes.

19  Q.  After that call between Sandy Gomez and the CW, did the CW

20  remain in contact with the Gomezes?

21  A.  Yes.

22  Q.  Why?

23  A.  I had instructed him to continue to put pressure on them to

24  find out if they were going to use the car, and if they weren't

25  going to use the car, for us to pick the car back up.

G5BKGOMH                           Dill - direct

1    Q.  What happened after those conversations?

2    A.  The car then left New Jersey and traveled towards Virginia,

3    where it stopped in Virginia.

4    Q.  How did you know where the car was going?

5    A.  I was tracking it on a GPS that was installed on the car,

6    and agents and task force officers from my group were

7    conducting physical surveillance on the car.

8    Q.  Did there come a time when you spoke with other law

9    enforcement officers about this vehicle?

10   A.  Yes.

11   Q.  Who did you speak to?

12   A.  The first conversation I had was with an agent in Virginia.

13   I had called down there to inform them that we had the car that

14   had the GPS in it, and we believed it was going to pick up a

15   shipment of narcotics, and that it was stopping -- had stopped

16   in Virginia at a hotel, and I asked them if they could provide

17   assistance with surveillance with the thought that the car may

18   be going to meet somebody to pick up the drugs.

19   Q.  Did you speak to any other law enforcement officers?

20   A.  Yes.  A short time after we conducted the surveillance in

21   Virginia, the car then started traveling south again, and we

22   spoke to agents in New Orleans, and, again, I asked them the

23   same thing, that we had a car coming down there, we suspected

24   it was coming to pick up a shipment of narcotics, can they

25   assist with surveilling the car.

G5BKGOMH                         Dill - direct

1    Q.  What, if anything, did you tell the agents in New Orleans

2    about the vehicle?

3    A.  That it had a GPS on it, that it was a DEA car that was

4    given to Jorge Gomez, and then later Sandy Gomez, with the

5    purpose of picking up a shipment of narcotics, and that we

6    would like assistance with watching the car, and then when we

7    feel that the car had picked up the drugs, to conduct a stop of

8    the car.

9    Q.  What, if anything, did you tell the agents in New Orleans

10   about whether the car had a secret compartment?

11   A.  I explained to them that it had the trap in the back seat.

12   Q.  Did you discuss a quantity of narcotics that you suspected

13   they would be picking up?

14   A.  Yes.  I told them that the trap could hold 25 to

15   30 kilograms, and that we believed that they were picking up

16   that range of drugs, 25 to 30 kilos.

17   Q.  You mentioned that the car had a GPS tracking device and

18   that you were using that to watch where the car went.  Were you

19   able to consistently monitor the GPS device?

20   A.  No.

21   Q.  Why not?

22   A.  The GPS failed.  It was working sporadically.  It was

23   having issues.

24   Q.  But there were agents who were performing surveillance on

25   the vehicle?

G5BKGOMH                          Dill - direct

1    A.  Yes.

2    Q.  Were those agents able to identify the occupants of the

3    vehicle as it was traveling from New Jersey south?

4    A.  Yes.

5    Q.  Who was in the vehicle?

6    A.  Sandy Gomez and Carolina Baez.

7    Q.  Who was driving the vehicle?

8    A.  Sandy Gomez.

9    Q.  Did law enforcement continue to perform surveillance on the

10   vehicle after it arrived in New Orleans?

11   A.  Yes.

12   Q.  What did they observe?

13   A.  The car made numerous stops, went to some restaurants, went

14   to a Winn-Dixie, I believe a Walgreens.  At one point Sandy was

15   driving the car by himself and picked up an individual, and

16   then later, the car was seen with Sandy by himself -- I'm

17   sorry, with Sandy with Carolina, and it started heading north

18   out of New Orleans.

19   Q.  And what happened as the car started heading out of New

20   Orleans?

21   A.  I spoke with TFO Patti, Michael Patti, and I instructed him

22   that they should conduct a motor vehicle stop on the car.

23             THE COURT:  What does "TFO" mean?

24             THE WITNESS:  Task force officer.

25   Q.  Where was Task Force Officer Patti when you spoke with him?

G5BKGOMH                        Dill - direct

1   A.  He had traveled from New Jersey to New Orleans, following

2   the car.

3   Q.  And was a traffic stop, in fact, performed?

4   A.  Yes.

5   Q.  You mentioned --

6            THE COURT:  So how long was the car actually in New

7   Orleans?

8            THE WITNESS:  I believe about a day, a day and a half.

9   It left New Jersey on the night of -- between the 4th and the

10  5th of December.  And then during the day, it stopped in

11  Virginia at a hotel, as they made the trip down, and I believe

12  the stop was on the 7th or the 6th.  Without having the report

13  in front of me, I can't tell you for sure, your Honor.  It was

14  a very short time frame.

15           THE COURT:  All right.

16  BY MS. CROWLEY:

17  Q.  You mentioned that the vehicle that Mr. Gomez was driving

18  was owned by the DEA.  Did the DEA build the trap inside the

19  vehicle?

20  A.  Yes.

21  Q.  And was it equipped with an alarm?

22  A.  It was.

23  Q.  Why?

24  A.  The alarm was supposed to signal us when the trap was open,

25  but it was linked to the GPS unit, so as the GPS was failing,

G5BKGOMH                          Dill - cross

1   the alert was failing also.

2   Q.  So did the alarm on the trap ever go off?

3   A.  Not after we gave the vehicle over to the Gomezes.

4            MS. CROWLEY:  One moment, your Honor?

5            THE COURT:  Yes.

6            (Pause)

7            MS. CROWLEY:  Nothing further.

8            THE COURT:  All right.

9            Cross-examination?

10           MS. TODD:  Yes, your Honor.  Thank you.

11   CROSS-EXAMINATION

12   BY MS. TODD:

13   Q.  Good morning, Agent Dill.

14   A.  Good morning.

15   Q.  How are you?

16   A.  Good.  Thank you.

17           How are you?

18   Q.  Good.  Thank you.

19           I have a few questions for you.

20           You testified to a phone conversation between the CW

21   and Jorge Gomez on December 3rd.  That was admitted in evidence

22   as Government Exhibit 18T?

23   A.  That's on December 4th.

24   Q.  I'm sorry?

25   A.  December 4th.

G5BKGOMH                         Dill - cross

1   Q.   18T?

2   A.   Yes.  I thought you said December 3rd, I'm sorry.

3   Q.   December 3rd?

4   A.   That call is on the 4th.

5   Q.   Okay.

6   A.   Would you like --

7   Q.   Maybe I misstated.  I'm talking about the meeting where

8   Jorge Gomez met with the CW and discussed the secret

9   compartment in the vehicle.  That was on December 3rd, correct?

10  A.   Yes.  That's 18T.

11  Q.   18T.

12  A.   Okay, yeah.

13  Q.   And you testified that you had an opportunity to observe

14  the meeting in the parking lot, correct?

15  A.   Some of the meeting.

16  Q.   Some of the meeting?

17  A.   Yes.

18  Q.   During your observation, Sandy Gomez was not present,

19  correct?

20  A.   I did not see Sandy Gomez, correct.

21  Q.   In fact, during the entire meeting, Sandy Gomez was not

22  observed to be present, correct?

23  A.   Correct.

24  Q.   So the meeting with respect to Government Exhibit 18T

25  discussing the operation of the secret compartment of the

G5BKGOMH                          Dill - cross

1   vehicle, the money that you described, how much it was going to

2   cost per day, Sandy Gomez was not part of that meeting,

3   correct?

4   A.  Yes.

5   Q.  Now, with respect to Government Exhibit 15T, which is

6   admitted in evidence, which is a call between Sandy Gomez and

7   the confidential informant, you testified that Sandy Gomez

8   discussed with the cooperating witness that he did not like how

9   the secret compartment looked.

10         Do you recall saying that?

11  A.  Yes.

12  Q.  I'm going to ask you to take a look at the entire

13  transcript and take as much time as you need and point to me

14  anywhere in that transcript where that discussion occurred.

15  A.  Sure.

16         Okay.  The first part where they start talking

17  about --

18  Q.  What page are you on, agent?

19  A.  I'm on page 2.

20  Q.  Okay.

21  A.  So my interpretation of reading the translation and based

22  on my conversation with the cooperating witness, was that Sandy

23  didn't like the way that the hidden compartment was made, and

24  that him and Jorge had an argument over that, he didn't want to

25  use the car.  And it starts, if you look at where one, two,

G5BKGOMH                        Dill - cross

1    three lines for Sandy, he says, "The issue with me is, you

2    know, when you're traveling, you go to different places that --

3    that car has a space in there, and the seats go down.  So I

4    said to him that," and my interpretation of this, and, again,

5    from what I was told by the cooperating witness, is that the

6    hidden compartment where the seats are, and that Sandy was

7    telling Jorge, I didn't like the way that looked, I didn't like

8    it.  And this continues to go on in the transcript as you read

9    it.

10             It goes on to the next page, they talk about the seat,

11   the back of the seat was broken, you know, I'm saying, and when

12   you look at the trap and where the trap was, the trap wasn't a

13   good trap, the trap was broken, it was old, and it was on those

14   seats, and Sandy's complaining that he doesn't like it, it's

15   broken.  And it continues onto the next page, too.

16   Q.   But let me stop you there, agent.  There is nowhere in what

17   you just indicated where he said that the trap was visible or

18   that he didn't like the way the trap looked, he's talking about

19   the seat being broken, correct?

20   A.   The seat is the trap.  You can see on the next line, the CS

21   says, "The back of the seat is a little broken, but with that

22   car, we've been -- I mean, I can't say that we've been the

23   unluckiest people because that car has been driven a lot, and

24   it's never had a problem."  They are discussing the trap, and

25   you can see where -- again, this is from my reviewing of the

1    transcript and from what the confidential source told me, that

2    Sandy didn't like the way it looked, he didn't like the way the

3    car looked, and that there was some back-and-forth between

4    Sandy and Jorge about using the car, and that he was trying to

5    reassure Sandy that the car would be sufficient for the job.

6    Q.  My question to you is not the conversation between Jorge

7    and the complainant, my question to you is a conversation

8    between Sandy Gomez and the cooperating witness.  And this is

9    the only conversation we have, correct?

10   A.  Right, and I'm reading you the conversation.

11   Q.  And so I'm asking you to show us where in the transcript

12   where Sandy complains that the trap is visible and that he is

13   uncomfortable.

14   A.  I didn't say the trap was visible, he's uncomfortable.  If

15   you read the next line, it says, "Okay, well, then that's like

16   I said to him.  He was criticizing me.  I checked it out

17   because the thing is that we -- he had said to me for you not

18   to -- to not -- I had that same one -- that same one, but a

19   newer one.  The problem I had, though, like I told you, is

20   because he says to me, oh, they're not the same, and I said to

21   him that it's because of the part, it's the part that makes it

22   look different.  Maybe you understand me, but if you tell me

23   that there's no problem, I did it because he said to me check

24   it out for me, you know what I'm saying.  And, excuse me, but

25   we're waiting for them to call him, and I was being told, no,

G5BKGOMH                           Dill - cross

1   hold on, don't send the guy yet and --"

2   Q.  So your understanding from reading that, because this is

3   your testimony, that you understood that to mean it was a

4   discussion about the compartment and not the fact that he had a

5   similar vehicle, so he knew how the seats should operate?

6   A.  My understanding, from what the cooperating witness told

7   me, and from reading this, and from the totality of given the

8   car with the trap, is that he's talking about that he doesn't

9   like the way the seat looks, that he had a similar car that had

10  a similar compartment in it.

11  Q.  A similar compartment, or does he know how the seat should

12  look?

13  A.  I mean the compartment is the seat.

14  Q.  When you say "the compartment is the seat," where exactly

15  was the compartment, so we understand?

16  A.  The seat, it's the back seat, it lifts up, and the

17  compartment is the seat.

18  Q.  Is the compartment underneath where you actually sit?

19  A.  Yes.  It's part of the seat, it's built into the seat.

20  Q.  So the upper part of the seat, which is where you would

21  lean back on --

22  A.  Uh-huh.

23  Q.  -- that's the part that doesn't go down, correct?  Because

24  the compartment prevents it from laying flatly?

25  A.  Right.

G5BKGOMH                          Dill - cross

```
1    Q.  So if you were to try to put luggage in the back of the
2    vehicle, that seat wouldn't fold because of the compartment
3    under the seat, correct?
4    A.  I mean, I'd have to look at it again to tell you.  I
5    haven't looked at the car in a year and a half.  I know the
6    hidden compartment was in the back seat, and that --
7    Q.  Underneath the seat?
8    A.  And the back seat didn't look right because of the
9    compartment.  It was not a very good trap.  It was an old trap,
10   and it did not look very good.
11   Q.  But as you described it, the trap is not actually in the
12   rest part of the seat, it's on the part that you would actually
13   sit underneath that?
14   A.  Correct, but it's all connected.  And this is -- like I
15   said, I haven't seen the trap in about a year and a half and
16   physically looked at the car, but I'm remembering this trap was
17   on the bottom of the seat, and that the whole seat lifted up.
18   Q.  Right.  So if you are looking at the seat, it's not visible
19   to the naked eye, you'd have to lifted up the seat, correct?
20   A.  Correct.
21   Q.  Now, you also testified that he was surveilled down to
22   Louisiana, correct?
23   A.  Yes.
24   Q.  And that he made several stops along the way, right?
25   A.  Correct.
```

G5BKGOMH                        Dill - cross

1    Q.  Could you list each of the stops that he made for us again?

2    A.  I cannot.

3    Q.  Okay.  He stopped at a gas station.  Does that sound --

4    A.  Again, I was tracking the GPS that was working

5    sporadically, and I was getting information from the agents

6    down there.

7    Q.  So what stops did the agents tell you that he made that

8    were suspicious to stop the vehicle?

9    A.  I know he stopped at a Winn-Dixie, and that he picked up

10   somebody in the car, and drove around with that person for a

11   short amount of time, and then was seen by himself after

12   dropping that person off somewhere.

13   Q.  Any other stops?

14   A.  Again, I know he made other stops.  I can't tell you which

15   stops they were.

16   Q.  At any of those stops, was he observed engaging in any

17   narcotics transaction?

18   A.  We didn't -- let me rephrase that.  I didn't receive any

19   information that he picked up any items from anybody that were

20   observed.

21   Q.  And according to you, the secret compartment was equipped

22   with an alarm, correct?

23   A.  Yes.

24   Q.  That alarm would sound if the secret compartment was

25   accessed, correct?

1    A.  If it was working.  It wasn't working at the time.

2    Q.  My question to you is:  If the compartment was accessed,

3    that alarm should go off, correct?

4    A.  "Should" is the key word, yes.  It should go off, but it

5    did not because it was not working.

6    Q.  So from the time Mr. Sandy Gomez got the vehicle in

7    New Jersey to the time he was stopped on his way back to the

8    Northeast region, no agent received any signal that that

9    compartment had been accessed, correct?

10   A.  That is correct, yes.

11           THE COURT:  Now, was the alarm on the trap checked

12   before the vehicle was provided to Jorge Gomez?

13           THE WITNESS:  It was, your Honor.

14           THE COURT:  Was it working then?

15           THE WITNESS:  That was checked, and the GPS was

16   checked, they were both working, and then around Virginia, I

17   believe, when the GPS stopped working, and it would turn on, it

18   would turn off, and if the GPS is not on, the alarm will not

19   activate.

20           THE COURT:  I see.

21           All right.  Go ahead.

22   BY MS. TODD:

23   Q.  So at the time that Mr. Gomez had been pulled over, there

24   was no observation that he had received any narcotics, correct?

25   A.  I stated what my observations or what I had been informed

G5BKGOMH                         Dill - cross

1  had happened, and based on what I was informed, I instructed

2  the agents down there to conduct the stop.

3  Q.  My question was there was no observation that he had

4  received narcotics, correct, at the time he was stopped?

