GB33GOMC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                              15 CR 348 (PGG)

5   SANDY GOMEZ,

6               Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           November 3, 2016
9                                          2:30 p.m.

10
    Before:
11
                    HON. PAUL G. GARDEPHE,
12
                                           District Judge
13

14                       APPEARANCES

15  PREET BHARARA
        United States Attorney for the
16      Southern District of New York
    RICHARD A. COOPER
17  SHAWN G. CROWLEY
    PATRICK EGAN
18      Assistant United States Attorneys

19
    LAW OFFICE OF NATALI J.H. TODD P.C.
20      Attorneys for Defendant
    NATALI J.H. TODD
21

22

23

24

25

GB33GOMC

1      THE DEPUTY CLERK:  United States of America v. Sandy

2   Gomez.  Is the government ready?

3      MR. COOPER:  Yes.  Good afternoon, your Honor.

4   Richard Cooper, Shawn Crowley, and Patrick Egan for the

5   government.

6      THE COURT:  Good afternoon.

7      THE DEPUTY CLERK:  Defendant?

8      MS. TODD:  Good afternoon, your Honor.  Natali Todd

9   for Sandy Gomez.  Mr. Gomez is also present.

10      THE COURT:  I believe it's necessary to arraign

11   Mr. Gomez on a superseding indictment.  Is that correct?

12      MS. TODD:  Yes, your Honor.

13      THE COURT:  Mr. Cooper?

14      MR. COOPER:  Yes, your Honor.

15      THE COURT:  Then Mr. Gomez, could you please stand.

16   You're here with Ms. Todd as your attorney this afternoon, is

17   that correct?

18      THE DEFENDANT:  Yes, sir.

19      THE COURT:  Have you received a copy of the S2

20   superseding indictment which reflects the charge against you?

21      THE DEFENDANT:  Yes, sir.

22      THE COURT:  Have you had an opportunity to read the S2

23   superseding indictment?

24      THE DEFENDANT:  Yes, sir.

25      THE COURT:  Have you discussed it with Ms. Todd?

GB33GOMC

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  You should understand that you are charged

3    in the S2 superseding indictment with violating 21, United

4    States Code, Section 846, which makes it a crime to conspire to

5    distribute controlled substances, including cocaine.

6              Do you understand that's the charge against you?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  Do you want me to read the S2 superseding

9    indictment to you now here in open court?

10             THE DEFENDANT:  No.

11             THE COURT:  I'll ask you now how do you plead as to

12   the charge in the S2 superseding indictment, guilty or not

13   guilty?

14             THE DEFENDANT:  Not guilty.

15             THE COURT:  Please be seated.

16             There are a number of pretrial motions that I'm going

17   to be addressing now.  First, the defendant some time ago had

18   filed a motion for a severance as to his co-defendant Jorge

19   Gomez.  That was Docket No. 73.  Jorge Gomez has since entered

20   a guilty plea, however, so the severance motion is denied as

21   moot.

22             The government has moved in limine to admit first

23   testimony from a DEA agent concerning confidential source

24   information that led to the investigation that culminated in

25   the defendant's arrest.  Citing Docket No. 84.  The government

GB33GOMC

1    also seeks a ruling which would permit statements made by the

2    defendant to a cooperating witness to be introduced before the

3    jury.  That's Docket No. 97.  And finally, the government has

4    moved in limine with regard to the defendant's prior narcotics

5    conviction.  It doesn't seek to introduce the conviction on its

6    direct case, but it says that the conviction may become

7    relevant for purposes of impeachment or as rebuttal evidence in

8    the event that the defendant argues or asserts that he's not

9    been involved in narcotics trafficking in the past, or lacks

10   knowledge of the drug trade.  Citing Docket No. 97 at 4.

11        With respect to the evidence, background evidence

12   concerning the DEA's investigation, the government seeks to

13   offer testimony from a DEA agent concerning the conversation

14   the agent had with a confidential source in late November 2014.

15   In that conversation, the source told the agent that the

16   defendant's brother, Jorge Gomez, was interested in obtaining a

17   vehicle with a hidden compartment, which is commonly knowns as

18   a trap.  Jorge Gomez had provided the source with a telephone

19   number that could be used to contact him.  Citing Docket No. 84

20   at pages two to three.  The DEA then arranged for a cooperating

21   witness to contact Jorge Gomez to offer such a vehicle.  *Id.* at

22   page three.

23        The defendant objects to this testimony as hearsay and

24   as violative of the confrontation clause.  Docket No. 108.  It

25   is neither.

GB33GOMC

"Testimony containing hearsay may be admissible not for its truth but as background information if (1) the non-hearsay purpose by which the evidence is sought to be justified is relevant, and (2) the probative value of this evidence for its non-hearsay purpose is [not] outweighed by the danger of unfair prejudice resulting from the impermissible hearsay use of the declarant's statement." *Ryan v. Miller*, 303 F.3d 231, 252 (2d. Cir. 2002); quoting *United States v. Reyes*, 18 F.3d 65, 70 (2d. Cir. 1994).  The same exception applies for purposes of the confrontation clause.  *See United States v. Paulino*, 445 F.3d 211, 216 (2d. Cir. 2006) ("It has long been the rule that so long as statements are not presented for the truth of the matter asserted, but only to establish a context, the defendant's Sixth Amendment rights are not transgressed." Quoting *United States v. Barone*, 913 F.2d 46, 49 (2d. Cir. 1990)).

