UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                              15 Cr. 348 (PGG)


SANDY GOMEZ,

                                          Trial
               Defendant.

------------------------------x

                                          New York, N.Y.
                                          November 7, 2016
                                          9:35 a.m.


Before:

               HON. PAUL G. GARDEPHE,

                                          District Judge
                                          -and a Jury-


                    APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
PATRICK EGAN
RICHARD A. COOPER
SHAWN G. CROWLEY
     Assistant United States Attorneys


NATALI J.H. TODD
     Attorney for Defendant

1        (Case called)

2        MR. EGAN:  Patrick Egan, Shawn Crowley and Richard

3    Cooper for the government.  Good morning, your Honor.

4        MS. TODD:  Good morning, your Honor, Natali Todd for

5    Mr. Gomez.

6        THE COURT:  Good morning.  My clerk tells me there is

7    an issue we need to discuss.

8        MR. COOPER:  Yes, your Honor.  Among the proposed

9    government exhibits is Government Exhibit 207T, which is a

10   transcript and translation of a call between the confidential

11   source and Jorge Gomez that took place on December 8, which is

12   after Sandy Gomez and Caronlay Ramon-Baez were arrested down in

13   Louisiana.  My understanding is that defense counsel objects to

14   its admissibility.  Ms. Todd can speak for herself, but my

15   understanding is that the objection is because the call

16   postdates the arrest of two members of the conspiracy.  Our

17   position is that the arrest does not terminate the conspiracy.

18   There is good Second Circuit law for that position.  I am not

19   sure if your Honor wants to hear from me now or from defense

20   counsel first on that.

21       THE COURT:  No.  I'll hear from Ms. Todd.

22       MS. TODD:  Thank you, your Honor.  Your Honor, I

23   object to the admissibility of this particular exhibit because

24   I believe the statements are hearsay upon hearsay.  I don't

25   believe this fits within the confines of the coconspirator

1    statement.  Having read the transcript, Jorge Gomez speculates

2    specifically about what's going on.  He has talked to a lawyer.

3    He has talked to --

4             THE COURT:  Before we go further I should take a look

5    at the transcript.  Can someone hand me up a copy.

6             What's the date of the translation?  What's the date

7    of this conversation?

8             MS. TODD:  The date of the conversation is December 8,

9    your Honor.  It's Exhibit 207T.

10            THE COURT:  What was the date of the arrest?

11            MS. TODD:  December 7.

12            THE COURT:  When I said the day of the arrest I was

13   meaning the day of Jorge Gomez's arrest.  Was that December 7?

14            MS. TODD:  No, your Honor.  The day of the arrest for

15   Sandy Gomez and Ms. Ramon-Baez, who were in the vehicle in

16   Louisiana at the time, was December 7.  Jorge Gomez was still

17   at liberty.  So he is communicating with the confidential

18   source about the arrest.  Jorge Gomez was not present when the

19   defendants were arrested.

20            THE COURT:  Just give me a moment.

21            I have read the transcript.  Go ahead, Ms. Todd.

22            MS. TODD:  Judge, I was saying, your Honor, that it

23   appears that Jorge Gomez is getting information from a number

24   of different people, including having spoken to a lawyer.  And

25   it's our position that it's hearsay upon hearsay.

1          So, for example, on page 4, four boxes up from the

2     bottom of the page where he refers to -- I'm sorry.  Two lines

3     up where he says:  Hello, yes, go ahead, they said they are

4     releasing her, it's unclear who he has spoken to to get that

5     information, whether he called law enforcement about his

6     girlfriend and his brother at the time, whether that was from

7     his lawyer or whether that was from Ms. Baez herself.

8          On page 5 he then says at the bottom of the page:

9     They are supposedly asking him about a man, about some people

10    there, but he doesn't know who it is.  Then he said:  Well, we

11    were on vacation.  That is all speculative as to what's going

12    on.  On page 7 he refers to, Morena already called me and told

13    me she is being released.  That is three boxes down from the

14    bottom of the page on page 7.

15         Judge, he's getting information and speculating about

16    what's really going on.  He doesn't know.  He wasn't there.

17    And I would object that this is a coconspirator statement

18    because the arrest happened.

19         I understand what the Second Circuit law says, but

20    given all these circumstances, I don't believe that this fit

21    within the scope of a coconspirator statement and I would

22    object to the transcript coming in.  Also, the issue of the

23    arrest is irrelevant or the fact of the arrest is irrelevant

24    with respect to this conversation.

25         THE COURT:  I'll hear from the government.

1              MR. COOPER:  Your Honor, we believe this fits squarely

2       within the coconspirator exception to hearsay.

3              THE COURT:  How isn't it in furtherance of the

4       conspiracy for Jorge Gomez who is telling this to a government

5       informant?

6              MR. COOPER:  Your Honor, he's updating the government

7       informant.

8              THE COURT:  But the government informant is not part

9       of the conspiracy.  The government informant is actually

10      working for the government.  Again, my question is, how is this

11      in furtherance of the conspiracy for him to be telling these

12      things to the government's informant?

13             MR. COOPER:  He's reporting on what his understanding

14      of what happened to other members of the conspiracy.

15             THE COURT:  But the confidential source is not a

16      member of the conspiracy.  You said you have lots of case law.

17      So the case law I want to see is case law arising in this

18      circumstance where a member of the conspiracy is reporting to

19      somebody who is a government informant and a court holding that

20      that is admissible as a statement in furtherance of the

21      conspiracy.  And then when you give me that law, I'll rule on

22      the application.

23             I will say, I don't view this as particularly

24      probative.  It's a conversation between the government's

25      informant and Jorge Gomez.  Jorge Gomez wasn't present.  So

 1    everything he's reporting to the confidential source is

 2    something that he's been told by somebody else.  The government

 3    is going to have direct evidence of what happened at the time

 4    of the arrest.  So this doesn't strike me as particularly

 5    probative.  It's second or thirdhand information.  But I'll

 6    take a look at the cases that you want to show me and then I'll

 7    rule on the application.

 8         Obviously, if I'm not able to rule on this before the

 9    openings, there is to be no mention of this during openings.

10         MR. COOPER:  Certainly, your Honor.

11         THE COURT:  Other issues that the parties want to

12    raise.

13         MR. COOPER:  Nothing from the government.  Thank you,

14    your Honor.

15         MS. TODD:  Nothing from the defense.  Thank you, your

16    Honor.

17         THE COURT:  We are expecting the panel to be brought

18    up some time between 10:15 and 10:30.  As soon as they arrive I

19    will come down and we will begin.

20         I will return this to whoever gave me this because you

21    have given me copies of all the exhibits.

22         MR. COOPER:  Yes.  Thank you.

23         THE COURT:  We will resume shortly.

24         (Recess)

25         (Continued on next page)

1            (A jury of twelve and two alternates impaneled and

2    sworn)

3            THE COURT:  Ladies and gentlemen, you are now a jury.

4    There is no higher function in our legal system.  From now on,

5    whenever you enter or leave the courtroom as a jury, my deputy

6    will instruct the parties and the audience to rise, the same as

7    it does for me, because you are every bit as powerful and

8    important as any judge.

9            Let me introduce you again to some of the people who

10   are here in the courtroom.  I'll be the judge presiding over

11   the trial and, as I told you, my name is Paul Gardephe.  If you

12   forget what courtroom we are in or how to get here, just ask

13   one of the marshals downstairs where Judge Gardephe's courtroom

14   is and they will be happy to direct you.

15           You've already met Mr. Gomez and Ms. Todd and you've

16   met Mr. Cooper, Mr. Egan and Ms. Crowley who are the Assistant

17   United States Attorneys.  My courtroom deputy seated right in

18   front of me is Mr. Michael Ruocco and he is the person to speak

19   with if you have any questions or difficulties during the

20   trial.  Mr. Fouts is my law clerk and his job is to help me

21   research any legal issues that might come up during the trial.

22           I have a few preliminary instructions to give you now.

23   And as soon as I've completed that we will hear opening

24   statements from the parties.

25           First I'll begin with a role of the jury.  In the

American system of justice the judge and jury have separate

roles.  My job is to instruct you as to the law that governs

and controls this case.  I am going to give you these

instructions now.  I may give you others from time to time

during the trial.  At the end of the trial I will give you

detailed instructions about the law you will need to apply when

you deliberate.  Your job as jurors is to determine the facts

based on the evidence at the trial.  You are the only triers of

fact and your decisions on the factual issues will determine

the outcome of the case.

         You must not take anything I may say or do during the

trial as indicating what your verdict should be.  Don't be

influenced by my taking notes.  What I write down may have

nothing to do with this trial or with those issues that you

have to be concerned about.

         You must pay close attention to all the evidence

presented.  Evidence consists only of the testimony of

witnesses, documents and other things admitted into evidence.

Sometimes there are stipulations which are agreements entered

into by the parties and those can be considered by you as well.

