1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          15 Cr. 348 (PGG)

5

    SANDY GOMEZ,
6
                                          Trial
7              Defendant.

8   ------------------------------x

9                                    New York, N.Y.
                                     November 8, 2016
10                                   9:30 a.m.

11

    Before:
12
                    HON. PAUL G. GARDEPHE,
13
                                          District Judge
14                                        -and a Jury-

15

                         APPEARANCES
16
    PREET BHARARA
17       United States Attorney for the
         Southern District of New York
18  PATRICK EGAN
    RICHARD A. COOPER
19  SHAWN G. CROWLEY
         Assistant United States Attorneys
20

21  NATALI J.H. TODD
         Attorney for Defendant
22

23
    ALSO PRESENT:  NATASHA BONILLA, Interpreter (Spanish)
24                 ELIZABETH CARUSO, Interpreter (Spanish)

25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

1               (Trial resumed; jury not present)

2         THE COURT:  We are still waiting for a couple of

3 jurors, but I'm prepared to rule on this issue regarding

4 Government Exhibit 207T.  We will do that while we are waiting.

5         The defendant objects to the admission of Government

6 Exhibit 207T, which is an English translation of a December 8,

7 2014 telephone conversation, which took place in Spanish,

8 between Jorge Gomez and the government's confidential source:

9 Jorge Gomez's alleged coconspirators, the defendant, Sandy

10 Gomez, who is on trial and Caronlay Ramon-Baez, who is expected

11 to be a witness, had been arrested the day before, on December

12 7, 2014, in Louisiana, after a traffic stop that was arranged

13 by the DEA.  The defendant argues that the conversation

14 reflected in Government Exhibit 207T is hearsay and does not

15 fall within the hearsay exception set forth in Federal Rule of

16 Evidence 801(d)(2)(E) because the statements made by Jorge

17 Gomez are not in furtherance of the charged conspiracy, citing

18 docket No. 111.  The government argues that the transcript is

19 admissible under Rule 801(d)(2)(E), citing docket No. 112.

20         In the conversation reflected in Government Exhibit

21 207T, Jorge Gomez reports to the government's informant that

22 Ramon-Baez and his brother, Sandy Gomez, have been arrested in

23 Louisiana.  Jorge Gomez is aware that the vehicle in which they

24 were arrested is registered to someone other than the

25 informant, and he asks the informant "in whose name is that

 1    under?"  Citing Government Exhibit 207T at pages 2-3.  The

 2    informant says that he has to call the owner "right now." Jorge

 3    Gomez agrees.  *Id.* at 4.  Jorge Gomez goes on to say that the

 4    vehicle has been seized by law enforcement and that the

 5    occupants, his brother and Ramon-Baez, have been arrested.  He

 6    goes on to say that he has "already hired a lawyer and

 7    everything."  *Id.*  Jorge Gomez expresses the hope that the

 8    police will not "find anything," and he confirms with the

 9    informant that the trap "won't open, right?" *Id.* at 6.  Jorge

10    Gomez and the informant discuss and agree that the owner of the

11    vehicle must be told about the traffic stop and the arrest.

12    Jorge Gomez says, "Yes, tell the truth because it's -- tell the

13    person under whose name, this is the truth, you have to tell

14    him."  Jorge repeatedly instructs the informant to contact the

15    owner immediately and then call Jorge back.  *Id.* at pages 7-9.

16         The defendant argues that Government Exhibit 207T

17    contains "multiple layers of hearsay" and "was not made in

18    furtherance of the conspiracy."  Citing docket No. 111 at page

19    1.  The defendant points out that the informant was not a

20    coconspirator, because he was acting at the government's

21    behest.  *Id.*  The defendant also argues that because the

22    defendant had been arrested by the time this telephone call

23    took place, the conspiracy had been terminated.  *Id.* at page 2.

24         Rule 801(d)(2)(E) states that a statement that is

25    "offered against an opposing party and was made by the party's

1   coconspirator during and in furtherance of the conspiracy" is

2   not hearsay.

3          As an initial matter, defendant's argument that the

4   conspiracy had been terminated as a result of his arrest and

5   Ramon-Baez's arrest, that argument is not correct.  The arrest,

6   or even the incarceration of coconspirators, does not

7   necessarily signal the end of a conspiracy.  *See*, *e.g.*, *United*

8   *States v. Persico*, 832 F.2d 705, 715-16 (2d Cir. 1987)

9   (conspiracy continued after incarceration of some members of

10  the conspiracy); also *United States v. Paredes*, 176 F.Supp.2d

11  183, 1989 (S.D.N.Y. 2001) (post-arrest telephone call for help

12  with posting bail found to be a coconspirator statement found

13  under 801(d)(2)(E).

14         "Even where particular crimes have already been

15  committed, the conspiracy does not necessarily end.  It

16  continues until its aim has been achieved, it has been

17  abandoned, or otherwise terminated." *United States v.*

18  *Arrington*, 867 F.2d 122, 130 (2d Cir. 1989) (quoting *United*

19  *States v. Rucker*, 586 F.2d 899, 906 (2d Cir. 1978).  "Though

20  the cessation of conspiratorial activity is generally

21  considered insufficient to demonstrate a withdrawal from the

22  conspiracy, either the making of a clean breast to the

23  authorities, or communication of the abandonment in a manner

24  reasonably calculated to reach coconspirators is sufficient to

25  establish withdrawal." *United States v. Greenfield*, 44 F.3d

1    1141, 1149-50 (2d Cir. 1995) (quoting *United States v. Borelli*,

2    336 F.2d 376, 388 (2d Cir. 1964).

3          Here, there is no evidence of a withdrawal of any

4    sort.  There was no clean breast made to the authorities.

5    There was no communication of abandonment.  There is nothing

6    that's been presented to me that suggests that any one of the

7    alleged coconspirators, whether it be Jorge Gomez, Sandy Gomez,

8    neither one had withdrawn from the conspiracy.

9          I further find that the evidence that's been presented

10   to me indicates that the conspiracy had not ceased.  Jorge

11   Gomez, in the taped conversation that's at issue, Government

12   Exhibit 207T, expresses the hope that the cocaine will not be

13   recovered by the police, presumably, so it can be distributed

14   later by him.  Moreover, a reasonable jury could find that the

15   purpose of Jorge Gomez's call was to protect the conspiracy

16   from disclosure.  He calls the informant to find out who the

17   car is registered to and to make sure that the informant will

18   alert the owner to the seizure of the vehicle.  It is a

19   reasonable inference that Jorge Gomez wants to make sure that

20   when the owner is contacted by the authorities, he will not say

21   anything that would endanger the conspiracy or its members.

22   For the same reasons, Jorge's statements are in furtherance of

23   the charged conspiracy.

24         To be in furtherance of a conspiracy "the statements

25   must in some way have been designed to promote or facilitate

1   achievement of the goals of the ongoing conspiracy." Citing

2   *United States v. James*, 712 F.3d 79, 106 (2d Cir. 2013).

3         The ways in which a statement might promote or

4   facilitate the conspiracy include, among others, seeking to

5   induce a coconspirator's assistance; informing coconspirators

6   as to the progress or status of the conspiracy; and prompting a

7   noncoconspirator to respond in some way that promotes or

8   facilitates the carrying out of criminal activity."  Citing

9   *James*, 712 F.3d at 106.

10         Here, Jorge's statements promoted the conspiracy in a

11   number of ways.  First of all, they updated a purported

12   coconspirator as to the status of the conspiracy and to a

13   particularly critical event, namely, the arrest of two

14   coconspirators.

15         Moreover, as I've said, Jorge Gomez's statements were

16   designed to ensure that the owner would be alerted to the fact

17   that the vehicle had been seized and to make sure that when the

18   owner was contacted by the authorities, as I said, that he

19   would not say anything that would endanger the conspiracy.  So

20   in seeking to protect the conspiracy from discovery by law

21   enforcement, Jorge Gomez was acting in furtherance of the

22   conspiracy.

23         Now, defense counsel has pointed out that the

24   informant obviously was not a coconspirator.  The informant was

25   acting on behalf of the government.  And so the question is

1    posed whether the fact that Jorge Gomez was unknowingly,

2    unwittingly speaking to an informant rather than a

3    coconspirator does that mean that his statements were not in

4    furtherance of the charged conspiracy.  "The principal question

5    in the in furtherance issue is whether the statement promoted

6    or was intended to promote the goals of the conspiracy."

7    Citing *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d

8    1181, 1199 (2d Cir. 1989).  As the Second Circuit has stated,

9    to be in furtherance, "the statements must in some way have

10   been designed to promote or facilitate achievement of the goals

11   of the ongoing conspiracy."  Citing *United States v. Tracy*, 12

12   F.3d 1186, 1196 (2d Cir. 1993).  This includes "communicating

13   with a person who is not a member of the conspiracy in a way

14   that is designed to help the coconspirators to achieve the

15   conspiracy's goals."  *United States v. Rivera*, 22 F.3d 430, 436

16   (2d Cir. 1994).  That is what happened here.

17        In accordance with this law, courts commonly admit

18   statements made by a coconspirator, even though they are

19   unwittingly being made to a government informant or agent.  In

20   *United States v. Farhane*, 634, F.3d 127, 162 (2d Cir. 2011),

21   for example, a coconspirator made statements to a government

22   informant and an undercover agent that "sought to persuade

23   someone whom [the coconspirator] thought could admit him to

24   Al-Qaeda that [the coconspirator and the defendant] were

25   trustworthy and would, in fact, provide material assistance to

1    that organization."  The circuit affirmed the district court's

2    admission of these statements.  *See Id.*  Similarly, in *United*

3    *States v. Minicone*, 960 F.2d 1099, 1109-10 (2d Cir. 1992), the

4    Court admitted a recorded conversation between the defendant's

5    coconspirator and an agent of the government, holding that it

6    was "immaterial that [the agent] was working for the government

7    at the time the conversation was recorded."  Accordingly, the

8    fact that a coconspirator's statement was made unwittingly to a

9    government informant does not preclude admission if the

10   coconspirator intended in making the statements that he did to

11   further the conspiracy.

12        I find that Jorge Gomez's statements in Government

13   Exhibit 207T were made in furtherance of the charged conspiracy

14   by him.  The informant's statements would not be hearsay, in

15   any event, because the government is not offering them for

16   their truth.  And if defense counsel requests an instruction to

17   that effect, I will give one.  In any event, the informant's

18   statements are also necessary to put Jorge Gomez's statements

19   in context.

20        Accordingly, Government Exhibit 207T will be received

21   as a statement in furtherance of the charged conspiracy.

22        MS. CROWLEY:  Judge, one additional issue.  We expect

23   that Ms. Ramon-Baez is going to be the second witness called

24   today.  And I just wanted to front for the Court and defense

25   counsel that I plan to lead her a little bit through the

1    sections of questioning where we discuss what your Honor ruled

2    on the other day with respect to statements that the defendant

3    made to her in order to make sure that she doesn't testify

4    about the threats that your Honor ruled could not come in.

5         THE COURT:  That makes sense to me.

6         MS. CROWLEY:  In addition, your Honor, we are going to

7    be reading some stipulations today, and I didn't know if the

8    Court wanted to instruct the jury on stipulations before we do.

9         THE COURT:  I'll be happy to do that.  You'll signal

10   to me when you first wish to introduce a stipulation, and I

11   will give them an instruction at that time.

12        MS. CROWLEY:  Thank you, your Honor.

13        THE COURT:  What is the nature of the stipulations?

14   Are these, the testimony would be, or to facts?  What kind of

15   stipulation?

16        MS. CROWLEY:  They are mainly fact stipulations.  They

17   have to do with the transcripts and translations and then just

18   getting some evidence in like phones.

19        THE COURT:  Ok.

20        We are waiting for juror no. 2, who is an 86-year-old

21   gentleman, and I don't know whether you noticed, but he moves

22   at a very, very, very slow rate and I wish counsel had kept in

23   mind the difficulties that was going to present to us.

24        We are now coming up on 10:00.  Court was supposed to

25   begin at 9:30, so we have already lost almost half an hour.  If

1  we hit the 10:00 hour and we have not heard from him and he

2  hasn't appeared, we need to start thinking about whether we are

3  going to proceed without him.  I fear this will be a recurrent

4  problem.  That's where we are.

5          (Continued on next page)

1           THE COURT:  All right.  How do the parties wish to

2    proceed?

3           We are now at 10 o'clock

4           MS. TODD:  Your Honor, Mr. Gomez would like to wait to

5    find out if something actually happened as opposed to him just

6    being late and just to give him an opportunity.  We realize the

7    Court is running late, but the juror expressed a desire to

8    serve.  Without any further information Judge, we would object

9    to replacing him at this time.

10          THE COURT:  How long do you propose that we wait?

11          MS. TODD:  Another half an hour, your Honor.

12          THE COURT:  We will wait until 10:30.

13          (Recess)

14          THE COURT:  All right.

15          The time now is 10:35.  We have not heard from Juror

16   No. 2 even though Mr. Ruocco yesterday gave him a telephone

17   number where he could contact us if he was going to have any

18   difficulty in coming to court.  He is an hour late, more than

19   an hour late at this point, and we have not heard anything from

20   him.

21          So, Ms. Todd, how do you wish to proceed?

22          MS. TODD:  We can proceed without Juror No. 2, and I

23   suppose we will have the alternate No. 13 move into --

24          THE COURT:  No.  Everybody will just move up.  So the

25   person who is now Juror No. 13 will become Juror No. 12.

1          MS. TODD:  That is fine, Judge.

2          THE COURT:  The government?

3          MR. COOPER:  No objection, your Honor.

4          THE COURT:  Then we will resume now.

5       (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Please be seated.

3          Sorry for the delay, ladies and gentlemen.  We were

4   prepared to proceed at 9:30, as I had told you yesterday.  We

5   have been waiting for Juror No. 2, who I am sure you are aware

6   is not here this morning.  So we are going to be proceeding

7   without him.

8          The law permits us in these circumstances to proceed

9   without him, so we are going to move forward at this point with

10  the evidence and we will continue without Juror No. 2.

11         So the government will call its next witness.

12         MR. COOPER:  Yes, your Honor.  The government calls

13  Antonio Jimenez-Baez.

14   ANTONIO JIMENEZ,

15       called as a witness by the Government,

16       having been duly sworn, testified as follows:

17  DIRECT EXAMINATION

18  BY MR. COOPER:

19         THE COURT:  Please proceed.

20         MR. COOPER:  Thank you, your Honor.

21  Q.  Mr. Jimenez, you may want to pull that microphone a little

22  closer to you to make it easier to hear.

23         How old are you?

24  A.  33 years old.

25  Q.  Where were you born?

79

```
 1    A.   Puerto Rico.

 2    Q.   Where did you grow up?

 3    A.   Puerto Rico.

 4    Q.   How far did you go in school?

 5    A.   High school diploma.

 6    Q.   Let's focus on 2012.

 7              Where were you living at that time?

 8    A.   Grand Rapids, Michigan.

 9    Q.   How long had you been living in Grand Rapids, Michigan?

10    A.   Around two years.

11    Q.   And what do you do for a living?

12    A.   I work for a shipping company.

13    Q.   What was your job at that shipping company?

14    A.   I picking up packages and drive it from Michigan to New

15    Jersey and New York.

16    Q.   Did you do anything else to make money at that time?

17    A.   Yes.  Selling drugs.

18    Q.   What kind of drugs were you selling at that time?

19    A.   Cocaine.

20    Q.   Can you describe for the jury some of the things that you

21    did to sell drugs in that period.

22    A.   I imported and distributing cocaine receiving by post

23    office mail and in airplanes.

24    Q.   From what other locations did you import the cocaine?

25    A.   Puerto Rico and Curacao and Colombia.
```

Cb8ngom2                Limenez            direct

80

1    Q.   What did you do with the drugs once they were in the United

2    States?

3    A.   I distribute it and sell it.

4    Q.   What was your particular role in all of that?

5    A.   I provide the people who have the address for picking up

6    the packages for the post office and have the connections in

7    South America.

8    Q.   Were you responsible for transporting drugs?

9    A.   Yes.

10   Q.   Did you ever use automobiles or trucks to do that?

11   A.   Yes.

12   Q.   How did you transport the drugs when you used automobiles

13   or trucks?

14   A.   In a secret compartment.

15   Q.   Is there a term that you used for secret compartments?

16   A.   That is a space you make inside of a car.  Make it look

17   original, but it is for hide illegal stuff.

18   Q.   You mentioned that you made a space inside of cars.

19            Can you describe for the jury some of the locations

20   inside of cars where secret compartment spaces were made.

21   A.   It can be anywhere you have enough space for hide stuff,

22   like the dashboard, the back seat, in the trunk of the car.

23   Q.   Is there a term that you use to refer to secret

24   compartments?

25   A.   Traps.

1    Q.   Traps.   Why did you use traps to transport drugs?

2    A.   Because if somebody is -- the police pull over me, they not

3    going to notice anything wrong in the car.

4    Q.   Did you use traps to transport other things in addition to

5    drugs?

6    A.   No.

7    Q.   Were you arrested in connection with your involvement in

8    selling cocaine?

9    A.   Yes.

10   Q.   When was that?

11   A.   In December 2012.

12   Q.   Did you plead guilty in that case?

13   A.   Yes.

14   Q.   When was that?

15   A.   In 2013.

16   Q.   As part of your guilty plea, did you agree to cooperate

17   with the government?

18   A.   Yes.

19   Q.   Did you assist the DEA after that in their investigations?

20   A.   Yes.

21   Q.   As part of your cooperation did there come a time when you

22   assisted in an investigation relating to Paterson, New Jersey?

23   A.   Yes.

24   Q.   How did you first get involved?

25   A.   I received a call from an agent.

82

1    Q.  You received a call from whom?

2    A.  From an agent.

3    Q.  What was the agent's name?

4    A.  Joe Dill.

5    Q.  When was it that you received a call from Agent Dill?

6    A.  Excuse me?

7    Q.  When was it that you received a call from Agent Dill?

8    A.  In December 2014.

9    Q.  Did he give you any instructions?

10   A.  Yes.

11   Q.  What were you instructed to do?

12   A.  He gave me a phone call, and he wants I call that number.

13   Q.  Were you informed anything about that number or who it

14   belonged to?

15   A.  Yes.  I supposed to call somebody and offer him I make

16   traps and have cars with traps.

17   Q.  Did you understand what role you were supposed to play when

18   you called that number?

19   A.  Yes.  I going to supply the car with the trap for that

20   person.

21   Q.  Did you call the number that you were given?

22   A.  Yes.

23   Q.  Did you end up speaking with anyone?

24   A.  Yes.

25   Q.  Did you ultimately learn that person's name?

```
 1   A.  Yes.

 2   Q.  What is it?

 3   A.  Jorge.

 4   Q.  Did you have conversations with Jorge after that?

 5   A.  Yes.

 6   Q.  What about meetings with Jorge?

 7   A.  Yes.

 8          MR. COOPER:  All right.  Your Honor, can we publish

 9   Government Exhibit 1 which is already in evidence?

10          THE COURT:  Yes.

11          MR. COOPER:  Thank you.

12          Ms. Thomas.

13   BY MR. COOPER:

14   Q.  All right.  Do you recognize this photo?

15   A.  Yes.

16   Q.  Who is it?

17   A.  Jorge.

18          MR. COOPER:  Thank you.  You can take that down,

19   Ms. Thomas.  Thank you.

20   Q.  With respect to the conversations and the meetings that you

21   had with Jorge, did you record them?

22   A.  Yes.

23   Q.  In the course of this investigation, did you have

24   conversations with anyone else?

25   A.  Yes.
```

1   Q.  Do you know the person's name?

2   A.  No.

3   Q.  All right.  Let's focus on Jorge for a minute.  Generally

4   speaking, what did you discuss with Jorge?

5   A.  I discussed with him, I going to provide him a car and rent

6   it by daily, and he want to make some traps in cars for him.

7   Q.  When you say that he wanted you to make some traps in cars

8   for him, what was that in reference to?

9   A.  Make secret spots in cars for driving and going and picking

10  up drugs.

