```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        15 Cr. 348 (PGG)

 5

     SANDY GOMEZ,
 6
                                         Trial
 7              Defendant.

 8   ------------------------------x

 9                                       New York, N.Y.
                                         November 9, 2016
10                                       9:50 a.m.

11
     Before:
12
                         HON. PAUL G. GARDEPHE,
13
                                         District Judge
14                                       -and a Jury-

15
                          APPEARANCES
16
     PREET BHARARA
17        United States Attorney for the
          Southern District of New York
18   PATRICK EGAN
     RICHARD A. COOPER
19   SHAWN G. CROWLEY
          Assistant United States Attorneys
20

21   NATALI J.H. TODD
          Attorney for Defendant
22


23
     ALSO PRESENT:  NATASHA BONILLA, Interpreter (Spanish)
24                  ELIZABETH CARUSO, Interpreter (Spanish)

25
```

1          (Trial resumed; jury not present)

2          THE COURT:  Are there any issues that we need to take

3    up before I bring in the jury?

4          MS. CROWLEY:  Not from the government, your Honor.

5          MS. TODD:  Not from the defense, your Honor.

6          THE COURT:  Mr. Ruocco, please bring in the jury.

7          (Jury present)

8          THE COURT:  Good morning, ladies and gentlemen.  We

9    are going to be continuing this morning with the direct

10   examination of Ms. Ramon-Baez.

11         Ms. Ramon-Baez, you remain under oath.  Please

12   proceed.

13    CARONLAY RAMON-BAEZ, resumed.

14   DIRECT EXAMINATION (cont'd)

15   BY MS. CROWLEY:

16   Q.  Good morning, Ms. Ramon-Baez.

17   A.  Good morning.

18   Q.  Yesterday when we broke we were talking about a phone call

19   that Jorge and Sandy had with a man who delivered the car with

20   the secret compartment.  Do you recall that?

21   A.  Yes.

22   Q.  And you testified that after that phone call Jorge Gomez

23   and Sandy Gomez had a conversation about the car.  Do you

24   recall?

25   A.  Yes.

1  Q.  And could you just describe for the jury what they

2  discussed in that conversation?

3  A.  After we had checked the entire inside, the secret

4  compartment and everything, Sandy told Jorge he didn't really

5  like this SUV because it had this small defect which was the

6  fact that it was in the back seat and the compartment was

7  underneath it.

8  Q.  What did Jorge say?

9  A.  Jorge told him he was going to call the owner of the SUV to

10  tell him what Sandy thought of the SUV.

11  Q.  And that was the phone call that you talked about

12  yesterday, right?

13  A.  Yes.

14  Q.  Following that phone conversation, what did Jorge and Sandy

15  decide to do about the car?

16  A.  Sandy and Jorge decided they were going to keep the vehicle

17  that had the secret compartment in it.

18  Q.  Now, did there come a time when you went back down to New

19  Orleans?

20  A.  Yes.

21  Q.  When?

22  A.  December 4, 2014.

23  Q.  How did you get there?

24  A.  Driving.

25  Q.  In what car?

```
 1   A.   In the white GMC.

 2   Q.   The one that the man had delivered to Jorge?

 3   A.   Yes.

 4   Q.   Who drove?

 5   A.   Sandy Gomez.

 6   Q.   Approximately what time did you leave New Jersey?

 7   A.   It was at night, like 6:30 or 7.

 8   Q.   And did you make any stops along the way?

 9   A.   Yes.  At a hotel.

10   Q.   Approximately what time did you stop at the hotel?

11   A.   5:30, 6.  I don't really remember the time.

12   Q.   In the morning?

13   A.   Yes.

14   Q.   So you drove through the night from New Jersey?

15   A.   Yes, we drove the whole night.

16   Q.   I'd like to publish Government Exhibit 402T, which is in

17   evidence.  These are the text messages between you and Jorge

18   that we discussed yesterday.  Do you recall that?

19   A.   Yes.

20           MS. CROWLEY:  And if we could focus in on the text

21   message that was sent on 12/5/2014 at 5:33 a.m.  You can go

22   down to 12/5/2014 at 5:35 a.m.

23   Q.   Are these text messages between you and Jorge Gomez?

24   A.   Yes.

25   Q.   And the first one, 12/5/2014 at 5:33 a.m., you tell Jorge,
```

1    we put gas in and were looking for a hotel.  Where were you

2    when you sent that text message?

3    A.  In the SUV sitting next to Sandy Gomez.

4    Q.  Is this the morning after you left New Jersey?

5    A.  Yes.

6    Q.  And then you tell Jorge Sandy is sleeping and he says:  Ok,

7    are you going to sleep?

8         Why are you telling Jorge Gomez this?

9    A.  So he would know everything I was doing.

10   Q.  Now, approximately when did you leave that hotel?

11   A.  We left about 6, 6:30 in the evening of that day.

12   Q.  So what did you do during that day?

13   A.  We bought food.  We stayed at the hotel.

14        MS. CROWLEY:  If we could go next to the line,

15   12/5/2014 at 2:05 p.m., if you could highlight that message.

16   Sorry.  It's 12/5/2014 at 2:05 p.m., the one right above that.

17   If you could just zoom in on that.

18   Q.  Now, this is a message that you sent to Jorge Gomez at

19   around 2 in the afternoon of December 5, 2014.  You said:  He

20   wants to go at 5 because the license plate is from New Jersey.

21        Where were you when you sent that message?

22   A.  At the hotel.

23   Q.  And who is the he that you are referring to there?

24   A.  Sandy Gomez.

25   Q.  And what did you mean by, he wants to go at 5 because the

 1   license plate is from New Jersey?

 2   A.  Because Sandy was saying that we had gone so far, it was

 3   40-hour trip.  If the police saw us, the fact that we had New

 4   Jersey plates, they were going to say, how come we had come so

 5   far so many miles in this vehicle.  And that's why he said it

 6   was better to drive at night.

 7   Q.  And you said you left the hotel later that evening?

 8   A.  Yes, that night.

 9   Q.  About what time did you arrive in New Orleans?

10   A.  We got there on the 6th at 6 in the morning.

11            MS. CROWLEY:  If we could now focus in on the messages

12   that begin on 12/6/2014 at 1:23 a.m.  And you can highlight

13   those three messages.

14   Q.  You can see here in these messages, which I believe all

15   should say 1:23 a.m., that you tell Jorge, that's good, we will

16   arrive around 5.  Arrive where?

17   A.  Get to New Orleans.

18   Q.  So you drove through that night as well?

19   A.  Yes, the whole night.

20   Q.  And what happened when you got to New Orleans?

21   A.  We got to New Orleans at about 6 in the morning.  We waited

22   for the hotel to open, which is about 8 or 9.  Sandy Gomez

23   brought our bags up.  We dropped them off at the hotel.  Then

24   he told me he had to go out to this place that only sells car

25   parts, to cover the part of the license plate where the name

1   New Jersey is, so you would only be able to see the number.

2   Q.  Did you go to that car place?

3   A.  Yes.

4   Q.  And what did you get there?

5   A.  We bought something that only covered the name New Jersey

6   on the license plate.

7   Q.  And did there come a time when that was put on the car?

8   A.  Yes.  We went to the hotel.  We parked and he put that on

9   the plates.

10  Q.  Who is he?

11  A.  Sandy Gomez.

12  Q.  And what was your understanding of why Sandy put that on

13  the license plate?

14          MS. TODD:  Objection.

15          THE COURT:  Sustained.  You have to lay a foundation.

16  Q.  What, if anything, did Sandy say to you about why he put

17  that cover on the license plate?

18  A.  He told me that it was if the police stopped us, they

19  wouldn't see that the plates were from New Jersey.  Because

20  they were going to say, you are driving a lot of miles --

21          INTERPRETER CARUSO:  Interpreter correction.

22  A.  You're putting a lot of miles on that vehicle.

23  Q.  And did the cover conceal the tire license plate or just

24  part of it?

25  A.  No.  Just the name New Jersey.

1    Q.  And this license plate cover was put on on December 6, is

2    that right?

3    A.  Yes.

4    Q.  What did you and Sandy Gomez do the rest of that day?

5    A.  We went to buy food.  We bought something to drink.  We

6    went back to the hotel.  Sandy called the guy with the kilos of

7    cocaine.  And the man said, I'll call you.

8    Q.  So Sandy called the guy who had the cocaine.  What day did

9    he do that?

10   A.  The 6th.  The 6th.

11   Q.  That was the same day you got the license plate cover, or

12   no?

13   A.  Yes.  When we were at the hotel.

14   Q.  And where were you when Sandy made this call?

15   A.  We were in the hotel.

16   Q.  And was this in the morning or the afternoon?

17   A.  That was around 11, 12, approximately.

18   Q.  11, 12 in the morning?

19   A.  In the morning (in English).

20   Q.  This is the same day that you bought the license plate

21   cover?

22   A.  Yes.

23   Q.  What did Sandy say when he called the man who owned the

24   cocaine?

25   A.  Hey, it's me, Pedro.  I'm here now.

1   Q.  Where were you when he had that conversation?

2   A.  Right next to Sandy in the hotel.

3   Q.  Could you hear what the man said in response?

4   A.  Yes.

5   Q.  What did he say?

6   A.  Ok.  I'll call you.

7   Q.  And did he call back?

8   A.  On the 7th, the next day.

9   Q.  What did he say when he called?

10  A.  He called at around 12.  He said he was ready and Sandy

11  could come and meet with him.

12  Q.  And what, if anything, did Sandy say about whether he had a

13  vehicle with him this time?

14  A.  The man already knew that we had the car with the secret

15  compartment in it.

16  Q.  How did he know that?

17  A.  Because Sandy had already told him that.

18  Q.  What happened after Sandy had this conversation with the

19  man who owned the drugs?

20  A.  Sandy said Yaneisy, I am going to go out now.  I'll be

21  right back.

22  Q.  Approximately how long was Sandy gone?

23  A.  Two hours, two and a half hours.  I don't really remember.

24  Q.  Where were you during this time?

25  A.  In the hotel.  I was lying down watching TV.

GB9MGOM1                      Ramon Baez - direct

1          MS. CROWLEY:  If we could turn back to Government

2   Exhibit 402T and zoom in on the line 12/7/2014, 1:29 p.m.

3   Q.  You send a text message to Jorge that says he already left

4   to see the people.  Who is the he you are referring to there?

5   A.  Sandy Gomez.

6   Q.  And what did you mean when you told Jorge that Sandy Gomez

7   left to see the people?

8   A.  That Sandy had left at that point to go pick up the kilos

9   of cocaine.

10  Q.  And did Sandy return to the hotel?

11  A.  Yes.

12  Q.  What happened when he returned?

13  A.  He brought me food from Dunkin' Donuts, and then he had a

14  paper bag with him with five kilos of cocaine in it.

15  Q.  Did you see the cocaine?

16  A.  Yes.  He put it on top of the bed.  He showed it to me.

17  Q.  How was it packaged?

18  A.  There was one that had kind of like a purple glove around

19  it, and the other ones had different kinds of wrapping.

20  Q.  When you say one, what do you mean?

21  A.  One of the kilos had -- well, they all had different

22  wrappings.

23  Q.  How many kilos were there?

24  A.  Five.

25  Q.  And what did Sandy say about why the man gave him five

1   kilos?

2   A.  Sandy said to me, hey, look, he only gave me five kilos.  I

3   thought he was going to give me 50 to a hundred.  He only gave

4   me five.  And he told me that he was just giving me those five

5   kilos because he hadn't really negotiated with me, and that

6   once I took that to New York and made it ok, then he would give

7   me the rest on the third trip.  And he also told me that he was

8   going to pay $10,000, meaning for those kilos for the cocaine

9   that he was going to go get.

10  Q.  When did you leave New Orleans?

11  A.  We left at night, on the 7th.

12  Q.  What did you do between the time Sandy returned with the

13  cocaine and the time you left?

14  A.  Sandy fell asleep and I stayed watching TV, football game

15  between New Orleans and Carolina.

16  Q.  Why did you leave at that time?

17  A.  Because of the same issue.  Because of the New Jersey

18  plates.  Because he didn't want for us, in case the police

19  stopped us, for the police realized that we had covered the

20  plate and in fact it was a New Jersey plate.

21  Q.  What did you do when you left the hotel?

22  A.  Mr. Sandy Gomez told me, oh, we have to look for a dark

23  street so that we can go and rearrange the kilos in the secret

24  compartment.

25  Q.  And what did you do?

1   A.   We stopped at a dark street and then Sandy opened the

2   secret compartment, which was actually from his side, to his

3   side.   And he arranged them as two kilos, two kilos, and one

4   kilo.   And then he put the pillows on top of the -- bed cover

5   on top and then he put the two suitcase in the back in such a

6   way so that the seat wouldn't move.

7   Q.   And just to be clear, who opened the secret compartment?

8   A.   Mr. Sandy Gomez.

9   Q.   Did you know how to open the secret compartment?

10   A.   No.

11   Q.   After Sandy Gomez put the cocaine in the secret

12   compartment, where did you go?

13   A.   We went to Popeyes.

14   Q.   Why did you go to Popeyes?

15   A.   Because we were hungry and we went to get some food.

16   Q.   What, if anything, did you discuss with Sandy at Popeyes?

17   A.   Yes.   Well Sandy told me, Yaneisy, we are leaving at night,

18   and he thought the police are always there on the highway.   And

19   if the police stopped us, what you have to say is we came to

20   New Orleans to have sexual relations because you are my

21   brother's former girlfriend and it would look really bad if we

22   were together in Paterson.   And you also have to say that we

23   came to watch the football game between New Orleans and

24   Carolina.

25   Q.   What did you say in response?

 1   A.  Yes, that it was fine.

 2   Q.  Had you actually come to New Orleans to have a sexual

 3   relationship with Sandy Gomez?

 4   A.  No, never.

 5   Q.  Did you have a sexual relationship with Sandy Gomez?

 6   A.  No, never, no.

 7   Q.  Had you actually gone to a football game that day?

 8   A.  No.

 9   Q.  What happened after you left Popeyes?

10   A.  We drove for about an hour and a half to two hours, and the

11   police stopped us.

12   Q.  What, if anything, did Sandy Gomez say as the police were

13   stopping you?

14   A.  He repeated the same thing.  Remember, that we came to New

15   Orleans to have sexual relations, because you are my brother's

16   girl, and also that we came to watch the football game between

17   Carolina and New Orleans.

18   Q.  Did there come a time when you were asked to step out of

19   the vehicle?

20   A.  Yes.

21   Q.  And did you?

22   A.  Yes.

23   Q.  What happened as you were standing outside the vehicle?

24   A.  First of all, they requested our IDs.  They spoke to me in

25   English and I told them no English.  Then they got us both out

1   of the vehicle.  And I told them that I was cold and the man,

2   the officer, then had me go in the back of the patrol car.

3   Q.  How long approximately were you in the back of the patrol

4   car?

5   A.  I don't remember exactly.  It was approximately two hours.

6   Q.  Were you placed under arrest later that night?

7   A.  Yes.

8   Q.  I'd like to jump ahead again.  Did there come a time

9   following your arrest when you spoke with Sandy Gomez about

10  trial in this case?

11  A.  Yes.

12  Q.  Where were you when you had that conversation?

13  A.  I always came to court with him because I didn't know my

14  way around, and we were on the train heading to 175th.

15  Q.  When you say him, what do you mean?

16  A.  Sandy Gomez.

17  Q.  And you had just come from court in this case?

18  A.  Yes.

19  Q.  What did Sandy Gomez say to you about what you should say

20  happened in December 2014?

21  A.  Sandy told me that I had to say either to my attorney or to

22  the government or to whoever asked that he had asked Jorge to

23  borrow that SUV from him and that the cocaine was already in

24  Jorge's SUV and we should blame it all on Jorge.

25  Q.  What did you say in response?

1   A.  That it was fine.

2   Q.  Did you actually say that in court?

3   A.  No, never, and I didn't even tell my attorney either.

4   Q.  I'd like to switch gears for a second.  Besides the crimes

5   that you pled guilty to, have you ever committed other crimes?

6   A.  Yes.

7   Q.  What?

8   A.  I committed the crime of having filed my tax return with a

9   false dependent, meaning I bought the child for $900 so that I

10  could get more money when I got the reimbursement from the IRS.

11  Q.  You said you bought the child.  Do you mean the child's

12  Social Security number?

13  A.  Yes, the Social Security number.

14  Q.  And you filed a tax return saying that you had a child?

15  A.  Yes.

16  Q.  But you didn't actually have a child at that time, right?

17  A.  No.

18  Q.  And when was this?

19  A.  2008, 2009, 2010, and 2011.

20  Q.  Ms. Ramon-Baez, when you were first charged in this case,

21  what crime were you charged with?

22  A.  With five kilos of cocaine.

23  Q.  And the other crimes that you've talked about here on the

24  witness stand, distribution of heroin, possession of firearms,

25  and the tax fraud you just discussed, what is your

1   understanding of how the government learned about those crimes?

2   A.  Because I told the government that I would tell them the

3   whole truth from the point when I came to this country up until

4   today.

5   Q.  So the government learned about those crimes because you

6   told them?

7   A.  Yes.

8   Q.  You testified earlier that you pled guilty in this case

9   pursuant to a cooperation agreement, right?

10  A.  Yes.

11  Q.  Before signing that agreement, did you meet with

12  prosecutors in this case?

13  A.  Yes.

14  Q.  When was the first meeting?

15  A.  Approximately a year ago, on 8/25/2015.

16  Q.  That was before or after you signed the cooperation

17  agreement with the government?

18  A.  Before.

19  Q.  About how much before?

20  A.  A year.

21  Q.  At that first meeting back in August of 2015, what did the

22  prosecutors tell you were your responsibilities if you wanted

23  to enter into a cooperation agreement with the government?

24  A.  To tell the whole truth.

25  Q.  And what did the prosecutors tell you about whether you

 1   should continue to communicate with Jorge and Sandy Gomez?

 2   A.  That I couldn't get in touch with any of my two

 3   codefendants.

 4   Q.  Following that meeting, did you continue to communicate

 5   with Sandy and Jorge Gomez?

 6   A.  Yes.

 7   Q.  But you knew you weren't supposed to do that?

 8   A.  Yes.

 9   Q.  Did you continue to communicate with them because you

10   didn't want them to know you were cooperating with the

11   government?

12   A.  Yes.

13   Q.  And you thought that they would be suspicious if you

14   stopped talking to them?

15   A.  Yes.

16   Q.  Following that first meeting did you continue to meet with

17   the prosecutors in this case?

18   A.  Yes.

19   Q.  Approximately how many times did you meet with the

20   prosecutors before you signed the cooperation agreement?

21   A.  Four times.

22   Q.  Who was present at those meetings?

23   A.  It was the prosecutor, my attorney, the translator, the man

24   from the DEA, and I was there present.

25   Q.  And what did you discuss in your meetings with the

1   prosecutors?

2           MS. TODD:  Objection.

3           THE COURT:  You want to be heard?

4           MS. TODD:  Yes, your Honor.

5           THE COURT:  Ok.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              THE COURT:  What is the answer going to be?

3              MS. CROWLEY:  She is going to say that she told us all

4     of her crimes that she committed.

5              MS. TODD:  I think the question is improper because it

6     suggested calls for hearsay and bolstering as to what she

7     discussed in those meetings.  Given the fact that her

8     credibility hasn't yet been challenged as to what she said or

9     didn't say, I don't think it's an appropriate question.  There

10    is another way to get there.

11             THE COURT:  I think it depends on the specificity of

12    the answer.  If the answer is, I talked generally about, you

13    know, what happened and I talked about the crimes I committed,

14    I don't think you have a problem with that.

15             MS. TODD:  I don't have a problem with that.

16             MS. CROWLEY:  That's what her answer is going to be.

17    That's what I think it's going to be.

18             THE COURT:  Do you want her to lead a little bit on

19    this?

20             MS. CROWLEY:  I can lead.

21             THE COURT:  It seems like she is prepared to answer in

22    a very general way.

23             MS. CROWLEY:  I can say generally speaking.

24             MS. TODD:  Yes.

25             (Continued on next page)

GB9MGOM1                    Ramon-Baez - direct

1              (In open court)

2    Q.  Ms. Ramon-Baez, generally speaking, what topics did you

3    discuss in your meetings with the prosecutors?

4    A.  About telling them the whole truth all the time, of all the

5    good and all the bad that I have done in these last 10 years,

6    to never commit any other crimes, and to cooperate in

7    everything that I can with the government.

8    Q.  You testified previously that you pled guilty to

9    distributing cocaine and heroin.  How much cocaine?

10   A.  Five kilos.

11   Q.  And how much heroin?

12   A.  One kilo or more.

13   Q.  And you testified previously that you pled guilty to

14   possessing firearms.  How many firearms?

15   A.  Two.

16   Q.  What is the maximum sentence that you face on the crimes

17   that you pled guilty to?

18   A.  Life.

19   Q.  And do the crimes that you pled guilty to carry any

20   mandatory minimum sentence?

21   A.  Yes.

22   Q.  What is that?

23   A.  Fifteen years.

24   Q.  When did you plead guilty?

25   A.  October 18, 2016.

1   Q.  At the time you pled guilty did you have a signed

2   cooperation agreement with the government?

3   A.  Yes.

4           MS. CROWLEY:  May I approach, your Honor.

5           THE COURT:  Yes.

6   Q.  Ms. Ramon-Baez, I'm showing you what's been marked

7   Government Exhibit 3504-4.  Do you recognize this?

8   A.  Yes.

9   Q.  What is it?

10  A.  The cooperation agreement.

11  Q.  If you could turn to the last page.  Is that your signature

12  there?

13  A.  Yes.

14  Q.  Who else signed this agreement?

15  A.  My attorney, the prosecutor, and the other stuff is in

16  English, so I don't know.

17  Q.  Before you signed that agreement did you have it translated

18  for you?

19  A.  Yes.

20  Q.  Are you testifying here under this agreement?

21  A.  Yes.

22  Q.  Have you been sentenced yet for the crimes you pled guilty

23  to?

24  A.  No.

25  Q.  Who will sentence you?

1   A.  The honorable judge.

2   Q.  As far as you know, will anyone else decide your sentence?

3   A.  No.  Just him.

4   Q.  What is your understanding about what you have to do under

5   this agreement you signed with the government?

6   A.  To tell the whole truth.

7   Q.  Anything else?

8   A.  No.  Well, I mean, to tell the whole truth, to cooperate

9   with the government in everything that I can, and to never

10  commit any other crimes.

11  Q.  Does this agreement contain all of the promises that the

12  government has made to you?

13  A.  Yes.

14  Q.  What is your understanding of what the government will do

15  if you fulfill your end of this agreement?

16  A.  They will write a letter to the judge that states all the

17  good and all the bad that I have done in these last 10 years.

18  Q.  And has the government promised you or told you what

19  sentence you will receive if you cooperate fully?

20  A.  No.

21  Q.  Has anyone else promised you or told you what sentence you

22  will receive if you cooperate fully?

23  A.  Nobody.

24  Q.  As far as you know, is the government going to recommend a

25  specific sentence to the judge?

G39MG0M1                    Ramon Baez - direct

1   A.  No.  The judge is the only one who knows.

2   Q.  Do you hope to get a lower sentence because you cooperated?

3   A.  I hope so.

4   Q.  What sentence do you hope to receive?

5   A.  Time served.

6   Q.  Do you know whether you will actually receive a lesser

7   sentence because you cooperated?

8   A.  No.

9   Q.  If the government sends a letter to the judge, what is the

10  least amount of time in jail that you could receive?

11  A.  Less than 15 years.

12  Q.  Time served?

13  A.  Possibly.

14  Q.  But just because the judge gets the letter, does he have to

15  sentence you to less prison time?

16  A.  No.

17  Q.  Besides writing the letter to the judge, did the government

18  promise anything else if you hold up your end of the

19  cooperation agreement?

20  A.  No, nothing else.

21  Q.  What, if anything, did the government promise with respect

22  to the tax crimes that you just discussed?

23  A.  They would only go forward with the charges, the two

24  charges against me, and they would tell the judge what I had

25  told them about my IRS fraud.

1   Q.   So the government promised you that if you live up to your

2   end of the cooperation they wouldn't prosecute you for the tax

3   crimes?

4   A.   Yes.

5   Q.   As far as you understand, will the outcome of this trial

6   have any effect on whether the government sends that letter to

7   the judge for you?