5  A.  No.

6          MS. TODD:  Nothing further, Judge.

7          THE COURT:  All right.

8          Redirect?

9          MR. SPORN:  Your Honor, I hadn't anticipated --

10         THE COURT:  Oh, I'm sorry, Mr. Sporn.

11         MR. SPORN:  That's all right, because I actually

12  hadn't anticipated asking, but with the Court's permission, I

13  would like to put a few questions.

14         THE COURT:  All right.

15  CROSS-EXAMINATION

16  BY MR. SPORN:

17  Q.  Good morning, agent.

18  A.  I don't know where the clock is.  Good morning.

19  Q.  I just want to talk to you for a few minutes about how

20  Jorge first came to the attention of the investigation.

21         On direct, I believe you said that the investigation

22  developed information from phone records.  Do you recall saying

23  that?

24  A.  Yes, sir.

25  Q.  What phone records are you talking about?

G5BKGOMH                          Dill - cross

1  A.  There's a coconspirator that I had been investigating, and

2  that coconspirator had numerous contacts with a phone number

3  that was later identified as being used by Mr. Gomez.

4  Q.  Was there a wire on that coconspirator's phone?

5  A.  No.

6  Q.  Okay.  Was there -- are you talking about consent

7  recordings?

8  A.  No, I'm not.

9  Q.  Well, then, tell me how you were able to learn about those

10  phone records.

11  A.  One of the coconspirators that I was investigating, I

12  obtained his phone records --

13  Q.  I'm sorry.

14  A.  I obtained his phone records, and on his phone records,

15  Mr. Gomez was a high-volume caller.  That number was later

16  identified as being used by Mr. Gomez.

17  Q.  I just want --

18  A.  This is just one piece of the investigation.

19  Q.  I understand.

20          So you're not talking about the content of the

21  telephone calls?

22  A.  No, I'm not talking about content, I'm talking about data.

23  Q.  Billing records?

24  A.  Correct.  Yes.

25  Q.  Was it based on the frequency of those calls that you saw

1   in the billing records that you asked the cooperating witness

2   to reach out to Jorge?

3   A.  In part.

4   Q.  And what was the other part?

5   A.  I had a source of information that told me that the person

6   using that phone was also involved in narcotic trafficking.

7            THE COURT:  The person using which phone?

8            THE WITNESS:  The Gomez phone that's on the toll

9   records.

10  BY MR. SPORN:

11  Q.  You mentioned that on direct, I believe?

12  A.  Yes.

13  Q.  That's who you were referring to?

14  A.  Yes.

15  Q.  I guess you don't want to tell us the identity of that

16  person?

17  A.  Correct.

18  Q.  But what I want to ask you is:  Was that person working in

19  conjunction with your cooperating witness?  Was there some

20  connection there?

21  A.  No, there was not.

22  Q.  An entirely independent source?

23  A.  Correct.

24  Q.  Did that person have a cooperation agreement?

25  A.  No.

G5BKGOMH                          Dill - cross

1    Q.  Were there reports prepared based on what that person told

2    the investigation relative to Jorge?

3    A.  That was not my source of information, so I don't know

4    whose the reports were.  It was a lead that was passed to me

5    from another field division.  And it wasn't -- it was about

6    that phone number.

7           So we took the information, and we developed a

8    separate investigation and were able to get our cooperating

9    witness to speak to Mr. Gomez on that phone, and that's where

10   our investigation started from.

11          THE COURT:  So all you got was a phone number?

12          THE WITNESS:  Correct, your Honor.  And we were able

13   to start developing the case from the phone number.

14   BY MR. SPORN:

15   Q.  And it was the investigation that set in motion the contact

16   that your cooperator had with Jorge?

17   A.  Yes.

18   Q.  Are you aware of whether Jorge Gomez was ever overheard on

19   a wire that was up and running?

20          MS. CROWLEY:  Objection, your Honor.  This is well

21   beyond the scope of direct.

22          THE COURT:  What does that have to do with whether

23   there was cause to search the vehicle?

24          MR. SPORN:  I'm not sure, Judge.

25          THE COURT:  I'm not sure either.  That's actually why

G5BKGOMH                          Dill - cross

1    we're here today.

2                MR. SPORN:  I have no further questions.

3                THE COURT:  Okay.

4                MR. SPORN:  Thank you, Judge.

5                THE COURT:  All right.  Before we do redirect, I had a

6    question.

7                You were asked whether there was any observation that

8    Sandy Gomez had received narcotics from anyone, remember that,

9    in New Orleans?

10               THE WITNESS:  Yes, your Honor.

11               THE COURT:  Did you understand that there was another

12   occupant in the vehicle?

13               THE WITNESS:  Yes, your Honor.  So with the GPS

14   failing, we were attempting to, or the agents in New Orleans

15   were attempting to do physical surveillance.  There were some

16   gaps where physical surveillance was not maintained, that

17   they'd lost the vehicle for short periods of time.  So during

18   one of those gaps, Jorge had a person in the car with him, and

19   then the person got out of the car.  So based on that

20   information, and the pattern of the car going down to New

21   Orleans and then shortly heading back north, I made the

22   determination that we should conduct the vehicle stop on the

23   car because I believed that the car had the trap in it, the

24   trap was given to Mr. Gomez to pick up drugs, and based on the

25   observations, that he more than likely picked up the drugs.

G5BKGOMH

1          THE COURT:  So you're saying that there was

2     surveillance in which officers observed Sandy meeting with

3     somebody?

4          THE WITNESS:  Correct, your Honor.

5          THE COURT:  How about Carolina?

6          THE WITNESS:  I believe she was at a hotel at the

7     time.  She'd stayed at the hotel.

8          THE COURT:  All right.

9          THE WITNESS:  And then shortly after this, Mr. Gomez

10    was found again on surveillance, he went and picked up

11    Carolina, and headed -- started heading out from New Orleans.

12         THE COURT:  Okay.

13         THE WITNESS:  That's when we made the determination

14    that we should attempt the stop.

15         THE COURT:  Okay.  So there was never any observations

16    of Carolina picking up narcotics?

17         THE WITNESS:  Correct.

18         THE COURT:  Okay.

19         All right.  Redirect?

20         MS. CROWLEY:  Nothing, your Honor.  Thank you.

21         THE COURT:  Okay.  You can step down.

22         THE WITNESS:  Thank you, your Honor.

23         THE COURT:  Thank you.

24         (Witness excused)

25         THE COURT:  Does the government have additional

1    evidence?

2              MS. CROWLEY:  Yes, your Honor.  The government calls

3    Senior Trooper Ronald Whittaker.

4     RONALD WHITTAKER,

5         called as a witness by the Government,

6         having been duly sworn, testified as follows:

7              THE DEPUTY CLERK:  Please state your full name and

8    spell it for the record.

9              THE WITNESS:  Trooper Ronald Whittaker, Jr.,

10   R-O-N-A-L-D, W-H-I-T-T-A-K-E-R, Jr.

11             THE COURT:  Please proceed.

12   DIRECT EXAMINATION

13   BY MS. CROWLEY:

14   Q.  Good morning.

15   A.  Good morning.

16   Q.  Who is your current employer?

17   A.  Louisiana State Police.

18   Q.  And what is your current title?

19   A.  Senior trooper.

20   Q.  How long have you been a trooper at the Louisiana State

21   Police?

22   A.  Fourteen years.

23   Q.  Which division are you in?

24   A.  The criminal patrols unit.

25   Q.  Where did you go to college?

G5BKGOMH                    Whittaker - direct

1   A.  I got my undergraduate degree at Southeastern Louisiana

2   University in Hammond, Louisiana, and my Master's degree in

3   criminal investigation in Baton Rouge, Louisiana.

4   Q.  Could you please briefly describe your duties and

5   responsibilities as a senior trooper?

6   A.  As a senior trooper in the criminal patrols unit, we're an

7   active aggressive traffic enforcement unit where our main

8   priorities are to apprehend wanted fugitives, violent felons,

9   drug couriers, money couriers, illegal guns, and weapons.

10  Q.  As part of your training to become a Louisiana state

11  trooper, are you required to learn Louisiana State traffic

12  laws?

13  A.  Yes, I am.

14  Q.  Were you required to undergo any training with respect to

15  traffic laws?

16  A.  Yes, I was.  I went through three different traffic law

17  schools.

18  Q.  I'm sorry, I didn't hear.

19  A.  I went through three different traffic law schools, three

20  different academies.

21  Q.  As a trooper with the Louisiana State Police, have you

22  performed traffic stops of vehicles?

23  A.  Yes, I have.

24  Q.  Approximately how many?

25  A.  Over a thousand.

G5BKGOMH                         Whittaker - direct

1    Q.  Have you conducted searches of those vehicles?

2    A.  Yes, I have.

3    Q.  How many?

4    A.  Hundreds.

5    Q.  Are you familiar with the term "walled-off traffic stop"?

6    A.  Yes.

7    Q.  What is it?

8    A.  A walled-off traffic stop is generally a request by another

9    agency to stop a person or a vehicle, but to develop your own

10   probable cause in doing so.  And the purpose of doing that is

11   normally that they involve long-term investigations, so they're

12   trying to protect the integrity of that investigation, whether

13   it's a confidential informant or undercover agent, a wire, or

14   whatever the case may be.

15   Q.  So when you say "protect the integrity of the

16   investigation," what do you mean?

17   A.  Meaning the person that you stop, you want to keep them

18   unaware that they're under an active investigation.

19   Q.  Have you performed walled-off traffic stops?

20   A.  Yes, I have.

21   Q.  Approximately how many?

22   A.  Probably ten.

23   Q.  Trooper Whittaker, are you familiar with something called a

24   trap?

25   A.  Yes, I am.

1    Q.   Can you explain what it is?

2    A.   A trap is another term used for a concealment location in a

3    vehicle.  And it's an aftermarket concealment method that they

4    use, and they call it a trap, and it's used to conceal or hide

5    weapons, narcotics, any kind of illegal contraband that they

6    wouldn't want somebody else to find.

7    Q.   Have you received any special training on traps?

8    A.   Yes, I have.  I've been to several concealment location

9    schools, and I'm a DIAP instructor, a Drug Interdiction

10   Assistance Program instructor, through the Federal Motor

11   Carrier Safety Administration, so I teach other law enforcement

12   agents how to find hidden compartments or traps in vehicles.

13   Q.   During searches of vehicles that you testified previously

14   you performed, have you located traps?

15   A.   Yes, I have.

16   Q.   Where are traps located?

17   A.   A trap can be anywhere in the vehicle.

18   Q.   Now, I'd like to direct your attention to December 7th,

19   2014.  Did you perform a traffic stop that day?

20   A.   Yes, I did.

21   Q.   Approximately what time?

22   A.   It was around 10:00 p.m.

23   Q.   Where were you?

24   A.   In St. Tammany -- it's Slidell, Louisiana, St. Tammany

25   Parish.

G5BKGOMH                         Whittaker - direct

1        THE COURT:  Could you spell all of that?

2        THE WITNESS:  S-L-I-D-E-L-L, and then Louisiana, and

3   St. Tammany, T-A-M-M-A-N-Y.

4        THE COURT:  Tammany, is that a parish?

5        THE WITNESS:  It is a county.  Parish is another word

6   for county.

7        THE COURT:  All right.

8   BY MS. CROWLEY:

9   Q.  Is Slidell outside New Orleans?

10  A.  Yes, it's just outside New Orleans.

11  Q.  Did you come to learn who was driving the vehicle that you

12  stopped that evening?

13  A.  After I stopped it, yes.

14  Q.  And who was that?

15  A.  Sandy Gomez.

16  Q.  And was there anyone else in the vehicle?

17  A.  Yes, there was.

18  Q.  Did you come to learn who that was?

19  A.  Yes.  Caronlay, and I can't pronounce her last name, I'm

20  sorry.

21  Q.  That's okay.

22       Just backing up a bit, when did you first become

23  involved in an investigation of Sandy Gomez?

24  A.  It was a couple of days before I made the stop.

25  Q.  And how did you become involved?

G5BKGOMH                        Whittaker - direct

1   A.  Our narcotics agents asked for the assistance of the

2   criminal patrols unit and making a stop of a vehicle that was

3   in New Orleans.  We were told that that vehicle was involved in

4   an active case out of New Jersey, that they were in New Orleans

5   picking up cocaine, that they would be heading back to

6   New Jersey.  And they gave us a description of the vehicle, the

7   color, make, model, and license plate number, but they were

8   unsure when exactly the vehicle would be leaving.

9   Q.  What, if anything, were you told about the owner -- about

10  who the vehicle belonged to?

11  A.  That it belonged to DEA, and that they had put a trap in

12  the vehicle, and that they were going to utilize that trap to

13  conceal the contraband or the cocaine.

14  Q.  On what kind of traffic stop were you instructed to

15  perform?

16  A.  A walled-off traffic stop.

17  Q.  When did you first see the vehicle that you later stopped?

18  A.  When it passed me on Interstate 59.

19  Q.  Were you parked, or were you driving?

20  A.  I was parked on the right shoulder of the roadway.

21          THE COURT:  This was a marked vehicle, right?

22          THE WITNESS:  Fully marked, yes, your Honor.

23  BY MS. CROWLEY:

24  Q.  Were you alone, or were you with other officers?

25  A.  I was alone in my vehicle, but there were other officers in

1    the area.

2    Q.  What did you see when the vehicle first passed you?

3    A.  When the vehicle passed me, it crossed over the center

4    dashed line of the roadway with its left tires and proceeded

5    north on I-59.  I then started moving off the shoulder to catch

6    up to the vehicle.  When I did catch up to the vehicle, you

7    could see its right tires hit the fog line, and that's when I

8    initiated the traffic stop.

9    Q.  Okay.  What's a fog line?

10   A.  A fog line is the solid white line on the right side of the

11   roadway that separates the travel lane from the shoulder.

12   Q.  So you testified that you first saw the vehicle cross the

13   center dashed line.  Is that a traffic violation?

14   A.  Yes, it is.

15   Q.  Which violation?

16   A.  That falls under Louisiana Revised Statute 3279, which is

17   improper lane use.

18   Q.  What does that violation -- or what does that statute

19   prohibit?

20   A.  The best way to explain it is that according to Louisiana

21   law, that specific statute, if you occupy a lane of travel, you

22   have to stay within that lane of travel unless it's safe to

23   exit or change lanes, make a turn, something to that effect.

24          THE COURT:  So you are saying anytime you cross a

25   line, that's a traffic violation?

1          THE WITNESS:  Maybe I didn't explain it good enough.

2     Normally what happens is, like, say, you're driving in the

3     right lane, and you want to change into the left lane, you have

4     to activate a turn signal, and you have to wait a hundred

5     feet -- that's the way the law reads -- before you change

6     lanes.  And it's also the same way if you're slowing to make a

7     turn, you still have to signal to make that turn.

8          In this case, he didn't signal or attempt to change

9     lanes, it just looked like maybe he was inattentive or

10    distracted, which is a cause of safety concern.

11         THE COURT:  Did he actually commit two violations or

12    one?

13         THE WITNESS:  It was two counts of one violation.

14         THE COURT:  All right.  Explain that.

15         THE WITNESS:  Okay.  So crossing the center dashed

16    line is considered a violation of 3279.

17         THE COURT:  When you say the center dashed line,

18    that's --

19         THE WITNESS:  Divides the right lane from the left

20    lane.

21         THE COURT:  It divides the travel lane from the

22    passing lane?

23         THE WITNESS:  Yes.

24         THE COURT:  Okay.  And he crossed over that?

25         THE WITNESS:  Yes.

G5BKGOMH                        Whittaker - direct

1           THE COURT:  Maybe inattentively, but he did it?

2           THE WITNESS:  Right.

3           THE COURT:  And that was one violation?

4           THE WITNESS:  Right.

5           THE COURT:  Okay.  Go ahead.

6           THE WITNESS:  And then the second would be when his

7    right tires touched the fog line, which is the solid white

8    line, that would be a second count of the same violation,

9    same -- it's a violation of the same statute.