The proposed testimony concerning what the confidential source said to the agent is not hearsay because his testimony is not being offered for its truth.  Instead, the proposed testimony provides background and explains why the DEA later arranged for a cooperating witness posing as someone who rents vehicles containing secret compartments to contact Jorge Gomez.  Absent this explanation, the cooperating witness's call to Jorge Gomez might be regarded by the jury as a random call. The proposed evidence thus "offers an explanation for something

GB33GOMC

about which the jury would be curious." Citing *Ryan*, 303 F.3d

at 253.  The risk of unfair prejudice to the defendant is

remote, because this information concerns Jorge Gomez, and not

the defendant.  Moreover, Jorge Gomez's interest in obtaining a

vehicle with a secret compartment or trap will be demonstrated

both by testimony from the cooperating witness and by tape

recordings of conversations between the cooperating witness and

Jorge Gomez regarding the vehicle and its secret compartment.

          Accordingly, the agent will be permitted to testify

that a confidential source told the agent that Jorge Gomez was

interested in acquiring a vehicle with a secret compartment,

and provided a telephone number where Jorge Gomez could be

reached.  When this testimony is offered, the Court will

instruct the jury that the confidential source's statement is

not being offered for its truth, but rather only to explain the

agent's subsequent actions.

          The government has moved in limine to admit evidence

on its direct case of certain statements that the defendant

made to a cooperating witness concerning the witness's

cooperation with the government and testimony at trial.  Citing

the October 19, 2016 letter from the government, Docket No. 97

at page one.  The government proffers "that the cooperating

witness will testify that following a status conference, before

[the Court], the defendant warned the cooperating witness

against cooperating with the government stating [that]

GB33GOMC

'snitches get their tongues cut out.'"  *Id.*  The government

also seeks to introduce evidence that the defendant told the

cooperating witness "that he and the CW could reach an

agreement and blame the whole thing on Jorge," presumably

referring to the defendant's brother and co-defendant Jorge

Gomez.  *Id.*

     The government argues that "evidence of the

defendant's efforts to obstruct the cooperating witness

testimony is clearly admissible as demonstrating his conscience

of guilt. " citing Docket No. 97 page two.  The defendant

opposes the government's motion, arguing that the statements do

not demonstrate either conscience of guilt or witness

tampering, and that the evidenced is more prejudicial than

probative under Federal Rule of Evidence 403.  Citing the

October 22, 2016 defense letter, Docket No. 102 at page one.

     "Evidence of a party's consciousness of guilt may be

relevant if reasonable inferences can be drawn from it and if

the evidence is probative of guilt."  Citing *United States v.*

*Perez*, 387 F.3d 201, 209 (2d. Cir. 2004).  "Such evidence is

admissible if the Court (1) determines that the evidence is

offered for a purpose other than to prove the defendant's bad

character or criminal propensity, (2) decides that the evidence

is relevant and satisfies Rule 403, and (3) provides an

appropriate instruction to the jury as to the limited purposes

for which the evidence is introduced, if a limiting instruction

is requested.  *Id.*  Citing *United States v. Mickens*, 926 F.2d 1323, 1328-29 (2d Cir. 1991).

A Court may "admit evidence of attempted witness tampering as probative of a defendant's conscience of guilt." *Id.*  The Second Circuit has instructed, however, that courts considering the admissibility of evidence that a defendant threatened a witness with violence must proceed with caution, particularly where the "alleged threats [bear] no relation to the offenses for which [the defendant] is being tried."  Citing *United States v. Morgan*, 786 F.3d 227, 232 (2d. Cir. 2015).  In *Morgan*, the Circuit stated that "the potential for unfair prejudice is so great that Rule 403's balancing test permits admission of death threat evidence only if there is a clear need for the evidence and it serves an important purpose." Citing *Morgan*, 786 F.3d at 229.

In *Morgan*, the government introduced evidence that the defendant, who was on trial for firearms and narcotics violations, had written letters to his girlfriend "seeking her assistance in the murder of the government's informant." *Id.* The Second Circuit vacated Morgan's conviction and remanded for a new trial finding that "the death threat testimony, unrelated as it was to the charged crimes, should have been kept from the jury because its potential for causing unfair prejudice outweighed its probative value with respect to Morgan's guilt." *Id.* at 233, quoting *United States v. Panebianco*, 543 F.2d 447,

GB33GOMC

455 (2d. Cir. 1976).  The Second Circuit further found that the
death threat evidence admitted during Williams's direct
examination had substantial "capacity to lure the jury into
declaring guilt on a ground different from proof specific to
the offense charged."  *Id.* at 232, quoting *United States v.
Massino*, 546 F.3d 123, 132 (2d. Cir. 2008).

Here, the threat that the government seeks to
introduce that "snitches get their tongues cut out" is of
limited probative value and poses a significant risk of unfair
prejudice.  As an initial matter, the defendant allegedly made
this statement to the cooperating witness after a status
conference in this case.  Accordingly, the alleged "threat" [is
not] "inextricably intertwined with the evidence regarding to
the charged offense*."  Id.* quoting *United States v. Quinones*,
511 F.3d 289, 309 (2d. Cir. 2007).

Moreover, the threat does not necessarily demonstrate
consciousness of guilt.  Broadly defined, a snitch is someone
who cooperates with the government by testifying that someone
else did something unlawful.  A person who is referred to as a
snitch is not necessarily telling the truth.  Indeed, every day
in this courthouse, and in many other courthouses, defense
lawyers contend that such witnesses are lying, and juries
sometimes find that such witnesses have lied.  In short,
assuming arguendo that the defendant made this threat to the
cooperating witness, he could be making this threat either

GB33GOMC

because he fears that the witness will falsely accuse him, or, because he fears that the witness will truthfully inculpate him.  The statement is thus ambiguous, and has limited probative value.