         However, certain things are not evidence and you must

not consider them as evidence.  For example, statements and

arguments by lawyers are not evidence.  They are simply

arguments in which the lawyers will tell you what they think

the evidence will prove or has proven and how they think you

 1    should analyze the evidence.  You should give these arguments

 2    only as much weight as is consistent with your common sense,

 3    and you should, under no circumstances, consider their

 4    arguments as evidence.  Any statement I may make to you is not

 5    evidence.

 6            Questions by lawyers are not evidence.  Only the

 7    answers given by the witnesses are evidence.  The question that

 8    the attorneys ask is only important insofar as it places the

 9    witness' answers in context.  For example, if a witness is

10    asked during cross-examination or direct examination, it was

11    raining on June 2, wasn't it, and the witness answers no, based

12    on that question and answer alone, there is no evidence in the

13    case that it was raining on June 2.

14            Objections to questions are also not evidence.

15    Lawyers have an obligation to object when they believe that

16    evidence being offered is improper under the rules of evidence.

17    You should not be influenced merely by the making of an

18    objection.  If I sustain the objection, you should ignore the

19    question and any answer that may have been given.  If I

20    overrule the objection, you should treat the answer just like

21    any other.  Any testimony that I exclude or strike or tell you

22    to disregard is not evidence and you must not consider it.  If

23    I instruct you that some evidence is only to be considered for

24    a particular purpose, you must follow that instruction.

25    Anything you may have seen or heard about this case outside the

courtroom is not evidence and must be disregarded.  You must

decide the case based solely on the evidence presented here in

this courtroom.

In deciding the facts of the case you'll have to make

decisions about the credibility of the witnesses, that is, how

truthful and believable they are.  How do you decide what to

believe and what not to believe?  You are going to listen to

the witnesses, watch them and observe them and then decide as

you would decide such questions in your ordinary lives, did the

witness know what he or she was talking about?  Was the witness

candid, honest, open, and truthful?  Or did the witness appear

to be falsifying, exaggerating, or distorting what happened?

Is there any reason to think the witness might be lying or just

plain mistaken about what they are telling you?

Sometimes it's not so much what a witness says but how

he or she says it that may give you a clue as to whether or not

to accept that witness' version of an incident or an event as

credible or as believable.  In short, the way a witness

testifies may play an important part in your reaching a

judgment as to whether or not you can accept the witness'

testimony as reliable.  You need to use your common sense and

your life experience in evaluating each witness' testimony.

As the trial proceeds you may develop impressions of a

witness or a particular issue.  You must not allow these

impressions to become fixed or hardened.  In other words, you

1    shouldn't make up your mind right away.  If you do, in a sense

2    you prevent yourself from considering the testimony of other

3    witnesses or other evidence that may be presented after the

4    witness or witnesses you have heard.  This would be unfair to

5    one side or the other.  A case can only be presented step by

6    step, witness by witness.  We know from experience that

7    frequently one person's initial description of an event might

8    sound impressive and even compelling.  But when we hear another

9    person's version of the same event, or even the same witness

10   cross-examined about the event, what seemed to be very

11   compelling and impressive may fall apart or become less

12   convincing.  Please remember that there may be another side to

13   any witness' story.

14        You will use your common sense and good judgment in

15   evaluating each witness' testimony based on all the

16   circumstances.  You must keep an open mind until the trial is

17   over.  You should not reach any conclusions until you have all

18   the evidence before you.

19        There are three basic rules about a criminal case that

20   I ask you to keep in mind throughout the trial.

21        First, the defendant is presumed innocent until proven

22   guilty.  The indictment brought by the government against the

23   defendant is only an accusation and nothing more.  It is not

24   proof of guilt or anything else.  The defendant starts out with

25   a clean slate.

1          Second, the burden of proof is on the government until

2     the very end of the case.  A defendant has no burden to prove

3     his innocence or to present any evidence or to testify.  Since

4     the defendant has the right to remain silent, the law prohibits

5     you from arriving at your verdict by considering that the

6     defendant may not have testified.

7          Third, the government must prove the defendant's guilt

8     beyond a reasonable doubt.  I will give you further

9     instructions on this point later.  But, as I've said many times

10    already, you should bear in mind in this respect that a

11    criminal case has a higher standard of proof than applies in

12    the civil case and, as I've said to those who sat on grand

13    juries, a much higher standard of proof than is used at the

14    grand jury stage.

15          In order to ensure that you decide the case based

16    solely on the evidence and that you are not influenced in any

17    way by anything that might occur outside the courtroom, I must

18    give you the following instructions:  First, don't discuss this

19    case among yourselves or with anyone else, including members of

20    your family or your friends.  You may tell your family that you

21    are a juror in a case, but don't tell them anything else until

22    after you have been discharged by me at the end of the trial.

23    Don't communicate with anyone about this case on your cell

24    phone, through e-mail or text message, on Twitter or through a

25    blog or website, whether Facebook, Google or any other form of

1    social media.

2          Also, you may discuss the case among yourselves only

3    after all the evidence is in and the case has been given to you

4    to decide in the jury room.  This rule is important because

5    experience has shown that when someone expresses an opinion

6    about a witness or the case, they begin to identify more

7    strongly with that opinion.  And since it's important, critical

8    that you keep an open mind until you have heard all the

9    evidence, you should not discuss the case with anyone,

10   including your fellow jurors, or communicate about the case in

11   any fashion until the case is given to you at the end of the

12   trial for you to reach a verdict.

13         Don't read anything in the newspapers or over the

14   Internet or anywhere else about the case.  Don't listen to or

15   watch any reporting about the case, if it should be broadcast

16   on TV or over the radio.  Don't let anyone speak to you about

17   the case.  If you are approached by anyone to speak about it,

18   tell them the judge has directed you not to do so.  If anyone

19   seeks to contact you or contacts you about the case, you must

20   immediately report that to me.

21         Don't do any research or any investigation about the

22   case on your own.  Don't visit any place you may hear described

23   during the trial.  Also, be sure that I'm informed if someone

24   you know comes into the courtroom.  This is a public trial, so

25   that could happen.  But it's important you did not hear from

1    them what may have happened in the courtroom while the jury was

2    not present.

3           If you should see a friend or relative or acquaintance

4    come into court, please send a note to me through Mr. Ruocco at

5    your first opportunity.

6           The attorneys, the parties and the witnesses are not

7    supposed to talk to the jury outside the courtroom, even to

8    offer a friendly greeting.  If you happen to see any of them

9    outside the courtroom, they will not and should not speak to

10   you.  Please don't take any offense.  They are only acting

11   properly by doing so.

12          The parties are entitled to have you render a verdict

13   in this case on the basis of your independent evaluation of the

14   evidence presented here in the courtroom.  Obviously, speaking

15   to others about the case or exposing yourself to information

16   outside the courtroom would compromise your service and the

17   duty of complete fairness that you owe to the parties.

18          Finally, let me say a few words about trial procedure.

19   The trial has three parts:  First, the lawyers have the

20   opportunity to make an opening statement to you.  These opening

21   statements are not evidence.  The purpose of opening statements

22   is for the lawyers to give you a preview or roadmap of what

23   they think the evidence will be.  Actual evidence, however,

24   only comes from the witnesses and the exhibits that are

25   received in evidence.

1       After the opening statements you will hear testimony

2   from witnesses.  Because the government has the burden of

3   proof, the government calls its witnesses first.  Each witness

4   will first give direct testimony and then he or she may be

5   cross-examined by the other side.  Sometimes there is redirect

6   testimony and recross-examination.  Also, exhibits and

7   stipulations or agreements as to facts may be received in

8   evidence.

9       Following the government's case the defendant may, but

10   is not required to, present witnesses and other evidence.  If

11   the defense calls witnesses, those witnesses will be examined

12   and cross-examined, just as the government's witnesses were.

13   If the defendant presents evidence, it's possible the

14   government may then present some rebuttal to that evidence.  Of

15   course the defendant never has to testify or present any

16   evidence at all.  The burden of proof remains at all times on

17   the government.

18       Finally, after all the evidence has been received,

19   each side will have an opportunity to make closing arguments to

20   you.  The lawyers will review the evidence with you and make

21   arguments as to what conclusions they think you should or

22   should not draw from the evidence.  These arguments also are

23   not themselves evidence, but they may be helpful to you in

24   reviewing the evidence during your deliberations.

25       After these closing arguments, or summations, as they

1    are called, I will give you detailed information and

2    instructions as to the law that applies and controls in this

3    case, and you must of course follow those instructions.

4            After you receive my instructions on the law, you will

5    go into the jury room to deliberate and discuss the evidence in

6    order to decide the facts and render your verdict.

7            From time to time during the trial it may be necessary

8    for me to talk with the lawyers out of the hearing of the jury

9    either by having a conference up here at the bench when the

10   jury is present in the courtroom or by calling a recess.  The

11   lawyers and I will do this as little as possible.  Please

12   understand that while you are waiting we are working.  The

13   purpose of any conference outside your hearing is not to keep

14   relevant information from you, but rather for me to decide

15   procedural issues or how proposed evidence should be treated

16   under the rules of evidence.