11  Q.  Did you ultimately provide anything to Jorge?

12  A.  Yes.

13  Q.  What did you provide to him?

14  A.  White Denali.

15  Q.  I'm sorry?

16  A.  White Denali.

17  Q.  When was it that you provided him that white Denali?

18  A.  In New Jersey.  Paterson, New Jersey.

19  Q.  And when was it?

20  A.  In December 2014.

21  Q.  Was there anything notable or special about the white

22  Denali that you provided to Jorge?

23              MS. TODD:  Objection.

24              THE COURT:  Grounds?

25              MS. TODD:  Leading.

```
 1              THE COURT:  Overruled.
 2   A.   Yes.  I have a trap in the back seat of the truck.
 3   Q.   OK.  We'll come back to that in a moment, but you mentioned
 4   another individual that you spoke with during the course of the
 5   investigation.
 6              What did you discuss with that other individual?
 7   A.   That guy called me saying he don't like the way the car
 8   looks like, because the trap looks bad.  And he -- because he
 9   have one of those cars before.  And I say him was no problem
10   because we use it before and we never have any issues with
11   that.
12   Q.   All right.  Did you ever come to learn what happened to
13   that white Denali that you provided to Jorge?
14   A.   Yes.
15   Q.   What happened to it?
16   A.   They get pulled over.
17   Q.   Now, Mr. Jimenez, you testified earlier that you had
18   pleaded guilty to federal crimes before you assisted in this
19   investigation.
20              In particular, what crimes did you plead guilty to?
21   A.   Importing and distributing drugs.
22   Q.   What kinds of drugs?
23   A.   Cocaine, heroin, and marijuana.
24   Q.   How much cocaine, heroin, and marijuana were you
25   responsible for distributing before you pled guilty?
```

1    A.  Hundreds of keys, of kilos.

2    Q.  Were you ultimately sentenced in that case?

3    A.  Yes.

4    Q.  When was it that you were sentenced?

5    A.  In 2014.

6    Q.  What sentence did you receive?

7    A.  Time served.

8    Q.  You mentioned that you had pled guilty pursuant to a

9    cooperation agreement.  What was your understanding of your

10   obligations under that agreement?

11   A.  Say the truth, help the agents in any investigation and

12   provide any information about illegal activities.

13   Q.  What was your understanding of what the government agreed

14   to do if you did all that?

15   A.  They can write a letter to the judge.

16   Q.  Did you have an understanding of the impact of that letter?

17   A.  Yes.

18   Q.  What is that?

19   A.  That can reduce my time.

20   Q.  As far as you understood, did the outcome of your

21   participation in this investigation have any impact on whether

22   the government sent that letter?

23   A.  Excuse me.

24   Q.  Did you have an understanding of whether the outcome of

25   your participation in this investigation that we are talking

1    about here today had any impact on whether the government sent

2    that letter to the judge?

3    A.   No.

4    Q.   Now, during the period before you were sentenced in that

5    case, did you assist the government in any of its ongoing

6    investigations?

7    A.   Yes.

8    Q.   Did your work in this case happen in that period before you

9    were sentenced?

10   A.   Yes.

11   Q.   Were you paid for the assistance you provided before you

12   were sentenced?

13   A.   No.

14   Q.   What about your out-of-pocket expenses?  Were they

15   reimbursed?

16   A.   Yes.

17   Q.   I think you mentioned, but when were you sentenced in that

18   case?

19   A.   Excuse me?

20   Q.   When were you sentenced in that case?

21   A.   In 2015.

22   Q.   And what sentence did you receive?

23   A.   Time served.

24   Q.   After you were sentenced, did you continue assisting law

25   enforcement agencies in their ongoing investigations?

1    A.   Yes.

2    Q.   Is that assistance done under an agreement you have with

3    the government?

4    A.   Yes.

5    Q.   What is your understanding of the obligations you have

6    under that agreement?

7    A.   The same as the first one; say the truth and help them in

8    any investigation and provide any information about legal,

9    illegal activities.

10   Q.   Are you paid for that assistance?

11   A.   Yes.

12   Q.   In total, how much money have you been paid by law

13   enforcement agencies for your assistance?

14   A.   Around $300,000.

15   Q.   Does that include reimbursement of expenses as well as

16   payments?

17   A.   Yes.

18   Q.   Are you being paid for your testimony here today?

19   A.   No.

20   Q.   All right.   Let's turn back to your participation in this

21   investigation.   You mentioned earlier after speaking with

22   agents you called a telephone number.   Did the person pick up?

23   A.   Yes.

24   Q.   Did you record the call?

25   A.   Yes.

89

1    Q.   How did you record it?

2    A.   A device the DEA provided me.

3    Q.   Did you have any other phone calls during the

4    investigation?

5    A.   Yes.

6    Q.   Did you record them all?

7    A.   Yes.

8    Q.   What language were they in?

9    A.   Spanish.

10   Q.   And did you provide all the recordings to the DEA?

11   A.   Yes.

12            MR. COOPER:  May I approach, your Honor?

13            THE COURT:  Yes.

14   Q.   I have handed you a stack of things there.  We'll go

15   through them one by one.

16            First off, you have what's been marked for

17   identification as Government Exhibit 200, which contains

18   recordings labeled Government Exhibit 201 through 207.

19            Do you recognize Government Exhibit 200?

20   A.   Yes.

21   Q.   How do you recognize it?

22   A.   Because they are my initials on that.

23   Q.   It is a disk.  Have you listened to the disk?

24   A.   Yes.

25   Q.   What's on it?

1   A.  Some of the recordings with the calls and meetings.

2         MR. COOPER:  Your Honor, at this point the government

3   would like to read a stipulation to the jury.

4         THE COURT:  All right.

5         Ladies and gentlemen, I mentioned stipulations

6   earlier, so let me just review that with you.  From time to

7   time, the lawyers will enter into agreements about certain

8   facts, and they are referred to as stipulations.  You can think

9   of it as an agreement.  But the point is that, in these

10   stipulations, both sides agree that certain facts are true, and

11   for your purposes you should accept those facts as true as

12   they're set forth in the agreement that both sides have entered

13   into.

14         So the first such stipulation the government is now

15   going to be introducing.

16         MR. COOPER:  Your Honor, there is a stipulation marked

17   Government Exhibit 1001.

18         It is hereby stipulated and agreed by and between the

19   United States of America by Preet Bharara, United States

20   Attorney, Richard Cooper, Patrick Egan and Shawn G. Crowley,

21   assistant United States attorneys, of counsel, and Sandy Gomez,

22   the defendant, by and through his attorney, Natali Todd, Esq.,

23   that:

24         1.  The right-hand column of Government Exhibits 201T,

25   202T, 203T, 204T, 205T, 206T, and 207T, contain true and

accurate transcriptions of the Spanish-language conversations

contained on Government Exhibits 201, 202, 203, 204, 205, 206

and 207.

       2.  The middle column of Government Exhibits 201T,

202T, 203T, 204T, 205T, 206T, and 207T contains true and

accurate translations of the Spanish-language transcriptions in

the right-hand column.

       3.  The speakers are identified in the left-hand

column of Government Exhibits 201T, 202T, 203T, 204T, 205T,

206T, and 207T.

       4.  The phone numbers used by each participant in the

call are listed on the first page of Government Exhibits 201T,

202T, 203T, 204T, 205T, 206T, and 207T.

       It is further stipulated and agreed that Government

Exhibits 201T, 202T, 203T, 204T, 205T, 206T and 207T as well as

this stipulation as Government Exhibit 1001 may be received in

evidence as Government Exhibits at trial.

       Dated New York, New York, November 3, 2016, and signed

by the parties.

       Your Honor, the government offers Government Exhibits

201T through 207T as well as Government Exhibit 1001U.

       THE COURT:  Any objection?

       MS. TODD:  No, your Honor.

       THE COURT:  Government Exhibits 201T through 207T and

Government Exhibit 1001 are received in evidence.

1           (Government's Exhibits 201T, 202T, 203T, 204T, 205T,

2    206T, 207T, and 1001 received in evidence)

3    BY MR. COOPER:

4    Q.  Mr. Jimenez, let's talk about the first call, that first

5    call you had with Jorge.

6           Where were you when you made that call?

7    A.  Yonkers, New York.

8    Q.  Can you please describe for the jury generally what was

9    discussed during that first call.

10          THE COURT:  Mr. Cooper, have we reached the point

11   where you would like the jury to have the binders?

12          MR. COOPER:  We're about to go to the transcripts, so

13   if it's convenient to distribute them now we can do that.

14          THE COURT:  OK.

15          MR. COOPER:  Thank you, your Honor.

16          THE COURT:  Ladies and gentlemen, we are going to hand

17   each one of you a binder that has the transcripts that you have

18   heard discussed in the testimony.

19          MR. COOPER:  ?May I proceed, your Honor.

20          THE COURT:  Please.

21          MR. COOPER:  All right.

22   BY MR. COOPER:

23   Q.  You mentioned that you were in Yonkers for that first call?

24   A.  Yes.

25   Q.  Can you please describe generally for the jury what you

1   discussed in that first call with Jorge?

2   A.   In the first call I discussed what time I'm going to drive

3   to, crossing the bridge and drive to Paterson, New Jersey, to

4   meet Jorge.

5   Q.   All right.

6         Let's look at the transcript for that call.

7   Ms. Thomas, can we put up on the screen Government Exhibit

8   201T.

9         So, page 1, United States v. Gomez; date, December 3,

10  2014; time 9:33 and 11 seconds in the morning; and participants

11  Jorge Gomez and confidential source.

12        Mr. Jimenez, have you reviewed all of these

13  transcripts prior to testifying today?

14  A.   Yes, sir.

15  Q.   Where the transcript say confidential source or CS, who is

16  that speaking?

17  A.   Myself.

18        MR. COOPER:  Your Honor, with the Court's permission

19  myself and Mr. Egan are going to read the transcripts.  I will

20  read the part of CS, or Mr. Jimenez, and Mr. Egan will read the

21  part of Jorge Gomez?

22        THE COURT:  All right.

23        MR. COOPER:  "Hello."

24        MR. EGAN:  "Hello, yes."

25        MR. COOPER:  Yes.  How are you?  I'm calling on of

94

1   behalf of Giovanni."

2           MR. EGAN:  "Oh, what's up?"

3           MR. COOPER:  Let's actually pause there for a moment.

4   BY MR. COOPER:

5   Q.  Mr. Jimenez, when you said that you were calling on behalf

6   of Giovanni, why did you say that?

7   A.  The agent gave me that name because that is the code and

8   the person who are making the introduction to Jorge.

9           All right.

10          MR. COOPER:  We will continue with the read.

11          "Yes."

12          MR. EGAN:  "What time -- what time can we meet?"

13          MR. COOPER:  "Uh, no, I don't know.  Uh -- uh -- I'm

14  up here in, in, in the towers.  Understand?  In the city."

15          Let's pause there.

16  BY MR. COOPER:

17  Q.  Mr. Jimenez, in the call you say that you are in the

18  towers.  What did you mean by the towers?

19  A.  That is a word we use when we want to say we are in New

20  York.

21  Q.  Any particular part of New York?

22  A.  Manhattan.

23  Q.  Is that a term the towers that you had used previously in

24  your drug trafficking business?

25  A.  Yes.

95

Ch8ngom2                          Jimenez - direct

```
 1            MR. COOPER:  All right.  Let's continue with Jorge
 2    Gomez.
 3            MR. EGAN:  "Yes.  But -- no -- when, uh, because the
 4    thing is weren't -- weren't you going to be seeing me today?"
 5            MR. COOPER:  "Yes, I'm going to see you today, but,
 6    uh, are you coming here, or do you want me to cross over?"
 7            MR. EGAN:  "No, cross over."
 8            MR. COOPER:  OK.  Well let me, let me finish up
 9    something I'm doing, and I'll call you back to tell you what
10    time I'll be -- I can be there, all right?"
11            MR. EGAN:  "Oh, well, all right.  No problem, OK."
12            MR. COOPER:  "OK.  OK."
13    BY MR. COOPER:
14    Q.  Mr. Jimenez, you talk in this call about crossing over.
15            What were you referring to when you said crossing
16    over?
17    A.  Crossing the George Washington bridge.
18    Q.  All right.  Did you speak again with Jorge that same day?
19    A.  Yes.
20    Q.  What did you discuss with him?
21    A.  The time I going drive down to meet him.
22    Q.  Did you discuss the particular car that you were going to
23    be providing to him?
24    A.  Yes.
25    Q.  What about the car did you discuss with him?
```

 1  A.  About the space have in the trap I going to provide him.

 2  Q.  What size was the trap in the car?

 3  A.  Between 25 to 30 kilos.

 4  Q.  And did you use the term kilos when you talked to him?

 5  A.  No.  I used the term miles per gallon.

 6  Q.  Why did you refer to kilos as miles per gallon rather than

 7  kilos?

 8  A.  Because when you are talking over the phone you don't say

 9  straight kilos.  You try to cover it up with any type of word

10  about the conversation you are talking to.

11  Q.  Why when talking on the phone would you want to cover up

12  the term kilos with something else?

13  A.  Because that's typical things in the business of drugs, you

14  never say the straight, because that can incriminate you right

15  away.

16          MR. COOPER:  All right.  Let's look at Government

17  Exhibit 202T, which is in evidence.

18          Ms. Thomas, can you please put up page 1 of that.

19          Date, December 3, 2014; time 11:33 and two seconds;

20  participants, Jorge Gomez and confidential source.

21          Phone numbers 862-250-0822 and 347-767-5609 for the

22  CS.  If we can turn to page 2.  And we'll read this.

23          MR. EGAN:  "What's up, sir."

24          MR. COOPER:  Hey, listen.  I didn't call you yet to

25  tell you the time because I'm waiting for one of my employees

1    to get to the shop so I can leave.  But I don't have any exact

2    time where I can tell you.

3              "Listen, I'm on my way there.  As soon as the man gets

4    here, he will be in charge of something here that I have to

5    finish off."

6              MR. EGAN:  "No."

7              MR. COOPER:  "To -- to deliver today then I'm come

8    over right away.  Understand?"

9              MR. EGAN:  "No problem.  What I wanted was the sec --

10   to be sure because, you know, that as I was talking to -- to

11   Giovanni about this, since, since I've wanted this since

12   Tuesday, he said yes that every day --"

13             MR. COOPER:  "No, because that's, that's --"

14             MR. EGAN:  "I mean."

15             MR. COOPER:  "It's there.  I don't know if he told you

16   the model and everything and that's, that's, that's the,

17   according to what I was discussing with him.  What I'm bringing

18   you runs 25 to 30 miles per, per, per, it has that space her

19   gallon.

20             "Understand what I'm saying?"

21             MR. EGAN:  "Yes.

22             "Listen.  We have to talk about that in person but,

23   uh, uh, what -- what I can tell you is he'll run 20 hours

24   with -- can you do that, uh, with the car?"

25             MR. COOPER:  No.  Listen.  30, 50, whatever you want.

```
 1   Understand?

 2          "But what we have to do is talk about, uh, you and I

 3   about --"

 4          Let's pause there.

 5   BY MR. COOPER:

 6   Q.  Mr. Jimenez, you say here 30, 50 whatever you want.  What

 7   were you referring to there?

 8   A.  The car can drive to any place he wants as far as he wants,

 9   because it was in good condition to drive.

10          MR. COOPER:  Let's continue.

11          MR. EGAN:  From, "There's no problem."

12          MR. COOPER:  "A couple of personal things and then

13   I'll come on over.  Not only that, I'll be leaving with the

14   frame in so you can see what it is.  Understand?"

15          MR. EGAN:  "Well, all right.  OK.  Yes."

16          MR. COOPER:  "I'll arrive with the frame there, and if

17   you like, you can keep it right there and then -- and tell me

18   it's such and such.  Bing, bang, boom and then we square things

19   away.  Understand?"

20          MR. EGAN:  "No, no -- yes, yes.  Don't worry.  Yes.

21   Because I wanted to -- uh, I'm leaving early tomorrow morning.

22   See what I mean?"

23          MR. COOPER:  "No, no problem.  No.  That's not a

24   problem.  The moment this guy comes in --"

25          MR. EGAN:  "We will be in touch here and everything
```

1    and you can come to my house.  But one thing --"

2            MR. COOPER:  "No, uh, tell me."

3            MR. EGAN:  In my house, not Giovanni or anyone.  No

4    one knows where I live.  Understand?"

5            MR. COOPER:  OK.

6    Q.  Mr. Jimenez, did there come a time when you discussed

7    meeting with Jorge?

8    A.  Yes.

9            MR. COOPER:  Ms. Thomas, you can take that down.

10           Thank you.

11   BY MR. COOPER:

12   Q.  What did you do?

13   A.  I drove over the George Washington Bridge in my car and I

14   went to Paterson, New Jersey.

15   Q.  Did you meet anyone in New Jersey when you first got there?

16   A.  I meet the agents.

17   Q.  All right.  Did you later meet anybody else?

18   A.  Jorge.

19   Q.  Can you describe for the jury generally what happened at

20   that meeting with Jorge?

21   A.  I meet him at the gas station, Shell, and then I follow him

22   to his apartment with the car with the trap.

23   Q.  And what happened at Jorge's apartment?

24   A.  I park in his parking spot and give him the keys of the

25   cars, explain him how the trap works, open and close, and then

```
1    we went inside the apartment and I charge him $500 per day and
2    he paid me $1500 for three days.
3    Q.  Was anyone else present for that meeting?
4    A.  It was a lady.
5    Q.  I'm sorry?
6    A.  Was a lady inside the apartment.
7    Q.  I want to slow down a bit.  Was the woman present for the
8    whole meeting?
9    A.  No.
10   Q.  All right.  Did you record that meeting also?
11   A.  Yes.
12   Q.  All right.  So let's go to the start of the meeting.
13            Where did you first meet Jorge?
14   A.  In a shell gas station in Paterson, New Jersey.
15   Q.  I think you mentioned that you met with agents before that.
16            Did you meet them in New Jersey?
17   A.  Yes.
18            MR. COOPER:  All right.  Government Exhibit 100 is
19   already in evidence.
20            Ms. Thomas, can we publish that, please.
21   Q.  Do you recognize Government Exhibit 100?
22   A.  Yes.
23   Q.  What is that?
24   A.  That is the white Denali I delivered to Jorge.
25   Q.  I'm sorry?
```

 1   A.   That is the white Denali I provided to Jorge.

 2   Q.   Where did you get the white Denali from?

 3   A.   From the agents.

 4   Q.   All right.  Did you meet with the agents?

 5   A.   Yes.

 6   Q.   When you met with them, did you inspect the car?

 7   A.   Yes.

 8   Q.   Can you describe for the jury some of the things you did to

 9   inspect the car?

10   A.   The agents showed me how the traps operate, how I need to

11   do for open it, and how I need to do for close, what type of

12   code, buttons I need to press.

13   Q.   You mentioned code and buttons.

14          Stepping back for a minute, can you describe for the

15   jury in your experience generally how traps operate?  How they

16   open and close?

17   A.   They almost, they work electrical and you use certain

18   buttons of the car like the windows, the heat, the brake,

19   whatever the code is, and you, with that you can open and close

20   it.

21   Q.   And if you don't open the code correctly -- don't enter the

22   code correctly what happens?

23   A.   It don't open.

24   Q.   In your experience, can traps be opened any other way than

25   entering the code?

1    A.   Yes.   If you -- if the police pull you over, they put a

2    battery and put the cable, a positive, like negative and

3    positive in the positive way of the battery, and that explodes

4    and opens the trap.

5    Q.   And if the police don't do something like that, are there

6    other ways to open the trap aside from entering in the

7    particular code?

8    A.   No.

9    Q.   All right.   Were you instructed on the particular code that

10   opened the trap in this white Denali, Government Exhibit 100?

11   A.   Yes.

12   Q.   Can you describe for the jury what that code was, please.

13   A.   It was hitting the brake five times, hit the lock of the

14   door of the driver, and then with the window of the driver, if

15   you pull it up open and you pull it down closed.

16   Q.   Did you practice that when you were with the agents?

17   A.   Yes.

18   Q.   Did you open the trap?

19   A.   Yes.

20   Q.   Was there anything in there?

21   A.   No.

22   Q.   Now, where in the car was the trap located?

23   A.   In the back seat of the passenger -- in the back seat of

24   the passengers.

25   Q.   When you say in the back seat, where in the back seat?

1   A.  In the bottom part.

2   Q.  Is the trap -- sorry.  When you say in the back seat, where

3   in the back seat was it located?

4   A.  In the bottom part of the back seat.

5   Q.  All right.  Did you have a view as to the quality of the

6   trap?

7   A.  Yes.

8   Q.  What was your view?

9   A.  It was bad.

10  Q.  What made it bad?

11  A.  It was not make it properly.  It have a lot of mistakes.

12  Q.  All right.  Can you describe some of the mistakes that you

13  identified in the trap.