8   A.   No.

9   Q.   Why not?

10  A.   Because I'm telling the whole truth.

11  Q.   What do you understand will happen to your agreement if you

12  do not tell the truth on the witness stand today?

13  A.   They will tear up my cooperation agreement.

14  Q.   Based on your understanding, if you don't tell the truth on

15  the witness stand, would you receive a sentencing reduction for

16  your cooperation?

17  A.   No.

18  Q.   And what would be the minimum sentence that you would face

19  if you don't tell the truth on the witness stand?

20  A.   Fifteen years mandatory.

21          MS. CROWLEY:  One moment, your Honor.

22          THE COURT:  Yes.

23          MS. CROWLEY:  Nothing further.

24          THE COURT:  Cross-examination.

25          MS. TODD:  Yes, your Honor.  Thank you.

 1   CROSS-EXAMINATION

 2   BY MS. TODD:

 3   Q.  Good morning, Ms. Ramon-Baez.

 4   A.  Good morning.

 5   Q.  So you testified on direct, I believe it was yesterday,

 6   that you were in a relationship with Jorge Gomez, correct?

 7   A.  Yes.

 8   Q.  And at some point you moved in with him, right?

 9   A.  Yes.

10   Q.  Do you have any children together?

11   A.  No.

12   Q.  You lived together with Jorge Gomez in Paterson, New

13   Jersey, correct?

14   A.  Yes.

15   Q.  And the person that introduced you to Jorge is Vladimir,

16   right, someone by the name of Vladimir?

17   A.  Yes.

18   Q.  And you began to work for Jorge Gomez with his narcotics

19   business, correct?

20   A.  Uh-huh, yes.

21   Q.  You worked in his house?

22   A.  No.

23   Q.  You did not work with Jorge with drugs in his house?

24   A.  Not at the beginning.  It was my mother's house.

25   Q.  At some point you also packaged drugs in his house,

1    correct?

2    A.   Yes.

3    Q.   By work you mean grinding up the drugs, yes?

4    A.   Yes.

5    Q.   Selling the drugs for him?

6    A.   I worked for him.

7    Q.   Did you deliver drugs to some of his customers at any

8    point?

9    A.   Yes.

10   Q.   Did you deal directly with some of his suppliers?

11   A.   Yes.

12   Q.   You collected money from them, correct?

13   A.   Yes.

14   Q.   In exchange for the drugs, right?

15   A.   Yes.  That was my job.

16   Q.   And sometimes you picked up the narcotics, correct?

17   A.   No.

18   Q.   You never picked up?

19   A.   Only Jorge.

20   Q.   And the drugs that you were involved with was heroin and

21   cocaine, correct?

22   A.   Yes.

23   Q.   Now, initially when you started working with Jorge Gomez

24   you started by putting stamps on the bags, correct?

25   A.   Yes.

GB9MGOM1                    Ramon - Cross

1   Q.   And the stamps were to identify your product different from

2   the other product on the market, correct?

3   A.   Yes.

4   Q.   And you bought the boxes for the stamps in New Jersey,

5   correct?

6   A.   No.

7   Q.   You never went to Newark to buy the stamps?

8   A.   Yes, Newark, New Jersey.  Sorry.  Yes.

9   Q.   And then you moved up the ladder, right?

10  A.   Yes.

11  Q.   You went from stamping the bags to now filling them,

12  correct?

13  A.   Yes.

14  Q.   And Jorge taught you how to package and stamp the heroin,

15  correct?

16  A.   Yes, the whole job.

17  Q.   You also learned how to mix the drugs, right?

18  A.   Yes.

19  Q.   This was to make it more so you could increase your profit,

20  right?

21  A.   Yes.

22  Q.   So in a sense the customer wasn't getting the purity of the

23  drugs because you mixed it, correct?

24  A.   We didn't always do that.  It depended on the number that

25  the work yielded.

GB9MGOM1                        Ramon-Baez

1   Q.  I'm sorry.  Say that again.

2   A.  Well, it depended on the number the heroin would yield.

3   For example, if it was nine, you could mix it with something.

4   It wouldn't get damaged.

5   Q.  But when you mixed it you were reducing the strength,

6   correct?

7   A.  It would depend.

8   Q.  What did you mix it with?

9   A.  With this paste that's sold in Newark.  And sometimes with

10  heroin itself, say one yielded five, five and a half, you could

11  mix that with some that yielded nine, nine and a half.

12  Q.  Ms. Ramon-Baez, you never sold drugs on the street corner,

13  correct?

14  A.  Never.

15  Q.  Because that would be too risky, right?

16  A.  Yes.

17  Q.  You wanted to avoid law enforcement detection, correct?

18  A.  But any way you look at it, I was still on the street.

19  Q.  I'm sorry?

20  A.  Any way you look at it, I was on the street.

21  Q.  But you weren't out in public, correct?

22  A.  No.  But everybody knew what we were doing.

23  Q.  Now, you had several suppliers of heroin, correct?

24  A.  Not me.  Jorge did.

25  Q.  But you worked with Jorge, correct?

1  A.  Yes.

2  Q.  And you knew exactly what he was doing, correct?

3  A.  Yes.

4  Q.  You were very much involved in what Jorge was doing,

5  correct?

6  A.  Yes.

7  Q.  And you dealt directly with some of the suppliers, correct?

8  A.  Yes.

9  Q.  And some of these suppliers were providing large quantities

10  of narcotics, correct?

11  A.  Yes.

12  Q.  David was one of the suppliers, correct?

13  A.  Yes.

14  Q.  Giovanny Perez, correct?

15  A.  Yes.

16  Q.  There was another guy, a Puerto Rican guy, correct?

17  A.  We sold products to him.

18  Q.  You sold products to him.  How much?

19  A.  300, 400, 500 bricks.

20  Q.  Would this be the Puerto Rican guy who would pay 17 to

21  $18,000 when he came?

22  A.  Yes.

23  Q.  Vladimir Garcia, who is that?

24  A.  He got us heroin to be packed, packaged, and I also worked

25  for him packaging heroin.

1  Q.  What is your relationship to him?

2  A.  How can I explain this.  So I have a sister-in-law.  My

3  sister-in-law and his wife are partner, are sisters.

4  Q.  You also worked with your brother, correct?

5  A.  Yes.

6  Q.  Your brother supplied you and Jorge with heroin?

7  A.  Yes.  He worked with us.

8  Q.  And your brother is Giancarlos?

9  A.  Yes.

10 Q.  Your mother was also involved in yours and Jorge's narcotic

11 trafficking, correct?

12 A.  Jorge worked at our house, yes.

13 Q.  When you say worked, you mean packaged drugs at her house,

14 correct?

15 A.  Yes.

16 Q.  You also distributed from her house?

17 A.  No.  Just work.

18 Q.  Did she ever pick up drugs for you and Jorge?

19 A.  No, never.

20 Q.  She has never gone to Boston to pick up drugs?

21 A.  Never.

22 Q.  Ms. Ramon-Baez, for all of this involvement in drugs, how

23 long was it before you got arrested?

24 A.  A long time.  Two years.

25 Q.  For a long time you were -- would you say you became very

GB9MGOM1                          Ramon-Baez - cross

1   clever at avoiding law enforcement?

2   A.   Can you repeat that question.

3   Q.   Would you agree that you became clever at avoiding law

4   enforcement for at least two to three years?

5   A.   What do you mean by clever?

6   Q.   Let me rephrase.

7   A.   Ok.

8   Q.   You were smart about hiding what you were doing from law

9   enforcement, correct?

10  A.   Yes.

11  Q.   And that was primarily to avoid getting arrested, correct?

12  A.   Yes.

13  Q.   You didn't want to get arrested, that is correct, right?

14  A.   Correct.

15  Q.   Nor did Jorge.  He didn't want to get arrested either.

16  A.   No.

17  Q.   Now, Jorge was paying you money for your assistance,

18  correct?

19  A.   Yes.

20  Q.   You were making up to $1800 every two days, correct?

21  A.   No.

22  Q.   You were not making $1800 every two days?

23  A.   No.

24  Q.   How much were you making?

25  A.   I started making $250 and then, after the four really good

1    customers that we had, I would make between 1200 to $1500 per

2    week.

3    Q.  As you testified on direct, you met with the government a

4    number of times discussing your crimes and other people's

5    crimes, correct?

6    A.  Yes.

7    Q.  And when you met with the government someone was taking

8    notes, correct?

9    A.  Yes.

10   Q.  And they were taking notes of everything that you were

11   saying, right?

12   A.  Yes.

13   Q.  And then they verified that the notes that they took was

14   what you in fact stated to them, correct?

15   A.  Yes.

16   Q.  They wrote down pretty much everything that you were

17   saying, correct?

18   A.  Yes.

19   Q.  And you never told the government that you were making 1800

20   every two days?

21   A.  As far as I remember, I never told them that, no.

22   Q.  Jorge Gomez also paid your rent, correct?

23   A.  Yes.

24   Q.  How much was your rent?

25   A.  875.  It depended on the other apartment.

1   Q.  And the money that you made from selling narcotics, the

2   government has not forfeited that, correct?

3   A.  No.

4   Q.  Where is that money?

5   A.  I spent it.

6   Q.  Spent all of it?

7   A.  Yes.

8   Q.  Did you open any businesses with some of the money that you

9   earned from trafficking narcotics?

10  A.  No, none.

11  Q.  Who owned the grocery store in New Jersey?

12  A.  I don't have a supermarket.

13  Q.  A grocery store, deli.

14  A.  Mandella.  He is the owner.

15  Q.  Who is he?

16  A.  The owner of the bodega.

17  Q.  Did you work at that bodega?

18  A.  Of course, yes.

19  Q.  What was your role at that bodega?

20  A.  I was a cashier.  Whenever people would get there to

21  purchase something, I would just help them out.

22  Q.  Did you receive or distribute drugs from that bodega?

23  A.  Not me, ever.

24  Q.  Did Jorge receive or distribute drugs from that bodega?

25  A.  No.

1   Q.  Now, you had several vehicles registered in your name?

2   A.  Yes.

3   Q.  How many?

4   A.  Four.

5   Q.  One was a 450 Mercedes?

6   A.  Yes.

7   Q.  What year was that?

8   A.  2012.

9   Q.  How much did that cost?

10  A.  50,000.  I got it with credit.

11  Q.  What was the next vehicle you owned?

12  A.  A 2007 Mercedes, a Tacoma, red Tacoma.  I think that it was

13  2002.  And my little Jeep, that was from 2004.

14  Q.  You owned all these vehicles?

15  A.  Yes.

16  Q.  These were not Jorge's vehicles and you had them in your

17  name registered?

18  A.  Jorge only had three, but I was the owner.

19  Q.  So Jorge owned the vehicles -- I'm not understanding.

20  A.  Jorge was the owner of the vehicles, but I registered them

21  under my name.

22  Q.  And you registered them under your name so that law

23  enforcement would not become aware?

24  A.  No.

25  Q.  Explain to us why the vehicles were in your name if you

1  didn't own them.

2  A.  Well, you know, I was the owner of the vehicles because,

3  first of all, Jorge told me that if I went and I got a plate,

4  then I would be the owner of the car.  Jorge had the vehicles

5  and the only thing I did was to insure them and to put them in

6  my name.

7  Q.  But they weren't really your vehicles, correct?

8  A.  Well, they were mine because they were in my name, but, no,

9  not really.  They were Jorge's.

10 Q.  When you told the insurance company that you owned the

11 vehicle, that was not entirely true, correct?

12 A.  I was the owner because I registered them, uh-huh.

13 Q.  Did you purchase those vehicles?

14 A.  I bought my Jeep.

15 Q.  But the other vehicles Jorge bought the vehicles, correct?

16 A.  Yes.  Well, the Mercedes I got through my credit line and

17 then the other two were purchased by Jorge.

18 Q.  How many cell phones did you have?

19 A.  Jorge -- well, I first got one on February 14, 2013, and

20 then Jorge started opening lines and lines and lines and then

21 we ended up with 12 total.

22 Q.  Whose names were those 12 cell phones under, yours or

23 Jorge's?

24 A.  I got them with my own credit.  We got them at AT&T.  We

25 had six tablets and six cell phones.

1   Q.  So the phones were under your name?

2   A.  Yes.

3   Q.  And that, again, was in an effort to avoid law enforcement,

4   correct?

5   A.  No.

6   Q.  Did you change the numbers frequently on those cell phones?

7   A.  No.  Just -- well, Jorge never changed his numbers, um-um.

8   And if he did change them, it was because of the women that he

9   would be hanging out with because he didn't want his wife to

10  find out.

11  Q.  His wife, meaning you?

12  A.  No.

13  Q.  You weren't his wife?

14  A.  Not at the time.  We separated.

15  Q.  But during the time when you had the 12 phones, what was

16  the purpose of having 12 phones?

17  A.  One was his son's, one was his wife's, then one was for his

18  girl, then I had my own.  And he had two other sons here in New

19  York.

20  Q.  And the extra phones were used for trafficking drugs,

21  correct?

22  A.  No.  I never used my personal AT&T line for anything

23  related to business.

24  Q.  So you had burner phones?

25  A.  Yes.

1   Q.  How many of those did you have?

2   A.  Jorge had several.

3   Q.  More than five?

4   A.  I don't know.

5   Q.  But several?

6   A.  Uh-huh, yes.

7   Q.  You also sent money out of the country, correct?

8   A.  Never.

9   Q.  You never sent money for David?

10  A.  No.  Let me see.  Just once.  Yes.  I'm sorry.

11  Q.  Because he had already sent too much, so he didn't want to

12  be detected, correct?

13  A.  Yes.

14  Q.  So you agreed to send it for him?

15  A.  Yes.

16  Q.  And the money that you were sending, you knew it came from

17  drugs, right?

18  A.  Yes.

19  Q.  And you had to fill out a form when you send the money,

20  correct?

21  A.  Yes.

22  Q.  And you didn't put on the form that the money came from

23  drugs, right?

24  A.  No.  Because I don't know where David got that from.  He

25  just told me to send those $2,000 and I just sent them.

Ramon Baez

 1   Q.  David was one of your suppliers, correct?

 2   A.  Yes.  But I can't tell if that money, if David got that

 3   from drugs or from somewhere else.  I don't know.

 4   Q.  Did David have a regular job, that you knew of?

 5   A.  I don't know.

 6   Q.  Now, one of the other ways that you hid from law

 7   enforcement was through the use of different e-mails, correct?

 8   A.  Yes.

 9   Q.  You would change your e-mail addresses constantly, correct?

10   A.  Yes.  Because I didn't have the $6 that I needed to have

11   monthly to write to Jorge.  If that hadn't been the case, I

12   wouldn't have changed them.

13   Q.  So every 15 days you would get a new e-mail address,

14   correct?

15   A.  Yes.  Because that was free.

16   Q.  And this way the e-mails wouldn't be traced back to you,

17   correct?

18   A.  Of course they could trace them.

19   Q.  You used your own name?

20   A.  I would put in my name, my mother's name, names of other

21   relatives of mine.

22   Q.  So that was a way so law enforcement couldn't figure out it

23   was you, correct?

24   A.  Yes.

25           MS. TODD:  One moment, your Honor.

```
 1              THE COURT:  Yes.
 2   Q.  Ms. Crowley asked you some questions about text messages
 3   while you were in Louisiana.  Do you recall those questions?
 4   A.  Yes.
 5   Q.  This was Government Exhibit GX402, 402T.
 6              Now, in these text messages you're communicating with
 7   Jorge, correct?
 8   A.  Yes.
 9   Q.  And at the time you are communicating with Jorge you did
10   not know that you were under investigation, correct?
11   A.  No.
12   Q.  So you have no idea the police was watching, right?
13   A.  No.
14   Q.  And these were private communications between you and
15   Jorge, right?
16   A.  Yes.
17   Q.  So during this entire exchange with Jorge Sandy was asleep,
18   correct?
19              THE COURT:  You have to give a point in time.
20              MS. TODD:  I'm sorry.  A moment, your Honor.
21              THE COURT:  Yes.
22   Q.  Ms. Baez, on I think it's row 7, December 5, 2014, starting
23   at 5:33 a.m., you are texting with Jorge, correct?
24   A.  Yes.
25   Q.  And you indicate to Jorge that Sandy is sleeping?
```

 1   A.  Yes.

 2   Q.  And then you continue to text with Jorge through 8:30 p.m.

 3   A.  You would have to put it up for me.

 4   Q.  I'm sorry.  I thought it was up.

 5   A.  I can't answer like that.

 6   Q.  I apologize.

 7       MS. TODD:  Ms. Thomas, GX402T, please.

 8   Q.  Ms. Baez, is 402T up on your screen?

 9   A.  Yes.

10   Q.  On row 7, December 5, 2014 at 5:33 a.m., you are

11   communicating with Jorge, correct?

12   A.  Yes.

13   Q.  And this is via text messages, right?

14   A.  Yes.

15   Q.  And you inform Jorge that Sandy is sleeping, correct?

16   A.  Yes.

17   Q.  And subsequent to the 5:33 a.m. text message there are

18   several text messages all the way through 2:05 p.m.  That's

19   line 14.  For most of this communication with Jorge Sandy was

20   not participating in it, correct?

21   A.  No.  How could he participate if that's my phone?  That's

22   my phone.

23   Q.  That's my point.  So he was sleeping at one point, correct?

24   A.  Yes.  He fell asleep around 5:33 and he actually woke up

25   again at 5:35 and he told me to tell Jorge to go to sleep now.

 1  Q.  I am going to ask you to take a look at 402T, the entire

 2  conversation.

 3          THE COURT:  When you say the entire conversation --

 4          MS. TODD:  The entire spreadsheet of texts from

 5  November 26, 2014 through 12/7/2014, which is from line 2

 6  through lines 26.

 7          Ms. Baez, there is nowhere in this conversation

 8  where --

 9          THE COURT:  This is over multiple days.  When you say

10  this conversation, it's kind of confusing.  You are talking

11  about a period of a number of days.  So the term this

12  conversation doesn't make a lot of sense.

13  Q.  Ms. Baez, you were communicating with Jorge on November 26,

14  2014 through November 27, 2014, correct?

15  A.  Yes.

16  Q.  And it's via these texts I'm referring to that is exhibited

17  in Government Exhibit 402T.

18  A.  Yes.

19  Q.  For those text communications I just referred to there is

20  no statement where it says that Sandy is picking up narcotics,

21  correct?

22  A.  No.  Because we were at the airport.  He hadn't gone out to

23  pick anything up because we were at the airport.

24          MS. TODD:  Move to strike as nonresponsive, everything

25  after no.

GB9MGOM1                    Ramon-Baez - cross

 1              THE COURT:  That's overruled.

 2   Q.  With respect to the text communication on December 5, line

 3   7 through line 12.

 4   A.  Here?

 5   Q.  Yes.

 6   A.  From the 5th to the 7th?

 7   Q.  There is no information reflected that Sandy says he is

 8   picking up narcotics, correct?

 9              THE COURT:  When you say lines 7 through 12, my

10   exhibit doesn't have numbers on it.

11              MS. TODD:  I'm sorry, Judge.

12              THE COURT:  I don't think the witness' does either.

13   That's the difficulty.  When you say line 7 through 12, I don't

14   have those numbers.  The witness doesn't either.

15              MS. TODD:  I have an older exhibit.

16              THE COURT:  That's the difficulty.

17              MS. TODD:  I apologize.

18   Q.  Referring to the date December 5, starting at 5:33 a.m. and

19   ending at 5:36 a.m., do you see that, Ms. Baez?

20   A.  Yes.

21   Q.  In any of those communications there is no statement that

22   Sandy says he is going to pick up drugs, correct?

23   A.  We hadn't gotten there yet.  That's why.  We were driving.

24   We were on the highway.

25              MS. TODD:  Your Honor, move to strike as

1   nonresponsive.

2           THE COURT:  The question was quite simply whether in

3   those text messages on December 5, between 5:33 a.m. and 5:36

4   a.m., the question from counsel is, in any of those messages,

5   does it say that Sandy is picking up drugs?  That's the

6   question.  If you can, try to answer it yes or no.

7   A.  No.

8   Q.  Further down, on December 5, beginning at 2:05 p.m. through

9   December 6 at 1:23 p.m., do you see that?

10  A.  Until 1:23?

11  Q.  Yes.

12  A.  Yes.  Uh-huh.

13  Q.  The text during those conversations does not say that Sandy

14  is picking up cocaine, correct?

15  A.  No.

16  Q.  And December 6, 2014, beginning at 1:24 p.m. and ending at

17  1:24 p.m., there is also no statement in this text where Sandy

18  says he is picking up cocaine, correct?

19  A.  No.

20  Q.  And then we go down to the last three items at the bottom

21  of the page, which is December 7, 2014, beginning at 12:51 p.m.

22  to 1:53 p.m.  There is no statement where Sandy says he is

23  picking up cocaine, correct?

24  A.  No.

25  Q.  Now, you testified on direct that Sandy asked you to --

1          MS. TODD:  A moment, your Honor.

2          THE COURT:  Yes.

3    Q.  Ms. Ramon-Baez, you testified on direct that Sandy asked

4    you to agree together to blame the drugs on Jorge, correct?

5    A.  Yes.

6    Q.  Now, during the time when that occurred you were

7    communicating with Sandy Gomez on Facebook, correct?

8    A.  Facebook and regular messages.

9    Q.  Regular messages, meaning text messages, right?

10   A.  Yes.

11   Q.  In none of those text messages or in any of the Facebook

12   messages, Sandy never asked you to blame it on Jorge, correct,

13   in any of those messages?

14   A.  Never in a message.  In person.

15   Q.  And never in those messages did he ask you to lie for him,

16   correct?

17   A.  No.

18   Q.  And in those text messages and Facebook messages he never

19   told you that the drugs in the vehicle were his, correct?

20   A.  No.

21   Q.  And those messages were over a long period of time, right?

22   A.  Yes, until June.

23   Q.  Almost a year?

24   A.  Approximately.

25   Q.  And during the time that you were communicating with Sandy

CB9MGOM1                    Ramon Baez

1   Gomez via Facebook and via text messages, you did not know that

2   you were being investigated?  You did not know whether or not

3   law enforcement was watching, correct?

4   A.  We had already been arrested.

5   Q.  You were communicating freely with him during that time,

6   correct?

7   A.  Yes.

8   Q.  Now, is it fair to say in 2014 you were having some trouble

9   in your relationship with Jorge?

10  A.  Jorge and I split up in 2013, at the end of 2013.

11  Q.  But you continued to work with him, correct?

12  A.  Yes.

13  Q.  And he had moved on in another relationship, correct?

14  A.  Yes, his wife.

15  Q.  Did you remain in the apartment that you and Jorge shared

16  or did you move to a different apartment?

17  A.  To another apartment.

18  Q.  And Jorge remained in the apartment that you both shared,

19  right?

20  A.  No.

21  Q.  What happened to that apartment?

22  A.  We left it.

23  Q.  All of your furniture was given to this new woman?

24  A.  No.  We sold it.

25  Q.  What about your designer purses and handbags, not given to

 1   the new woman?

 2   A.  No, nothing.

 3           MS. TODD:  A moment, your Honor.

 4           THE COURT:  Yes.

 5           MS. TODD:  Thank you, your Honor.

 6   Q.  Ms. Ramon-Baez, without getting into the details, is it

 7   true that in 2014 you had some serious medical issues, without

 8   the details?

 9   A.  Yes.

10   Q.  And without any details you suffered stomach pains as a

11   result?

12   A.  No.

13   Q.  Did you suffer pains in your upper part of your body?

14   A.  Yes.  In my breast.

15   Q.  For that you took prescription medication, correct?

16   A.  Yes.

17   Q.  Now, did you indicate to the government that Sandy first

18   came to New Jersey in August 2014?

19   A.  Yes.  It was August or September.  I don't remember the

20   date.  I really don't remember what the date was.  I don't

21   remember.  I don't know when he came.

22   Q.  Did there come a time when you knew when he came to New

23   Jersey?

24           THE COURT:  You have to rephrase.  It's just not

25   clear.

1  Q.  You don't remember now when he came to New Jersey, correct?

2  That's what you are saying?

3  A.  Yes.

4  Q.  And prior to today you told the government when he came to

5  New Jersey, correct?

6  A.  Yes.  October, November.  I don't remember the exact month.

7  Q.  Is it possible that you told the government that he came in

8  August 2014?

9  A.  I don't remember.

10 Q.  As you sit here today, what is your belief as to when he

11 came to New Jersey?