10   BY MS. CROWLEY:

11   Q.  So when the tires touched the fog line, did they have to go

12   over the fog line to be in violation of the statute?

13   A.  No, they just have to touch it.

14   Q.  What happened after you observed the tires touch the fog

15   line?

16   A.  That's when I activated my emergency lights to initiate a

17   traffic stop on the vehicle.

18   Q.  And did the vehicle pull over?

19   A.  Yes, it did.

20   Q.  When the vehicle pulled over, could you see how many

21   occupants were in the car?

22   A.  After the vehicle came to a stop, and I shot him a Q-beam

23   or the bright light in the back window, I could see two

24   occupants in the vehicle.

25   Q.  What did you do next?

G5BKGOMH                         Whittaker - direct

1    A.  I instructed the driver to exit his vehicle and walk to the

2    front of my patrol car.

3    Q.  Why did you instruct the driver to exit the vehicle?

4    A.  It's our policy with Louisiana State Police that we don't

5    approach vehicles.

6    Q.  What happened after the driver exited the vehicle?

7    A.  He exited the vehicle and handed me his driver's license,

8    which I asked him for.

9    Q.  And did you speak with him?

10   A.  I did.  When he was handing me his driver's license, he

11   stated that he was coming from a game, and I asked him how the

12   game went, and he couldn't really give me an answer and seemed

13   to be kind of nervous, so...

14   Q.  What, if anything, did you ask him about where he was

15   coming from?

16   A.  He said he was coming from New Orleans from a game, and I

17   asked him what the score was, and he went from not knowing the

18   score to -- I think at one point, he said that it fell through,

19   and he maybe didn't even go.  It was kind of hard for me to

20   understand what he was saying, but in any event, he wasn't able

21   to provide any details about the game that he was supposed to

22   be at.

23   Q.  Did you discuss how long he had been in New Orleans?

24   A.  Yes, I did.  He said that he was in New Orleans for one

25   day.

1   Q.   Just to be clear, when you say "he," who are we referring

2   to?

3   A.   Sandy Gomez.

4   Q.   What observations did you make about Mr. Gomez's demeanor

5   while you were having this conversation?

6   A.   When -- the first thing that I observed is when he exited

7   the vehicle, he walked back to me faster than most people do,

8   which caught my attention.  And the fact that when I asked him

9   about a sports game that he just left from, he wasn't able to

10  provide any information, which to me seemed more like he was

11  trying to justify why he was down there, but was being

12  deceptive in doing so.

13  Q.   Did there come a time when another officer arrived?

14  A.   Yes.  Trooper Gus McKay assisted me with the traffic stop.

15  Q.   How long after you first pulled over the vehicle did

16  Trooper McKay arrive?

17  A.   A couple of minutes, maybe.

18  Q.   What did he do when he got there?

19  A.   When he got to the scene, he walked to the front of my

20  patrol car and just basically stood there.

21  Q.   What is a dash cam?

22  A.   A dash cam is a permanently mounted in-car camera system

23  that records both audio and video.

24  Q.   Does your police car have a dash cam?

25  A.   Yes, it does.

G5BKGOMH                          Whittaker - direct

1   Q.  Did it have a dash cam back on December 7, 2014?

2   A.  Yes, it did.

3   Q.  Was the stop that we have been discussing recorded by the

4   dash cam?

5   A.  Yes, it was.

6   Q.  Have you reviewed that recording?

7   A.  Yes, I have.

8   Q.  When did the dash cam first begin recording the stop?

9   A.  The dash cam is preset for 30 seconds, so basically what

10  that means is I don't actually turn the camera on, all I do is

11  hit my emergency lights, and when I hit my emergency lights, it

12  automatically backs up 30 seconds and then records from there.

13  Q.  So did the dash cam record both of the traffic violations

14  or just one?

15  A.  Just one.

16  Q.  Which one?

17  A.  The second one.

18          MS. CROWLEY:  May I approach, your Honor?

19          THE COURT:  Yes.

20  Q.  I'm showing you what's been marked Government's Exhibit 2.

21  Do you recognize this?

22  A.  Yes, I do.

23  Q.  What is it?

24  A.  That is the copy of the traffic stop.

25  Q.  And have you reviewed this disk?

1   A.  I have.

2   Q.  How do you know?

3   A.  Because my initials are on the CD.

4           MS. CROWLEY:  Your Honor, the government offers

5   Government Exhibit 2.

6           MS. TODD:  No objection, your Honor.

7           MR. SPORN:  No objection.

8           THE COURT:  Government Exhibit 2 is received.

9           (Government's Exhibit 2 received in evidence)

10          MS. CROWLEY:  Your Honor, we're going to play a

11  portion of this video, if that's okay.

12          THE COURT:  All right.

13          (Video playback)

14          MS. CROWLEY:  Can you just stop for one second?

15  BY MS. CROWLEY:

16  Q.  Do you see the vehicle Sandy Gomez was driving in this

17  video right now?

18  A.  Yes, I do.

19  Q.  Which one is it?

20  A.  It's the first vehicle closest to us in the right lane.

21  Q.  Trooper Whittaker, the sound was not so great.  Did you ask

22  him where he had come from?

23  A.  Yes.

24  Q.  Where did he say?

25  A.  North Carolina.

G5BKGOMH                    Whittaker - direct

1    Q.  And what did you do after speaking with Mr. Sandy Gomez?

2    A.  Approached the driver's side of the vehicle and spoke with

3    the passenger.

4    Q.  And was the window of the driver's side open?

5    A.  Yes, it was.

6    Q.  What did you speak with her about?

7    A.  I asked her for the registration to the vehicle, and she

8    said that she didn't know where it was.  I asked her where they

9    were coming from and how long they were there, and she gave me

10   a different response than what he said.  She said they were

11   coming from Alabama, and that they had been there for a couple

12   of days.

13   Q.  Was she speaking in Spanish or English?

14   A.  I really don't remember.

15   Q.  Do you speak Spanish?

16   A.  A little bit.

17   Q.  What can you say in Spanish?

18   A.  I can ask where they're going, where they're coming from,

19   how long have you been there, where do you work.

20   Q.  Have you asked those questions in Spanish during traffic

21   stops before?

22   A.  Yes, I have.

23   Q.  While you were speaking with the passenger of the vehicle,

24   did she appear to understand you?

25   A.  Yes, she did.

1    Q.   Did she ever give you any indication that she did not

2    understand you?

3    A.   No.

4    Q.   Where were you standing as you were speaking with her?

5    A.   On the driver's side door outside of the door through the

6    window.

7    Q.   I'm sorry?

8    A.   I was talking through the window outside of the driver's

9    side door.

10   Q.   While you were speaking with her, did you remain there, or

11   did you move around?

12   A.   I remained there while I was talking to her at that point.

13   Q.   Did you ever open any doors?

14   A.   No.

15            (Video playback)

16   Q.   What are you doing during this part of the video?

17   A.   She, I believe, was looking for the registration, and while

18   she's looking for it is when I was asking her, you know, where

19   she was coming from, and how long, and all that kind of stuff.

20   Q.   Here at 4:33, who is that?

21   A.   That's Trooper McKay.

22   Q.   Where is Sandy Gomez at this time?

23   A.   He is standing on the right side of my vehicle, which would

24   be at Trooper McKay's right side.

25            MS. CROWLEY:  We can stop there, at 4:45.

 1   Q.  Was Sandy Gomez in handcuffs at that time?

 2   A.  No.

 3   Q.  Was he restrained at all?

 4   A.  No.

 5   Q.  We just saw you walk back from your vehicle.  Where were

 6   you going?

 7   A.  I was going to my unit to get their driver's license and

 8   check for criminal history on the driver and the passenger.

 9   Q.  Did you do that?

10   A.  Yes, I did.

11   Q.  And what did you learn?

12   A.  That they couldn't find any record on Ms. Caronlay, and

13   they said that Mr. Gomez had no history in NCIC.

14   Q.  After you ran their licenses, what did you do next?

15   A.  After I got the criminal histories back is when I

16   approached Mr. Gomez again.

17   Q.  What did you discuss?

18   A.  I asked him why Ms. Caronlay gave a different version of

19   events from what he had told me initially, and he said that

20   maybe she got Alabama and North Carolina confused.  And I asked

21   him if he had ever been arrested, and he said that he was

22   arrested on a previous narcotics charge.

23   Q.  Why did you ask him if he had ever been arrested?

24   A.  I knew at that time that I was going to ask him for

25   permission to search the vehicle, and for safety reasons, I

1    want to know if he's wanted by another agency or another

2    jurisdiction, I want to know if he has any kind of weapons

3    violations, and I want to know if he has any, you know,

4    dangerous assault or battery charges, anything like that.

5    Q.  What, if anything, did you ask Mr. Gomez about what was in

6    the vehicle?

7    A.  I asked him if he had anything illegal in the vehicle, any

8    type of illegal narcotics, currency, specific types of

9    narcotics, and which he said nope to all of them.

10   Q.  Are those standard questions that you ask during traffic

11   stops?

12   A.  Yes, they are.

13   Q.  What, if any, observations did you make about Mr. Gomez's

14   demeanor while you were having this conversation?

15   A.  He remained just as nervous as when I initially stopped

16   him, and that's important to me as a trooper, because,

17   generally, when you pull somebody over, they're initially going

18   to be nervous, but that level of nervousness as the traffic

19   stop goes on normally goes down, and his state elevated.

20   Q.  Did there come a time when you asked Mr. Gomez for consent

21   to search the vehicle?

22   A.  Yes.

23   Q.  How did you ask him?

24   A.  I asked him verbally if he would have any problems with me

25   searching the vehicle, and he said no.  And I have a written

1   State Police Consent to Search Form, which I had filled out

2   prior to me exiting the vehicle to talk to him.  I explained to

3   him that I had put all his information at the top, I went over

4   the form with him, and told him what the form said.  And at

5   that point is when he gave permission to search the vehicle and

6   signed the form.

7   Q.  I'm going to show you on the screen what's been marked

8   Government Exhibit 3.

9           Do you recognize this?

10  A.  Yes, I do.

11  Q.  What is it?

12  A.  That is a Louisiana State Police Consent to Search Form

13  filled out by me.  It has Sandy Gomez's information at the top,

14  with his signature and my signature at the bottom.

15  Q.  Does this accurately depict the form that you showed to

16  Mr. Gomez?

17  A.  Yes.

18  Q.  Where is his signature?

19  A.  On the bottom left corner, under the signature block.

20  Q.  And your signature is on the right?

21  A.  Yes.

22          MS. CROWLEY:  Your Honor, the government offers

23  Government Exhibit 3.

24          MS. TODD:  No objection, your Honor.

25          MR. SPORN:  No objection.

G5BKGOMH                        Whittaker - direct

1           THE COURT:  Government Exhibit 3 is received.

2           (Government's Exhibit 3 received in evidence)

3    BY MS. CROWLEY:

4    Q.  Now, you testified that before asking Mr. Gomez to sign the

5    form, you explained it to him?

6    A.  Yes.

7    Q.  Can you tell us what you explained?

8    A.  Yes.  I told him what it was, that it was a consent to

9    search form, and that I was asking for permission to search his

10   vehicle.  I explained to him that he had the right to refuse

11   that consent if he chose to do so, and even if he gave me

12   consent, at any time during the search, he had the right to

13   revoke that consent.

14   Q.  Did Mr. Gomez appear to read the form before he signed it?

15   A.  Yes, he did.

16   Q.  Did he at any time indicate that he did not understand the

17   form?

18   A.  No.

19   Q.  Did he at any time indicate that he did not understand what

20   you were saying to him?

21   A.  No.

22   Q.  Was anyone else present while you were explaining this form

23   to Mr. Gomez?

24   A.  Trooper McKay.

25   Q.  Where was he standing?

G5BKGOMH                          Whittaker - direct

1   A.  Off to the right side of my unit.

2   Q.  Was he restraining Mr. Gomez in any way?

3   A.  No.

4   Q.  Was he holding onto his weapon?

5   A.  No.

6   Q.  You testified previously that you have searched hundreds of

7   vehicles during traffic stops; is that correct?

8   A.  Yes.

9   Q.  Have you obtained written consent to search those vehicles?

10  A.  Yes.

11  Q.  Have you always used this form?

12  A.  Yes.

13  Q.  In those other stops, how do you generally explain the

14  form?

15  A.  I explain --

16          MS. TODD:  Objection; relevance.

17          THE COURT:  Sustained.

18          By the way, I take it that none of this was captured

19  on the video?  When I say none of this, your advising him about

20  the consent form, explaining that he had the right to refuse

21  consent.  All of your interactions with him about the consent

22  form, was any of that captured on the video?

23          THE WITNESS:  Yes, your Honor, it was.

24          THE COURT:  Okay.

25          Were we getting to that?

1          MS. CROWLEY:  We're going to play that.  It's hard to

2    hear all the video, so I -- if we could play at 11:40.

3          THE COURT:  So we're going back to -- what's the

4    exhibit number?

5          MS. CROWLEY:  Exhibit No. 2.

6          THE COURT:  Okay.

7    BY MS. CROWLEY:

8    Q.   Trooper Whittaker, what did you do after Mr. Gomez signed

9    the consent to search form?

10   A.   After he signed the consent to search form --

11         THE COURT:  I'm sorry, before we get to that, I heard

12   you say to him something along the lines, can I search real

13   quick?

14         THE WITNESS:  Uh-huh.

15         THE COURT:  But I couldn't quite make out what the

16   response was, so could you -- best you can recall, what was

17   your question to him about whether you could search the

18   vehicle, and what was his response?

19         THE WITNESS:  I asked him verbally, do you mind if I

20   search your vehicle to make sure there's nothing in there, and

21   he said yes.  And that's when I wanted to get the written

22   consent as well, and that's when I started explaining the

23   consent to search form and what his rights were related to the

24   search.

25         THE COURT:  So you asked him something along the lines

1    can I -- one thing I heard clearly was "real quick."  So you

2    said something like is it okay if I search the car real quick?

3              THE WITNESS:  Yes, your Honor.

4              THE COURT:  And his response was it was okay, or yes,

5    or some consent?

6              THE WITNESS:  Yes.

7              THE COURT:  You don't remember exactly the words he

8    used?

9              THE WITNESS:  I don't remember if he said yes or sure,

10   but he verbally said that it was okay.

11             THE COURT:  Okay.  And then you gave him the consent

12   to search form?

13             THE WITNESS:  Correct.

14             THE COURT:  And then I think I saw you walk away.

15             THE WITNESS:  After he signed the form is when I

16   walked away to put the form back in my vehicle.

17             THE COURT:  Oh, I see.

18             So you gave him the form, he signed it?

19             THE WITNESS:  Yes.

20             THE COURT:  And then you took it back to the car?

21             THE WITNESS:  Right.

22             THE COURT:  Your car?

23             THE WITNESS:  Yes.

24             THE COURT:  Okay.

25             Go ahead.

G5BKGOMH                         Whittaker - direct

 1   BY MS. CROWLEY:

 2   Q.  And what did you do after that?

 3   A.  After I put the consent to search form back in my vehicle

 4   is when I began to search the car.

 5   Q.  At any time while you were searching the car, did Mr. Gomez

 6   ask you to stop?

 7   A.  No.

 8   Q.  Did Carolina ask you to stop?

 9   A.  No.

10   Q.  And where was Carolina while you were searching the car?

11   A.  She was outside of the car, standing with Sandy Gomez and

12   Trooper McKay.

13   Q.  Where did you begin the search of the vehicle?

14   A.  The front right passenger's side.

15   Q.  Why did you begin there?

16   A.  Because that's where they were both sitting, in between the

17   driver's seat and the passenger's seat, and I wanted to search

18   that area first.