The risk of unfair prejudice to the defendant is significant, however.  The defendant is charged in a single count with conspiring to distribute cocaine.  And in the words of the Second Circuit "the alleged threat here [bears] no relation to the offense for which [the defendant] is being tried." *Id.*  Introducing an element of violence into this case also has the potential to dramatically reshape it.  While the government seeks to distinguish *Morgan* by arguing that it "does not intend to offer prolonged testimony or extensive evidence concerning the defendant's attempt to obstruct the cooperating witness's cooperation," see October 19, 2016, government letter Docket No. 97 at three, it is difficult to predict what use may be made of the threat once it is introduced.  The government's use of such evidence in summation in *Morgan* was noted by the Circuit, and such use in summation is foreseeable here.  Not because the threat is particularly probative, but because it is sensational.

For purposes of the government's direct case, I conclude that introduction of the threat is not appropriate under Rule 403 because the risk of unfair prejudice outweighs the limited probative value of the threat.

1          By contrast, the defendant's alleged statement to the

2    cooperating witness "that he and the cooperating witness could

3    'reach an agreement' and 'blame the whole thing on Jorge'" is

4    highly probative and is in no way unfairly prejudicial.  A

5    reasonable jury could infer that the defendant was suggesting

6    that he and the cooperating witness could "reach an agreement"

7    and falsely assert that only Jorge Gomez knew about the

8    cocaine.  By suggesting that he and the cooperating witness

9    could by agreement shift the blame to Jorge Gomez, the

10   defendant implicitly acknowledged his own culpability.  Such

11   witness tampering has been held to constitute conscience of

12   guilt.  *See Perez*, 387 F.3d at 209 (noting that the Second

13   Circuit has "upheld the admission of evidence of attempted

14   witness or jury tampering as probative of a defendant's

15   consciousness of guilt") citing *Mickens*, 926 F.2d at 1329;

16   *United States v. Ivanova*, 19 F.Supp. 3d 511, 516 (S.D.N.Y.

17   2014) (admitting evidence that defendant "tampered with

18   witnesses as relevant toward her consciousness of guilt.")

19   Moreover, unlike evidence of the alleged threat of violence,

20   there is little risk that the evidence of the defendant's

21   proposal to "blame Jorge" will "unduly inflame the passion of

22   the jury, confuse the issues before the jury, or

23   inappropriately lead the jury to convict on the basis of

24   conduct not at issue in the trial."  Citing *United States v.*

25   *Quattrone*, 441 F.3d 153, 186 (2d. Cir. 2006).

GB33GOMC

1              Defense counsel has asked that she receive proffer

2       notes concerning the cooperating witness before the Court rules

3       on the issue so that she can understand the context in which

4       these statements were made.

5              Mr. Cooper, has the 3500 material been turned over to

6       the defense?

7              MR. COOPER:  Yes, your Honor.

8              THE COURT:  So Ms. Todd, you have that information?

9              MS. TODD:  Yes, I do, your Honor.

10             THE COURT:  Has that given you a sense of the context

11      in which the statements were made?

12             MS. TODD:  It does, your Honor.

13             THE COURT:  All right.

14             The government's motion in limine is granted as to the

15      defendant's alleged proposal to reach an agreement to "blame

16      Jorge."  If the defense wishes me to issue a limiting

17      instruction regarding this evidence, counsel will submit

18      proposed language to me by Monday morning.

19             Finally, as I noted, defendant has a 1998 conviction

20      for criminal possession of a controlled substance in the third

21      degree.  The conviction stems from a March 20, 1998, incident

22      in which NYPD officers found him in a livery cab with

23      5 kilograms of cocaine.  Citing the October 19, 2016,

24      government letter, Docket No. 97 at pages three to four.  The

25      government does not seek to introduce evidence of this

GB33GOMC

1    conviction on its direct case, but argues that it may become

2    admissible for cross-examination or rebuttal "in the event the

3    defendant argues in his opening statement, through

4    cross-examination of government witnesses, or his own testimony

5    or the presentation of testimony from other witnesses, that he

6    has not been involved in narcotics trafficking or lacks

7    knowledge of the drug trade." *Id.* at page four.  The defendant

8    has not opposed the government's motion.

9            Given that this motion turns on whether certain

10   arguments are raised by the defendant at trial, I will reserve

11   decision.  *See United States v. Paredes*, 176 F. Supp. 2d 179 at

12   181 (S.D.N.Y. 2001).  Noting that "courts considering a motion

13   in limine may reserve judgment until trial so that the motion's

14   placed in the appropriate factual context."  I do note that

15   "should the defendant testify at trial, and suggest through his

16   testimony that he has never been involved in drug activity,

17   evidence of the conviction would directly contradict such

18   testimony, and the government may renew its motion to admit the

19   conviction." *United States v. Vasquez*, 840 F.Supp. 2d 564,

20   573-74 (E.D.N.Y. 2011).

21           While *Vasquez* speaks of the defendant's testimony, in

22   my judgment, the admissibility of the conviction might also be

23   appropriate, depending on arguments that are made by defense

24   counsel as well as the introduction of testimony through

25   witnesses other than the defendant.  In any event, I reserve

GB33GOMC

1    decision on that matter.

2         We are scheduled to begin trial on Monday at 9:30.  I

3    will meet with you then to discuss any issues that might have

4    emerged over the weekend.  My anticipation is that a jury panel

5    will arrive some time between 10 and 10:15.

6         I will qualify how many jurors, Mike?  45.  I will

7    qualify 45 jurors.  I will hear challenges for cause once that

8    processes is complete.  And then I will excuse the panel for 10

9    or 15 minutes and give the lawyers an opportunity to consider

10   the exercise of peremptory challenges.

11         MS. TODD:  I'm sorry, your Honor.  Your voice is

12   dropping.