17           Is the government prepared to give its opening

18   statement?

19           MR. EGAN:  We are, your Honor.

20           On the night of December 7, 2014, Louisiana state

21   police pulled over a white SUV as it made its way north on the

22   highway outside New Orleans.  Now for most people on the

23   highway that night, that white SUV looked like a pretty

24   ordinary car.  Even upon closer inspection, very few people

25   would have noticed the things that were a little bit odd about

1    the back seat, the mismatched plastic molding, how the seat

2    didn't quite work.

3         But the driver of that car knew a secret.  The driver

4    of that car knew that if he sat in the driver's seat, pushed

5    the lock button, pumped the brake five times, and pulled up on

6    the window buttons, two hydraulic pistons would lift the bench

7    off of that back seat, revealing a large secret compartment, a

8    large secret compartment that on that night contained five

9    tightly wrapped bundles of cocaine, each weighing about a

10   kilogram, that the driver was transporting from Louisiana up to

11   New Jersey.

12        But the driver wasn't the only person who knew about

13   that compartment.  The two agents from the Drug Enforcement

14   Administration who had followed the driver from New Jersey down

15   to Louisiana that weekend, they also knew about that

16   compartment.  When they looked in that compartment after the

17   state troopers had pulled them over, they found those drugs

18   stashed in that compartment.

19        And that's why we are here today, ladies and

20   gentlemen, because the driver of that car is in the courtroom

21   today.  The defendant, Sandy Gomez, was the man behind the

22   wheel that night.  And based on what the agents found in that

23   compartment, based on everything that they had learned in their

24   investigation that led them to follow him to Louisiana in the

25   first place, the defendant is charged with one count of

conspiring to possess that cocaine with the intent to
distribute it once he got back up to the northeast.  The
evidence at this trial will prove that the defendant is guilty
as charged.

Now, I want to take a couple of minutes to tell you
about what the government is going to prove at this trial and
then take a couple of minutes to tell you how the government is
going to prove it.

First, the government will prove that in the late fall
of 2014, the defendant, Sandy Gomez, came up from Louisiana to
New Jersey to ask his brother, Jorge Gomez, who help him get 25
to 50 kilograms of cocaine from Louisiana to New Jersey.  See,
the defendant had someone in Louisiana who was willing to give
him large quantities of cocaine to distribute in and around New
York.

Jorge and his former girlfriend, Caronlay Ramon-Baez,
agreed and in November 2014, Caronlay flew with the defendant
down to New Orleans to pick up the drugs.  But the source
wouldn't give them the drugs because they didn't have a car.
The source told them to go and get a car with a secret
compartment, as it's sometimes called, a trap large enough to
carry the drugs that they were there to pick up.

You will learn that the defendant returned to New
Jersey and asked Jorge to help him find a car with a trap.
Jorge called someone he knew in Paterson, New Jersey, who

1    reached out to someone who specialized in renting exactly that

2    kind of car.

3              Unfortunately for Jorge, that person was a

4    confidential informant for the DEA, and he promptly reached out

5    to the agents and told them, there is someone in Paterson

6    looking to get a car with a trap big enough to carry large

7    quantities of narcotics, and he passed on the number that Jorge

8    had given to reach him.

9              So the agents contacted another confidential informant

10   they work with, a man named Tony, and they told Tony to pose as

11   someone who rented such cars.  Tony reached out to Jorge and

12   negotiated to rent a car with a secret compartment large

13   enough, the white SUV, to carry 25 to 30 kilos per trip.  The

14   DEA then gave Tony a car to pass on to Jorge, a car the DEA can

15   track.

16             Shortly after they gave the car you will learn that

17   the agents were alerted that the car was on the move and two

18   agents followed them.  Again, the defendant, Sandy Gomez, was

19   at the wheel and, again, Caronlay Ramon-Baez was with them.

20   They followed them as they drove two days down to New Orleans

21   where the two of them checked into a motel.

22             You will hear how on December 7, a day after they

23   arrived in New Orleans, the defendant left the room to go pick

24   up the narcotics as the DEA conducted surveillance.  You will

25   hear how the defendant returned to the room with only five of

1    the kilograms, explaining to Caronlay that the source hadn't

2    wanted to give him all of it until he learned he could

3    transport this much.  You will hear that as they started their

4    way back to New Jersey, a Louisiana state trooper, working with

5    the DEA, pulled him over, opened that compartment, and found

6    those drugs.  That's what the government is going to prove at

7    this trial.

8              As I said, I want to take a couple of minutes to tell

9    you how we are going to prove it.  First, you will hear from

10   some law enforcement agents who worked on this case.  An agent

11   from the DEA will explain how, using informants, they were able

12   to pass the defendant a car, the very car with the trap he was

13   looking for, but one that the DEA could track and therefore

14   intercept the drugs.  He will explain how the day after they

15   arrived, agents watched the defendant as he spent hours driving

16   around New Orleans by himself, met up with another individual

17   before returning to his hotel room by himself.  And you will

18   hear from the Louisiana state trooper who stopped them, as the

19   defendant and Caronlay left town later that night and who found

20   those five kilograms stashed in the trap.

21             In addition, you will see transcripts of recordings

22   made by the informant of conversations the informant had with

23   Jorge Gomez and with the defendant, transcripts of recordings

24   where Jorge tells the informant he needs a car that can carry

25   the 25 to 50 kilos of cocaine they were expecting to bring from

1    Louisiana, transcripts of the defendant himself talking to the

2    informant about his concerns about the trap and whether it

3    would be discovered before the informant assured him this car

4    has been used many times.  There won't be any problems.

5         You will see documentary evidence.  Flight records

6    will confirm that first trip that Caronlay and the defendant

7    took to New Orleans.  You'll see text messages between Caronlay

8    and Jorge Gomez during that second trip to New Orleans where

9    Caronlay tells Jorge that the defendant has already gone out to

10   meet the people who are going to give them the drugs and that

11   she was waiting for him to return.

12        Finally, you will hear from Caronlay Ramon-Baez

13   herself, the person who is sitting next to the defendant the

14   entire time.  She will tell you all about that first trip to

15   New Orleans, the failed trip, and she will explain to you why

16   they were looking for a car with a trap in the first place.

17   She will tell you all about their trip down to New Orleans the

18   second time, how they took little steps like covering the name

19   of the state on their license plate or driving at night, in

20   hopes of minimizing the chance that they would attract the

21   attention of law enforcement.  She will tell you how the

22   defendant was planning to pick up dozens of kilos of cocaine

23   but only came back with five, explaining that the source

24   wouldn't give them any more at that point.

25        Now, given her position, Ms. Ramon-Baez is in a unique

 1    position to give you an insider's view of this crime as almost

 2    no other witness could.  But make no mistake, Ms. Ramon-Baez

 3    committed a crime.  I expect she is going to get on that stand

 4    and she will tell you that she conspired with this defendant

 5    and his brother to commit this crime.  And I expect that she

 6    will tell you that she is testifying here to get leniency at

 7    sentencing.  When you consider her testimony you should

 8    consider that.  But you should also consider the extent to

 9    which her testimony is corroborated by other evidence you are

10    going to see in this case, testimony from the other witnesses,

11    the documentary evidence I just discussed, and those

12    transcripts.

13            I don't think this will be a very long trial, but it

14    is an important case, important to the government and important

15    to the defendant.  While you are here I am going to ask you to

16    do three things.  First, listen to the evidence very, very

17    carefully; two, listen to Judge Gardephe's instructions on the

18    law; and, three, perhaps most importantly, use your common

19    sense, the same common sense that you use in your everyday

20    lives.  And if you do that, when all is said and done, you will

21    return the only verdict that is consistent with all the

22    evidence you will see and hear in this case, and that is that

23    the defendant is guilty.  Thank you.

24            THE COURT:  Ms. Todd.

25            MS. TODD:  Thank you, your Honor.

1          Good afternoon, ladies and gentlemen.  My name is

2     Natali Todd and I represent Mr. Gomez, who is seated at the

3     table with me.

4          This is a criminal case, as you have already been

5     informed.  Criminal cases are different.  In all of my years of

6     experience they are different from civil cases, from commercial

7     litigation, from any other type of case.  Criminal cases

8     involve the most serious kind of government action.  It

9     involves one's liberty and one's freedom.  So as the government

10    says, this is an important case to the government.  It's also

11    an important case to Mr. Gomez.

12         The government evidence we believe draws on the

13    relationships between Mr. Gomez and his brother Jorge Gomez and

14    Jorge's girlfriend, Caronlay Ramon-Baez.  And Ms. Baez was

15    also, as the government indicated, charged in this conspiracy.

16    She is now cooperating with the government and will be taking

17    the witness stand and testifying.  We do not expect the

18    evidence to establish that there was this close brotherly

19    relationship to suggest that there is the trust that is

20    required for this conspiracy between the brothers.  In fact,

21    they have not spoken in many years.