14  A.  Like, the wires were -- was all over the place.  You know,

15  the wires on the -- on the part of the back of the seat was

16  broke, and if you push it, you can see a gap between the bottom

17  and the back.

18  Q.  Why did you believe that those two things, the fact that

19  wires could be seen and that there was a gap in the back seat,

20  why did you believe that those two things could be a problem?

21  A.  Because that make it suspicious.

22  Q.  All right.  Now, you have in front of you what's been

23  marked for identification as Government Exhibit 103.  It's one

24  of the pieces of paper that's in front of you.

25          Do you see that?

 1    A.  No.

 2             MR. COOPER:  May I approach, your Honor?

 3             THE COURT:  Yes.

 4    Q.  If you can take a look at Government Exhibit 103.

 5             Do you recognize that?

 6    A.  Yes.

 7    Q.  How do you recognize it?

 8    A.  This is the back part of the white Denali.

 9    Q.  Does Government Exhibit 103 depict what the back part of

10    that white Denali looked like when you inspected it?

11    A.  Yes.

12             MR. COOPER:  The government offers Government Exhibit

13    is 103?

14             MS. TODD:  No objection, your Honor.

15             THE COURT:  Government Exhibit 103 is received.

16             (Government's Exhibit 103 received in evidence)

17             MR. COOPER:  Ms. Thomas, please publish that for the

18    jury.

19    BY MR. COOPER:

20    Q.  Now, I think you can actually touch your screen and it

21    should make a mark on the photo.  So we'll give it a shot now.

22             Can you describe for the grand jury -- sorry.

23    Describe for the jury and indicate on the photo --

24    A.  You can see the wires here, and in this spot on here was --

25    this part was broke.  And if you push it back, you can see a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    gap here.

2    Q.  All right.  Let's take each of those parts in turn.

3           You mentioned --

4           MR. COOPER:  Ms. Thomas, can we take the markings off

5    of the screen for a moment.  Thank you.

6    Q.  Let's go one by one.  You mentioned wires.  Where are the

7    wires in this picture?

8           THE COURT:  You need to create a record here.  It's

9    fine to have him mark, but you need to elicit from him what

10   part of the photograph he's marking so the record reflects

11   what's going on in the courtroom.

12          MR. COOPER:  Yes, your Honor.  I intend to do that.

13   BY MR. COOPER:

14   Q.  Can you indicate on the picture where the wires are

15   located.

16   A.  Here.

17          MR. COOPER:  Your Honor, indicating on the right-hand

18   side of the picture, just to the right of the seat cushion, the

19   black wire.

20   Q.  You mentioned a gap in the bench?

21   A.  Yeah.  A little bit more up is a gap and then that goes all

22   the way and the back of the back seat was broke.  If you put --

23   when you press that, it was a big gap and you can see all the

24   work inside of that.

25   Q.  All right.  Let's focus on that.  When you say you push on

1   the back, what part of the seat are you referring to?

2   A.   The back.

3   Q.   The back --

4   A.   Yeah.

5   Q.   The back rest?

6   A.   Yes.

7   Q.   And what happened if you pushed back on that back rest?

8   A.   It make a gap and you can see some of the work for the

9   space of the trap.

10  Q.   When you say you could see some of the work for the space

11  on the trap, what's the work?

12  A.   Like some modifications on the, on that part.

13            MR. COOPER:  All right.  You can take Government

14  Exhibit 103 down, please.

15            Thank you.

16  Q.   All right.  Let's go back to the Shell gas station.

17            Did you see how Jorge got to the gas station?

18  A.   Yes.

19  Q.   What kind of car did he come in?

20  A.   Black Mercedes.

21  Q.   Was he with anybody?

22  A.   He was alone.

23  Q.   And how did you get there?

24  A.   I drove the white Denali to the gas station.

25  Q.   Where did you go from the gas station?

1   A.  I followed him to his apartment.

2   Q.  Were each of you in separate cars?

3   A.  Yes.

4   Q.  Did you park your car when you got to Jorge's apartment?

5   A.  Yes.

6   Q.  How long a drive was it from the gas station to the

7   apartment?

8   A.  A couple of miles, like ten minutes.

9   Q.  Where did you park your car when you got to Jorge's

10  apartment?

11  A.  In his parking spot.

12  Q.  What time much day was it that you met?

13  A.  It was in the afternoon.

14          MR. COOPER:  All right.  Let's go to Government

15  Exhibit 203T.  Ms. Thomas, could we also have that up on the

16  screen, please.

17          This is a transcript.

18          On page 1 it says live meet, December 3, 2014, time

19  1545.  Participants:  Confidential source, Jorge Gomez,

20  Caronlay Ramon-Baez.

21          MR. COOPER:  We are going to turn to page 3.

22          I will read the part of the CS.

23          Mr. Egan is Jorge Gomez.

24          MR. COOPER:  "In 4A?"

25          MR. EGAN:  "Put it in there."

1          MR. COOPER:  "In 4A"?

2          MR. EGAN:  "You know what he told me."

3          MR. COOPER:  "How are you, my friend?"

4          MR. EGAN:  "How are you?  I'm Jorge.

5          "He told me that you had plates from another place."

6          MR. COOPER:  All right.  Let's just stop there.

7   BY MR. COOPER:

8   Q.  Mr. Jimenez what is 4A that is referred to here?

9   A.  That is Jorge's parking spot.

10  Q.  And when Jorge said he told me that you had plates from

11  another place, do you know who the he refers to there?

12  A.  Giovanni.

13  Q.  All right.  Did you develop an understanding from your

14  conversation with Jorge about where the car was going to be

15  driven to?

16  A.  Louisiana.

17  Q.  I'm sorry?

18  A.  Louisiana.

19  Q.  What was your understanding based on that the car was going

20  to be driven to Louisiana?

21  A.  To pick up some drugs.

22  Q.  What was that based on?

23  A.  Based on the conversations and the requirement he asked me

24  for.

25  Q.  All right.  Let's continue.

1        MR. COOPER:  "No.  Because, I told him that I had one

2   from up there in New York and this one here.  But there's a lot

3   more heat with the one from New York."

4        MR. EGAN:  "Yes, damn, it's going to -- to Louisiana.

5   Do you think it's --"

6        MR. COOPER:  "To Louisiana?  No, there's no problem

7   there.  From New York, it's really hot."

8        MR. EGAN:  "Yes, OK."

9        MR. COOPER:  "Listen, uh, how many days are you?"

10       MR. EGAN:  I don't want to -- before Friday -- before

11  Saturday you'll have it.  I don't want to tell you what day.  I

12  also don't want anyone to know where, uh, what we're doing.  I

13  mean, she's with me."

14       MR. COOPER:  All right.  Let's pause there.

15  BY MR. COOPER:

16  Q.  Why did you say, No, there's no problem here.  I'm sorry.

17  No, there's no problem there at the top of page 4?

18  A.  It is no problem to drive to Louisiana with that car and

19  the plates the car have.

20  Q.  What about the plate would be an issue?

21  A.  Because when you drive south and you have east coast New

22  York plates and they are -- you got more chance, a risk you get

23  pulled over from the cops.

24  Q.  You say, From New York it's really hot.  What did you mean

25  by that?

1   A.  When you typically drive with a New York plate to southern

2   states, it's a very big chance you get stopped and pulled over

3   by the cops.

4   Q.  All right.  Did you discuss the capacity of the trap with

5   Jorge in this meeting?

6   A.  Yes.

7   Q.  And what was the capacity of the trap?

8   A.  Between 25 to 30 kilos.

9   Q.  Did you develop an understanding of how big a trap Jorge

10  was looking for?

11  A.  Yes.

12  Q.  How big?

13  A.  For 50 kilos.

14          MR. COOPER:  All right.  Let's go to page 5 of this

15  transcript, the third paragraph down.

16          "And I was also going to tell you, I -- I have a

17  mechanic shop.  That's what I do for a living.  I have a body

18  shop and light mechanical work."

19          MR. EGAN:  "And if I -- if I get a van like this, how

20  much would you charge me to do one?"

21          MR. COOPER:  "How much?"

22          MR. EGAN:  "Yes."

23          MR. COOPER:  "It depends on what you size you want,

24  what you want, then --"

25          MR. EGAN:  "For 50.

1          "How much does this one hold?"

2          MR. COOPER:  "This one can take about 20.  Like, it

3   depends how you arrange them.  I -- what I want to do is show

4   it to you, and I have to explain all of it to you.  There's no

5   problem here?"

6          MR. EGAN:  "Yes, there's no problem here."

7          MR. COOPER:  "Yes, because I see people came in."

8          MR. EGAN:  "I mean, this is my house not --"

9          MR. COOPER:  "And --"

10         MR. EGAN:  "The thing is, it looks -- what's it like?"

11         MR. COOPER:  "No, because it's, uh -- it's in the back

12  seat.  You lift up the -- the back of the rear seat."

13         Let's stop there.

14  BY MR. COOPER:

15  Q.  When you said, It depends on what size you want, when you

16  said that to Jorge, what were you referring to?

17  A.  He was asking me if I can make a trap in the car for him

18  and how much I can charge him for making the trap, and I

19  explained him, depend what size and which part, depend where

20  on -- where he want.

21  Q.  Where were you when you were having this part of the

22  conversation?

23  A.  In the parking area.

24  Q.  And when you said there, the last part that we read, It's

25  in the back seat, you lift up the back of the rear seat, what

1    were you talking about?

2    A.  I am referring to the trap of the white Denali.

3    Q.  Did there come a time when you met someone who was with

4    Jorge?

5    A.  Yes.

6    Q.  Who did you understand that person to be?

7    A.  During the conversations, he's explained, she was his

8    fiancee or wife.

9    Q.  Did you ever learn her name?

10   A.  No.

11   Q.  All right.  Mr. Jimenez earlier we discussed that you used

12   the term miles to refer to kilos.  In your experience what

13   other terms are used for kilos?

14   A.  You can use pesos, dollars, money -- you can use any

15   type -- it depend what conversation do you have is that word

16   you use for cover that word.

17   Q.  What were the words that you just referenced?

18   A.  You can use pesos, dollars, bottles, anything.

19         MR. COOPER:  OK.  Let's turn to page 8 of the

20   transcript then.  We'll start four paragraphs down.

21         "Sat -- I mean, on Saturday at the latest.

22         MR. EGAN:  "It's that -- uh -- how can I say this?

23   They're waiting for me there."

24         MR. COOPER:  "OK.  Well, look --"

25         MR. EGAN:  "But I told them that I needed one for 50

```
 1    pesos."

 2             MR. COOPER:  "No.  This one, this one, not this one.

 3    I, I --"

 4             MR. EGAN:  "How much can this one hold?"

 5             MR. COOPER:  "This one, like 30."

 6             THE WITNESS:  "Anywhere between 25, 30."

 7             MR. EGAN:  "You know, it's still -- let's see if we

 8    arrange them well and get 30 in."

 9             MR. COOPER:  "Yes.  Look, I, I'm going to teach you

10    how.  Wait.  Look.  Let me explain it to you.  First of all --

11    and this is very important, I don't know what time you're going

12    to leave and I don't care."

13             MR. EGAN:  "I know."

14             MR. COOPER:  "But, uh, if you're going to have it --

15    if you are not leaving tonight right away, at around noon you

16    turn it on and leave it on for a while.  What's the story?  I

17    have a double fuse for it.  So that -- so that if they put

18    computer on it or something --"

19             MR. EGAN:  "Uh-huh."

20             MR. COOPER:  -- "it would burst but it won't open

21    here."

22             All right.  Let's pause there are for a second.

23    BY MR. COOPER:

24    Q.  When, Mr. Jimenez, you talk about double fuse and the

25    computer, what were you talking about there?
```

1    A.   I talking about -- if the cops pull over, they can put a

2    computer and send a signal, like electric shock, and that has a

3    fuse.  If you have just one, that fuse is going to break, and

4    the trap is going to open.  But if you put two the first fuse

5    break, but the second one don't let the trap open.

6    Q.   Did you show Jorge how to open the trap?

7    A.   Yes.

8    Q.   Where were you when you showed it?

9    A.   In the parking area.

10   Q.   I'm sorry?

11   A.   In the parking area.  In his parking.

12   Q.   Was anybody else present when you did that?

13   A.   No.

14            MR. COOPER:  Let's turn then to page 13.

15            We'll start three paragraphs down with Jorge Gomez.

16            MR. EGAN:  "It won't work for me.  They're going to

17   give me 50 pesos, right?"

18            MR. COOPER:  "OK."

19            MR. EGAN:  "So I'll have to make two trips, because

20   it's 25 for me and 25 for another person."

21            MR. COOPER:  "Yes."

22            MS. TODD:  "That's what the deal was, understand?"

23            MR. COOPER:  "Yes."

24            MR. EGAN:  "So I told him, so how much do you want per

25   day?"

```
 1              MR. COOPER:  All right.

 2   BY MR. COOPER:

 3   Q.  Mr. Jimenez, did you negotiate a rate for the car?

 4   A.  Yes.

 5   Q.  What was the rate?

 6   A.  $500 per day.

 7   Q.  Did you have an understanding of how many days Jorge was

 8   going to pay for?

 9   A.  Yes.

10   Q.  What's that?

11   A.  Three days.

12   Q.  I'm sorry?

13   A.  Three days.

14              MR. COOPER:  All right.  Let's turn to page 15, then.

15   We are going to start three paragraphs from the bottom.

16              "Listen.  So, listen.  I'll give it to you for -- I

17   can charge you 500 a day."

18              MR. EGAN:  "OK."

19              MR. COOPER:  "But, uh, you have to give me something

20   today before I, uh --"

21              MR. EGAN:  "OK.  Yes."

22              MR. COOPER:  "Understand?  You have to give me at

23   least three days before I go."

24              MR. EGAN:  "Like three days?  I don't understand."

25              MR. COOPER:  "1500."
```

1          MR. EGAN:  "Oh, I should give you the 1500?"

2          MR. COOPER:  "Yes."

3          MR. EGAN:  "OK."

4          MR. COOPER:  "Understand?"

5          MR. EGAN:  "Let's go into my house.  So that means if

6    I turn it off now I have to come back soon and turn it back

7    on?"

8          MR. COOPER:  All right.

9    BY MR. COOPER:

10   Q.  Mr. Jimenez, where did you go at this point in the

11   conversation?

12   A.  Inside of Jorge's apartment.

13   Q.  And where was Jorge's apartment located in reference to the

14   parking area you were in?

15   A.  In the first floor.

16   Q.  Was anybody else in the apartment?

17   A.  Yes.

18   Q.  Who is that?

19   A.  The lady.

20   Q.  Was anyone else there other than the lady?

21   A.  No.

22   Q.  What happened inside the apartment?

23   A.  We talked some, and he paid me.  The lady give him a bag

24   with some cash, and he pulled all the cash out of his pocket

25   and he count the 1500 and pay me.

1    Q.  Did you discuss any other potential business with him?

2    A.  Yes.

3    Q.  What did you discuss?

4    A.  He wants I -- he, he asked me if I can make cars and what

5    type of cars he can buy for I make traps.

6    Q.  All right.  You mentioned somebody else was in the

7    apartment.

8            MR. COOPER:  If we can could publish, Ms. Thomas,

9    Government Exhibit 2, which is in evidence, please.

10   Q.  Do you recognize the individual in Government Exhibit 2?

11   A.  Yes.

12   Q.  Who is that?

13   A.  That's the lady inside of the apartment.

14           MR. COOPER:  All right.  Thank you.

15           You can take that down, Ms. Thomas.

16   Q.  Let's go back to the transcript, Government Exhibit 203T.

17           Let's go to page 19.

18           We will start at the very bottom, the very last

19   paragraph on page 19:

20           MR. EGAN:  "And would you sell this little car?  How

21   much would you sell it for?

22           MR. COOPER:  "No.  In this -- this has a divine

23   blessing on it.  We've gone all the way to Texas, Arizona, and

24   it come back fine because this happens."

25           MR. EGAN:  "I'd like -- I wish you had a couple of

1    cars doing little things to them."

2            MR. COOPER:  "No.  Because, because, because, look,

3    see what happens.  If you have to put it in double, I'll -- do

4    this one in that car.  And when you give it back to me on

5    Saturday, to go down with the second one, I'll bring you

6    another one."

7            MR. EGAN:  "OK."

8            MR. COOPER:  "And I can bring you another one with

9    plates from -- and that one holds 40."

10           MR. EGAN:  "Damn.  It with -- with --"

11           MR. COOPER:  "With plates from -- I have a -- I have,

12   I have, I have one with, with plates from, from Florida and

13   another one.  The other one has plates from, from Ohio."

14           MR. EGAN:  "Huh."

15           MR. COOPER:  "One has plates from Ohio and the other

16   has plates from Florida."

17           MR. EGAN:  "Not Florida."

18           MR. COOPER:  "No, I know.  Lots of people don't like

19   that.  That's why I'm telling you."

20           MR. EGAN:  "But the Ohio one is fine."

21           MR. COOPER:  "Yes."

22           MR. EGAN:  "How much fits in the Ohio one?"

23           MR. COOPER:  That one holds, that one holds like -- it

24   depends on how you organize it and it depends on how -- what

25   the squares are like.  Like 38 to 40, understand?  Do you have

1    trash cans to throw this in?"

2           MR. EGAN:  "Yes.  Look at it here.  I mean, count it.

3    I think -- ah, I'll deliver it on Friday.  Understand?

4           "That's why I'm going to give you three days and

5    that's what I'll do.  What I'll do is, if I have to make

6    another trip -- then I'll get you the other one, ah -- I'll get

7    the other one from you right away.  And this way --"

8           MR. COOPER:  All right.

9    BY MR. COOPER:

10   Q.  Mr. Jimenez, how did the meeting end?

11   A.  I leave the car to him, he pay me the money and I -- the

12   lady drove me back to the gas station and I meet the agents

13   after that.

14   Q.  Where were you when you were paid the money?

15   A.  Inside of the apartment in the living room.

16   Q.  Who gave you the money?

17   A.  Jorge.

18   Q.  Was anybody else involved in giving you the money?

19   A.  No.

20   Q.  All right.  The woman whose picture you just looked at,

21   Government Exhibit 2.  Was she there when you were given the

22   money?

23   A.  Yes.

24   Q.  After the meeting where did you go?

25   A.  The lady drove me to the gas station -- back to the gas

1   station, and then after the gas station, an agent picked me up

2   and then we meet, going meet all the agents.

3   Q.  Who picked you up at the gas station?

4   A.  An agent.

5   Q.  When you drove in the car with the lady, you were talking

6   about did you talk with her?

7   A.  Yes.

8   Q.  What did you talk about?

9   A.  Just general stuff about restaurants and places for hang

10  out.

11  Q.  All right.  Did you speak on the phone with Jorge after

12  that meeting?

13  A.  Yes.

14  Q.  Did you have conversations the following day, December 4,

15  2014?

16  A.  Yes.

17  Q.  What did you discuss with him?

18  A.  I discussed with him because he said he was not ready to

19  leave, and we was arguing if I go and pick it up, the white

20  Denali, or leave it to him.

21          MR. COOPER:  All right.  Let's take a look at

22  Government Exhibit 204T, Ms. Thomas can we have the first page

23  6 that please.  Thank you.

24          Date, December 4, 2014; time 1443 and 54 seconds

25  participants, confidential source and Jorge Gomez; phone

1    numbers 862-250-0822 and 347-767-5609 for the CS.

2              Let's read this call.

3              MR. EGAN:  "Hello?"

4

5              MR. COOPER:  "Hello.  What's up, sir?  What's up?"

6              MR. EGAN:  "What's up?

7              "Uh, I spoke to the man."

8              MR. COOPER:  "Listen."

9              MR. EGAN:  "What?"

10             MR. COOPER:  "I'm -- I'm calling you to plan things

11   for myself, because the guy is going to leave to run and

12   errand, and I want to know, so that if it's a no, I won't send

13   him.  I want to know if I have to go and get that today.

14             "See what I'm saying?"

15             MR. EGAN:  "OK.  OK.  But since you told me this, I

16   told my people to move quickly so they will told me -- the

17   thing is, we -- you know how it is.  They make you wait and

18   stuff.  But it's there."

19             MR. COOPER:  "The thing is --"

20             MR. EGAN:  "What I'm waiting for is, look --"

21             MR. COOPER:  "I --"

22             MR. EGAN:  "I'm going to be -- I'm going to be honest

23   with you.