12 A.  October or November.  I am not sure.

13 Q.  Could it be October or could it be November?  You are not

14 sure?

15 A.  I'm not sure.

16         THE COURT:  Could you elicit the year you are

17 referring to?

18         MS. TODD:  I'm sorry.

19 Q.  2014.

20 A.  Yes.  It was in 2014.

21 Q.  And when he came in October or November, did he remain

22 without returning back -- this is in 2014.  Did he remain in

23 New Jersey?

24 A.  Yes, at Jorge's house.

25 Q.  And that's when you met him for the first time?

 1   A.  Yes.

 2   Q.  You did not know him before, correct?

 3   A.  No.

 4   Q.  You had never met him before, correct?

 5   A.  No.

 6   Q.  And you had never spoken to him before that time you met

 7   him in New Jersey in 2014, correct?

 8   A.  No, never.

 9   Q.  Did you fly to New Orleans in the end of October 2014?

10   A.  No.

11   Q.  You never flew to New Orleans in October 2014?

12   A.  No.

13   Q.  And you never told the government that you flew to New

14   Orleans in October 2014?

15   A.  No.

16   Q.  Did you tell the government that you flew to New Orleans in

17   October 2014 with Sandy Gomez?

18   A.  No.

19           THE COURT:  Do you have much more, Ms. Todd?

20           MS. TODD:  Yes, your Honor.

21           THE COURT:  Ladies and gentlemen, we are going to take

22   our midmorning recess.  Don't discuss the case.  Keep an open

23   mind.  There is more evidence.  We will be back to you shortly.

24   Thank you all very much.

25           (Jury not present)

```
 1            THE COURT:  We will resume in about 10 minutes.  Is

 2   there anything we need to discuss?

 3            MS. CROWLEY:  Not from the government.

 4            (Recess)

 5            THE COURT:  Please bring in the jury.

 6            (Jury present)

 7            THE COURT:  Please proceed.

 8   BY MS. TODD:

 9   Q.  Ms. Ramon-Baez, isn't it a fact that you met Sandy Gomez

10   for the first time in late November 2014?

11   A.  Yes.

12   Q.  And that was sometime around after November 20, 2014,

13   correct?

14   A.  Yes.

15   Q.  And Sandy Gomez came to New Jersey for a funeral, correct?

16   A.  I don't know.

17   Q.  You don't know that he came to a funeral?  You're aware

18   that his cousin died in late November 2014, correct?

19   A.  Yes.

20   Q.  You're aware that Sandy Gomez at the time lived in Texas,

21   correct?

22   A.  Yes.

23   Q.  And you're also aware that the burial for that funeral for

24   his cousin was in New Jersey, correct?

25   A.  In New York.
```

1   Q.  Let me rephrase that.  The funeral service was in New York,

2   correct?

3   A.  Everything was in New York.

4   Q.  And the burial was not in New Jersey?

5   A.  No.  Everything was in New York.  They went to New York.

6   All of them went to New York.

7   Q.  Did you go to the funeral?

8   A.  No, I didn't go.

9   Q.  So you don't know exactly where the burial took place then,

10  correct?

11  A.  I know it was in New York.  Jorge told me that everything

12  took place in New York.

13  Q.  And everything that Jorge tells you you believe, correct?

14  A.  Yes.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Gb9Mgom2                      Ramon-Baez - Cross

1   BY MS. TODD:

2   Q.  And the funeral was close to Thanksgiving time, correct?

3   A.  I can't tell you when it was, because I didn't go.  I don't

4   know.

5   Q.  It was the end of November, around the time you met Sandy,

6   correct?

7   A.  Yes.

8   Q.  Now, sometime in late November 2014, you and Sandy Gomez

9   took a trip to Louisiana, correct?

10  A.  Yes.

11  Q.  And during the trip down to Louisiana from New Jersey in

12  November 2014, you talked to each other on the way, on the

13  trip, correct?

14  A.  Yes.

15  Q.  And you discussed with Sandy Gomez your relationship, your

16  romantic relationship with Jorge, correct?

17  A.  Yes, I spoke about everything.

18  Q.  And you expressed your frustration about your relationship

19  with Jorge with him, correct?

20  A.  Yes.

21  Q.  And you also discussed your health-related problems with

22  him in 2014, correct?

23  A.  Yes.

24  Q.  He was understanding, correct?

25  A.  Yes.

 1   Q.  Now, during the November -- withdrawn.

 2           On the November 2014 trip to Louisiana, you told Sandy

 3   you had friends in Louisiana, correct?

 4   A.  No, never.

 5   Q.  Do you have friends in Louisiana?

 6   A.  No.

 7   Q.  No family in Louisiana?

 8   A.  Nobody, no.

 9   Q.  Now, during this November 2014 trip, you did not see Sandy

10   Gomez meeting with anyone, correct?

11   A.  No.

12   Q.  In fact, Sandy Gomez went to the casino on that trip,

13   correct?

14   A.  Yes, with me.

15   Q.  And when you got to the casino, you went your separate

16   ways, correct?

17   A.  No.  He was here, I was here, right next to each other.

18   Q.  So you spent the entire day in the casino with each other,

19   is that your testimony?

20   A.  Yes.  We had drinks and everything right there at the

21   casino.

22   Q.  So to be clear, you didn't go off on your own and come back

23   several hours later?

24   A.  Not in that one, no.

25   Q.  Did you meet anyone in Louisiana at that time?

 1  A.  No.

 2  Q.  And the trip was cut short, correct?

 3  A.  Yes.

 4  Q.  It was supposed to be longer, right?

 5  A.  Yes, it depended.  Yes.

 6  Q.  Jorge wanted you back earlier than you had expected,

 7  correct?

 8  A.  Yes.

 9  Q.  He called you and asked you to come back home immediately,

10  correct?

11  A.  Yes.

12  Q.  And so you had to change your flights coming back, correct?

13  A.  We didn't change it.  We hadn't purchased it.

14  Q.  The initial trip was not a round trip ticket?

15  A.  No.

16  Q.  And you testified on direct that Sandy Gomez purchased the

17  tickets.  Do you recall saying that?

18  A.  Yes, he purchased both tickets.

19  Q.  Did you see him do that?

20  A.  Of course.

21  Q.  So it isn't true that Jorge Gomez was the one who purchased

22  tickets?

23  A.  No.  Jorge never purchased tickets.

24  Q.  You have any receipts with those tickets?

25  A.  No.

1   Q.  You have no receipt that Sandy Gomez actually purchased the

2   tickets, correct?

3   A.  No, but he purchased them on the tablet, and I was there.

4   Q.  Now, Jorge did not come to Louisiana on this November 2014

5   trip, correct?

6   A.  No.

7   Q.  And the fact is Jorge cannot leave the state of New Jersey,

8   correct?

9   A.  Yes.

10  Q.  And this is because Jorge is on the restrictions that he

11  cannot leave the state of New Jersey, correct?

12  A.  Yes, he had, he has a bracelet.

13  Q.  Now, there was a second trip in December 2014, right?

14  A.  Yes.

15  Q.  You and Sandy Gomez went to New Orleans in December 2014,

16  correct?

17  A.  Yes.

18  Q.  And it was during this trip in December 2014 that you and

19  Sandy Gomez got arrested, right?

20  A.  Yes.

21  Q.  On the second trip to Louisiana in December 2014, you had

22  one suitcase with you, correct?

23  A.  Yes.

24  Q.  Was this trip an opportunity for you to get a break from

25  Jorge Gomez?

 1   A.  No.

 2   Q.  Did you intend after this trip to go to Texas for a few

 3   weeks?

 4   A.  No.

 5   Q.  You never discussed that with Sandy Gomez?

 6   A.  Yes, we talked about it, but I wasn't going to leave my

 7   job.

 8   Q.  And what was your job at the time?

 9   A.  Distribution of heroin for Jorge Gomez, even the packaging

10   of it.

11   Q.  But you wanted a change, right?

12   A.  Yes, I wanted to get out of everything.

13   Q.  And you were looking for a new place to live, correct?

14   A.  No.  I just wanted to leave that work.

15   Q.  And Texas, you wanted to see what it was like, correct?

16   A.  Yes.

17   Q.  Wanted to see if it was a place that you'd like to reside

18   at some point, right?

19   A.  Yes.

20   Q.  Now, you knew there was a trap in the vehicle, right?

21   A.  Yes.

22   Q.  And Jorge had no idea of your desires to leave the job,

23   right?

24   A.  No.

25   Q.  Never discussed it with him, right?

 1   A.  No, because he didn't like that.

 2   Q.  So he never knew that you had plans to move to another

 3   state to get away from him?

 4   A.  No.

 5   Q.  Now, on this December 2014 trip, you never saw Sandy Gomez

 6   meet with anyone, correct?

 7   A.  No.

 8   Q.  Now, during this December trip, you were not always with

 9   him, correct?

10   A.  No.  We separated.  We went our separate ways.

11   Q.  And you left the hotel by yourself at one point, correct?

12   A.  Never.

13   Q.  You never left the hotel by yourself?

14   A.  No.

15   Q.  You never went down to the car to retrieve your medication?

16   A.  No.  I always had my medication with me.

17   Q.  You never left the room to get fresh air?

18   A.  No.  Only inside.

19   Q.  Now, you talked about Sandy covering the license plate.  Do

20   you recall that testimony?

21   A.  Yes.

22   Q.  The license plate cover that you're referring to is a frame

23   around the plate, correct?

24   A.  Yes.

25   Q.  Because the truck did not have a frame around the plates,

 1  correct?

 2  A.  Yes, but he didn't put it because of that.

 3          MS. TODD:  Move to strike everything after "yes" as

 4  nonresponsive.

 5          THE COURT:  Motion's granted.

 6  Q.  Now, you also testified yesterday on direct that Sandy

 7  offered to pay you $2,000 to come to Louisiana with him,

 8  correct?

 9  A.  Yes.

10  Q.  Did he pay you that in cash?

11  A.  He didn't get to pay me.  He said that when we got to

12  Paterson, he would pay me in cash.

13  Q.  So he had no money, correct?

14  A.  No.

15  Q.  And the five kilos of cocaine that you talked about that he

16  picked up, according to you, he had no money, correct?

17          THE COURT:  I don't understand the question.  You're

18  going to have to rephrase the question.

19          MS. TODD:  I'll rephrase it.

20  Q.  The five kilos of cocaine that you picked up, did he pay

21  for that?

22  A.  No.

23  Q.  He got them for free?

24  A.  Of course.  He just went to get it.  That was it.  And they

25  were going to pay him.

 1    Q.  Who is "they"?

 2    A.  Sandy knows who.

 3    Q.  But you don't know who it is, correct?

 4    A.  I never saw anyone.

 5    Q.  Was this the same person -- withdrawn.

 6            Now, is it your belief that the guy who owned the five

 7    kilos was the same person who met with Jorge in January 2014?

 8            MS. CROWLEY:  Objection.

 9            THE COURT:  Sustained.  Sustained.

10            MS. TODD:  I --

11    Q.  Did Jorge meet with a supplier in Louisiana, from

12    Louisiana, in January 2014?

13    A.  No.

14    Q.  He never did?

15    A.  Never.

16    Q.  Now, you knew there was a trap in the vehicle, correct?

17    A.  Yes.

18    Q.  And you knew there was a trap in the vehicle because you

19    were present at a meeting with Jorge Gomez and the confidential

20    source, correct?

21    A.  Yes.

22    Q.  This meeting occurred on December 3, 2014, right?

23    A.  I don't know the date.

24    Q.  But this was early December 2014, correct?

25    A.  Yes.

1   Q.  But at the time you did not know that this person was

2   cooperating with the government, right?

3   A.  No.

4   Q.  And you knew at the time that you got the vehicle it was to

5   transport narcotics, correct?

6   A.  Yes.

7   Q.  And Sandy Gomez was not present at this meeting, correct?

8   A.  No.

9   Q.  Now, you testified on direct that Jorge showed Sandy how to

10  open the trap.  Do you recall saying that?

11  A.  Yes.

12  Q.  Could you tell us when this was?

13  A.  So it was when the SUV was delivered, Sandy said to Jorge,

14  Get out of here; I don't want you to see the person that

15  delivered it.  And then we called Sandy, and that's when Jorge

16  showed it to him.

17  Q.  Around what time was this?

18  A.  It was in the afternoon.  I don't remember the time.

19  Q.  Was it before six?

20  A.  It was in the afternoon.  I couldn't tell you what time.

21  Six, in the afternoon.

22  Q.  Was it the same day that the vehicle was delivered to

23  Jorge?

24  A.  Yes.

25  Q.  And you were present when this demonstration took place?

1  A.  Yes.

2  Q.  So you had an understanding of how to open the trap?

3  A.  I never saw how it opened.

4       THE INTERPRETER:  May the interpreter just clarify.

5  A.  I just went to the back and checked it out.  I never saw

6  that.

7  Q.  You were right there when, according to you, Jorge was

8  demonstrating how to operate the trap, correct?

9  A.  Yes, but Jorge never showed me how to open it.

10  Q.  My question to you is, you were present when, according to

11  your testimony on direct, Jorge showed Sandy Gomez how to open

12  the trap, correct?

13  A.  Yes.

14  Q.  Did you see the trap open at that time?

15  A.  Yes.

16  Q.  So you were not in the back, as you said?

17  A.  I was.  I was, because it opened up, like this.

18  Q.  And how long did this demonstration take place?

19  A.  It didn't last very long.

20  Q.  Less than five minutes?

21  A.  Longer.  Maybe 10, 15, because then we made a phone call.

22  Q.  So it was after the trap was open you made a phone call?

23  A.  Yes.

24  Q.  And it was during this phone call, according to your

25  testimony on direct, Jorge told the informant that his brother

Gb9Ugrom2                    Ramon-Baez - Cross

1    didn't like how it looked, correct?

2    A.  Yes.

3    Q.  Now, when the vehicle was stopped on I-59 in Louisiana,

4    Sandy was driving, correct?

5    A.  Yes.

6    Q.  You were in the passenger's seat, right?

7    A.  Yes.

8    Q.  And you believed that narcotics were inside that vehicle,

9    correct?

10   A.  Yes.

11   Q.  And you didn't want to be driving this vehicle if it got

12   stopped, correct?

13   A.  No.  All Sandy said to me was, Come with me, I'll drive.

14   Q.  So you weren't supposed to drive halfway back?

15   A.  No.  The idea was if he got tired, I would start driving,

16   but he said, I'm going to keep driving.  You don't know the

17   way.

18   Q.  And so when you got pulled over, you knew exactly what was

19   happening at that moment, correct?

20          THE COURT:  I don't understand the question.  Could

21   you rephrase the question.

22   BY MS. TODD:

23   Q.  When the vehicle was stopped, you knew you were being

24   stopped because narcotics were in the car, correct?

25   A.  I didn't know why they stopped us.

1    Q.  You didn't know why you were stopped?

2    A.  No.  We were fine.

3    Q.  You had suspicions about it, though?

4    A.  Because of where it was, I never thought they would see the

5    drugs there.

6    Q.  So when the officer asked you where you were coming from,

7    what did you tell him?

8    A.  I told him, I told him I didn't speak English, no English.

9    Q.  So you didn't tell the officer who asked you where you were

10   coming from a location; you never gave him a location?

11   A.  No.  I said no English.

12   Q.  So at no point in time when the officer first approached

13   you, you never said, We're coming from -- you spent two days in

14   Alabama?

15   A.  I don't remember.  I don't remember.

16   Q.  Ms. Baez, do you consider yourself an honest person?

17   A.  Yes.  I do, yes.

18   Q.  Besides dealing drugs, you were in the business of using

19   stolen social security cards, correct?

20   A.  No.

21   Q.  You purchased the social security card from the supplier,

22   correct?

23   A.  Yes, but it wasn't stolen.

24   Q.  It wasn't yours, was it?

25   A.  No, but it wasn't stolen.  It was sold to me for 90 --

1   $900.

2   Q.  You paid $900 for a social security card that did not

3   belong to you?

4   A.  Yes, and in 2011, I paid a thousand dollars.

5   Q.  So that was two social security numbers, correct?

6   A.  It's the same one.  He just increased the price.

7   Q.  And you have had that social security number for several

8   years, correct?

9   A.  Yes.

10  Q.  You knew it was illegal?

11  A.  Yes.

12  Q.  And do you consider purchasing social security numbers

13  honest?

14  A.  No.  It's illegal.

15  Q.  So it's dishonest, correct?

16  A.  It's something bad that I shouldn't do.

17  Q.  And you used that social security number to try and make

18  false claims for dependents, correct?

19  A.  Yes, one dependent.

20  Q.  I'm sorry?

21  A.  One dependent.

22  Q.  You did that for a number of years, correct?

23  A.  Yes, three, three or four years.

24  Q.  You also gave your daughter's social security number to

25  someone else to use, right?

```
 1              THE COURT:  Do you mean that social security number,

 2    because you said your daughter's?  Is that what you meant to

 3    say?

 4              MS. TODD:  Yes.

 5              THE COURT:  Your daughter's?

 6              MS. TODD:  Yes, your Honor.

 7              THE COURT:  OK.

 8    Q.  Do you have a daughter?

 9    A.  I have two children.

10    Q.  Your daughter was, one of your children was born 2013,

11    correct?

12    A.  Yes.

13    Q.  And you allowed someone to use that daughter's social

14    security number, correct?

15    A.  Yes, my brother.

16    Q.  Now, you're facing some serious penalties as a result of

17    your conviction, correct?

18    A.  Yes.

19    Q.  You're facing a maximum of life imprisonment?

20    A.  Yes, but I said I was going to tell the truth.  I don't

21    care.

22    Q.  And you're facing a mandatory minimum sentence of ten

23    years, correct?

24    A.  Fifteen.

25    Q.  For the drugs.  I'm sorry.  For the narcotics you're facing
```

1    a mandatory minimum sentence of ten years, correct?

2    A.   Yes.

3    Q.   You've also pled guilty to possessing guns during this

4    narcotics conspiracy, correct?

5    A.   Yes.

6    Q.   And with the guns there's a mandatory consecutive sentence

7    of five years on top of the ten years, right?

8    A.   Yes.

9    Q.   These guns were kept in your house, correct?

10   A.   Yes.

11   Q.   For protection, right?

12   A.   Yes.

13   Q.   This is inside the home with your two children?

14   A.   No.   My children never lived with me while I was doing

15   illegal business.

16   Q.   So between the guns and the drugs, you're facing a

17   mandatory minimum of 15 years, right?

18   A.   Yes.

19   Q.   And you signed an agreement with the government that might

20   allow you not to go to jail, correct?

21   A.   No.   Nobody's guaranteed me anything.

22   Q.   Well, let me ask you this.   You pled guilty -- withdrawn.

23        You agreed to cooperate with the government with the

24   hope that you would receive a lenient sentence, correct?

25   A.   No.

 1  Q.  So if you thought you would get 30 years, you would still

 2  plead guilty?

 3  A.  Yes, because I'm guilty of everything that I was charged

 4  with.  I did what I did, and I'm guilty of it.

 5  Q.  And you agreed to cooperate no matter what the sentence is?

 6  A.  Yes, because I wanted to tell the whole truth.

 7  Q.  So you're not expecting a lenient sentence at all?

 8  A.  I don't know.

 9  Q.  Is it my understanding that it doesn't matter to you what

10  the sentence is?

11          MS. CROWLEY:  Objection, your Honor.

12          THE COURT:  Can you rephrase the question?  It's

13  confusing.

14  BY MS. TODD:

15  Q.  Does it matter to you, Ms. Ramon-Baez, what the sentence

16  will be?  Do you care?

17  A.  Yes, I do care about that.

18  Q.  You don't want to spend the rest of your life in prison,

19  right?

20  A.  No.

21  Q.  So the fact is you're hoping for less time, right?

22  A.  Yes.

23  Q.  And you're in jail right now, correct?

24  A.  Yes, I am.

25  Q.  Not a nice place, right?

 1  A.  It's not nice, but you get used to it.

 2  Q.  Can't see your family as often?

 3  A.  Every Monday.

 4  Q.  But not every day like you would normally do?

 5  A.  No.

 6  Q.  And with your cooperation, the government gets to write a

 7  letter to the judge, right?

 8  A.  Yes.

 9  Q.  And with that letter, the judge has the discretion to

10  sentence you below the mandatory minimum sentence, correct?

11  A.  No.

12  Q.  The judge doesn't have the discretion to sentence you to

13  less than 15 years?

14  A.  The judge is the person who knows what sentence I'm going

15  to get.

16  Q.  And so that's my question.  The judge can decide with that

17  letter if he should sentence you to less than 15 years or

18  sentence you to more time, correct?

19          MS. CROWLEY:  Objection to form.

20          THE COURT:  Overruled.  You can answer the question.

21  A.  Could you repeat that?

22  Q.  The judge has the discretion to sentence you to less than

23  the mandatory minimum sentence, correct?

24  A.  Yes.

25  Q.  And so the judge could sentence you to as less as time

1   served, correct, if he so chooses?

2   A.   Whatever he decides.

3   Q.   And the only way he can do that is if he considers the 5K

4   letter that the government will provide to you, correct?

5   A.   Yes.

6   Q.   And how old are your children, Ms. Baez?

7   A.   I have a ten-year-old son, my daughter's three, and I'm

8   pregnant now.

9   Q.   So, Ms. Baez, if you go to prison for at least 20 years,

10  your children will grow up without you, correct?

11  A.   With my mother, their second mother.

12  Q.   But you wouldn't have the opportunity to be involved in

13  their lives if you weren't with them, correct?

14  A.   No.

15  Q.   So you're hoping to get out of jail, correct?

16  A.   Yes.

17          MS. TODD:  Nothing further, your Honor.

18          THE COURT:  All right.  Redirect.

19          MS. CROWLEY:  Yes, your Honor.

20          May I approach, your Honor?

21          THE COURT:  Yes.

22  REDIRECT EXAMINATION

23  BY MS. CROWLEY:

24  Q.   Ms. Ramon-Baez, you were asked questions on

25  cross-examination about meetings you had with the government.

1   Do you remember those?

2   A.  Yes.

3   Q.  And you were asked whether anyone took notes at those

4   meetings?

5   A.  Yes.

6   Q.  Who took those notes?

7   A.  Madam prosecutor.

8   Q.  Did you ever take any notes at these meetings?

9       Did the prosecutor ever show you the notes that she had

10  taken at these meetings?

11  A.  Yes.

12  Q.  Did the prosecutor ever ask you if the notes that were

13  taken at these meetings were accurate?

14  A.  Yes.

15          MS. CROWLEY:  May I approach, your Honor?

16          THE COURT:  Yes.

17  Q.  I'm handing you what's been marked Government Exhibit

18  3504-04.

19  A.  It's the same one as this one, right?

20  Q.  Oh, I'm sorry.  It's still up there?

21      Is that your cooperation agreement with the government?

22  A.  Yes.

23  Q.  And you signed that agreement?

24          MS. CROWLEY:  Your Honor, the government offers

25  Government Exhibit 3504-04.

1          THE COURT:  Any objection?

2          MS. TODD:  Yes, your Honor.

3          THE COURT:  All right.  I'll hear you at the bench.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At sidebar)

2         THE COURT:  3504-04 is the cooperation agreement.  You

3    object to it?

4         MS. TODD:  Yes, your Honor.  I want to understand what

5    is the basis for offering it into evidence.

6         THE COURT:  The law, as I understand it, is once a

7    cooperating witness's credibility has been challenged, as it

8    has been on cross-examination, the government is generally

9    entitled to offer the cooperation agreement which reflects the

10   agreement between the witness and the government as to their

11   cooperation, what the government will do for them and what the

12   witness will do for the government.

13        MS. TODD:  Judge, I don't recall challenging what the

14   cooperation agreement says.  I recall asking her a number of

15   questions about her meetings with the government and what was

16   said in those meetings with respect to specific dates in the

17   proffer notes.

18        THE COURT:  No, but you have in cross-examining her

19   put her credibility into question, and you have suggested at

20   least implicitly -- maybe explicitly, I don't know -- that what

21   she is saying is not exactly true, and so you have challenged

22   her credibility.  And I suspect that the reason why the

23   government wants to introduce the agreement is that it imposes

24   certain truth-telling obligations on her and reflects an

25   understanding or an agreement between the parties that if she

1   does not fulfill her obligations under the agreement, it will

2   be terminated and she will be back to facing the mandatory

3   minimum sentence about which we've heard.