19   Q.  And where did you search next?

20   A.  After I moved from there, I went into the back seat.

21   Q.  And, by the way, were you searching by yourself or with

22   someone else?

23   A.  I started by myself, yes.

24   Q.  Did there come a time when you located something inside the

25   car?

G5BKGOMH                            Whittaker - direct

1    A.  Yes.

2    Q.  What did you see?

3    A.  I saw an abnormality in the construction of the second-row

4    seat, meaning when a car comes from the factory, all the

5    molding is the same color or at least the same type, and the

6    molding that I saw underneath the second-row seat, I thought to

7    be aftermarket, and that's what led me to do some further

8    inspection on that second-row seat, to make sure that was

9    normal or not normal, which in this case, it wasn't normal.

10   Q.  And before conducting this stop, had you been told where

11   the secret compartment was located?

12   A.  Yes.

13   Q.  In your work as a trooper in the car searches that you

14   performed, have you searched this type of vehicle before?

15   A.  Yes, I have.

16   Q.  And you're familiar with what the inside of the vehicle

17   looks like?

18   A.  Yes.

19   Q.  Where was the secret compartment located?

20   A.  It was underneath the cushion -- the seat cushion of the

21   second-row seat, and it went from the width of the vehicle.

22           MS. CROWLEY:  If you could put up on the screen

23   Government Exhibit 9.

24   Q.  What is this?

25   A.  Right there, you're looking at the second-row seat, and the

G5BKGOMH                          Whittaker - direct

 1   shiny molding underneath the bottom of the seat is concealing

 2   the metal box, which is the compartment.

 3              THE COURT:  For the record, you've got to have him

 4   identify what this is and offer it, okay?

 5              MS. CROWLEY:  Yes.

 6   Q.  Do you recognize this?

 7   A.  No.

 8              THE COURT:  No, this the Government Exhibit 9.

 9   BY MS. CROWLEY:

10   Q.  Do you recognize Government Exhibit 9?

11   A.  I do.

12   Q.  What does it depict?

13   A.  That is a picture of Mr. Gomez's vehicle that he was

14   driving, and that is a specific picture of the second-row seat.

15   Q.  Does it accurately depict the back seat of Mr. Gomez's

16   vehicle on December 7, 2014?

17   A.  Yes.

18              MS. CROWLEY:  The government offers Government Exhibit

19   9.

20              MS. TODD:  No objection, your Honor.

21              MR. SPORN:  No objection.

22              THE COURT:  Government Exhibit 9 is received.

23              (Government's Exhibit 9 received in evidence)

24   BY MS. CROWLEY:

25   Q.  Can you explain to us what we're looking at in this

1    photograph?

2    A.   Okay.  This is the passenger's side view, I believe, and

3    the shiny molding at the bottom is basically a way to conceal

4    the sheet metal box underneath the seat.

5    Q.   You testified previously that the molding looked different

6    from the molding in the rest of the car.  Is that what you mean

7    by that?

8    A.   Yes.  It was a different color and a different texture.

9              MS. CROWLEY:  Can we go to 1620?

10             We're going back to Government Exhibit 2.

11             (Video playback)

12             MS. CROWLEY:  1656.

13   Q.   Why did you tell Carolina to leave the passenger's seat?

14   A.   Because it's our policy that we're not going to search a

15   vehicle while occupants are still sitting in it.

16   Q.   And where did she stand while you were searching the

17   vehicle?

18   A.   She stood with Trooper McKay and Mr. Gomez.

19   Q.   Was she handcuffed?

20   A.   No.

21   Q.   Was she restrained in any way?

22   A.   No.

23   Q.   Did there come a time when she got into your police car?

24   A.   Yes.

25   Q.   Why?

1    A.  She asked to sit in the police car because she was cold.

2    Q.  And did you allow her to do that?

3    A.  Yes.

4    Q.  Did she leave the police car at any time?

5    A.  Yes.

6    Q.  Why?

7    A.  After she had been sitting in the rear of my vehicle, she

8    knocked on the window and asked to get out, at which point we

9    let her out.

10          MS. CROWLEY:  You can keep going.

11          (Video playback)

12   Q.  What are you doing here?

13   A.  Searching the passenger's seat and center console, glove

14   compartment, and I'm looking around the rest of the vehicle as

15   well.

16   Q.  Now, you testified that you began with the front

17   passenger's seat and then moved to the rear?

18   A.  Right.

19   Q.  Did there come a time when you spoke with Mr. Gomez again?

20   A.  Yes.

21   Q.  What did you say?

22   A.  Later, after the dog got there and alerted to the

23   vehicle --

24   Q.  Did you --

25   A.  -- we continued the search after that K-9 alert, and I

G5BKGOMH                         Whittaker - direct

1    explained to Mr. Gomez that I had located a trap in the vehicle

2    that the dog had alerted.  I told him that he wasn't under

3    arrest, but he was being detained, and I read him his Miranda

4    rights, and he was handcuffed at that point.

5    Q.  Okay.

6           MS. CROWLEY:  If we could just back up for a second.

7    You can pause.

8    Q.  You mentioned that a K-9 was brought in.  Did you have a

9    conversation with Mr. Gomez about the K-9 before it was brought

10   in?

11   A.  Yes.  I told him that a K-9 was available, and to speed up

12   this process, that I was going to have the K-9 officer come to

13   me.

14   Q.  Did he object to that?

15   A.  No.

16   Q.  Did he ask you to stop searching?

17   A.  No.

18   Q.  Why did you want a K-9 to come and continue the search?

19   A.  Because when I initially started searching the vehicle, I

20   could see abnormalities in the seat, plus I knew where the

21   compartment was, and I wanted to get some outside confirmation

22   about the presence of narcotics in the vehicle, is why I called

23   for the K-9.

24   Q.  Have you worked with K-9s before?

25   A.  Yes.

1   Q.  How many times?

2   A.  We have a K-9 unit assigned to us.  So several times.

3   Q.  Now, before the K-9 arrived, did any other law enforcement

4   officers come to the scene?

5   A.  Yes.

6   Q.  Who?

7   A.  Special Agent Patti with the Drug Enforcement

8   Administration from New Jersey, and Rene Bodet, the trooper

9   with the K-9.

10  Q.  How long did it take for the K-9 to arrive?

11  A.  I want to say ten, fifteen minutes.

12  Q.  What were you doing during that time?

13  A.  I continued searching the vehicle.

14  Q.  Where was Mr. Sandy Gomez during that time?

15  A.  He stayed in the same place, which was on the right side of

16  my vehicle in the grass.

17          THE COURT:  Now, how much time elapsed from the stop

18  to the K-9 unit arriving?  Do you recall?

19          THE WITNESS:  Probably, I'm guessing, 25, 30 minutes.

20          THE COURT:  Okay.

21  BY MS. CROWLEY:

22  Q.  Who brought the K-9?

23  A.  Trooper Bodet.

24  Q.  Have you worked with Trooper Bodet before?

25  A.  Yes, I have.

1              THE COURT:  How do you spell his name?

2              THE WITNESS:  B-O-D-E-T.

3     Q.  Is he a trained K-9 handler?

4     A.  Yes.

5     Q.  What happened after the K-9 arrived?

6     A.  Trooper Bodet deployed his K-9 around the vehicle, and came

7     to me, and advised me that his K-9 alerted to the vehicle.

8     Q.  When you say "deployed his K-9 around the vehicle," what do

9     you mean by that?

10    A.  He conducted what they call free air sniff around the

11    vehicle, which means he has the dog on a leash, and he walked

12    around the vehicle.

13    Q.  Did he open any of the doors of the vehicle at the time?

14    A.  No.

15             MS. CROWLEY:  Can we play 37.

16             (Video playback)

17    Q.  Is this Trooper Bodet?

18    A.  Yes, it is.

19    Q.  What is he doing here?

20    A.  He's conducting the free air sniff of the vehicle.

21    Q.  Who is that individual at 3743 o'clock.

22    A.  That's Agent Patti.

23    Q.  Who is on the left-hand part of the screen?

24    A.  That's me.

25    Q.  You can see on the screen, about a minute ago, Trooper

G5BKGOMH                          Whittaker - direct

1    Bodet said something to you.  Do you recall what he said?

2    A.  That's where he was telling me that the dog alerted to the

3    vehicle.

4    Q.  What did you do after that?

5    A.  After that, I continued searching the car, and I don't

6    remember how long it takes, but I go back and talk to Mr. Gomez

7    and explain everything to him.

8    Q.  What did you explain?

9    A.  That the K-9 handler had told me that his dog alerted to

10   the vehicle, that we had located a trap in the vehicle, and I

11   asked him if he knew anything about it or what was in it.

12   Q.  Did you provide him with his Miranda warnings?

13   A.  Yes, I did.

14   Q.  Before or after you asked him if he knew anything about

15   what was in the vehicle?

16   A.  Before.

17   Q.  What did he say?

18   A.  He said that he didn't know what was in the vehicle, that

19   he borrowed the car.

20   Q.  While you were giving Mr. Gomez his Miranda warnings, did

21   he indicate that he did not understand you?

22   A.  No, he did not.

23   Q.  And while you were questioning --

24           THE COURT:  Trooper Bodet tells you that the dog

25   alerted, and then you have a conversation with Sandy Gomez?

G5BKGOMH                          Whittaker - direct

1              THE WITNESS:  Yes.

2              THE COURT:  And tell us again what you said to him.

3              THE WITNESS:  To Mr. Gomez?

4              THE COURT:  Yes.

5              THE WITNESS:  That we located the trap in the vehicle,

6      that Trooper Bodet told me that his dog alerted to the vehicle,

7      and I told him that he was being detained, at which point I did

8      handcuff him, and I asked him, after giving him Miranda rights,

9      if he was aware of the trap or what was in it.  And that's when

10     he told me that he didn't know what was in it and that he

11     borrowed the vehicle.

12             THE COURT:  Okay.  Did you tell him he was under

13     arrest?

14             THE WITNESS:  No, I did not.

15             THE COURT:  Okay.  You just told him you are being

16     detained?

17             THE WITNESS:  I told him he was being detained, and I

18     did handcuff at that point.

19     BY MS. CROWLEY:

20     Q.  Why did you detain him at that point?

21     A.  I detained him at that point because we knew the

22     compartment was there, we knew that it was supposed to contain

23     cocaine, and I felt like if he was going to run, resist, fight,

24     that that would be the time that he was going to do it.  So

25     that's why I handcuffed him at that point.

1            MS. CROWLEY:  Can you play 40.

2            (Video playback)

3    Q.  After you had that conversation with Mr. Gomez, what did

4    you do next?

5    A.  We continued searching the vehicle, and we gained access to

6    the compartment.

7    Q.  How did you gain access to the compartment?

8    A.  Agent Patti had the sequence to open it, and he opened the

9    compartment.

10           MS. CROWLEY:  Can we put up on the screen Government

11   Exhibit 12.

12           THE COURT:  When you say he had the sequence, can you

13   explain what you mean?

14           THE WITNESS:  Okay.  This compartment was -- had two

15   hydraulic pistons, and it's very common that they'll use some

16   kind of random sequence to activate the pistons.  And since it

17   was a trap the DEA built, Agent Patti had knowledge ahead of

18   time on what you had to do to get the compartment to open.

19           THE COURT:  So there's some kind of code you have to

20   punch in?

21           THE WITNESS:  Yes.

22   BY MS. CROWLEY:

23   Q.  Do you recognize Government Exhibit 12?

24   A.  Yes, I do.

25   Q.  What does it appear to depict?

1   A.   That is a picture of the trap underneath the second-row

2   seat that has been opened.

3   Q.   Does this accurately reflect the trap after you opened it?

4   A.   Yes.

5          MS. CROWLEY:   The government offers Government Exhibit

6   12.

7          MS. TODD:   No objection.

8          MR. SPORN:   No objection.

9          THE COURT:   Government Exhibit 12 is received.

10         (Government's Exhibit 12 received in evidence)

11  BY MS. CROWLEY:

12  Q.   Did there come a time when you opened those bags that

13  appear in the trap?

14  A.   Yes, we did.

15  Q.   And what was inside?

16  A.   Five kilo sized packages that were suspected to be cocaine.

17         MS. CROWLEY:   Put up Government Exhibit 14.

18  Q.   Do you recognize Government Exhibit 14?

19  A.   Yes, I do.

20  Q.   What does it depict?

21  A.   The five individual packages that had been taken out of the

22  bags.

23  Q.   And that's an accurate depiction of those packages?

24  A.   Yes.

25         MS. CROWLEY:   The government offers Government Exhibit

1   14.

2            MS. TODD:  No objection.

3            MR. SPORN:  No objection.

4            THE COURT:  Government Exhibit 14 received.

5            (Government's Exhibit 14 received in evidence)

6   BY MS. CROWLEY:

7   Q.  Trooper Whittaker, what did you do after these narcotics

8   were located?

9   A.  After I located the narcotics, I went back and told

10  Mr. Gomez that we had found five kilos -- I actually said five

11  birds, which is another term for kilos, but I told him that

12  that's what we had found in the trap.

13  Q.  Did he say anything in response?

14  A.  That he didn't know anything about them.

15  Q.  Did there come a time when you placed Mr. Gomez and

16  Carolina under arrest?

17  A.  Yes.  It was at that time.

18  Q.  And what did you do next?

19  A.  Next, I believe Special Agent Patti took possession of the

20  narcotics, and we removed the car, Mr. Gomez, and Carolina from

21  the scene, and we relocated to Troop L in Mandeville.

22            THE COURT:  You're going to need to spell those names.

23            THE WITNESS:  M-A-N-D-E-V-I-L-L-E.

24            THE COURT:  What was the first one?

25            THE WITNESS:  No, I was just saying that Mr. Gomez and

G5BKGOMH                        Whittaker - direct

1    Carolina --

2              THE COURT:  No, you said Troop L?

3              THE WITNESS:  Troop L.  It's basically like a

4    substation for the state police.

5              THE COURT:  Okay.  So it's Troop L?

6              THE WITNESS:  Troop L.

7              THE COURT:  Troop L?

8              THE WITNESS:  Yes.

9              THE COURT:  I'm sorry, go ahead.

10   BY MS. CROWLEY:

11   Q.  And that's a police station?

12   A.  Yes.

13   Q.  And did you have any other involvement in the case after

14   this?

15   A.  After that?  No, I did not.

16   Q.  Now, Trooper Whittaker, following the vehicle stop that we

17   have been discussing, did you write a report?

18   A.  Yes, I did.

19   Q.  When did you write the report?

20   A.  It would have been a day or two after this.

21   Q.  Do you generally write reports after you conduct traffic

22   stops?

23   A.  Yes, I do.

24   Q.  What information did you include in the report with respect

25   to why you pulled over the vehicle?

G5BKGOMH                        Whittaker - direct

1   A.  I included my information, the vehicle information that

2   Mr. Gomez was driving, both Mr. Gomez and Caronlay's

3   information, and the circumstances that led to why I stopped

4   the vehicle, what I did during the vehicle stop, and what jail

5   they were booked in.

6   Q.  What were the circumstances that you wrote in the report as

7   to why you stopped the vehicle?

8   A.  For 3279, improper lane use.

9   Q.  That's the statute we were discussing earlier?

10  A.  Yes.

11  Q.  Did you include in your report any of the background

12  information that you received about the vehicle and the secret

13  compartment?

14  A.  No, I did not.

15  Q.  Why not?

16  A.  Because Agent Patti with DEA, or it could have been one of

17  our narcotics guys assigned to the investigation, asked me to

18  conduct a walled-off stop, which is not to reveal that they

19  were under investigation, that they had been under surveillance

20  for four or five days, that they didn't want any of that in the

21  report at this time to protect the integrity of the

22  investigation.

23  Q.  You testified earlier that you have performed about ten

24  walled-off traffic stops before?