13         THE COURT:  Sorry.  I said that I will excuse the

14   panel for 10 to 15 minutes in order to give the lawyers time to

15   think about the exercise of peremptory challenges.  I will then

16   ask counsel to submit simultaneously lists of the jurors

17   against whom they wish to exercise peremptory challenges.  The

18   defendant of course will have 10 peremptory challenges, and the

19   government will have six.  And those lists will be submitted

20   simultaneously.  I will then read the lists to you, and we will

21   agree on who are the 12 lowest numbered panel members that

22   remain, and they will become the jury.  And then we will go on

23   to select the two alternates, and each side will have one

24   peremptory challenge as to the alternates.

25         With respect to the schedule, on Monday we'll sit 9:30

GB33GOMC

1   to 5.  On Tuesday, Tuesday being Election Day, it is a court

2   holiday but I will not be observing the holiday except that the

3   schedule will be modified.  I intend to sit from 9:30 to

4   2 o'clock on Tuesday without a lunch break, so we'll break for

5   a brief period some time around 11 or 11:15, depending on the

6   proof, and then we'll have another short break perhaps around

7   12:45 or so, and then we'll end at 2 o'clock so that people

8   have ample opportunity to exercise their voting rights.

9           The schedule for Wednesday and Thursday will be 9:30

10  to 5.  And if necessary, my intention is to sit on Friday,

11  which is Veterans Day, even though that's a federal holiday.

12          I would ask the lawyers now that we are a little bit

13  closer to trial if they have a better sense of how long a trial

14  might take.  So Mr. Cooper, what is your best estimate?

15          MR. COOPER:  Your Honor, we think that our direct

16  case, given the schedule, will likely last until Wednesday,

17  perhaps to the very beginning of Thursday but not much longer

18  than that.  Most likely to conclude on Wednesday.

19          THE COURT:  All righty.  Do you think we'll be able to

20  conclude on Thursday, Ms. Todd?  Does that seem reasonable?

21          MS. TODD:  That's a fair assessment, your Honor.

22          THE COURT:  So I guess I'll tell the jury I expect the

23  trial will take about four days or so.  Could be a little more,

24  could be a little less, but four days is our best estimate.

25  Other issues that the parties would like to raise?

GB33GOMC

1          MR. COOPER:  Your Honor, we have a couple of

2     substantive and a couple of procedural issues to raise with the

3     Court.  I guess I can knock off the procedural issues first.

4     Among the government exhibits are going to be transcripts or

5     translations of consensual recordings.  The government's intent

6     is for some folks at the front table to read those, one person

7     taking one part, another person taking the other part.

8          THE COURT:  Is someone going to sit in the witness

9     stand?

10          MR. COOPER:  We intend to introduce them during the

11     course of the testimony of the confidential source who made the

12     recordings.  So I think we would do it from the lectern and

13     counsel table to read the portions of the transcript.

14          THE COURT:  Any objection to that procedure, Ms. Todd?

15          MS. TODD:  No, your Honor.  We've discussed that.

16          THE COURT:  Okay.

17          MR. COOPER:  Second, your Honor, we're making

18     transcript binders for the jury.  We obviously want to

19     distribute those in the least disruptive fashion.  We can do it

20     prior to the time when that the witness during whose testimony

21     those transcripts will come in, before he takes the stand, or

22     we could do it at the point that we admit the transcripts.

23     We're not sure what the Court's preference is there.

24          THE COURT:  I don't feel strongly about it.  Mike,

25     what's your view?  Should we just pass them out when they're

GB33GOMC

1    admitted?

2                  THE DEPUTY CLERK:  Yes.

3                  THE COURT:  We'll just pass them out.  Mike will

4    distribute them to the jury once they're admitted.

5                  MR. COOPER:  All right.  One substantive issue to

6    raise.  Co-defendant Jorge Gomez pled guilty.  The Court has --

7                  THE COURT:  Before we leave the subject of

8    transcripts, are the conversations in Spanish and they're

9    translated?

10                 MR. COOPER:  That's correct, your Honor.

11                 THE COURT:  So the transcripts will actually be the

12   evidence.  And so Ms. Todd, have you reviewed the -- are you

13   going to have any objection to the transcripts being received

14   in evidence?

15                 MS. TODD:  No, your Honor.  We've been working

16   together with the translators and making sure it's correct in

17   our view.

18                 THE COURT:  We may have some Spanish speaking people

19   on the jury, and it is my practice to tell them that even

20   though they may understand Spanish, they are obligated to rely

21   on the translation that the parties have put before them.  So I

22   will give that instruction at the appropriate time.

23                 Go ahead, Mr. Cooper.  I interrupted you.

24                 MR. COOPER:  Yes, your Honor.  Co-defendant Jorge

25   Gomez has pled guilty.  The Court has accepted the plea.  One

GB33GOMC

1    of the witnesses who is going to testify is Caronlay Ramon-Baez

2    who is another co-defendant.

3            To the extent that the cross-examination of

4    Ms. Ramon-Baez suggests that she is shifting blame from Jorge

5    Gomez to Sandy Gomez, or is shading her testimony in that

6    fashion, we believe we should be able to admit the fact of

7    Jorge Gomez's plea to counteract the misleading impression

8    which would be implicit in that sort of questioning or that

9    sort of argument that Jorge Gomez got off easy and that

10   Ms. Ramon-Baez was minimizing Jorge Gomez's role or was somehow

11   untruthful either with the government in proffer sessions or in

12   her testimony on the stand.

13           THE COURT:  Now, was there a romantic relationship

14   between those two people, Jorge Gomez and the cooperating

15   witness?

16           MR. COOPER:  Yes.  They were romantically involved for

17   a period of time, although I believe the romantic part of their

18   relationship ended before the conspiracy period in this case.

19   But they had been romantically involved prior to that.

20           THE COURT:  Ms. Todd, anything you want to tell us at

21   this point about your intentions?