22         Mr. Gomez did in fact, as the evidence will establish,

23    come to New York in November of 2014, late 2014, and he came to

24    New York once, not to engage in drug trafficking, but the

25    evidence will establish that he came to New York from Texas,

where he had been living since 2003, to attend a funeral of a
close relative.  That's what we expect the evidence to
establish.

　　　　Now, the government must prove beyond a reasonable
doubt that not only did Mr. Sandy Gomez agree with his brother
and his brother's girlfriend to commit this crime, but that he
did so knowingly.  Yes, there was a trap in the vehicle that he
was driving.  What we expect the evidence to establish is that
Mr. Gomez had no idea there was a trap in the vehicle.  There
are in fact telephone recordings between the confidential
informant, who presented himself as a mechanic, who had
numerous conversations with Jorge Gomez, and at one point in
time spoke with Sandy Gomez.  We expect the evidence to
establish that there was no discussion between Sandy Gomez and
this cooperating informant about his discomfort about
visibility of a trap and that the discussion, as the evidence
will establish during that conversation, was about a broken
seat, the broken back seat wherein the confidential informant
ultimately admitted to Mr. Gomez that the seat was in fact
broken.

　　　　There is also a recording between Jorge Gomez and the
confidential informant negotiating the price for the trap of
the vehicle and quantities of narcotics to be transported in
that vehicle.  That meeting was surveilled by DEA agents who
will testify as to their observation.  The evidence will show

1    that Mr. Sandy Gomez was never present at this meeting, was

2    never present as part of the negotiation for the price of the

3    vehicle, was never present in attempting to get a vehicle, and

4    that the only three people that were present were Jorge Gomez,

5    the confidential informant, and George's girlfriend, Caronlay

6    Ramon-Baez, who has worked with George in his narcotics

7    trafficking business over the years.  That evidence will be

8    established at this trial.

9            And this confidential informant's name is Antonio

10    Jimenez Baez and you will learn throughout the trial, as the

11    evidence comes in, that he too at the time that he was

12    assisting DEA agents was under investigation himself for

13    narcotics trafficking.  And so when you listen to the evidence

14    of these two witnesses, you should listen carefully, scrutinize

15    their testimony carefully, and I will agree with the

16    government, use your common sense.  Use your everyday

17    experience in assessing the reliability and the believability

18    of these witnesses.

19            As I indicated, Sandy Gomez resided in Texas where he

20    has worked very jobs, has a family there.  Hasn't been to New

21    York in a number of years.  And the evidence will establish

22    that, that the only time he came to New York was in November

23    2014.  This case did not begin with Sandy Gomez.  This case

24    began with Jorge Gomez, who was being investigated based on his

25    numerous contacts with other people participating in narcotics

1    trafficking in New Jersey.  So the informant informed the DEA.

2    They started looking at it.  George Gomez did not work alone.

3    He worked very closely with Caronlay Ramon-Baez, who is his

4    girlfriend, and she too will be testifying here today.

5            As I indicated, I am going to ask you very carefully

6    to scrutinize the evidence, withhold your judgment until all of

7    the evidence is in, and wait for the Court's instruction

8    because it is my expectation that at the end of this trial

9    Sandy Gomez will be proven not guilty and you will come to that

10   conclusion, that there is no evidence that establishes that he

11   knowingly and willingly participated in this conspiracy for

12   which he is charged.  Thank you.

13           THE COURT:  Is the government prepared to begin?

14           MR. EGAN:  Yes, your Honor.

15           THE COURT:  Please call your first witness.

16           MR. EGAN:  The government calls Detective Jose Garcia.

17    JOSE M. GARCIA,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MR. EGAN:

22   Q.  Good afternoon, Mr. Garcia.

23   A.  Good afternoon.

24   Q.  Are you employed?

25   A.  Yes.

Garcia - Direct

1    Q.   By whom?

2    A.   Paterson Police Department.

3    Q.   How long have you been employed by the Paterson Police

4    Department?

5    A.   It will be 26 years in December.

6    Q.   What did you do before you worked for the Paterson Police

7    Department?

8    A.   I was a mailman.

9    Q.   For how long?

10   A.   For four years.

11   Q.   And prior to that?

12   A.   I was in the army.

13   Q.   What is your current assignment with the Paterson Police

14   Department?

15   A.   I'm assigned to the DEA as a task force officer.

16   Q.   What is your rank within the Paterson Police Department?

17   A.   A detective.

18   Q.   What is a task force officer?

19   A.   What they do, they don't have enough special agents in DEA,

20   so they use detectives from the various police departments to

21   assist them in doing jobs.

22   Q.   How long have you been a task force officer assigned to the

23   DEA?

24   A.   Thirteen years.

25   Q.   Are you assigned to a particular group within the DEA?

GB7MGOM2                                Garcia - Direct

1   A.  Yes.  Group 5.

2   Q.  Group 5?

3   A.  Yes.

4   Q.  What area does group 5 cover?

5   A.  Everywhere.  Anywhere they need us.

6   Q.  Anywhere in the country?

7   A.  Yes.

8   Q.  Where are you based?

9   A.  Newark, New Jersey.

10  Q.  What are some of your duties and responsibilities as a task

11  force officer with the DEA?

12  A.  We do money laundering, narcotics.  Basically that's what

13  we do.

14  Q.  Those are the crimes you investigate?

15  A.  Yes.

16  Q.  As a task force officer what are your assignments?

17  A.  Whatever they need me to do, surveillance, undercover, lot

18  of paperwork.

19  Q.  Did you ever participate in an investigation of an

20  individual named Sandy Gomez?

21  A.  Yes.

22  Q.  Would you recognize Sandy Gomez if you saw him today?

23  A.  Yes.

24  Q.  Do you see that individual in the courtroom today?

25  A.  Yes.

 1   Q.   Can you point him out and describe an article of clothing

 2   that he's wearing.

 3   A.   He's sitting over there.

 4   Q.   Front table or back table?

 5   A.   Front table, behind this gentleman and this woman here.

 6   Got a bald head and he is bearing a black suit with a light

 7   shirt.

 8              MR. EGAN:   Indicating the defendant, your Honor.

 9              THE COURT:   Yes.

10   Q.   Were you present when the defendant was arrested?

11   A.   I was -- yeah, I was there doing the job.  Not present at

12   the time he was arrested.

13   Q.   When was he arrested?

14   A.   December 7, 2014.

15   Q.   Where did that take place?

16   A.   Right outside of New Orleans, but in Louisiana.

17   Q.   How did you first get involved in that investigation?

18   A.   I was called by a confidential source who told me someone

19   approached him about needing a trapped vehicle so they can move

20   drugs.

21   Q.   When you say a trapped vehicle, what is a trapped vehicle?

22   A.   A trapped vehicle is a vehicle with a hidden compartment.

23   Q.   You've had experience with trapped vehicles?

24   A.   Yes.

25   Q.   What sort of hidden compartment?  What do you mean by

 1   hidden compartment?

 2   A.   They take a vehicle and they put it in a certain

 3   compartment, they will either hollow it out and then repair

 4   around it so you can't see it from the outside of the vehicle,

 5   and they will put hydraulics on there, and there is a system

 6   for them to open and close it so that you can't detect whatever

 7   is in the hidden compartment.

 8   Q.   In addition to telling you that there was this person who

 9   was looking for a trapped vehicle, did the confidential source

10   give you any other information about this person?

11   A.   Yes.  He told me that the person wanted to move anywhere

12   from 20 to 25 kilos of cocaine.

13   Q.   Did the confidential source have a way to contact the

14   person who was looking for the vehicle?

15   A.   Yes.  By phone.

16   Q.   Approximately how long before the arrest that you described

17   on December 7 were you contacted by the confidential source?

18   A.   I think it was the month before.  So it was about a month,

19   month before, in November.

20   Q.   Some time in November?

21   A.   Of 2014, yes.

22   Q.   What steps did you take and your group take next after

23   getting this information?

24   A.   We spoke to our supervisor, who made phone calls in order

25   to find out if we had any vehicles with trapped compartments.

1   Q.  What was the plan?

2   A.  The plan was to give the person who wanted the trapped

3   vehicle the vehicle in order for us to surveil him, and we

4   would know because these trapped vehicles that belonged to the

5   DEA have GPS in them and they have alarms that when the traps

6   are opened, they alert you.  They have some sort of an app that

7   alerts you.

8   Q.  It has both a tracking device in the car --

9   A.  Correct.

10  Q.  -- and you mentioned an alarm.  How does that alarm work?

11  A.  It works on a computer.  You put the program into your

12  computer.  And when the trap is opened or closed, it's

13  indicated through your computer.

14  Q.  Did there come a time where you or your group determined

15  whether you would be able to find such a vehicle?

16  A.  Yes.

17  Q.  When was that?

18  A.  During that month he spoke to the -- an agent down in, I

19  think it's Camden office, and they told him they had several

20  vehicles with traps in it and also the GPS system.