24             "Wait.  Listen.  Let me finish.  What I'm waiting for

25   is the order from the man on the other side.  It's over there."

```
 1              MR. COOPER:  "Yes.  Right.  I understand."

 2              MR. EGAN:  "I'm waiting.  Waiting for the order.

 3    Understand?"

 4              MR. COOPER:  "Look.  I understand because --"

 5              MR. EGAN:  "And as soon as he tells me, yes.

 6         Look.  Let me finish."

 7              MR. COOPER:  "Because, look, I --"

 8              MR. EGAN:  "What?"

 9              MR. COOPER:  "I -- what I want to do is plan things

10    for myself, because I don't want to -- don't want you to call

11    me, uh, you, I mean if you call me, I want you to call me ahead

12    of time so I'll know, so I'll go.  Because I have my employees,

13    and I can't leave this alone here.

14              "Understand what I'm saying?"

15              MR. EGAN:  "So, let me make a call."

16              MR. COOPER:  "So --"

17              MR. EGAN:  "In, in an hour I'll call you."

18              MR. COOPER:  "Oh, OK.  Because listen also.  Listen

19    I --"

20              MR. EGAN:  "Tell me."

21              MR. COOPER:  "I got you.  Since you told me you were

22    going to do another one, I -- yesterday when I came up here, I

23    made a, a thing.

24              "I called a, a customer I have.  I'm going to take one

25    that he has, that he has, and that what -- and that one will
```

1    work for you.  You hear?  But --"

2              MR. EGAN:  "And what plates?

3              Does it have Ohio plates?"

4              MR. COOPER:  "I need -- yes, I need, uh, that one

5    is -- it's for the number you told me.  Understand?"

6              MR. EGAN:  "Yes.  And does it have -- does it have

7    Ohio plates because the ones from New Jersey --"

8              MR. COOPER:  "I don't know."

9              MR. EGAN:  "What plates does it have."

10             MR. COOPER:  "But let, let, let me, let me tell you

11   something.  I need you to get me -- once I get there, I need

12   you to get a garage, because in order to show it like I showed

13   you yesterday it has to be -- we have to be in an enclosed

14   place, understand?  It can't be the way I showed it to you

15   yesterday."

16             MR. EGAN:  "All right.  OK.  Well let me call you back

17   in two second, in two seconds."

18             MR. COOPER:  "All right.  So check and see beforehand,

19   because what I don't want to do is send the guy to run the

20   errand because he will be out of the state, so --"

21             MR. EGAN:  "No, no, no, no."

22             MR. COOPER:  "I can't leave today.  I have to wait

23   until tomorrow."

24             MR. EGAN:  "No, no.  Don't send him if you do the

25   errand.  It's better if I, I --"

1           MR. COOPER:  "Let me, let me -- before you call me,

2     I'll confirm the plates so I can -- so I can tell you what it

3     is, OK?"

4           MR. EGAN:  "OK.  Well, all right.  OK."

5           MR. COOPER:  "OK.

6           "How soon will you call me, so I'll know?"

7           MR. EGAN:  "In less, less than a half an hour."

8           MR. COOPER:  "OK, OK."

9           MR. EGAN:  "OK.  Bye."

10          MR. COOPER:  "All right.  OK."

11    BY MR. COOPER:

12    Q.  Mr. Jimenez, did you have conversations with anyone other

13    than Jorge?

14    A.  Yes.

15    Q.  When?

16    A.  That same day.

17    Q.  How did you know that it was a different person?

18    A.  Because it was a different voice.

19    Q.  Male or female?

20    A.  Male.

21    Q.  What language did you speak with that male in?

22    A.  Spanish.

23    Q.  When you first spoke with that individual, did you know

24    whether he had any relationship with Jorge?

25    A.  No.

1   Q.  Did you ever come to learn that he had a relationship with

2   Jorge?

3   A.  Yes.

4   Q.  What's that relationship?

5   A.  His brother.

6   Q.  I'm sorry?

7   A.  His brother.

8   Q.  That first conversation, what did the two of you discuss?

9   A.  He was calling me and telling me he didn't like the way

10  that the traps looks like because he said he have a car of

11  that.  And I say that car don't never have any problems.  He

12  can use it.

13  Q.  Did you have an understanding of why how the trap looked

14  would be a problem?

15  A.  Because it don't looks in proper way to make it, you know,

16  have some issues.

17          MR. COOPER:  All right.  Let's look at Government

18  Exhibit 205T.

19          Ms. Thomas, can we have page 1 of that.  Thank you.

20          Date, December 4, 2014; time 5:50 and two seconds

21  p.m.;  Participants, confidential source, Sandy Gomez, Jorge

22  Gomez; phone numbers 210-727-0565 and 267-705-6067 for the CS.

23          MR. COOPER:

24  Q.  Mr. Jimenez, before we read this, there are three

25  participants listed here.  You mentioned that you spoke with

Cb8ngom2                    Limone - direct

1    one other person.  Were there other people on this phone call?

2    A.   Yes.

3               (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Who else?

2    A.  Jorge.

3    Q.  At what point did Jorge get on this phone call?

4    A.  At the very end of the call.

5            MR. COOPER:  Let's go to page 2, please.  I should

6    note, Mr. Egan had previously read Jorge Gomez.  Now Mr. Egan

7    is going to read the Sandy Gomez part.  Thank you.

8            "CS:  Hello.

9            "SANDY GOMEZ:  Yes, talk to me, sir.

10           "CS:  Tell, tell, tell me now, and explain to me

11   what's happening.

12           "SANDY GOMEZ:  Well, look, I uh -- myself and this

13   guy, we were checking out the car and I was explaining to him

14   that I used to have a car just like that one, so then I said --

15           "CS:  Right.

16           "SANDY GOMEZ:  The issue with me is, you know, when

17   you're traveling and you are going to different places, that,

18   that, that car has a space in there and the seats go down, so

19   then I said to him that --

20           "CS:  Oh!

21           "SANDY GOMEZ:  -- with any -- you know what I'm

22   saying?

23           "CS:  Because the thing is, the thing is that the --

24   that the back of the seat, the back of that seat is broken.

25   You know what I'm saying?  So, so --

1          "SANDY GOMEZ:  Yes.

2          "CS:  The back of that seat is a little broken -- but

3    with car we -- I mean it can't be that we are the unluckiest

4    people, because that car has been driven a lot and it's never

5    had a problem.

6          "SANDY GOMEZ:  Ok.  Well then it's like I said to him.

7    He was criticizing me.  I told him -- I checked it out because

8    the thing is that we -- he had said to me for you not to -- to

9    not -- I had the same one.  That same one, but a newer one.

10   The problem I had, like I told you, is because he says to me,

11   oh, they are not the same, and I said to him:  It's because of

12   the part.  It's the part that makes it look different.  You

13   understand me?  But if you tell me that there is no problem --

14   I did it because he said to me, check it out for me.  And you

15   know what I'm saying?  And excuse me.  But we were waiting for

16   them to call him and I was being told no, hold on.  Don't send

17   the guy yet.  And that --

18         "CS:  Yes, because, because, because the -- the -- the

19   problem is -- the problem is, you know what I'm saying?  But

20   what I don't like is the back and forth.  Yes, it's done; no,

21   this and that, and I can't come by and get it today.  But I

22   know there is no problem at all with that car because I repeat,

23   it's been rolling for a while, you know what I'm saying?

24         "SANDY GOMEZ:  Well, that was -- right.  Because in

25   the -- never -- I understand, yes.  But the thing is that I

1    never -- is that it never moved, you know.  That's what

2    happened, as I said to you.  It was -- I -- it has -- they had

3    said to me to tell him to go, you know what I'm saying.  They

4    were pushing us.  Then they said to me.  Hold on.  Don't -- a

5    small problem developed.  It developed and then we thought it

6    was for -- that they were going to let us know and it wasn't a

7    good idea to go somewhere and just sit around and wait.  It's

8    no good for you or for us.  I don't know if you understand what

9    I'm saying."

10            MR. COOPER:  Let's pause there for a moment.

11   Q.  Mr. Jimenez, did you have an understanding of what Sandy

12   Gomez was saying here?

13   A.  Yes.

14   Q.  What's that?

15            MS. TODD:  Objection, your Honor.

16            THE COURT:  Sustained.

17   Q.  Let's continue with the readback and then we will circle

18   back, Mr. Jimenez.

19            MR. COOPER:  Continuing at the bottom of page 4:

20            "CS:  No, no, no.  Explain it to me again.  What was

21   that?  What was that?

22            "SANDY GOMEZ:  When he said that he was leaving.

23            "CS:  Right.

24            "SANDY GOMEZ:  And that everything was fine, they

25   called us from over there to say that something happened.

1    That's what I -- I had already said to him, you are better off

2    telling him to wait because it's not worth his while for him to

3    go over there and wait around.  You know what I'm saying?

4              "CS:  Well, no.  Because I'm -- I'm busy.  I can't.  I

5    can't.  I can't go there and sit around just like that.  No."

6              Let's pause there for a second.

7    Q.  Mr. Jimenez, when you were saying, because I can't go there

8    and sit around just like that, what were you referring to?

9    A.  Going to pick up the white Denali.

10   Q.  When were you expecting to go pick up the white Denali?

11   A.  When they came back from Louisiana.

12   Q.  And did you have an expectation or an understanding of what

13   would happen after that?

14   A.  Yes.

15   Q.  What's that?

16   A.  I supposed to bring another car with another trap.

17   Q.  Let's continue at the bottom of page 5.

18             "SANDY GOMEZ:  Well, of course not.  That's fine.  Now

19   it's fine.  That's what happened.  I said to them because it

20   makes it look like -- you know what I'm saying.  It looks

21   very -- the problem is that where it's going, those people

22   check everything, but don't worry.  It's fine.  Let me see what

23   we are going to do.  The only reason I was saying it was

24   because, you know, I didn't feel safe.

25             "CS:  Well, but there is no problem as a matter of

GB8MGOM2                    Timenez          direct

1   fact.  The papers, many, they are in the name of a person.

2   They are legit.  That person is legit man because when they put

3   them through they will see that it's not new.  It's not like a

4   new registration.  It's something from a long time ago, new and

5   legal.  They belong to someone who works and is all legal.  You

6   know what I'm saying?

7          "SANDY GOMEZ:  Yes.

8          "CS:  That's not --

9          "SANDY GOMEZ:  Well, all right then.

10         "CS:  I mean I, I, I was thinking, I was explaining to

11  you this is what I do for a living.  I do that.  I do that kind

12  of work to, to cars.  You know what I'm saying?

13         "SANDY GOMEZ:  Yes.

14         "CS:  And, and, and that is what I -- that's what I do

15  for a living, you know what I'm saying?  And I know that it has

16  no --

17         "SANDY GOMEZ:  Yes.

18         "CS:  -- problems, because it's just that we have been

19  driving in it.

20         "SANDY GOMEZ:  Ok.  Yes.  All right.  Let me see

21  how -- what I can do so that he can then leave.

22         "CS:  Well, let me talk to the man so the man can tell

23  me how we are going, what we are going to do.  Put the man on,

24  please.

25         "SANDY GOMEZ:  Ok."

1   Q.  Mr. Jimenez, at this point did somebody else begin speaking

2   on the phone?

3   A.  Yes.

4   Q.  Who was that?

5   A.  Jorge Gomez.

6          MR. COOPER:  Let's continue.

7          Mr. Egan, if you can read the part of Jorge Gomez?

8          "JORGE GOMEZ:  Hello.

9          "CS:  Talk to me, man.

10         "JORGE GOMEZ:  Talk to me.

11         "CS:  What are we going to do?

12         "JORGE GOMEZ:  No.

13         "CS:  Hello?

14         "JORGE GOMEZ:  Hold on.  Hold on.  Hold on a moment.

15   Let me call you back so I can talk to -- to my brother and I'll

16   call you back in two --"

17   Q.  Mr. Jimenez, did you speak again with that other

18   individual?

19   A.  Yes.

20   Q.  When?

21   A.  The following day.

22   Q.  What did you talk about with him the following day?

23   A.  He gave me a call and say he is going to start driving.  I

24   am going to be the next day in the morning.

25         MR. EGAN:  Your Honor, I wasn't sure when you wanted

 1    to take a few moments.

 2              THE COURT:  We have been going about an hour.  How

 3    much longer is your examination going to be?

 4              MR. COOPER:  Probably about 10 minutes, 15 minutes,

 5    your Honor.

 6              THE COURT:  Why don't we try to finish it and then we

 7    will take a break.

 8              MR. COOPER:  Ok.

 9              Let's look at Government Exhibit 206T.

10              Ms. Thomas, can we have page 1 of that, please.  Date:

11    December 5, 2014.  Time:  11:28 a.m.  Participants:

12    Confidential source and Sandy Gomez.  Phone number 210-727-0565

13    and 267-705-6067 for the CS.  Starting read at page 2.

14              "CS:  Hello.

15              "SANDY GOMEZ:  Yes.  What's going on, Charlie?"

16              MR. COOPER:  Let's stop there.

17    Q.  Mr. Jimenez, do you know who Charlie is?

18    A.  No.

19    Q.  Do you know why Sandy Gomez was calling you Charlie?

20    A.  No.

21              MR. COOPER:  Let's continue.

22              "CS:  Hey.  Hello.  How are you?

23              "SANDY GOMEZ:  Fine.  And you?

24              "CS:  Fine, thank God, working.  What's going on?

25              "SANDY GOMEZ:  Yes, no, nothing.  Just calling you to

1  see how you are, so that you know that I'll be there early

2  tomorrow.

3       "CS:  All right.  Ok.  Well no problem then.  As soon

4  as you are around, let me know so that I send for it and I'll

5  see if I can have the other one ready so I can bring it down

6  for you the right away?

7       "SANDY GOMEZ:  Oh well.  All right then.

8       "CS:  Yes, listen.

9       "SANDY GOMEZ:  Do what you --

10      "CS:  Speak, speak with -- with the man, because he

11  said that he was going to have one there so that I could bring

12  it to do it.  One, the 250 diesel.

13      "SANDY GOMEZ:  Right.

14      "CS:  So that I -- so that I can bring up both of them

15  at the same time in one trip?

16      "SANDY GOMEZ:  Oh, Ok, all right.

17      "CS:  All right.  All good then.  Have a nice day.  If

18  anything comes up, call me.

19      "SANDY GOMEZ:  Ok.  All right.  Bye.

20      "CS:  Ok.  Bye."

21  Q.  Mr. Jimenez, here on page 3 you talk about a 250 diesel.

22  What were you talking about there?

23  A.  That is the other car I offered to provide them.

24  Q.  And below that you say, so I can bring up both of them at

25  the same time in one trip.  What were you talking about there?

1   A.   Bring it up that one and pick -- bring up the 250 diesel

2   and pick up the white Denali.

3   Q.   Did you speak with Jorge again after that?

4   A.   Yes.

5   Q.   Did you have any discussions with Jorge about what happened

6   to the white Denali?

7   A.   Yes.

8            MR. COOPER:  Let's go to Government Exhibit 207T,

9   please.

10           Ms. Thomas, could you please put up page 1.

11           Date:  December 8, 2014.  Time:  11:05 a.m.

12   Participants:  Confidential source and Jorge Gomez.  Phone

13   numbers:  201-640-9064 and 267-705-6067 for the CS.

14           Starting on page 2.

15           "CS:  Hello.

16           "JORGE GOMEZ:  Talk to me, man.

17           "CS:  Hey, what's up?

18           "JORGE GOMEZ:  I'm hanging in.  Can we talk on here?

19           "CS:  Yes, yes, yes, yes, yes.  Tell me what's going

20   on.  You've got me.  You've got me, you've got me.

21           "JORGE GOMEZ:  Listen.  In whose name?

22           "CS:  On hold.  What's going on?

23           "JORGE GOMEZ:  Uh, Louisiana didn't pass inspection."

24           MR. COOPER:  Let's pause there for a minute.

25   Q.   Mr. Jimenez, in your prior experience transporting

GB8MGOM3                Jimenez - direct

1   narcotics, have you used the phrase pass inspection?

2   A.   Yes.

3   Q.   Or didn't pass inspection?

4   A.   Yes.

5   Q.   What do you mean by didn't pass inspection?

6   A.   The car got pulled over and stopped from the police.

7          MR. COOPER:  Let's continue three paragraphs up from

8   the bottom on page 2.

9          "CS:  What do you mean?  That can't be.

10         "JORGE GOMEZ:  That the --

11         "CS:  -- because that was -- it was good.

12         "JORGE GOMEZ:  No, no, no, no, no -- uh -- they got --

13  I -- you know -- I was in a different car and they got the girl

14  and she got pulled over in the car.  They brought the dogs and

15  all that.  They took the van away.  And she was arrested.

16         "CS:  Shit, dude.

17         "JORGE GOMEZ:  I'm -- and here -- whose name is it

18  under?  You know, I'm saying under whose name is that in?

19         "CS:  Well, I have to call right now, but now I have a

20  big problem with him, with the owner of that shit, you know

21  what I'm saying?

22         "JORGE GOMEZ:  Yes."

23         MR. COOPER:  Let's pause for a moment.

24  Q.   Mr. Jimenez, when you said you had a big problem with the

25  owner of that shit, what were you talking about?

1    A.   I going to have owner with the problem of the white Denali.

2    Q.   What were you portraying yourself to be in your

3    interactions with Jorge?

4    A.   I borrow that car for a customer for use it and I bring it

5    to him for $500 a day.

6    Q.   Had you told Jorge that you were the owner of the car?

7    A.   No.

8    Q.   Who had you communicated was the actual owner of that white

9    Denali?

10   A.   One client.

11             MS. TODD:   Your Honor, if we may just pause for a

12   moment for a brief approach to the bench.

13             THE COURT:   Sure.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1                    (At the side bar)

2            MS. TODD:  I didn't know if you wanted me to wait

3    until he was finished to give a limiting instruction with

4    respect to this phone call.  This was the phone call that we

5    were challenging this morning with respect to the statements

6    that are coming in.

7            THE COURT:  I'm happy to give the instruction whenever

8    you want me to.  Do you want me to do it now?

9            MS. TODD:  I think so.  We should have done it at the

10   beginning, but I didn't realize you were going there at that

11   point.

12           THE COURT:  What exactly do you have in mind in terms

13   of an instruction?

14           MS. TODD:  That the conversation that Jorge is

15   reporting is not coming in for the truth and that there is no

16   indication that he actually spoke with Sandy Gomez.

17           MR. COOPER:  Your Honor, we would object to the second

18   part of that, which is a commentary on the evidence.

19           THE COURT:  It's contrary to the tape because Jorge

20   says he is in contact with them.  They are calling him from the

21   jail.  Remember?

22           MS. TODD:  I heard that, Judge.  But he also said that

23   he had spoken with the lawyer and gotten information, so it's

24   difficult to figure out who he is talking to or what kind of

25   information is he relaying.

```
 1              THE COURT:  There is a discussion about which phone
 2   number the witness should call and Jorge says that they are
 3   calling me on one number, so call the other.  That's towards
 4   the end of the conversation, as I recall it.  I suppose -- he
 5   says they are calling me from jail.  I guess I assumed it was
 6   either Sandy or Ramon Baez was calling from jail.  That's the
 7   way I interpreted it.
 8              MS. TODD:  Further on in the conversation, I think
 9   they said I spoke to La Morena, which would be her.  My point,
10   he didn't say he spoke with Sandy.  He says they understand
11   they are questioning them.  Morena says she will be released
12   shortly.  She is speaking to immigration and he has an
13   understanding that Sandy was being questioned.
14              THE COURT:  So you want me to instruct the jury that
15   the statements that Jorge is making about his brother are not
16   offered for their truth?
17              MS. TODD:  No.  I think it could be more general.
18   That these statements that are coming in are not coming in for
19   the truth, that it actually -- I'm having a moment here.
20              THE COURT:  Maybe we should take a break and we will
21   discuss it outside the presence of the jury.
22              MS. TODD:  Yes.
23              (Continued on next page)
24
25
```

1              (In open court)

2              THE COURT:  Ladies and gentlemen, we are going to take

3     a brief recess now so I can talk about this legal issue with

4     the lawyers.  We will be right back to you very shortly.  Thank

5     you.

6              (Jury not present)

7              THE COURT:  In my ruling on Government Exhibit 207T --

8              MS. TODD:  The witness is still here, your Honor.

9              THE COURT:  Yes.  We are talking about legal issues,

10    but the witness will step out.  Ok.

11             In the ruling I made this morning I offered to give an

12    instruction that certain statements in Government Exhibit 207T

13    were not being offered for their truth.  The statements I

14    referred to were the statements of the informant because I

15    suspect that nothing the informant said in Government Exhibit

16    207T was true and the government is not contending otherwise.