4           Is that it?

5           MS. CROWLEY:  That's correct, your Honor.  In

6   addition, she was asked about forfeiture and whether the

7   government had forfeited any of the money.  I'd like to point

8   out what her cooperation agreement says about forfeiture.

9           THE COURT:  OK.  She was definitely asked about

10  forfeiture.  You asked her whether she --

11          MS. TODD:  Forfeited, and she said she spent it all.

12          THE COURT:  Right, but you asked if she had been

13  required to forfeit the money that she had earned from selling

14  drugs, and you're correct that she said she had spent the

15  money, but the point is that the cooperation agreement

16  addresses the question of forfeiture, and the witness has

17  identified this document as reflecting her agreement with the

18  government.  Given that the agreement in fact addresses

19  forfeiture --

20          MS. TODD:  OK.

21          THE COURT:  -- it seems reasonable for that document

22  to be before the jury, not just for the purposes of the

23  forfeiture but on the issue of the witness's obligations to

24  testify truthfully.

25          I will point out that much of this was brought out on

Cb9Ubrom2                    Ramon Baez - Redirect

1   direct examination of the witness without objection, so it's

2   not clear to me that the letter adds a whole lot, but

3   undoubtedly it's more detailed than the testimony that we've

4   heard.  In any event, as I said, my understanding of the law is

5   that once a cooperating witness's credibility has been

6   challenged on cross-examination, it is appropriate upon offer

7   of the cooperation agreement for it to be received.

8            MS. TODD:  OK, your Honor.  Thank you.

9            (Continued on next page)

1           (In open court)

2           THE COURT:  The objection is overruled.  Government

3  Exhibit 3504-04 is received.

4           (Government Exhibit 3504-04 received in evidence)

5  BY MS. CROWLEY:

6  Q.  Ms. Ramon-Baez, what did you agree to do in this agreement?

7  A.  To tell the whole truth.

8  Q.  And does this agreement lay out what the government will do

9  if you live up to your end of the agreement?

10  A.  Yes.

11  Q.  And this agreement lays out what the government will do at

12  the time that you are sentenced, correct?

13  A.  Yes.

14  Q.  Ms. Todd asked you some questions on cross-examination

15  about the money that you made while you were working for Jorge

16  Gomez.  Do you recall those questions?

17  A.  Yes.

18  Q.  And she asked you whether the government had forfeited any

19  of the money that you had made while you were working for Jorge

20  Gomez.  Do you recall that?

21  A.  Yes.

22  Q.  And you said that the government had not forfeited the

23  money that you made, is that correct?

24  A.  Yes.

25  Q.  OK.  If you could turn to page 2 of the cooperation

1    agreement, and the fourth paragraph from the top says, "The

2    defendant furthermore admits the forfeiture allegation with

3    respect to Count One of the information and agrees to forfeit

4    to the United States, pursuant to Title 21, United States Code,

5    Section 853, a sum of money representing the amount of proceeds

6    Ramon-Baez obtained directly or indirectly as a result of the

7    offense."  Do you understand that?

8    A.  Yes.

9    Q.  And is it true that in this agreement you agreed to forfeit

10   the money that you made from your drug dealing to the

11   government?

12   A.  Yes.

13   Q.  And under the terms of this letter, that forfeiture will be

14   done at the time you are sentenced?

15   A.  Yes.

16   Q.  Ms. Ramon-Baez, you were asked on cross-examination about

17   your tax crimes that you committed.  Do you recall that?

18   A.  Yes.

19   Q.  And you talked about how you used a social security number

20   to claim that you had a dependent that you didn't in fact have.

21   Do you recall that?

22   A.  Yes.

23   Q.  How did the government learn that you committed those tax

24   crimes?

25   A.  Because I told them I would tell them the whole truth.

 1   Q.  What is your understanding of whether the judge who

 2   sentences you will be told about these tax crimes when he

 3   decides your sentence?

 4   A.  That I have to return the money, the judge will give me a

 5   form and I will have to pay all the money that I got.

 6   Q.  OK.  Let me ask a different question.  Do you know whether

 7   the judge who decides your sentence will be told about the tax

 8   crimes that you committed?

 9   A.  Could you say that again, because I didn't understand.

10   Q.  Do you know whether the government will tell the judge who

11   decides your sentence about the tax crimes that you committed?

12   A.  Yes.

13   Q.  And if you lie on the witness stand today, can you be

14   prosecuted for those tax crimes?

15   A.  Yes.  (In English).

16   Q.  Sorry.  What did you say?

17   A.  I'm not sure.  Yes, I think so.

18   Q.  Ms. Ramon-Baez, you were asked on cross-examination about

19   whether you, I believe the word was "became clever" at avoiding

20   law enforcement.  Do you recall that?

21   A.  Yes.

22   Q.  You were asked whether you did certain things to avoid

23   being arrested by the police.  Do you recall that?

24   A.  Yes.

25   Q.  Whose idea was it to get a car with a secret compartment?

 1   A.  Sandy Gomez.

 2   Q.  And whose idea was it to drive at night as you made your

 3   way from New Jersey to New Orleans?

 4   A.  Mr. Sandy Gomez.

 5   Q.  And whose idea was it to put a cover over the New Jersey

 6   license plate?

 7   A.  Mr. Sandy Gomez's.

 8   Q.  And how many phones, if you know, how many phones was Sandy

 9   Gomez using on your two trips to New Orleans?

10   A.  Two.

11   Q.  And when he spoke to the man who was providing the cocaine,

12   what name did he use?

13   A.  Pedro.

14          MS. CROWLEY:  Your Honor, I'd like to publish

15   Government Exhibit 402T, which is in evidence.

16          THE COURT:  All right.  Go ahead.

17          THE INTERPRETER:  Now, right.

18   Q.  These are the text messages between you and Jorge Gomez, is

19   that right?

20   A.  Yes.

21   Q.  You were asked a number of questions about these text

22   messages on cross-examination.  Do you recall that?

23   A.  Yes.

24   Q.  And Ms. Todd pointed to certain of the text messages on

25   this chart and asked you whether any of them explicitly say

 1   that Sandy Gomez went to pick up drugs.  Do you recall that?

 2   A.   Yes.

 3   Q.   And you answered that no, they did not, correct?

 4   A.   Yeah.

 5   Q.   I just want to point you to a text message that Ms. Todd

 6   didn't show you, the first text message on December 7, 2014, at

 7   12:51 p.m.

 8            MS. CROWLEY:  If you could zoom in on that and the one

 9   below it, Ms. Thomas.

10   Q.   And the first message is from you to Jorge and says, "Man,

11   I don't believe with that work they haven't called."  Who is

12   the "they" that you're referring to in that text?

13   A.   Owners of the five kilos of cocaine.

14   Q.   And when you say "work," what do you mean?

15   A.   To the kilos of cocaine.

16   Q.   And then the next text message down, you say -- it's about

17   30 minutes later, 40 minutes later, you say, "He already left

18   to see the people."  Who is he?

19   A.   Mr. Sandy Gomez.

20   Q.   And who are the people?

21   A.   The people that Sandy Gomez said he was going to go get the

22   kilos of cocaine.

23   Q.   And is the word "work" a term that you've used before?

24   A.   Yes.

25   Q.   And when you use it, what do you understand it to mean?

Gb9Vgrom2                    Ramon-Baez - recross

 1   A.  Well, work, I understand that, for example, what I did with

 2   Jorge, that was work.  You never mention the word "heroin" or

 3   things like that.  You would always say work.

 4   Q.  So you never sent a text message that explicitly said

 5   heroin or cocaine?

 6   A.  At times.  It was only work.

 7   Q.  You'd refer to it as work?

 8   A.  Yes.  All of that, all of that, all of that was work.

 9            MS. CROWLEY:  One moment, your Honor.

10            Nothing further.  Thank you.

11            THE COURT:  Anything else, Ms. Todd?

12            MS. TODD:  Yes, your Honor.  Briefly.

13   RECROSS-EXAMINATION

14   BY MS. TODD:

15   Q.  Ms. Ramon-Baez, during and in your cooperation agreement

16   with the government, you agreed to forfeit all of your assets,

17   correct?

18   A.  Yes.

19   Q.  And that would include all the vehicles that we talked

20   about earlier this morning, correct?

21   A.  I don't have any.

22   Q.  You don't have the Jeep Liberty?

23   A.  Jorge sold all of that when I was in jail.

24   Q.  So you have no vehicle, correct?

25   A.  I lost everything, everything, everything.

1   Q.  So there's no assets for the government to forfeit,

2   correct?

3   A.  I don't have anything.

4           MS. TODD:  Nothing further.

5           THE COURT:  Anything else?

6           MS. CROWLEY:  No, your Honor.

7           THE COURT:  All right.  You can step down.

8           (Witness excused)

9           THE COURT:  Ladies and gentlemen, we're going to take

10  our luncheon recess.  The time now is a couple minutes before

11  one.  We'll return at 2:15.

12          As always, don't discuss the case.  Keep an open mind.

13  There's more evidence.  Have a pleasant lunch.  We'll see you

14  at 2:15.  Thank you.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1              (Jury not present)

 2          THE COURT:  The government has two more witnesses?

 3          MS. CROWLEY:  Two more witnesses, your Honor.

 4          THE COURT:  And how long do you think they will take?

 5          MS. CROWLEY:  The first witness will take ten minutes.

 6  I don't anticipate much longer.  And the second will be about a

 7  half an hour.

 8          THE COURT:  OK.  I had provided the draft charge to

 9  the lawyers last night, so I would want to go over the charge

10  after we complete the evidence today so that we can be prepared

11  for summations and the charge to be given tomorrow morning.

12  Have the lawyers had an opportunity to review the charge?

13          MS. CROWLEY:  Yes, your Honor.

14          THE COURT:  All right.  Ms. Todd, will you be prepared

15  to proceed with the charge after we complete the evidence?

16          MS. TODD:  Your Honor, I intend to put on a defense.

17  I expect to have at least one witness today.  I'm still sort of

18  negotiating with the other witness from earlier today.  I will

19  know after lunch whether my client intends to testify or not,

20  and I will advise the Court after lunch.

21          THE COURT:  OK.  All of that's fine.  My only point is

22  I would like to have the charge conference sometime whenever

23  the evidence ends.

24          MS. TODD:  OK.

25          THE COURT:  Anything else we should talk about before

we adjourn?

    MS. CROWLEY:  No, your Honor.

    MS. TODD:  No, your Honor.

    THE COURT:  Then we'll resume at 2:15.

    (Luncheon recess)

Gb9ursom2                                                                        302

 1                        AFTERNOON SESSION

 2                           2:15 p.m.

 3           (Jury not present)

 4           THE COURT:  Are we done with Ramon-Baez?

 5           MS. CROWLEY:  We are.

 6           THE COURT:  Do you have a witness ready?

 7           MS. CROWLEY:  Yes, we do, and before we call the

 8   witness and, I guess, after the jury's in, we just want to read

 9   a stipulation.

10           THE COURT:  All right.  We can bring the jury in.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Please be seated.

3          The government will call its next witness.

4          MS. CROWLEY:  Yes, your Honor.  Before we do that, may

5    I read a stipulation?

6          THE COURT:  Go right ahead.

7          MS. CROWLEY:  "It is hereby stipulated and agreed by

8    and between the parties that:

9          "1.  On or about September 28, 2016, Caronlay

10   Ramon-Baez met with Assistant United States Attorney Patrick

11   Egan, an agent from the Drug Enforcement Administration, a

12   paralegal from the United States Attorney's Office, and a

13   Spanish-language interpreter; and

14          "2.  At that meeting, Caronlay Ramon-Baez said, in

15   substance or in part, that Sandy Gomez came to New Jersey from

16   Texas around August 2014.

17          "It is further stipulated and agreed that this

18   stipulation as Government Exhibit 1005 may be received in

19   evidence as a Government Exhibit at trial."

20          Your Honor, the government offers Government Exhibit

21   1005.

22          THE COURT:  Any objection?

23          MS. TODD:  No, your Honor.

24          THE COURT:  Government Exhibit 1005 is received.

25          (Government Exhibit 1005 received in evidence)

1        MS. CROWLEY:  And, your Honor, the government calls

2   Debbie Erickson.

3    DEBORAH ERICKSON,

4        called as a witness by the Government,

5        having been duly sworn, testified as follows:

6        THE COURT:  Please proceed.

7   DIRECT EXAMINATION

8   BY MS. CROWLEY:

9   Q.  Good afternoon, Ms. Erickson.  Are you currently employed?

10  A.  No.

11  Q.  Are you retired?

12  A.  Yes.

13  Q.  Before you retired, where did you work?

14  A.  Airlines Reporting Corporation, also known as ARC.

15  Q.  Also known as ARC?

16  A.  ARC, A-R-C.

17  Q.  And when did you retire from ARC?

18  A.  June 30, 2016.

19  Q.  How long did you work at ARC before you retired?

20  A.  39-1/2 years.

21  Q.  And what is ARC?

22  A.  It is a company that is owned by the U.S. airlines, and it

23  runs the travel agency program for the United States, U.S.

24  Puerto Rico, U.S. Virgin Islands, and American Samoa.

25  Q.  What was your position at ARC before you retired?

1    A.   Manager, fraud prevention.

2    Q.   What were your duties and responsibilities?

3    A.   Looking at data through our corporate warehouse to find

4    patterns of fraud that travel agents may be perpetrating on the

5    airlines.

6    Q.   Do you still do any work for ARC?

7    A.   Yes.

8    Q.   What kind of work do you do?

9    A.   I'm a contractor and lend my expertise of 39 years to the

10   company.

11   Q.   Do you provide testimony in court?

12   A.   Yes.

13   Q.   Now, you mentioned what ARC is.  Could you explain what ARC

14   does?

15   A.   Yes.  We accredit travel agents who meet certain standards,

16   such as personnel and location and financial, and once the

17   travel agent is accredited then they get blank ticket stock in

18   order to issue airline tickets and services for the airline.

19   Then the travel agent reports those sales on a weekly basis

20   through our system, and we settle the moneys and credit card

21   billings between the travel agent's sales and the airlines.

22   Q.   Now, does ARC keep records of tickets that are purchased

23   through these travel agencies?

24   A.   Yes.

25   Q.   And what kind of travel agencies does ARC keep records of?

1   A.  Well, all the ones that are accredited, for example,

2   brick-and-mortar agents in a storefront and also online travel

3   agents, such as Expedia, Orbitz, Priceline.

4   Q.  Does ARC keep records of tickets that individuals purchase

5   directly from an airline?

6   A.  No.

7   Q.  What type of information does ARC obtain with respect to

8   each ticket that is purchased through a travel agency?

9   A.  It's the information that's on the face of the ticket.  So

10  it would be the passenger name; the date the ticket was issued

11  by the travel agent; where the passenger wants to fly, to and

12  from; the dates of travel; the cost of the ticket; whether the

13  ticket was credit card, or cash, check.

14          MS. CROWLEY:  I'd like to put up on the screen for the

15  witness Government Exhibit 52.

16  Q.  Ms. Erickson, do you recognize this document?

17  A.  I don't have the document in front of me.

18          MS. CROWLEY:  May I approach, your Honor?

19          THE COURT:  Yes.

20  Q.  I can hand you a paper copy of Government Exhibit 52, and

21  you can take a minute to look through it.

22  A.  Yes.  Yes, I'm familiar with this document.

23  Q.  What do you recognize it to be?

24  A.  This is a report given to you all through a subpoena

25  process.  We have staff that produces this information; it's in

Cb9Wcrm3                      Erickson - Direct

 1   standard format.

 2   Q.  And are these documents that are maintained by ARC in the

 3   ordinary course of business?

 4   A.  Yes.

 5            MS. CROWLEY:  Your Honor, the government offers

 6   Government Exhibit 52.

 7            MS. TODD:  No objection.

 8            THE COURT:  Government Exhibit 52 is received.

 9            (Government Exhibit 52 received in evidence)

10            MS. CROWLEY:  May I approach, your Honor?

11            THE COURT:  You may.

12   Q.  Now handing you what's been marked Government Exhibit 53,

13   do you recognize this?

14   A.  Yes, this is part of the document that we just discussed.

15   Q.  Is it a summary chart of that document?

16   A.  Yes.

17   Q.  Did you prepare this chart?

18   A.  It would have been prepared under staff at ARC, yes.

19   Q.  Have you verified the accuracy of this chart?

20   A.  Yes.

21   Q.  Where did the information in this chart come from?

22   A.  It came from our data warehouse that stores over 39 months'

23   worth of ticketing data.

24            MS. CROWLEY:  The government offers Government Exhibit

25   53.

Gb9Ngrom3                    Erickson - Direct

```
 1              MS. TODD:  Without objection.

 2              THE COURT:  Government Exhibit 53 is received.

 3              (Government Exhibit 53 received in evidence)

 4              MS. CROWLEY:  May we publish that for the jury?

 5              THE COURT:  You may.

 6    Q.  Ms. Erickson, could you describe what this chart depicts?

 7    A.  Yes.  It is standardized data that we produce in response

 8    to a subpoena.  Going across the top, the date of issuance,

 9    that's the date that the travel agent issued the ticket; the

10    passenger name for the ticket, and the ticket number.  And if

11    you'll see that Sandy Gomez has the same ticket number two

12    lines in a row, ending in 129, and that's because that ticket

13    has two legs to the travel, from point A to B and then B to C,

14    and I'll describe that in just a moment.  You'll see the date

15    of departure, when Sandy Gomez is leaving; the time of

16    departure; the lifting/flying carrier, UA, which is United; the

17    flight number; the date -- the origin airport code, EWR, which

18    is Newark, New Jersey; and the destination airline, airport

19    code, which is Houston.

20         And then right below that, staying with that same ticket

21    ending in 129, you'll see that the trip continued on the return

22    from Houston to MSY, which is New Orleans.  Then the form of

23    payment is a credit card, a Visa card.  You'll see the

24    transaction amount is $229.10.  The travel agency code -- every

25    travel agent that is accredited by ARC is given an agency code
```

1    number, and that's the code number of Priceline.  You'll see

2    the void status next, to see whether or not the ticket was

3    issued and then voided.  In this case, the ticket was not

4    voided.  And then the document status, T for ticket.

5    Q.  Just so I understand you correctly, the first two lines

6    represent one ticket with two legs to the trip?

7    A.  Correct.

8    Q.  And what about the next two lines down?

9    A.  For Ramon-Baez, Carolina, again, one ticket ending in 130;

10   two legs of the transportation, again on United from New Jersey

11   to Houston to New Orleans.

12   Q.  And is that the same flight as Sandy Gomez?

13   A.  Yes.

14   Q.  And you may have mentioned this, but the form of payment,

15   how were these tickets paid for?

16   A.  By credit card.

17   Q.  And the travel agency code, are you aware of what travel

18   agent was used to purchase these tickets?

19   A.  Yes.  That's Priceline, in Connecticut.

20   Q.  Is that an online travel agency?

21   A.  Yes.

22   Q.  And was the same credit card used to purchase both of those

23   tickets?

24   A.  Yes.

25   Q.  And now the bottom two lines, could you explain the

1   information in those lines?

2   A.   Again, the date of issuance for these tickets this time is

3   November 28 for both Sandy Gomez and Carolina Ramon-Baez.   They

4   are two different ticket numbers in this case, for Mr. Gomez

5   ending in 522 and for Ms. Ramon-Baez ending in 523.   The date

6   of departure is now November 28, this time on U.S. airline --

7   US Airways.   The lifting/flying carrier US is that designation.

8   Again, the flight number.   The origin airport code is now New

9   Orleans back to Newark, New Jersey.   It's paid for by a

10  different Visa credit card, and the amount of each of those

11  tickets is $223.10, again from Priceline.   And again, the

12  ticket is not voided and status is ticket.

13  Q.   Those two tickets, the one for Sandy Gomez and Caronlay

14  Ramon-Baez, were purchased using the same credit card?

15  A.   Yes.

16  Q.   And those tickets were issued the same day that that flight

17  departed?

18  A.   Yes.

19  Q.   Now, Ms. Erickson, does ARC track whether a passenger

20  actually boards a flight?

21  A.   No.

22  Q.   And what about if a flight is delayed or cancels; does ARC

23  track that information?

24  A.   No.

25           MS. CROWLEY:   One moment, your Honor.

```
 1                THE COURT:  Yes.

 2                MS. CROWLEY:  Nothing further.

 3                THE COURT:  Cross-examination.

 4                MS. TODD:  No questions, your Honor.

 5                THE COURT:  All right.  You may step down.

 6                (Witness excused)

 7                THE COURT:  The government will call its next witness.

 8                MR. EGAN:  The government calls Senior Trooper Ronald

 9      Whittaker.

10       RONALD WHITTAKER Jr.,

11            called as a witness by the Government,

12            having been duly sworn, testified as follows:

13                THE COURT:  Please proceed.

14      DIRECT EXAMINATION

15      BY MR. EGAN:

16      Q.  Good afternoon, Mr. Whittaker.  Are you employed?

17      A.  Yes.

18      Q.  By whom?

19      A.  The Louisiana State Police.

20      Q.  How long have you been employed by the Louisiana State

21      Police?

22      A.  14 years.

23      Q.  I'm going to ask you to sit a little closer to the mike.

24      A.  Yeah.  14 years.

25      Q.  What, if anything, did you do prior to joining the
```

 1   Louisiana State Police?

 2   A.   I worked for the Southeastern Louisiana University Police

 3   Department for three semesters -- three years, I'm sorry, and

 4   the Tangipahoa Parish Sheriff's Office for three years.

 5   Q.   Could you spell the name of that parish?

 6   A.   Tangipahoa Parish, T-A-N-G-I-P-H -- P-I-H-O-A.  Sorry.

 7           THE COURT:  That's just the way I thought it was

 8   spelled.

 9   Q.   You mentioned Southeastern Louisiana University, working

10   there.  Did you work there while you attended school there?

11   A.   Yes.  I worked for the police department there while I was

12   obtaining my undergraduate degree.

13   Q.   How far did you get in school?

14   A.   So when I got hired with the sheriff's office is when I

15   actually finished my undergraduate degree, and then while I was

16   employed with the state police is when I finished my master's

17   degree in criminal investigation.

18   Q.   You said master's in criminal investigation?

19   A.   Yes.

20   Q.   Take us through after the working for the Southeastern

21   Louisiana University.  You mentioned going to the sheriff's

22   office?

23   A.   Yeah.

24   Q.   How long were you there?

25   A.   Three years.

1   Q.  And after there you went?

2   A.  To the state police in Louisiana.

3   Q.  What is your current title with the Louisiana State Police?

4   A.  Senior trooper.

5   Q.  Are you assigned to a particular unit or squad?

6   A.  Yes.  I'm currently assigned to troop L, which is uniformed

7   patrol division, and within that division I'm in the criminal

8   patrols unit.

9   Q.  What is the criminal patrols unit?

10  A.  The criminal patrols unit main function is to locate and

11  apprehend criminals that are utilizing the highways, whether

12  it's state, state highways, interstates.

13  Q.  And what are specifically your duties as a member of the

14  criminal patrols unit?

15  A.  I'm the team leader of that unit, so I coordinate

16  schedules.

17  Q.  Are you yourself in a car on the road?

18  A.  Yes.

19  Q.  And you mentioned, so how long have you been in criminal

20  patrols?

21  A.  I started in criminal patrols in 2014, in January of 2014.

22  Q.  And prior to January 2014, what were you doing?

23  A.  I was in plainclothes narcotics for five years.

24  Q.  And prior to that?

25  A.  I was on interdiction as well.

1   Q.   Interdiction is the same thing?

2   A.   Yes.  Criminal patrols, yes.

3   Q.   Have you received any specialized training for your job

4   relevant to narcotics?

5   A.   Yes.

6   Q.   Can you describe that training for the jury?

7   A.   I've been to several schools, but the highlighted ones are

8   basic narcotics investigations, advanced narcotics

9   investigations, interview and interrogation, T3 wire

10  intercepts, financial investigations, criminal patrols,

11  tactics.

12  Q.   Are those trainings in the classroom or on the job?

13  A.   It's a combination.

14  Q.   As a state trooper, have you previously participated in any

15  traffic stops?

16  A.   Yes.

17  Q.   Approximately how many?

18  A.   Thousands.

19  Q.   Have you ever had a reason to search a vehicle as a result

20  of one of these stops?