25  A.  Yes.

G5BKGOMH                              Whittaker - cross

1    Q.  Do you always write a report afterward?

2    A.  Yes, I do.

3    Q.  And do you ever include the background information when

     writing that report?

5    A.  No, I do not.

6            MS. CROWLEY:  One moment, your Honor?

7            THE COURT:  Yes.

8            (Pause)

9            MS. CROWLEY:  Nothing further.

10           THE COURT:  Cross-examination.

11           MS. TODD:  Thank you, your Honor.

12   CROSS-EXAMINATION

13   BY MS. TODD:

14   Q.  Good afternoon, Trooper Whittaker.

15   A.  Good afternoon.

16   Q.  You testified that you first observed -- you observed two

17   traffic infractions, correct?

18   A.  Yes, ma'am.

19   Q.  The first traffic infraction occurred while you were parked

20   somewhere?

21   A.  Yes, ma'am.

22   Q.  Where exactly were you?

23   A.  I was parked on the shoulder of the interstate.

24   Q.  In what direction were you positioned?

25   A.  I was on the right shoulder facing northbound.

G5BKGOMH                        Whittaker - cross

1    Q.  And in what direction was the vehicle that Sandy Gomez was

2    driving?

3    A.  He was traveling northbound as well.

4    Q.  Now, it's my understanding, and correct me if I am wrong,

5    this was on I-59, correct?

6    A.  Yes, it was.

7    Q.  And is it a fact that I-59 runs north to south?

8    A.  Yes, ma'am.

9    Q.  So the shoulders are northeast -- southeast and northeast?

10   A.  The -- I'm not sure I'm understanding your question.  The

11   shoulder of the roadway parallels the roadway.  So both travel

12   lanes in that direction were heading northbound, and I was on

13   the northbound shoulder facing northbound.

14   Q.  Okay.  Now, the first traffic infraction that you observed,

15   can you describe that for us?

16   A.  Yes, ma'am.  I had had prior information about the vehicle,

17   and when that vehicle initially passed me is when I saw the

18   first traffic violation.

19   Q.  What exactly was that?

20   A.  That was crossing over the center line on the left side.

21   That's the center dashed line in the middle separating the left

22   lane and the right lane.

23   Q.  Is it at that point that you activated your lights?

24   A.  No, ma'am, it wasn't.

25   Q.  So what did you do at that moment?

1    A.  When the vehicle passed me, due to traffic, I had some cars

2    I had to get around to catch up to the Yukon, so when I caught

3    up to it is when I saw him hit the fog line on the right side,

4    and after that second violation is when I activated my

5    emergency lights.

6    Q.  And the second violation is, according to you, when he hit

7    the fog line?

8    A.  Yes, ma'am.

9    Q.  And you testified that that second violation is visible on

10   the videotape, correct?

11   A.  It is.

12   Q.  Now, my other question to you is, just to confirm, that the

13   vehicle that you were traveling with has a video recording

14   unit, correct?

15   A.  Yes, it does.

16   Q.  And it constantly records, correct?

17   A.  Not necessarily.  It doesn't stay on, like it doesn't

18   record everything.  It has basically like an internal hard

19   drive, so when you activate your emergency lights, it backs up

20   a certain amount of time, and that's when it writes that

21   information to the DVD.

22   Q.  So it backs up to about 30 seconds, correct?

23   A.  Yes.

24   Q.  Which is why you indicated that when you activated your

25   lights, the second violation is visible on the video, correct?

G5BKGOMH                       Whittaker - cross

1   A.   Correct.

2   Q.   I'm going to play that video and ask you to identify where

3   that second violation is.

4   A.   Okay.

5        MS. TODD:   So that's Government Exhibit 2?

6        MS. CROWLEY:   Yes.

7        (Video playback)

8        MS. TODD:   Can you just pause that for a minute?

9   Sorry.

10  BY MS. TODD:

11  Q.   So you are behind two vehicles at this point, correct, and

12  you have just merged over to the left lane, passing lane,

13  correct?

14  A.   Yes.

15  Q.   And the vehicle that you're attempting to intercept is the

16  third vehicle, correct, up ahead?

17  A.   Yes.

18        (Video playback)

19  Q.   So by this time, your lights are on, correct?

20  A.   No.   Right there is where you can see the one that's hard

21  to see on the video, but he's touching the line right there.

22        Right there.   You paused it right on it.

23  Q.   You had your lights on, correct?

24  A.   No, I did not.

25  Q.   You didn't have your flashing lights on at that point?

G5BKGOMH                          Whittaker - cross

1    A.   No.

2    Q.   So you were just driving without your lights on?

3    A.   Without my overhead lights?

4    Q.   Yes.

5    A.   Yes.

6    Q.   You had -- did you have any emergency lights, any

7    indications on that you were --

8    A.   No.

9    Q.   -- law enforcement officer?

10   A.   No.  You can see the blue reflection.  You'll be able to

11   see it on the back of his vehicle when I activate my lights.

12   Q.   So he is pulling over, however, correct?

13   A.   No, he's not pulling over at this point.

14          MS. TODD:  Okay.  Let's continue to play.

15          (Video playback)

16          THE WITNESS:  Right there is where I activate my

17   lights.

18          MS. TODD:  Pause.

19   BY MS. TODD:

20   Q.   At this point, you have your flashing lights on?

21   A.   Yes, I have my flashing lights and my overhead lights.

22          THE COURT:  Can you tell us -- flashing lights and

23   overhead lights, could you tell us what those are?

24          THE WITNESS:  My overhead lights are mounted on the

25   top of my vehicle, and they're blue, and the flashing lights

1  are actually installed in my headlights, and it's just the

2  headlights blink.  They're the same color, but they'll blink

3  left and right.

4          THE COURT:  Okay.  The same color as?

5          THE WITNESS:  Normal headlights.  It's normal

6  headlights, but they just flash.

7          THE COURT:  I see.  All right.

8  BY MS. TODD:

9  Q.  The overhead lights, what do they do?

10  A.  They flash blue.

11  Q.  Were they flashing before the second traffic violation that

12  you described?

13  A.  No.  You can see it on the video because you'll see the

14  blue lights reflecting off of his vehicle.

15  Q.  I can't see it, which is why I'm asking you.

16  A.  Okay.  If you want to rewind it, I can show you exactly

17  where the lights go on.

18          MS. TODD:  Let's rewind.

19          (Video playback)

20  A.  Right there.  That's where they come on.

21  Q.  So it is your testimony, Trooper Whittaker, that at the

22  point where the vehicle touched the white line, it wasn't being

23  pulled over by you?  That is your testimony?

24  A.  Yes, ma'am.

25  Q.  And that your lights weren't on at that time?

G5BKGOMH                        Whittaker - cross

1   A.  Correct.

2   Q.  However, it's recording, correct?

3   A.  It is recording, yes.

4   Q.  So the recording will activate based upon whether the

5   lights are activated, correct?

6   A.  Yes.

7   Q.  So can you explain why it captures this 30-second recording

8   if a trigger event -- I'm sorry, withdrawn.

9            Can you explain to the Court what a trigger event for

10  the recording is?

11  A.  A trigger event for the recording is when I hit my lights

12  is when the internal DVD will go back 15 seconds and capture

13  that information.  So --

14           THE COURT:  What was it, 15 or 30?

15           THE WITNESS:  Thirty seconds.  Thirty.  Sorry.

16           It goes back and captures that information.  It's

17  preset, and I don't have any control over that.

18  BY MS. TODD:

19  Q.  So the recording that we just saw --

20  A.  So basically what you're seeing is that time period before

21  I hit my lights.  You understand?

22  Q.  I understand what you're saying.

23  A.  Okay.

24  Q.  Now, you indicated one of the reasons why you became

25  suspicious was that Mr. Gomez, when he came out of the vehicle,

G5BKGOMH                    Whittaker - cross

1   he walked to you real fast?

2   A.  Yes.

3   Q.  What about his walking fast was suspicious of criminal

4   activity to you?

5   A.  It's -- in conducting all these traffic stops, people act a

6   certain way, I guess, and most of the time, they'll shut the

7   door, and they'll walk casually.  To me, he seemed to be

8   walking faster than what a normal person that I've stopped

9   normally does.  And, generally, that's an indicator that

10  subconsciously, he's trying to separate himself from the

11  vehicle.

12  Q.  But you've never seen him walk before, correct?

13  A.  No, I have not.

14  Q.  So you don't know what his pace of walking normally looks

15  like, correct?

16  A.  No, I do not.

17          THE COURT:  Is it common, after you've pulled somebody

18  over, for people to get out of the car before you approach the

19  car?

20          THE WITNESS:  It happens, but most people will wait

21  for you to give them some kind of instruction.

22  BY MS. TODD:

23  Q.  And did you give him instruction, which is why he walked

24  out of the car toward you?

25  A.  Yes.

G5BKGOMH                              Whittaker - cross

1          THE COURT:  So you had told him to get out of the car?

2          THE WITNESS:  I did.

3          THE COURT:  Okay.  How did you communicate?  Where

4     were you when you told him to get out of the car?

5          THE WITNESS:  I exited my vehicle, and I was standing

6     in front of my door.

7          THE COURT:  Okay.

8          THE WITNESS:  And I verbally communicated for him to

9     get out of the vehicle and walk to me.

10         THE COURT:  Okay.

11    BY MS. TODD:

12    Q.  Now, you also stated that when you asked Mr. Gomez for his

13    license, you also asked him where he was coming from.  You

14    recall that testimony?

15    A.  What happened was I asked him for his driver's license.  He

16    handed me his driver's license and said he was coming from a

17    game.

18    Q.  Did he say he was coming from a game, or did he say he was

19    supposed to go to the game, and it got canceled?

20    A.  Well -- and that goes back to the conflicting statements

21    that he made.  He told me initially that he was coming from a

22    game, which is why I had asked him, you know, how did the game

23    go.

24         MS. TODD:  Can we just continue to play this because

25    this is right at the beginning.

1           (Video playback)

2           MS. TODD:  Can we pause it.

3    BY MS. TODD:

4    Q.  You called in the plates of the Yukon, correct?

5    A.  Yes.

6    Q.  You wanted to make sure it wasn't stolen, right?

7    A.  Well, that's part of it, but that's not the only reason.

8    Q.  But that was part of the reason, you wanted to make sure

9    the vehicle was not stolen, correct?

10   A.  Sure, that's part of the reason.

11   Q.  It checked out okay based on the report that came back,

12   correct?

13   A.  I don't know if she actually gave me the registration, but

14   it's typical that if there's a 29 on it, which is another way

15   of saying that it's stolen, the dispatcher would have told me

16   that, and she never told me that it was stolen.

17   Q.  Okay.

18           MS. TODD:  Can we continue to play.

19           (Video playback)

20   Q.  Right there, sir, you asked where he was coming from,

21   correct?

22   A.  Well, after he told me that he was watching the game.

23   Q.  Maybe I'm hearing it incorrectly.

24           MS. TODD:  Could you just rewind it back just a little

25   bit and just pause it for a second.

G5BKGOMH                    Whittaker - cross

1    Q.  I'm going to ask you just to listen to that piece of

2    conversation.  Did he say he was coming from the game, or did

3    he say he was watching the game?  I'm going to ask you to

4    listen to the audio.

5                (Video playback)

6    Q.  Is it still your testimony, Trooper Whittaker, that the

7    statement that he said was that he was coming from the game, or

8    as the video reflects, that he was watching the game, he was

9    supposed to go, but it got canceled?

10   A.  I think you could interpret that either way because he said

11   I'm coming from watching the game, so I think that's pretty

12   close.

13               (Video playback)

14   Q.  So, Trooper Whittaker, you patted him down as your standard

15   practice, right?

16   A.  Yes, ma'am.

17   Q.  You found no weapons?

18   A.  No, ma'am.

19   Q.  And then after that, you -- I'm sorry, withdrawn.

20               MS. TODD:  Can we just play -- I apologize, but my

21   numbers for some reason are different from the numbers on here,

22   so I can't kind of jump to where I need to be.

23               (Video playback)

24   Q.  So you testified on direct that at this point, you never

25   went inside the vehicle.  Is that still your testimony?

1    A.  Yes, ma'am.

2    Q.  At no point you didn't go in with your flashlight and look

3    around?

4    A.  I shined my light in the window.

5    Q.  At this point you didn't open the door or didn't go inside?

6    A.  No.

7    Q.  You weren't at any point right here sitting inside the

8    vehicle with your flashlight?

9    A.  Oh, absolutely not.

10            (Video playback)

11   Q.  Now, this entire time, you're waiting for the registration

12   to be given to you?

13   A.  I called the plate in, but I didn't ask to get it back.

14   But I asked Ms. Caronlay for the registration to the vehicle.

15   Q.  At this point you're still by the Yukon, you haven't gone

16   back to your car to check the license, correct?

17   A.  No.  I gave them the license plate number for the -- the

18   registration to the car itself, I gave them that when I made

19   the traffic stop, but I have a radio, so if they would have

20   gave me that information back, I would have heard it or they

21   would have called my number.  So they did give it back to me on

22   the air, but I was asking Ms. Caronlay for the registration to

23   the vehicle.

24   Q.  At some point she gave it to you, correct?

25   A.  No, she couldn't find it.

1    Q.   Now, you indicated on your direct testimony that she stated

2    to you that she was coming from Alabama, correct?

3    A.   Yes.

4    Q.   Couldn't recall whether you spoke to her in English or

5    Spanish, do you recall that?

6    A.   I don't recall.

7    Q.   She does not speak English; isn't that right?

8    A.   I don't know.

9    Q.   I'm sorry?

10   A.   I don't know if she does or not.

11   Q.   At some point later on in the evening, you attempted to

12   communicate with her, correct, and she indicated that she --

13   and you indicated that you didn't understand her, you needed to

14   get somebody to speak Spanish.  Do you recall that?

15   A.   I think we're confusing two different -- the timeline is a

16   little different.  I testified earlier that there are some

17   things that I can ask in Spanish, which is -- I don't know if I

18   asked her in English or in Spanish, but in any event, I got the

19   information that she said she was coming from Alabama and was

20   there for a couple of days.

21        So to ask more detailed questions, that would have

22   been asked in the follow-up process.  That would have been

23   something that one of the narcotics agents or DEA agents would

24   have spoken to her about.  They may have needed a translator to

25   get the more detailed information, but I didn't ask her any of

1   those kinds of questions.

2   Q.  My question to you is:  With your interaction with her,

3   subsequent to asking her where they were coming from, whether

4   you had any difficulty communicating with her because she

5   didn't speak English?

6   A.  I was able to ask her where she was coming from and how

7   long she was there, but I don't remember if I spoke in English

8   or in Spanish.

9           MS. TODD:  Just a moment, your Honor?

10          THE COURT:  Yes.

11          (Pause)

12          MS. TODD:  Can we fast forward up to 1656.  Back up a

13   little.  1640, maybe.  I'm sorry, try 1600.

14          (Video playback)

15          MS. TODD:  Can we pause it for a minute?

16   BY MS. TODD:

17   Q.  So when you said, "Can you hope out for a minute," she

18   responded to you in Spanish, correct?

19   A.  She did, but I don't know what she said.

20   Q.  And then you motioned something with your hand.  You

21   motioned --

22   A.  Right.

23   Q.  -- with your hand?

24   A.  Uh-huh.  She said she had dropped her water.  I heard her

25   say that, but that was the only thing I could understand.

1    Q.  In Spanish?

2    A.  Yes.

3    Q.  Mi agua?

4    A.  Uh-huh.  And that's when I told her that I'd get it for

5    her.

6    Q.  You wanted her to step out of the vehicle?

7    A.  Yes.

8    Q.  You said that in English, she didn't seem to understand, so

9    you motioned to her?

10   A.  Right, because I don't know how to say that in Spanish.

11          See there, she said "a donde," which she was

12   confirming where I wanted her to go, and that's when I said,

13   yes.  And that's when she went.