22           MS. TODD:  Yes, your Honor.  And I would object

23   strenuously to what the government is proposing.  Not only is

24   Ms. Baez's credibility and motive is at the center of all of

25   this, I think that is a fair -- that material is fair for

GB33GOMC

```
1    cross-examination.  And Jorge Gomez pleading to whatever he
2    pled guilty to should not come in under any circumstances,
3    because he's not here on trial.  And the fact that he's pled
4    guilty is prejudicial to my client who is charged in a
5    conspiracy with him, suggesting that he, too, is guilty.
6             Judge, I don't see under what rule of law that the
7    government would be allowed to allow Jorge Gomez's plea to come
8    in given the relationship, the longstanding relationship with
9    Ms. Baez and Jorge, and their relationship as being involved in
10   the drug conspiracy for what I understand to be quite some
11   time.
12            THE COURT:  Mr. Cooper, what is your understanding,
13   separate and apart, actually, from this issue, what is your
14   understanding as to the admissibility of Jorge Gomez's plea
15   just for purposes of establishing the conspiracy?
16            MR. COOPER:  I believe that under current Second
17   Circuit law, that would be impermissible in the government's
18   case in chief.
19            THE COURT:  All right.
20            MR. COOPER:  The idea here, your Honor, is if the
21   defense argument is that Ms. Ramon-Baez is misleadingly or
22   untruthfully shifting blame from Jorge Gomez to Sandy Gomez
23   through her testimony on the stand, implicit in that is that
24   she is protecting Jorge Gomez, that he is getting off easy in
25   some way.  When the fact is that he pled guilty to a (b)(1)(A)
```

1   narcotics conspiracy offense.

2           We wouldn't seek to introduce anything other than the

3   fact that he pled guilty, and the charge that he pled guilty

4   to.  Perhaps the date of the guilty plea as well.  Which would

5   go to that very issue of whether Jorge Gomez somehow got off

6   easy, and that goes to whether the witness had a motivation to

7   lie.

8           THE COURT:  So Ms. Todd, let me make sure I understand

9   your argument.  You want to suggest that Baez is biased and

10  that she has decided to put the blame on Sandy Gomez in an

11  effort to protect her former boyfriend Jorge?

12          You want to do that, right?

13          MS. TODD:  Not -- not entirely, Judge.  That's -- I

14  think it's narrowing the scope of my cross-examination of her.

15  Jorge Gomez pled guilty because he is in fact guilty, whether

16  or not Ms. Baez had anything to do with it one way or the

17  other.  They had a relationship, for a long time she protected

18  him.

19          I've received information in the 3500 material that

20  the government has provided me that indicated that at some

21  point, that discussion was raised between Ramon-Baez and Jorge

22  Gomez, whether or not they should actually come together and

23  blame Sandy.  And I don't know what ultimately she decided to

24  do.  But that's ripe for cross-examination, and I should be

25  allowed to do that.  It goes exactly to her bias, and her

1   motive.

2        THE COURT:  Yes.  But the problem that we're currently

3   discussing is, assuming that you go down the road that you just

4   described, the takeaway on the jury's part could be that Baez

5   has, as a result of shifting blame on to Sandy, allowed Jorge

6   to get away scot-free.  And that would be a misleading

7   impression.  That would be wrong.

8        MS. TODD:  It --

9        THE COURT:  In other words, it wouldn't be fair to the

10  government for the jury to come away with the impression that

11  as a result of Baez incriminating Sandy Gomez, that Jorge Gomez

12  got away scot-free.

13       MS. TODD:  I don't think I would suggest that in my

14  cross-examination in any way, because not only would that just

15  be entirely misleading to the Court and to everyone, that's not

16  my intention at all.

17       THE COURT:  Okay.

18       MS. TODD:  But to not allow cross-examination with

19  respect to her relationship and favoritism with respect to

20  Jorge Gomez I think is limiting my client's right to confront

21  his witnesses.

22       THE COURT:  I guess the devil's in the details.  I

23  accept your point that Baez's former relationship with Jorge

24  Gomez is appropriate fodder for cross-examination.  But I am

25  concerned about any questioning which would suggest to the jury

GB33GOMC

1    something that is counterfactual.  And I think that's what the

2    government is concerned about, too.  They're concerned that the

3    takeaway from your cross-examination might be that she is

4    motivated to incriminate Sandy Gomez in order to protect her

5    former boyfriend.  And if that was the impression that you were

6    trying to create --

7              MS. TODD:  No, Judge.

8              THE COURT:  I know you're not doing that.  You've said

9    that now a couple of times.  But I'm trying to figure out what

10   exactly you are going to say.  Because it goes directly -- let

11   me sort of just get down to the basics here.

12             If you were going to go down that road, whether Jorge

13   Gomez pled guilty goes directly to her motivations to

14   incriminate Sandy Gomez.  Because once Jorge Gomez has pled

15   guilty, then her motive for protecting him largely goes away.

16   Maybe it goes away entirely.  And so that's kind of the nub of

17   the issue.

18             We can't have a situation where the jury thinks Baez

19   has a motive to protect Jorge Gomez from prosecution, when the

20   truth is, he's already pleaded guilty.  So that's the problem.

21   That's the nub of the problem.

22             And I understand you don't want Jorge Gomez's plea to

23   come in.  But, we also can't have a situation where the jury

24   could come away with the impression that Baez has a motive to

25   implicate or incriminate Sandy Gomez, because Jorge is subject

GB33GOMC

1    to prosecution and is in jeopardy of prosecution, when in fact

2    the truth is he's already pleaded guilty.

3            MS. TODD:  That's fine, Judge.  But what I'd like to

4    be able to do, which I think I'm entitled to, is to speak to

5    the history of these two, what she has done in the past.  With

6    respect to her protecting Jorge Gomez, I've got enough, I think

7    I've got enough fodder to work with without having to make that

8    claim that that's what she's doing.