21  Q.  What was the plan in terms of how you were going to get

22  this vehicle into the hands of the person who was looking for

23  it?

24  A.  We were going to drive the vehicle up to northern New

25  Jersey, and we used a different source of information that

1    deals with an agent called Joe Dill.  And this gentleman was

2    going to be introduced to the gentleman who wanted the vehicle,

3    and they were going to find a way of getting the vehicle to

4    him.

5    Q.  So you were going to use another confidential source to

6    give it to this person?

7    A.  Correct.  He was to be introduced by the initial

8    confidential source that contacted me.

9    Q.  Do you know the name of that confidential informant that

10   was going to be providing the vehicle?

11   A.  Yes.  Tony.

12   Q.  Tony is how you know him?

13   A.  Yes.

14   Q.  And what role, if any, was Tony going to play?

15   A.  He was going -- in essence, he was going to play the owner

16   or the middleman with the trapped vehicle.  He was going to

17   hand over the trapped vehicle to the gentleman who wanted it.

18   Q.  Did there come a time when you actually obtained the car?

19   A.  Yes.

20   Q.  Who went and got it?

21   A.  TFO, Michael Patti and myself.

22   Q.  Where did you get it from?

23   A.  In the Camden office, down by the Cherry Hill area.

24              THE COURT:  What does TFO mean?

25              THE WITNESS:  Task force officer.

1   Q.  What kind of kind of car was it?

2   A.  It was a Yukon, light-colored SUV.

3            MR. EGAN:  If I can approach the witness, your Honor.

4            THE COURT:  Yes.

5   Q.  I'm handing you a folder with a number of documents in it.

6   If you can pull out and look at Government Exhibit 100 marked

7   for identification.

8   A.  Yes.

9   Q.  Do you recognize what's depicted in that photo?

10  A.  Yes.

11  Q.  What is it?

12  A.  Yukon Denali, GMC.

13  Q.  How do you recognize it?

14  A.  This is the vehicle that we picked up in the Cherry Hill

15  area, by Camden office, with the trap and the GPS.

16           MR. EGAN:  The government would seek to admit

17  Government Exhibit 100, your Honor.

18           MS. TODD:  No objection.

19           THE COURT:  Government Exhibit 100 is received.

20           (Government Exhibit 100 received in evidence)

21           MR. EGAN:  If we can publish that to the jury.

22           THE COURT:  You may.

23  Q.  Government Exhibit 100 is the car that you provided to

24  Tony?

25  A.  Yes.

1   Q.  You said you went down to Camden.  What did you do

2   specifically once you got that car?

3   A.  We drove it back up to the Newark office, and the following

4   day we met with Tony so Tony can give it to the person who

5   wanted the vehicle.

6   Q.  Did you or agents from your group check out the vehicle

7   before you gave it to Tony?

8   A.  Yes, we did.  While we were in Camden, I guess the person

9   in charge of these vehicles showed us how to open and close the

10  trap compartment and gave us the app so we can see it on our

11  laptops and also gave us the GPS.

12  Q.  When you say gave us the app, you are referring to that

13  trap alarm you described before?

14  A.  Yes.

15  Q.  Did you test either of those?

16  A.  Yes, we did.

17  Q.  Which ones?

18  A.  Both.

19  Q.  What did you find?

20  A.  They were in working order.

21  Q.  Consistently?

22  A.  Not consistently.

23  Q.  What do you mean by not consistently?

24  A.  As we were heading down to New Orleans, it gave us some

25  problems.

1   Q.  Which one?

2   A.  The GPS was not working for parts of the travel when we

3   were going down there.

4   Q.  What about the trap alarm?  Did you have any problems with

5   the trap alarm?

6   A.  At the beginning we didn't, but I think -- I don't know

7   what happened to the vehicle once we arrived to New Orleans,

8   but it was giving us a hard time.

9   Q.  Once you had come up and tested those systems, what did you

10  do next?

11  A.  We met with our confidential source, Tony, and he spoke to

12  the gentleman who wanted the vehicle, and they set up a meet

13  date.

14  Q.  Do you remember if they met the same day that you brought

15  the car up or whether it was another day?

16  A.  No.  It was the following day.

17  Q.  Were you present when Tony met with the individual who was

18  looking for the car?

19  A.  Yes.  I was part of the surveillance.

20  Q.  What was your role?

21  A.  Just to watch and see where the cars are traveling once

22  they started traveling.

23  Q.  Were you at a particular location?

24  A.  We were in the area of Market and Madison in Paterson, New

25  Jersey.

 1   Q.  Did you observe who Tony met with that day, if anyone?

 2   A.  Yes.  He met with defendant, with a person named Jorge

 3   Gomez.

 4   Q.  Describe your observations of the meeting.

 5   A.  I didn't actually observe Gomez arrive that day.  At that

 6   moment with the CS.

 7           THE COURT:  Who is the CS?

 8           THE WITNESS:  Tony, the confidential source.

 9   Q.  You didn't observe the initial meeting between Tony and

10   Jorge?

11   A.  No.  I was a couple of blocks away.

12   Q.  What did you observe?

13   A.  I observed them when they arrived at 28th Street in

14   Paterson, New Jersey, and drove up into an apartment complex,

15   like garden apartments.

16   Q.  So the first time you saw them, describe who you saw and

17   how they got to that location.

18   A.  I saw -- they drove in tandem a black Mercedes Benz, which

19   was driven by George Gomez, and Tony was driving the Yukon and

20   they were driving together to Jorge's house.

21   Q.  They were both in the Yukon?

22   A.  No, no.  Jorge was in his car, a black Mercedes.

23   Q.  If I can ask you to look in that folder one more time and

24   look at Government Exhibit No. 1.  Do you recognize the person

25   in Government Exhibit 1?

1   A.   Yes.

2   Q.   Who is that?

3   A.   That's Jorge Gomez.

4   Q.   How do you recognize that person?

5   A.   He was the one that met with Tony that wanted the vehicle

6   initially.

7          MR. EGAN:  The government seeks to admit Government

8   Exhibit 1.

9          MS. TODD:  Without objection.

10         THE COURT:  Government Exhibit 1 is received.

11         (Government Exhibit 1 received in evidence)

12         MR. EGAN:  May we publish it to the jury.

13         THE COURT:  You may.

14  Q.   You said, I believe, that as we are waiting for that to be

15  published that you were in the area of Market and Madison, is

16  that right?

17  A.   Yes, sir.

18  Q.   What is your understanding of what that location is?

19  A.   There is a gas station, there is a church, the fire

20  department is around the corner on Madison Avenue, and there is

21  a pharmacy and some other stores.

22  Q.   So as they arrived, what vehicle was Jorge Gomez?

23  A.   In a black Mercedes Benz.

24  Q.   And the person you called Tony, what vehicle were they in?

25  A.   He was in the Yukon.

Garcia - Direct

1  Q.  What happened when they arrived at that area?

2  A.  They spoke and -- I didn't actually see, observe that.  It

3  was coming over the radio that they spoke for a minute or two

4  and then they drove away.

5  Q.  What about when they got to the location where you were?

6  A.  I asked where it was on the surveillance team that followed

7  them to 28th Street and observed them going up into a driveway

8  that leads into an apartment complex, but it sits higher up off

9  of the road.

10  Q.  When you observed them they were going up to a location and

11  parked their cars in a driveway?

12  A.  Correct.

13  Q.  What happened then?

14  A.  Well, I moved away from there, but, like I said, over the

15  radio they were talking about that they were doing something in

16  the vehicle, in the Yukon, Jorge and Tony, and then Jorge and

17  Tony went into an apartment.

18  Q.  And approximately how long were they in that apartment for?

19  A.  I am going to say about 15 minutes, maybe, approximately.

20  Q.  What happened then?

21  A.  After that, I observed Tony walking with a female,

22  darker-skin female, Hispanic, and they walked to a green Jeep

23  Liberty and drove off.

24  Q.  Did you ever learn the name of the female?

25  A.  Yes.

39

1    Q.  What was her name?

2    A.  Caronlay Baez.

3    Q.  If you can look at Government Exhibit 2 in your folder

4    there.

5    A.  Yes.

6    Q.  Do you recognize the person in Government Exhibit 2?

7    A.  Yes.

8    Q.  Who is that?

9    A.  Caronlay Baez.

10   Q.  How do you recognize her?

11   A.  She was from the day of the job.  She was the one that got

12   into the vehicle, that Jeep Liberty, with our source, Tony, and

13   also she was arrested down in New Orleans.

14          MR. EGAN:  The government would ask to admit

15   Government Exhibit 2.

16          MS. TODD:  Without objection, your Honor.

17          THE COURT:  Government Exhibit 2 is received.

18          (Government Exhibit 2 received in evidence)

19          MR. EGAN:  If we could publish that to the jury.

20          THE COURT:  Yes.

21   Q.  So this individual, Ms. Baez, you say came out of the

22   apartment, just her and Tony?