17    And there are two sides to the conversation.  If Jorge Gomez is

18    saying certain things, the informant is saying certain things,

19    and what I had offered to do was to tell the jury that the

20    statements the informant is making are not being offered for

21    their truth.

22             As to Jorge Gomez's statements in Government Exhibit

23    207T, I had ruled that they were admissible as coconspirator

24    statements in furtherance of the conspiracy.  So I'm receiving

25    them as evidence under that rule and I had not intended on give

1     any particular instruction as to Jorge's statements because I

2     believe that his statements are clearly admissible under Rule

3     801(d)(2)(E) for the reasons that I said earlier this morning.

4          MS. TODD:  I withdraw the objection, your Honor,

5     having reconsidered.  Thank you.

6          THE COURT:  We will take a brief recess.

7          (Recess)

8          THE COURT:  Are we prepared to proceed?

9          MR. COOPER:  Yes, your Honor.  We are just getting our

10    witness from outside.

11         THE COURT:  Give us a minute, Mike, to get the witness

12    up on the stand.

13         (Jury present)

14         THE COURT:  Please proceed, Mr. Cooper.

15         MR. COOPER:  Thank you, your Honor.

16         If we can have Government Exhibit 207T back up on the

17    screen, please, Ms. Thomas.  I believe we were on the bottom of

18    page 3.  Let's begin with the bottom paragraph on page 3.

19         "CS:  Now to we have to figure out what we do.  But

20    now I have to answer up to the owner of that stuff with, uh,

21    shit, dude.  And how did those people wrap that thing, because

22    if you wrap it up well, uh --

23         "JORGE GOMEZ:  Wrap -- it was -- no, no.  But they

24    haven't yet charged her.  What they actually took was, they

25    arrested her and they took the van away.  I already hired a

1  lawyer and everything.

2        "CS:  Oh, but they still haven't -- haven't arrived at

3  the place?

4        "JORGE GOMEZ:  Well, I -- now they have, yes.

5        "CS:  Shit.

6        "JORGE GOMEZ:  They already took the van away and

7  everything.  They, they just called me.  Um, um, immigrat saw

8  her.  They said they were going to --"

9        MR. COOPER:  Let's stop there.

10 Q.  Mr. Jimenez, at the bottom of page 3 and the top of page 4

11 you ask:  How did those people wrap that thing if you wrap up

12 it well.  What were you referring to?

13 A.  How they were wrapping up the kilos.

14       MR. COOPER:  Let's continue, bottom of page 4, three

15 paragraphs up.

16       "CS:  It's getting cut off.  Hello, hello?

17       "JORGE GOMEZ:  Hello, yes.  Go ahead.  They said had

18 they are releasing her.

19       "CS:  The phone call is getting cut off.  Hello?

20       "JORGE GOMEZ:  Hello.  I said that she is getting

21 released.

22       "CS:  Oh, ok.

23       "JORGE GOMEZ:  And my brother, my brother.

24       "CS:  Right?

25       "JORGE GOMEZ:  He's supposedly -- supposedly he is

 1   being questioned about someone.

 2           "CS:  About whom?

 3           "JORGE GOMEZ:  Because they are supposedly asking him

 4   about a man, about some people there, but he doesn't know who

 5   it is so then he said, well, we were on vacation.  You know

 6   what I'm saying.  And that's where they are at.

 7           "CS:  Shit, dude.

 8           "JORGE GOMEZ:  They -- they're in Louisiana, but --

 9           "CS:  Damn.

10           "JORGE GOMEZ:  I'm telling you because, if anything,

11   they can get released just like that because if they can't find

12   anything, you know what I'm saying, if they don't -- if they

13   don't find anything, you know.  You told me that even if they

14   put that thing on, it won't open, right?

15           "CS:  Well, of course it won't open.  It won't open at

16   all.

17           "JORGE GOMEZ:  Ok.  So then let's --"

18           MR. COOPER:  Stop there for a moment.

19   Q.  When you said of course it won't open, it won't open at

20   all, what were you referring to?

21   A.  About the trap.

22           MR. COOPER:  Let's continue, three paragraphs from the

23   bottom on page 6, Mr. Egan.

24           "JORGE GOMEZ:  Ok.  So then let's --

25           "CS:  If they put -- if they put it in the computer,

1   it won't open at all.  But you know I was supposed to give that

2   back tomorrow.  Now I don't know because I have to tell this

3   person the truth.  You know what I'm saying?

4           "JORGE GOMEZ:  Yes.  Tell the truth because it is --

5   also tell the person, under whose name this is, the truth.  You

6   have to tell him.

7           "CS:  Well, well, the person under whose name it is, I

8   have to get him moving right now.  He has to move.

9           "JORGE GOMEZ:  Well, move -- move and call me back at

10  this number.  Don't call the other number because what's

11  happening on the other one is that they are calling me from

12  over there, from over there, from the jail.

13          "CS:  Yes.

14          "JORGE GOMEZ:  That's why I told you that I couldn't

15  talk there, you know what I'm saying?"

16  Q.  Now, Mr. Jimenez, after this phone call on December 8, did

17  you continue to have phone calls with Jorge after that?

18  A.  Yes.

19  Q.  Did you ever meet him again?

20  A.  Yes.

21  Q.  What generally did you discuss in those phone calls and in

22  that meeting?

23  A.  About to try to get the indictment on the paper of the

24  problem in Louisiana and how we are going to make money for pay

25  back the supposed owner of the truck.

1    Q.  I think the first thing you mentioned was getting papers?

2    A.  Yes.

3    Q.  What do you mean by that?

4    A.  The indictment and the arrest paper for the people who got

5    arrested in Louisiana.

6    Q.  Why would it be important to get the indictment and the

7    arrest paperwork for the people who got arrested in Louisiana?

8    A.  Because if this was something real, I need to show the

9    papers to the owner of the car.

10   Q.  I think the second thing you said is to make money to pay

11   back the owner of the car?

12   A.  Yes.

13   Q.  Why was that important?

14   A.  Because the car was not mine.  I supposed to pay it back.

15   Q.  Did you discuss with Jorge how the two of you might make

16   money to pay back the owner of the car?

17   A.  Yes.

18   Q.  What types of things did you discuss?

19   A.  I asked him if he can get access to cocaine and heroin for

20   sell it and that profit we can pay back the people.

21   Q.  Did you ever actually transact additional deals with Jorge

22   after that?

23   A.  No.

24              MR. COOPER:  One moment, please, your Honor.

25              No further questions.

GB8MGOM2                        Jimenez - Cross

1          THE COURT:  Cross-examination.

2          MS. TODD:  Yes, your Honor.  Thank you.

3   CROSS-EXAMINATION

4   BY MS. TODD:

5   Q.  Good afternoon, Mr. Jimenez.

6   A.  Good afternoon.

7   Q.  Is it Jimenez-Baez or just Jimenez?

8   A.  Jimenez-Baez.

9   Q.  Thank you.

10  A.  You're welcome.

11  Q.  Now, on December 3, you got in touch with Jorge Gomez,

12  correct?

13  A.  Yes.

14  Q.  And the purpose of getting in touch with Jorge Gomez was to

15  discuss a vehicle with a trap, yes?

16  A.  Yes.

17  Q.  And as far as you understood, Jorge Gomez was supposed to

18  be the target of your interest, correct?

19  A.  No, not my interest.  The agent's interest.

20  Q.  You were acting on behalf of the agent, correct?

21  A.  Yes.

22  Q.  So they directed you to contact Jorge, correct?

23  A.  Yes.

24  Q.  And to provide him with a vehicle with a trap, yes?

25  A.  Yes.

```
 1   Q.  And essentially your job was to set him up, correct?

 2   A.  No.

 3   Q.  Your job was not to set him up?

 4   A.  No.

 5   Q.  When you indicated that you were calling him on behalf of

 6   Giovanny, that was not true, correct?

 7   A.  Excuse me?

 8   Q.  When you indicated that you were calling him on behalf of

 9   Giovanny, that was not true, right?

10   A.  That was true.

11   Q.  Giovanny asked you to call him?

12   A.  I called him.

13   Q.  My question to you was, were you acting on behalf of

14   Giovanny?

15   A.  The agent told me, call on behalf of Giovanny.  And when I

16   say that, he talk and he was agree with that.  So he knows

17   somebody who was Giovanny.

18   Q.  Have you ever met Giovanny?

19   A.  No.

20   Q.  Have you ever spoken with Giovanny?

21   A.  No.

22   Q.  You were not acting on behalf of Giovanny, correct?

23   A.  Yes.

24   Q.  When you first spoke with George, this was about 9:33 a.m.

25   on December 3, yes?
```

CB8MG0M3                      Jimenez - cross

```
 1   A.  Yes.

 2   Q.  Let me direct your attention to Government Exhibit 202T.

 3   This is a conversation between you and Jorge Gomez, correct?

 4   A.  Yes.

 5   Q.  Now, in this conversation on page 2 you talk about waiting

 6   for your employees to get to a shop.  You see that in the very

 7   first box you say that?

 8   A.  Yes.

 9   Q.  I didn't call you yet.  I tell you the time because I'm

10   waiting for one of my employees to the shop, correct?

11   A.  Yes.

12   Q.  But you don't have any employees, right?

13   A.  No.

14   Q.  And you don't have a shop?

15   A.  No.

16   Q.  You don't have a mechanic shop?

17   A.  No.

18   Q.  Nor do you have a body shop?

19   A.  No.

20   Q.  Nor are you a mechanic?

21   A.  No.

22   Q.  But you represented to Jorge that you fix cars, correct?

23   A.  Yes.

24   Q.  And that you work on cars?

25   A.  Yes.
```

1  Q.  Now, on page 3 of the same exhibit, second box down from

2  the top Jorge says:  Listen.  We have to talk about that in

3  person.  From that you understood he didn't want to discuss

4  anything on the phone, correct?

5  A.  He don't want to discuss about how many kilos fit in the

6  trap on the phone.

7  Q.  So he did not want to discuss how much the trap could hold

8  over the phone, correct?

9  A.  Yes.

10 Q.  He wanted to meet in person, yes?

11 A.  Yes.

12 Q.  So you made an agreement to meet with him at his apartment,

13 correct?

14 A.  Yes.

15 Q.  On page 4 Jorge says to you:  No, no, yes, yes.  Don't

16 worry.  Yes.  Because I wanted to -- I'm leaving early in the

17 morning -- early tomorrow morning, see what I mean.  And you

18 respond:  No, no problem.  No.  That's not a problem.  The

19 moment this guy comes in.

20      What did you mean by that?

21 A.  At the moment the supposed employee came to the shop, I --

22 at the moment the supposed employee came to the job I supposed

23 to drive to meet him.

24 Q.  What time did you agree to meet?

25 A.  We don't have any time frame.

1    Q.  But at some point you spoke with him again, right?

2    A.  Yes.

3    Q.  And you agreed to meet him at his apartment where he lived?

4    A.  No.  We agreed to meet in Paterson, New Jersey and then I

5    follow him.  I don't know where we are going.

6    Q.  You met near Market Place is it?

7    A.  Yes.

8    Q.  From there you drove to a parking lot?

9    A.  I follow him.

10   Q.  And where did you actually end up?

11   A.  In his apartment.

12   Q.  Before you got to his apartment, where did you meet?

13   A.  In the Shell gas station.

14   Q.  From the Shell gas station did you get to a location near

15   his house?

16   A.  No.  We drive straight to his apartment.

17   Q.  Explain to the jury where exactly you demonstrated to

18   George how to operate the trap.  Where exactly did that take

19   place?

20   A.  You put -- hit the brake five times.

21   Q.  No.  Let me withdraw that question.  Location.  That did

22   not happen inside his apartment, correct?

23   A.  No.  That happened in the parking -- in his parking spot.

24   Q.  Where is his parking spot?

25   A.  Outside of the building.

1    Q.  Outside of building of his apartment, correct?

2    A.  Yes.

3    Q.  You testified on direct that with respect to Government

4    Exhibit 203T, on page 4, where the conversation continues from

5    page 3 where Jorge says: Yes, damn.  It's going to -- to

6    Louisiana.  Do you think it is -- and you respond to Louisiana.

7    No.  There is no problem there.  From New York it's really hot.

8    And you explained that it was no problem driving to Louisiana,

9    meaning that the car was in good condition to drive to

10   Louisiana?

11   A.  No.  Meaning we was talking about plates.

12   Q.  I'm sorry.  Talking about --

13   A.  State plates, the plates of the car.

14   Q.  And that the plates were ok for it to drive to Louisiana?

15   A.  I say to him, from New York it's a hot plate for driving to

16   Louisiana, but Jersey don't have any problem.

17   Q.  What license plate was on that car?

18   A.  Excuse me?

19   Q.  What state plate was on the car?

20   A.  New Jersey.

21   Q.  There was no problem with that plate, correct?

22   A.  That's what I say to George, Jorge.

23   Q.  When you get to Jorge's house on December 3, you're wearing

24   a recording device, correct?

25   A.  Yes.

1   Q.  And the purpose of wearing the recording device was to

2   capture the entire conversation, correct?

3   A.  Yes.

4   Q.  And who was present during your meeting with Jorge?

5   A.  Inside of the apartment was a lady.  Other than that, it

6   was just Jorge.

7   Q.  Did I understand you on direct to refer to her as the boss

8   lady, or I didn't hear that correctly?  Did you refer to her as

9   the boss lady?

10  A.  No.  He say in calls after everything happened, he say she

11  is my wife, my fiancé.  Jorge say that.

12  Q.  Inside of the apartment it was yourself, Jorge, and the

13  woman he represented to be his wife?

14  A.  Yes.

15  Q.  That person is Government Exhibit 2, I believe it is.

16          MS. TODD:  Can you put that up, please, Ms. Thomas.

17  Q.  Is that the woman that was in the apartment?

18  A.  Yes.

19  Q.  Did you get her name at all?

20  A.  No.

21  Q.  Now, at the house you were paid a sum of $1500?

22  A.  Yes.

23  Q.  Did the wife contribute to the payment?

24  A.  She bring the money in a bag, in the paper bag, and give

25  some money to him to Jorge.  Jorge put some money out of his

1    pocket and he count 1500 and pay me.

2    Q.  And 1500 was in full payment for the vehicle, right?

3    A.  For the three days.

4    Q.  $500 a day, right?

5    A.  Yes.

6    Q.  Now, on page 4 of Government Exhibit 203T, towards the

7    bottom, George says:  I don't want anyone to know that you and

8    I are doing this deal.  Do you see that?

9    A.  Yes.

10   Q.  And you respond:  No, no, no.  Because not only that, you

11   know, I told him that I would work it out with you.

12           Your understanding is that that was going to be an

13   arrangement between you and Jorge, correct?

14   A.  Yes.

15   Q.  On that very same page Jorge says:  That's the woman who

16   came with me, referring to Government Exhibit 2 that we just

17   showed his wife?

18   A.  Yes.

19   Q.  On page 5 of that same exhibit you tell George, I was going

20   to tell you, I have a mechanic shop.  That's what I do for a

21   living.  I have a body shop and light mechanic work.  You see

22   that?

23   A.  Yes.

24   Q.  That was a lie, right?

25   A.  Yes.

1    Q.   And then you discuss quantities of cocaine that the trap

2    could hold?

3    A.   Yes.

4    Q.   And then you discuss prices, correct?

5    A.   Yes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Sandy Gomez was not present during any of that

2    conversation, correct?

3    A.  No.

4    Q.  How many times did you show Jorge how to open the trap?

5            How many times?

6    A.  One.

7    Q.  This was outside?

8    A.  Yes.

9    Q.  Was anybody else present besides you and him?

10   A.  No.

11   Q.  Jorge also had several other vehicles that he discussed

12   with you, right?

13   A.  Yes.

14   Q.  And are those other vehicles he wanted you to put traps in

15   them?

16   A.  Yes.

17   Q.  After your meeting with Jorge, his wife gave you a ride

18   back, correct?

19   A.  Yes.

20           MS. TODD:  If we can get to Government Exhibit 204T.

21   Q.  You call Jorge again at 2:43 p.m. the next day.  Correct?

22   A.  Yes.

23   Q.  You wanted to find out if Jorge was keeping the vehicle?

24   A.  Yes.

25   Q.  Up until this point you had no idea that anybody else was

1   going to drive the vehicle, correct?

2   A.   Excuse me.

3   Q.   Up until this point you had no idea that anyone else is

4   going to drive the vehicle, correct?

5   A.   Yes.

6   Q.   It is your understanding at this point that was Jorge who

7   was going to drive the vehicle?

8   A.   I don't know who is going to drive the vehicle.

9   Q.   I'm sorry?

10  A.   I don't know who is going to drive the vehicle.

11  Q.   In Government Exhibit 204T, he says he was waiting for an

12  order from the man on the other side.  This is on -- I'm

13  sorry -- on page 3.

14         He says:  "I'm waiting, I'm waiting for his order,

15  understand?"

16         You respond, "Look, I understand because --"

17         And Jorge says, "And as soon as he tells me yes -- let

18  me finish.

19         And you respond, "Because, look, I --"

20         Jorge says, "What?"

21         And you say, "What I want to do is plan things for

22  myself because I don't want you to call me, uh, you -- I mean,

23  if you call me, I want you to call me ahead of time so I'll

24  know -- so I'll go, because I have my employees and I can leave

25  this alone here.  Understand what I'm saying?"

```
 1                And Jorge says, "So let me make the call."

 2                You respond, "So in, in an hour."

 3                You understood from that that he was waiting for a

 4    call from someone, correct?

 5    A.   Yes.

 6    Q.   He didn't say he was waiting for a call from Sandy Gomez?

 7    A.   No.

 8    Q.   In fact, he didn't tell you who he was waiting to hear from

 9    with respect to this call, right?

10    A.   No.

11    Q.   So after this call you spoke with him several times, right?

12    A.   Yes.

13    Q.   And essentially just discussing the trap and when the

14    vehicle would leave, correct?

15    A.   Yes.

16    Q.   So Government 205T, which happens at 5:50 on December 4,

17    the conversation began with you speaking with Jorge Gomez,

18    correct?

19    A.   No.

20    Q.   Not Government Exhibit T.

21    A.   Excuse me?

22    Q.   Before this conversation you spoke with Jorge Gomez,

23    correct?

24    A.   Yes.

25    Q.   And while you are on the phone with him, he puts this other
```

```
1    person on the line?

2    A.   Somebody called him.

3    Q.   Right.   This person you had never spoken with before,

4    correct?

5    A.   No.

6    Q.   As the government elicited on direct, you later learned his

7    name to be Sandy Gomez, right?

8    A.   Excuse me.

9    Q.   You later learned the person, that second person who you

10   spoke with, you later learned his name to be Sandy Gomez,

11   correct?

12   A.   No.   I don't know how -- what his name was.

13   Q.   Not at that time?

14   A.   No.

15   Q.   You have since learned his name?

16   A.   I see a name in the paper, but I don't know.

17   Q.   So the entire time you had no idea who he was, correct?

18   A.   No, but it was different voice from Jorge.   It was not

19   Jorge.

20   Q.   It was not Jorge.   The second person that you were talking

21   to, you had no idea who he was, correct?

22   A.   Yes.

23   Q.   You did?

24   A.   What?

25   Q.   Did you know who he was --
```

1    A.  No.

2    Q.  -- at the time you were speaking with him?

3    A.  No.

4    Q.  And you did not know what his relationship was with Jorge

5    at the time you spoke with him, correct?

6    A.  In the first call, no.

7    Q.  From this conversation in Government Exhibit 205T, you

8    understood that the person that you were now talking to would

9    be the person driving the vehicle?

10   A.  No.

11   Q.  You still didn't know who was going to drive the vehicle?

12   A.  I don't know.

13   Q.  OK.  The second person that you were talking to explained

14   to you that he used to have a car like that, correct?

15   A.  Yes.

16   Q.  Nowhere in the conversation does he say he used to have a

17   car with a trap like that, does he?

18   A.  He didn't mention he have a car with a trap like that.  He

19   said he have a car like that, but newer.

20   Q.  I'm sorry?

21   A.  He said he had a car like that, but newer model.

22   Q.  Right.  But he never said I had a car with a trap like

23   that, did he?

24   A.  No.

25   Q.  At the bottom of page 2 he says to you -- you say, "Because

1    the thing is -- the thing is, back of the seat, the back of the

2    seat is broken.

3              "You know that, you know what I'm saying."

4              So you're agreeing with this person that the seat was

5    broken, correct?