21  A.   Yes.

22  Q.   Approximately how many vehicles?

23  A.   I'd say hundreds.

24  Q.   Are you familiar with the term "trap" when referring to a

25  car?

Gb9Wgcm2                    Whittaker - Direct

1   A.   Yes.

2   Q.   In your experience, what is a trap?

3   A.   A trap is another term that's used for a hidden compartment

4   within a vehicle.

5   Q.   What sort of -- well, let me ask it this way.  What's the

6   difference between simply hiding something in your car, like

7   under the seats, and a trap?

8   A.   So you can conceal something in your car just by putting it

9   under the seat or behind some kind of structure that's

10  naturally in the car.  A trap is something that when you pick

11  the car up off the lot it wasn't there, and you manufacture a

12  box to conceal whatever it is you're trying to hide.

13  Q.   Have you ever encountered a trap in the course of the

14  searches you described a moment ago?

15  A.   Yes.

16  Q.   Approximately how many?

17  A.   20 or 30.

18  Q.   As part of the training you described earlier, do you

19  receive any training relevant to hidden compartments or traps?

20  A.   I've been to hidden compartment schools and conferences and

21  I'm a certified instructor on how to find compartments.

22  Q.   What sort of material is covered in the hidden compartment

23  schools you've attended?

24  A.   So generally it's a lot of networking.  Sometimes they'll

25  bring out cars that have compartments in them that have already

Gb9Wgrm2                      Whittaker - Direct

1   been seized, or traps that have already been seized, and

2   there's a lot of videos in the training where whoever it was

3   found it will go through and basically illustrate what he saw

4   that made him have a hunch there was a trap in the vehicle.

5   Q.  Are you given any training in how to identify the presence

6   of a trap?

7   A.  Yes.

8   Q.  What sort of things are you instructed to look for?

9   A.  Basically, the simplest way to explain it is you're looking

10  for things that aren't supposed to be in the car, whether it's

11  aftermarket wiring, aftermarket pistons, paint that doesn't

12  match, Bondo.

13  Q.  When you use the term "aftermarket," what do you mean?

14  A.  Aftermarket meaning it wasn't factory.  They -- when the

15  car was manufactured, it wasn't there; they put it in after.

16  Q.  In your experience, how are traps accessed?

17  A.  They vary.  They can be very simple and it goes to very

18  technical.

19  Q.  What's an example of a very simple trap?

20  A.  So your simplest form of trap is going to be a box that

21  they put a plate over it and Bondo to where it seals off the

22  box, and to access it you just break the Bondo and remove the

23  plate.

24          THE COURT:  You've used the term "Bondo" a couple

25  times.  Could you tell us what Bondo is?

 1           THE WITNESS:  So, when you wreck your car and bring it

 2    to a body shop, sometimes they can't get all of the dents out

 3    of it so they'll use Bondo and they'll smooth it over and

 4    repaint it.  That's what Bondo is.

 5    Q.  And what's an example of a more complicated trap?

 6    A.  A more complicated trap would be the use of electronics and

 7    pistons to where there's a complicated sequence that you have

 8    to do to allow the door to open.

 9    Q.  When you say a sequence, what do you mean by that?

10    A.  Some kind of either mechanical or electrical sequence that

11    completes the wiring circuit that will allow the piston to

12    turn, so an example would be putting your foot on the brake and

13    hitting the left turn signal would complete the circuit and the

14    trap door would open.

15    Q.  I want to now direct your attention to the evening of

16    December 7, 2014.  Were you working that day?

17    A.  Yes.

18    Q.  What was your assignment?

19    A.  I was in uniform patrol in the criminal patrols unit.

20    Q.  Were you in a marked or an unmarked car?

21    A.  Fully marked car.

22    Q.  And did you participate in a traffic stop that night?

23    A.  Yes, I did.

24    Q.  At approximately what time?

25    A.  I want to say it was around nine or ten, is my best guess.

Gb9Wgom3                      Whittaker - Direct

1   Q.  Where did you make that stop?

2   A.  In Slidell on I-10, actually off I-59.

3           THE COURT:  Can you spell that place for us.

4           THE WITNESS:  S-L-I-D-E-L-L.

5   Q.  What kind of car was it that you stopped?

6   A.  A white GMT Yukon Denali.

7   Q.  What kind of plate did it have?

8   A.  New Jersey.

9   Q.  How many people were in the car the night on December 7?

10  A.  Two.

11  Q.  What gender were they?

12  A.  Male and female.

13  Q.  And just quickly to loop back, you mentioned Slidell.

14  Where is that in relation to New Orleans?

15  A.  It's basically 30 minutes from New Orleans if you're

16  leaving New Orleans going towards Mississippi.

17  Q.  So you mentioned there was a male and a female.  Did you

18  ever learn their names?

19  A.  I did.

20  Q.  What were their names?

21  A.  Sandy Gomez and, excuse me for the pronunciation but

22  Carolyn Baez, I think it was the female's name.

23  Q.  Would you recognize either of those people if you saw them

24  today?

25  A.  Yes.

Whittaker - Direct

1   Q.  Do you see either of them in the courtroom today?

2   A.  Yes.

3   Q.  If you can point to -- first of all, who do you see in the

4   courtroom?

5   A.  Mr. Gomez, in the purple tie.

6           MR. EGAN:  Indicating the defendant?

7           THE COURT:  Yes.

8   Q.  I'm going to hand you a Government Exhibit already in

9   evidence.

10          MR. EGAN:  Actually, if we could just pull up

11  Government Exhibit 2.

12  Q.  Do you recognize the person in that photo?

13  A.  Yes.

14  Q.  Who is that?

15  A.  Ms. Baez.

16  Q.  When you pulled over the car, who was driving?

17  A.  Mr. Gomez.

18  Q.  Where was Ms. Ramon-Baez?

19  A.  In the front passenger's seat.

20  Q.  Backing up a bit, before you pulled them over, were you

21  involved in an investigation involving either of these people?

22  A.  No.

23  Q.  When did you first become involved?

24  A.  Couple of days before I made the stop.

25  Q.  How did you become involved?

1  A.  We were contacted by narcotics, meaning the criminal

2  patrols unit was contacted by narcotics that they were going to

3  need assistance in conducting a walled-off stop, but they were

4  unsure of when they were going to be leaving New Orleans.

5          MS. TODD:  Objection, your Honor.

6          THE COURT:  Hearsay?

7          MS. TODD:  Yes.

8          THE COURT:  Do you want to be heard?

9          MR. EGAN:  Briefly.

10         THE COURT:  OK.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                (At sidebar)

 2                THE COURT:  I suspect that the testimony being

 3     elicited is not offered for its truth but to explain the

 4     trooper's actions that followed.  Is that why you're getting

 5     into this?

 6                MR. EGAN:  Yes.  I think he's just testifying as to

 7     instructions.

 8                MS. TODD:  And I understand exactly what the

 9     government is doing, and I generally wouldn't have any

10     objection to that except that I think that the detail of

11     information that he's providing goes beyond what is required.

12     And it's actually bolstering his testimony.

13                THE COURT:  All right.  The witness testified that the

14     criminal patrols unit was contacted a couple days before the

15     stop about making a walled-off traffic stop.  That's what he's

16     testifying to.

17                MS. TODD:  Right.

18                MR. EGAN:  I think at the time of the objection he was

19     testifying that he didn't know, he was told they didn't know

20     exactly when.

21                THE COURT:  Yes, he said that as well.

22                Is there anything that troubles you about that?

23     Because that seems fairly straightforward.

24                MS. TODD:  I imagine since we're here the next

25     question is to describe what a walled-off stop is.

Gb9Wgon3                    Whittaker - Direct

1           THE COURT:  Yes.

2           MS. TODD:  And they'll go into details about the

3   integrity of the investigation, as he testified at the hearing.

4   That I'm going to object to.

5           THE COURT:  I don't see any problem with him

6   testifying about what a walled-off traffic stop is.  What he's

7   going to say is that the nature of the walled-off traffic stop

8   is that you have to develop your own probable cause pulling the

9   person over because you're trying to protect the underlying

10  investigation.  Anything that troubles you about that?

11          MS. TODD:  Well, we went through that at the

12  suppression hearing.  The issue of probable cause is no longer

13  relevant, and so I'm not sure why the details of all of that is

14  necessary.

15          MR. EGAN:  Your Honor, I just want to provide the jury

16  with some context so they don't just think that he randomly

17  selected a car, and to the extent there was information, at the

18  hearing there was testimony about what he put in his report,

19  and to the extent the video is going to say, they're going to

20  hear "I pulled you over because you were touching the fog

21  line."  I just want to provide a little context so it's not

22  misrepresenting.

23          THE COURT:  There was testimony at the hearing about

24  his interactions.  The trooper testified he told the driver he

25  pulled him over because he had crossed what he referred to as

 1      the fog line, which is a painted line, I guess, on the

 2      right-hand side of the road.  I don't really see it as

 3      bolstering.

 4              MS. TODD:  Not the fact that he stopped him because he

 5      crossed the fog line.  It's everything else about what a

 6      walled-off stop is with respect to this investigation.  He is

 7      suggesting, or he will based on his testimony at the hearing,

 8      that the walled-off stop is designed to develop, as the Court

 9      says, an independent basis so as to protect the integrity of

10      the investigation, and it's that part.  I don't see why that is

11      necessary, because implicit in that is that everything that the

12      government did was indeed correct.  We may disagree.  The

13      Court, however, found otherwise, and so I don't understand why

14      we need to rehash the hearing testimony.  That's all I'm

15      saying.  Probable cause is no longer an issue.  And I

16      understand the government's need for some context, but it needs

17      to be limited.

18              MR. EGAN:  We'll try to keep it pretty brief as to the

19      walled-off stop.  What is a walled-off stop?  Why did you do

20      it?

21              THE COURT:  You'll ask him what a walled-off stop is.

22      He'll say in a walled-off stop, we try to develop our own

23      probable cause for stopping a person, rather than telling them

24      you're under investigation and that's why we pulled you over.

25      And that will be it, really.

1          MS. TODD:  Right.

2          MR. EGAN:  Yes.

3          THE COURT:  Then you'll go into his interactions with

4    the driver and his interactions with Ramon-Baez, OK.

5          MR. EGAN:  OK.

6          MS. TODD:  That's fine.

7          (Continued on next page)

Gb9Wgoo3                        Whittaker - Direct

1          (In open court)

2    BY MR. EGAN:

3    Q.   Before we took a moment there, I believe you had testified

4    that you had been asked to conduct a walled-off stop, but you

5    weren't sure exactly when you were going to need to do it.   Is

6    that right?

7    A.   Yes.

8    Q.   What is a walled-off stop?

9    A.   A walled-off stop is a stop that's used where a trooper or

10   an officer will use probable cause to stop a vehicle that's

11   already currently under investigation, and the reasoning behind

12   that is it allows law enforcement to stop a car in furthering

13   an investigation without alerting the occupants of the vehicle

14   that they're necessarily being under, that they're being

15   investigated.

16   Q.   On the night of December 7, without saying specifically the

17   information that was communicated to you, what, if any, types

18   of information was communicated to you in advance of that stop

19   with respect to the car?

20   A.   Description of the vehicle and the license plate number.

21   Q.   Were you given a location, an approximate location?

22   A.   Well, approximate.

23   Q.   Where were you when you first saw the vehicle?

24   A.   On the shoulder of the interstate.   In Slidell.

25   Q.   In Slidell, you said?

Whittaker - Direct                326

 1   A.  Yes.

 2   Q.  Were you parked or were you moving?

 3   A.  Parked.

 4   Q.  Were you alone or with other officers?

 5   A.  I was alone.

 6   Q.  So at the time that you first saw the vehicle, which

 7   direction were they moving?

 8   A.  East.

 9   Q.  Is that same direction you're facing or the opposite?

10   A.  Same.

11   Q.  What observations, if any, did you make?

12   A.  When they were surveilling the vehicle, when the vehicle

13   passed me, it crossed the center line, which was my initial

14   observation of the vehicle.  Traffic at that time, I had to let

15   a couple cars pass before I could get up safely off the

16   shoulder, and when I got off the shoulder is when I proceeded

17   towards the vehicle.  When I got behind it, it was in the right

18   lane, I was in the left lane, and you could see the right tires

19   cross the fog line of the interstate, which is that solid line

20   going along the outside, and that's when I activated my lights.

21   Q.  Crossing the fog line or the center line, is that a

22   violation?

23   A.  Yes.

24   Q.  What did you do next?

25   A.  When the vehicle came to a stop, I instructed the driver to

 1   exit his vehicle and walk to mine.

 2   Q.  Let me ask you this.  You turned on your lights?

 3   A.  Yes.

 4   Q.  Did the car pull over?

 5   A.  Yes.

 6   Q.  Approximately how long after you turned on your lights?

 7   A.  It immediately pulled over, faster than normal.

 8   Q.  When you pulled the car over, could you see how many people

 9   were in the car?

10   A.  Yes.

11   Q.  How many?

12   A.  Two.

13   Q.  What happened next?

14   A.  When the vehicle came to a stop is when I asked the driver

15   to exit his vehicle and walk to mine.

16   Q.  How did you communicate that instruction?

17   A.  Verbally.  I was standing outside of my car.

18   Q.  Did the driver comply?

19   A.  Yes.

20   Q.  Who got out?

21   A.  The driver, Mr. Gomez.

22   Q.  When the defendant got out, what did he do next?

23   A.  Introduced myself to Mr. Gomez and told him why I had

24   stopped him.

25   Q.  And what other information did you obtain?

 1   A.  When I told him why I'd stopped him, he had stated that he

 2   was coming from a football game in New Orleans.

 3   Q.  What was the purpose of that conversation from your point

 4   of view?

 5   A.  Talk to everybody like that, meaning always kind of engage

 6   in conversation, because a lot of times people are generally

 7   going to be nervous when they're encountered by the police, so

 8   I try to put them at ease.

 9   Q.  Did he say how long he'd been in New Orleans?

10   A.  For the day.

11   Q.  And what observations, if any, did you make about his

12   demeanor?

13   A.  He was extremely nervous, meaning typically at first it's

14   normal, I guess, to be a little nervous, but his level of

15   nervousness, I think, got a little worse as the conversation

16   went on.

17   Q.  Up to this point, were you still alone or had you been

18   joined by another officer?

19   A.  At some point another officer came, but I don't know

20   exactly when it was.

21   Q.  Do you know who that other officer was?

22   A.  Trooper McKay.

23   Q.  Do you recall whether you called that person to the scene

24   or whether they just arrived?

25   A.  I don't.

1   Q.  Are you familiar with the term "dash cam"?

2   A.  Yes.

3   Q.  What is a dash cam?

4   A.  A dash cam is an in-car video recording system that's

5   permanently attached to the car that records both video and

6   audio.

7   Q.  Was the car you were using that night equipped with a dash

8   cam?

9   A.  Yes.

10  Q.  How does it work?

11  A.  It's set to record when I activate my lights, and the

12  recording backs up 15 to 30 seconds before my activation of the

13  lights.

14  Q.  Why does it back up like that?

15  A.  It's designed to do that because a lot of times you can see

16  a violation, but it's too late to record it, so once you see it

17  and activate your lights, it backs up that time to capture that

18  violation on the video.

19  Q.  What about audio?

20  A.  Audio is automatically activated when you turn the lights

21  on.

22  Q.  What about when you're outside of your car?

23  A.  I have a mike on my belt.

24  Q.  Do you activate that, or is that automatic?

25  A.  It's automatic.

1   Q.  I want to show you --

2            MR. EGAN:  If I can approach, your Honor.

3   Q.  -- Government Exhibit 300 for identification.  Do you

4   recognize that?

5   A.  Yes.

6   Q.  What is that?

7   A.  This is the video of the traffic stop with Mr. Gomez.

8   Q.  How do you know that?

9   A.  My initials are on the DVD.

10  Q.  Did you watch that video before initialing it?

11  A.  Yes.

12  Q.  Does what's on that video fairly and accurately depict what

13  you observed from your car that night?

14  A.  Yes.

15           MR. EGAN:  The government seeks to admit Government

16  Exhibit 300.

17           MS. TODD:  Without objection, your Honor.

18           THE COURT:  Government Exhibit 300 is received.

19           (Government Exhibit 300 received in evidence)

20           MS. TODD:  A moment, your Honor?

21           THE COURT:  Yes.

22           MR. EGAN:  If we can pull up Government Exhibit 300

23  and go back to the beginning and play from there.

24           (Video played)

25           MR. EGAN:  We can turn off the monitors.

Gb9Wgom3                    Whittaker - Direct

1   Q.  It was a little tough to hear there.  How long did he say

2   he'd been in New Orleans?

3   A.  For the day.

4   Q.  What did he say he'd been doing there?

5   A.  It was kind of confusing because he said he was going to

6   watch a game and it got canceled, or for whatever reason I

7   think his plans were canceled, I think he meant to say.

8   Q.  Did you ask him any follow-up questions about that game?

9   A.  I asked him what the score was and he attempted to give me

10  the score of the game but then said he lost track.

11  Q.  And did you ask him who was in the car with him?

12  A.  I did.

13  Q.  Who did he say it was?

14  A.  His girlfriend.

15  Q.  After speaking with him, what did you do next?

16  A.  After talking to him, I approached the driver's side of the

17  car to talk to the passenger.

18  Q.  And where was, what information were you trying to get from

19  the passenger?

20  A.  I wanted to see, ask her where they were coming from to see

21  if they were going to have the same information.

22  Q.  Where had he said they were coming from?

23  A.  New Orleans.

24  Q.  Where had he said, did he indicate where they'd been

25  before?  You said they were in New Orleans for a day?

cb9Wgon3                    Whittaker - Direct

1   A.  Right, because with the registration being out of New

2   Jersey, I thought -- I asked him, You came from New Jersey all

3   the way today?  And he said no, I was coming from North

4   Carolina today.

5   Q.  When you spoke with the passenger, what language were you

6   speaking in?

7   A.  I attempted to talk to her in English, but I could tell she

8   couldn't understand what I was saying, so I asked her in

9   Spanish where she was coming from.

10  Q.  Without going into what was said, was the information she

11  provided consistent or inconsistent with what he'd given?

12  A.  Inconsistent.

13  Q.  In what way, generally?

14  A.  Two different places.

15  Q.  After you spoke with Ms. Ramon-Baez, what did you do next?

16  A.  I walked back to my car with their driver's license

17  information.

18  Q.  For what purpose?

19  A.  To check the status of their driver's license and I have

20  paperwork that I have to fill out if I, like a

21  consent-to-search form is what I went back to my car to fill

22  out.

23  Q.  And during, while you were in your car, where was the

24  defendant at that time?

25  A.  Standing outside of my car off to the right side.

1  Q.  Was anyone with him?

2  A.  No.

3  Q.  Any other officers on the scene at that time?

4  A.  There may have been, but I don't remember exactly.

5  Q.  So after you were in your car and you did the checks you

6  were describing and the paperwork, what did you do next?

7  A.  After I filled the form out, the consent-to-search form, I

8  exited my vehicle and asked Mr. Gomez some follow-up questions.

9  Q.  Did you ask him anything with respect to searching the

10  vehicle?

11  A.  I did.

12  Q.  What did you ask?

13  A.  I asked him if I could search the vehicle, and he said that

14  I could.

15  Q.  How did he indicate his willingness?

16  A.  I had the consent-to-search form and I read it to him and

17  explained it to him, so he gave both verbal and written

18  consent.

19          MR. EGAN:  If we can pull up Government Exhibit 300

20  again.  If we could play from 3:09.  I think we have an audio

21  issue.

22          (Video played)

23

24

25

 1   Q.  The form that was on your clipboard, what is that?

 2   A.  Consent-to-search form.

 3           MR. EGAN:  Can we pull up Government Exhibit 50 for

 4   identification, just for the witness.

 5   Q.  Showing you what's marked as Government Exhibit 50, do you

 6   recognize that?

 7   A.  Yes.

 8   Q.  What do you recognize that to be?

 9   A.  This is a state police consent-to-search form with

10   Mr. Gomez's signature and my signature.

11   Q.  Is that the form that was filled out that night?

12   A.  I think this is a copy.

13   Q.  An exact copy?

14   A.  Yes.

15   Q.  Is that an English or in Spanish?

16   A.  The top part is in English.  The bottom part is in Spanish.

17   Q.  Whose signature appears on the form?

18   A.  Mr. Gomez and mine.

19           MR. EGAN:  The government would seek to admit

20   Government Exhibit 50 at this point.

21           MS. TODD:  Without objection, your Honor.

22           THE COURT:  Government Exhibit 50 is received.

23           (Government Exhibit 50 received in evidence)

24   Q.  After you signed the form, what did you do next?

25   A.  I began to conduct my search.  I had Ms. Baez exit the

 1   vehicle and then I conducted my search.

 2   Q.  Did you conduct the search alone or with someone else?

 3   A.  I started out by myself.  At some point another agent or

 4   another trooper helped.

 5   Q.  Where did you start your search?

 6   A.  In the rear cargo area.

 7   Q.  To be clear, prior to this, were you aware whether there

 8   was a compartment in the car?

 9   A.  Yes.

10   Q.  Did you know where it was?

11   A.  Yes.

12   Q.  Why did you begin your search at the back of the car?

13   A.  Because I knew this they wanted it to be a walled-off stop,

14   so I didn't want to go straight to the compartment because I

15   felt like that would indicate that I obviously knew something

16   was there.

17   Q.  So describe the process of the search.  You started in the

18   back and then what happened?

19   A.  So I started in the back, checked the bags and the rear

20   cargo area in general, and then I went to the passenger doors.

21   Q.  The passenger doors.  Did you open them?

22   A.  Yes.

23   Q.  Looking in the rear, you say you started by yourself.  Did

24   there come a time when someone else arrived?

25   A.  Yes.

GB9MGOM4                          Whittaker - direct

1    Q.   Who was that?

2    A.   Trooper McKay would have been there, Agent Patti with DEA

3    and Trooper Bodet with the state police.  He's our K-9 handler.

4    Q.   You said you went to the back of the car.  Where

5    specifically did you go?

6    A.   I opened the rear hatch to the cargo area.

7    Q.   After you searched the rear hatch, where did you go?

8    A.   I walked around to the passenger door.

9    Q.   The passenger door at the back or the front?

10   A.   The back.

11   Q.   What did you observe when you looked in the back passenger

12   side?

13   A.   When I opened the door I immediately saw the compartment.

14   Q.   What specifically drew your attention?

15   A.   When a car comes from the factory, all the molding in that

16   car is generally the same color.  And when I looked at the

17   second row seat, I'm a little familiar with those cars and I

18   know that if you look under the seat you should be able to see

19   from one side to the other, and you can see that they had

20   constructed a box that I couldn't see from one side to the

21   other.

22   Q.   I want to hand you, if I can approach, your Honor,

23   Government Exhibits 100 through 105.  Government Exhibits 100

24   and 103 are already in evidence.  The others are just marked

25   for identification at this time.  If I can ask you to look

1    through those.  Do you recognize what's depicted in those

2    exhibits?

3    A.  Yes.

4    Q.  What is depicted?

5    A.  The exterior of the car that I stopped with the license

6    plate information, and then it goes to interior pictures with

7    showing the discrepancies and the color of the molding in the

8    box under the seat and then with the compartment open

9    containing the contraband.

10   Q.  Do they fairly and accurately depict how the exterior and

11   interior of the car looked that night?

12   A.  Yes.

13           MR. EGAN:  Your Honor, at this time we would ask to

14   admit Government Exhibits 101, 102, 104, and 105.

15           MS. TODD:  Without objection.

16           MR. EGAN:  And I believe 100 and 103 are already in

17   evidence.

18           THE COURT:  Government Exhibits 101, 102, 104 and 105

19   are received.

20           (Government Exhibits 101, 102, 104 and 105 received in

21   evidence)

22           MR. EGAN:  If we can pull up Government Exhibit 101.

23   Q.  Sir, what are we looking at here?

24   A.  That is a picture of the license plate that was on the

25   vehicle I stopped.

1   Q.   Looking at the top of the license plate, do you see the

2   black stripe across that?

3   A.   Yes.

4   Q.   What is that?

5   A.   A piece of plastic covering up the name of the state.

6   Q.   And was that there the night that you stopped the car?

7   A.   Yes.

8           MR. EGAN:  If we can look at Government Exhibit 102.

9   Q.   What are we looking at here?

10  A.   That's the second row seat and you can see the molding

11  underneath the seat.  That's the boxed-off area that I was

12  talking about.