14          MS. TODD:  Another moment, Judge?

15          THE COURT:  Sure.

16          (Pause)

17          MS. TODD:  If I could ask you to go to 4909 maybe.

18          (Video playback)

19   Q.  Now, that's your voice in the background, correct?

20   A.  Yes.

21          MS. TODD:  Can we just play that little clip.

22          (Video playback)

23   Q.  Now, that is Ms. Baez trying to have a conversation with

24   you in Spanish, correct?

25   A.  Yes.

G5BKGOMH                         Whittaker - cross

 1   Q.  And you indicated that you don't understand, and you'll get
 2   somebody to speak to her?
 3   A.  Yes.
 4   Q.  Now, you also indicated that Mr. Gomez was very nervous, he
 5   was shaking, correct?
 6   A.  Yes.
 7   Q.  The fact is, it was cold out that night, correct?
 8   A.  It was cold.
 9   Q.  He was only wearing a T-shirt?
10   A.  Uh-huh.
11   Q.  Yes?
12   A.  Yes.
13   Q.  In fact, at some point he asked to get his jacket that was
14   in the truck, correct?
15   A.  He did.
16   Q.  Now, after you ran a check on Mr. Gomez's license, it came
17   back clean, correct?
18   A.  It did.
19   Q.  And at that point, you didn't allow him to just leave,
20   correct?
21   A.  No, I did not.
22   Q.  You immediately started questioning him?
23   A.  I did.
24   Q.  You questioned him about his past criminal history,
25   correct?

1    A.  Yes, I did.

2    Q.  You questioned him about whether he had any large amounts

3    of cash inside the vehicle?

4    A.  Yes.

5    Q.  You questioned him whether there were any methamphetamines

6    in the vehicle?

7    A.  Yes.

8    Q.  Any drugs of any type?

9    A.  Yes.

10   Q.  You, in fact, asked him whether or not he would know if

11   there was something illegal in the vehicle, correct?

12   A.  If there was something illegal, yes.

13   Q.  At that point you asked him if he minded if you searched

14   the vehicle real quick.  Do you recall that?

15   A.  Yes.

16   Q.  And it is your testimony that he said yes?

17   A.  Yes.

18   Q.  Well, we couldn't hear what his response was on the

19   recording, correct?

20   A.  That's why we do both written and verbal, in case something

21   happens with the audio in a situation like this where you can't

22   hear it, we still have a written record of him giving

23   permission.

24   Q.  You do have the ability, if you so desire, to mute the

25   recording, correct?

G5BKGOMH                          Whittaker - cross

1    A.  Yes.

2    Q.  And it's your testimony that you weren't doing that at that

3    point?

4    A.  That's correct.

5    Q.  Now, during the time that you were asking him questions

6    about his prior criminal history, whether there were any drugs

7    in the car, any narcotics, any large amounts of cash, at that

8    point he wasn't free to leave, correct?

9    A.  Correct.

10   Q.  So your initial search of the vehicle, you went through the

11   cabin compartment, moved the seats around, used your

12   flashlight, correct?

13   A.  Yes.

14   Q.  You opened the trunk of the vehicle?

15   A.  At some point, I did, yes.

16   Q.  They had some suitcases in the back?

17   A.  Yes.

18   Q.  You opened those suitcases, you looked inside the

19   suitcases?

20   A.  Uh-huh.

21   Q.  Found nothing, correct?

22   A.  Correct.

23   Q.  And you did this several times, correct?

24   A.  Yes.

25   Q.  Just so we're clear, at the point when you returned his

G5BKGOMH                      Whittaker - cross

1    driver's license, and you were questioning him about whether or

2    not he was aware of any drugs, had large cash, anything in the

3    vehicle, you did not read him his Miranda rights at that point,

4    correct?

5    A.  No, I did not.  And he didn't ask to leave at that point

6    either.

7    Q.  I'm sorry?

8    A.  He didn't ask to leave at that point either when I asked

9    him those questions.

10   Q.  But, as you just testified, he was not free to leave,

11   correct?

12   A.  I didn't tell him he wasn't free to leave, but with the

13   information that we had, I wasn't going to let him leave.

14   Q.  Now, after you searched the vehicle several times, you told

15   Mr. Gomez that you had a dog up the road that you were going to

16   get, correct?

17   A.  Yes, ma'am.

18   Q.  You weren't asking his permission at that point, you were

19   telling him that's what you were going to do, correct?

20   A.  I did tell him that's what I was going to do.

21   Q.  So you weren't asking him his permission, correct?

22   A.  No.

23   Q.  In fact, he never responded to you?

24   A.  He didn't object or confirm.  He didn't say anything.

25   Q.  He didn't say anything, correct?

G5BKGOMH                         Whittaker - cross

1    A.  Right.

2    Q.  And between the time of the stop and the appearance of that

3    dog, how much time had elapsed, about 35 minutes, 37 minutes?

4    A.  It could have been, but I don't know specifically.  But 30

5    minutes sounds right.

6    Q.  We can verify that by verifying when the dog appears?

7    A.  We can.

8              MS. TODD:  Can we move the marker to 36 -- 37.

9              (Video playback)

10   A.  That's when he first arrives.

11   Q.  So the first appearance of the dog, according to the video

12   marker, is 37 minutes and 17 seconds, correct?

13   A.  Yes.

14   Q.  Now, prior to the dog's arrival, you had not observed any

15   narcotics in the vehicle, correct?

16   A.  I didn't observe any narcotics, no.

17   Q.  At that point did you observe the trap in the vehicle?

18   A.  Yes.

19   Q.  Had you lifted up the seats and seen the trap?

20   A.  I didn't know the sequence to lift up the seats.

21   Q.  I'm sorry?

22   A.  I didn't know the sequence.

23   Q.  But the trap is underneath the seat?

24   A.  Right.  I attempted to -- and that's part of the reason

25   that I knew a trap was there.  Like I described earlier, the

G5BKGOMH                    Whittaker - cross

1   mold was different.  Normally you can lift up those seats, and

2   I couldn't lift them up, so I knew a trap was there.  But Agent

3   Patti had the sequence, and he hadn't given me that sequence,

4   so that's why I needed him to open up the trap.

5   Q.  What was the color -- what was the color of the molding for

6   the rest of the vehicle?

7   A.  Well, they were both tan, but the molding around the trap

8   was a different shade, and it was a different texture.

9   Q.  When you say different shade, can you describe it for us?

10  A.  Yes.  The molding around the trap was shiny, and the

11  molding in the rest of the vehicle wasn't.

12  Q.  But it was the same color?

13  A.  It was kind of a different shade.  And if we can go back to

14  one of the pictures, I can probably better explain it.

15          THE COURT:  But what you're saying is that it was

16  glossy and shiny, and I take it the molding in the rest of the

17  car wasn't glossy and shiny, right?

18          THE WITNESS:  Yes.

19  BY MS. TODD:

20  Q.  This is at night, correct?

21  A.  It is.

22  Q.  It was dark out?

23  A.  Yes.

24  Q.  But for your flashlight, that was the only light you were

25  working with inside the vehicle?

G5BKGOMH                         Whittaker - cross

1    A.  The flashlights, the interior dome lights, and I guess my

2    headlights.

3    Q.  Now, inside the vehicle, there was also some food, some

4    chicken -- chicken box of food, correct?

5    A.  I don't recall that.  It's possible, but I don't remember

6    absolutely one way or the other.  It is possible, but I don't

7    have -- I don't know a hundred percent if there was or not.

8    Q.  The photographs that were taken of the interior of the

9    vehicle, who took those photographs, you or somebody else?

10   A.  One of the narcotics agents.

11   Q.  But you had an opportunity to look at those photographs,

12   correct?

13   A.  I have.

14          MS. TODD:  One moment, your Honor?

15          THE COURT:  Yes.

16          Ms. Todd, how much longer do you think you'll be?

17          MS. TODD:  I'll be a while, your Honor.

18          THE COURT:  Okay.  I think it might make sense for us

19   to break at this point, have lunch, and come back.  So why

20   don't we resume at 1:30.  It's about 12:30 now.  And we'll

21   complete the rest of the testimony.  Okay?

22          MS. TODD:  Thank you, your Honor.

23          THE COURT:  All right.  You can step down.

24          (Witness temporarily excused)

25          (Luncheon recess)

1                          AFTERNOON SESSION

2                                1:40 PM

3              THE COURT:  All right.  Trooper, you remain under

4       oath.

5              Ms. Todd, please proceed.

6              MS. TODD:  Thank you, your Honor.

7       BY MS. TODD:

8       Q.  Trooper Whittaker, when we broke for lunch, I was asking

9       you about whether or not you recall some chicken -- a box of

10      chicken being in the truck.  Is it your testimony that you

11      don't remember?

12      A.  Yeah, I don't remember if there was or not.

13      Q.  There were photographs taken of the interior of the vehicle

14      at some point after the arrest, correct?

15      A.  Yes.

16      Q.  And the photographs were taken once the truck went back to

17      the station, correct?

18      A.  They could have been on the scene of the stop or when it

19      was back at the station, but I know somebody took photographs.

20      Q.  And you have had an opportunity to look at some of those

21      photographs, correct?

22      A.  Some of them, yes.

23      Q.  I'm going to show you what has been marked as Defense

24      Exhibit A and ask you if that photograph is part of a series of

25      photographs that was taken?

1    A.   I don't see anything on the screen.

2    Q.   It's coming.

3    A.   Okay.

4    Q.   Could you see that box of Popeyes Chicken box right there?

5    A.   There's nothing on the screen.

6              Okay, yes.  Well, it flashed.

7    Q.   I'm sorry, can you see that now?

8    A.   Now I see it.  Yes, I see it.

9    Q.   There's a box of Popeyes Chicken box?

10   A.   Yep.

11   Q.   Now, you don't know if there was any chicken in there?

12   A.   I don't know.

13             MS. TODD:  You can take that down.

14   Q.   Now, you also testified that -- now, at the time you had

15   Mr. Gomez sign the consent form, he was not read his Miranda

16   warnings, correct?

17   A.   Correct.

18   Q.   Just so we understand, the trooper that was standing next

19   to Mr. Gomez on the side of the road, he was there to make sure

20   that Mr. Gomez did not leave, correct, to secure Mr. Gomez?

21   A.   His purpose for being there was making sure I was safe

22   while I was searching the vehicle.

23   Q.   He was not guarding Mr. Gomez?

24   A.   No, I don't think that's an accurate term.

25   Q.   But you agree he was standing next to him the entire time?

G5BKGOMH                        Whittaker - cross

1  A.  Yes, he was.

2  Q.  Now, we have established that there was a K-9 that was

3  brought to the car, and you indicated in your testimony that

4  the K-9 alerted to the truck, correct?

5  A.  The handler told me that the K-9 alerted, yes.

6          MS. TODD:  That is Government Exhibit 2, if I could

7  ask?  I think it's 3714.

8          (Video playback)

9  Q.  Is there anything on your screen, sir?

10  A.  Yes.

11          MS. TODD:  Can you pause it right there.

12  Q.  Now, you see the K-9 handler kick something out of the way,

13  correct?

14  A.  Yes.

15  Q.  Was that the chicken bone, or you don't know?

16  A.  I don't know what that was.

17  Q.  The dog goes down the side of the embankment after the

18  object, correct?

19  A.  Yes.

20          MS. TODD:  Could you continue.

21          (Video playback)

22          MS. TODD:  Can we stop, please.  Thank you.

23  Q.  You indicated that the handler informed you that the dog

24  alerted to narcotics in the car?

25  A.  Yes.

G5BKGOMH                         Whittaker - cross

1   Q.  You have no information about the training of this dog,

2   correct?

3   A.  No, I don't.

4   Q.  Now, at some point, you did, in fact, recite Miranda

5   warnings to Mr. Gomez, yes?

6   A.  Yes.

7   Q.  Well, right before you recited the Miranda warnings, you

8   indicated to him that there was a compartment in the car,

9   correct?

10  A.  Yes.

11  Q.  And you asked him several questions about the hidden

12  compartment, correct?

13  A.  I believe I asked him if he knew what a compartment was.

14  Q.  And then after that, you recited Miranda warnings, correct?

15  A.  Yes.

16  Q.  Now, after reciting Miranda warnings, your immediate

17  question after that was to ask him what was in the compartment,

18  correct?

19  A.  Yes.

20  Q.  You did not ask him if he understood his rights, correct?

21  A.  He -- I took it to mean he understood his rights.  He never

22  asked me any questions or never appeared not to understand

23  them.

24  Q.  But you never asked him if he understood the rights as you

25  had just recited them to him?

1     THE COURT:  I'm sorry, you can't both talk at the same

2  time.  So maybe you can just ask your question, and then listen

3  to it, and then respond, okay?

4     THE WITNESS:  Yes, your Honor.

5  BY MS. TODD:

6  Q.  At no point during the time that you recited the warnings

7  to Mr. Gomez did you ask him if he understood the rights,

8  correct?

9  A.  Correct.

10 Q.  And you never asked him if he waived the rights that you

11 had just recited to him, correct?

12 A.  Correct.

13 Q.  Now, you also informed him, after reading him his rights,

14 that there were five kilos of coke in the car, correct?

15 A.  Yes.

16 Q.  But at that point, the trap had not been opened, correct?

17 A.  No, it had been opened.

18 Q.  It had been?

19 A.  Yes.  That's how I knew there were five in there.

20 Q.  I'm sorry?

21 A.  That's how I knew there were five in there.

22     MS. TODD:  Okay.  So if we could just fast forward

23 to -- I think it's 48.

24     (Video playback)

25 Q.  So right around 48 minutes somewhere there, you indicated

1    to him that there were five birds in the car, and it's your

2    testimony that the trap at that point had been opened?

3    A.  Yes.

4    Q.  And you could see exactly what was in the container?

5    A.  Yes.

6            MS. TODD:  If we could fast forward to 51 minutes.

7            (Video playback)

8            MS. TODD:  Can you pause it?

9    Q.  That's another agent in the background, correct?

10   A.  Yes.

11   Q.  And he says, "He's not telling us how to open the thing"?

12   A.  Correct.

13   Q.  So this is almost -- this is several minutes after you

14   indicated that it had been opened?

15   A.  Yes.

16   Q.  But according to his statement, it had not yet been opened?

17   A.  Correct.

18           THE COURT:  When you say "it," you're going to have to

19   be --

20           MS. TODD:  The trap.

21   Q.  The secret compartment had not been opened, correct?

22   A.  That's what he said to Mr. Gomez, Agent Patti.

23   Q.  That's Agent Patti?

24   A.  Yes.

25   Q.  The same agent who had the sequence to open --

1   A.  Yes.

2   Q.  -- the compartment?

3          THE COURT:  I'm not clear who's saying what to who.

4   Maybe you could explore that a little bit.

5   Q.  48 seconds, where you indicated that -- where there is --

6          THE COURT:  It's 48 minutes, right?

7          MS. TODD:  48 minutes.

8   Q.  That was you saying that there were five birds in the

9   compartment, correct?

10  A.  Correct.

11  Q.  And at 51 minutes, Agent Patti was saying that the secret

12  compartment -- he's not telling him how to open the secret

13  compartment, correct?

14  A.  Correct.

15         THE COURT:  And who's "he"?  Who is Agent Patti

16  referring to?

17         THE WITNESS:  Agent Patti is the DEA case agent from

18  New Jersey.  He was on the scene of the stop.

19         THE COURT:  No, I understand that.  What I asked you

20  was, when he said "he's not telling us," who was "he"?

21         THE WITNESS:  Sandy Gomez.

22         THE COURT:  Sandy Gomez is not telling us.

23         And who was Agent Patti speaking to when he said that?

24         THE WITNESS:  Sandy Gomez.

25         THE COURT:  I'm confused.

1          MS. TODD:  I can rewind it.

2          THE COURT:  Yeah.  Go ahead.

3          THE WITNESS:  I think -- he could have been talking to

4     another trooper, but he was in conversation with Mr. Gomez.