9            So I have no intention to say she's protecting Jorge

10   while throwing, for lack of a better word, Sandy Gomez under

11   the bus in this situation.  But I will speak to the history of

12   the two of them, and what she's done in the past, which I think

13   is highly relevant.

14           THE COURT:  When you say what she's done in the past,

15   are you comfortable enlightening me?

16           MS. TODD:  In terms of their relationship --

17   historical drug relationship, and what she's done to protect

18   him in the past and protect the business that they were in

19   together.  I think that's fair.

20           THE COURT:  Mr. Cooper, your thoughts?

21           MR. COOPER:  Your Honor, it seems like a couple of

22   different issues there.  The clearest example is the one that

23   the Court posed where there is the argument, implicit or

24   explicit, that the testimony on the stand is shaded in any way

25   to allow Jorge Gomez to get away scot-free or with little

GB33GOMC

1   consequences.  It seems that issue is fairly clearcut.

2                 We're in no way seeking to preclude or seeking a

3   ruling precluding cross-examination of Ramon-Baez on any of

4   these issues.  We believe it's all fair game for

5   cross-examination.  It's difficult to predict how some of these

6   questions would play, or how the answers would come out either.

7                 But to the extent there is an argument implicit in the

8   questions that even as a result of their prior drug dealing

9   relationship or their prior romantic relationship, that

10  Ms. Ramon-Baez would have any motive to shade the truth about

11  Jorge Gomez vis-a-vis Sandy Gomez on the stand, the plea does

12  seem relevant.

13                If the argument is they were romantically involved in

14  the past, and anyone who has a romantic partner would of course

15  not say anything bad about that romantic partner, maybe that's

16  a different story.  It is hard to see how that argument gets

17  made on these facts.

18                THE COURT:  I'm sorry.  Could you say that to me

19  again?

20                MR. COOPER:  Sure.  If the argument is purely a

21  historical one, in that these two were lovers in the past, and

22  nobody would want to do anything to implicate one of their

23  previous lovers, that seems purely historical.  It's rebutted

24  by the facts.

25                THE COURT:  Could I just step back for a second.

1   Because of course I have no idea what she's going to say.  But,

2   I assume she's going to implicate Jorge Gomez.  Am I wrong?

3           MR. COOPER:  Absolutely.

4           THE COURT:  So I guess, Ms. Todd, it's not really

5   clear to me how she could be -- and maybe, Mr. Cooper, this

6   should be better directed to you.  Assuming Baez gets up and

7   tells the whole story about how Jorge wanted this vehicle to go

8   down there and pick up drugs and bring it back and got Sandy

9   involved and all of that, all of that is highly incriminating.

10  And so, how could the jury come away with a sense that while

11  she's protecting Jorge, what she's going to say will be highly

12  incriminating of him, right?

13          MR. COOPER:  Sure.  One of the concerns here is that

14  there is in the 3500 for Ramon-Baez discussions with both Sandy

15  Gomez about, hey, we should get together and put the blame on

16  Jorge.  There are also discussions with Jorge Gomez going in

17  the opposite direction.  This is while Jorge was still a

18  defendant here.  Hey, let's get together, we're going to put it

19  all on Sandy.

20          THE COURT:  But she's not going to do that on your

21  direct case.  You're going to elicit the full story about Jorge

22  and she's going to incriminate him quite substantially, I

23  suspect.  And so, in the unlikely event that Ms. Todd was going

24  to be arguing to the jury that she's trying to protect him, it

25  doesn't seem that that argument would have very much traction,

GB33GOMC

given she's going to get up here and completely incriminate

him.

          MR. COOPER:  That's true, your Honor.  She is going to

get up there and talk about Jorge Gomez's role in the whole

thing.

          THE COURT:  So it would seem to be a ridiculous

argument to get up and say, oh, you shouldn't believe Baez

because she's protecting Jorge, when she just got through

giving all this testimony that's highly incriminating of Jorge.

          MR. COOPER:  We agree it is unlikely.  We wanted to

raise it with the Court and with defense counsel, just so

everybody was aware that that's our intention, if the argument

goes in that direction.  Which, admittedly, isn't the likeliest

place for it to go, but you never know.

          THE COURT:  I'm glad you did.  I'm glad you did.  And

I think I've made it crystal clear I'm not going to countenance

anything that could mislead the jury about the fact that Jorge

Gomez actually pled guilty.  Any suggestion to the contrary,

that he's going to escape liability or jeopardy, I would view

quite dimly.

          But, given the context here, while I think we have to

tread carefully, Ms. Todd, and I think you have to tread

carefully, it doesn't seem to me that the argument that

Mr. Cooper is concerned about is one that you're likely to

make.  But you have to tread very carefully because I'm not

GB33GOMC

1   going to allow the jury to be misled.

2           MS. TODD:  That was my confusion, your Honor.  Because

3   I expect her to get up there and talk about what she's to done

4   with Jorge and implicate my client and implicate Jorge in the

5   process.  So I was somewhat trying to narrow the scope because

6   I didn't understand how that would make a difference.  But I

7   think we'll be fine, Judge.

8           THE COURT:  Okay.

9           MR. COOPER:  There is one other issue, your Honor,

10  that be Ms. Crowley can speak to.

11          THE COURT:  Yes.

12          MS. CROWLEY:  Just with respect to your Honor's ruling

13  on the government's motion to elicit testimony of the

14  defendant's threat to the cooperating witness.  We understand

15  your Honor's ruling.  We do just want to raise for the Court at

16  this point that we expect that the cooperating witness,

17  Ms. Ramon-Baez, will testify that she began meeting with the

18  government last summer, 2015, and that the government

19  instructed her not to continue communicating with either of the

20  co-defendants.  And that despite that instruction, in the year

21  between her first meeting and the next meetings with the

22  government, Ms. Ramon-Baez continued to communicate with both

23  defendants.  Her communications have been provided to defense,

24  of course, in 3500 material.