23   A.  Yes.

24   Q.  And what car did they get into?

25   A.  Into a green Jeep Liberty, SUV.

1   Q. What happened then?

2   A. Then we surveilled them to the area of Market and Madison.

3   And after she -- after Tony got out of the vehicle, we stopped

4   surveillance.

5   Q. So the car in Government Exhibit 100 remained behind at the

6   apartment?

7   A. Correct.

8   Q. Did you ever conduct additional surveillance involving that

9   car?

10   A. We made periodic stops at the house just to make sure the

11   vehicle was there because it was a new system for us and we

12   just wanted to make sure that it was working properly. So

13   every once in a while, depending on movement, the alarms go off

14   with the GPS. Although it's not moving, it has different

15   colors, indicators that say, when a vehicle is stopped or when

16   the vehicle is actually traveling.

17   Q. And other than these sort of spot checks of the systems you

18   were using, did there come a time when you conducted more

19   long-term surveillance on that video?

20   A. Yes.

21   Q. When was that?

22   A. That was on December 4.

23   Q. Describe what happened that day.

24   A. That day the trap alarm kept ringing like somebody was

25   testing out the trap. It rang several times. And then closer

GB7MGOM2                        Garcia - Direct

 1    to 9:00 at night that evening the vehicle started to move.

 2    Q.  What did you do when you found out the vehicle was moving?

 3    A.  TFO Michael Patti and myself, we had our own vehicle, and

 4    we started surveilling that vehicle.

 5    Q.  Did there come a time when you caught up with that car?

 6    A.  Yes.  We caught up to it at a gas station in -- I don't

 7    even know what state it was.

 8    Q.  Who was in the car?

 9    A.  Sandy Gomez and Caronlay Baez.

10    Q.  You mentioned there was another detective in the car with

11    you?

12    A.  Yes.

13    Q.  Who was that?

14    A.  Michael Patti.

15    Q.  Describe where the defendant and Ms. Ramon-Baez went when.

16    A.  After that they continued traveling down in the early

17    morning of the 5th.  They ended up in Virginia, somewhere in

18    Virginia.  I don't know what town.

19    Q.  They drove through the night to get to Virginia?

20    A.  Yes.

21    Q.  What happened when they arrived in Virginia?

22    A.  They stopped at a motel and we didn't see them for a few

23    hours after that.  We were surveilling the area because there

24    was a strip mall across the street that sat high so we could

25    see down towards the motel.  Also we were assisted by Virginia

Garcia - Direct

1    DEA.

2    Q.  As you were sitting there, what happened next?

3    A.  Later on that evening we saw them going back -- getting

4    back into the vehicle and they started moving again.

5    Q.  This is, again, you said towards the evening of the 5th

6    now?

7    A.  Correct.

8    Q.  What happened then?  Where did they go?

9    A.  They started traveling down south, and we followed them all

10   the way to the borderline of Mississippi and Louisiana, where

11   we were backed by DEA in Louisiana and also Louisiana State

12   Police.

13   Q.  Was the GPS tracker working at this point?

14   A.  No.

15   Q.  How were you guys following them?

16   A.  We were just following them.  There was a lot of rain and

17   just making sure we kept --

18            MS. TODD:  Objection.  Move to strike.

19            THE COURT:  I'll hear you at side bar.

20            (Continued on next page)

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  I didn't understand the basis for the

3  objection, so I thought it was better to do it here.

4          MS. TODD:  The basis for objection is, the question

5  was:  Were you following him to Virginia?  Yes.  And how were

6  you doing that?  Just following him.  Then he proceeds to

7  describe the weather conditions and whatever else was

8  happening, which goes beyond what the question asked for.

9          THE COURT:  Give me a moment.

10          They are already at the border of Louisiana and

11  Mississippi.  He testified that they were at the border of

12  Louisiana and Mississippi.  That's where they met up with the

13  DEA and Louisiana state troopers.  Then the next question:  Was

14  the GPS working?  The answer was no.  And then the next

15  question, the one you objected to.

16          MS. TODD:  How were you following it or were you just

17  following it, which is fine.

18          THE COURT:  And then he did start talking about the

19  fact that it was raining.

20          MS. TODD:  Right.

21          THE COURT:  That's what you object to.

22          MS. TODD:  Yes.

23          THE COURT:  You'll elicit from him what the weather

24  conditions were.

25          Your motion to strike is directed to the fact that it

1    was raining?

2          MS. TODD:  Right.  To everything after, we were just

3    following it.

4          THE COURT:  That motion is granted.  You can elicit.

5          MS. TODD:  I didn't want to seem to be interruptive.

6    With all of the questions and responses he speaks of we saw, we

7    observed.  Caution the witness just to talk about what he

8    observed.

9          MR. EGAN:  Ok.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1             (In open court)

 2    Q.  You mentioned the GPS tracker wasn't working.  What were

 3    the weather conditions like that day?

 4    A.  It was raining.

 5    Q.  And at that time you and Detective Patti were just

 6    maintaining visual surveillance then?

 7    A.  Correct.

 8    Q.  Describe what happened at that point, after you followed

 9    them into Louisiana.

10    A.  The DEA from Louisiana pretty much took over there, and we

11    were all just following and staying in radio communication, and

12    we observed them -- it was early in the morning.

13             MS. TODD:  Objection.

14             THE COURT:  Yes.  If you could just tell us what you

15    saw.  Ok.

16             THE WITNESS:  Ok.

17    Q.  If you can describe personally what you observed.

18    A.  They were already in the hotel area, in the motel that they

19    went into, and we drove by.  We could see the vehicle in the

20    motel in the outskirts of New Orleans.

21    Q.  So you did not observe them go to the motel, but you drove

22    by the motel and saw the vehicle parked there?

23    A.  Correct.

24    Q.  What did you do at that point?

25    A.  We went about seven or eight blocks away, and we just

Garcia - Direct

1    parked there.

2    Q.  Did there come a time when either of them left that day?

3    A.  Yes.  It was not evening yet.  It was between 4 and 5:00.

4    Q.  Who left?

5    A.  Sandy and Caronlay.

6    Q.  Where did they go?

7    A.  They went to a Pep Boys and to a gas station, and they went

8    back to the motel.

9    Q.  That you are aware of, did they go anywhere else that

10   night?

11   A.  No.

12   Q.  Was someone surveilling the motel that they were staying at

13   throughout the night?

14   A.  Yes.

15   Q.  Did you personally participate in that surveillance?

16   A.  No.

17   Q.  What instructions, if any, did you provide to the people

18   who were conducting the surveillance?

19   A.  If the vehicle starts to move to give us a call.

20   Q.  Were you alerted at any point that night?

21   A.  No.

22   Q.  The next day, so at this point December 7, did either of

23   them leave the apartment that day?

24   A.  Yes.  They left the motel.

25   Q.  Who?

1  A.  Sandy.

2  Q.  At approximately what time?

3  A.  It was before 12, so I am going to say between 11 and

4  12:00.

5  Q.  Did you personally conduct surveillance?

6  A.  Yes.

7  Q.  Focusing particularly on what you observed, if you can

8  describe for the jury what you observed that day.

9  A.  I observed them coming out of a store.  I don't know.  It

10  was a big store.  And we observed him parked at several other

11  establishments, businesses.

12       THE COURT:  When you say we, we don't know who you are

13  talking about.  You have to indicate.

14  A.  When I say we, I'm talking about Michael Patti because he

15  was with me in the vehicle.

16  Q.  Understood.  You and Detective Patti observed, you said,

17  him at an establishment?

18       MS. TODD:  Objection, your Honor.

19       THE COURT:  Just ask what they observed.

20  Q.  Going back, describe personally what you and Detective

21  Patti observed that day.

22       MS. TODD:  Objection to the form.

23       THE COURT:  If you could just tell us what you

24  observed.  We understand Mr. Patti was with you.  If you could

25  focus on what you saw.

 1   A.  Ok.  I observed him parked at several establishments.  And

 2   after that I observed him at -- near a strip mall and some

 3   apartments.  And he was with a black male in the vehicle.

 4   Q.  Did you see at what point that other individual got into

 5   the car?

 6   A.  Well, no.  Not me personally see, no.

 7   Q.  Describe when you first saw that other individual in the

 8   car.

 9   A.  When I was at the strip mall, there were some apartments

10   across the street.

11   Q.  Describe what you saw then.

12   A.  I observed a black male leave the vehicle, but he went in

13   between cars and I couldn't see anymore where he went to.  I

14   don't know if he went to the strip mall or I don't know if he

15   went to the apartments.

16   Q.  Do you know who that individual is?

17   A.  No.

18   Q.  Did you ever observe that individual get back into the car?

19   A.  No.

20   Q.  What did you observe next?

21   A.  After that, I observed when Sandy drove off from the area

22   and surveillance was again started.

23   Q.  Where do you observe the defendant go next?

24   A.  I didn't observe him, but he went back --

25            THE COURT:  All right.  If you didn't observe it, move

Garcia - Direct

1    on.