6    A.  Yes.

7    Q.  Now, you have no information whether or not George Gomez

8    told this second person that you were talking to about what you

9    and George Gomez had discussed, correct?

10   A.  Excuse me?

11   Q.  You have no information about -- withdrawn.

12             You do not know whether George Gomez disclosed the

13   conversations that you had with George with this second person

14   who you were now talking to at that time, correct?

15   A.  Jorge knows because he was present, because at the end of

16   the call he put me George on the phone, so he was on the side.

17   Q.  My question --

18             MS. TODD:  Move to strike as nonresponsive.

19             THE COURT:  Sustained.

20             Yes.  That will be stricken from the record, that

21   answer.

22   BY MS. TODD:

23   Q.  My question to you, sir, is whether or not you had any

24   information that Jorge had discussed your conversations that

25   you had with Jorge with the second person that you were talking

1    to?

2    A.  No.

3    Q.  During this conversation with the second person that you

4    were talking to, you never said in that conversation I've

5    transported cocaine in this truck, no problem, correct?

6    A.  No.

7    Q.  You never said that?

8    A.  No.

9    Q.  In fact, you said the car has driven a lot and it has never

10   had a problem, right?

11   A.  Yes.

12   Q.  What name did you tell George -- what name did you give him

13   as your name?

14   A.  Daniel.

15   Q.  Daniel.  Did you ever tell him that your name was Samuel?

16   A.  Excuse me?

17   Q.  Did you ever tell Jorge that your name was Samuel?

18   A.  Samuel?

19   Q.  Yes.

20   A.  No.

21   Q.  And you never told him your name was Charlie, correct?

22   A.  No.

23   Q.  Had you driven that vehicle before?  Had you driven the

24   vehicle before?

25   A.  If I drove what?

1   Q.  Had you driven the vehicle before?

2   A.  When I drove -- I drove with -- when I meet with the agents

3   to the gas station and then followed George.

4   Q.  Any mechanical problems when you drove it?

5   A.  No.

6   Q.  It seemed to operate fine?

7   A.  Yes.

8   Q.  Now, the trap was not readily visible, correct?

9   A.  Excuse me?

10  Q.  The trap in the vehicle, it was not immediately -- it was

11  not very obvious, right?

12  A.  Yes.

13  Q.  It was obvious?

14  A.  No.

15  Q.  OK.  So unless you knew what you were looking for you

16  wouldn't know it's there, right?

17  A.  Yes.

18  Q.  And it was underneath the seat, correct, the back seat?

19  A.  Yes.

20  Q.  Underneath a part of the seat that you actually sit on,

21  that's where the trap was, right?

22  A.  No, in the passenger's -- on my back.

23  Q.  Right.  The passenger's back seat, right?

24  A.  Yes.

25  Q.  The part that you sit on?

```
1    A.  Yes.

2    Q.  And they color matched the finish so it would look like

3    it's factory, right?

4    A.  Yes.

5    Q.  At the time you were talking to the second person, this was

6    ten minutes to 6, according to the time on the phone call, 5:50

7    p.m.?

8    A.  Yes.

9    Q.  This was December 4, 2014?

10   A.  Yes.

11   Q.  It was dark at that time?

12   A.  Probably.

13   Q.  The sun wasn't out, though?

14   A.  Maybe evening.

15   Q.  I'm sorry.  December at 6 o'clock in the evening, was the

16   sun out?

17   A.  I don't know.

18   Q.  You don't --

19   A.  I don't remember.

20   Q.  OK.  But it was not in the middle of the day, correct?

21   A.  Yes.

22   Q.  By the way, George asked you a number of questions about

23   quantity of narcotics different vehicles could carry, correct?

24   A.  Yes.

25   Q.  The second person on the phone that you were speaking with
```

1    never asked any of those questions, right?

2    A.   Yes.

3    Q.   He never asked you to explain how to open the trap, right?

4    A.   Yes.

5    Q.   And he never asked you about payment for the vehicle,

6    correct?

7    A.   Yes.

8    Q.   And he never asked you about when he was to return it to

9    you, correct?

10   A.   Excuse me.

11   Q.   The second person never asked you when he should return the

12   vehicle to you, correct?

13   A.   Yes.

14   Q.   When you were finished speaking with him, you asked to

15   speak to the man in charge, correct?

16   A.   Yes.

17   Q.   And that person was George, correct?

18   A.   Yes.

19   Q.   And so Sandy, the second person that you were talking to,

20   put George on the phone, and you continued the conversation

21   with George?

22   A.   Yes.

23   Q.   Government 206T.

24        This is a conversation that takes place on December 5,

25   2014, 11:28 a.m.

1          The conversation begins where you say, "Hello?"

2          And Sandy Gomez says, "What's going on, Charlie?"

3          Charlie is not your name, right?

4    A.   No.

5    Q.   And you were somewhat confused why he was calling you

6    Charlie, correct?

7    A.   No.

8    Q.   You weren't confused?

9    A.   No.

10   Q.   Did you not testify -- all right.  Let me rephrase this.

11         Were you wondering why he was calling you Charlie?

12   A.   No.

13   Q.   You testified on direct that you wondered why he called you

14   Charlie?

15   A.   Excuse me.

16   Q.   You testified on direct that you wondered why he called you

17   Charlie?

18   A.   I was wondering?  No.  I no was wondering.  He just say,

19   Charlie, and I answered normal.  I know he's the same voice I

20   talked in the other call.

21   Q.   Let me ask you this:  When you testified on direct that

22   because Charlie wasn't your name and you wondered why he was

23   calling you Charlie, what did you mean by that?

24              MR. EGAN:  Objection.

25              THE COURT:  Grounds?

166

```
 1                 MR. EGAN:  Misstates direct testimony.

 2                 THE COURT:  Why don't you explore what he said on

 3     direct.

 4     BY MS. TODD:

 5     Q.  On direct you were asked whether or not your name was

 6     Charlie, correct, whether or not you told George your name was

 7     Charlie?

 8     A.  I told George Daniel.  That's your question?

 9     Q.  Let me rephrase.  You never told Jorge your name was

10     Charlie, correct?

11     A.  No, I never told him that.

12     Q.  So in this conversation you are being referred to as

13     Charlie?

14     A.  Yes.

15     Q.  You were asked on direct why you were being called Charlie,

16     and you responded you did not know?

17     A.  I don't know.

18     Q.  You further stated that you did not know why you were being

19     called Charlie.

20                 So my question to you then, is, were you confused why

21     you were being referred to as Charlie when you never --

22     A.  I was not confused.

23     Q.  -- told anybody --

24                 MS. TODD:  Let me finish my question.

25                 THE COURT:  Let her finish the question, and then you
```

Chagoury - Jimenez - cross

 1    can answer.

 2    BY MS. TODD:

 3    Q.  My question to you is were you confused why you were being

 4    called Charlie when you never told anyone your name was

 5    Charlie?

 6    A.  No, I was not confused, because it was the same voice.

 7    Q.  It was the same voice?

 8    A.  Yes.

 9    Q.  When he referred to you as Charlie, that didn't seem odd to

10    you?

11    A.  No.

12    Q.  Now, in that call, Sandy says to you, "Fine."

13            And you respond, "Fine.  Thank God, working.  What's

14    going on?"

15            And Sandy says, "Yes.  No, nothing.  Just calling you

16    to see how you are so that you know that I'll be there early

17    tomorrow."

18            From that you believe he's updating you as to where

19    he's going to be with the car?

20    A.  With that, I understand he update me, he's going to be back

21    in New Jersey, Paterson, New Jersey, the next day in the

22    morning.

23    Q.  Back in New Jersey the next morning?

24    A.  Yes.

25    Q.  That was one day after he left for Louisiana?

1   A.  Excuse me?

2   Q.  That was one day after he left for Louisiana?

3   A.  That was when he was with the car down there.

4   Q.  He left on the 4th, correct?

5          You left the car there on the 4th?  You left the car

6   with Jorge on the 4th --

7   A.  Yes.

8   Q.  -- correct?

9          This was the 5th, correct?

10  A.  Yes.

11  Q.  The car was rented for three days, right?

12  A.  Yes.

13  Q.  So three days from the 4th would not be the next day,

14  correct?

15  A.  Yes.

16  Q.  So is he updating you that he is going to be back in New

17  Jersey the next day or in Louisiana the next day?

18          MR. EGAN:  Objection.

19  A.  In New Jersey the next --

20          THE COURT:  Ground?

21          MR. EGAN:  Speculation.

22          THE COURT:  Well, she can explore with him what his

23  understanding was.  They are having a conversation, so

24  overruled.

25  BY MS. TODD:

1    Q.  So it was your understanding from this conversation that he

2    was letting you know that he would be back in New Jersey on the

3    6th?

4    A.  In the morning, yes.

5    Q.  In that same conversation he says, "Oh, all right.  Well,

6    OK, no problem then, as soon as you're around let me know and

7    I'll send for it and -- and I'll see if I can have the other

8    one ready so I can bring it down for you right away."

9              And Sandy Gomez says, "Oh, well, all right then."

10             You say, "Yes, listen."

11             Sandy says, "Do what you --"

12             And then you tell him, "Speak with the man, because he

13   said that he was going to have one there so I could bring it to

14   do it one, with 250 diesel."

15             You had some other conversation with George about 250

16   diesel, correct?

17   A.  Yes.

18   Q.  And so when Sandy says, "OK, OK," you told him to talk to

19   George about it, correct?  Speak with the man?  You were

20   referring to George, right?

21   A.  Yes.

22   Q.  Now, during that conversation, Sandy does not discuss with

23   you anything about any quantity of narcotics he was picking up,

24   correct?

25   A.  Yes.

1   Q.  When you say yes you mean, no, he did not discuss it,

2   right?

3   A.  Yeah.  He did not discuss it, yeah.

4   Q.  All the communication you had about when the trip would

5   occur, when he was leaving, when the vehicle would return,

6   would be George, correct?  Was with George, correct?

7   A.  Yes.

8   Q.  How old are you, Mr. Baez?

9   A.  33.

10  Q.  33?

11  A.  Yes.

12  Q.  How old were you when you were first convicted of a crime?

13  A.  29, 28 -- 28, 29.

14  Q.  29?

15  A.  28, 29, yeah.

16  Q.  But you had been committing crimes long before you were

17  convicted, correct?

18  A.  No.

19  Q.  So when you got convicted of a crime when you were 29, when

20  was that?

21  A.  2012.  December 2012 I got arrested.

22  Q.  You got arrested in 2012, but your crimes began long before

23  2012, did they not?

24  A.  Yes.

25  Q.  So my question to you is, how old were you when you started

1   committing crimes?

2   A.   15.

3   Q.   That would be about 2006?  Around about?  Not sooner than

4   that?

5   A.   Around that.  No -- more --

6   Q.   15 years ago?

7   A.   -- sooner than that.

8          THE COURT:  You can't talk over each other.

9          MS. TODD:  I'm sorry.

10         THE COURT:  Would you ask the question again.  You're

11  talking over each other.

12  Q.   You started at 15.  What were you doing at 15 years old?

13  A.   Selling marijuana.

14  Q.   And from marijuana you started selling coke?

15  A.   Yes.

16  Q.   So would it be fair to say you have lived a life of crime,

17  correct?

18  A.   Excuse me.

19  Q.   You have lived a life of committing crimes since you were

20  15 years old?

21  A.   Yes.

22  Q.   You got very good at it, right?  You got very good at it?

23  A.   Yes.

24  Q.   But eventually you were arrested, correct?

25  A.   Yes.

1  Q.  And you were charged with committing narcotics offenses,

2  yes?

3  A.  Yes.

4  Q.  You figured out very quickly how to help yourself, correct?

5  A.  Yes.

6  Q.  Because the most important factor always, has always been

7  what's important for you, right?  What's best for you?

8  A.  For my family.

9  Q.  And for you?

10 A.  Yes.

11 Q.  You certainly have no intention of spending the rest of

12 your life in jail, correct?

13 A.  Yes.

14 Q.  And you figured out how to stay out of jail, correct?

15 A.  Yes.

16 Q.  That involved cooperating with the government, correct?

17 A.  Yes.

18 Q.  That meant lying to people?

19 A.  Excuse me?

20 Q.  That meant lying to people about who you were?

21 A.  No.

22 Q.  So when you told George Gomez that your name was Daniel,

23 that you had a mechanic shop, that you owned a body shop, that

24 you had employees?

25 A.  My agreement was help the agents with any investigation,

1  tell them about any illegal activities and be truthful with

2  them, say the truth all the time.

3  Q.  And that involved lying to other people, correct?

4  A.  No.

5  Q.  So when you told George Gomez that you were a mechanic,

6  that you owned a body shop, that you had employees, you weren't

7  lying to him?

8  A.  Yes.

9  Q.  When you were selling drugs, did you always use your own

10 name?

11 A.  Never.

12 Q.  Never.  You always gave a different name, right?

13 A.  Yes.

14 Q.  You didn't want people to know who you were?

15 A.  Yes.

16 Q.  Had different telephone numbers, too, correct?

17 A.  Yes.

18 Q.  That way law enforcement wouldn't be able to find you?

19 A.  Excuse me?

20 Q.  Had different telephone numbers so you could hide from law

21 enforcement, correct?

22 A.  Can you repeat again the question, please.

23 Q.  You had different telephone numbers so you could hide from

24 the authorities?

25 A.  Yes.

```
 1   Q.  You have made, according to you, approximately $300,000

 2   since you have been cooperating, correct?

 3   A.  Yes.

 4   Q.  The government has paid you that?

 5   A.  Yes.

 6   Q.  Did you pay taxes on that?

 7   A.  Yes.

 8   Q.  When?

 9   A.  Last year and this year.

10   Q.  Last year and this year?

11   A.  I just got sentenced last year, so I started getting paid

12   this year, so taxes still not coming.

13   Q.  Had you paid taxes before?

14   A.  Yes.

15   Q.  In the past you have paid your taxes?

16   A.  Yes.

17   Q.  From all the cocaine that you were selling you paid taxes?

18   A.  No.

19   Q.  When did you pay taxes?

20   A.  I have legitimate work before.

21   Q.  What legitimate work did you have?

22   A.  I work in factories, I work in the shipping company, I work

23   in construction.

24   Q.  How long did you do that?

25   A.  A couple of years.
```

1    Q.  But your main source of income was importing and

2    trafficking cocaine, correct?

3    A.  Yes.

4    Q.  You imported cocaine from Colombia?

5    A.  Yes.

6    Q.  Puerto Rico?

7    A.  Yes.

8    Q.  And I believe you said Curacao?

9    A.  Yes.

10   Q.  And you distributed it throughout New York?

11   A.  Yes.

12   Q.  Mr. Baez, do you get paid based on the value of the

13   information you provide to the government?

14   A.  After I get sentenced, yes.

15   Q.  So is it fair to say, then, the more valuable the

16   information, the more you get paid?

17   A.  Yes.

18   Q.  Sometimes you would get paid even for the most trivial of

19   information, correct?

20   A.  Excuse me?

21   Q.  Even for the most small amount of information you'll get

22   paid?

23   A.  Depends.

24   Q.  You're motivated to make money, correct?

25   A.  Yes.

cb8agcon4                        Jimenez - cross

1  Q.  And so in every conversation you have, your motivation is

2  to make sure that you get paid, correct?

3  A.  Yes.

4  Q.  Now, have you had any reward payments yet from your

5  cooperating with the government?

6  A.  Yes.

7  Q.  Tell the jury what rewards payments are.

8  A.  Each one of them?

9  Q.  Explain in general to the jury what reward payments are.

10 A.  Reward payments are, after you've done a job with the

11 agency, they pay you for the job you -- whatever drugs they

12 seize, whatever money they seize for the case.

13 Q.  So, based on the amount of money or drugs seized and the

14 number of people indicted, correct?  That would be fair?

15 A.  Yes.

16 Q.  These reward payments are sometimes made after a verdict in

17 the case, correct?

18 A.  After what?

19 Q.  A verdict in a case?

20 A.  No.

21 Q.  You get reward payment before?

22 A.  They claim it before.

23 Q.  Do you expect a reward payment in this case?

24 A.  No.

25 Q.  You are not expecting anything?

1    A.   No.

2    Q.   You are just doing this from the goodness of your heart?

3    A.   No, I did it when I was working out of my charges.

4    Q.   I'm sorry?

5    A.   I did it when I was working out of my charges.

6    Q.   Besides the federal conviction in this district, have you

7    been convicted in other districts?

8    A.   In Michigan.

9    Q.   For what?

10   A.   For importing and distributing cocaine.

11   Q.   Did you serve any time there?

12   A.   Excuse me?

13   Q.   Did you serve any time in Michigan?

14   A.   Yes.

15   Q.   How much?

16   A.   A couple of months.

17   Q.   What is a couple of months?  Two months?  Three months?

18   A.   Working with the law enforcement in Michigan?

19   Q.   No, when you were sentenced in Michigan, how much -- what

20   period of incarceration were you sentenced to, if any?

21   A.   One day.

22   Q.   One day?

23   A.   Yes.

24   Q.   What were you originally charged with in Michigan?  Were

25   you facing a mandatory minimum sentence?

 1   A.   Yes.

 2   Q.   Ten years?

 3   A.   Yes.

 4   Q.   You got one day?

 5   A.   Because I was --

 6   Q.   Cooperating?

 7   A.   -- cooperating.

 8   Q.   In Pennsylvania were you convicted of a crime there as

 9   well?

10   A.   No.

11   Q.   So in this district you were convicted of three separate

12   conspiracies, correct?

13   A.   Yes.

14   Q.   And each conspiracy covered a different time period,

15   correct?

16   A.   Yes.

17   Q.   So one conspiracy was between 2011 through 2012.  That was

18   a drug trafficking conspiracy?

19   A.   Yes.

20   Q.   Cocaine?

21   A.   Yes.

22   Q.   And on that, during that conspiracy two of your

23   coconspirators delivered 28 kilograms of cocaine?

24   A.   Excuse me?

25   Q.   Two of your coconspirators delivered 28 kilograms of

1    cocaine, correct?

2    A.   Yes.

3    Q.   And sometime in October 2012 you went to the post office

4    looking for two kilograms of cocaine, correct?

5    A.   I call, yes.

6    Q.   You were expecting a shipment in the mail?

7    A.   Yes.

8    Q.   But the package of cocaine had already been seized by law

9    enforcement, correct?

10   A.   Yes.

11   Q.   You've pleaded guilty to the conspiracy we were just

12   talking about from 2011 through 2012 to traffic cocaine,

13   correct?

14   A.   I pleaded guilty about everything I did in the past.

15   Q.   Let's take them one at a time.  From 2011 to 2012 you pled

16   guilty to that conspiracy, correct?

17   A.   Yes.

18   Q.   You were facing a life sentence, correct?

19   A.   Yes.

20   Q.   With a mandatory minimum sentence of ten years?

21   A.   Yes.

22   Q.   You also pled guilty to -- from a conspiracy from 2006

23   through 2010, correct?

24   A.   Yes.

25   Q.   On that you were also facing a life sentence?

1    A.   Yes.

2    Q.   Mandatory minimum sentence of 10 years, correct?

3    A.   Yes.

4    Q.   You also pled guilty to a conspiracy from 2004 through

5    2006, distributing, correct?

6    A.   Yes.

7    Q.   That was also a mandatory sentence of 10 years?

8    A.   Yes.

9    Q.   Facing a life sentence?

10   A.   Yes.

11   Q.   A maximum lifetime supervision you faced on that?

12   A.   Maximum of lifetime in jail.

13   Q.   And if you ever got out, you were facing a maximum lifetime

14   of supervision, correct?

15   A.   No.

16   Q.   You were not facing a maximum lifetime of supervision?

17   A.   No.

18   Q.   What is the minimum of supervision you faced had you been

19   released?

20   A.   Two years.

21   Q.   I'm sorry?

22   A.   Two years.

23   Q.   Three years?

24   A.   Two.

25   Q.   Two years.

1          MS. TODD:  One moment, your Honor.

2          THE COURT:  Yes.

3  Q.  Are you certain that you were facing two years?

4  A.  Excuse me.

5  Q.  Are you certain that you were only facing --

6  A.  After I get sentenced, I have two years supervision

7  release.

8  Q.  Before you were sentenced.  The question is before you were

9  sentenced, what were you facing?

10 A.  Lifetime in jail.

11 Q.  You were facing lifetime in jail, correct?

12 A.  Yes.

13 Q.  And a lifetime of supervised release, correct?

14 A.  Yes.

15 Q.  Based on your cooperation, you served one day in jail,

16 correct?