13  Q.   I think if you touch your screen it will make a mark.

14          Where is the molding that you are describing?

15          MR. EGAN:  Indicating the tan rectangle immediately

16  under the seat in the center of the photo.

17  Q.   Again, what is unusual about that?

18  A.   The colors don't match.  It's a shade off and it's not

19  supposed to be.  And generally you should be able to see from

20  one side of the car to the other.

21  Q.   If we look at Government Exhibit 103, this is a closer

22  look.  Again, what, if anything, unusual sticks out in this

23  photo?

24  A.   You can see that this is -- the paint is shinier than the

25  other molding is.

Whitaker - direct

 1   Q.  Again, you've indicated a line on the rectangle underneath

 2   the seat.  And that's the molding you are talking about?

 3   A.  Yes.

 4   Q.  What's different about that molding?

 5   A.  This is glossier, what I have marked, than the natural

 6   molding of the car.

 7          MR. EGAN:  We can take Government Exhibit 103 down.

 8   Q.  After you found the compartment did you open it at that

 9   time?

10   A.  No.

11   Q.  Why not?

12   A.  Because I personally didn't have the sequence to open it at

13   that time, and I didn't want to destroy the compartment in case

14   they needed to use it.

15   Q.  Did there come a time when someone who did know the

16   sequence arrived on the scene?

17   A.  Yes.

18   Q.  Who was that?

19   A.  Agent Patti.

20   Q.  That's Michael Patti?

21   A.  Yes.

22   Q.  Did you at that time open the compartment?

23   A.  No, I did not.

24   Q.  What step did you take next?

25   A.  The next step that I took was, I requested the assistance

1    of a K-9 to come to the scene.

2    Q.  Why did you do that?

3    A.  Because I didn't want to give the impression that I knew it

4    was there.  So I had the K-9 handler run his dog around the

5    car.

6    Q.  When you say a K-9 and a K-9 handler, what are you

7    referring to?

8    A.  A trooper with a certified narcotics detection dog.  He

9    deployed his K-9 around the vehicle and Trooper Bodet told me

10   that his dog alerted to the car.

11          THE COURT:  How do you spell Bodet?

12          THE WITNESS:  B-o-d-e-t.

13   Q.  After the dog alerted, what did you do?

14   A.  Then we detained Mr. Gomez and Ms. Baez.

15   Q.  Did there come a time when you opened the compartment?

16   A.  Yes.

17   Q.  When was that?

18   A.  When Agent Patti arrived, it was a couple of minutes after

19   he arrived and he opened it.

20   Q.  And after the dog had conducted that search?

21   A.  Correct.

22   Q.  What, if anything, did you find in the compartment?

23   A.  A Whole Foods bag containing five packages of suspected

24   cocaine.

25          MR. EGAN:  If I can pull up Government Exhibit 104 at

GB9MGOM4                  Whittaker - direct
341

1   this time.  If it's possible to get rid of that line right

2   there.

3   Q.  Do you see in the sort of lower middle portion -- describe

4   what we are looking at.

5   A.  This is the Whole Foods bag that I was talking about.

6   Q.  Taking a step back, what part of the car are we looking at?

7   A.  This is under the second row seat.

8   Q.  Do you see those two on the front and towards the right

9   side, there are two metal bars that appear to be attached to

10  that bench?

11  A.  Yes.

12  Q.  What are those?

13  A.  Pistons.

14  Q.  And the portion of the seat that they are attached to, what

15  is that?

16  A.  This is -- this is the piston right here.

17  Q.  Again, a purple line on the left of the two metal poles in

18  the photo towards the left side?

19  A.  And this going across is what you would call the door.

20  Q.  The door of the trap?

21  A.  Yes.

22  Q.  That's indicating the area on the photograph that's covered

23  in sort of silver wrapping?

24  A.  Yes.

25  Q.  Now, what is in the trap?

GB9MGOM4                    Whittaker - direct

1  A.  In the trap is the Whole Foods bag that I had marked

2  originally, and then you can see the packages of cocaine here,

3  here, and then you can see the duct tape on that one.

4  Q.  That's in the sort of bundle that's in the center lower

5  portion of the photograph?

6  A.  Yes.

7          MR. EGAN:  If we can get rid of those marks and pull

8  up Government Exhibit 105, Ms. Thomas.

9  Q.  What are we looking at here?

10  A.  That is the packages of cocaine removed from the bag.

11  Q.  What is the silver material around those packages?

12  A.  Basically, a heat shield or heat shield tape.

13  Q.  In your experience, what function, if any, does that serve?

14  A.  They try to use -- utilize that to seal the compartment to

15  defeat the odor omitting out of it.

16  Q.  And the same with the stuff wrapped around the packages?

17  A.  Yes.

18  Q.  How many total packages did you recover there?

19  A.  Five.

20  Q.  After you discovered this, what did you do next?

21  A.  Placed Mr. Gomez and Ms. Baez in custody and told them that

22  they were under arrest.

23  Q.  Where were they taken from there?

24  A.  To troop L in Mandeville is where we went.

25  Q.  And the drugs were recovered out of that trap?

1  A.  Yes.

2              MR. EGAN:  Your Honor, I'd like to read a stipulation

3  at this time.

4              THE COURT:  All right.  What's the exhibit number?

5              MR. EGAN:  It is 1004.  It is hereby stipulated and

6  agreed, by and between the United States of America, by Preet

7  Bharara, United States Attorney, Richard Cooper, Patrick Egan

8  and Shawn G. Crowley, Assistant United States Attorneys of

9  counsel, and Sandy Gomez, the defendant, by and through his

10  attorney, Natali Todd, Esq. that:  Government Exhibit 403A,

11  403B and Government Exhibit 403C were recovered by law

12  enforcement on December 7, 2014 from inside the vehicle

13  occupied by Sandy Gomez, the defendant, and Caronlay

14  Ramon-Baez.

15              Government Exhibit 403A contains the packaging

16  materials within which Government Exhibit 403B and Government

17  Exhibit 403C were located on December 7, 2014.

18              Government Exhibit 403B and Government Exhibit 403C

19  were weighed and analyzed by a forensic chemist trained for

20  such matters and in compliance with the standards and practices

21  normally acceptable by government experts in this area and

22  whose identity is known to the defendant by way of a previously

23  furnished report.

24              Based on tests performed at the laboratory of the Drug

25  Enforcement Administration located in New York, New York,

GB9MGOM4                     Whittaker - direct

1   following normal protocols and procedures within standards

2   acceptable in the profession, the forensic chemist determined

3   that Government Exhibit 403B and Government Exhibit 403C

4   contained cocaine with a total weight of approximately 4,890

5   grams.

6          It is further stipulated and agreed that Government

7   Exhibit 403A, Government Exhibit 403B, and Government Exhibit

8   403C have been in the continual custody of law enforcement,

9   including the Louisiana State Police, the Drug Enforcement

10  Administration, or the United States Attorney's Office for the

11  Southern District of New York, and are in substantially the

12  same condition today as they were when they were obtained by

13  law enforcement.

14         It is further stipulated and agreed Government Exhibit

15  403A, Government Exhibit 403B, and Government Exhibit 403C, and

16  this stipulation as Government Exhibit 1004, may be received in

17  evidence as government exhibits at trial, dated November 9,

18  signed by myself and Ms. Todd.

19         The government would move to admit 403A, 403B, 403C,

20  and 1004 at this time.

21         MS. TODD:  Without objection.

22         THE COURT:  Government Exhibits 403A, 403B, 403C, and

23  1004 are received.

24         (Government Exhibits 403A, 403B, 403C, and 1004

25  received in evidence)

1        MR. EGAN:  May I publish, your Honor?

2        THE COURT:  You may.

3   Q.  This is Government Exhibit 403A, which per the stipulation

4   contains the packaging.  And these are Government Exhibits 403B

5   and 403C?

6        MR. EGAN:  Nothing further, your Honor.

7        THE COURT:  Cross-examination.

8        MS. TODD:  Yes, your Honor.

9   CROSS-EXAMINATION

10  BY MS. TODD:

11  Q.  Good afternoon, Trooper Whittaker.

12  A.  Good afternoon.

13  Q.  How are you?

14  A.  Good.

15  Q.  When you pulled over Sandy Gomez and Caronlay Ramon-Baez on

16  December 7, 2014, you called in the plates also, correct?

17  A.  I did.

18  Q.  And the dispatch did not report that the vehicle was

19  stolen, correct?

20  A.  Correct.

21  Q.  You asked Mr. Gomez to step outside the vehicle, correct?

22  A.  Yes.

23  Q.  And he complied?

24  A.  Yes.

25  Q.  You asked him to come towards you, correct?

1    A.   Yes.

2    Q.   And he complied, right?

3    A.   Yes.

4    Q.   You requested his driver's license, yes?

5    A.   I did.

6    Q.   And he gave that to you?

7    A.   He did.

8    Q.   And you didn't have to ask him for his driver's license

9    twice, right?

10   A.   No, I did not.

11   Q.   And this is a commercial driver's license?

12   A.   I don't remember if it was a commercial driver's license or

13   not.

14   Q.   And you ran a check on his license, right?

15   A.   Yes.

16   Q.   And no problems came back with respect to his license,

17   correct?

18   A.   Correct.

19   Q.   There were no warrants on the license?

20   A.   No.

21   Q.   No outstanding tickets, right?

22   A.   No.

23   Q.   And then you ran a check on him, correct?

24   A.   What kind of check?

25   Q.   Did you run a check to see if there was any outstanding

Whittaker

 1   warrants on him?

 2   A.   I did.

 3   Q.   There were no outstanding warrants, correct?

 4   A.   Correct.

 5   Q.   And no outstanding tickets, correct?

 6   A.   Correct.

 7   Q.   And you also patted him down?

 8   A.   Yes.

 9   Q.   You found no weapons on him, right?

10   A.   Right.

11   Q.   You found no large amounts of cash on him, correct?

12   A.   Correct.

13   Q.   No contraband on him personally, correct?

14   A.   On his person, no.

15   Q.   And there was no contraband in the glove compartment

16   either, correct?

17   A.   Correct.

18   Q.   You also searched the luggage that was inside the trunk

19   area of the vehicle, correct?

20   A.   Yes.

21   Q.   You found no drugs inside the luggages, correct?

22   A.   Not in the luggage, no.

23   Q.   There was a football game in town that day, correct?

24   A.   I think there was, but I'm not a hundred percent.

25   Q.   Now, you requested permission to search the vehicle, right?

 1   A.  Yes.

 2   Q.  One other question.  You mentioned that he was very

 3   nervous.  Do you recall stating that on direct?

 4   A.  Yes.

 5   Q.  He was shivering?

 6   A.  He was.

 7   Q.  He was wearing a T-shirt, correct?

 8   A.  He was.

 9   Q.  It was cold outside, correct?

10   A.  I don't remember the temperature.

11   Q.  He asked you for his jacket, correct?

12   A.  No.  I think Ms. Baez asked me for her jacket.

13   Q.  Mr. Gomez did not request his jacket?

14   A.  If he did, I don't remember that.

15   Q.  Did you testify in a prior proceeding?

16   A.  Yes.

17   Q.  This was sometime prior to today, correct?

18   A.  Yes.

19   Q.  And do you recall being asked a question?

20          MS. TODD:  I'm sorry.  This is page 90 of the hearing

21   transcript.

22   Q.  Do you recall being asked the question:

23   "Q.  It was cold out that night, correct?

24   "A.  It was cold."

25          Does that now refresh your memory that you did indeed

1   say that?

2   A.   Yes.

3   Q.   "QUESTION:  He was only wearing a T-shirt?

4   "A.   Uh-huh.

5   "Q.   Yes?

6   "A.   Yes."

7   A.   He was wearing a T-shirt.

8   Q.   "QUESTION:  At some point he asked to get his jacket that

9   was in the truck, correct?

10  "A.   He did."

11  A.   I don't remember that, no.

12  Q.   You don't remember making that statement?

13  A.   No.

14          MS. TODD:  Your Honor, unfortunately, I don't have an

15  exhibit --

16          THE COURT:  Yes.  My clerk will give you an exhibit

17  sticker.

18          MS. TODD:  May I approach the witness, your Honor.

19          THE COURT:  Yes.

20  Q.   I'm showing you what has been previously marked as Defense

21  Exhibit H.  Directing your attention to lines 14 through 15.

22          THE COURT:  What page?

23          MS. TODD:  Page 90.

24  Q.   Directing your attention to lines 13 through 15.  Would you

25  take a look at that and see if that refreshes your

GB9MGOM4                    Whittaker - cross

1    recollection.

2    A.  What is your question about this?

3    Q.  My question is, you testified previously that he requested

4    his jacket from the truck and it was provided to him, correct?

5    A.  I couldn't hear you when you were walking away.

6    Q.  He requested his jacket from the truck because it was cold

7    outside and you provided it to him?

8    A.  Ok.

9    Q.  Yes?

10   A.  If he asked for it, I am sure I would have let him go back

11   and get it.

12   Q.  So the answer to my question is yes, based on your previous

13   testimony?

14   A.  Just looking at that document doesn't jog my memory any

15   more than you reading the question to me.

16   Q.  Now, you presented Mr. Gomez with a consent form, correct?

17   A.  Yes.

18   Q.  The purpose of the consent form was to search the vehicle,

19   right?

20   A.  Yes.

21   Q.  And you asked him to sign it, correct?

22   A.  Yes.

23   Q.  And he does, right?

24   A.  Yes.

25   Q.  And so with the consent form you went ahead and searched

CB9MGOM4                    Whittaker - cross

1    the vehicle, correct?

2    A.   After getting the consent-to-search form signed is when I

3    would have started to conduct my search.

4    Q.   Correct.  So he signed the form giving you permission to

5    search the vehicle?

6    A.   Yes.

7    Q.   He does not quarrel with you with your desire to search the

8    vehicle, correct?

9    A.   No, he didn't object.

10   Q.   He signs a consent form and stands off to the side, right?

11   A.   Yes.

12   Q.   By the way, when you returned his license to him he was

13   free to leave?

14   A.   No.

15   Q.   He was not in handcuffs, right?

16   A.   No.

17   Q.   But he didn't leave?

18   A.   He did not leave or ask to leave.

19   Q.   So he stood off to the side, right?

20   A.   Yes.

21   Q.   He never asked you if he could leave, right?

22   A.   Correct.

23   Q.   And at no time did he attempt to run away, right?

24   A.   Correct.

25   Q.   You searched the trunk area where the luggages were, right?

1    A.   Yes.

2    Q.   You found no narcotics in the trunk area, correct?

3    A.   Correct.

4    Q.   Prior to discovering the contents of the trap you searched

5    the vehicle in excess of 30 minutes, correct?

6    A.   I don't know the exact time.

7    Q.   You were searching for quite sometime, correct?

8    A.   I started in the rear cargo area.  And when I went to the

9    passenger door is where I saw the trap, where DEA told me the

10   trap was.

11   Q.   But you didn't immediately see that, correct?

12   A.   As soon as I opened the door, when I got to that area of

13   the vehicle, it was immediately apparent to me that that's what

14   it was.

15   Q.   But you continued to search the rest of the vehicle for a

16   number of minutes, correct?

17   A.   Yes.

18   Q.   And you also removed the luggages from the trunk of the

19   vehicle, correct?

20   A.   Yes.

21   Q.   You looked under the mat in the trunk of the vehicle,

22   correct?

23   A.   I'm sure I would have, yeah.

24   Q.   Found no contraband, right?

25   A.   No.

1   Q.   While you are doing all of this Mr. Gomez doesn't try to

2   stop you, correct?

3   A.   He does not.

4   Q.   He doesn't say anything to you at that point, correct?

5   A.   Correct.

6   Q.   He doesn't claim he is sick and need to go to the hospital,

7   correct?

8   A.   Correct.

9   Q.   The trap was underneath the back seat, yes?

10  A.   The second row seat, yeah.

11  Q.   And to the untrained eye it's not immediately obvious,

12  correct?

13  A.   Correct.

14  Q.   You really had to look at it?

15  A.   You have to know what you are looking at, yes.

16  Q.   And in order to get to the trap the seat had to be lifted

17  up, correct?

18  A.   Yes.

19  Q.   And a code was required to open that?

20  A.   A sequence, yeah.

21  Q.   Did you have the sequence?

22  A.   I did not.

23  Q.   Agent Patti had the sequence, right?

24  A.   Correct.

25  Q.   Now, the upright portion of the back seat stayed in

354

1   position, correct, before it was open?

2   A.   You're talking about the seat where you lean back against?

3   Q.   Yes.

4   A.   Yes, it was upright.

5   Q.   And that part of the seat was firmly in place, correct?

6   A.   Yes.

7   Q.   You couldn't move it, correct?

8   A.   No.

9   Q.   So it was not moving back and forth, right?

10  A.   Correct.

11  Q.   It wasn't loose, right?

12  A.   I don't remember if it was loose or not, but the back seat

13  stayed up, if that answers your question.

14  Q.   Now, when the secret compartment was opened, Mr. Gomez was

15  standing off to the side of the road, correct?

16  A.   Yes.

17  Q.   And he was not brought to the vehicle to observe the

18  contents of what was in the trap, correct?

19  A.   Correct.

20  Q.   On the shopping bags that the drugs were found inside of,

21  Mr. Gomez's fingerprints were not on that bag, correct?

22  A.   I can't testify to that.  I don't know.

23  Q.   You don't know?

24  A.   I don't know.

25  Q.   You are not aware of any report of any fingerprints of his

1   on the packaging, correct?

2   A.  I'm not aware of any.

3   Q.  Now, you also gave him Miranda warnings, correct?

4   A.  Yes.

5   Q.  And asked him some questions after that?

6   A.  Yes.

7   Q.  He answered your questions, right?

8   A.  He did.

9   Q.  When you first pulled over the vehicle, you asked

10  Ms. Ramon-Baez where she was coming from, right?

11  A.  Yes.

12  Q.  And you had information as to where they were, correct?

13  A.  Not specifically, but I had a general idea of where they

14  were coming from.

15  Q.  At the very least you knew they were in Louisiana, correct?

16  A.  Yes.

17  Q.  And you knew where they had come from, correct?

18  A.  I knew they were leaving New Orleans.

19  Q.  But you knew they had come from New Jersey, right?

20  A.  I assumed it was somewhere in the northeast, but I didn't

21  know exactly where.

22  Q.  When you asked where she was coming from and she said they

23  had been in Alabama for two days you knew that wasn't true,

24  right?

25  A.  Correct.

1   Q.  You have no information at the time when you stopped the

2   vehicle about Mr. Gomez had been seen receiving any bags from

3   anyone, correct?

4   A.  The only information that I was provided was a description

5   of the vehicle and an approximate time of when they wanted me

6   to stop it.

7   Q.  So the answer to my question is yes, you had no information

8   whether he had accepted packages from anyone at that point when

9   you stopped him?

10  A.  I had no information about him personally receiving

11  packages.

12  Q.  And you had no information that he was seen giving anyone

13  any packages, correct?

14  A.  Correct.

15  Q.  Nor did you have any information that Ms. Baez was seen

16  accepting packages, correct?

17  A.  Correct.

18  Q.  Or giving packages to anyone, correct?

19  A.  Correct.

20  Q.  And you had no information that Mr. Gomez was observed

21  engaging in any drug-related activity, correct?

22  A.  I wasn't involved with any of the surveillance.

23  Q.  I'm sorry?

24  A.  I wasn't involved with any of the surveillance.

25  Q.  You had no information as to what was known or not known,

1    correct?

2    A.   Correct.

3    Q.   When you opened the suitcases there was no odor of any

4    narcotics coming from the suitcases, correct?

5    A.   Not that I can recall, no.

6              MS. TODD:   May I approach the witness, your Honor.

7              THE COURT:   Yes.

8    Q.   Trooper Whittaker, I've handed you a series of exhibits,

9    Defense Exhibits D, E, F, and G.   Do you recognize the photos

10   in these exhibits?

11   A.   Yes.

12   Q.   What do you recognize Defense Exhibit D through F to be?

13   A.   D is the Whole Foods bag in the compartment, E is a picture

14   of the front driver's seat, F is a picture of the passenger's

15   seat, the front, and did you want me to identify G, too?

16   Q.   And G.

17   A.   G is the rear cargo area with the suitcases.

18   Q.   And is Defense Exhibit D through G a fair and accurate

19   representation of the vehicle as it appeared to you on the

20   night of December 7, 2014?

21   A.   Yes.

22             MS. TODD:   Defense offers Exhibits D, E, F, and G.

23             THE COURT:   Any objection?

24             MR. EGAN:   No objection.

25             THE COURT:   Defendant's Exhibits D, E, F, and G are

GB9MGOM4                          Whittaker - cross

1    received.

2                (Defendant's Exhibits D, E, F, and G received in

3    evidence)

4                MS. TODD:  I would ask to publish each.  We will start

5    with D.

6                THE COURT:  Yes.

7    Q.  Can you tell us, Trooper Whittaker, what Exhibit D

8    represents?

9    A.  Exhibit D is the Whole Foods bag in the compartment under

10   the second row seat.

11   Q.  That was found inside the trap, correct?

12   A.  Yes.

13   Q.  And Defense Exhibit E.

14   A.  That's a photo of the front of the vehicle from the

15   driver's side.

16   Q.  And Defense Exhibit F.

17   A.  That's a photo of the front interior of the vehicle from

18   the passenger's side.

19   Q.  And Defense Exhibit G.

20   A.  That's a photo of the rear cargo area with the suitcases.

21   Q.  How many suitcases were in the back of that vehicle?  More

22   than one?

23   A.  I don't recall.  I think there was more than one, but I

24   don't remember an exact number.

25                MS. TODD:  Just a moment, your Honor.

CB9MGOM4                    Whittaker - cross

1          THE COURT:  Yes.

2    Q.  Now, the government asked you about Government Exhibit

3    GX102, which is the license plate?

4    A.  Yes.

5    Q.  And you testified that it had a black plastic over it?

6    A.  Yes.

7    Q.  Isn't it true that the black plastic that you are referring

8    to is a license plate frame, goes around the frame of the

9    license plate?

10   A.  It's hard to tell from this picture, and I don't

11   specifically remember, but it appears to be a license plate

12   frame, but what I'm not certain of is, I don't know why that

13   piece is covering up the state.

14   Q.  Trooper Whittaker, do you have Government Exhibit 101 in

15   front of you?

16   A.  Yes.

17   Q.  The plastic covering that you are referring to is the frame

18   around the license plate, correct?

19   A.  There is a frame around the license plate.

20          MS. TODD:  Nothing further.

21          THE COURT:  Any redirect?

22          MR. EGAN:  Nothing, your Honor.

23          THE COURT:  You can step down, Trooper.

24          (Witness excused)

25          THE COURT:  Government have other evidence?

1             MR. EGAN:  The government rests, your Honor.

2             THE COURT:  Ms. Todd, do you wish to be heard at side

3    bar?

4             MS. TODD:  Yes, your Honor.

5             THE COURT:  All right.

6             MS. TODD:  I ask the defendant to join us.

7             THE COURT:  Absolutely.

8             (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2         MS. TODD:  We are at that moment.  Rule 29.

3         THE COURT:  You wish to make any argument?

4         MS. TODD:  Yes, your Honor.  I would ask that the case

5    be dismissed pursuant to Rule 29 because the government has

6    failed to establish legally sufficient evidence that Sandy

7    Gomez knowingly agreed and knowingly joined in this conspiracy.

8         THE COURT:  I will reserve decision.

9         Ms. Todd, what's the defense case going to be?

10        MS. TODD:  The defense case is going to be Mr. Gomez's

11   son.  He is outside.  And then Mr. Sandy Gomez intends to

12   testify in his own behalf.  I think given the hour I think we

13   are going past 5:00.  Subsequent to his testimony then,

14   Ms. Jessica Hernandez will testify sometime tomorrow.

15        THE COURT:  Who is she exactly?

16        MS. TODD:  She is the mother of his children who

17   resides in Texas, and Sandy Gomez, Jr. is his son.

18        THE COURT:  Are you prepared to proceed then?

19        MS. TODD:  Yes, your Honor.  I am prepared to start

20   with his son.

21        MR. EGAN:  Your Honor, can we have a moment.  These

22   drugs need to get into the vault by 4:30.