5     Maybe that's what the mixup is.

6          MS. TODD:  Let's rewind it to 49 seconds -- 49

7     minutes, I'm sorry.  In fact, let's start the conversation from

8     where the trooper indicates that there were five birds in the

9     car, 48 minutes.

10          (Video playback)

11    BY MS. TODD:

12    Q.  So just to confirm, the person who just says "It doesn't

13    make any sense, he's not telling us how to open this thing" --

14    A.  Right.

15    Q.  -- that was Agent Patti speaking?

16    A.  Yes.

17    Q.  And he was addressing Sandy Gomez at the time?

18    A.  He was talking to another agent --

19          MS. CROWLEY:  Your Honor, Trooper Whittaker was

20    clearly not present for this conversation.  You can see that

21    he's behind the truck.

22          THE COURT:  Well, I don't know where Trooper Whittaker

23    is during the conversation.

24          Did you hear the conversation?

25          THE WITNESS:  No, sir.  I'm standing outside of the

1  car.  Mr. Gomez and Sandy -- Agent Patti are talking from

2  inside the rear of my vehicle.

3          THE COURT:  Okay.  And who is shown in the video at

4  this point?

5          THE WITNESS:  Myself and Trooper McKay.

6          THE COURT:  Okay.  So what exactly is your objection?

7          MS. CROWLEY:  Well, it seems like Ms. Todd is asking

8  him about who Agent Patti was talking to at the point -- at

9  that point.  I'm not sure how he could know who he was talking

10 to.

11          THE COURT:  The only way to know is if he recognizes

12 the voices, right?

13          MS. TODD:  Which was my next question, Judge.

14          THE COURT:  Yes.  So you will elicit if he recognizes

15 the voices.  We'll take it from there.

16 BY MS. TODD:

17 Q.  Do you recognize the voice that says, "It doesn't make any

18 sense, he's not telling me how to open this thing"?

19 A.  Yes.

20 Q.  And you recognize that voice to be Agent Patti?

21 A.  Yes.

22 Q.  And Agent Patti is part of the task force, correct?

23 A.  Yes.

24 Q.  And he was present at some point during the stop of the

25 vehicle, correct?

G5BKGOMH                        Whittaker - cross

1    A.  Yes.

2    Q.  He was also present during the search of the vehicle,

3    correct?

4    A.  Yes.

5    Q.  And he's also assisting in trying to open the compartment,

6    correct?

7    A.  The compartment was already opened by this point.

8    Q.  So when Sergeant Patti says, "He's not telling me how to

9    open this thing" --

10   A.  I can explain that if --

11   Q.  -- he's not referring to the compartment?

12   A.  I can explain that, if you would like me to.

13          Agent Patti is talking to Mr. Gomez in the back of my

14   vehicle.  Agent Patti didn't know that I had already told Sandy

15   that we had the compartment opened, and that there was five

16   keys in it.  I can't testify exactly to why Agent Patti would

17   ask him that, but I'm assuming that he was trying to get some

18   type of admission to the sequence, which is why he asked him

19   that question.

20   Q.  When you told Sandy Gomez that there are five birds in the

21   car, he was not seated in the vehicle with Agent Patti at the

22   time?

23   A.  Mr. Gomez was in my vehicle, but Agent Patti was not.

24   Q.  Now, you testified that you completed some arrest reports

25   as part of this case, correct?

1    A.  Yes, ma'am.

2    Q.  And it is a fact that Mr. Gomez, Sandy Gomez, was being

3    prosecuted for possession of narcotics under Louisiana State

4    law, correct?

5    A.  Yes.

6    Q.  And he had been under Louisiana State prosecution from the

7    time of his arrest on December 7, 2014, until he was extradited

8    here, correct?

9    A.  It was my understanding that he was to be booked in

10   St. Tammany jail, but that eventually it was going to go to

11   federal.  It was always the intent for him to be prosecuted up

12   here, was my understanding.

13   Q.  My question to you is:  For nine or ten months, he was

14   being prosecuted in the State of Louisiana based on your

15   arrest, correct?

16   A.  He was held in Louisiana, but it was never my --

17   Q.  Was he charged with a crime in Louisiana?

18   A.  I booked him in Louisiana.  I don't know what the --

19   Q.  And based on your report, he was held in Louisiana for ten

20   months, correct?

21          MS. CROWLEY:  Objection, your Honor.  I don't know

22   what relevance this has to whether the stop was valid.

23          MS. TODD:  The relevance is, your Honor, the

24   government elicited from this witness that his report did not

25   contain all the information, and I am simply ascertaining that

G5BKGOMH                        Whittaker - cross

1    based on the information in his report, there is a prosecution

2    that was started in Louisiana.

3              MS. CROWLEY:  I still don't understand how that's

4    relevant to the validity of the stop.

5              THE COURT:  How is it relevant to the validity of the

6    stop?

7              MS. TODD:  I can't hear you, your Honor.  I'm sorry.

8              THE COURT:  How is it relevant to the validity of the

9    constitutional validity of the search?

10             MS. TODD:  It isn't, but it goes to the credibility of

11   the witnesses as to what information was put forth.

12             THE COURT:  So just so I understand the argument, I

13   think what you're saying is that there was a possibility that

14   this was going to proceed in Louisiana, and so, therefore, if

15   the report wasn't entirely accurate, there was a motive to

16   supplement it?  Is that what you're saying?

17             MS. TODD:  I can make the arguments without the

18   witness being on the stand, of course.

19             THE COURT:  I'm going to overrule the objection in any

20   event.  You can ask the question, and we'll get the answer.

21   BY MS. TODD:

22   Q.  You filed a report based on the stop of Mr. Gomez in

23   Louisiana, correct?

24   A.  Yes.

25   Q.  And that report indicated that the basis of your stop was

1   for traffic infraction, correct?

2   A.  Yes.

3   Q.  Nowhere in that report did it indicate that this was a

4   joint task force, correct, between the Louisiana State Police

5   and federal agents, correct?

6   A.  Correct.

7   Q.  And your report was submitted in furtherance of the

8   prosecution in the State of Louisiana, correct?

9   A.  My report was submitted to my agency.  What happened from

10  there, I don't know.  Like I say, it was always my

11  understanding that he was going to be prosecuted federally.  I

12  understand that he was held in a parish jail, but I don't have

13  the answer to why he was there.

14  Q.  Let me ask you this:  Was your report submitted to the

15  state prosecutor?

16  A.  I submitted my report to my rank, and they submitted it to

17  the state prosecutor, but they weren't supposed to.

18  Q.  Just one more question, Trooper Whittaker:  Was there a lab

19  report done for the narcotics that were seized at the time of

20  the arrest?

21          MS. CROWLEY:  Again, your Honor, I don't see what the

22  relevance is to this question to the validity of the stop.

23          THE COURT:  Overruled.

24          THE WITNESS:  I'm sure there would have been a lab

25  report completed, as per our policy, but I didn't do the lab

G5BKGOMH                          Whittaker - cross

1    report.

2    BY MS. TODD:

3    Q.  But do you know that for sure?

4    A.  About a hundred percent sure.

5    Q.  Was that provided to the government in this case?

6    A.  If -- it depends on who took custody of the narcotics.  I

7    don't know if DEA took possession or if the case agent on the

8    state side took possession.  If the state agent would have took

9    possession, then the narcotics would have went to our crime

10   lab.  If it would have been in federal possession, then they

11   would have sent the paperwork up on their side.

12   Q.  I'm simply asking you, was there -- to your knowledge, was

13   there a lab report done?

14   A.  I can't say one way or the other.

15            MS. TODD:  Thank you.  Nothing further.

16            THE COURT:  All right.

17            Redirect?

18            Oh, Mr. Sporn again.  Sorry.  Anything you want to

19   ask?

20            MR. SPORN:  Judge, there is just one point I'd like to

21   go into.

22            THE COURT:  All right.

23            MR. SPORN:  I'm not going to go through, and it would

24   require looking at the dash cam video at the point before the

25   witness passes the two vehicles.

1          MS. CROWLEY:  Can we just start at the beginning?

2          MR. SPORN:  It's close to the beginning, if not at the

3     beginning, yes.  I'm sorry, I don't have the exact timeline.

4     CROSS-EXAMINATION

5     BY MR. SPORN:

6     Q.  Do you have it on your screen, sir?

7     A.  I do.

8     Q.  There is a vehicle directly in front of you?

9     A.  Yes.

10         MR. SPORN:  It's not moving now.  Can we start it, and

11    then I'm going to ask to stop it at a certain point, to pause

12    at a certain point.  Go ahead.

13         (Video playback)

14         MR. SPORN:  And stop.

15    BY MR. SPORN:

16    Q.  You're starting to pass the truck in front of you?

17    A.  Yes.

18    Q.  And the truck in front of you, would you agree that its

19    right tires are on the white line between the roadway and the

20    shoulder?

21    A.  Yes.

22    Q.  All right.  Thank you.

23         MR. SPORN:  You can take that down.  Before you do

24    that.

25    Q.  There is yet another car in front of that one that you had

G5BKGOMH                         Whittaker - cross

1    to pass, and it's the Yukon that's way up ahead in the

2    distance?

3    A.  Yes.

4    Q.  So you had to pass these two cars and speed up to catch up

5    to the Yukon, right?

6    A.  Yes.

7    Q.  This is obvious, but you didn't stop the truck that's

8    immediately in front of you for violating Louisiana law by

9    touching the line?

10   A.  Correct.

11   Q.  And, in fact, you had a specific purpose at that point in

12   time, correct?

13   A.  Yes.

14   Q.  And that was to stop the Yukon?

15   A.  Yes.

16   Q.  And that was because the joint task force asked you to do

17   that?

18   A.  Yes.

19   Q.  And basically they told you to find an excuse to do it?

20   A.  They told me to develop all probable cause for a traffic

21   stop, which is what I did.

22   Q.  You didn't stop the Yukon because its tires hit the line,

23   did you?

24   A.  I did.

25   Q.  Well, in fact, you stopped it because the joint task force

1    asked you to stop it?

2    A.   That's an additional reason.

3              MR. SPORN:   Thank you.

4              THE COURT:   All right.   Redirect?

5              MS. CROWLEY:   Yes, your Honor.

6    RECROSS EXAMINATION

7    BY MS. CROWLEY:

8    Q.   Trooper Whittaker, Mr. Sporn just asked you some questions

9    about the other two vehicles that you passed before stopping

10   the Yukon.   Do you recall those?

11   A.   I do.

12   Q.   And you said that at least one of them appeared, from the

13   video that you just saw, like it had its right tire on the fog

14   line?

15   A.   Correct.

16   Q.   But you didn't stop it?

17   A.   Correct.

18   Q.   But you did stop the Yukon?

19   A.   Yes.

20   Q.   Why did you stop the Yukon?

21   A.   Because DEA asked me to stop the Yukon.

22   Q.   If you had not seen the Yukon commit a traffic violation,

23   would you have stopped it?

24   A.   What I would have done at that point was call Agent Patti

25   and asked him if he wanted me to use his information and

1    background on the case to initiate the stop, but at that point,

2    I would have had to have given details of the investigation to

3    Mr. Gomez.

4    Q.  If Agent Patti had said, no, I don't want you to reveal the

5    details of the investigation, what would you have done?

6    A.  Let it go.

7    Q.  Before the lunch break, Ms. Todd asked you some questions

8    about when you were -- after you had run the criminal history

9    on Mr. Gomez and Ms. Baez, you got back out of the car and

10   asked Mr. Gomez some additional questions.  Do you remember

11   that?

12   A.  Yes, I do.

13   Q.  You asked him about his criminal history?

14   A.  Yes.

15   Q.  And whether there were any weapons or drugs in the car?

16   And she asked you if at that time Mr. Gomez was free to leave.

17   Do you recall that?

18   A.  Yes.

19   Q.  And you testified that he was not --

20   A.  Correct.

21   Q.  -- is that right?

22   A.  Yes.

23   Q.  Did you tell him that he wasn't free to leave at that time?

24   A.  No, I did not.

25   Q.  Did you hear anyone else tell him that?

1    A.  No.

2    Q.  Was he in handcuffs at that time?

3    A.  No.

4    Q.  Did he ask to leave?

5    A.  No.

6    Q.  In fact, during the entire stop, until he was actually

7    placed in handcuffs, did he ever ask that the search be

8    discontinued?

9    A.  No.

10   Q.  And did he ever ask if he could leave?

11   A.  No.

12   Q.  Was he ever restrained before the K-9 alerted on the car?

13   A.  No.

14   Q.  Was he ever prevented from leaving?

15   A.  No.

16   Q.  You testified here today, and we saw on the video, that you

17   had several conversations with Mr. Gomez, right?

18   A.  Yes.

19   Q.  Did you ever yell at him?

20   A.  No.

21   Q.  Did he ever yell at you?

22   A.  No.

23   Q.  Did you ever hear any other law enforcement agent who was

24   on the scene yell at him?

25   A.  No.

1   Q.  Ms. Todd asked you some questions about the Miranda

2   warnings that you provided to Mr. Gomez.  Do you remember that?

3   A.  Yes.

4   Q.  And she asked if after you provided the Miranda warnings,

5   Mr. Gomez said anything about whether he understood them.  Do

6   you recall that?

7   A.  Yes.

8   Q.  And you said that you don't remember what he said?

9   A.  Correct.

10  Q.  You had spoken with Mr. Gomez several times before that

11  conversation, correct?

12  A.  Yes.

13  Q.  Did he appear to understand you?

14  A.  Yes.

15  Q.  Did he ever indicate that he couldn't understand you?

16  A.  No.

17  Q.  Did he ever ask you any questions about words that you were

18  using?

19  A.  No.

20  Q.  A few minutes ago, Ms. Todd played sections of the video in

21  which TFO Patti asked or said something to Mr. Gomez about not

22  telling us what was in the -- or how to open the compartment.

23  Do you recall that?

24  A.  Yes.

25  Q.  Were you present for that conversation?

G5BKGOMH                          Whittaker - recross

1    A.   No.

2    Q.   Could you hear that conversation while it was happening?

3    A.   No.

4    Q.   Before TFO Patti was having that conversation with

5    Mr. Gomez, you spoke to Mr. Gomez, right?

6    A.   Yes.

7    Q.   And you said there are five birds in the car?

8    A.   Correct.

9    Q.   Had the trap been opened at that point?

10   A.   Yes.

11   Q.   Can you explain what the vehicle -- how the trap was

12   opened, how you knew that the trap had been opened?

13   A.   Their agent, Agent Patti, sat in the driver's seat, and I

14   don't remember the exact sequence, but it was either the unlock

15   button or the window button, when you press it a certain way,

16   the cushion of the seat lifted forward, lifted up from the back

17   going up.

18   Q.   And you could see that happening?

19   A.   Yes.

20   Q.   I believe earlier today, you testified that when you spoke

21   with the DEA agents, they told you -- and they told you about

22   the vehicle with the trap, they indicated a quantity of

23   narcotics that they expected to be in the trap; is that

24   correct?

25   A.   Yes.

1    Q.  And what quantity was that?

2    A.  They told me 25.

3    Q.  25 what?

4    A.  Kilos of cocaine.

5    Q.  So until the trap was actually opened, how many kilograms

6    of cocaine did you think would be in there?

7    A.  I thought it would be 25.

8    Q.  So when did you learn that it was five kilos of cocaine in

9    the trap?

10   A.  After we opened it.

11   Q.  And you saw what was in the trap?

12   A.  Yes.

13   Q.  You were just asked questions about the report that you

14   wrote up about the stop.

15   A.  Yes.

16   Q.  Do you recall those?

17   A.  Uh-huh.

18   Q.  You testified you didn't include any of the background

19   information that you had learned about the investigation in

20   that report?