25          We expect that Ms. Ramon-Baez is going to testify that

GB33GOMC

1    the reason she continued to communicate with both defendants,

2    including Sandy Gomez, is because she was afraid of them.  And

3    she thought that if she stopped talking to these people who she

4    had been talking to so frequently, and who she was arrested

5    with, they would figure out that she was cooperating with the

6    government.

7         Part of that testimony would have been that Sandy

8    Gomez threatened her by saying snitches get their throats cut

9    out.

10        So, we're not seeking to revisit your Honor's ruling

11   at this point, but to the extent there is cross-examination of

12   Ms. Ramon-Baez on that point of her continued communication

13   with this defendant, then we may seek to revisit your Honor's

14   ruling at that point.

15        THE COURT:  Let me ask you this.  Would you be

16   comfortable merely eliciting from her that she didn't want

17   either man to find out that she was cooperating and leave it at

18   that, without getting into this whole thing about her being

19   afraid of them?  Because it would be normal for a cooperator

20   not to -- it's completely normal for every cooperator to not

21   want their cooperation to become known to their co-defendants.

22   And there is nothing unusual about that.

23        Ms. Todd, how do you propose to address the problem?

24   Because I think it sounds like it's going to come up, because

25   she continued to have conversations with them, even after she

1    went in to talk with the government.  Those conversations, I

2    gather notes of those conversations have been turned over,

3    notes regarding those conversations, so you have some sense of

4    what they are.

5               MS. TODD:  Right.

6               THE COURT:  And if you get into this, which you may

7    well want to, I don't know, might be helpful to the defense to

8    get into it, I don't know, she's going to kind of have to

9    explain why she didn't disclose to them that she was

10   cooperating.

11              MS. TODD:  Judge, I don't think that's necessary.  I

12   disagree.  I think it is a way to do an end run around the

13   Court's ruling.  In fact, in those communications, at least the

14   ones that I've looked at with respect to my client, they're

15   cordial.  There is nothing in there to suggest fear, that my

16   client is in any way threatening her.

17              And the Court is correct, cooperators are often told

18   by the government don't let anyone know that you are

19   cooperating.  She chose to communicate with both of them.  I'm

20   not understanding why she now gets to augment whatever is in,

21   whether it be Facebook messages or text messages that does not

22   express any fear at all, to say, well, I was afraid, which is

23   why I was communicating with them.  I think that's improper.

24              And your Honor, just as an addition, she maintained a

25   relationship with Jorge Gomez.  There are numerous phone

GB33GOMC

1   conversations.  They, according to some of the 3500 material,

2   they sent money to each other.  It is a relationship.

3          So, I think it's not entirely -- there's a reliability

4   issue as to the truth of that concern that she was in fear.

5   She's done everything to suggest otherwise.

6          MS. CROWLEY:  I think that last statement sort of

7   illustrates the point of why we think this is appropriate for

8   her to testify.  Which is that she would say that a big part of

9   the reason why she continued to communicate with both

10  defendants so frequently, and in such a cordial manner, was

11  because she wanted to make it seem like there was nothing going

12  on here.  And she felt that way from -- this is not something

13  she just made up to augment her testimony now, but she felt

14  that way from the time of her arrest.

15         So, I don't know that we would be comfortable with

16  just eliciting from her that, as with any cooperator, she

17  didn't want her co-defendants to know she was cooperating.

18  Because I don't think that tells the whole story.

19         MS. TODD:  Or, Judge, the alternative response to that

20  would be that she is trying to gather information to assist in

21  providing information to the government.  She seemed to be

22  asking a lot of questions of my client in those communications.

23  I think we're just going wayward by allowing the government to

24  say that is the reason.  Because from reading the transcripts

25  of those communications, it suggests otherwise in my opinion.

GB33GOMC

1          THE COURT:  That may well be true, and that may well

2     be an area for fruitful cross-examination, but if you are going

3     to cross-examine on that point, she's not going to be barred

4     from explaining her conduct.

5          In other words, if you start asking her about, well,

6     you're all friendly with Jorge and Sandy Gomez, and you're

7     continuing your relationship with them and all of that, even

8     though you're meeting with the government and blaming them for

9     this cocaine transaction.  And you suggest to the jury that

10    she's being dishonest or two-faced or whatever, I can't

11    preclude her from explaining why she was being two-faced and

12    dishonest with Jorge and Sandy Gomez.

13         And if the explanation, if part of the explanation as

14    to why she was being two-faced and dishonest with them was that

15    she was afraid to tell them that she was a cooperator, how

16    could I preclude her from saying that?

17         MS. TODD:  Your Honor, what we're doing right now I

18    think it's -- I don't know how the evidence is going to come

19    out.  And I can't make these types of decisions.  The

20    government has spoken with her, they know what they're going to

21    ask her.  They should not be allowed to ask her those

22    questions.

23         THE COURT:  Which questions?

24         MS. TODD:  With respect to why did she continue to

25    communicate with Sandy Gomez after she was told not to.  I

GB33GOMC

1      don't know --

2                 THE COURT:  You don't think they should be allowed to

3      elicit the explanation for that, even when you are going to

4      raise it on cross?

5                 MS. TODD:  They can also get to rebut that testimony,

6      but I don't know every question that I'm going to ask until I

7      hear her testimony.

8                 THE COURT:  I understand that, but it's not fair to

9      the government to say, well, you can't get into the area of why

10     she was not telling Jorge and Sandy Gomez that she was

11     cooperating, and allow that to come out for the first time on

12     cross-examination, because then it looks like the government

13     was trying to mislead the jury about this woman, and they don't

14     want to be in that position for obvious reasons.

15                So, I understand your point, you don't know exactly

16     what questions you're going to ask, and you don't know exactly

17     how her direct's coming in.  I totally understand that, and I

18     take the point.