2    Q.   Approximately how long did you conduct surveillance of the

3    defendant that day, that afternoon?

4    A.   Mostly the whole day.  With him the whole day.

5    Q.   When was the next time that you personally observed the

6    defendant?

7    A.   I observed him at a gas station that evening, early

8    evening.  It was around 7:00 in the evening.  And I observed

9    him and Caronlay go to a restaurant, one of those fast food

10   restaurants, to pick up food.

11   Q.   The next time you personally saw them, it was about 7:00?

12   A.   Yes.

13   Q.   Where did they go after the restaurant?

14   A.   They started heading north, I guess, I don't know what

15   direction that is, but they started heading away from New

16   Orleans.

17   Q.   What did you do then?

18   A.   I left Patti off with someone else, and I just stayed at --

19   on the highway.

20   Q.   Stayed on the highway?

21   A.   Yes.

22   Q.   Describe what you saw next.

23   A.   At a distance I saw police lights.

24            (Continued on next page)

25

1   BY MR. EGAN:

2   Q.  Police lights?

3   A.  Yes.

4   Q.  Did you participate personally in the stop of the

5   defendant?

6   A.  No.

7   Q.  And describe what you did after the defendant was stopped.

8   A.  After the defendant was stopped, and I went to one of the

9   barracks in Louisiana State Police.  I don't know what town; I

10  really don't know the area that well.  And I met up with

11  Michael Patti and we spoke to Caronlay.

12  Q.  For how long?

13  A.  Not long.

14  Q.  And then what did you do?

15  A.  And then we left.

16  Q.  Did you remain in Louisiana?

17  A.  Until the next day, and then we, we left.  We flew back to

18  New Jersey.

19          MR. EGAN:  One moment, your Honor.

20          Nothing further, your Honor.

21          THE COURT:  Cross-examination.

22          MS. TODD:  Yes, your Honor.

23  CROSS-EXAMINATION

24  BY MS. TODD:

25  Q.  Good afternoon, Agent Garcia.

1   A.  Good afternoon.

2   Q.  How are you?

3   A.  Good.

4   Q.  I'm going to ask you some questions regarding, first,

5   confidential informants who had led you to further the

6   government investigation.  Not Mr. Jimenez-Baez, the first

7   person.

8   A.  I don't know who Jimenez-Baez is.

9   Q.  I'm sorry?  There were two informants, correct?

10  A.  Correct.

11  Q.  One informant brought information about Jorge Gomez leading

12  trafficking, correct?

13  A.  Correct.

14  Q.  And the first informant brought information that Jorge

15  Gomez was involved in narcotics trafficking?

16  A.  I'm sorry.  Could you repeat that.

17  Q.  The first informant --

18  A.  Yes.

19  Q.  -- informed them that Jorge Gomez was informed in your

20  narcotics trafficking.

21  A.  That he wanted a trap vehicle.

22  Q.  I'm sorry?

23  A.  That Jorge Gomez wanted a trap vehicle.

24  Q.  The first informant indicated that?

25  A.  Yes.

 1   Q.  And this first informant, was he in regular contact with

 2   Jorge Gomez?

 3   A.  I'm not sure.

 4   Q.  Did you develop information from phone records about Jorge

 5   Gomez's drug trafficking?

 6   A.  I didn't do it, no.

 7   Q.  From the investigation, you were not aware of that?

 8   A.  From the investigation, yes.

 9   Q.  And so the phone communication between Jorge Gomez and this

10   confidential, the first confidential informant was one of high

11   volume, correct?

12   A.  Well, I guess you would call it that way.

13   Q.  It's -- what do you mean guess?

14   A.  He gave me information, and I relayed it to my boss, and we

15   found the other confidential source, Tony.  They spoke and Tony

16   was introduced to Jorge, and they took it from there.  The

17   other guy was gone.  He was in the wind, the other CS.  We

18   didn't use him anymore.  We didn't talk to him anymore.

19   Q.  But that other CS was involved in narcotics trafficking,

20   correct?

21   A.  The other CS?

22   Q.  Yes.

23   A.  Well, he knew traffickers, yes.

24   Q.  And at that time, the DEA was not investigating Sandy

25   Gomez, correct?

 1   A.  Not that I'm aware of that, no.

 2   Q.  Now, the second individual, cooperating witness who is, you

 3   called him Tony, is that Antonio Jimenez-Baez?

 4   A.  I don't know his full name.  I know him as Tony.

 5   Q.  Do you know his last name?

 6   A.  No, I don't.

 7   Q.  But Tony was the second individual who provided information

 8   about the Jorge needing a trap vehicle, correct?

 9   A.  Well, he ended up speaking with Jorge, yes.  He didn't give

10   me information.  He didn't have initial information.  He spoke

11   to Jorge.  He was introduced to Jorge and he spoke to Jorge and

12   Jorge told him that he needed a trap vehicle.

13   Q.  And this confidential informant Tony, he was also under

14   investigation, correct?

15   A.  Not by, not by me.

16   Q.  Was he being prosecuted for narcotics crimes?

17   A.  I'm not sure.

18   Q.  So you have no information about whether he was being

19   prosecuted, whether he pleaded guilty, any of that?

20   A.  I don't know, because he is a source for a special agent

21   named Dill.

22   Q.  Now, you indicated that the vehicle that was provided to

23   Jorge Gomez had a secret compartment, correct?

24   A.  Correct.

25   Q.  And at the time the vehicle was provided to Jorge Gomez,

 1   the informant was wearing a body wire, correct?

 2   A.  Yes, he was.

 3   Q.  And the body wire allowed for recording of that meeting,

 4   correct?

 5   A.  Whatever meeting he was going to have with him, yes.

 6   Q.  The conversation between Jorge Gomez and the confidential

 7   informant Tony was recorded, correct?

 8   A.  Correct.

 9   Q.  And were you able to listen to that conversation?

10   A.  I didn't listen to it, no.

11   Q.  Now, when you observed Tony meet at the location with

12   Jorge, Mr. Sandy Gomez was not present, correct?

13   A.  Correct.

14   Q.  Were you able to listen to the conversation with respect to

15   the meeting that took place inside?

16   A.  No, I did not.

17   Q.  Were you able to observe the demonstration of the opening

18   up and the closing of the trap between Jorge Gomez and Tony?

19   A.  No, I did not see that.  The parking lot where that, on

20   28th Street, sits high, so you can't really see that well

21   unless you have a car parked up there, and I wasn't up there.

22   Q.  Now, this vehicle, the white you call it, was equipped with

23   a GPS tracker, correct?

24   A.  Correct.

25   Q.  The tracker was designed to allow you to track the vehicle

1   from New Jersey to Louisiana, correct?

2   A.  Well, wherever he was going to drive it to, yes.

3   Q.  And the trap also had an alarm attached to it, correct?

4   A.  Correct.

5   Q.  And the purpose of that alarm was to signal any access,

6   whether it was opened, of that trap, correct?

7   A.  Correct.

8   Q.  Would it be fair to say that -- withdrawn.

9       Would it be fair to say that the opening of that trap would

10  suggest that narcotics are being placed inside?

11          MR. EGAN:  Objection.

12          THE COURT:  Sustained.

13  Q.  The purpose of the alarm was to send a signal to the DEA

14  agents when the secret compartment was opened, correct?

15  A.  Correct.

16  Q.  You never, you or any members of your team, ever received

17  an alarm, correct?

18  A.  What do you mean we didn't receive an alarm?

19  Q.  You never received a signal that the alarm, that the trap

20  was accessed, correct?

21  A.  Whenever it was accessed, we would receive an alarm, yes.

22  Q.  You never received an alarm, correct?

23  A.  I don't understand the question.

24  Q.  Did you receive a signal that the trap had been opened

25  between the time that it left New Jersey to the time it got to

1    Louisiana?

2    A.   Between New Jersey and Louisiana?

3    Q.   Yes.

4    A.   No.

5    Q.   I'm sorry?

6    A.   No, I don't believe we have.  I don't remember it being,

7    getting an alarm that it was being opened.

8    Q.   Now, you indicated that you observed Sandy in Louisiana

9    meet with an individual, correct?

10   A.   I saw him in, with a black male in his vehicle, in the

11   Yukon.

12   Q.   During your observation, you did not observe Mr. Gomez,

13   sitting here, engage in any type of exchange, correct?

14   A.   I did not.

15   Q.   And during the time that he was being surveilled in

16   Louisiana, you never observed him engaging in any type of

17   narcotics transaction, correct?

18   A.   I did not.

19   Q.   And you never observed Sandy Gomez receiving any packages

20   from anyone, correct?

21   A.   I did not.

22   Q.   Nor did you observe him, Sandy Gomez, giving any packages

23   to anyone, correct?

24   A.   I did not.  Correct.

25   Q.   Nor did you observe Ms. Ramon-Baez accepting or receiving

1   packages, correct?

2   A.  No.  I --

3   Q.  I'll do them one at a time.

4   A.  OK.

5   Q.  You never observed Ms. Ramon-Baez giving a package to

6   anyone, correct?