17 A.  I get the letter, the 5K letter.

18 Q.  You served one day in jail, correct?

19 A.  Yes.

20 Q.  And you made over $300,000 that the United States

21 government paid you, correct?

22 A.  Yes.

23          MS. TODD:  Thank you, nothing further.

24          THE COURT:  Redirect?

25          MR. EGAN:  Yes, your Honor.

1    REDIRECT EXAMINATION

2    BY MR. COOPER:

3    Q.  Mr. Jimenez, you were asked questions on cross-examination

4    about pleading guilty in your case that you were arrested on in

5    2012.  Do you recall that?

6    A.  Yes.

7    Q.  I just want to go over the time line for a moment.

8            When were you arrested in this case?

9    A.  On December 18, 2012.

10   Q.  And when did you plead guilty in that case?

11   A.  In 2013.

12   Q.  And was that guilty plea done pursuant to a cooperation

13   agreement with the government?

14   A.  Yes.

15   Q.  Was it at that point that you began your cooperation?

16   A.  No.

17   Q.  When did you begin your cooperation?

18   A.  The first day they arrested me.

19   Q.  When you were arrested, did you tell the assessing agents

20   about what you had done?

21   A.  Yes.

22   Q.  And did you meet with the government after that?

23   A.  Yes.

24   Q.  Did you disclose all your prior crimes?

25   A.  Yes.

183

1    Q.   Did you discuss ways in which you might be helpful to the

2    government in the future?

3    A.   Yes.

4    Q.   And then you pled guilty to a cooperation agreement, right?

5    A.   Yes.

6    Q.   When were you sentenced in that case?

7    A.   When I get sentenced?

8    Q.   Yes.

9    A.   In 2015, May or June.  I don't remember exactly the month.

10   Q.   The summer of 2015?

11   A.   Yes.

12   Q.   Was it the summer of 2015?

13   A.   Yes.

14   Q.   And so that there were about two years in between when you

15   pled guilty and when you were sentenced?

16   A.   Yes.

17   Q.   All right.  In that two-year period of time, did you assist

18   the government in any of its investigations?

19   A.   Yes.

20   Q.   Was this investigation that we have been talking about

21   today related to Jorge and all those phone calls, was that done

22   in that two-year period between when you pled guilty when you

23   were sentenced?

24   A.   Yes.

25   Q.   Now, in that two-year period between when you pled guilty

1    and when you were sentenced, were you paid any of the reward

2    money for any of the investigations that you helped?

3    A.   No.

4    Q.   Why were you assisting the government in those

5    investigations in that two-year period if not to get paid?

6    A.   Because I can get a 5K letter for the judge.

7    Q.   So let's talk about that for a moment.  Now when you pled

8    guilty to the crimes you pled guilty to back in 2013, what was

9    the maximum sentence that you faced on those crimes?

10   A.   Lifetime.

11   Q.   Was there a mandatory minimum sentence that you faced?

12   A.   Ten years.

13   Q.   I'm sorry?

14   A.   Ten years.

15   Q.   All right.  At the time you pled guilty, did you have a

16   signed cooperation agreement with the government?

17   A.   Yes.

18             MR. COOPER:  May I approach, your Honor?

19             THE COURT:  Yes.

20   Q.   Mr. Jimenez, I've handed you what's been marked as 3503-13.

21   Do you recognize this?

22   A.   Yes.

23   Q.   All right.  Is this the cooperation agreement that you

24   signed around the time of your plea?

25   A.   Yes.

```
 1   Q.  In this agreement, do you agree to cooperate with the

 2   government?

 3   A.  Yes.

 4   Q.  Let's talk about what your obligations were under this

 5   cooperation agreement.  Can you describe for the jury what your

 6   obligations were under this cooperation agreement?

 7   A.  Tell the truth to the agents of any investigation, help

 8   them with any investigation they want.  I help and tell them

 9   about any illegal activity I know about it.

10   Q.  Were you permitted to commit any new crimes?

11   A.  No.

12   Q.  If you did all that, what was your understanding of what

13   the government agreed to do?

14   A.  They can write a letter to the judge.

15   Q.  Now, did you have an understanding of what impact that

16   letter would have on your potential sentencing?

17   A.  That can reduce my time.

18   Q.  If you managed to get the letter from the government, what

19   was the most, the highest sentence that you could get from the

20   judge?

21   A.  Life.

22   Q.  What is the lowest sentence that you could possibly get

23   from the judge if you got that letter?

24   A.  Time served.

25   Q.  Time served.  Who's the one who you understood at that
```

1    point was going to sentence you?

2    A.   Judge Sweet.

3    Q.   Was it the government or the agents who were going to

4    decide your sentence?

5    A.   Yes.

6    Q.   I'm sorry.  Was it the government or the agents who would

7    decide your sentence --

8    A.   No.

9    Q.   -- or was it the judge?

10   A.   No, the judge.

11   Q.   Did you have an understanding of what would happen to your

12   cooperation agreement if you lied?

13   A.   Yes.

14   Q.   What is that understanding?

15   A.   The letter is going to be broken, and I'm going to get time

16   in jail.

17   Q.   The letter would be broken you said?

18   A.   Yes.

19   Q.   If you lied, and if, as you say, the letter were broken,

20   did you understand there to be a mandatory minimum sentence

21   that you faced?

22   A.   Ten years.

23   Q.   Ten years in jail.  At the time that you were assisting the

24   government in its investigations in that period, that two-year

25   period between your plea and when were you sentenced, did you

```
 1    understand that the outcome of your participation in any
 2    particular investigation would affect whether the government
 3    sent the letter to the judge?
 4    A.  No.
 5    Q.  No, it would not have any effect?
 6    A.  No.
 7    Q.  Does that include your participation in this investigation?
 8    A.  Yes.
 9    Q.  So is it fair to say that your participation in this
10    investigation, the outcome of the investigation had no impact?
11    A.  No, no impact.
12    Q.  All right.  Now, to be clear, since you were arrested in
13    2012, have you committed any new crimes?
14    A.  No.
15    Q.  I believe defense counsel asked you some questions on
16    cross-examination about Michigan.
17    A.  Yes.
18    Q.  Your Michigan case was the same as your New York case --
19    A.  Yes.
20    Q.  -- isn't that right?
21    A.  Yes.
22    Q.  So it's not the fact that you had two separate arrests and
23    two separate cases, one in Michigan and one in New York, right?
24    A.  No, it was just the same case.
25    Q.  It's all the same thing?
```

1    A.   Yes.

2    Q.   All right.  I want to talk a minute about your payments and

3    the time line.

4         So we just talked about that two-year period between

5    your plea and when you were sentenced.  Again, why were you

6    cooperating and providing assistance in that two-year period?

7         MS. TODD:  Objection.

8    A.   For --

9         THE COURT:  I'm sorry.

10        Could I hear the question again.

11        MR. COOPER:  I had asked why Mr. Jimenez was providing

12   assistance and cooperation in that two-year period between plea

13   and sentence.

14        MS. TODD:  And the question is asked and answered.

15        THE COURT:  Overruled.

16   A.   Because I can get the 5K letter and reduce the time.

17   Q.   All right.  Now, you said that you were sentenced by Judge

18   Sweet.  When?

19   A.   In the summer of 2015.

20   Q.   All right.  At that point did you begin assisting the

21   government in, or -- sorry.  Withdrawn.

22        At that point did you continue assisting the

23   government in its investigations?

24   A.   Yes.

25   Q.   Was that assistance done pursuant to the cooperation

Gb8qgon4                    Jimenez - redirect

1   agreement we have been discussing, 3503-13, or was it done

2   pursuant to a different agreement that you signed?

3   A.  No, it's the same.

4   Q.  All right.  Did there come a point in time after you were

5   sentenced when you signed a confidential source agreement with

6   the government?

7   A.  Yes.

8   Q.  Did that happen after you were sentenced?

9   A.  Yes.

10  Q.  And is that the agreement, the confidential source

11  agreement that you signed after your sentencing, is that the

12  bon that you get paid under?

13  A.  Yes.

14  Q.  Are you obligated to tell the truth in that confidential

15  source agreement?

16  A.  Yes.

17  Q.  What's your understanding of what happens if you don't tell

18  the truth?

19  A.  I can get charged.  I can make time.

20  Q.  Now, in the period after you were sentenced, have you been

21  paid reward payments for your assistance?

22  A.  Yes.

23  Q.  To be clear, are you paid for every piece of information

24  you bring to the agents' attention?

25  A.  No.

1    Q.  So, if you make a phone call to them and report on

2    something you heard on the street, do you automatically get

3    paid for that?

4    A.  No.

5    Q.  All right.  In the period that you have been paid -- sorry,

6    withdrawn.

7         Do you get paid for testifying?

8    A.  No.

9    Q.  Are you being paid by the DEA or any other law enforcement

10   agency for being on the stand here today?

11   A.  No.

12   Q.  Are you testifying today because when you participated in

13   this investigation it was in that two-year period before you

14   were sentenced?

15   A.  Yes.

16   Q.  And that's when you made these recordings?

17   A.  Yes.

18         MR. COOPER:  One moment, please, your Honor.

19         No further questions, your Honor.

20         Thank you.

21         THE COURT:  Anything else, Ms. Todd?

22         MS. TODD:  Yes, your Honor.

23   RECROSS EXAMINATION

24   BY MS. TODD:

25   Q.  Mr. Jimenez-Baez, Mr. Cooper asked you some questions about

1    the 5K letter.

2    A.  Yes.

3    Q.  The 5K letter is a letter that the government writes to the

4    judge in support of your sentencing, correct?

5    A.  All I did in the past and all the cooperation and work I

6    did with the -- for the government.

7    Q.  So the government writes to the judge and tells the judge

8    what you have done, correct?

9    A.  And what I did before I got arrested.

10   Q.  A 5K letter, you only get that 5K letter if you provide

11   substantial assistance, correct?

12   A.  Yes.

13   Q.  And testifying in court would be substantial assistance,

14   correct?

15   A.  Yes.

16   Q.  Now, the government is the only body, these prosecutors,

17   for example, who sit here, who decide if you're telling the

18   truth, correct?

19   A.  No.

20   Q.  They decide if you're telling the truth in deciding whether

21   or not you get a 5K letter, isn't that correct?

22   A.  Excuse me?

23   Q.  The government decides if you get a 5K letter, correct?

24   A.  Yes.

25   Q.  And they give you a 5K letter if you provide substantial

1   assistance, as you've already said, correct?

2   A.   Yes.

3   Q.   And if they believe you've told the truth, correct?

4   A.   Yes.

5   Q.   So, even if you are lying, but the government believes you

6   in fact are telling the truth, you still get your 5K letter,

7   correct?

8   A.   No.

9   Q.   So you don't get the 5K letter if your you're lying but the

10  government believes you are telling the truth?

11  A.   I don't get the 5K letter if I lie about any illegal

12  activity or anything illegal thing in the investigation.

13  Q.   Maybe I didn't -- let me rephrase the question or ask it a

14  different way.  You get a 5K letter if the government believes

15  you've told the truth, correct?

16  A.   Yes.

17  Q.   However, if you lie, but the government still believes that

18  you in fact told the truth, you still get that 5K letter,

19  correct?

20  A.   There's no way you can lie.

21  Q.   That's not my question.  My question is, if they believe

22  you have told the truth, even if you're lying you will still

23  get that letter, correct?

24  A.   There's no way.

25  Q.   You have testified earlier that you have become pretty good

1    at lying in the past, correct?

2              MR. EGAN:  Objection.

3              THE COURT:  Overruled.

4    Q.  You've testified that you have become very good at lying in

5    the past, correct?

6    A.  But not lie to the law enforcement or any investigation.

7              MS. TODD:  Move to strike.

8              THE COURT:  Overruled.

9    Q.  You have lied in the past, yes?

10   A.  Yes.

11   Q.  You have become very good at it, correct?

12   A.  Yes.

13   Q.  And you've told lies where people believe you are actually

14   telling the truth, correct?

15   A.  It depends.

16   Q.  It depends on what?

17   A.  It depends on which people, because when I am doing a case

18   I have a device and you can see if I'm telling the truth or

19   not.

20   Q.  If someone is meeting you for the first time, Mr. Baez, and

21   they don't know you, how will they know if you are telling the

22   truth?

23   A.  They need to believe.

24   Q.  Because you say so, right?

25   A.  Yeah.

1  Q.  Now, with this 5K letter, you were facing a mandatory

2  minimum of 10 years, correct?

3  A.  Yes.

4  Q.  Without the 5K letter, the judge sentencing you has the

5  obligation to sentence you to a mandatory minimum of 10 years,

6  correct?

7  A.  Yes.

8  Q.  But with the 5K letter the judge has the discretion to go

9  below the ten years, correct?

10  A.  Yes.

11  Q.  So with that 5K letter the judge can sentence you to

12  anything less than ten years?

13  A.  Yes.

14  Q.  Including one day, correct?

15  A.  Yes.

16  Q.  Including no time at all?

17  A.  Yes.

18  Q.  And in this case you got time served, correct?

19  A.  Yes.

20  Q.  You had a 5K letter?

21  A.  Yes.

22  Q.  You were facing a mandatory minimum of ten years?

23  A.  Yes.

24  Q.  Facing a maximum life sentence, correct?

25  A.  Yes.

Cba8agon4          Ramon Baez - Direct

1   Q.  You received one day in jail?

2   A.  Yes.

3            MS. TODD:  No further questions.

4            THE COURT:  All right.  Anything else?

5            MR. EGAN:  Very briefly, your Honor.

6   FURTHER REDIRECT EXAMINATION

7   BY MR. COOPER:

8   Q.  Mr. Jimenez, you got your 5K letter over a year ago, didn't

9   you?

10  A.  Yes.

11           MR. COOPER:  No further questions, your Honor.

12           THE COURT:  All right.

13           Anything else?

14           MS. TODD:  No, your Honor.

15           THE COURT:  You may step down, Mr. Jimenez.  The

16  government will call its next witness.

17           MS. CROWLEY:  Your Honor, the government calls

18  Caronlay Ramon-Baez.

19   CARONLAY RAMON-BAEZ,

20       called as a witness by the Government,

21       having been duly sworn, testified as follows:

22           (Through interpreter)

23  DIRECT EXAMINATION

24  BY MS. CROWLEY:

25           MS. CROWLEY:  May I proceed, your Honor?

1            THE COURT:  Please.

2    Q.  Ms. Ramon-Baez, how old are you?

3    A.  30.

4    Q.  Where were you born?

5    A.  Dominican Republic.

6    Q.  Where did you grow up?

7    A.  Dominican Republic.

8    Q.  How far did you go in school?

9    A.  College.

10   Q.  When did you come to the United States?

11   A.  September 20, 2007.

12   Q.  And how did you come?

13   A.  By plane with a permanent residency.

14   Q.  Where do you live now?

15   A.  In jail, at the jail.

16   Q.  Why do you live in the jail?

17   A.  Because I pled guilty to two charges that I was accused of.

18   Q.  What charges were those?

19   A.  I had two firearms in my possession to defend the drug

20   business from other people and distribution of cocaine and

21   heroin.

22   Q.  OK.  I want to talk about the drug distribution for a

23   minute.

24          Did there come a time when you were arrested for that

25   crime?

Ramon-Baez - Direct

```
 1   A.  Yes.

 2   Q.  When was that?

 3   A.  December 8, 2014.

 4   Q.  Were you arrested by yourself or with someone else?

 5   A.  With someone else.

 6   Q.  With who?

 7   A.  With Mr. Sandy Gomez.

 8   Q.  And do you see Sandy Gomez in the courtroom today?

 9   A.  Yes.

10   Q.  Could you identify him by where he is sitting and an

11   article of clothing he's wearing?

12   A.  He is sitting right next to his attorney, and he's got a --

13   a, you know, black with a tie.

14           MS. CROWLEY:  Your Honor, may the record reflect that

15   the witness has identified the defendant.

16           THE COURT:  It will so reflect.

17   Q.  Ms. Ramon-Baez, what crime did you commit with the

18   defendant?

19   A.  Five kilos of cocaine.

20   Q.  Doing what with five kilos of cocaine?

21   A.  We went to get them in New Orleans.  We left from New

22   Jersey, went to New Orleans to get five kilos of cocaine.

23   Q.  Ms. Ramon-Baez, why are you testifying here today?

24   A.  Because I have an agreement with the government to tell the

25   whole truth.
```

1   Q.  Are you testifying here under that agreement?

2   A.  Yes.

3   Q.  You mentioned that you pled guilty to distributing drugs.

4   When did you first begin your involvement in that?

5   A.  I got involved in 2012 when I started a romantic

6   relationship with Mr. Jorge Gomez.

7          MS. CROWLEY:  Your Honor, I would like to publish on

8   the screen Government Exhibit 1, which is in evidence.

9          THE COURT:  Yes.  Go ahead.

10  Q.  Do you recognize the individual depicted in this photo?

11  A.  Yes.  That's Mr. Jorge Gomez.

12  Q.  You mentioned that you first met Jorge Gomez in around

13  2012?

14  A.  Yes.

15  Q.  When did you first become involved in distributing drugs?

16  A.  Beginning 2013.

17  Q.  And how did you first become involved?

18  A.  I moved in with Jorge to an apartment, and he asked me if I

19  could help him stamp the heroin bags.

20  Q.  Could you explain what a stamp is?

21  A.  Yes.  Well, stamps are something that you actually use to

22  identify with different names to identify the heroin on the

23  street, identify your heroin from other people's heroin on the

24  street.

25  Q.  And you were stamping, placing a stamp onto bags of heroin?

1   A.  Yes.

2   Q.  And did you ever do anything else for Jorge Gomez?

3   A.  Yes.

4   Q.  Could you tell us what.

5   A.  Yes.  Well, in the beginning I started stamping the heroin

6   bags, and then I also started making the bundles, the heroin

7   bundles.

8         The bundles are ten packets of heroin that you tape

9   together, and then you create a bundle and then you make

10  bricks.  The bricks, that means it's five bundles, meaning a

11  total of 50 bags of heroin to create a brick.

12  Q.  Were you working alone or with others?

13  A.  With other people.

14  Q.  Who?

15  A.  My brother, Gian Carlos, his wife Judith Payano, her

16  mother, and Jorge and myself.

17  Q.  Where were you doing this work?

18  A.  At my mother's house.

19         (Continued on next page)

20

21

22

23

24

25

GB8MGOM5                     Ramon Baez - Direct                     200

1   Q.  For how long were you doing this work at your mother's

2   house?

3   A.  Two months.

4   Q.  And after those two months did you continue to perform this

5   work elsewhere?

6   A.  Yes.  In an apartment.

7   Q.  Approximately how much heroin were you packaging throughout

8   this period?

9   A.  We started with 50 grams a week and then once we got four

10  really good customers, then we started doing 600 grams a week.

11  Q.  And where were you getting the heroin that you were

12  packaging?

13  A.  Two of Jorge's friends were getting it for us.

14  Q.  And who were you giving the heroin to after it had been

15  packaged?

16  A.  To Jorge's customers, to the four customers that Jorge had.

17  Q.  Were you being paid to do this work?

18  A.  Yes.

19  Q.  Who was paying you?

20  A.  Mr. Jorge Gomez.

21  Q.  How much was he paying you?

22  A.  Well, he started paying me $250 a week.  Then he started

23  paying me between $1200 to $1500 a week.

24  Q.  Why did he pay you more?

25  A.  Because we had four really good customers and then we had

CB8MGOM5                    Ramon Baez - Direct

1    one of them who came every week to look for more merchandise.

2    Q.  When you say merchandise, what do you mean?

3    A.  To the bricks.

4    Q.  Bricks of what?

5    A.  The heroin bricks that we were making.

6    Q.  Did Jorge pay anyone else in your family to perform this

7    work?

8    A.  Yes.

9    Q.  Who?

10   A.  To my brother Giancarlos, he paid him $450 a week, and my

11   mother, he would pay him $1,000 for the use of her house.

12   Q.  For how long did Jorge Gomez pay your mother?

13   A.  Two months.

14   Q.  And for approximately how long did Jorge Gomez pay your

15   brother?

16   A.  Five months.

17   Q.  Were you being paid by anyone besides Jorge?

18   A.  Yes.

19   Q.  Who?

20   A.  Vladimir Garcia and another person by the name Moya.

21   Q.  What did Vladimir Garcia pay you to do?

22   A.  Vladimir Garcia would bring me 100 grams of heroin, which I

23   would turn into 100 bricks, and he would pay me $700.