23        THE COURT:  You want me to take a brief recess?

24        MR. EGAN:  We can have the agent come to the rail.

25        MR. COOPER:  One other point, your Honor.  Prior to

GB9MGOM4                    Whittaker - cross

1    Mr. Gomez testifying, if your Honor could allocute him on his

2    right not to testify as well.

3            THE COURT:  Ok.

4            Mr. Gomez, you understand that you have both the right

5    to testify in your defense and the right not to testify.  You

6    heard me tell the jury a number of times already that if you

7    chose not to testify that no inference could be drawn against

8    you because of your decision not to testify.  Understand that

9    you have a right to testify and a right not to testify and that

10   no adverse inference could be drawn against you if you chose

11   not to testify.

12           I gather, from what Ms. Todd has told me, that you

13   have concluded, after consulting with her, that it is in your

14   best interests to testify in your defense in this case.

15           THE DEFENDANT:  Yes, sir.

16           MR. COOPER:  Thank you, your Honor.

17           THE COURT:  Are we all set?

18           MR. COOPER:  Yes.

19           (Continued on next page)

20

21

22

23

24

25

```
 1                    (In open court)

 2                THE COURT:  Is the defense prepared to proceed?

 3                MS. TODD:  Yes, your Honor.

 4                THE COURT:  Ms. Todd, call your first witness.

 5                MS. TODD:  The defense calls Sandy Gomez, Jr. to the

 6      stand.

 7       SANDY BRYANT GOMEZ Jr.,

 8            called as a witness by the Defendant,

 9            having been duly sworn, testified as follows:

10      DIRECT EXAMINATION

11      BY MS. TODD:

12      Q.  Good afternoon, Mr. Gomez.

13      A.  Good afternoon.

14      Q.  You are here pursuant to a subpoena, right?

15      A.  Yes, ma'am.

16      Q.  How old are you?

17      A.  I'm 21.

18      Q.  When did you turn 21?

19      A.  Today.

20      Q.  Happy birthday.

21      A.  Thank you.

22      Q.  Where do you live?

23      A.  I live in Hackensack, New Jersey.

24      Q.  I'm sorry?

25      A.  Hackensack, New Jersey.
```

1   Q.  Since when have you lived in Hackensack, New Jersey?

2   A.  I have lived in Hackensack, New Jersey, since before 2014

3   Halloween.

4   Q.  When you say before 2014 Halloween?

5   A.  Before 2014 October 30.

6   Q.  Are you in school?

7   A.  Yes, I am.

8   Q.  And where do you go to school?

9   A.  Bergen Community College.

10  Q.  What are you studying?

11  A.  Computer science.

12  Q.  And do you know Sandy Gomez?

13  A.  Yes, I do.

14  Q.  And how do you know him?

15  A.  He is my dad.

16  Q.  Have you always lived in Hackensack, New Jersey?

17  A.  No, I have not.

18  Q.  Who do you live with in Hackensack, New Jersey?

19  A.  I live with my mother.

20  Q.  And up until the time that you came in October 2014 to live

21  with your mother, with whom did you reside?

22  A.  With my dad.

23  Q.  And where was that?

24  A.  That was San Antonio, Texas.

25  Q.  Did you go to school while you lived in San Antonio, Texas?

1   A.  Yes, I did.

2   Q.  Can you tell us how often you saw your dad when you lived

3   with him?

4   A.  I saw him every day after school.

5   Q.  And in August 2014, how often did you see your dad?

6   A.  I saw him every day after school.

7   Q.  In September 2014, how often did you see him?

8   A.  Every day after school.

9   Q.  And up until the time you came close to Halloween in

10  October 2014, how often did you see your dad?

11  A.  I'm sorry.  Can you repeat that?

12  Q.  Up until when you came around Halloween in October 2014 to

13  New Jersey, how often had you seen your dad?

14  A.  I saw him at a funeral towards the end of November.

15  Q.  Prior to that, in October?

16  A.  In October.  I saw him every day up until I left.

17  Q.  And after you moved back to New Jersey with your mom, when

18  was the next time you saw your dad?

19  A.  At the funeral.

20  Q.  When was this funeral?

21  A.  The end of November.

22  Q.  What year?

23  A.  2015.

24  Q.  2015?

25  A.  '15, that's the year.

1  Q.  Are you sure about that?

2  A.  2014.  Yes.  2014.  I apologize.

3  Q.  You saw your dad 2014 at a funeral in November?

4  A.  Yes.  It was a funeral for a cousin in November of 2014.

5  Q.  And whose funeral was this?

6  A.  It was a cousin.  His name was Dorbi.

7          THE COURT:  Can you spell that, please.

8          THE WITNESS:  I'm not quite sure how to spell it.

9          THE COURT:  Give us your best.

10         THE WITNESS:  D-o-r-b-i.

11         THE COURT:  You can pull the chair a little closer to

12  the mic and pull the mic closer to you.

13         THE WITNESS:  The name was Dorbi, D-o-r-b-i.

14  Q.  At this funeral, who else was there?

15  A.  I saw the side of my family, I saw my father, my

16  grandmother, my mother was there.  Aunts, uncles, and cousins.

17         MS. TODD:  Nothing further, your Honor.  Thank you.

18         THE COURT:  Cross-examination.

19         MR. EGAN:  No questions, your Honor.

20         THE COURT:  You can step down, Mr. Gomez.

21         (Witness excused)

22         THE COURT:  Defense call its next witness.

23         MS. TODD:  Defense calls Sandy Gomez to the stand.

24   SANDY GOMEZ,

25      the Defendant, called as a witness on his own behalf,

```
 1            having been duly sworn, testified as follows:

 2            THE COURT:  Mr. Gomez, you might want to pull the

 3   chair a little closer to the mic.

 4            MS. TODD:  Can I just have a moment, your Honor.

 5            THE COURT:  Yes.

 6            MS. TODD:  Thank you.

 7   DIRECT EXAMINATION

 8   BY MS. TODD:

 9   Q.  Good afternoon, Ms. Gomez.

10   A.  Good afternoon, Ms. Todd.

11   Q.  I need to ask you to speak up and speak into the microphone

12   so everybody can hear.

13   A.  I'm sorry.  Good afternoon, ma'am.

14   Q.  How are you?

15   A.  Ok.

16   Q.  Take a deep breath.  Are you married?

17   A.  No.

18   Q.  Any children?

19   A.  Yes, ma'am.

20   Q.  How many?

21   A.  Four.

22   Q.  How old are your kids?

23   A.  Twenty-five -- I'm sorry.

24            THE WITNESS:  Could we take a minute, please?

25            THE COURT:  Yes.
```

Gomez - direct

 1              THE WITNESS:  Use the bathroom.

 2              THE COURT:  We are going to take a brief recess,

 3    ladies and gentlemen.  Don't discuss the case.  Keep an open

 4    mind.  We will back to you shortly.

 5              (Jury not present)

 6              THE COURT:  You can step down, Mr. Gomez.

 7              We will resume in about five minutes.

 8              (Recess)

 9              THE COURT:  We are going to bring the jury in.

10              Mr. Gomez, you can retake the stand.

11              (Jury present)

12              THE COURT:  Please resume, Ms. Todd.

13              MS. TODD:  Thank you, your Honor.

14    BY MS. TODD:

15    Q.  Mr. Gomez, before the break I asked you how old were your

16    children.  Can you tell us?

17    A.  Yes, ma'am.  I got four kids.  My oldest is 25, my other

18    son is 21, and I have a 13-year-old and an eight-year-old.

19    Q.  Up until the time of your arrest on December 7, 2014, where

20    did you reside?

21    A.  Converse, Texas.

22    Q.  And up until your arrest, where did your children reside?

23    A.  Converse, Texas.

24    Q.  How long had you resided in Converse, Texas?

25    A.  Since the end of 2003 until the day of my arrest.

1  Q.  While you lived in Texas from 2003 up until your arrest,

2  were you employed?

3  A.  Yes, ma'am.

4  Q.  Can you tell the jurors what you did for a living and where

5  you worked between that time?

6  A.  Yes.  When I moved to Texas I started working for a company

7  called Santex International Trucking.  I was a parts salesman.

8  From there I moved on to another job, SI Precast, doing funeral

9  service attending, making caskets.

10         THE COURT:  Could you spell those names.  Begin with

11  the first name.  Santex.

12         THE WITNESS:  S-a-n-t-e-x International Trucking.

13         THE COURT:  And what was the second business?

14         THE WITNESS:  SI Precast.

15  A.  At the moment my family was growing, got me another job as

16  a driver for Bill Miller's Barbecue.  Pursued a career as a

17  driver and that was in 2005.  Became the driver for -- I'm

18  sorry.  From SI Precast in 2005, I pursued another job as a

19  driver for Bill Miller's Barbecue, lasted from 2008 to 2009.

20         And I apply for another company called PVI as a driver

21  delivering food to the prisons, federal prisons, and picking up

22  food in Washington State and delivering it to the stores.  And

23  from 2009 to 2011, I was working for PVI.  From PVI I

24  transferred to another company called JTM, the main carriers of

25  GMC products, like for the Toyota plant, for GMC, Toyota, and

1    Chevrolet.  And my last job that I was doing is, I was working

2    in the oil field.

3    Q.  Did you work anywhere else at the time you were working at

4    the oil field?

5    A.  Yes, ma'am.  I was hired on a part-time job doing metal

6    roofing.  It was called -- I'm sorry -- Quality Metals.

7    Q.  What did you do at Quality Metals?

8    A.  I was a machine operator making metal roofs.

9    Q.  What did you do at the oil fields?

10   A.  I used to carry in the trucks sand and supplies to the men

11   working in the field.

12   Q.  At the time of your arrest were you working?

13   A.  Yes, ma'am.

14   Q.  Where were you working at that time?

15   A.  I was working for a company called Condor Trucking.

16               THE COURT:  Condor?

17               THE WITNESS:  Yes.

18               THE COURT:  C-o-n-d-o-r?

19               THE WITNESS:  Yes.

20   Q.  What did you do at Condor Trucking?

21   A.  That was the company that works in the oil field.  We used

22   to provide the material, sand, supplies and stuff for the

23   people that were working in the oil field.

24   Q.  Since your indictment in this case, where have you resided?

25   A.  In the Bronx.

GB9MGOM4                    Gomez - direct

1  Q.  Do you currently work?

2  A.  Yes, ma'am.

3  Q.  Where do you work?

4  A.  I work in strong glass temperament.

5  Q.  What do you do there?

6  A.  I'm a machine operator.  I design cut glass, I polish it,

7  set up the order for the customers.

8  Q.  How many days do you work at the glass cutting place?

9  A.  I work six days a week.

10  Q.  What are your hours?

11  A.  From 8 in the morning to 6:00 in the afternoon.

12  Q.  Have you ever at any point in your life lived in New

13  Orleans?

14  A.  No, ma'am.

15  Q.  How many siblings do you have?

16  A.  Two.

17  Q.  And what are their names?

18  A.  Yanira Ortiz and Jorge Gomez.

19  Q.  Jorge Gomez, is that the Jorge Gomez we have been

20  discussing during this trial?

21  A.  Yes, ma'am.

22  Q.  And how would you describe your relationship with Jorge?

23  A.  We didn't have a good relationship.

24  Q.  In 2014, did you have any family residing in New York?

25  A.  Yes, ma'am.

1   Q.   Which family member?

2   A.   My cousin that passed away, like a little sister, Dorivee

3   Alvarez.

4           THE COURT:   What's the last name?

5           THE WITNESS:   Alvarez.

6           THE COURT:   She was your cousin?

7           THE WITNESS:   Yes.

8   Q.   When did she pass?

9   A.   She died of cancer on November 19, 2014.

10   Q.   And where was she buried?

11   A.   She was buried in New Jersey.

12   Q.   Did you attend her funeral?

13   A.   Yes, ma'am.

14   Q.   When was this?

15   A.   The funeral was on Monday, November 24, 2014.

16   Q.   When did you arrive in New Jersey in 2014?

17   A.   In November 22, 2014.

18   Q.   And prior to November 22, 2014, had you come to New Jersey

19   during that year?

20   A.   No, ma'am.

21           MS. TODD:   Your Honor, may I approach.

22           THE COURT:   Yes.

23   Q.   Mr. Gomez, I am showing you what has been marked as Defense

24   Exhibit C.   Do you recognize that document?

25   A.   Yes, ma'am.

1   Q.   What do you recognize it to be?

2   A.   It's a death certificate.

3   Q.   And a death certificate of who?

4   A.   For my passed-away cousin.

5          MS. TODD:  Your Honor, at this time we offer

6   Defendant's Exhibit C.

7          THE COURT:  Any objection?

8          MR. COOPER:  No objection.

9          THE COURT:  Defense Exhibit C is received.

10         (Defendant's Exhibit C received in evidence)

11         MS. TODD:  May I approach, your Honor.

12         THE COURT:  You may.

13  Q.   Can you tell us the date of your cousin's death?

14  A.   It was November 19, 2014.

15  Q.   Besides coming to the funeral, did you have any other

16  reason for coming to New Jersey at that time?

17  A.   No, ma'am.

18  Q.   After the funeral, what was your intention?

19  A.   I was going to return home to be with my kids.

20  Q.   Now, I want to talk to you about your trip coming into New

21  Jersey around that time.  Prior to the circumstances leading up

22  to your cousin's death, when was the last time you had spoken

23  with your brother Jorge?

24  A.   It had been a while.  We hadn't spoke for years.  The only

25  time we kind of talked is when a family death or somebody was

 1   sick, but we rarely spoke.

 2   Q.  And within days of your arrival into New Jersey in November

 3   2014, did you speak with your brother Jorge?

 4   A.  Yes, ma'am.

 5   Q.  What was the nature of those conversations?

 6   A.  Preparation for the funeral and how we are going to move

 7   around family just to get together to mourn the death of a

 8   cousin.

 9   Q.  When you arrived in New Jersey in November 2014, where did

10   you stay?

11   A.  I was staying with my sister.

12   Q.  At any point in time did you end up staying with your

13   brother, Jorge?

14   A.  Yes.

15   Q.  How did that come about?

16   A.  There was too many people coming over.  It wasn't enough

17   space, so my mother arranged for me to stay with my brother.

18   Q.  And while you were with your brother how did you get

19   around?

20   A.  Well, I wasn't getting around because we were using the

21   cars to move the family to do the errands for the funeral.

22   Q.  Where was Jorge during the time that you were doing that?

23   A.  I have no idea.  I was doing the preparations with the

24   family.

25   Q.  And Ms. Ramon-Baez, when did you first meet her?

 1    A.  I don't remember exact date, but I just met her one day.

 2    She came over the house to talk to Jorge.

 3    Q.  Did you know her before you came for the funeral?

 4    A.  No.

 5    Q.  And did you have an understanding of who she was in

 6    relation to Jorge?

 7    A.  Yes.  It's his girlfriend.

 8    Q.  Did you go to Louisiana with her?

 9    A.  Yes, ma'am.

10    Q.  How many times?

11    A.  Two times.

12    Q.  When was the first time?

13    A.  The first time was on November 26, 2014.

14    Q.  Was this before or after the funeral?

15    A.  That was before the funeral.

16    Q.  So you went to Louisiana before the funeral?

17    A.  I'm sorry.  After the funeral.  I apologize.

18    Q.  Why were you going to Louisiana with her?

19    A.  At the moment I met her my brother asked me, they needed a

20    little time because they were going through a lot of problems,

21    if I could do him a favor and take his girlfriend because she

22    needed the time, and he knows I was a driver and I live in that

23    type of town, to take her around so she could see some family.

24    They needed some time apart.

25    Q.  Why didn't Jorge just take her himself?  Why did he ask

1   you?

2   A.  At that time Jorge couldn't leave the state.  He was

3   secluded in New Jersey with an ankle bracelet on parole.

4   Q.  Did you fly or did you drive?

5   A.  We flew.

6   Q.  Did you have any conversation during that flight to

7   Louisiana in November 2014?

8   A.  Yes, ma'am.

9   Q.  What did you talk about?

10  A.  Mostly she was complaining about her relationship with

11  Jorge, the things that she was going through, that she was

12  tired, him having other women, and complaining about the pains

13  that she was suffering from the medications she was taking, and

14  she wanted a better life.  She didn't want to be around him no

15  more, but she didn't know how to do it.

16  Q.  Did you discuss with Ms. Ramon-Baez at any time during that

17  trip picking up drugs from someone in Louisiana?

18  A.  No, ma'am.

19  Q.  Did you know whether she was involved with drugs?

20  A.  No.

21  Q.  Did she discuss with you whether Jorge was involved with

22  drugs?

23  A.  No.

24  Q.  Did Jorge share with you whether he was involved with

25  drugs?

CB9MGOM4                    Gomez - direct

1   A.  No, ma'am.

2   Q.  When you stayed with Jorge in November 2014, was Ms. Baez

3   living with Jorge at the time?

4   A.  No, ma'am.

5   Q.  Did you observe during the time that you were at Jorge's

6   house any packaging of drugs at his house?

7   A.  No, ma'am.

8   Q.  How did you pass your time while you were at his house?

9   A.  I just slept there most of the time.  I was with the family

10  doing errands.  I was only there at nighttime.

11  Q.  When you say the family, who are you referring to?

12  A.  The family came for the funeral.

13  Q.  And who is that?

14  A.  My cousins, mother, uncles.

15  Q.  While you were in New Orleans did you meet any of

16  Ms. Baez's friends?

17  A.  No, ma'am.

18  Q.  Did you meet any family members of hers?

19  A.  No, ma'am.

20  Q.  And when you were in New Orleans how did you spend your

21  time?

22  A.  Well, I just was in the room and one day when she said she

23  was going to meet her friends, I just went to the casino.

24  Q.  Did she come to the casino with you?

25  A.  We walked together, but she went her own way.

1    Q.  How long were you in the casino by yourself?

2    A.  The whole day, about five hours, maybe more.

3    Q.  Did you meet up together at some point later?

4    A.  She bumped into me in the casino, but we weren't together.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. TODD:

2   Q.  At what time did you guys come back together?  Withdrawn.

3       What time did you meet up?

4   A.  It was around 5, 6:00 in the afternoon.

5   Q.  And where did you meet up?

6   A.  I was in the slot machine playing when she walked by me and

7   asked me what I was doing.

8   Q.  And describe your observations of her.

9   A.  She looked upset.  She was complaining that Jorge told her

10  that she need to get home right now.

11  Q.  And so what did you do then?

12  A.  I asked her what happened.  She said she didn't want to

13  talk about it, that here's the information, to book a flight,

14  and for us to get back home.

15  Q.  What information did she provide to you?

16  A.  She gave me the, the airlines and the tickets leaving at

17  that day.

18  Q.  But you were not scheduled to leave at the time that you

19  left?

20  A.  No.

21  Q.  When were you scheduled to leave?

22  A.  That was on the -- I'm sorry.  I don't remember, but it was

23  supposed to be, I was supposed to be there for like three or

24  four days.

25  Q.  When you flew down to Louisiana on that November trip, who

1  paid for the tickets?

2  A.  My brother.

3  Q.  You didn't buy the tickets on your credit card?

4  A.  No, ma'am.

5  Q.  Coming back, who paid for the tickets?

6  A.  I did.  She told me, like I said, that he want us to head

7  back home right now, and I told her, What about the tickets we

8  have?  And she mention, I just want to give you the

9  information; he will deal with it when we get back home.

10  Q.  Now, you took another trip with her in December, on

11  December 4, 2014, correct?

12  A.  Yes, ma'am.

13  Q.  When were you scheduled to return to work?

14  A.  I was scheduled to work, return to work December 8.

15  Q.  And so why were you taking a second trip on December 4?

16  A.  At that moment, it wasn't decided.  I was looking for a

17  flight ticket to go back home, but because of the holidays, it

18  was Christmas in December, and before the holidays the tickets

19  were kind of expensive, so at the moment I was just surfing,

20  trying to find a flight to leave to Texas.

21  Q.  How much were the tickets that you were looking at?

22  A.  Costed about $600 or more.

23  Q.  And what was your understanding of why you were driving to

24  Louisiana?

25  A.  Like I explained, at first my brother asked me for do him a

1    favor.  He bought, he was a, his job was sales and repair cars.

2    Friend of his, a mechanic, they were partners.  So they used to

3    buy cars and repair them and sell them to customers.  He told

4    me he had a buyer for a new car that he have, and he wanted me

5    to drive the car to the buyer.  And in a sense, sounded like he

6    was trying to help me so I could get home.  So I told him, I

7    said, I'll think about it.

8    Q.  Let me ask you, why didn't Jorge drive the car to the new

9    buyer himself?

10   A.  Like I said before, Jorge couldn't get out of the state.

11   Jorge was on ankle bracelet on parole.  He couldn't leave the

12   state.

13   Q.  At what point did you decide that you would drive this

14   vehicle?

15   A.  Well, he asked me, he was waiting for the buyer to confirm

16   that he would take the car and I told him I would take the car

17   and drop it off if he pay for expenses.

18   Q.  How much were the expenses?

19   A.  Probably like a thousand dollars.  I told him, You pay gas

20   and hotel, I will take it.

21   Q.  How were you planning to get home from Louisiana once you

22   got there?

23   A.  It would be cheaper for me from Louisiana, like I said, a

24   hundred, hundred twenty bucks for a flight.  Louisiana's like

25   border with Texas.

1   Q.  During the discussion with Jorge, did he tell you the dates

2   you were leaving for Louisiana in December?

3   A.  No, ma'am.

4   Q.  When did you learn you were leaving?

5   A.  He called me and asked, asked me, did the owner of the car,

6   the new buyer was ready to take the truck if I could take it.

7   He called me on December 4 and asked me if I could take the

8   truck.

9   Q.  Before departing on your trip, what, if anything, did you

10  do?

11  A.  Well, I show up at his house.  He told me, Take a look at

12  the truck, see if it's drivable.  So I went, did a inspection,

13  looked, check out the gas, fuel -- I mean check out the fuel,

14  oil, check tires.  In the process I was bringing my luggage to

15  put it inside the vehicle.  I couldn't fit what I have inside

16  the car, so at that moment I told him, I said:  Look,

17  something's wrong with this car because the back seat is

18  broken.  It's stable, it don't move.  And he asked me, like,

19  What do you mean.  I said I have a similar truck like this one

20  and when you move, you sit in it, try and put stuff in the back

21  of the truck, you could push the seat forward and it stay flat

22  so you could stuff any, any luggage, anything you carry in the

23  trunk of the car.

24  Q.  And what date was this that you were having this

25  conversation with him?

1   A.   December 4.

2   Q.   And did you at some point speak with someone else regarding

3   the seat on that date?

4   A.   Yes, that day he said he was going to call his partner or

5   friend or owner of the truck, so he called the guy so he could

6   explain to me because he keep telling me I was wrong, that was

7   the way the vehicle was.

8   Q.   The owner of the truck, who did you understand him to be?

9   A.   He was a mechanic that worked with Jorge.  They used to do

10  jobs together in the sense that Jorge buy the cars, he repair

11  them, fix them, and they sell it.  He told me his partner's

12  name, because they were partners in the business of buying and

13  selling cars, so he told me, Speak to Samuel; that's my friend

14  that repair the cars.

15  Q.   How many pieces of luggage did you have on that trip with

16  you?

17  A.   I had two pieces of luggage.

18  Q.   And why did you have two pieces of luggage?

19  A.   That was the clothes, the luggage I came in when I came

20  from Texas.

21       MS. TODD:  Ms. Thomas, could I ask you to publish

22  Government Exhibit 205T, please.

23       Your Honor, may I approach?

24       THE COURT:  Yes.

25  Q.   Mr. Gomez, I'm going to ask you some questions about the

1    conversation you had with the individual that you believed to

2    be the owner of the truck.  This is Government Exhibit 205T,

3    December 4, approximately 5:50 p.m.  What did you believe his

4    name was?

5    A.   Samuel.

6    Q.   And how did you come to that understanding?

7    A.   Because that's why my brother told me, that that was his

8    partner, the mechanic that fixed the truck.

9    Q.   If we could turn to page 2, please, let me direct your

10   attention to four columns from the top, where you say, "Well,

11   look, I -- myself and this guy."  Who is this guy you're

12   referring to?

13   A.   Jorge.

14   Q.   "We were checking out the car and I was explaining to him

15   that I used to have a car just like that."  What did you mean

16   by that?