21   A.  Correct.

22   Q.  Why is that?

23   A.  The DEA asked me to wall off the stop, and that's part of

24   it.

25   Q.  Have you read that report since you wrote it?

1    A.  Yes.

2    Q.  Is everything in that report that you wrote accurate?

3    A.  Yes.

4            MS. CROWLEY:  One moment, your Honor.

5            Nothing further.

6            THE COURT:  Anything else?

7            MS. TODD:  Yes, your Honor, briefly.

8    RECROSS EXAMINATION

9    BY MS. TODD:

10   Q.  Can you tell us, Trooper Whittaker, who opened the trap?

11   A.  Agent Patti.

12   Q.  Agent Patti?

13   A.  Yes.

14   Q.  This is the same agent whose voice we heard at 51 minutes

15   indicating that he couldn't open the trap?

16   A.  Yes.

17           MS. TODD:  Thank you.  Nothing further.

18           MR. SPORN:  Just one quick one.

19   RECROSS EXAMINATION

20   BY MR. SPORN:

21   Q.  You were asked on redirect whether Mr. Gomez Sandy was

22   prevented from leaving.  Do you recall that?

23   A.  Yes.

24   Q.  You said -- your answer was he was not prevented?

25   A.  Correct.

G5BKGOMH                         Whittaker - recross

1   Q.  He didn't try to leave, did he?

2   A.  No.

3   Q.  If he had, you would have prevented him?

4   A.  Yes.

5   Q.  And because, in fact, he was not free to go?

6   A.  He didn't know that.

7   Q.  I'm not asking you that.  He was not free to go?

8   A.  I wouldn't have let him leave.  I've been consistent.

9   Q.  That's what you said this morning, right?

10  A.  Yes.

11  Q.  And he wasn't free to go because you knew that he was a

12  target of the joint task force investigation?

13  A.  That, combined with I knew there was a DEA trap in the

14  vehicle.

15  Q.  By the way, did you ever issue him a ticket for riding on

16  the white line?

17  A.  I did not.

18  Q.  And he was not free to leave for the same reason that the

19  vehicle was not free to leave, meaning you were going to pull

20  that car over because the joint task force asked you to do it?

21  A.  It was my understanding it was DEA's vehicle, so...

22  Q.  Does that make a difference?

23  A.  I guess not.

24          MR. SPORN:  Thank you.

25          THE COURT:  Anything else?

G5BKGOMH

1           MS. CROWLEY:  Nothing further, your Honor.

2           THE COURT:  All right.  You may step down.

3           THE WITNESS:  Thank you.

4           (Witness excused)

5           THE COURT:  Does the government have any other

6    evidence?

7           MS. CROWLEY:  No, your Honor.

8           THE COURT:  All right.  Does defense have any

9    evidence?

10          MS. TODD:  No, your Honor.

11          MR. SPORN:  No, your Honor.

12          THE COURT:  All right.  How do the parties wish to

13   proceed?  Do you want to argue now, do you want to make

14   posthearing submissions?  How do you want to proceed?

15          MS. CROWLEY:  We're prepared to argue today.

16          MS. TODD:  Your Honor, I'd prefer to submit something

17   in writing posthearing.  However, just from a scheduling point

18   of view, I'm actually leaving the country next week on a

19   vacation, so I'd ask for some extra time.  I come back

20   June 10th.

21          THE COURT:  You're going to be gone for a month?

22          MS. TODD:  No, your Honor.  I leave on the 17th, next

23   week, and I come back -- it sounds like a month, right -- I

24   come back June 10th.  A little less than a month.

25          THE COURT:  Okay.  So when can you get your papers in?

G5BKGOMH

1          MS. TODD:  A week after I come back, Judge.

2          THE COURT:  So that would be the 17th?  I'm sorry, did

3    you say you were returning on the 11th, right?

4          MS. TODD:  I return June 10th.

5          THE COURT:  June 10th?  So the 17th for your papers?

6          MS. TODD:  Yes, your Honor.

7          THE COURT:  And the government, a week?

8          MS. CROWLEY:  Yes, a week is fine.

9          THE COURT:  All right.  So any papers from the defense

10   will be due on the 17th, and any papers from the government

11   will be due on the 24th.

12          Ms. Todd, could you give me a sense of what your

13   argument is going to be on consent?  We have testimony from the

14   trooper that your client consented to the search, we have a

15   consent form that bears his signature.  So how do you intend to

16   counter that?

17          MS. TODD:  I intend to look at this somewhat further,

18   but my initial response to that would be that he was, in fact,

19   in custody, there were no Miranda warnings, there had been no

20   attenuating factors from the beginning up to that point, and,

21   therefore, the consent was invalid and involuntary.

22          THE COURT:  Well, we have a schedule for the

23   submissions.  I guess the only remaining matter is, I had

24   received from you, Ms. Todd, a request to modify Mr. Sandy

25   Gomez's bail conditions.

G5BKGOMH

1          MS. TODD:  Yes, your Honor.

2          THE COURT:  I'm not going to act on that at this time.

3    Obviously, the results of the suppression hearing would have an

4    enormous effect one way or the other.

5          I have reviewed the transcript at which I set bail,

6    and I was very clear at the time that I thought the home

7    confinement aspect was necessary given the defendant's contacts

8    with, I think it was, the Dominican Republic as well as all the

9    other circumstances in the case.  The government had sought

10   detention, of course.

11         While it appears to be the case that Mr. Sandy Gomez

12   has complied with his bail conditions, there hasn't been any

13   change in the circumstances, in my judgment, that would justify

14   reducing those conditions in any way.  That is, of course,

15   subject to the outcome of the suppression hearing.  Were I to

16   suppress the evidence, then I may well decide that some

17   adjustment in those conditions is appropriate.  Conversely, if

18   I deny the suppression motion, then my statements about the

19   weight of the evidence become a fortiori, and then the

20   arguments against any reduction in the conditions, I think,

21   become more powerful.  So I'm going to hold your application in

22   abeyance.

23         I will say that to the extent that your application

24   indicates that the home confinement aspect is preventing him

25   from obtaining employment, I don't understand that.  I assume

G5BKGOMH

1    that he has the capability of leaving the premises for purposes

2    of employment, and I understand he has a part-time job, doesn't

3    he?

4              MS. TODD:  He does.

5              THE COURT:  So how is the home confinement interfering

6    with his efforts to pursue lawful employment?

7              MS. TODD:  The way it works is, whenever Mr. Gomez has

8    to leave the confines of his home, whether for work or anything

9    else, he has to notify pretrial services.  They can get back to

10   him sometimes within a day, sometimes a few hours, sometimes

11   two days later.  So, for example, when I have to make a request

12   to meet with him, I have to submit that request in writing and

13   give him 48 hours.

14             In the circumstances that relates directly to

15   employment, a lot of the jobs that are occurring are happening

16   right then and there, they want him to come down to the site

17   right away.  And based on his experience as a driver of these

18   big tractor trucks that do construction, they want him right

19   away, and by the time he hears from pretrial services, the

20   position has been filled.  So that's been happening quite

21   frequently.

22             He currently works at the pizza company, Papa John's,

23   and he's limited to anywhere between 10 to 15 hours because

24   they just don't have more hours to work.

25             THE COURT:  Well, that helps me understand why this is

1    interfering with his employment efforts, but as I've said, I'm

2    not going to modify those conditions in any way until I resolve

3    the question of whether the evidence against him is going to be

4    suppressed or whether the motion is going to be denied.

5              MS. TODD:  Thank you, your Honor.  Fair enough.

6              THE COURT:  Anything else?

7              MS. CROWLEY:  Yes, your Honor.  I believe we need to

8    exclude time.  It was only excluded till today.  I don't know

9    if you want to set a control date and exclude time between now

10   and then?

11             THE COURT:  Before I get to that, Mr. Sporn, anything

12   you want to say?

13             MR. SPORN:  Just two things.  I assume your Honor will

14   authorize the transcription of today's hearing for CJA?

15             THE COURT:  Absolutely.  Absolutely.

16             MR. SPORN:  It would be helpful in briefing.

17             THE COURT:  With respect to the Assistant's request to

18   exclude time, what's going to happen here is, we have a

19   briefing schedule that takes this out to June 24th, so time is

20   automatically excluded through June 24th because the matter

21   hasn't been briefed yet.  I'm not sure whether I'll hold oral

22   argument or not.  I probably won't.  If anybody wants oral

23   argument, you're welcome to ask for it.  If there was oral

24   argument, it would be excluded automatically through the date

25   of oral argument.

G5BKGOMH

1          If it turns out that the last submission is June 24th,

2     the matter would be fully submitted at that point, and then I

3     would have 30 days to decide the motion, and on day 31, the

4     Speedy Trial Clock will start ticking again.

5          So we're all set with the Speedy Trial Clock for at

6     least through June 24th, and in the event that I scheduled oral

7     argument, we would be fine through the date of the oral

8     argument.  But as I said, if anyone wants oral argument, let me

9     know, otherwise I'll decide the motion on the papers.

10          MR. SPORN:  Judge, there was one more thing I would

11     raise now, if it's convenient, not related to the suppression

12     hearing, and it's a discovery question.  I think at our last

13     status conference, Mr. Egan was here for the government, and we

14     raised two discovery issues.  One was we wanted the dash cam

15     video camera, which obviously we received, but also at the same

16     time, I think we asked for the production of prison calls.

17     Unless I missed something, we still don't have those.  And what

18     I'm referring to are my two codefendants, when they were in

19     custody in Louisiana, made a number of calls.  Those calls were

20     recorded -- at least I'm quite sure they were -- and I think my

21     client may have spoken with one or both of the two

22     codefendants, and we're still missing those.

23          MS. CROWLEY:  Your Honor, as I said to Mr. Sporn when

24     we talked yesterday, we don't have those calls, we were not

25     aware of those calls, we aren't aware of those calls now.  If

G5BKGOMH

1    Mr. Sporn's client is telling him that he made calls with his

2    codefendants while they were in state custody in Louisiana, we

3    don't have them.  We're a separate sovereign.  We have not

4    requested them.  And I have spoken with the prosecutor down in

5    Louisiana.  They don't know about these calls either.

6         MR. SPORN:  Well, it's the first I'm hearing that they

7    don't know about it in Louisiana.  And I think, if memory

8    serves us, we raised it at the last conference, and --

9         THE COURT:  To be honest with you, I don't remember

10   whether it was raised or not.  What I will say is that the U.S.

11   Attorney's Office in this district is not required to obtain

12   taped calls that are held by the prison system in Louisiana.  I

13   obviously don't want a situation where, as we get closer to

14   trial, any taped calls are produced, so that's not a road we're

15   going to go down, but what I'm hearing from the government is

16   they don't have the calls, they haven't requested the calls,

17   and I don't think they have an obligation to obtain the calls.

18        MR. SPORN:  You may be right.  I'm not sure I agree

19   with your Honor about that.

20        THE COURT:  Well, if you have an application, I'm

21   happy to see it, but I will tell you, generally speaking, that

22   the government's required to produce information in their

23   custody and control.  They're not required to obtain things

24   that are not in their custody and control, and that would

25   certainly include things that are being held by the Louisiana

G5BKGOMH

1    prison system, state prison system.  They're not required to

2    obtain those materials for you.  If you disagree, you're

3    welcome to make an application, and I will rule on it.

4              MR. SPORN:  Well, there is such a thing as the

5    exercise of due diligence to produce what's requested.

6              THE COURT:  You're operating under a fundamental

7    misapprehension, which is that the government has an obligation

8    to obtain, in this case, tape-recorded statements by your

9    client that are held by a different sovereign, and I'm telling

10   you they don't have that obligation.  They absolutely do not

11   have that obligation.

12             Now, what I wouldn't want to have happen is what I

13   just articulated, which is, as the case proceeds to trial,

14   suddenly the Louisiana State prison tape calls show up, and

15   they're produced at the last minute to defense counsel.  That,

16   I don't want to have happen.  But the question of whether the

17   government, the federal government, the U.S. Attorney's Office

18   in this district is required to obtain and produce in discovery

19   materials held by Louisiana, they are not obligated to do that.

20   Absolutely they have no obligation.  If you disagree, as I

21   said, make an application, and I'm happy to rule on it.  That's

22   my current understanding.

23             MR. SPORN:  You may well be right, your Honor, but a

24   couple of things:  I don't want to follow this down a long

25   rabbit hole, but they're potentially exculpatory and --

G5BKGOMH

1          THE COURT:  Well, they may be exculpatory, they may be

2     inculpatory, we don't know.

3          MR. SPORN:  That's why I'd like to see them.

4          THE COURT:  But even Brady doesn't require the federal

5     government to obtain materials that it doesn't have any control

6     over.

7          MR. SPORN:  I hear your Honor.

8          THE COURT:  Particularly where there's no reason to

9     believe they would be exculpatory or inculpatory.  We just

10    don't know what they contain.  But the basic point here is:

11    Does this prosecutor have an obligation to obtain materials

12    being held by the Louisiana State prison system, and I'm

13    telling you my understanding is they do not have an obligation

14    to do that even if what we're talking about is tape-recorded

15    statements of your client.

16         MR. SPORN:  Right, they are statements of my client.

17    But putting aside whether there is a legal obligation, and,

18    undoubtedly, your Honor is probably correct about that, but I

19    think it was represented that the government would inquire

20    about it at least.  And I guess that's all I'm asking, and I'm

21    hearing for the first time that maybe an inquiry was made, and

22    they were told that -- I don't know what they were told -- that

23    they don't know about whether they exist or they don't have

24    them, and over the longer term, that may be more problematical

25    from my point of view.

G5BKGOMH

1      It's certainly been my experience that the

2  government -- I guess I would put it this way -- would go

3  beyond what they're required to do and make inquiries, and

4  that's where I thought we were.

5      THE COURT:  I'll have to go back and read the

6  transcript because I, frankly, don't remember this at all.  So

7  I will obtain the transcript, and then I will review it.  I do

8  think it's one thing when the government has recordings of

9  calls that the defendant made in the MCC or the MDC, it's

10  another thing when we're talking about materials held by the

11  Louisiana State prison system.  I think those are two separate

12  matters.  But I'll take a look at the transcript and see what

13  it says, and then, as I said, Mr. Sporn, if you have an

14  application, I'm happy to consider it.

15      MR. SPORN:  I appreciate that, Judge.  I don't know I

16  would have more to say than what I just said, and I don't know

17  if that was -- that what I'm referring to was even on the

18  record discussion.  It might have been a discussion we had with

19  Mr. Egan after the proceeding concluded for the day about

20  discovery going forward.  So I don't know whether there's going

21  to be anything in the transcript or not.

22      THE COURT:  Okay.

23      MS. TODD:  Just one other matter related to discovery,

24  your Honor:  I've made inquiries regarding the laboratory

25  report with respect to the narcotics that were seized.  I think

G5BKGOMH

1    I spoke with Mr. Cooper recently, and he communicated that --

2    it was you?

3              MS. CROWLEY:  I can address that.

4              MS. TODD:  So basically I'd like to get a copy of that

5    report sooner than later.

6              MS. CROWLEY:  I'm happy --

7              THE COURT:  Usually that's provided in Rule 16

8    discovery.

9              MS. CROWLEY:  It is, and we just actually -- so

10   there's like a new DEA New Jersey policy where you have to --

11   the prosecutor has to request that a lab report be run, so

12   that's happening right now.  We received, I believe last night,

13   the preliminary lab report, not the full reports.  When we get

14   the full report, which should be this week, we will, of course,

15   turn it over to defense counsel.

16             THE COURT:  Okay.

17             So it's coming, Ms. Todd.

18             MS. TODD:  Thank you, your Honor.

19             THE COURT:  Anything else?

20             MS. CROWLEY:  No.

21             THE COURT:  All right.

22             MS. CROWLEY:  Thank you, your Honor.

23             MS. TODD:  Thank you, your Honor.

24             (Adjourned)

25