19                But I also take the point that the government can't be

20     in a position where it could be seen to have misled the jury

21     about what Ms. Baez was doing during this period where she was

22     meeting with them, but also continuing her relationship with

23     Sandy and Jorge.  And it seems likely, based on what you've

24     said, that the topic of what she was saying to them while she

25     was cooperating with the government, that that's likely to come

1    up.  It's likely to come up on cross.  And if it is likely to

2    come up on cross, it would be rational for the government to

3    want to address that subject with her on direct.

4         MS. TODD:  But, your Honor, why isn't it sufficient,

5    as the Court suggested, for the government to simply ask the

6    question that you were instructed not to communicate with

7    either Sandy Gomez or Jorge Gomez during the pendency of this

8    prosecution, and you continued to do so.  And leave it at that.

9    Unless I then decide to challenge her on why.  But why is it

10   then that they have to explain to the jury then -- Judge, maybe

11   I'm not clear.  I understand what the government is trying to

12   do. They don't want to mislead the jury that she wasn't -- she

13   didn't follow the Court's instructions.  They can simply elicit

14   that from her, that she continued to speak to both the

15   defendants.

16        THE COURT:  Well, it sort of begs the question

17   though -- so let's just accept your proposition for just a

18   second.  So, under your proposal, the government would simply

19   bring out that the prosecutors told her not to continue talking

20   with Jorge and Sandy, but she did it anyway.

21        MS. TODD:  Well, the government is trying to, I think,

22   I think do an end run around the Court's ruling about the

23   threats.

24        THE COURT:  No, I don't think so.  Because I'm not

25   going to change -- well, for purposes of the government's

GB33GOMC

```
1    direct case, I'm not going to be changing my mind about the

2    admissibility of snitches get their tongues cut out.  And I

3    don't think the government is urging me to go back on that

4    decision for purposes of their direct case.

5           But what they are saying is this woman continued to

6    have interactions, communications with the defendants, even

7    though she was told not to, and the jury's going to wonder why

8    she continued to have those conversations.

9           And what seems obvious to me is that she didn't want

10   them to find out she was cooperating.  And that's why I asked

11   Ms. Crowley, you know, wouldn't that be good enough, because it

12   seems obvious to me the reason why she was continuing to

13   communicate with them, it seems obvious to me.  I don't know

14   what happened.  But, one rational interpretation of why she was

15   continuing to speak with them is she didn't want them to find

16   out she was cooperating.

17          If you were to pursue that on cross-examination, why

18   it was that she didn't want them to cooperate, then you should

19   expect she's going to say I was afraid of them.

20          MS. TODD:  But I don't think that's what the

21   government said, though, your Honor.  They wanted to get into

22   why she was communicating with them, and I get the sense that

23   they weren't satisfied with "I didn't want them to find out

24   that I was cooperating."  That's my understanding.

25          Am I mistaken?
```

GB33GOMC

1          THE COURT:  Well, I think if Ms. Crowley had her

2     druthers, she would want to get into I am afraid.  But there is

3     that Rolling Stones song that you don't always get what you

4     want, you know.  And I'm proposing the compromise position.

5     That's all I'm doing.  I'm proposing a compromise.  And my

6     proposal would be that when asked why did you continue talking

7     with them, even after we told you not to, even though we told

8     you not to, she would say something like "I continued talking

9     with them because I didn't want them to find out that I was

10    cooperating with the government."  And that, to me, is

11    completely plausible and doesn't raise any issues about her

12    credibility.

13          And then if Ms. Todd chose to pursue that, it would be

14    in my view appropriate where further explanation is sought as

15    to the whys, that she would be permitted to explain why, which

16    is that she was afraid of them.  She was afraid of them and

17    that's why she was acting the way she was acting.

18          So that really puts the ball in defense counsel's

19    court as to whether they want to go down the road of she was

20    afraid, because that's where it's headed.  That's where it's

21    headed.  And if you choose to pursue that, if you seek an

22    explanation from her, I'm not going to bar her from giving one.

23          So what do you say, Ms. Crowley?

24          MS. CROWLEY:  I'll take it, Judge.

25          THE COURT:  So, that's my ruling.  No, I think that's

GB33GOMC

```
1    the fair thing to do.  The government is permitted to elicit
2    what I consider to be a completely plausible explanation from
3    the witness and with no further explanation.  But if defense
4    counsel wants an explanation, she'll get one.  And it's going
5    to open -- it's going to open that issue of her being afraid.
6    I'm not saying we're going to come back to you're going to get
7    your tongue cut out, but the concept of being afraid, that's
8    going to come out.  She's going to be able to answer that
9    question why didn't you want them to -- you say that you didn't
10   want them to find out you were cooperating.  Why?  Well, she's
11   going to be able to say why.
12        So that's the strategic call.  And you have the
13   communications, and you can make whatever arguments you want.
14   You can argue you're saying you are afraid, but that doesn't
15   make any sense if you look at these communications or whatever.
16   But, she can still say that, yeah, I was communicating because
17   I was afraid.
18        So, other issues?
19        MR. COOPER:  Not from the government.  Thank you, your
20   Honor.
21        MS. TODD:  Not from the defense, your Honor.
22        THE COURT:  So we'll resume at 9:30 on Monday morning.
23   If anything does come up over the weekend, you want to talk
24   about even earlier than 9:30 let me know.  There will be a
25   little bit of a delay getting the panel up here because they
```

GB33GOMC

1    show the panel a video and that takes a little time.  So I

2    would anticipate a panel somewhere between 10 and 10:15.

3            So if there is anything of substance that needs to

4    happen before then, we can even meet earlier than 9:30.  Just

5    let me know.  Okay?  Thank you.

6                              o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25