7   A.  No I did not.

8   Q.  Nor did you observe him receiving a package from anyone,

9   correct?

10  A.  I did not.  Correct.

11  Q.  This package you described in the Yukon, it's not really

12  visible to the naked eye, correct?

13  A.  Correct.

14  Q.  You have to lift up the seat to find it, correct?

15  A.  Well, the seat is lifted when, if activated, yes.

16  Q.  Just so the jury understands, this trap is in the back

17  seat, right?

18  A.  In the back seat, correct.

19  Q.  And it's underneath the seat itself in the back, correct?

20  A.  Yes.

21  Q.  So the trap is underneath the part that you would sit on,

22  correct?

23  A.  Correct.

24  Q.  Now, Mr. Sandy Gomez was driving the vehicle at the time

25  you surveilled him, correct?

58

1   A.  Correct.

2   Q.  At various times Ms. Ramon-Baez was the front passenger,

3   correct?

4   A.  Correct.

5           MS. TODD:  Moment, your Honor.

6           THE COURT:  Yes.

7   Q.  Now, you indicated you observed him going into various

8   establishments.  One was Pep Boys, the gas station later, and

9   during that time, he was not observed meeting with anyone,

10  correct?

11  A.  Correct.

12  Q.  Were you part of the processing of Mr. Gomez's arrest?

13  A.  No.

14  Q.  And do you recall what fast food restaurant; was that

15  Popeye's that they went to?

16  A.  Yes, correct.

17  Q.  And Government Exhibit, I believe it's --

18          MS. TODD:  May we have Government Exhibit 100 up?

19  Q.  On top of that truck, Government Exhibit 100, is that the

20  Popeye's chicken box?

21  A.  I don't know what that is.

22  Q.  But that is an object, correct?

23  A.  I don't know if it's on the vehicle or it's something on

24  the other side of the vehicle, but I see something up there.

25  Q.  That is not a fixture of the vehicle, is it?

 1   A.  I don't know.  I can't really tell by that picture.

 2   Q.  You were one of the agents who delivered this vehicle to

 3   the informant to give to George Gomez, correct?

 4   A.  Correct.

 5   Q.  You know what the vehicle looked like initially, correct?

 6   A.  Yes.

 7   Q.  The thing that's sitting on the top was not there when you

 8   gave it to --

 9   A.  What I'm saying is I don't know if that's on top of the

10   vehicle because I can't really tell if that's really on top of

11   the vehicle or if that's something that's next to the vehicle.

12   Q.  Fair enough.  Now, you indicated that when Mr. Gomez was

13   stopped, you were not present?

14   A.  Correct.

15   Q.  But you observed the flashing lights?

16   A.  Yes, I did.

17   Q.  You observed them being pulled over?

18   A.  No.  All I saw was flashing lights.

19   Q.  So the next time you saw -- withdrawn.

20           MS. TODD:  Nothing further, your Honor.

21           THE COURT:  All right.  Any redirect?

22           MR. EGAN:  Briefly, your Honor.

23   REDIRECT EXAMINATION

24   BY MR. EGAN:

25   Q.  On cross-examination, you were asked some questions about

 1   the condition of the car when you gave it to Tony.  Do you

 2   recall that?

 3   A.  Yes.

 4   Q.  Prior to turning over the car to the CS, did you guys check

 5   inside the trap?

 6   A.  Yes.

 7   Q.  Was there anything in the trap at that time?

 8   A.  No.

 9   Q.  Was there anything elsewhere in the car, or was the car

10   empty?

11   A.  The car was empty.

12   Q.  You also mentioned that when you, with respect to the

13   alarms, the trap alarms, you said there were some problems or

14   eventually there were some problems.  Can you describe what

15   those were?

16   A.  It wasn't functioning.

17   Q.  How do you know that?

18   A.  Well, we already know because we weren't getting any

19   signals that the trap was being opened or closed.

20   Q.  When you were initially testing it, did you have the same

21   sort of problems?

22   A.  No.

23            MR. EGAN:  One moment.

24            Nothing further, your Honor.

25            THE COURT:  All right.  Anything else, Ms. Todd?

1           MS. TODD:  Yes, your Honor.  Briefly.

2    RECROSS-EXAMINATION

3    BY MS. TODD:

4    Q.  Despite the GPS not functioning, you were able to track the

5    vehicle from New Jersey to Louisiana, correct?

6    A.  Correct.

7           MS. TODD:  Nothing further.

8           THE COURT:  All right.  Anything else?

9           MR. EGAN:  Not from the government.

10          THE COURT:  You can step down, sir.

11          (Witness excused)

12          THE COURT:  All right.  Ladies and gentlemen, that's

13   going to conclude the testimony for today.  I do want to tell

14   you what our schedule is going to be.  First of all, as I told

15   you during jury selection, we're going to have an unusual day

16   tomorrow in light of the election, so we're going to begin at

17   9:30 in the morning, but we will end at 2:00.  That means no

18   lunch.  What I'm going to ask you to do, we're going to take

19   two breaks.  We're going to take a morning break and then we're

20   going to take a break at, say, 12:45 or so.  Bring a granola

21   bar or a snack or something to keep you going until 2:00,

22   because we're not going to take a lunch break.  We're going to

23   take two ten-minute breaks during the day and then at 2:00

24   we're going to call it quits.  Wednesday, we'll resume a

25   9:30-to-5 schedule and Thursday, if necessary, we'll continue

1    with the 9:30-to-5 schedule.  Tomorrow is unusual; it's just

2    for Election Day, and that will be the schedule that we will be

3    on.

4               In just a moment, I'm going to ask Mr. Ruocco to lead

5    you into the jury room.  That's where you will report tomorrow

6    morning.  Mr. Ruocco will give you a telephone number where we

7    can be reached, and he will ask you to give him a telephone

8    number so that we can have communication if necessary.

9               In the meantime, don't discuss the case.  You've only

10   heard a little bit of the testimony.  Don't discuss the case

11   with anyone.  Keep an open mind, because there's more testimony

12   to hear.  And we'll resume at 9:30 tomorrow morning.  In the

13   meantime, goodnight, and please follow Mr. Ruocco into the jury

14   room.  Thank you all very much.

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

```
 1                    (In open court; jury not present)

 2              THE COURT:  Please be seated.  We do have the legal

 3     issue remaining about the transcript.  I did find the case that

 4     Mr. Cooper had mentioned earlier, the Sanin case.

 5              Mr. Cooper, that's a summary order; it's not anything

 6     I can rely on.  I'm still interested in authority, precedential

 7     authority, so I would like to get a letter from the parties.

 8              Ms. Todd, you're welcome to put in a letter as well.

 9     But I would like authority on this issue.  The issue is very

10     straightforward.  The government has argued that the statements

11     that Mr. Jorge Gomez made on the transcript, which is

12     Government Exhibit 207T, were made in furtherance of the

13     conspiracy even though two of the coconspirators had been

14     arrested and even though the statement was made to a government

15     informant.  What I'm looking for is authority confirming that a

16     statement made to a government informant can be a coconspirator

17     statement, essentially if the person believes that the person

18     he is speaking to is a coconspirator and if the speaker also

19     believes that the statement is made in furtherance of the

20     conspiracy.

21              If the government could focus on cases that involve

22     that scenario, I'd be happy to read the authority.  And as I

23     said, Ms. Todd, I'm happy to look at any authority you have on

24     the subject as well.

25              Anything else the parties want to raise before we
```

1  break for the evening?

2     MR. EGAN:  Not from the government.

3     MS. TODD:  Not from the defense, your Honor.

4     THE COURT:  All right.  When do you expect the

5  transcripts to start coming in?

6     MR. COOPER:  The first witness tomorrow, your Honor.

7     THE COURT:  OK.  So let's talk about the issue about

8  the transcript postarrest, I guess you could call it the

9  postarrest transcript in the sense that it's post Sandy Gomez

10 and Caronlay Baez.  It's post their arrest but before Jorge

11 Gomez was arrested.  Let's talk about that transcript before we

12 begin tomorrow, so let's start at nine so we can chat about

13 that before the jury arrives.  OK?

14    MR. COOPER:  Certainly, your Honor.  Thank you.

15    THE COURT:  Thank you all.  See you tomorrow morning.

16    (Adjourned to November 8, 2016, at 9:00 a.m.)

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                          Page

JOSE M. GARCIA

Direct By Mr. Egan . . . . . . . . . . . . . . .26

Cross By Ms. Todd  . . . . . . . . . . . . . .50

Redirect By Mr. Egan . . . . . . . . . . . . .59

Recross By Ms. Todd  . . . . . . . . . . . . .61

GOVERNMENT EXHIBITS

Exhibit No.                                     Received

 100   . . . . . . . . . . . . . . . . . . . . .33

 1   . . . . . . . . . . . . . . . . . . . . .37

 2   . . . . . . . . . . . . . . . . . . . . .39