24   Q.  How many times did he pay you?

25   A.  Three times.

1    Q.   And you mentioned another person with the last name Moya.

2    What did Moya pay you to do?

3    A.   Moya would bring me 100 grams of heroin, 100 grams of

4    heroin, and I would turn them into 100 bricks of heroin, so he

5    would pay me also $700.

6    Q.   How many times did you do this work for Moya?

7    A.   Twice.

8    Q.   How many times did he pay you?

9    A.   Two times.

10   Q.   Throughout this period that you were working for Jorge

11   Gomez packaging drugs, where were you living?

12   A.   1043 Madison Street in Paterson, New Jersey.  That was my

13   apartment.

14   Q.   Who was paying for that apartment?

15   A.   Mr. Jorge Gomez.

16   Q.   Where were the drugs that you were packaging being stored

17   throughout this time?

18   A.   At my apartment in the closet.

19   Q.   Besides drugs, were you storing anything else illegal in

20   your apartment?

21   A.   Yes.

22   Q.   What?

23   A.   Two guns.

24   Q.   Where did you get the guns?

25   A.   Jorge brought them to the house and he said that that was

CB8MGOM5                    Ramon-Baez - Direct

1  for us to defend ourselves from other people who were also in

2  the middle in there selling heroin.

3  Q.  When did Jorge bring the guns to your house?

4  A.  Jorge brought the first gun in 2013, when we first moved

5  into the apartment --

6            THE INTERPRETER:  The interpreter could ask her to

7  repeat the name of the avenue?

8  A.  Haledon Avenue.  And then he brought the second gun and

9  that's when I already lived at 1043 Madison Avenue in Paterson,

10 New Jersey.

11 Q.  Did you ever use either gun?

12 A.  No.

13 Q.  As far as you know, did Jorge ever use either gun?

14 A.  No, he didn't.

15 Q.  Where did you store them in your apartment?

16 A.  In the closet in my bedroom.

17 Q.  Ms. Ramon-Baez, you testified that you were arrested with

18 Sandy Gomez.  When was that?

19 A.  In New Orleans.

20 Q.  When?

21 A.  December 8, 2014.

22 Q.  Are Sandy and Jorge Gomez related?

23 A.  Yes.  They are brothers.

24 Q.  When did you first meet Sandy Gomez?

25 A.  I don't remember the month exactly.  It was either October

1    or November at Jorge's house.

2    Q.  Where was Sandy Gomez living at that time?

3    A.  San Antonio, Texas.

4    Q.  Where was Jorge Gomez living at that time?

5    A.  28th and 8th in Paterson, New Jersey.

6    Q.  You mentioned that you first met Sandy Gomez at Jorge

7    Gomez's house in October or November, is that correct?

8    A.  Yes.

9              THE COURT:  What year?

10   Q.  What year was that?

11   A.  In 2014.

12   Q.  What did Sandy tell you about why he had come from San

13   Antonio, Texas to New Jersey?

14   A.  He told me that things were not really good for him in San

15   Antonio, Texas, and that he wanted Jorge to give him work here.

16   Q.  What kind of work did Sandy Gomez say he wanted Jorge to

17   give him?

18   A.  Working with us at the table packing heroin.

19   Q.  You mentioned a table.  What is that?

20   A.  A table is a place where other five other people worked,

21   and we worked packaging heroin.

22   Q.  What did Jorge say when Sandy asked to work at the table?

23   A.  Jorge had told me that he didn't work with family members

24   because then he later on could be robbed.

25   Q.  What, if anything, did Sandy Gomez do after that?

1   A.   Sandy made a phone call and then he went back.

2   Q.   Went back where?

3   A.   Where we were working at Jorge's house.

4   Q.   What did Sandy say after he came back to where you were

5   working?

6   A.   Sandy said that he needed one of the people who were

7   working by the table who could go with him to New Orleans and

8   that he would pay that person $2,000.

9   Q.   What did Sandy say about why he wanted to go to New

10  Orleans?

11  A.   Well, Sandy said at the table -- what he first said was he

12  wanted somebody with a license to go with him.  I said I would

13  go with him.  Jorge said no, because he didn't want to take

14  responsibility in case something happened to me.  But I still

15  agreed anyway.  I agreed.  Sandy said he had this acquaintance

16  in New Orleans who was going to give him 50 to a hundred kilos

17  to bring back to Paterson -- sorry.  Back to New York.

18  Q.   Kilos of what?

19  A.   Cocaine.

20  Q.   What did Sandy say he was going to do with that cocaine

21  after he brought it back to New York?

22  A.   He was going to give that to some people here in New York.

23  Q.   Did there come a time when you traveled to Louisiana with

24  Sandy Gomez?

25  A.   Yes.

 1    Q.  And when was that?

 2    A.  We made our first trip in November.

 3    Q.  Do you remember when in November?

 4    A.  No.  Just that it was at the end of November.

 5    Q.  How did you get there?

 6    A.  By plane.

 7    Q.  Did you and Sandy fly together?

 8    A.  Yes.

 9    Q.  Who bought the plane tickets?

10    A.  Mr. Sandy Gomez.

11    Q.  How did he buy them?

12    A.  On the Internet, with his card.

13    Q.  Did he buy one-way tickets or round trip?

14    A.  Just one way because he didn't know how many days we were

15    going to be down there.

16    Q.  Which airport did you fly out of?

17    A.  Newark, New Jersey.

18    Q.  And where did you fly to?

19    A.  We flew to Houston because it was snowing a lot and we

20    spent the night there.

21    Q.  Why did you spend the night in Houston?

22    A.  Because it was snowing a lot.  The flight was cancelled.

23    Q.  Was it your original plan to spend the night in Houston?

24    A.  No.

25    Q.  And where did you go after you spent the night in Houston?

GB8MGOM5                    Ramon-Baez - Direct

1  A.   We went -- the bus picked us up at the hotel and took us to

2  the airport.  From the airport we flew to Louisiana.  Once in

3  Louisiana, Sandy called for a cab and it took us to New

4  Orleans.

5        MS. CROWLEY:  Your Honor, I'd like to read a

6  stipulation at this time.

7        THE COURT:  Yes.

8        MS. CROWLEY:  This is Government Exhibit 1003.

9        It is hereby stipulated and agreed by and between the

10 United States of America and Sandy Gomez, the defendant that:

11       1.  Government Exhibits 401 and 402 are cellular

12 phones seized by law enforcement agents from inside the car

13 that Sandy Gomez, the defendant, and Caronlay Ramon-Baez were

14 traveling in on December 7, 2014.

15       2.  Government Exhibit 401R is a report reflecting a

16 true and accurate copy of data extracted from Government

17 Exhibit 401 and Government Exhibit 402R is a report reflecting

18 a true and accurate copy of data extracted from Government

19 Exhibit 402.

20       3.  Government Exhibit 402T is a summary chart

21 reflecting Spanish language text messages extracted from

22 Government Exhibit 402R as well as true and accurate

23 translations of the Spanish language text messages.

24       It is further stipulated and agreed that Government

25 Exhibits 401, 401T, 402, 402R, and 402T, and this stipulation

1    as Government Exhibit 1003, may be received in evidence as

2    government exhibits at this trial.

3          Your Honor, the government would move those exhibits

4    just listed.

5          THE COURT:  Any objection?

6          MS. TODD:  No, your Honor.

7          THE COURT:  Government Exhibits 401, 401T, 402, 402R,

8    402T, and 1003 are received in evidence.

9          (Government Exhibits 401, 401R, 402, 402R, 402T, and

10   1003 received in evidence)

11         MS. CROWLEY:  I believe I said 401T but it should be

12   401R.

13         THE COURT:  I said 401T.  Apparently, the correct

14   exhibit is 401R, so 401R is received.

15         MS. CROWLEY:  May I approach the witness?

16         THE COURT:  You may.

17   Q.  Ms. Ramon-Baez, I'm handing you what's been marked as

18   Government Exhibit 402.  Do you recognize that?

19   A.  Yes.  That's my cell phone.

20   Q.  And how do you know that's your cell phone?

21   A.  Because I made this mark on it down here.

22   Q.  And is that the cell phone that you were using around the

23   time that you took this trip to Louisiana?

24   A.  Yes.

25         MS. CROWLEY:  If we could publish Government Exhibit

GB8MGOM5                    Ramos-Baez - Direct

1     402T, which we just moved in evidence.

2              THE COURT:  Yes.

3     Q.  Do you recognize this document?

4     A.  Yes.

5     Q.  What is it?

6     A.  Those are the messages I was sending Jorge.

7     Q.  And were those messages that you were sending using that

8     phone that's marked Government Exhibit 402?

9     A.  Yes.

10    Q.  I'd like to direct your attention to the second and third

11    lines here.

12    A.  Ok.

13    Q.  You see that on November 26, 2014, at 7:23 p.m. you send a

14    message to Jorge:  We are getting on the plane soon.

15    A.  Yes.

16    Q.  Do you recall sending that message?

17    A.  Yes.

18    Q.  Where were you when you sent it?

19    A.  I was sitting on the plane.  I was sitting.

20    Q.  At which airport?

21    A.  In Newark, New Jersey.

22    Q.  And then the next line down, November 27, 2014, at 12:24

23    a.m., you text Jorge again and say:  We just arrived in

24    Houston.

25    A.  Yes.

1   Q.  Why were you telling Jorge this?

2   A.  Because I had told Jorge I was going to be telling him

3   everything we were doing on the trip.

4   Q.  Now, you mentioned that when you got to New Orleans the

5   following day you took a taxi.  Where did you take the taxi to?

6   A.  To the hotel.

7   Q.  And what happened when you got to the hotel?

8   A.  We got to the hotel, we went upstairs, dropped off our

9   bags.  Sandy said to me, let's take a walk.  Let's get

10  something to eat.  Then we took a walk and Sandy called the man

11  with the kilos of cocaine, the ones we were going to pick up,

12  and he said, hey, it's Pedro.  He never used his real name.  He

13  always changed his name.  So the owner of the cocaine said, ok.

14  Sandy said, I'm here now.  So he, the owner of the kilos, said,

15  hey, did you bring the car with the secret compartment in it.

16  And Sandy said no.  I thought you were going to get me the car

17  with the secret compartment.  So we were unable to pick up the

18  kilos of cocaine because we didn't have a car with a

19  compartment in it.  Interpreter correction.  A car with a

20  secret compartment.  We continued to walk and we went to a

21  casino.

22  Q.  If we could just back up a second.  This phone conversation

23  that you just described, where were you when Sandy Gomez was

24  having this conversation?

25  A.  Right next to Sandy.  We were walking.

GB8MGOM5                    Ramon-Baez - Direct

1   Q.  Could you hear both sides of the conversation?

2   A.  Yes.

3   Q.  How?

4   A.  He had it on speaker.

5        MS. CROWLEY:  May I approach, your Honor?

6        THE COURT:  Yes.

7   Q.  Ms. Ramon-Baez I'm handing you what's been marked

8   Government Exhibit 401.  Do you recognize that?

9   A.  Yes.  That's the cell phone Sandy was using to call that

10  person.

11  Q.  Did you pick up any drugs during this trip to New Orleans?

12  A.  No.

13  Q.  How long did you stay there?

14  A.  I don't really remember.  Two days, one day.  I really

15  don't remember.

16  Q.  And did you come back to New Jersey?

17  A.  Yes.

18  Q.  How did you get back?

19  A.  By plane.

20  Q.  Who paid for those plane tickets?

21  A.  Mr. Sandy Gomez.

22  Q.  And how did he pay for them?

23  A.  On the Internet.

24  Q.  Did you have a layover on the trip back?

25  A.  No.  It was straight through.

 1   Q.  What happened when you got back to New Jersey?

 2   A.  We got back to New Jersey and then we went over to Jorge's.

 3   We explained to Jorge that we hadn't been able to pick up the

 4   kilos of cocaine because we needed a car with a secret

 5   compartment in it.

 6   Q.  And what did Jorge say?

 7   A.  Jorge said, let me make a call.  He was going to call his

 8   friend Giovanny Perez, who was going to call a friend of his

 9   who had a car with a secret compartment in it.

10   Q.  What did Jorge say about who was going to pay for that car

11   with the secret compartment?

12   A.  Sandy said he didn't have money to pay for the car, so

13   Jorge said he would lend him the money as long as Sandy paid

14   him back once he got back to Paterson.

15   Q.  And did Jorge get a car with a secret compartment?

16   A.  Yes.  The next day.

17   Q.  Who did he get it from?

18   A.  Giovanny Perez's friend.

19   Q.  Were you present when Giovanny Perez's friend gave Jorge

20   the car with the secret compartment?

21   A.  Yes.

22   Q.  And where did this happen?

23   A.  At Jorge's house, at 28th and 8th Avenue in Paterson, New

24   Jersey.

25   Q.  What kind of car was it?

1    A.   A white GMC with tinted windows.

2    Q.   Where was the secret compartment?

3    A.   In the back, the last seat in the back, underneath it.

4         MS. CROWLEY:   Your Honor, may I publish Government

5    Exhibit 100, which is in evidence?

6         THE COURT:   Yes.

7    Q.   Do you recognize what's depicted in this photograph?

8    A.   Yes.   That's the one we traveled in.

9    Q.   Is that the car that the man that Giovanny Perez's friend

10   gave to Jorge Gomez?

11   A.   Yes.

12   Q.   By the way, the man who brought the car to Giovanny Perez,

13   had you ever seen that man before?

14   A.   No.   Just the day he delivered the SUV to Jorge Gomez.

15   Q.   And what did Jorge and that man discuss at that time?

16   A.   He delivered the SUV to Jorge.   Jorge said:   How much is

17   it?  He said $4,000.  Jorge said to him, I'll give you 2700 up

18   front.  And when Sandy comes back I'll pay you the remaining

19   1300.

20   Q.   And did Jorge pay the man that day?

21   A.   Yes.   $2700.

22   Q.   What happened after Jorge paid the man?

23   A.   Jorge said to me, Yaneisy, you have to take the guy back to

24   the bus stop so he can go back to New York.

25   Q.   Why did Jorge call you Yaneisy?

1   A.  That's my middle name.

2   Q.  Did you take the man somewhere?

3   A.  Yes.  I took him so he could get on the bus to come back to

4   New York.

5   Q.  And what car did you drive to take him back?

6   A.  I had a Jeep.

7   Q.  What happened after you dropped the man off?

8   A.  I went back to Jorge's house.  We called Sandy.  And then

9   Sandy showed up.

10  Q.  What happened after Sandy came?

11  A.  Jorge, we were showing him the entire inside of the

12  vehicle, the SUV, how everything worked, how the compartment

13  worked, everything on the inside.

14  Q.  Did Jorge show you how the compartment worked?

15  A.  No.  Just Sandy.

16  Q.  Did you see inside the compartment at that time?

17  A.  Yes.

18  Q.  Was there anything inside the compartment at that time?

19  A.  No.  Just the compartment.

20  Q.  What did Sandy say about the car?

21  A.  He didn't really like that SUV.  He didn't have much

22  confidence in it because he said he had a similar one, and you

23  couldn't tell that -- on this one you could tell that the back

24  seat was loose.

25  Q.  What did Sandy say about why he didn't like that you could

1   tell the back seat was loose?

2   A.   He said -- it was because the secret compartment, the fact

3   that it was underneath the seat, it made it move a lot, so he

4   really wasn't too sure about it because if the police stopped

5   us they would realize it was there.

6   Q.   What happened after Sandy said this?

7   A.   Jorge called the SUV's owner and he said, well, my brother

8   is not really sure that he is going to want to use that car

9   because you could tell that under the last seat the seat is a

10  little like loose.

11  Q.   And did Sandy get on the phone?

12  A.   And, yeah, he got on the phone and he said, look, my

13  friend, I have a very similar SUV to this one, and this one you

14  can tell that the seat where the secret compartment is is a

15  little loose.

16  Q.   After that phone call what did Jorge and Sandy decide to do

17  about the car?

18  A.   Sandy told Jorge, either, ok, you either accept it or not,

19  because I don't have any other vehicles that I can get for you.

20  And then Jorge said, well, I mean, if you want, you can take my

21  new Mercedes and you actually can have a secret compartment

22  built, but you would have to pay me $20,000.  That's what he

23  wanted.  And Sandy said no.  Those people are not going to want

24  to do that because, first of all, that's a new vehicle.  And

25  then in the end he ended up accepting this SUV.

```
 1              THE COURT:  I think we are going to have to leave it
 2    there for today.
 3              Ladies and gentlemen, I said we would break at 2:00
 4    because it's Election Day.  We will break now.  We will return
 5    at 9:30 tomorrow morning to resume trial.
 6              In the meantime, don't discuss the case with anyone.
 7    Keep an open mind because there is more evidence.  Have a very
 8    pleasant evening.  We will see you tomorrow morning at 9:30.
 9    Thank you all very much.
10              (Jury not present)
11              THE COURT:  The witness can step down.
12              Mr. Cooper, how is the proof going?  How much longer
13    do you think the government's case will be?
14              MS. CROWLEY:  I'm about halfway done with this
15    witness.  We have two other witnesses after this.  One will be
16    about 10 minutes and the other probably half an hour.
17              THE COURT:  It seems like the proof will be ending
18    tomorrow.
19              Ms. Todd, do you have a sense of the defense case at
20    this point?
21              MS. TODD:  Yes, your Honor.  Still working on the
22    witnesses.  But we expect to have some witnesses.
23              THE COURT:  Any issues that anyone wants to raise
24    before we break for the day?
25              MS. TODD:  Not an issue, your Honor.  Just a reminder,
```

 1   and I'm sure the government is aware of this.  They are not to

 2   speak to Ms. Ramon-Baez between now and tomorrow.

 3            THE COURT:  I'm sure they are aware of that.

 4            MS. CROWLEY:  We are on direct still.

 5            THE COURT:  She is still on direct, Ms. Todd.  They

 6   can talk with their witness while they are on direct.  It's

 7   when they are on cross that there is a problem.

 8            MS. TODD:  Ok.

 9            THE COURT:  You think you will be about as long with

10   her as you were today.

11            MS. CROWLEY:  Yes, your Honor.  About 45 minutes, I

12   think, your Honor.

13            THE COURT:  We started with her at 1:24 and we ended

14   at a little after 2.  That was about 40 minutes.  Think about

15   the same.

16            MS. CROWLEY:  Might be a little less.

17            THE COURT:  Little less.  Seems pretty clear we are

18   going to end the proof tomorrow.

19            Anything else we should talk about?

20            MR. COOPER:  Not from the government.  Thank you, your

21   Honor.

22            MS. TODD:  Not from us, your Honor.

23            THE COURT:  We will resume at 9:30 tomorrow.

24            MR. COOPER:  Your Honor, I'm sorry.  Should we be

25   ready, assuming that the schedule moves along as we think it

 1     might, to close tomorrow, or would your Honor want --

 2             THE COURT:  We will have to have a charge conference,

 3     although I don't think the charge is going to be pretty

 4     complicated.  I think what we should do is plan on summing up

 5     Thursday morning.  I don't think you'll have to close tomorrow,

 6     so don't worry about that.  We will close Thursday morning, but

 7     we may well have the charge conference tomorrow afternoon.

 8             MR. COOPER:  Thank you, your Honor.

 9             MS. TODD:  Just for clarity, your Honor, just for

10     scheduling purposes, should I understand that the government

11     expects to be finished with Ms. Baez in like half an hour

12     tomorrow, at most, maybe?

13             THE COURT:  That's what Ms. Crowley said.

14             MS. CROWLEY:  I would say 40 minutes at most.

15     Probably between 30 and 40 minutes.

16             MS. TODD:  Thank you.

17             THE COURT:  We will resume tomorrow at 9:30.  Thank

18     you.

19             (Adjourned to Wednesday, November 9, 2016, at 9:30

20     a.m.)

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

ANTONIO JIMENEZ

Direct By Mr. Cooper . . . . . . . . . . . . . .78
Cross By Ms. Todd  . . . . . . . . . . . . . 146
Redirect By Mr. Cooper . . . . . . . . . . . 182
Recross By Ms. Todd  . . . . . . . . . . . . 190
Redirect By Mr. Cooper . . . . . . . . . . . 195

CARONLAY RAMON-BAEZ

Direct By Ms. Crowley  . . . . . . . . . . . 195

                    GOVERNMENT EXHIBITS

Exhibit No.                               Received

 201T, 202T, 203T, 204T, 205T, 206T, . . . . . .92
        207T, and 1001
 103   . . . . . . . . . . . . . . . . . . . 104

 401, 401R, 402, 402R, 402T, and 1003  . . . . 208