17   A.   Jorge told me to look at the car; when I told him the

18   situation in the car was broken, I told him I have a truck

19   similar to that.  I have the same car.  It was a different

20   model.

21   Q.   Did you at the time know whether or not there was a trap in

22   the vehicle?

23   A.   No, ma'am.

24   Q.   The confidential source you believed to be Samuel says,

25   "Right," and then you respond, "The issue with me is, you know,

1    when you're traveling and you go to different places, that,

2    that, that car has a space in there and the seats go down."

3    What are you talking about?

4    A.   I was talking about the trunk space, that the seat's

5    supposed to go set down flat so you could put luggage.   When

6    you're traveling, you buy stuff -- like I said, I was

7    purchasing stuff up there.   If I stop in a town, see something

8    for my kids, buy it and put it in the trunk.

9    Q.   The next page, page 3 -- I'm sorry.   Let's go back to page

10   2 for a minute.   At the very bottom the confidential source

11   says:   "Because the thing is, the thing is, the back of the

12   seat, the back of the seat is broken.   You know what I'm

13   saying?"   And you respond yes.   The confidential source then

14   says:   "The back of the seat is a little broken, but with that

15   car, we -- I mean, it can't be that we're the unluckiest people

16   because that car has been driven a lot and it's never had a

17   problem."   What did you understand him to mean when he said

18   because the car has been driven a lot and it's never had a

19   problem?

20   A.   That enginewise --

21             MR. COOPER:   Objection.

22             THE COURT:   Grounds?

23             MR. COOPER:   Speculation.

24             THE COURT:   Overruled.

25   Q.   What did you understand him to mean when he said because

1   that car had been driven a lot and it's never had a problem?

2   A.  That it's in working condition enginewise and motor, that

3   it's drivable, it would have no problem.

4   Q.  On that same page, the next column, you say:  "OK.  Well,

5   then, it's like I said to him, he was criticizing me."  Who are

6   you referring to as criticizing you?

7   A.  Like I was trying to explain, we had, when I had a

8   conversation with the guy, it's like a third party.  It's my

9   brother's partner, so he's trying to explain to me that I'm

10  wrong what I'm telling him.  I'm looking at this vehicle, if

11  something's broken, I don't want to be held responsible for it.

12  So I said when he's criticizing me, he told me like I don't

13  know what I'm talking about, so that's why, the reason Samuel

14  came to explain to me, to show me that I was wrong and he was

15  right, the way it is, the vehicle's fine.

16  Q.  And then you say later down in that paragraph, "And I said

17  to him" -- you see that -- "that it's because of the part, it's

18  the part that make it look different."  Do you see that?

19  A.  Yes.

20  Q.  What did you understand by saying that -- what were you

21  trying to say?

22  A.  I was trying to say the seat's supposed to lay flat to make

23  the whole trunk lay down like a bigger compartment -- I mean,

24  compartment, a bigger space to put the luggage in.

25  Q.  And then you say to him, "But if you tell me there's no

 1  problem, I did it because he said to me, Check it out for me,

 2  you know what I'm saying?  And excuse me, but we're waiting for

 3  them to call him and I was being told no, hold on, don't send

 4  the guy yet."

 5  A.  OK.

 6  Q.  Explain to us what you're saying to him.

 7  A.  When I told him, if he said, he stand up like that, it's

 8  OK, it's not a problem.  Who is me to argue, and when I was

 9  telling him about, they told me I'm talking about my brother

10  telling me, like I thought they were together, whoever the

11  buyer is, to call him, they told her to wait before I could go

12  take and drop off the truck.

13  Q.  Now, on page 5, at the bottom, you say, in the middle of

14  the paragraph:  "The problem is that where it's going, those

15  people check everything, but don't worry.  It's fine.  Let me

16  see what we're going to do."  What did you mean by that?

17  A.  The same reason when I was looking at the truck, to see

18  there's a broken seat, I didn't want to take it to the owner,

19  new owner and he tell me, What is this, it's broken, and I'll

20  be held responsible for something.  I'm just doing a favor

21  delivering it to a new buyer.

22  Q.  And then on page 6, you say, "I didn't feel safe."  What do

23  you mean by that?

24  A.  At the same token, they're saying if I'm supposed to be

25  delivering this truck to a new buyer and the guy said that he

 1   don't want it, that mean I would be held responsible, I would

 2   have to take the blame for something I didn't do.

 3            THE COURT:  We're on page 6, the top of the page?

 4            MS. TODD:  Top of the page, yes, your Honor.

 5   BY THE COURT:

 6   Q.  And what was the name of the buyer that you were told that

 7   you were delivering this vehicle to in Louisiana?

 8   A.  My brother told me his name was Charlie.

 9            MS. TODD:  If we could have Government Exhibit 206T,

10   please.

11   Q.  This is a conversation on December 5, 2014.  Where are you

12   at this point, if you recall?

13   A.  I was in the freeway driving to Louisiana.

14   Q.  Do you have that in front of you, Mr. Gomez, 206T?

15   A.  Yes.

16   Q.  And this call is at 11:28 a.m.?

17   A.  Yes.

18   Q.  And the call is to the confidential source.  Who made this

19   call?

20   A.  I asked Caronlay could she please call Charlie so we could

21   give him the info, because I wanted to be ready when he show up

22   so he could go pick up his vehicle.

23   Q.  Did she call Charlie?

24   A.  She dialed the number.

25   Q.  And the confidential source says, "Hello," and you respond,

1  "Yes.  What's going on Charlie?"  At that point who do you

2  think you're talking to?

3  A.  To the new owner of the truck named Charlie.

4  Q.  And the confidential source says:  "Hey.  Hello.  How are

5  you?"  And you respond, "Fine.  And you?"  And then the

6  confidential source says, "Fine, thank God.  Working.  What's

7  going on?"  And you say, "Yes, know nothing, just calling you

8  to see how you are, to let you know that I'll be there early

9  tomorrow morning -- early tomorrow."  What were you trying to

10  tell this Charlie person?

11  A.  I was communicating I was on the way, that I'll be there

12  tomorrow to deliver the truck.

13  Q.  And then the confidential source says:  "Oh, all right.

14  Well, OK.  No problem then.  As soon as you're around, let me

15  know so that I send for it, and I'll, and I'll see if I can

16  have the other one ready so I can bring it down for you."  What

17  did you understand that to mean?

18  A.  Honestly, I don't know what he was talking about.  I

19  figured that because the reason that he was supposed to drop me

20  off -- pick up the car, drop me off, and I would go on my way.

21  Q.  Mr. Gomez, did you have any knowledge that there was a trap

22  in the truck?

23  A.  No, ma'am.

24  Q.  Any knowledge that you'd be transporting narcotics on

25  December 4, 2014?

 1   A.   No, ma'am.

 2   Q.   Did you have any knowledge that you'd be picking up

 3   narcotics from anyone on --

 4   A.   No.

 5   Q.   Let me finish the question.

 6   A.   I'm sorry.

 7   Q.   Did you have any knowledge that you would be picking up

 8   narcotics from anyone on December 4, 2014?

 9   A.   No.

10   Q.   And did you have any knowledge that the vehicle that you

11   were driving might be involved in narcotics trafficking?

12   A.   No, ma'am.

13   Q.   Did your brother get the truck because you asked him to get

14   it for you?

15   A.   No.

16   Q.   Did you contribute any payment toward that truck?

17   A.   No.

18   Q.   During your drive from New Jersey to Louisiana in December,

19   on this December 4, 2000, trip, did you and Ms. Baez discuss

20   narcotics?

21   A.   No.

22   Q.   What did you talk about on the second trip?

23   A.   She was still complaining about the relationship that she,

24   first time she try and take off, it was caught short and

25   telling me that she wanted to go check out Texas, see how's it

1   is, if she can move up there, if she can find a job.  I told

2   her:  Yeah, it's a nice place to raise your family.  Think

3   about your kid.  And she said she was tired of the relationship

4   they had because he had a lot of women and she felt she was

5   mistreated.

6   Q.  Once you arrived in Louisiana on the December 2014 trip,

7   did you call the intended owner of the truck?

8   A.  Yes.

9   Q.  And what was his name?

10  A.  Charlie.

11  Q.  And what was the substance of that conversation?

12  A.  Give me an address so I can meet him and give him the

13  truck.

14  Q.  Did you speak with him at the time you called?

15  A.  No.

16  Q.  What happened?

17  A.  I left a voicemail.

18  Q.  Did he call you back?

19  A.  Yes.

20  Q.  When?

21  A.  The following day.

22  Q.  What did you do in the meantime?

23  A.  We were there.  I asked her if she was hungry.  I told her

24  that I notice that the vehicle, the plates were loose, so we

25  went to an auto part and bought a cover plate, because the

1   plates was falling off; they was not properly put on.  So we

2   went to the store, bought it, got something to eat and came

3   back to the hotel, and I asked her:  The guy haven't called, so

4   whatever happen I let you know, and if you want to just, you

5   know, go out, something, she said no, she didn't want to do

6   nothing.

7           MS. TODD:  A moment, your Honor, please?

8           THE COURT:  Yes.

9           MS. TODD:  Ms. Thomas, if you could publish Government

10  Exhibit 101, please.

11  Q.  This is Government Exhibit 101.  The black frame around the

12  license plate, is that the frame that you're referring to?

13  A.  Yes, ma'am.

14  Q.  And when did you purchase that?

15  A.  I purchased that in Louisiana.

16  Q.  And why did you feel the need to put a frame around the

17  license plate?

18  A.  Well, I didn't feel the need.  The plates was falling off.

19  They only have one screw holding up, and the plate, they was

20  sideways.  One time I check, walking around the vehicle, and I

21  saw the plate, that it didn't have no frame, and it was falling

22  off.

23          MS. TODD:  We can take that down.

24  Q.  The next day, at what time, approximately what time did you

25  meet the owner of the truck?

 1  A.  I don't remember the time, but it was in the morning.

 2        THE COURT:  Could you establish what the day is that

 3  you're talking about?

 4        MS. TODD:  That was my next question, Judge.

 5  Q.  What date was this?

 6  A.  That was the 7th, December 7.

 7  Q.  And did you meet with the owner of the truck?

 8  A.  Yes, ma'am.

 9  Q.  Did you meet him alone, or was Ms. Baez present?

10  A.  No.  I went by myself.

11  Q.  Why did you go by yourself?

12  A.  She was in the room complaining that she had stomachache

13  and she wasn't feeling well, so she was thinking of taking her

14  medication.

15  Q.  So where did you meet this Charlie, who was supposed to

16  take ownership of the truck?

17  A.  He send me an address, told me to meet, I think it was a

18  Walgreen, the address he gave me.

19  Q.  Did you meet him at the address he gave you at Walgreens?

20  A.  Yes, ma'am.

21  Q.  What happened when you got to Walgreens?

22  A.  He showed up.  He told me to drive across the street.

23  There was like a store.  I told him:  Yeah, this is the truck.

24  What was the arrangement, for you to take me back to the hotel

25  or drop me off?  He said, Let me take a look at the truck.  So

1   I saw a store and I went into the store to get some souvenirs,

2   and I left him there.

3   Q.   What store did you go into to get souvenirs?

4   A.   They call it Winn-Dixie.

5   Q.   At some point did you come back outside?

6   A.   Yes, ma'am.

7   Q.   Did you meet up with the owner?

8   A.   He met me halfway.  I was inside the store when he came in

9   and told me that he didn't want the truck.

10  Q.   How long were you inside the store?

11  A.   I couldn't tell.  Maybe 20, 30 minutes.

12  Q.   And when he said he didn't want the vehicle, did he explain

13  why he didn't want the vehicle?

14  A.   No, ma'am.

15  Q.   Where was the vehicle when you came back out of the store?

16  A.   It was on the same spot that I left it.

17  Q.   So when he said he didn't want the vehicle, what did you do

18  then?

19  A.   I asked him, Listen, my thing was just to give you the

20  truck, give you the paperwork, and that was it.  And he said:

21  Well, I already spoke to your brother.  Take it back.  I don't

22  want nothing to do with it.

23  Q.   What did you do next?

24  A.   I called my brother and he -- I told him, Listen, I did you

25  the favor.  I got it all the way here.  The guy don't want the

Gb2Wgom5                        Gomez - Direct

1   truck.  I don't know what you want to do.  I'm going to leave

2   it and go home.  And he said, No, give it back to Caronlay, and

3   we drove it back.

4   Q.  Did you have a conversation with Caroline about driving the

5   truck back?

6   A.  At the moment when I spoke to him, I drove him back to the

7   truck I drove, stop and buy some breakfast to try and break up

8   the news to her that I didn't know what she was going to say

9   because we supposedly, when we went to buy the truck we were

10  going to go to Texas.

11  Q.  When you broke the news to her, what did she say?

12  A.  Well, when I got there, she looked like she was pretty

13  upset, but she looked like she already knew?

14  Q.  Why did you believe she already knew about it?

15  A.  She was just like complaining:  Why he want to do that to

16  me?  Look at my condition, I got all this problem, taking

17  medication, and I'm scared to drive all the way back to, by

18  myself, to New York, I never took a long trip like that.

19  Q.  What did you do then?

20  A.  I saw, Let's cool off, let's think about it, because I

21  really didn't want to come back.  I was willing to go home, I

22  was right there.  She kept saying, Why he going to do this to

23  me.  So I said watch the game, just to see what happen, relax a

24  minute and think about what, and call him and ask him.  She

25  said, she told me, He told me for me to drive it back.

1   Q.  What game were you watching?

2   A.  We were watching the Super Bowl.

3   Q.  Who was playing?

4   A.  North Carolina Panthers and the Saints, North

5   Carolina-Saints.

6   Q.  Where were you watching the game, on TV or at the game

7   itself?

8   A.  Well, when it saw it was on TV, but I was trying to offer

9   her to go watch the game somewhere else, but we were watching

10  it on TV.

11  Q.  And do you recall the score?

12  A.  At the moment, it was 17-3, but I kind of really don't

13  remember.  I don't recall.

14  Q.  Did you watch the entire game?

15  A.  No, ma'am.

16  Q.  At some point you decided to leave New Orleans.  Around

17  what time was that?

18  A.  Well, we were watching the game and she said that she

19  wanted to leave because she wanted -- she miss her daughter,

20  and it was like around 7:00.  I was still indecisive what were

21  we going to do.  She told me: Let's go.  Let's get out of

22  here.  I want to get out of here and get it over with.

23      My plan was, Listen, I didn't want to leave her because she

24  complaining she was sick, taking medicine, it was a long trip.

25  I said I'm going to help you drive, you drive the rest of the

1   way, when I get there, I'm going to go home.

2   Q.  From the time you got to Louisiana, what date did you

3   arrive in Louisiana on the December trip?

4   A.  We arrive there the, December 6.

5   Q.  2014, right?

6   A.  Yes, ma'am.

7   Q.  And what did you do between the time that you were waiting

8   for the buyer to call for you to deliver the truck?

9   A.  On December 6?

10   Q.  Yes.  What did you do?

11   A.  Well, we got there, we rented a hotel.  I went to sleep.  I

12   was tired, so I just told her, When the guy calls, let me know

13   so we can just get this done and keep in our merry way.

14   Q.  How long were you sleeping for?

15   A.  I slept for a few hours.

16   Q.  What's a few hours, two, three, four, five hours?

17   A.  No, six, seven hours.

18   Q.  And on that day, did you have any conversation with Jorge

19   Gomez?

20   A.  No, ma'am.

21   Q.  And when you woke up that evening on December 6, what did

22   you do?

23   A.  She was dressed.  She asked me that she was hungry, and

24   that's when we went out, you know, sight-seeing, just buy some

25   food.  She said she wanted something to drink, bought something

cb9Wgom5                    Gomez - Direct

1    to drink, and they came back to the hotel.

2    Q.  Were you together at all times?

3    A.  Not really.

4    Q.  Apart from the time when you were sleeping, were you

5    together at all times?

6    A.  No.

7    Q.  At what point were you not together on that trip?

8    A.  She step out a few times saying she was going to get

9    something out of the truck.  And other time that I think when

10   we went to the store, she just was walking around, and we met

11   back outside.

12   Q.  Once she stepped out to get something out of the truck,

13   what did you think she was getting?

14   A.  Her medication, that she left it in the truck.

15   Q.  What were you doing; where were you?

16   A.  I was just laying down.

17   Q.  Did you meet with -- besides the buyer for the truck in New

18   Orleans, did you meet with anyone else?

19   A.  No.

20   Q.  Did you pick up narcotics from anyone?

21   A.  No, ma'am.

22   Q.  Did you bring any narcotics to the room?

23   A.  No, ma'am.

24   Q.  Now, Ms. Baez testified that on the way from Louisiana, you

25   stopped on the street somewhere.  Did you do that?

1   A.   On the way?

2   Q.   Stopped on a dark street.

3   A.   No, ma'am.

4   Q.   Did you stop?

5        What did you do before departing for your trip on

6   December 7, 2014?

7   A.   I came down, put up the luggage.  She was in the room.  I

8   went back up.  She came down by herself, came out.  She was

9   already in the truck.  She told me, Let's go.  We drove, picked

10  a highway, fuel, fueled the truck.  She told me she was hungry,

11  and we stopped at Popeye's to get something to eat.

12  Q.   Did you bring any of the food from Popeye's with you?

13  A.   Yes, ma'am.

14  Q.   Did you intend to make any stops on the way between New

15  Orleans and New Jersey?

16  A.   Yes.

17  Q.   Where were you planning to stop?

18  A.   On the way back to New York, like I said, when I decided to

19  bring the truck with her, that's why I told her I was going to

20  drive some of it halfway and she would keep driving the rest.

21  I was trying to stop in a family member that lived in North

22  Carolina that I missed the funeral, and I figured now they

23  already got the time off, so I could just go back and, like

24  take her.  I was just going to stop there one day to rest and

25  just keep going.

 1   Q.  When you were pulled over by the trooper, where were you

 2   going?

 3   A.  We were on highway 59, northeast.

 4   Q.  Where were you heading?

 5   A.  Well, we were heading to New York.

 6   Q.  Now, once you're pulled over, the government played a video

 7   of you handing your driver's license to the officer.  Where was

 8   Ms. Baez during that time?

 9   A.  She was sitting inside the truck.

10          MS. TODD:  A moment, your Honor?

11          THE COURT:  Yes.

12          MS. TODD:  Thank you.

13   Q.  So let me ask you this, Mr. Gomez.  Can you describe the

14   search for us that the trooper conducted of the vehicle?

15   A.  He went and opened the front door.  Got in, was looking.

16   He came back out.  Opened both front doors, put stuff out.

17   Then he went to the back to cut the luggage, opened the

18   luggage.  Then he went to the back seat, opened it.  Open the

19   trunk and he kept looking and going around, but I don't -- he

20   just kept, I don't know what he was looking for.

21          THE COURT:  How much more do you have, Ms. Todd?

22          MS. TODD:  Two minutes.

23          THE COURT:  OK.

24   Q.  And how many pieces of luggage did you have in that

25   vehicle?

1   A.   Altogether, it was about four pieces.

2   Q.   And how many of those four pieces of luggage belonged to

3   you?

4   A.   Three of them were me.

5   Q.   And were you aware there was a trap, there was a

6   compartment in the truck?

7   A.   No, ma'am.

8   Q.   Did you see the compartment that they said was inside the

9   truck?

10  A.   No.

11  Q.   Did you see the drugs that were recovered from the

12  vehicle --

13  A.   No, ma'am.

14  Q.   -- at the scene?

15          And did you agree with anyone at all to transport

16  narcotics on either the November or the December trip?

17  A.   No, ma'am.

18          MS. TODD:   Thank you, your Honor.   Nothing further.

19          THE COURT:   All right.   Ladies and gentlemen, it's

20  about 5:05.   We'll break for the evening.   Don't discuss the

21  case.   Keep an open mind.   We'll resume at 9:30 tomorrow

22  morning.   Thank you all very much.

23          (Continued on next page)

24

25

Gb9Wgom5

1          (In open court; jury not present)

2          THE COURT:  You can step down, Mr. Gomez.

3          (Witness temporarily excused)

4          THE COURT:  Please be seated.  Issues that the lawyers

5    want to raise?

6          MR. COOPER:  Nothing from the government.  Thank you,

7    your Honor.

8          THE COURT:  Prior to the start of the trial, there was

9    motion *in limine* practice about the defendant's prior

10   conviction, as well as an alleged threat that he had made to

11   Ms. Ramon-Baez.  I ruled on those issues for purposes of the

12   government's direct case, case in chief, and so I need to

13   understand whether the government intends on getting into those

14   issues on cross-examination, because if it does, I'm going to

15   want to see briefing on those points prior to tomorrow morning.

16         MR. COOPER:  Could we have one moment, your Honor?

17         THE COURT:  Yes.

18         MR. COOPER:  Thank you.

19         Your Honor, at this point barring an answer that

20   Mr. Gomez gives on cross, the government is not seeking to

21   introduce either of those two facts in its rebuttal case.

22         THE COURT:  All right.  Or on cross-examination.

23         MR. COOPER:  Yes, your Honor.

24         THE COURT:  Ms. Todd, anything you want to raise

25   before we break for the evening?

```
 1              MS. TODD:  No, your Honor.  Thank you.

 2              THE COURT:  Can the government estimate at this point

 3    how long its cross-examination will be?

 4              MR. COOPER:  Your Honor, hard to estimate, but

 5    probably under half an hour, maybe a bit more than half an

 6    hour.

 7              THE COURT:  And how long will Ms. Hernandez be?

 8              MS. TODD:  Two minutes.

 9              THE COURT:  Two minutes.

10              MS. TODD:  Five minutes tops.

11              THE COURT:  In terms of scheduling, the proof should

12    end by midmorning, right?  Everybody's nodding their heads.

13    We'll break when the evidence is over.

14              Has anyone had an opportunity to read the charge?  Are

15    there likely to be substantial comments on the charge?

16              MS. TODD:  Your Honor, I haven't had a chance.

17              THE COURT:  All right.  We'll have a charge

18    conference.  It will take as long as it takes.  Summations will

19    be hopefully sometime around the lunch hour.  When we're

20    finished with the proof, I'll release the jury, tell them to

21    get something to eat.  In the meantime, we'll have our charge

22    conference and then they'll come back and then we'll want to

23    have summations.  How long are summations going to be?

24              MR. COOPER:  Ours probably under half an hour.

25              THE COURT:  OK.
```

1                MS. TODD:  I'm going to work on that tonight, your

2    Honor, and try to keep it similar to what the government's

3    time.

4                THE COURT:  All right.  That will give us plenty of

5    time to charge the jury and get some deliberations in tomorrow.

6    We'll resume at 9:30 tomorrow morning.  Thank you.

7                MS. TODD:  Thank you.

8                (Adjourned to November 10, 2016, at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

CARONLAY RAMON-BAEZ

Direct By Ms. Crowley . . . . . . . . . . . 221

Cross By Ms. Todd . . . . . . . . . . . . . 244

Redirect By Ms. Crowley . . . . . . . . . . 287

Recross By Ms. Todd . . . . . . . . . . . . 298

DEBORAH ERICKSON

Direct By Ms. Crowley . . . . . . . . . . . 304

RONALD WHITTAKER Jr.

Direct By Mr. Egan . . . . . . . . . . . . . 311

Cross By Ms. Todd . . . . . . . . . . . . . 345

SANDY BRYANT GOMEZ Jr.

Direct By Ms. Todd . . . . . . . . . . . . . 363

SANDY GOMEZ

Direct By Ms. Todd . . . . . . . . . . . . . 367

1                           GOVERNMENT EXHIBITS

2     Exhibit No.                                    Received

3     3504-04   . . . . . . . . . . . . . . . . . . . 293

4     1005      . . . . . . . . . . . . . . . . . . . 303

5     52        . . . . . . . . . . . . . . . . . . . 307

6     53        . . . . . . . . . . . . . . . . . . . 308

7     300       . . . . . . . . . . . . . . . . . . . 330

8     50        . . . . . . . . . . . . . . . . . . . 334

9     101, 102, 104 and 105   . . . . . . . . . . . 337

10    403A, 403B, 403C, and 1004   . . . . . . . . 344

11                           DEFENDANT EXHIBITS

12    Exhibit No.                                    Received

13    D, E, F, and G   . . . . . . . . . . . . . . . 358

14    C    . . . . . . . . . . . . . . . . . . . . . 373

15

16

17

18

19

20

21

22

23

24

25