```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4               v.                        15 Cr. 348 (PGG)

 5

     SANDY GOMEZ,
 6
                                          Trial
 7               Defendant.

 8   ------------------------------x

 9                                        New York, N.Y.
                                          November 10, 2016
10                                        9:45 a.m.

11

     Before:
12
                        HON. PAUL G. GARDEPHE,
13
                                          District Judge
14                                         -and a Jury-

15
                          APPEARANCES
16
     PREET BHARARA
17        United States Attorney for the
          Southern District of New York
18   PATRICK EGAN
     RICHARD A. COOPER
19   SHAWN G. CROWLEY
          Assistant United States Attorneys
20

21   NATALI J.H. TODD
          Attorney for Defendant
22

23

24

25
```

 1              (Jury present)

 2              THE COURT:  Good morning, ladies and gentlemen.  We

 3    will now hear the cross-examination of Mr. Gomez.

 4     SANDY GOMEZ, resumed.

 5    CROSS-EXAMINATION

 6    BY MR. COOPER:

 7    Q.  Good morning, Mr. Gomez.

 8    A.  Good morning, sir.

 9    Q.  You mentioned on direct examination that you worked for a

10    company called JTM for a few years, is that correct?

11    A.  Yes, sir.

12    Q.  That company, JTM, they carry GMC products, right?

13    A.  Yes, sir.

14    Q.  And that includes products for Yukon Denali cars?

15    A.  Yes, sir.

16    Q.  And you're familiar with Yukon Denali cars, right?

17    A.  I don't understand the question.

18    Q.  Are you familiar with Yukon Denalis, that kind of car?

19    A.  Not really.

20    Q.  You used to own a Yukon Denali, right?

21    A.  No, sir.  I used to own a Chevy Tahoe.

22    Q.  It's your testimony here today that you never owned a Yukon

23    Denali in the past?

24    A.  Yes.

25    Q.  Now, you were a professional driver, right, sir?

GBAMGOM1                    Gomez - Cross

1   A.  I'm still a professional driver.

2   Q.  For many years your job was to drive, correct?

3   A.  Yes, sir.

4   Q.  I want to ask a few questions about this case.  Sir, you

5   were arrested in this case in December 2014, isn't that right?

6   A.  Yes, sir.

7   Q.  And after you were arrested you received discovery in this

8   case, right?

9   A.  Yes, sir.

10  Q.  And that discovery included that dashboard camera video

11  that we all saw in court yesterday, is that right?

12  A.  Yes, sir.

13  Q.  And that discovery included reports on surveillance that

14  the DEA conducted when you were down in Louisiana, right?

15  A.  Yes, sir.

16  Q.  And you got the recordings of your conversations with the

17  confidential source, right?

18  A.  Yes.

19  Q.  And you got recordings of your brother's conversations with

20  the confidential source, right?

21  A.  Yes.

22  Q.  Those are the recordings that we saw at trial this week,

23  right?

24  A.  Yes, sir.

25  Q.  And you reviewed that material?

1   A.   Yes.

2   Q.   And we had a hearing in this case a few months ago, isn't

3   that right?

4   A.   Yes, sir.

5   Q.   And you prepared for that hearing, didn't you?

6   A.   Yes, sir.

7   Q.   In fact, you put in an affidavit.  You swore to an

8   affidavit that you submitted to the Court here, right?

9   A.   Yes, sir.

10  Q.   And in preparation for that hearing you again reviewed all

11  those discovery materials, isn't that right?

12  A.   Yes.

13  Q.   And in preparation for trial here today you got more

14  materials, right?

15  A.   Yes, sir.

16  Q.   And you reviewed those materials?

17  A.   Yes, sir.  With my lawyer.

18  Q.   And you reviewed reports by the officers and the agents who

19  testified on the stand here this week?

20  A.   I don't understand what you mean, when you say I review.

21  Q.   You got reports and documents that were prepared by the

22  agents and the officers who testified here this week, isn't

23  that right?

24  A.   Yes.

25  Q.   And before trial you looked at them, right?

1    A.    My lawyer discuss it with me.

2    Q.    And with respect to the transcripts and the translations,

3    do you remember those?  Those were Government Exhibits 201T

4    through 207T.  We took a look at those?

5    A.    Yes, sir.

6    Q.    You saw those before trial as well, right?

7    A.    Yes, sir.

8    Q.    Now, Mr. Gomez, I want to talk a bit about when you first

9    came up to New Jersey in November 2014.  For a period of time

10    there you stayed with your brother Jorge, right?

11    A.    Could you repeat that question because you said did I stay?

12    Q.    You came up to New Jersey, your testimony is, in November

13    2014, right?

14    A.    Yes, sir.

15    Q.    In late November?

16    A.    Yes, sir.  The 22nd of November.

17    Q.    November 22?

18    A.    Yes, sir.

19    Q.    And you testified on direct examination that first you were

20    staying with, was it your sister?

21    A.    My sister.

22    Q.    And then at some point in time things got too crowded, so

23    you went to stay with your brother, Jorge, right?

24    A.    Yes, sir.

25    Q.    That's Jorge Gomez, the individual we have been speaking

 1   about this week?

 2   A.  Yes, sir.

 3   Q.  Now, at that time Jorge was not living with Caronlay

 4   Ramon-Baez, right?

 5   A.  No.

 6   Q.  They had broken up before that?

 7   A.  I didn't know nothing about that.

 8   Q.  Jorge was in fact living with his wife, right?

 9   A.  Well, when I went to his apartment, he said that was his

10   girlfriend.  Like I said, I never knew -- I didn't know his

11   relationship, what it was, his status.

12   Q.  You saw that he was living with a woman at that apartment,

13   right?

14   A.  Yes, sir.

15   Q.  That was the apartment that you went to stay at?

16   A.  Yes, sir.

17   Q.  And that woman was not Caronlay Ramon-Baez, right?

18   A.  No, sir.

19   Q.  It was somebody different?

20   A.  Yes.

21   Q.  Now, when you came up to New Jersey in November of 2014,

22   you had never met Caronlay Ramon-Baez at that point, right?

23   A.  No.

24   Q.  Hadn't spoken to her on the phone?

25   A.  No.

1   Q.   Never met her in person?

2   A.   No.

3   Q.   It was the first time on November 22, or some time around

4   there, that you met her, right?

5   A.   Yes, sir.

6   Q.   Let's talk about your first trip down to New Orleans.  Your

7   testimony on direct examination was that Jorge and Caronlay

8   were having some problems, right?

9   A.   Yes, sir.

10  Q.   They were having fights, they had broken up?

11  A.   That's what he told me.

12  Q.   And his testimony is that Jorge asked you to take Caronlay

13  down to New Orleans, right?

14  A.   Yes, sir.

15  Q.   And your testimony was that they needed some time apart?

16  A.   Yes, sir.

17  Q.   She needed somebody to go with her?

18  A.   Yes.

19  Q.   To comfort her?

20  A.   Not that way.  He just told me to keep her company because

21  he knows I'm from out of town and I knew the area.  She didn't

22  know very much about over there.

23  Q.   Your testimony is Jorge knew that you knew the area, right?

24  A.   Yes.

25  Q.   You knew New Orleans?

1   A.   Not like that, but I'm a truck driver, so he figured I

2   would know the surroundings.

3   Q.   Is it your testimony that Jorge knew that you were a truck

4   driver?

5   A.   Yes.

6   Q.   And so believed that because you were a truck driver you

7   would know your way around New Orleans, right?

8   A.   Yes, sir.

9   Q.   And that's the reason you say that he asked you to

10  accompany Caronlay down to New Orleans with you, right?

11  A.   Yes.

12  Q.   And you agreed?

13  A.   Yes.

14  Q.   Now, your testimony is that Jorge bought the tickets to go

15  to New Orleans, right?

16  A.   Yes.

17  Q.   And he bought them just the day before you and Caronlay

18  flew down to New Orleans, right?

19  A.   Yes.

20  Q.   Now, when you were in New Orleans you stayed over in a

21  hotel?

22  A.   Yes.

23  Q.   Were you and Caronlay in the same hotel room or different

24  hotel rooms?

25  A.   When we arrived, the booking of the hotel, they didn't have

1   no more rooms, so they gave us a room with two beds.  I asked

2   her, was it OK.  And she said yeah.

3   Q.  Stepping back for a second, when you came up from Texas to

4   New Jersey -- I do want to come back to New Orleans, but let's

5   go back to when you first came up from Texas to New Jersey.

6   That was, your testimony, November 22?

7   A.  Yes.

8   Q.  Did you meet Caronlay for the first time that same day, the

9   first day you came up?

10  A.  No.

11  Q.  That was the 22nd.  What about the second day that you were

12  there, the 23rd?

13  A.  No.

14  Q.  What about the third day, the 24th?

15  A.  No.

16  Q.  What about the fourth day, November 25?

17  A.  Yes.

18  Q.  So you met Ms. Ramon-Baez on the 25th, right?

19  A.  Yes.

20  Q.  And you flew down to New Orleans with her the following

21  day, November 26?

22  A.  Yes.

23  Q.  Now, your testimony is, you get down to New Orleans and you

24  check into the hotel, right?

25  A.  Yes.

1  Q.  And on direct examination you testified that you stayed in

2  the hotel room for the most part and one day Caronlay went to

3  meet some friends, right?

4  A.  Yes.

5  Q.  When she went to meet friends your testimony is you went to

6  the casino, right?

7  A.  Yes.

8  Q.  The two of you separated for that period of time?

9  A.  Yes.

10 Q.  And your testimony is that you were in the casino for five

11 or more hours, right?

12 A.  Yes, sir.

13 Q.  I think you said on direct examination something like it

14 was pretty much the whole day?

15 A.  Yes.

16 Q.  And you happened to bump into Ms. Ramon-Baez there, right?

17 A.  Yes.

18 Q.  I think you said on direct examination that you were at the

19 slot machines and she happened to be passing by and that's when

20 you encountered each other after a whole day apart?

21 A.  Yes.

22 Q.  Now, on direct examination you also talked about why you

23 and Ms. Ramon-Baez flew back to New York, right?

24 A.  Yes.

25 Q.  You were planning on staying for a few more days?

 1  A.  Not myself.  The plan was, she was going for a few days.  I

 2  was just accompanying her.

 3  Q.  Were you going to leave before Ms. Ramon-Baez?

 4  A.  No.

 5  Q.  You were going to stay there as long as she was there?

 6  A.  Yes.

 7  Q.  And the whole plan, your testimony is, that you and Jorge

 8  and Caronlay agreed on is that you would go down for longer

 9  than just those two days, right?

10  A.  Well, he pushes the flights.  It was going to be for a few

11  days that she was going to visit friends, to let her be because

12  she needed some time apart.

13  Q.  Your testimony is that when you bumped into Ms. Ramon-Baez

14  in the casino, she was upset?

15  A.  Yes, sir.

16  Q.  I think you said on direct examination she was really upset

17  because Jorge told her she had to come home, right?

18  A.  Yes, sir.

19  Q.  And that was the day after you got down to New Orleans?

20  A.  Yes.

21  Q.  That was just two days after Jorge asked you to fly down to

22  New Orleans with Ms. Ramon-Baez?

23  A.  Yes.

24  Q.  And you agreed.  That's your testimony?

25  A.  Yes.

1    Q.  And you bought tickets the same day?

2    A.  I didn't buy the tickets.  He did.

3    Q.  Your testimony on direct examination is that Jorge paid for

4    the tickets, right?

5    A.  Yes.

6    Q.  You were the one who actually arranged for the flights,

7    right?

8    A.  No.

9    Q.  So you are saying that it was all Jorge's idea?

10   A.  He -- he asked me to go, he will buy the tickets, he would

11   provide -- it was for her to spend some time away.  I never

12   agree with anyone else.  I was supposed to accompany her, help

13   her -- at the time they were having problems -- and I said OK.

14   Q.  Your testimony is, you were just being the good brother?

15   A.  Yes.

16   Q.  You were just being the good friend to Caronlay Ramon-Baez,

17   right?

18   A.  Yes.

19   Q.  The shoulder she could cry on?

20   A.  No.

21   Q.  The person to escort her around New Orleans, right?

22   A.  That was it.

23   Q.  Before you came up to New Jersey at the end of November

24   2014, when was the last time you talked to Jorge?

25   A.  I spoke to him maybe a month or so, when he was knowing

1   about the family member that passed away, just to set up

2   funeral arrangements.  We were talking about how the family

3   would get together, what we were going to do, if he was going

4   to be present.  The person that passed away was like a little

5   sister emotionally.  We never spoke.  That's the only reason we

6   were speaking, setting up, arranging, how the family was going

7   to travel, where we were to get together, and doing those types

8   of preparations.

9   Q.  It was just logistics?

10  A.  Yes, sir.

11  Q.  Who was going to travel where, right?

12  A.  Not like that.  When are we going to get together, sleep,

13  arrangements, because a lot of people didn't live in the city.

14  We just scattered around.  Everybody was going to come in for

15  that time, that moment in time, for a family mourn.

16  Q.  For a funeral, right?

17  A.  Yes.

18  Q.  Making arrangements for who was going to go where, where

19  people were going to stay, right?

20  A.  Yes.

21  Q.  Logistics, right?

22  A.  Yes.

23  Q.  Now, on direct examination you testified that you didn't

24  really speak to your brother, right?

25  A.  Yes.

1   Q.  You pretty much only spoke to him to do the things you just

2   spoke about, to make arrangements and logistics for family

3   funerals, right?

4   A.  Yes.

5   Q.  You didn't have a particularly close relationship with

6   Jorge?

7   A.  No.

8   Q.  You didn't talk about your job, how it was going?

9   A.  No.

10  Q.  You didn't talk about his job and how it was going?

11  A.  No.

12  Q.  You didn't talk about your family and your relationships,

13  anything like that?

14  A.  No.

15  Q.  And he didn't do the same thing either, right?

16  A.  No.

17  Q.  You guys pretty much just talked about family events,

18  family funerals, logistics, that sort of thing, right?

19  A.  Yes.

20  Q.  Now, in this trial you've seen the transcripts, right?

21  A.  Yes.

22  Q.  I am going to hand to you Government Exhibit 205T.

23          MR. COOPER:  May I approach, your Honor.

24          THE COURT:  Yes.

25  Q.  Mr. Gomez, I handed you Government Exhibit 205T, which is

 1  in evidence.

 2          MR. COOPER:  Your Honor, there is some AV issues, but

 3  I believe the jury has transcript binders.

 4          THE COURT:  OK.  Actually, there is some binders at

 5  the end that I guess the jury needs.  Does everybody have a

 6  binder?

 7          Go ahead.

 8          MR. COOPER:  Thank you, your Honor.

 9  Q.  We will get to the exact transcript in a minute, Mr. Gomez,

10  because you've read this transcript before, right?

11  A.  Yes.

12  Q.  And this is a call among you, your brother is on the phone,

13  too, and the confidential source, who we know now is

14  Mr. Jimenez-Baez, right?

15  A.  Yes.

16  Q.  That's your voice on the call?

17  A.  Yes.

18  Q.  Where it says Sandy Gomez on the call that's you?

19  A.  Right.

20  Q.  You stipulated to that, right?

21  A.  Yes.

22  Q.  There is no question about that, right?

23  A.  Yes.

24  Q.  You called using your phone, right?

25  A.  No.  My brother made the call.

1   Q.  Let's talk about the phone number.  Take a look at page 1

2   of Exhibit 205T.  You see where it says phone numbers, sir?

3   A.  Sir.

4   Q.  210-727-0565.  That's you, right?

5   A.  That's a number that I had at that moment.

6   Q.  It's your telephone number, right?

7   A.  Yes.

8   Q.  On your telephone?

9   A.  Yes.

10  Q.  And that's the phone that called the confidential source

11  that day, right?

12  A.  Yes.

13  Q.  Now, that's December 4, 2014?

14  A.  Yes.

15  Q.  You were with your brother that day?

16  A.  Yes.

17  Q.  You were at his apartment building, right?

18  A.  Yes.  He called me to come by his house.

19  Q.  And when you got there that day you did a full inspection

20  of the white Denali, right?

21  A.  He told me to check it.  That was the truck I supposed to

22  help to get it to the new owner.

23  Q.  My question is whether you did an inspection of the car

24  that day?

25  A.  Can you explain to me what you mean by inspection.

1   Q.  I think on direct examination you checked the gas?

2   A.  Yes.

3   Q.  You checked the fuel?

4   A.  Yes.

5   Q.  You checked the oil?

6   A.  Yes.

7   Q.  You checked the tires?

8   A.  Yes, sir.

9   Q.  You brought your luggage?

10  A.  Yes.

11  Q.  It's those two suitcases in the defense exhibit that you

12  looked at yesterday?

13  A.  Yeah.  But it was more than two suitcases.

14  Q.  More than two suitcases.

15          You looked inside the car, right?

16  A.  I didn't really look.  I -- my problem was, I couldn't put

17  my luggage inside the car.

18  Q.  Did you consider putting your luggage in the back seat,

19  sir?

20  A.  It wouldn't fit.

21  Q.  Your testimony is that your luggage wouldn't have fit in

22  the back seat?

23  A.  No.

24  Q.  But you ultimately managed to get your luggage into that

25  trunk, didn't you?

1   A.  Yes.

2   Q.  And you placed this phone call, 2005T, right?

3   A.  No.

4   Q.  Your testimony is, it was your phone, but your brother

5   dialed the number?

6   A.  Yes.  He has the phone -- he asked me for my phone, 2,000

7   number.

8   Q.  And your testimony is that you thought you were talking to

9   the owner of the car, right?

10  A.  That's what he told me.  I am going -- his partner, the guy

11  they work together.  So he could explain to me because I told

12  him the car -- the back seat was broken.

13  Q.  I think your testimony on direct examination, and I just

14  want to clarify this, is that you thought that your brother and

15  this other guy were partners, right?

16  A.  Yes, sir.

17  Q.  And that together their job, their work was to get cars,

18  fix them up and sell them, right?

19  A.  That's what he told me, that's what he was doing in

20  business.

21  Q.  Sir, try to answer my question.  That was your

22  understanding of what your brother was doing and what this

23  other guy was doing, right?

24  A.  Yes.

25  Q.  Now, let's look at the transcript.  If you can turn to page

1   2, sir.  Let's look four paragraphs up from the bottom where

2   you say:  The issue with me is -- I'm sorry.  Two paragraphs

3   above that.  You say:  We were checking out the car and I was

4   explaining to him that I used to have a car just like that one.

5   You see that, sir?

6   A.  Yes.

7   Q.  Now, when you say, myself and this guy, you were talking

8   about your brother.  Jorge is the guy that you are talking

9   about there?

10  A.  Yes.

11  Q.  And you were checking out the car?

12  A.  Yes.

13  Q.  And you told the guy on the phone that you used to have a

14  car just like that one, right?

15  A.  Yes.

16  Q.  Let's look two paragraphs below that.  You say:  That car

17  has a space in there and the seats go down, right?

18  A.  Yes.

19  Q.  Now, your testimony on direct examination is that you were

20  concerned about having enough space in the car, right?

21  A.  Yes.

22  Q.  You wanted the seats to go down.  That was your story?

23  A.  Yes.

24  Q.  Because you had luggage?

25  A.  Yes.

 1 Q.  And because you were planning to buy some souvenirs on this

 2 trip, right?

 3 A.  Yes.

 4 Q.  And you wanted to be sure that there was enough space to

 5 put all that stuff in the car, right?

 6 A.  Yes.

 7 Q.  Now, it was just you and Caronlay Ramon-Baez who were going

 8 to make the trip, right?

 9 A.  At that point I didn't know if she was coming with me or

10 not.

11 Q.  So you thought it could have been just you?

12 A.  Yes.

13 Q.  And if not just you, maybe there would be one other person,

14 Caronlay Ramon-Baez, coming, right?

15 A.  No.  I never thought of that.

16 Q.  I'm sorry?

17 A.  No.

18 Q.  You thought at that point just you, Mr. Sandy Gomez, doing

19 this trip down to New Orleans for your brother?

20 A.  I wasn't doing just the trip.  I was help -- doing the

21 favor, deliver the truck to its new owner, and I was going

22 home.  That was the reason that I accepted to take the truck.

23 Q.  The issue you were talking about here is there was a gap in

24 the back seat, right?

25 A.  No.

1   Q.  There was a space where the bench met the back rest?

2   A.  No.

3   Q.  Did you inspect that back seat?

4   A.  No.  The problem wasn't the seat didn't move.  It was set

5   to stay still.  That's why I told him, in that particular

6   vehicle I'm in, it should move down to open more space.

7   Q.  Sir, my question is a bit different.  Did you look in the

8   back seat where the bench met the seat?

9   A.  No.

10  Q.  You didn't see whether or not there was a gap there that

11  was noticeable?

12  A.  No.

13  Q.  Now, in the same paragraph that we were looking at,

14  Government Exhibit 205T, a few paragraphs up, you say:  The

15  issue with me is, you know, when you are traveling and you go

16  to different places.  Do you see that?

17  A.  Yes.

18  Q.  I just want to be clear.  You weren't concerned about the

19  car being in Paterson, New Jersey, right?

20  A.  No.

21  Q.  Your concern was when you are traveling around, right?

22  That's what you say here.

23  A.  That's not what I meant.  What I told him was, I'm

24  traveling around.  If you stop and purchase anything, you carry

25  to put anything in the trunk.  I say I was carrying luggage.

 1  Q.  I see.  Your testimony here is your main concern is that
 2  you were going to buy so much stuff that they couldn't possibly
 3  fit in the car, right?
 4  A.  No.
 5  Q.  That unless you put that back seat down you were going to
 6  be out of luck, right?
 7  A.  No.
 8  Q.  Let's turn to page 3, the next page.  You weren't concerned
 9  with the engine, right?
10  A.  Concerned?
11  Q.  Were you concerned that the engine was going to break down?
12  A.  Yes.
13  Q.  You did an inspection of the car, you checked out the
14  engine before you left?
15  A.  Yes.
16  Q.  You were satisfied that the engine was OK, right?
17  A.  I checked that everything -- fluids and everything was
18  level.  Because I couldn't tell because I didn't drive the
19  truck.
20  Q.  You didn't raise any concerns about the engine when you
21  called the guy that you thought was the owner of the car,
22  right?
23  A.  I spoke to Jorge, and I say, everything needs to came back,
24  when the guy called me to explain to me -- my concern was, the
25  seat was broken.  I didn't want to have the truck delivered to

1    the owner and then the guy say he didn't want it or complain,

2    and I would end up paying for a car that was not even mine.

3    Q.  You sir didn't express any concerns about the engine of the

4    car?

5    A.  That's what I was trying to explain, sir.  Everything I

6    talked to my brother, when my brother put the gentleman on the

7    phone --

8            THE COURT:  The question is, did you express concerns

9    to the person you believe was the owner of the car about the

10   engine?  That's the question.  Try to answer the question.

11           THE WITNESS:  Yes.

12   Q.  You did.  Can you show us where in Government Exhibit 205T

13   you expressed concerns about the engine of the car when you are

14   talking to the guy you thought was the owner.

15   A.  When I told him:  Well, look --

16           THE COURT:  Where are you reading from?

17           THE WITNESS:  From the top, the full paragraph.

18           THE COURT:  What page?

19           THE WITNESS:  Page 2.

20           THE COURT:  Page 2, what paragraph?

21           THE WITNESS:  No. 4.

22   A.  I told him:  Well, look, you, myself and this guy, we were

23   checking the car.  I was explaining to him that I used to have

24   a car just like that, that one.

25   Q.  And just to be clear, and I think you can answer this

GBAMGOM1                         Gomez

1    question with a yes or no, your testimony here right now is

2    that when you said that, you were talking about the engine?

3    A.  Yes.

4    Q.  And you were expressing a concern about the engine?

5    A.  Well, I was concerned about the car -- yeah, the engine.

6    Q.  Let's go back to page 3, sir, the bottom paragraph of page

7    3.  We are going to look about halfway down.  Are you there,

8    the bottom paragraph?

9    A.  Um-hum.

10   Q.  Halfway down you say:  And I said to him that it's because

11   of the part.  It's the part that makes it look different.  You

12   understand me?

13           Do you see that there, sir?

14   A.  Yes.

15   Q.  Now, your testimony on direct examination, I want to be

16   clear about this, is that when you said that, you were talking

17   about how the seat in the back didn't lay down flat, right?

18   A.  Yes.

19   Q.  To expand the trunk?

20   A.  Yes.

21   Q.  That's what you were saying when you were talking about

22   part?

23   A.  Yes.

24   Q.  You are saying that this isn't a conversation about how

25   some parts of the car looked different from the others?

1   A.  No, sir.

2   Q.  And you are saying on the stand here now that this isn't

3   about the molding underneath the back seat looking different

4   from the other molding in the car?

5   A.  Yes, sir.  It wasn't about that.

6   Q.  Let's turn to page 5, sir.

7           Before we talk about the transcript, again, one

8   question.  You said earlier in this transcript when you were

9   talking about that you used to have a car, a car just like that

10  one --

11  A.  Yes.

12  Q.  -- were you talking about the Tahoe that you used to have?

13  A.  Yes, sir.

14  Q.  Not a Yukon Denali?

15  A.  No, sir.

16  Q.  Let's look at the bottom of page 5, please.  So you say

17  there, and this is about halfway down at the very bottom

18  paragraph, you say, The problem is that where it's going, those

19  people check everything, but don't worry, it's fine.  Let me

20  see what we are going to do.

21          Do you see that?

22  A.  Yes.

23  Q.  To be clear, on direct examination you were asked about

24  that sentence there, right?

25  A.  Um-hum.

1    Q.  I'm sorry?

2    A.  Yes.

3    Q.  And what your testimony was is that you said that because

4    you were concerned that the buyer of the car in New Orleans was

5    going to think the car was broken, right?

6    A.  Yes, sir.

7    Q.  And you didn't want to be held responsible, right?

8    A.  Yes, sir.

9    Q.  Now, you hadn't given the mechanic, the owner of the car,

10   any cash before you left, right?

11   A.  No.

12   Q.  You didn't buy the car, you weren't going to resell the

13   car, right?

14   A.  No.

15   Q.  You were just transporting the car, right?

16   A.  Yes, sir.

17   Q.  You were going to get paid?

18   A.  No.

19   Q.  You were doing this out of the goodness of your heart?

20   A.  Yes, sir.

21   Q.  A favor for your brother?

22   A.  Yes.

23   Q.  A favor for the mechanic, the guy you never met?

24   A.  I don't know the guy.

25   Q.  Just a favor for your brother, right?  Drive how many

 1    thousand miles from New Jersey to Louisiana?

 2    A.  Not thousand miles.  It's 1200 miles.

 3    Q.  Took you two days, right?

 4    A.  Yes.

 5    Q.  That was the favor?

 6    A.  Well, the favor that he was helping me to get home, and I

 7    had to purchase an expensive ticket.  I figured that's an easy

 8    way to get home.

 9    Q.  I want to ask about one more thing on this transcript.

10    Could you please turn to page 6.  You say here the only

11    reason -- and this carries over from the bottom of the last

12    page:  The only reason I was saying it, meaning --

13           THE COURT:  Where are you reading from?

14           MR. COOPER:  I'm sorry, your Honor.  It's actually the

15    bottom of page 5.

16    Q.  Right after you say, The problem is where it's going, those

17    people check everything, and your testimony is that you were

18    talking about the buyer of the car, right?

19    A.  Yes.

20    Q.  You were concerned he was going to discover the fact that

21    the seats didn't go all the way down, right?

22    A.  It was broken, yeah.

23    Q.  It was broken is your testimony, right?

24    A.  Yes.

25    Q.  Because of that, you would somehow be on the hook for

1   something, right?

2   A.  Yes.

3   Q.  You would be in trouble if you delivered a car that had a

4   broken seat back, right?

5   A.  Yes.

6   Q.  And you go on from there to say, the only reason I was

7   saying it was because, you know, I didn't feel safe, right?

8   A.  Exactly what you said.  I didn't want to deliver a car and

9   the guy said this was broken, it wasn't part of whatever the

10   deal was.  My car was to deliver the car.  If it was damaged, I

11   don't want to be held responsible.

12   Q.  Sir, is it your testimony that you thought the buyer of the

13   car down in New Orleans was going to attack you if he

14   discovered that the seat didn't go down?

15   A.  No.

16   Q.  That you would somehow be in danger?

17   A.  No.

18   Q.  That he was a violent guy?

19   A.  I didn't know the guy.

20   Q.  That he had friends who would hurt you somehow?

21   A.  I don't know.

22   Q.  That's not what you were saying.  You weren't thinking that

23   when you went down to New Orleans, right?

24   A.  No.

25   Q.  You weren't thinking that when you made this call, right?

1    A.  No.

2    Q.  You just said that you didn't feel safe with the car,

3    right?

4    A.  In the situation being stuck with a vehicle that say that I

5    broke it without me doing anything to it.

6    Q.  That's something that made you feel not safe, right?

7    A.  Yes.

8              MR. COOPER:  One moment, please, your Honor.

9              THE COURT:  Yes.

10   Q.  I do want to ask a few questions about Government Exhibit

11   206T.

12             MR. COOPER:  May I approach, your Honor.

13             THE COURT:  Yes.

14   Q.  So you don't have to flip, Mr. Gomez, there it is.

15             Let's talk about this call for a moment.

16   A.  OK.

17   Q.  This is a call from the next day, December 5, 2014, right?

18   A.  Yes.

19   Q.  And it's a call between your phone and the phone of the

20   confidential source, right?

21   A.  Yes.

22   Q.  Your testimony on direct examination is that you thought

23   that Ms. Ramon-Baez, who was sitting next to you, had dialed

24   the buyer of the car in New Orleans, right?

25   A.  Yes.  That's what I asked her, if she could call the guy.

1   Q.  You weren't expecting the buyer to give you anything, were

2   you?

3   A.  No.

4   Q.  He wasn't going to give the cash to you, right?

5   A.  No.

6   Q.  He wasn't going to give you a car, right?

7   A.  No.

8   Q.  In fact, you were giving him a car, right?

9   A.  Yes.

10  Q.  You weren't going to get anything else from him, right?

11  A.  No.

12  Q.  Your job was to just drop off a car and get out of there,

13  right?

14  A.  Yes.

15  Q.  You were trying to get back to Texas?

16  A.  Yes.

17  Q.  Now, Texas is right next to Louisiana, right?

18  A.  Yes.

19  Q.  It's a pretty short flight from New Orleans to Converse,

20  Texas, where you lived?

21  A.  Yes.

22  Q.  Much closer to get from New Orleans to Converse than to get

23  from Paterson, New Jersey down to Converse, right?

24  A.  Yes.

25  Q.  With all that in mind, you spoke on the phone with the guy

1    you are saying you thought you were just going to drop off a

2    car to, right?

3    A.   Yes.

4    Q.   And so let's look at the call.  Let's look at page 2, four

5    paragraphs up from the bottom.  This is what says here CS.

6    This is the guy you are saying you thought was the buyer of the

7    car, right?

8    A.   Yes.

9    Q.   You were going to drop the car off to him and then get out

10   of there?

11   A.   Yes.

12   Q.   And he says:  As soon as you are around, let me know so

13   that I send for it and I'll see if I can have the other one

14   ready so I can bring it down for you right away, right?

15   A.   Yes.

16   Q.   You see that?

17   A.   Yes.

18   Q.   That was the guy you thought you were going to drop off the

19   car to, right?

20   A.   Yes.

21   Q.   Let's look at the next page.  I'm sorry.  I think this can

22   be answered with a yes or no.  You don't say, hold on, what are

23   you talking about, right?

24   A.   Can I answer.

25             THE COURT:  No.  It's a yes or no question.

1   Q.  What do you say next?  Do you say, hold on, I have no idea

2   what you are talking about?

3   A.  No.

4   Q.  You say, all right then, right?

5   A.  Yes.

6   Q.  And then on the next page, sir, if you can turn to page

7   3 -- actually, talking about this call, did you happen to

8   notice that the guy that you were talking to had the same exact

9   voice as the guy you spoke to the day before?

10  A.  No.

11  Q.  The day before you had that long phone call we talked

12  about, Government Exhibit 205T, right?

13  A.  Yes.

14  Q.  You talked about the car?

15  A.  Yes.

16  Q.  You asked him questions?

17  A.  Yes.

18  Q.  He was talking to you about how the car has no problems,

19  right?

20  A.  Yes.

21  Q.  He has driven it all over, no problem at all?

22  A.  Yes.

23  Q.  And then right here, Government Exhibit 206T, you were

24  talking to the same guy you now know, right?

25  A.  No.

1   Q.  You don't now know that you were talking to the same guy?

2   A.  Now?  Now, I knew.  Before I didn't know.  I couldn't tell

3   it was him.

4   Q.  Your testimony is at the time you didn't draw the link

5   between the two, right?

6   A.  No.

7   Q.  Let's look at page 3 then of Government Exhibit 206T.  This

8   is the very top, sir.  This is what the other guy said.  This

9   is the guy you are saying you thought was the buyer?

10  A.  Yes.

11  Q.  Not going to give you anything, right?

12  A.  Yes.

13  Q.  No cash?

14  A.  Yes.

15  Q.  Your testimony is you certainly were not going to get any

16  drugs from this guy?

17  A.  Yes.

18  Q.  Not at all?

19  A.  No.

20  Q.  You were just going to give him something?

21  A.  The truck.

22  Q.  He wasn't going to give you a car?

23  A.  No.

24  Q.  You were going to give him a car, right?

25  A.  Yes.

 1  Q.  Let's look at what he says at the top, sir.  He says:

 2  Speak with the man because he said that he was going to have

 3  one there so that I could bring it to do it -- one, the 250

 4  diesel, right?  You see that?

 5  A.  Yes.

 6  Q.  Now, you know that a 250 diesel is a kind of car, right?

 7  A.  That's not a car.

 8  Q.  Not a car?

 9  A.  A 250 diesel.  That's not a car.

10  Q.  The man you were talking to here was saying that he is

11  going to bring it to you, right?

12  A.  Yes.  That's what he's saying.

13  Q.  And, again, when he said that, your answer wasn't, what are

14  you talking about, right?

15  A.  Yes.  Can I explain?

16  Q.  Let me ask you a question here.  250 diesel is not a car,

17  right?

18  A.  Yes.

19  Q.  It's an engine?

20  A.  Yes.

21  Q.  It's a particular kind of engine?

22  A.  Yes.

23  Q.  You knew that at the time, right?

24  A.  Yes.

25  Q.  Were you expecting the buyer of the car to bring you a new

1   engine to swap into the car you were dropping off for him?

2   A.  No.

3   Q.  No, you weren't, right.

4           Were you expecting him to give you an engine in a box

5   that you would carry back up to New Jersey with you?

6   A.  No.

7   Q.  Now, when he says this, this thing about bringing you the

8   250 diesel, do you say, what are you talking about?

9   A.  No.

10  Q.  Do you say, that's not the deal?

11  A.  No.  I didn't say anything.

12  Q.  Do you say, I talked to Jorge, I talked to the mechanic, I

13  am not carrying a 250 diesel back to New Jersey with me?

14  A.  I didn't say anything.

15  Q.  You do say something, sir.  You say, right.  You see that?

16  A.  Can I just explain?

17  Q.  Do you see that, sir?

18  A.  Yes.

19  Q.  Two paragraphs below that, not that you say nothing, it's

20  not that you say, what are you talking about; you say, OK, all

21  right.  You see that?

22  A.  Yes.

23          MR. COOPER:  One moment, please, your Honor.

24          No further questions.

25          THE COURT:  Redirect.

1          MS. TODD:  No, your Honor.

2          THE COURT:  Mr. Gomez, you can stand down.

3          (Witness excused)

4          THE COURT:  Ms. Todd, other evidence.

5          MS. TODD:  Defense rests, your Honor.

6          THE COURT:  I'll hear the lawyers at side bar.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  (At the side bar)

 2                  THE COURT:  Do you have a motion?

 3                  MS. TODD:  I renew my Rule 29 motion based on the

 4      evidence so far.

 5                  THE COURT:  I will reserve decision.

 6                  Have the lawyers had an opportunity to review the

 7      charge?

 8                  MS. TODD:  I have, your Honor.

 9                  MR. EGAN:  Yes, your Honor.

10                  THE COURT:  Can you give me a sense of how many

11      comments you are going to have?

12                  MS. TODD:  I have one comment.

13                  MR. EGAN:  I maybe have one from the government.

14                  THE COURT:  Would it make sense for me to tell the

15      jury we are going to take say a 15-minute recess?

16                  MR. EGAN:  Mr. Cooper is doing summation.  There may

17      be some stuff out of the cross that he wants to incorporate, if

18      we could have a little bit --

19                  THE COURT:  That would be quite shocking.  Maybe a

20      little bit longer than that.  Should I ask them to come back in

21      half an hour?

22                  MS. TODD:  Yes, your Honor.

23                  MR. COOPER:  Yes, your Honor.  I told the Court

24      yesterday, I expected the summation to be half an hour.  I

25      think based on last night and now, probably more like 45
```

CRAMG0M1

 1  minutes or maybe a bit more than that, just so the Court can

 2  plan.

 3          THE COURT:  I think we are doing well in terms of

 4  time.  Counsel on both sides should feel free to take as long

 5  as they need to do their summations.  I'm happy with the pace

 6  of the trial and it's clear to me that I'll be able to get the

 7  closings in and the charge and also have the jury able to

 8  deliberate some time today.  I'm pleased with how things are

 9  going.

10          I'll tell the jury.

11          MS. TODD:  Do we get a prize, your Honor?

12          THE COURT:  We will talk about that later.

13          I'll tell the jury to come back in half an hour and

14  when they return they will hear the closing arguments and we

15  will go into the jury instructions.  Then the case will be

16  given to them for their deliberation and determination.

17          MR. COOPER:  Thank you.

18          (Continued on next page)

19

20

21

22

23

24

25

```
 1              (In open court)

 2              THE COURT:  Ladies and gentlemen, that concludes the

 3    evidence in the case, so let me tell you what our schedule is

 4    going to be.

 5              I need to meet with the lawyers to review the jury

 6    instructions I am going to be giving you later today.  I am

 7    going to ask you to come back in half an hour.  When you come

 8    back in half an hour we will hear the closing arguments from

 9    the lawyers and then we will go right into the jury

10    instructions.  And after I deliver the jury instructions the

11    case will be given to you for your deliberation and decision on

12    the charge against Mr. Gomez.

13              As always, don't discuss the case, keep an open mind,

14    because you have not heard the closing arguments yet.

15              The time now is about 10:30.  Please come back at 11

16    a.m.  We will hear the closing arguments, you'll hear the jury

17    instructions, and the case will be given to you.  Thank you all

18    very much.

19              (Jury not present)

20              THE COURT:  I had sent around a revised charge last

21    night because the charge I had originally sent had included an

22    instruction for when the defendant has chosen not to testify.

23    Obviously, I had to take that charge out and I made that

24    change.

25              I also added language to the general charge about
```

GBAMGOM1

1    witness credibility.  This is on page 10 at the bottom.  I

2    added the sentence:  You should judge the defendant's testimony

3    in the same way that you judge the testimony of any other

4    witness.

5         Having made those changes, and also I had a bracketed

6    instruction on limiting the instructions that I had given.  I

7    couldn't recall any limiting instructions I actually gave.  I

8    took that bracketed material out.

9         Those are the changes I remember making from the

10   earlier draft and now I'm happy to hear other comments that the

11   lawyers have on the proposed charge.  I don't know what page

12   comes first, but just let me know.

13        MS. TODD:  Your Honor, on page 13, the third

14   paragraph, where the sentence begins:  The government must take

15   its witnesses as it finds them.  Not a problem with that.  And

16   frequently must use such testimony in criminal prosecutions

17   because otherwise it would be difficult or impossible to detect

18   and prosecute wrongdoers.

19        Your Honor, I would object to that portion of the

20   sentence where it begins, it frequently and with wrongdoers.  I

21   think the government has -- it's their option to use them.

22   They choose to use these witnesses.  They could have proceeded

23   otherwise.

24        I think it's prejudicial to say that it would be

25   difficult or impossible to detect and prosecute wrongdoers.  I

1   think it's prejudicial to my client.  It serves to neutralize

2   any potential motive or bias that may occur, and I think it's

3   the government's option.  They choose to do that.

4          THE COURT:  Mr. Egan, what do you say?

5          MR. EGAN:  Your Honor, one, I think this statement is

6   factually accurate, that it would be difficult or impossible,

7   and I also think it's a fairly standard piece of the charge on

8   cooperator testimony, that it is fair to -- obviously, the

9   thrust of the charge there is about caution that they should

10  use in evaluating any potential bias that a cooperator may

11  have, but that it is also important that they realize that this

12  is permissible and why.  I think that sentence is appropriate.

13         THE COURT:  The purpose of the language, and this is

14  standard language that I use in every case involving a

15  cooperator, and the purpose of the language is to tell the jury

16  that because of the nature of, as in this case, criminal

17  conspiracy, which, as I say at a later point in the charge is

18  generally by its nature secret, it frequently would be

19  difficult for the government to prosecute such behavior without

20  the willingness of someone who actually participated in the

21  conspiracy to testify.

22         Now, I think this is important to communicate to the

23  jury because someone who is not familiar with the criminal

24  justice system and who is brought in to serve on a jury for the

25  first time such as this, and we have a number of first-time

1  jurors in this particular jury, might find it odd or jarring

2  that the government has decided to use as witnesses people who

3  have engaged in criminal behavior themselves.

4       And here we had two such people, two such people who

5  admitted that they participated in criminal activity but who

6  nonetheless were called by the government, and those people

7  were Antonio Jimenez-Baez and Caronlay Ramon-Baez, both of whom

8  gave critical testimony, both of whom admitted that they

9  themselves engaged in extremely serious crimes.

10      Mr. Jimenez-Baez told us that he had been involved in

11  the distribution of I think he said hundreds of kilos of

12  narcotics.  Ms. Ramon-Baez said that she pleaded guilty to

13  participating in a conspiracy that involved five kilograms and

14  more of cocaine and to firearms charges related to those drugs

15  and faced a 15-year minimum mandatory sentence.  These were

16  witnesses who admitted that they engaged in pretty serious

17  criminal activity and, again, for people who are not familiar

18  with the criminal justice system, it might raise very serious

19  questions as to why the government would use such people as

20  their witnesses in this case, and it is for that reason that

21  this language is in here.

22      The purpose of the language is, first of all, to

23  communicate that for those who are not familiar with the

24  criminal justice system, it's not unusual for the government to

25  rely on such witnesses.  That's the first point.

GBAMGOM1

1          The second point goes to why would the government use

2    such witnesses in the first place.  And so the second sentence

3    of the third paragraph on page 13 tells the jury that the

4    reason why the government decides to use such witnesses is that

5    often it would be difficult to prove a case without the

6    cooperation of someone who had actually engaged in the

7    conspiracy.  The language is standard.  It addresses an issue

8    that might be of concern for people who are not familiar with

9    the criminal justice system.

10          And the instruction, considered as a whole, is

11   balanced, which is something that, of course, I strive for in

12   every instruction.  I say balanced here because the next

13   paragraph talks about the need to scrutinize the testimony of

14   cooperating witnesses with special care and caution for the

15   reason that they have admitted participating in criminal

16   conduct and that raises a question as to their credibility.

17          I'm going to keep the language as it is.  Any

18   objection to it is overruled.

19          What's next?

20          MS. TODD:  That's it for me, your Honor.

21          THE COURT:  Mr. Egan, you told me you had something.

22          MR. EGAN:  I had one.  I had gone back and forth on

23   the cooperating witness because it describes them both having

24   entered into cooperation agreements --

25          MS. TODD:  I'm sorry.  What page are you on?

 1          MR. EGAN:  12 now.  Having both entered into

 2    cooperation agreements which of course they both did,

 3    obviously, and that they did so in hopes of receiving a lesser

 4    sentence.

 5          Obviously, as Mr. Jimenez-Baez sits here now, he has

 6    been sentenced.  But after reviewing it, I think it is the most

 7    accurate description of where they were at the time they were

 8    engaging in this.  So I think there is no need, unless people

 9    disagree, to further clarify that because I think when he

10    engaged in this operation he was doing so with that motive.

11          THE COURT:  I thought about this because, obviously,

12    he has been sentenced, but he was also quite clear that at the

13    time he participated in these discussions he had not been

14    sentenced and that the testimony came through quite clearly

15    that what he did in this case in terms of talking with Jorge

16    Gomez and then talking with both Jorge Gomez and the defendant,

17    that that was all part of his cooperation at the time, prior to

18    sentencing, and it was for that reason that I used the language

19    that I did.

20          MR. EGAN:  Like I said, I had gone back and forth.

21    For the same reason, unless people think there is a need, I

22    think it does accurately capture sort of the motives there.

23          The other one was on page 27 and it's very small, in

24    the venue section.  It says:  Within the Southern District of

25    New York, the Southern District of New York --

1              MS. TODD:  I agree, yes.

2              MR. EGAN:  -- includes Manhattan and the Bronx.  There

3      is also testimony about the cooperator being in Yonkers.  I

4      know sometimes people list all the counties.  I would be fine

5      if you said Manhattan, Bronx, Yonkers or if you want to say

6      Westchester County.  Just something to let them know that that

7      part, Yonkers, is relevant to venue as well.

8              THE COURT:  That sentence which is on page 27 will

9      read:  Southern District of New York includes the Bronx,

10     Manhattan, and Yonkers in Westchester County.

11             MR. EGAN:  That's fine.

12             THE COURT:  Anything else, Mr. Egan.

13             MR. EGAN:  Not from the government.

14             THE COURT:  Ms. Todd, anything else.

15             MS. TODD:  No, your Honor.  I'm actually in agreement.

16     I noted that.

17             THE COURT:  I should tell you that the version of the

18     charge the jury will get will not have any of the case

19     annotations.  I suspect you know that.  I just wanted to tell

20     you that.

21             The reason why I give the annotations is so that in

22     the event there is any challenge to the charge on appeal, the

23     circuit will have available to it the case law that I relied

24     on.  So it is my practice to give the attorneys a version of

25     charge that contains the annotations, to docket that, but then,

CRAMG0M1

1    obviously, to give the jury a version of the charge that does

2    not contain the annotations.  We will resume at 11.

3         MR. EGAN:  One last thing.  I just wanted to let the

4    Court know in terms of exhibits going back, we had agreed with

5    Ms. Todd the dash cam video.  There is a portion of it where

6    they ask him about a prior conviction and we had agreed to

7    redact that.

8         We are running into technical difficulties with

9    redactions.  I assume the Court's practice is, if they come out

10   and want to see that portion, we will continue to try to redact

11   it.  If we are not able to do it, we just want to make sure if

12   they ask to see that, that they do it in the courtroom so we

13   can drop the volume out of that so the jury does not hear that

14   portion.

15        THE COURT:  You don't have any objection to that,

16   Ms. Todd?

17        MS. TODD:  No, your Honor.  We are in agreement.

18        THE COURT:  I had forgotten about the video.  I will

19   add that.  I will tell them that all of the exhibits will be

20   sent to the jury room except for the dash cam video and the

21   drug evidence.  If they want to see the video or the drug

22   evidence, it will be shown to them in the courtroom.  I will

23   make that change.

24        If there is nothing else, we will resume at 11.

25        (Recess)

1                    (In open court; jury present)

2                    THE COURT:  Please be seated.

3               Ladies and gentlemen, we're now going to hear the

4    summation on behalf of the government.  The procedure here is

5    the government has an opening summation and then the defense

6    has an opportunity to give its summation, and then the

7    government has the opportunity to give a brief rebuttal.  The

8    order is determined by who has the burden of proof, and as you

9    have heard me say many times already, and you'll hear me say

10   again when I give you the final instructions on the law, the

11   government, of course, has the burden of proving the charge

12   against Mr. Gomez beyond a reasonable doubt.

13                    Mr. Cooper.

14                    MR. COOPER:  Thank you, your Honor.

15               Sandy Gomez was nervous.  He was pulled over on the

16   side of the road in Slidell, Louisiana, and there were police

17   lights flashing in the rear view mirror.  When Trooper

18   Whittaker started asking questions, he tried to answer as he

19   had rehearsed with Caronlay Ramon-Baez back in New Orleans, and

20   he was nervous.  Now, as you have seen and heard the evidence

21   over these last few days, you know precisely why Sandy Gomez

22   was nervous.  He was nervous because he was in the middle of a

23   very large cocaine deal.  He was bringing the first part of

24   that deal, about five kilos, from New Orleans back to New

25   Jersey.  And he had a promise, if he succeeded, in dozens and

1    dozens of kilos more.  But he didn't succeed.  He was caught

2    redhanded in that car.

3         Now, Mr. Egan began this trial by describing the story

4    of that car, and now at the close of the case you understand

5    why, because that car, the story of how it got to Paterson, of

6    how Sandy Gomez drove that car down to New Orleans and tried to

7    come back, that tells you everything you need to know about

8    this case and everything you need to know about why the

9    defendant is guilty.

10        Ladies and gentlemen, the evidence is in.  This is our

11   opportunity to review that evidence and discuss how it all fits

12   together and leads to one, and only one, conclusion: that

13   defendant Sandy Gomez is guilty.

14        Here's what I'd like to do in this closing statement.

15   First I want to say just a few words about the law that I

16   expect the judge will instruct you about, and second, the most

17   important, or just as important, I should say, I'd like to

18   review the evidence in the case and discuss how the evidence --

19   the testimony on the stand, the documents, the recordings that

20   you've heard -- how they all fit together, how they prove the

21   defendant's guilt.  Now, there's really not a lot in dispute in

22   this case.  As I said, the judge will instruct you on the law,

23   and what the judge says controls, but I expect the judge will

24   tell you that there are two things, or elements, that the

25   government needs to prove for the crime charged in the

1   indictment.  I just want to spend a few minutes now to talk

2   about that.

3           The defendant is charged with conspiracy to distribute

4   and possess with the intent to distribute cocaine.  I expect

5   you'll hear that there are two elements to this offense:

6           First, that the conspiracy existed; and second, that

7   the defendant knowingly became a member of the conspiracy.  On

8   the first element, there's really not a lot of dispute.

9   There's really no dispute at all that there was in fact a

10  conspiracy here.  Let's for a moment set the defendant, Sandy

11  Gomez, aside.  You know there was a conspiracy here.  Jorge

12  Gomez, Caronlay Ramon-Baez, the Louisiana cocaine supplier, the

13  customers in New York and New Jersey, even Yovanny Perez, the

14  guy Jorge reached out to get the car with the trap.  They were

15  all working together.  They were all agreeing together to get

16  cocaine from New Orleans up to New Jersey and beyond and sell

17  it.  Even before you get to the defendant, you know there was a

18  conspiracy, which really is an agreement by two or more people

19  to accomplish a criminal purpose.  So element 1, you can set

20  that aside, there's really no dispute here.

21          I also expect that the judge will instruct you you're

22  going to have to make a determination about the amount of

23  cocaine that was involved here, and here also there really is

24  no dispute.  I expect the judge will instruct you that you do

25  not need to agree on the precise quantity, but you do need to

1    agree that the weight was at least five kilograms, so let's

2    talk for just a moment about all of the weights or some of the

3    weights that you know that this conspiracy involved that amount

4    of drugs.

5              First, let's talk about the capacity of that trap.

6    You know it was 25 to 30 kilograms.  The testimony of Antonio

7    Jimenez-Baez, the confidential source posing as the trap maker:

8    between 25 and 30 kilos.  We also know that from the

9    transcripts, from the recordings that Mr. Jimenez-Baez made

10   with this defendant and with Jorge Gomez.  Government Exhibit

11   202T, what does Mr. Jimenez-Baez say?  "What I'm bringing you

12   holds 25 to 30 miles per gallon.  It has that space per

13   gallon."  He's talking about that size of the trap.  Ladies and

14   gentlemen, why get a car with a trap that big unless you need

15   it?

16             How else do you know this involved more than five

17   kilograms?  Mr. Jimenez-Baez's conversations with Jorge Gomez.

18   Again, let's go to the transcripts, 203T.  These are stipulated

19   to, ladies and gentlemen.  Everyone agrees, both sides agree

20   that these are accurate and the people who were talking said

21   what they say.  So what did they say?  203T, this is that

22   meeting in Paterson, New Jersey, between the confidential

23   source, Mr. Baez, and Jorge Gomez.  You see.  What's Jorge

24   looking for?  He's looking for one to hold 50, 50 kilos.  What

25   else do they say?  "50 pesos."  Now, you know he's not talking

1   about 50 Mexican bills.  He's talking about 50 kilos there.

2         What else does he say?  Again, 50 pesos, and here he

3   says, "25 for me and 25 for another person."  That's what

4   they're looking for; that's what they're expecting.  Again,

5   another way you know that it was more than five kilos, because

6   this defendant, Sandy Gomez, and his brother were trying to get

7   more cars, more traps, bigger traps.  Why?  To move more drugs.

8         203T again.  What do they say?  Jorge Gomez and

9   Mr. Jimenez-Baez are talking about more cars.  "I wish you had

10  a couple of cars doing little things to them."  At the bottom,

11  what does the confidential source say?  "I'll bring you another

12  one and that one holds 40."  More cars, more traps.

13        Talking about a different car here, same exhibit,

14  203T, "That one holds 38 to 40."  They're talking about a

15  Highlander to hold 28.  40 kilos, a Toyota 100.  More cars,

16  more traps.  And the defendant, Sandy Gomez, gets in on the

17  game too when he talks about more cars, more traps.

18        Government Exhibit 206T, this is the phone call that

19  the defendant made when he was on the way down to New Orleans

20  with Caronlay Ramon-Baez by his side.  What does he say?  These

21  are the defendant's own words.  The confidential source says,

22  "I'll see if I can have the other one ready so I can bring it

23  down for you right away."  What does he say?  He doesn't say,

24  What are you talking about?  He doesn't say, I don't

25  understand.  He says, "All right then.  OK.  Do what you can."

1       Again, "the 250 Diesel."  We'll come back to this and

2  talk about the defendant's testimony on the stand.  That was a

3  pretty vivid moment.  But here you have it, "the 250 diesel."

4  Another engine, another car, another trap.

5       How do you know that this involved cocaine?  Well,

6  ladies and gentlemen, you saw the evidence, Government Exhibits

7  403D and 403C.  This is almost five kilos of cocaine that was

8  recovered from the car that the defendant was driving in

9  Louisiana.  And there's a stipulation on this.  The stipulation

10  is Government Exhibit 1004.  It was cocaine and it weighed just

11  under five kilos.  So let's put that aside.

12       The only question left, the only thing really at issue

13  in this case is whether the defendant knowingly joined the

14  conspiracy.  And here too, on that question, even though the

15  defense is disputing that, there is overwhelming evidence that

16  he joined this conspiracy.  There are many reasons.  I'm just

17  going to focus on three in this closing statement:

18       First, the testimony of Caronlay Ramon-Baez.  She gave

19  you an insider's view on this conspiracy.  She was by the

20  defendant's side step by step, from New Jersey down to New

21  Orleans, back to New Jersey, back to New Orleans, until they

22  were stopped and arrested in Slidell.  Her testimony, ladies

23  and gentlemen, is absolutely devastating for the defendant.

24  But even setting her testimony aside, the story of the

25  defendant's travels, starting when he came up to New Jersey in

1  November 2014, it's been proven at this trial and it shows the

2  defendant's guilt.  But even setting that aside, perhaps most

3  important and most problematic are the defendant's own words.

4  His words are those transcripts when he calls the CS, the

5  confidential source, and his words on the stand yesterday

6  afternoon and this morning.  You could convict the defendant

7  based just on that.

8          I want to talk about each one of these in turn and

9  review some of the evidence.  First there's Ramon-Baez.  As I

10  said, she had a front row seat and she gave you a front row

11  seat and took you inside the workings of this conspiracy.

12  Let's talk about what she said.  First the defendant came up

13  from Texas in November 2014 and he wanted Jorge to give him

14  work here.  What was work?  Work was working at that heroin

15  table, but you will learn that Jorge said, and this is the

16  transcript at 205, you'll learn that Jorge said no.  He didn't

17  want to work with family members.  I'm sorry.  This is

18  transcript at page 204.  So here, this is what I was just

19  talking about.  Sandy Gomez wanted work.  He wanted to get to

20  that table.  Jorge said, "I don't work with family."  But

21  Ms. Ramon-Baez told us how it was this defendant who came to

22  the table and approached workers there to find somebody who

23  could go with him to New Orleans, and he was willing to pay.

24          You learned from Ms. Ramon-Baez, "Sandy said he had

25  the acquaintance in New Orleans to give him 50 to a hundred

GbaWgom2              Summation - Mr. Cooper

1    kilos to bring back to Paterson."  What was he going to do once

2    that cocaine got back?  He was going to give it to people in

3    New York.

4          Now, Ms. Ramon-Baez told you a bit about that first

5    trip down to New Orleans at the end of November.  She and the

6    defendant flew from Newark, and we saw the text messages she

7    traded with Jorge.  This was Government Exhibit 402T.  You

8    remember Ms. Ramon-Baez was updating Jorge about where they

9    were and what they were doing.  And when they got to New

10   Orleans, you heard about the defendant's attempts to get the

11   cocaine from the supplier.  Let's look at that.  This is

12   transcript at page 210.  What did this defendant say to the

13   supplier?  He said, "Hey, it's Pedro."  He made up a fake name,

14   but there was a miscommunication.  The defendant and the

15   supplier got crossed up.  Each thought the other was going to

16   provide the car with a trap, so the trip was a no-go.

17         The defendant had to find a car.  So what did he do?

18   Again, we heard from Ms. Ramon-Baez exactly what he did.  He

19   got back to Paterson, he talked to Jorge, and Jorge said, I can

20   arrange for a trap.  Jorge was going to call his friend Yovanny

21   Perez, and the defendant and Jorge came to a financial

22   arrangement.  This is transcript page 212.  Jorge was going to

23   front the money and the defendant was going to pay Jorge back

24   after he brought the drugs to Paterson.  And we know that the

25   defendant tested the trap car.  We know that from

GbaWgom2                    Summation - Mr. Cooper

1    Ms. Ramon-Baez.  We know it from other witness that we'll talk

2    about in a minute.  But looking at what Ms. Ramon-Baez said, on

3    December 14, 2014, what happened?  The three of them -- Sandy,

4    Jorge, and Ms. Ramon-Baez -- got together at Jorge's apartment,

5    and Jorge showed Sandy how the trap worked.  And even

6    Ms. Ramon-Baez knew that the defendant had a problem with the

7    trap.  She told you about that.  Everybody knew that the

8    defendant, Sandy Gomez, had a problem with the trap.  It was

9    because of an issue in the back seat.  The back seat was loose;

10   the trap was visible.  And he was concerned that if they got

11   stopped by the police, the police would be able to see there

12   was a hidden compartment in the car, but he took the car

13   anyway.

14            Now with the car he drove back to New Orleans with

15   Ms. Ramon-Baez by his side.  She told you how they drove all

16   night on December 4.  They spent the next day at a hotel and

17   then drove all night again on December 5.  You saw the message

18   that Ms. Ramon-Baez sent to Jorge letting him know all about

19   that last leg of the trip.

20            Government Exhibit 402T, these are the text messages

21   that Ms. Ramon-Baez exchanged with Jorge Gomez to update him.

22   What did she say on December 5?  This is when they were stopped

23   at the hotel in Virginia before they were going to drive all

24   night.  She says, in a text, "He wants to go 5:00 because the

25   license plate is from New Jersey."  Remember Ms. Ramon-Baez's

1    testimony on this very point.  Why did he care?  "Because if

2    the police saw us, the fact that we had New Jersey plates, that

3    was going to be a problem."  You know exactly why he was

4    concerned, because he knew that the car had a trap and he knew

5    he had a mission.

6          So what did the defendant do?  You heard that from

7    Ms. Ramon-Baez also.  When they got down to New Orleans, he

8    covered up, he wanted a cover for the part of the license plate

9    that said New Jersey, and he used the name Pedro again when he

10   called the supplier in New Orleans.  The defendant left

11   Ms. Ramon-Baez in the hotel and went out for a few hours, and

12   when he came back, he had the cocaine.  Now, Ms. Ramon-Baez had

13   a very vivid recollection of this.  You may recall that

14   testimony.  The defendant came back, and this is the

15   transcript, pages 229 and 230:  "He came back to the hotel

16   room, took out the cocaine, and put it on the bed in the hotel

17   room," and she saw that they were packaged differently.  One

18   had a purple glove around it; the others had different kinds of

19   wrapping, and there were five individually wrapped bricks.

20         What did they do then?  Mr. Gomez drove to a dark

21   street to put the kilos in, to open up the trap and put the

22   kilos in.  Of course he drove to a dark street.  He's not going

23   to put the kilos in in a parking lot of a hotel with cars

24   coming and going and guests coming and going.  That makes

25   sense.  And then you also know that down in Louisiana, before

GbaWgom2                    Summation - Mr. Cooper

 1   they started coming back up, the defendant coached

 2   Ms. Ramon-Baez on what to do and what to say if they were

 3   stopped by the police.  He told her to tell the police that

 4   they were having a sexual relationship and to say that they

 5   came to watch the football game between New Orleans and

 6   Carolina.  And ladies and gentlemen, when they were stopped by

 7   Trooper Whittaker, that's exactly the defendant's story,

 8   exactly what he told the trooper, which you know not to be

 9   true, and what she testified on the stand also was not true.

10   It was a lie.

11          Now, Ms. Ramon testified yesterday, I'm sure it's

12   fresh in your minds.  Her testimony, you know, is absolutely

13   devastating for the defendant.  And Ms. Todd knows that

14   Ms. Ramon-Baez's testimony is problematic for her client

15   because hearing that testimony you know the defendant is

16   guilty, and that's why Ms. Ramon-Baez was asked a number of

17   questions on cross-examination about her incentive to tell the

18   truth and what she said about this and what she said about

19   that.  So let's talk about that because, ladies and gentlemen,

20   you should scrutinize Ms. Ramon-Baez's testimony carefully.

21   She pled guilty to serious crimes.  You don't need to like her,

22   but you do need to consider her testimony and ask yourself

23   whether it makes sense.  Ask yourself, What was her demeanor

24   like on the stand?  Did she answer Ms. Todd's questions in the

25   same manner that she answered Ms. Crowley's?  Yes, she did.

1   Did she seem like she was holding back, or did she talk about

2   her own drug-dealing past, Jorge's drug-dealing past, the

3   defendant's participation in this conspiracy, even the

4   participation of her family members?  She laid it all out

5   there.  She had nothing to hide.  Also important, ask yourself,

6   Is her testimony corroborated?  Is there other evidence that

7   her memory is correct and she was being truthful?  What about

8   the documents?  What about other witnesses's testimony?  Let's

9   take a look because you will see that time and time and time

10  again, in ways big and small, her testimony from the stand is

11  corroborated by documents that are in evidence in this case and

12  other testimony.

13          So that first New Orleans trip, the flight that the

14  defendant and Ms. Ramon-Baez took at the end of November, she

15  told you how she and the defendant flew down to New Orleans

16  again in November to meet the source and get the drugs.  She

17  told they flew from Newark to Houston and from Houston to

18  Louisiana.  Well, we have the flight records, and you saw them.

19  Government Exhibit 53 that came in through Debbie Erickson, the

20  witness from the company that manages the travel systems.

21          What did they show?  Sandy Gomez, Caronlay Ramon-Baez,

22  date of departure, November 26.  Where did they fly?  Newark to

23  Houston, Houston to New Orleans.  Corroborates Ms. Ramon-Baez's

24  testimony.

25          What about that second New Orleans trip?

 1   Ms. Ramon-Baez told you how she and the defendant flew down to

 2   New Orleans at the end of November to meet the source and get

 3   the drugs.  I'm sorry.  She told you how they drove.  This is

 4   the second New Orleans trip.  She told you how they drove all

 5   night and they slept during the day and they drove all night

 6   again, and that's corroborated by what you heard from Task

 7   Force Officer Garcia, the first witness who testified.  He was

 8   doing surveillance.  They got trap alarms on December 4, and

 9   then closer to 9 p.m. the vehicle started to move.  You

10   remember, he and his partner, Detective Patti, jumped in the

11   car and chased after the white SUV.  They drove all night to

12   get to Virginia, and then later on that evening they got back

13   in the vehicle and they started moving again, corroborating

14   Ms. Ramon-Baez's testimony.

15          So Ms. Ramon-Baez told you how when they were in New

16   Orleans, for the most part they stayed in the hotel, but the

17   defendant went out around town to meet the supplier and get the

18   cocaine.  That's corroborated first by the testimony of Task

19   Force Officer Garcia, who said they did surveillance, the DEA

20   and local law enforcement, and they saw the defendant, Sandy

21   Gomez, go out alone from the hotel while Ms. Ramon-Baez stayed

22   there.  But it's also corroborated by the text messages.  This

23   is Government Exhibit 402T, again, Ms. Ramon-Baez's text

24   messages back and forth with Jorge Gomez, updating him about

25   what's going on.  What does she say on December 7?  "Man, I

1   don't believe with that work they haven't called."  You know

2   she's not talking about any job other than cocaine.  She can't

3   believe the supplier's not getting back to them.  And then what

4   does she update Jorge Gomez?  "He already left to see the

5   people."  Right there, ladies and gentlemen.  That is where

6   Sandy Gomez went out to get the cocaine.

7         Now, even minor details that Ms. Ramon-Baez recalls,

8   those are corroborated too.  For example, she said that she and

9   Sandy got Popeye's because they were hungry.  That's in the

10  transcript at page 231.  What do we see in Defense Exhibit F?

11  It's a little small.  I'll hold it up so you can see it, but

12  this is a picture of the car that was pulled over by Trooper

13  Whittaker, and if you look in the passenger's side of the seat,

14  it's a Popeye's box.  Again, details big and small.

15        What else did she say?  She said the seat was broken.

16  We all know that by now.  So what did Sandy do?

17  Ms. Ramon-Baez, and this is again transcript at page 231, she

18  said that Sandy put pillows and bedcover on the top of the

19  trunk so the seat wouldn't move.  Another defense exhibit,

20  Defense Exhibit G, I'll hold it up again.  What do you see

21  there right behind the seats, the back seat?  You see pillows

22  and a blanket propping up that back seat.  Again, details big

23  and small, Ms. Ramon-Baez time and time and time again

24  corroborated by documents, corroborated by pictures and

25  corroborated by other witnesses' testimony.

1           Ladies and gentlemen, Ms. Ramon-Baez's testimony is

2    reliable because it is corroborated, time and time again.

3    You've also seen that she had every incentive on the stand to

4    tell the truth.  She's facing very serious penalties, and you

5    heard her say that she's cooperating in the hopes of obtaining

6    leniency.  You also heard her say she believes if she lies, the

7    benefits of her cooperation go away and she's still facing very

8    serious penalties, yet another reason to know that she was

9    truthful on the stand.

10           And by the way, we know exactly why the defendant is

11   so concerned about Ms. Ramon-Baez's testimony.  It's not just

12   the concern that started here at the trial; it's a concern that

13   started months ago.  We heard from Ms. Ramon-Baez, and this is

14   transcript at page 233, after a court proceeding, the two of

15   them got on the train together to go back from court to New

16   Jersey, and Sandy told her that whoever asked -- her lawyer,

17   the government, or whoever -- to say that Sandy asked Jorge to

18   borrow the SUV, the cocaine was already in the SUV, and they

19   should blame it all on Jorge.  Why?  Because he knew that if

20   Ms. Ramon-Baez took the stand and testified truthfully, it was

21   game over.  You could convict the defendant based just on

22   Ms. Ramon-Baez's testimony, but ladies and gentlemen, there's

23   much, much more here.  So let's talk about the second reason

24   you know the defendant is guilty, the story of his travels.

25           Now here, he flies down to New Orleans late November

1  2014 with the ex-girlfriend of his long-estranged brother.  He

2  stays down there for two days and then he flies back.  And all

3  this is on flights that were purchased either the same day or

4  just the day before.  Those are the undisputed facts.  OK.

5  Maybe he can craft some kind of explanation for what that's all

6  about.  But then a week later, what does he do?  He gets in the

7  car, given to him by his brother, with Ms. Ramon-Baez by his

8  side, and drives all the way back down to New Orleans.  So

9  let's even set aside for a moment the transcripts.  His voice,

10  his words, where he tells the confidential source:  "Trap

11  doesn't look good; concerned about safety; those people down

12  there, they check everything."

13        Let's set that aside.  We're going to come back to it.

14   But what does he do when he gets to New Orleans?  Well, even

15  before he gets to New Orleans, what does he do?  He drives all

16  night and sleeps all day.  You know why he was driving only at

17  night.  Once he gets down to New Orleans, what does he do?  He

18  buys a cover for the license plate that covers up the New

19  Jersey, and now we know exactly why.

20        What happens down in New Orleans?  He's seen going by

21  himself around New Orleans, making stops, meeting with another

22  person, while his long-estranged brother's ex-girlfriend stays

23  back in that hotel room.  That's what we heard from Task Force

24  Officer Garcia.  And then what happens?  He gets back behind

25  the wheel and, with his companion in the passenger's seat,

1    starts back to New Jersey.  And here, ladies and gentlemen,

2    he's stopped by Senior Trooper Ron Whittaker, so let's focus on

3    that for a minute.

4           You heard the testimony of Trooper Whittaker.  He

5    talked about how he received information from the DEA that they

6    wanted him to stop that white Yukon Denali.  So he did.  Who

7    was driving the car?  The defendant was driving the car.  Who

8    was in the passenger's seat?  Ms. Ramon-Baez.  Let's talk about

9    the things the defendant said to Trooper Whittaker.  You saw

10   that dashboard camera video.  It was a little shaky, but we

11   could hear what was going on, and Trooper Whittaker testified

12   about what was going on.  What happened?  The defendant lied.

13   Again and again he lied.  He lied that Ms. Ramon-Baez was his

14   girlfriend.  He lied that he had come from North Carolina.  He

15   lied that he had been to a game, and then he forgot the score

16   to the game.  He literally could not get his story straight.

17   And ask yourself why.  Why lie?  Why tell lie upon lie upon

18   lie?  You know why.  The evidence and your common sense tell

19   you exactly why he lied.  He was protecting the precious cargo

20   hidden in the trap in the back seat.

21          Ladies and gentlemen, think of all the people who knew

22   that there was a trap in the car and there were drugs in the

23   trap.  Jorge knew.  Ms. Ramon-Baez knew.  Even the confidential

24   source back in New Jersey and New York knew the car was going

25   to come down and come back up with drugs.  But the man behind

1   the wheel of that car is the one person in this whole room who

2   didn't know?  That defies logic, that defies the evidence, and

3   that defies your common sense.  You could convict the defendant

4   based just on those facts.  But if that weren't enough, ladies

5   and gentlemen, the most devastating evidence in this case --

6   the most devastating evidence -- are his own words, the

7   defendant's own words on those transcripts and the defendant's

8   own words on the stand.  You could convict the defendant based

9   just on his own words.  We'll talk about the transcripts now,

10  but first I want to address the man who wore the recording

11  device, Mr. Jimenez-Baez.  He was the second witness.

12          Now, I must remind you that the defense bears no

13  burden in this case.  The burden remains on the government, and

14  we embrace that burden.  But when the defense questions

15  witnesses and offers evidence in its case, you should

16  scrutinize all of that very carefully, and we're entitled to

17  comment on it.  So let's talk about that.

18          Ms. Todd spent most of her cross-examination of

19  Mr. Jimenez-Baez attacking him and suggesting that he was this

20  large-scale drug trafficker who might have been lying on the

21  stand in the hopes of obtaining a reduced sentence.  Well,

22  guess what, ladies and gentlemen.  It's not true.  You heard

23  him say he got that 5K letter and he was sentenced a year

24  before he took the stand in this case.  But the fundamental

25  point here, and you know this at this point, is that

1    Mr. Jimenez-Baez was nothing more than a walking recording

2    machine.  He made recordings.  From those recordings

3    transcripts were made.  They were stipulated to by the

4    defendant.  They are accurate, that's what he said, that's what

5    Mr. Jimenez-Baez bias said.  No amount of attack on

6    Mr. Jimenez-Baez can change the defendant's words on those

7    transcripts.

8              The first transcript that the defendant's is on,

9    that's Government Exhibit 205T, December 4, 2014, in the

10   afternoon.  Who is on the call?  It's the confidential source,

11   it's this defendant, and it's Jorge Gomez.  After you've heard

12   all the evidence in this case, at this point you know exactly

13   what they're talking about:  The call that the trap in this car

14   is not very good.  We've had plenty of testimony about that,

15   Mr. Jimenez-Baez, Trooper Whittaker, Ms. Ramon-Baez.  Everybody

16   agrees it's a bad trap.  You can open up the back door, you see

17   the molding is mismatched, you see wires, you see a gap in the

18   seat.  The trap is no good.  And we saw a picture of the back

19   seat of that Denali, and we had testimony.  You can see there's

20   a wire.  This is Government Exhibit 103 on the screen.  There's

21   a wire exposed on the right-hand side, and what Trooper

22   Whittaker said:  If you look at the bottom, underneath that

23   cushion, that's supposed to be empty.  You're supposed to be

24   able to see all the way through, but you can't.  There's

25   molding there and the molding doesn't match the rest of the

1  car.  The point is, ladies and gentlemen, the trap is not very

2  good; it can be seen.

3        So what do they talk about in this call?  What does

4  Mr. Gomez say?  "Well, look, we were checking out the car.  I

5  was explaining to him that I used to have a car just like that

6  one."

7        Now, I'm unclear after cross-examination whether he

8  actually had a Yukon Denali, whether it was a Tahoe, the Tahoe

9  was stolen, but the point is, ladies and gentlemen, what were

10  they doing, what were they checking out the car?  Was it

11  looking at the oil and the gas, as Mr. Gomez would have you

12  believe, or was it taking a look at the quality of that trap?

13        Remember the testimony of Task Force Officer Garcia on

14  this very day.  On December 4, the trap alarm kept going on

15  off.  Transcript at pages 40 and 41.  Officer Garcia said, "It

16  kept ringing like somebody was testing out the trap.  It rang

17  several times," December 4, the same day as this telephone

18  call.  We know why, because Jorge and Mr. Gomez, this

19  defendant, were together.  He admitted that on the stand.  He

20  said they were together that day.  The trap alarm was going off

21  why?  He was testing the trap.

22        What else do they say?  Mr. Gomez says, "When

23  traveling and you go to different places, the car has space in

24  there and the seats go down."  You know exactly what he's

25  talking about.  There's a space.  There's that gap in between

1    the bench and the cushion, you can look down, you can see the

2    trap, another explanation that defies logic and defies common

3    sense.

4         And by the way, remember the defendant's

5    cross-examination just probably an hour ago.  I asked him when

6    he said that he wasn't concerned about a trap, he said he was

7    concerned about the engine.  That was his goal, because when

8    you're traveling and you go to different places you want to be

9    sure that the engine is all right.  OK.  So I asked him on

10   cross-examination.  Take a look at the transcript, take a look

11   at the whole transcript and tell us where it is -- where it

12   is -- that you were talking about the engine.  And what did he

13   say?  He actually said it was back here where he was saying:

14   "We were checking out the car.  I was explaining to him that I

15   used to have a car like that."  His testimony is that's about

16   the engine.  Ladies and gentlemen, that's ridiculous.  You know

17   it wasn't about the engine.  You know it was about the trap.

18        What else did he say?  "Back of the seat's a little

19   broken."  This is the confidential source talking to Mr. Gomez.

20   "It can't be that we're the unluckiest people.  The car's been

21   driven a lot and it's never had a problem."  You heard

22   Mr. Jimenez-Baez's testimony on the stand.  The problem is the

23   police.  That's what they were talking about.  Mr. Gomez, "And

24   I said to him it's because of the parts, the part that makes it

25   look different."  What part?  There's only been testimony at

1   this trial about one part in the car that looked different, and

2   it was Trooper Whittaker's testimony and he was talking about

3   the molding underneath the cushion of that back seat, the

4   molding that concealed the trap.  That's the evidence, ladies

5   and gentlemen.

6         Mr. Gomez, "The problem is that where it's going those

7   people check everything."  What was his explanation for this?

8   That he was taking the car to a buyer and he was concerned that

9   the buyer was going to check everything and that he would be on

10  the hook.  Why is that a problem for somebody whose only job is

11  to drop off the car as a favor for his brother.  He wasn't on

12  the hook for anything.  He was the delivery guy.  What's the

13  problem he was talking about?  You know the problem.  The

14  problem is the police check cars, especially cars in Louisiana

15  that have New Jersey license plates.

16        And then not content to merely talk about the quality

17  of the trap with the confidential source and the source's

18  supply in New Orleans, the defendant calls the confidential

19  source the following day -- this is December 5 -- to update him

20  about the status of the trip.  Now, that's Government Exhibit

21  206T.  He says he thought he was talking to the buyer of the

22  car -- that's his story -- down in New Orleans.  Either way,

23  let's take a look at what he says.  He says he'll be there

24  tomorrow.  We know that's accurate.  But what else does he say?

25  Person on the other end of the line says, "I'll bring you the

1    250 Diesel so that I can bring up both of them at the same time

2    in one trip."  Are they talking about the delivery of a car,

3    ladies and gentlemen?  No, they're not.  You know, based on

4    this, based on the defendant's testimony, and all the other

5    evidence, they're talking about traps.

6            So here, ladies and gentlemen, we have not only the

7    defendant's transcripts, transcripts of him talking to the

8    confidential source, we have the most devastating evidence in

9    this case.  We have a sustained effort yesterday afternoon and

10   this morning on the stand to get up there and to weave a story

11   and to try to get you to believe it.  Now, the defendant has an

12   absolute right not to testify, but as I expect the judge to

13   instruct you, because he chose to testify, you should judge his

14   testimony in the same way you judge the testimony of any other

15   witness.  Ask yourself, Does it make sense?  Is it consistent

16   with your common sense?  Is it consistent with logic and the

17   way that the world works and that people interact with each

18   other?  The answer is no.  He got up on the stand and made it

19   all up, lie after lie after lie.  Things that made no sense

20   whatsoever.  Ask yourself, Why would he do that?  The answer is

21   clear.  Because he had no other choice.  If he told the truth,

22   he would admit to his participation in this cocaine-trafficking

23   conspiracy, so he couldn't do that.

24           I'm only going to take a few minutes and talk about

25   the defendant's testimony because I'm sure it's very fresh in

GbaWgom2                          Summation - Mr. Cooper

1   your minds.

2          Now, the defendant would have you believe from his

3   testimony that he came to New Jersey at the end of November,

4   November 22, after long being estranged from his brother Jorge.

5   He says they only talked about logistics for family funerals

6   for years.  No personal conversations, no conversations about

7   family, about relationships, about jobs, about anything other

8   than who was going to sleep where and drive where at family

9   funerals.  That was November 22.  And his story is he didn't

10  meet Caronlay Ramon-Baez that day or the next day or even the

11  next day.  He said he met Caronlay Ramon-Baez on November 25.

12         What else happened on November 25, ladies and

13  gentlemen?  You saw those airline records, the date of issuance

14  of the tickets for this defendant and for Ms. Ramon-Baez to fly

15  down to New Orleans, issued on November 25, the same day he

16  says he met Caronlay Ramon-Baez.  Does that make any sense?

17  No, it doesn't.  And his explanation for that first trip, let's

18  just think about that for a minute.  He says, he wants you to

19  believe that he comes to New Jersey, talks to his

20  long-estranged brother, meets a woman he had never met before,

21  and his brother asks him to take this woman on a consolation

22  trip down to New Orleans because their relationship is

23  strained, the relationship, mind you, between Jorge and his

24  ex-girlfriend when Jorge is already living with a different

25  woman.  Of course could Caronlay get down to New Orleans

1    herself?  She was a grown woman, of course she could have.  But

2    no, obviously she wanted to be soothed and comforted by a guy

3    she had met just the day before, the long-estranged brother of

4    her ex-boyfriend.  But that's where he met Ms. Ramon-Baez for

5    the first time.  And this is his explanation for it.  His

6    brother asked him, he says, because his brother knew he was a

7    driver and he lived in that type of town, so take her around so

8    she could see some family, because Jorge and Caronlay needed

9    some time apart.  Ladies and gentlemen, that also is

10   ridiculous.

11         What else does he say?  He says that when he got back

12   to New Jersey, less than a week later, his brother asked him to

13   turn around and drive down to New Orleans to drop off a car.

14   No explanation, mind you, for why Caronlay Ramon-Baez was going

15   for the ride to go back to a city she had just been to a week

16   before.  No explanation for that.  Again, they have no burden,

17   but he testified.  No explanation.  His whole goal, you heard,

18   was to get back to Converse, Texas, in the cheapest way

19   possible.  Understandable.  You heard him testify that the

20   flights from New Jersey down to Texas were expensive; they were

21   600 bucks, and so he wanted to get closer to Texas because the

22   flights there were cheaper.  So what did he do?  He flies down

23   at the end of November.  Doesn't go from there to Texas.  Comes

24   back up to New Jersey because his brother asked him to, his

25   long-estranged brother, and then he drives back down.  He said

1    it's 1,200 miles in the car.  He's down in New Orleans, and

2    what did he do then?  Did he go to Converse, Texas?  No.  He

3    started driving back to New Jersey with Ms. Ramon-Baez.  Those

4    are not the actions of a man who is trying to get back to

5    Texas.  Those are the actions of a man who was driving a car

6    loaded with cocaine.

7        Ladies and gentlemen, I'm not going to go through any

8    more of the defendant's testimony.  I trust you saw it for what

9    it was: lie upon lie upon lie, from a person who had two years

10   to look at the evidence and to try to connect the dots in a way

11   he hoped would make sense.  But it did not make any sense, and

12   you know why.  Ladies and gentlemen, you could convict the

13   defendant based just on his own words.  But you have all of

14   these things.  You have the testimony of Ms. Ramon-Baez.  You

15   have the undisputed facts and the timeline of his trips down

16   and back from New Orleans, and you have, most important, his

17   own words, undisputed.  All of these things are clear.  All of

18   these things are consistent.

19       Ladies and gentlemen, the evidence is in and it is

20   overwhelming.  You saw the evidence.  You saw the transcripts,

21   205T and 206T.  I don't think I need to go through those in any

22   great detail any more than we already have in this trial.  You

23   saw the things that he said to the confidential source.  You

24   saw the things that were concerning him.  He was trying to get

25   traps, he was trying to get cars, he wanted to move more kilos

1   of cocaine, and he was concerned about the police.  If you have

2   any questions about those transcripts, you can ask to see them.

3   It's not worth going through them any more.

4          The defendant at this point has had his day in court,

5   but ladies and gentlemen, make no mistake.  Just because a case

6   goes to trial does not make it a close case.  And this?  This

7   is not a close case.  Based on everything you've seen, based on

8   everything that you've heard at this trial, there is one, and

9   only one, conclusion from the evidence: that the defendant,

10  Sandy Gomez, is guilty.

11         Thank you.

12         THE COURT:  All right.  Ladies and gentlemen, we'll

13  now hear the defense summation from Ms. Todd.

14         MS. TODD:  Thank you, your Honor.

15         On Monday morning, I stood before you and told you

16  that Sandy Gomez was an innocent man, and he is.  And I still

17  believe that, and I believe that the evidence has established

18  that unequivocally.  And I told you that I'd get back up here

19  at the end of this case and walk you through how the government

20  has failed to prove its case beyond a reasonable doubt.

21         (Continued on next page)

22

23

24

25

1            MS. TODD:  We are at this moment.  The government must

2      prove beyond a reasonable doubt each and every element of the

3      crime charged that Sandy Gomez agreed to participate in the

4      conspiracy with Caronlay Ramon-Baez and Jorge Gomez, and that

5      when he agreed to participate in the conspiracy that he knew

6      that the purpose was to traffic narcotics.  The Court will

7      instruct you when the Court gives its charges that the

8      government must -- not may -- must prove each and every element

9      of the crime charged beyond a reasonable doubt.

10           Mr. Gomez is accused in the indictment of

11     participating in the charged conspiracy since August 2014

12     through December 7, 2014, when he got arrested.  We now know

13     that's not true.  All of the plotting and scheming and

14     discussion of prices, quantity of cocaine, the size of the

15     traps, all those Conversations were between Jorge Gomez and the

16     confidential informant Antonio Jimenez-Baez.  Mr. Gomez did not

17     participate in any of those conversations, nor was he present

18     during any of those conversations.  There is not a single phone

19     call, and all the phone calls were translated from Spanish to

20     English that are in your binders and all of them are in

21     evidence, and there is not a single phone call that establishes

22     that Sandy Gomez knowingly participated in this conspiracy.

23           Now, Ms. Ramon-Baez indicated that during that

24     December 4, 2014, 5:50 p.m., call which we have read to death,

25     that Jorge Gomez said, my brother was not comfortable to the

1   confidential informant.  You can read through the transcript.

2   There is nothing in there that says that, absolutely nothing

3   that says, my brother was not comfortable.  And if you recall

4   when I asked Antonio Jimenez-Baez when he was speaking to the

5   second person that he did not recognize to be Jorge Gomez,

6   whether or not he knew what the relationship was with that

7   person, he had no idea.  He didn't know that Sandy was Jorge's

8   brother.

9          Sandy came to New Jersey in November, late November,

10  after November 19, 2014 for one purpose, one purpose only.  He

11  came to a funeral.  His cousin Dorivee had passed.  They grew

12  up together.  She is like a sister to the family and all of the

13  family came together.  He came up from Texas.  The death

14  certificate, which is Defense Exhibit C, is in evidence.  As

15  you can see, it indicates that Dorivee passed on November 19

16  and Sandy came up shortly thereafter.  His son, 21-year-old,

17  Sandy Gomez, Jr., testified yesterday that they were all at the

18  funeral and he, too, was at the funeral.

19          Sandy Gomez did not come to New Jersey to traffic

20  cocaine.  He came to a funeral.  And the entire 2014 that was

21  the only trip he made.  He had not been here in August, he had

22  not been here in September, he had not been here in October,

23  and he had not been here prior to November 19, prior to her

24  death.  And his son testified that at the time he lived with

25  his dad in Texas, Converse, Texas, and he would see his dad

1  every day.  He would go to work and come back.  He would go to

2  school and come back.  Dad would be there.  It's impossible for

3  him to be here and be there at the same time.

4         Now, Sandy Gomez's reason for being in the truck was

5  very simple.  His brother asked him to drive the truck to

6  someone in Louisiana named Charlie and Sandy's understanding

7  was that Charlie was the new buyer of the vehicle because Jorge

8  explained to him that he was in the business of buying and

9  selling used vehicles and the confidential informant was the

10 mechanic who repaired those vehicles.  And Sandy accepted to

11 drive the vehicle to Louisiana because at the time ticket

12 prices from New Jersey to Texas were expensive.  It was around

13 Thanksgiving.  Right after Thanksgiving, December 4, he said

14 the tickets were around $600.  Jorge offered to, if he would

15 drive the vehicle to Louisiana and drop it off to this new

16 buyer, Jorge would offer the gas and the hotel and that's what

17 happened.  He didn't get paid for the trip.  And the ticket

18 prices from Louisiana to Texas, which borders each other, was a

19 little over $100.  Great deal.  Why wouldn't he do that to save

20 some money.  And so that was the only reason why he did that.

21        Now, there was all this talk about checking the

22 vehicle, that Sandy knew the trap was there.  But it's very

23 simple.  He is going on a long road trip, so he is checking the

24 vehicle.  Checks the oil, checks the air pressure, checks the

25 gas.  He goes to put his luggage in the back and it's crowded.

1    The trunk is not as big, can't fit everything.

2           And he does what we all do when we are putting stuff

3    in the trunk of a vehicle for those of us that drive, try the

4    fold the back seat down.  It wouldn't go down.  It sits

5    upright.  He brings that to his brother's attention and they

6    get into this discussion because his brother knows why the seat

7    won't go down, because the trap is underneath.  Sandy doesn't

8    know that.  If he knew that, why is he calling the mechanic

9    confidential source even though Jorge at the time didn't know

10   this was a CI.  Why is he calling and putting Sandy on the

11   phone and saying, talk to him?  If he knew there was a trap

12   under that seat, why is he calling the confidential source?

13          Now, the government would like you to believe that

14   he's calling the confidential source because he's

15   uncomfortable.  Every single witness who testified indicated

16   that the trap was not visible, that you had to know exactly

17   what you were looking for to find it.  It was well hidden, not

18   visible to the naked eye.  You have to go looking for it.

19          Sandy speaks to the confidential informant and he

20   tells him he has a similar truck, so he knows the seat can go

21   down.  And after some back and forth, the confidential

22   informant agrees that the seat is a little broken.  There is no

23   discussion about drugs, there is no discussion about a trap.

24   There is none of that.  The exhibit is in evidence.  It's in

25   plain English.  Use your common sense, read it, and see what it

1  says to you.  I'm of the belief that you'll come to the same

2  conclusion, that it doesn't say what the government wants you

3  to believe it says.  You have got to make a lot of leaps and

4  bounds to get there.

5        If you will recall, the confidential informant had

6  told Jorge that he was a mechanic, that he repaired vehicles,

7  that he had a body shop.  So none of this is as farfetched as

8  the government wants you to believe.  So Jorge is running his

9  own operation.  His own operation was between him and Caronlay

10  Ramon-Baez.  The two of them are together in this all the time,

11  relying on each other.  I went through the extensive history of

12  her relationship with him dealing with his suppliers, picking

13  up and delivering drugs, collecting money, selling it, lining

14  it up, packaging it in her mother's house.  They have workers,

15  all of that.  She is his right hand.  They are together.  This

16  is their operation.

17        Now, there were two trips to Louisiana.  My client

18  didn't deny that.  Never lied about that.  He took those trips.

19  And it was innocent.  He had no idea that there was a trap in

20  the vehicle.  And you have to remember, Jorge couldn't leave

21  the State of New Jersey.  He had an electronic bracelet.  He

22  can't leave.  He asked my client to drive the vehicle down to

23  New Orleans because he can't get out of the state.  He would be

24  in trouble with the law if he did that.

25        Caronlay gives my client one story and she gives Jorge

1    the other story.  And the other story with Jorge is that she is

2    in partnership with him.  If you will recall, she testified she

3    admitted that she wanted out.  She wanted a different life.

4    She was looking to Texas to see if she liked it.  She also

5    discussed her relationship, her romantic relationship.

6    Although Jorge was living with another woman, it didn't seem to

7    be over because I asked her, and she said they were having

8    problems.  She confided in Sandy Gomez about what was going on

9    in their relationship.  She confided in him about her medical

10   problems, about medication that she was taking, and she

11   admitted that he was understanding.  We are not pulling this

12   out of thin air.  This is from the witness' own mouth.

13        As she said, whatever Jorge says she goes along with

14   it, and that's her testimony.  The question was:  And

15   everything that Jorge tells you you believe, correct?  Yes.

16   She goes along with whatever program he's on.  She is on board

17   with him because they are partners in crime.

18        The fact is, Ms. Ramon-Baez had two plans going.  The

19   sob story that she was telling Sandy Gomez about her

20   relationship with Jorge and wanting to go to Texas to live

21   there.  This is in her testimony.  I asked her:  You wanted a

22   change, right?  And she said:  Yes, I wanted to get out of

23   everything.  And I asked her:  You're looking for a new place

24   to live, right?  And she says.  No.  I just wanted to leave

25   that work.  And I pressed her.  And Texas, you wanted to see

1    what it was like, correct?  And she said yes.  Wanted to see if

2    it was a place that you'd like to reside at some point, right?

3    She agreed.  She said yes.

4         Now, Ms. Ramon-Baez told some very tall tales.  I am

5    going to go through a few of them, just line them up for you.

6    She is what I call the gift that just kept on giving.

7         Before she testified, she met with the government many

8    times and wove what I consider a web of lies and by the time

9    she took the stand she just simply couldn't keep it straight.

10   When she realized the jig was up, she restored to, I don't

11   remember.  That's her routine.  I don't remember is a way of

12   avoid accepting that she had lied.  This was important because

13   there was a pattern.  There is a stipulation, and that is

14   Government Exhibit 1005 where it clearly states that we agree,

15   meaning the government and myself, that on or about September

16   28, 2016, Caronlay Ramon-Baez met with Assistant United States

17   Attorney Patrick Egan, an agent from the Drug Enforcement

18   Administration, a paralegal from the United States Attorney's

19   Office, and a Spanish interpreter.  At that meeting Caronlay

20   Ramon-Baez said, in substance and in part, that Sandy Gomez

21   came to New Jersey from Texas around August 2014.  And the

22   stipulation continues:  It is further stipulated and agreed

23   that this stipulation, as Government Exhibit 1005, may be

24   received in evidence as a government exhibit at trial.

25   Because, as you will recall, when she was on the witness stand

1    she is trying to backtrack as to when he came because now she

2    realizes, it's not true.  So it's October, some time in

3    November, she can't remember.

4         There is absolutely no communication in August between

5    my client and her, none in September between my client and her,

6    none in October of any sort between Sandy Gomez and

7    Ms. Ramon-Baez.  Why?  Because they didn't know each other.

8    They met each other for the very first time when he came to New

9    Jersey at that funeral some time after November 19, which is

10   when his cousin passed.

11        Now, Ms. Baez also said that when they went to

12   Louisiana my client spoke with somebody who had kilograms of

13   cocaine and the owner of the kilos said, hey, did you bring the

14   car with the secret compartment in it?  This is where your

15   common sense kicks in because what drug dealer talks like that.

16   None.  Did you bring the car with the secret compartment in it.

17        She also testified that the cost of renting the truck

18   was $4,000.  In fact, she insisted on it, that it was $4,000,

19   and she said, Jorge paid $2,700 up front and that Jorge told

20   the man that when Sandy came back he would pay the remaining

21   $1300.  This is her testimony.  The government asked her:  And

22   what did Jorge and that man discuss at that time?  And she

23   responded:  He delivered the SUV to Jorge.  Jorge said how much

24   is it?  He said $4,000.  Jorge said to him:  I'll give you 2700

25   up front and when Sandy comes back I'll pay you the remaining

 1   $1300.  That's her testimony.

 2         First of all, we know that Sandy didn't rent that

 3   truck.  We know the rental of the truck did not cost $4,000 and

 4   that George never said anywhere when Sandy comes back he would

 5   pay the balance of $1300.  That's nowhere in any recording at

 6   all.  And why she is doing this?  Because she is desperately

 7   trying to tie Sandy to this conspiracy.  We know the truck cost

 8   $1500, which was paid by Jorge because we have a recording on

 9   December 3, 2014.  That is Government Exhibit 203T, page 16.

10   This is the body wire.  This is the actual meeting between

11   Jorge Gomez and the confidential informant on December 3, 2014

12   where they discussed the price, quantity, and price of the

13   truck and when they could have it.  And on page 15 of the same

14   transcript the confidential informant says:  It's $1500.  And

15   Jorge says:  Oh, I should give you the $1500.  Yes.  That was

16   the price.  Not $4,000.  And the $1500 was $500 per day for

17   three days.  If you will recall, Antonio Jimenez-Baez, who was

18   the confidential source at that time, said, Ms. Baez brought

19   out a bag of money in a paper bag and Jorge counted $1500 for

20   full payment.

21         The first trip to Louisiana was cut short.  This is

22   the trip in November 2014.  And not because they didn't get any

23   drugs.  Because on cross-examination I asked her, it's simply

24   because Jorge wanted her back.  Somehow he seemed to have had

25   this -- I don't know if it's control but, like she said, she

1    does whatever he says.  And so I asked her.  This is

2    Ms. Ramon-Baez on cross-examination.  I asked her:  And the

3    trip was cut short, correct?  She answered yes.  I asked:  It

4    was supposed to be longer, right?  She answers yes.  It

5    depended?  Yes.  The next question was:  Jorge wanted you back

6    earlier than you had expected, correct?  Yes.  He called you

7    and asked you to come back home immediately, correct?  And she

8    said yes.  There is no discussion that she is coming home

9    because they didn't pick up any drugs on that.  The reality is,

10   Jorge wanted her back.

11        Now, according to Ms. Ramon-Baez, Sandy was broke but

12   offered her $2,000 to go with him.  This is the whole

13   conversation about asking to sit at the table.  So this man

14   left his job in Texas, if you follow her logic, and comes to

15   work at a crack or cocaine table.  There is no space for him

16   there.  So he goes out and makes a phone call, according to

17   her, and says he can get drugs in Louisiana and offers her

18   $2,000 to go on this trip with him.  And I asked her if he paid

19   her $2,000.  And she said no.  She expected payment when they

20   came back.

21        She further testified, and this is the part that just

22   makes no sense, that they go all the way to Louisiana in

23   December to pick up kilos and although he had not paid her she

24   goes along.  He gets five kilos of cocaine without any money.

25   You can't make this up.  The five kilos of cocaine that you

GBAMG0M3                    Summation - Mr. Todd

1   picked up, did he pay for that?  No.  He got them for free?  Of

2   course.  He just went to get it.  That was it.  And they were

3   going to pay him.  So she wants you to believe that he goes and

4   gets five kilos from whomever, all the way down in Louisiana,

5   and these people don't take any money from him, just let him go

6   with the five kilos halfway across the country with the trust

7   and belief that when he sells it he will pay them.  Does that

8   make any sense?  Drug dealers notoriously don't trust anybody.

9   This, again, is where your common sense kicks in.  Use your

10  common sense.  Assess the reliability and the credibility of

11  this witness, and I have no doubt that you will come to the

12  same conclusion that that is just senseless.

13          But, like I said, Ms. Ramon-Baez is the gift that just

14  keeps on giving.  She testified that after they got the kilos

15  of cocaine, they put it in the trap, started on their journey.

16  And then he, Sandy, pulled over on a dark street and he

17  repacked the cocaine two and two and one on top.  I'm not going

18  to put all the photos in.  They are all in evidence.  You can

19  take a look at it and you can see how they were packed when it

20  was opened.  Certainly doesn't look like that.

21          But I want to draw your attention to, we stop at a

22  dark street and when Sandy opened the secret compartment, which

23  was actually from his side, as you will recall, Sandy was

24  surveilled.  They gave all of the stops coming into Louisiana.

25  They described that.

1             Agent Garcia was one of the first witnesses who

2     testified and he spoke about their observations of the truck

3     coming into New Orleans and they also spoke about their

4     observations of the truck when it was parked at the hotel.

5     They had eyes on it.  Watched it when it left and tracked it

6     from wherever it went to the gas station, to the supermarket,

7     to the chicken spot, Popeye's.  Nothing in his testimony

8     indicated that they observed him stopped on a dark street.

9     There was no such evidence.  She is making it up because, like

10    I said, she is desperately trying to tie him to whatever she

11    was doing with Jorge.

12            You have to ask the question.  The government makes

13    this to do about this 402T, all of these text messages.  The

14    reality is, she is texting who are say.  What is Sandy doing?

15    He is sleeping, for crying out loud.  And she says that in the

16    text messages.  He is asleep.  And he is asleep for a number of

17    hours.  When Sandy woke up, she was dressed.  At one point she

18    needed to go to the car to get her medication.  We don't know

19    how long.  She was down there.  She claims Jorge did not show

20    her how to operate that trap.  Do you really believe that?  She

21    knew everything about what he was doing, everything from A to

22    Z, because she was his right arm.  She was his partner.  She

23    was his confidant.  She knew everything.

24            She also tried to make it seem, as everybody is trying

25    to make it seem, that the reason why Sandy complained about the

1    seat is because he knew the trap was broken.  I am just going

2    to put her testimony out there because she claims that the seat

3    was loose and that Sandy didn't have much confidence in the

4    truck as a result.  All of this to try to suggest to you that

5    Sandy knew something was wrong with the seat as a result of the

6    trap underneath it.

7          You know who else had an opportunity to examine that

8    seat?  Trooper Whittaker.  When he pulled over the truck and he

9    was looking around, he had an opportunity to observe what was

10   going on in that truck.  And I asked him.  I was asking him

11   about the seat.  And so in clarification he says, you're

12   talking about the seat where you lean back against?  Yes.  It

13   was upright.  And that part of the seat, was it firmly in

14   place?  Yes.  You couldn't move it.  No.  And it was not moving

15   back and forth, right?  Correct.

16         Now, the government, Mr. Cooper in his closing a few

17   minutes ago, said, the pictures in the defense exhibit

18   corroborate Ms. Ramon-Baez's testimony that this was a space in

19   the seat or the seat was loose and the pillows and the blankets

20   were used to prop up the seat, to the back seat, Mr. Cooper

21   says.  I have to tell you, that must be some super heavy

22   blankets and pillows to be propping up that seat.  Again,

23   common sense.

24         The license plate also became a fertile discussion for

25   Ms. Ramon-Baez and Trooper Whittaker and both of them made it

1    seem like that Sandy covered the license plate.  When I asked

2    Trooper Whittaker if that was simply a license plate frame, he

3    reluctantly said yes.  Didn't just want to say yes.  This is

4    another occasion where I'm asking you to use your common sense

5    For those of us who have cars or those of us who don't, we see

6    this all the time, not unusual.  This is Government Exhibit

7    101.  That's a license plate frame.  We all have that on our

8    cars.  It's not unusual.  It's not trying to cover up the

9    plate.  We use that to keep the plate in place.  Common sense.

10           Where did Mr. Gomez go when he went to Louisiana?

11   Normal places that people go when they travel.  Gas station,

12   places to get food.  He went to the store to get souvenirs to

13   his children.  Absolutely no one saw him engage in any

14   narcotics-related activity.  They didn't see him receiving any

15   packages, transferring packages to anybody.  And no one saw

16   Mr. Ramon-Baez either engaging in any criminal activity.  On

17   the drive back, on that December 4 trip, she was supposed to

18   drive back.  In fact, when Sandy goes back to tell her that the

19   buyer did not accept the car and it has to go back, she

20   pretended to be upset, but also, she had already known.  Why?

21   She had already spoken with Jorge.  Then she claims she is

22   sick.  Her medication makes her drowsy.  She has never driven

23   that distance.  And she is just dramatic.  Why?  It's all part

24   of the act to get Sandy to drive back.

25           Where was she seated when the vehicle was stopped?  In

 1   the passenger's seat.  Why?  Because she figured that the

 2   passenger would not get in trouble.  You are not the one

 3   driving the car.  We know that because there is some

 4   conversation about that with Jorge Gomez telling the CI on that

 5   December 3, 2014 call.  That's GX 2017.  Take a look at it,

 6   where he's saying, they usually let passengers go.  That was

 7   the plan.

 8           We know her involvement with drugs is extensive.  I

 9   went through that.  That took a minute to get through all of

10   that.  All the suppliers and buyers and quantities of heroin

11   and cocaine that she and Jorge engaged in from 2012 up to her

12   arrest was seemingly endless.

13           What is most troubling is her use of other people's

14   Social Security numbers.  That goes directly to her credibility

15   and honesty.  Remember, I asked her, do you consider yourself

16   an honest person and she looked me straight in the eye and said

17   yeah.  Then when I confronted her about using other people's

18   Social Security card and that it was stolen, she challenged me

19   that it's not stolen.  I paid $900 for it.  Because she paid

20   for it, that made it all OK.  And then the price went up, she

21   said, to a thousand dollars and she was OK with that because

22   she paid for it.

23           Ms. Ramon-Baez is the type of person that would sell

24   her soul to the devil, sell your soul to the devil to save

25   yourself.  Think about it.  Her daughter is three years old by

1    now.  Was born in 2013.  And she took her daughter's Social

2    Security card and gave it to somebody else without even

3    thinking twice about it.  What do you think she wants to do to

4    him?  She hardly knows him.

5           Now, the government, I believe, has not satisfied

6    their burden of venue, that the crime that Mr. Gomez is charged

7    with occurred in this district.  Although the burden is not

8    proof beyond a reasonable doubt, it's preponderance of the

9    evidence.  However you look at it, they have not satisfied it.

10   The only witness who testified as to any occurrence occurring

11   in this district is Antonio Jimenez-Baez, that at one point

12   when he called Jorge he was in Yonkers.

13          Mr. Jimenez-Baez admitted that he's an admitted liar.

14   He got really good at it.  And besides him saying he was in

15   Yonkers, New York on one of the four calls to Jorge, there is

16   no other testimony that any of the conduct happened here in

17   Manhattan, Bronx, Westchester, Yonkers, or anywhere in the

18   Southern District of New York.  We have no phone records to

19   establish that he was actually in New York and we know that he

20   lied about everything.  He told us so himself.  Remember, he

21   was telling Jorge he was a mechanic, that his name was Daniel,

22   Charlie or Samuel or whatever.  None of it was true.  He didn't

23   own a mechanic's shop, didn't own a body shop, anything of the

24   sort.

25          And if you will recall his testimony, that's him right

1    there.  I asked him:  You don't have a mechanic shop?  He

2    answered no.  Nor do you have a body shop?  He says no.  Nor

3    are you a mechanic?  No.  But you represented to Jorge that you

4    fix cars, correct?  Yes.  And that you work on cars?  Yes, he

5    says:  All of what he was telling Jorge, including that he was

6    in Yonkers all eyes, because that was his job.  And outside of

7    him saying it, there is no other record to establish that he

8    was in Yonkers.  He's a highly paid criminal making an

9    incredible amount of money with ease; as he told you, around

10   $300,000.  He has never worked an honest day in his life.  This

11   guy, Antonio Jimenez-Baez, who is facing a life sentence for a

12   major flirtation with narcotics, gets one year in jail.

13        And Agent Garcia, the first witness, who was working

14   with him, couldn't care less what his last name was.  When I

15   asked him, what's his last name, all I know, I know him as

16   Tony.  Do you know anything about his criminal background?  No.

17   Whether he is being prosecuted for crimes?  No.  He could have

18   been a serial killer, a murderer, anything.  He wouldn't know

19   because it didn't matter.

20        Antonio Jimenez-Baez claimed that the wires were all

21   over the place in the vehicle.  That was part of the trap.  He

22   said that.  He said it was a lousy job.  All of the photos are

23   in evidence.  You should take a look at them and see if you see

24   any wires just hanging loose anywhere.

25        While you are doing that, just recall that the

GBAMGOM2                     Summation - Ms. Todd

1    collective testimony from just about all the witnesses who had

2    an opportunity to look at the strap said it was not obvious, it

3    was hidden, the molding around was done to make it look like

4    factory, like it came like that out of the factory.  There was

5    no gap in the seats.  You can look at the pictures in evidence.

6            Trooper Whittaker was on the stand yesterday.  He is

7    the officer who pulled over Sandy Gomez and Caronlay

8    Ramon-Baez.  He never testified about observing any wires.

9    That never came out at all.  Why?  Because it doesn't exist.

10   We know that Antonio Jimenez Baez, for him, it's what's best

11   for him.  I asked him.  Because the most important factor

12   always has been what's important for you, right?  What's best

13   for you?  He responds, for my family.  And I said for you?  And

14   he agreed, yes.

15           THE COURT:  Ms. Todd, let me break in for a minute.

16   Let's all stand, ladies and gentlemen, take a moment to stretch

17   and Ms. Todd will continue.

18           MS. TODD:  Mr. Jimenez-Baez also told you that the

19   more valuable information he provided, the more he gets paid

20   and that he is motivated to make money, and his motivation was

21   to get paid.  And if you will recall his testimony, that's Mr.

22   Jimenez right there.  I asked him, do you get paid based on the

23   value of your information you provide to the government?  After

24   I get sentenced, yes.  So is it fair to say then the more

25   valuable the information, the more you get paid?  Yes.  You're

1    motivated to make money, correct?  Yes.  And so in every

2    conversation you have your motivation is to make sure that you

3    get paid, correct?  Yes.

4           Now, you saw the video of Mr. Gomez when he was pulled

5    over.  He immediately provided his driver's license to the

6    officer.  He didn't fuss.  He is calm.  He's cooperative.  He

7    comes to the officer as directed instead of running away.  This

8    is not the behavior of a guilty person.  He turns around so he

9    can be patted down.  The trooper finds nothing illegal on his

10   person, no weapons, no large amounts of cash.  Sandy is made to

11   stand on the side of the road.

12          He's not in handcuffs and he does not make a run for

13   it.  He doesn't offer the officer a bribe.  You will recall,

14   he's searching for quite some time.  He doesn't claim he is

15   sick, take me to the hospital so he can disrupt the flow of

16   what's going on.  He doesn't fight with the officer, doesn't

17   quarrel with him, doesn't argue with him.  In fact, he signs a

18   consent form and the consent form gives the officer permission

19   to search the vehicle.  This is not what someone who is guilty

20   does.  His entire behavior is consistent with someone who is

21   innocent.

22          Now, you will recall there were photographs, and they

23   are all in evidence.  There is Defense Exhibits D, E, F, and G.

24   But inside of the trap there were shopping bags containing the

25   narcotics that were recovered.  When you look at those

1   photographs, those packages are stuffed in that compartment.

2   Somebody had to push them in there.  This is no fingerprint

3   evidence at all.  I promise you, if his fingerprints were on

4   those bags, you would have heard about it.  The government

5   would have paraded that in front of you.  There wasn't any.

6   There was no fingerprints of him inside of the trapped area

7   either.

8          Now, there was some talk about the alarm on the trap

9   that was set up so when the trap was accessed, the agents would

10  receive the signal that the trap was accessed.  At no time did

11  they ever receive the signal.  Conveniently for them it wasn't

12  working.  It wasn't working.

13         Mr. Gomez's phone was seized when they arrested him.

14  If there was any evidence of any narcotics-related activity on

15  that phone, you would have been looking at it.  You didn't get

16  any.  Why?  Because there was nothing on the phone that suggest

17  that he was engaging in any criminal activity.

18         THE COURT:  Ms. Todd, we are going to take a brief

19  recess.

20         Ladies and gentlemen, we will be back to you very

21  shortly.  Don't discuss the case yet because it hasn't been

22  given to you.  We will be back to you very shortly.

23         (Jury not present)

24         THE COURT:  Sorry for the interruption, Ms. Todd, but

25  one of our jurors was nodding off.  I thought that the stand-up

1   stretch routine would be adequate.  It was for a while.  But

2   then it started happening again.  I just wanted to take a brief

3   recess, give him an opportunity to deal with that, and we will

4   resume in five minutes.

5           MS. TODD:  I'm almost finished, your Honor.  I have

6   five minutes or less.

7           THE COURT:  How long does the government expect for

8   rebuttal?

9           MS. CROWLEY:  Fifteen to 20 minutes.

10          THE COURT:  We will resume in five minutes.

11          (Recess)

12          THE COURT:  Are we prepared to proceed?

13          MS. TODD:  Yes, your Honor.

14          (Jury present)

15          THE COURT:  Ms. Todd.  Please continue.  Sorry for the

16  interruption.

17          MS. TODD:  Thank you, your Honor.

18          Sandy Gomez's mere presence in the vehicle, without

19  knowledge that there was a trap in the vehicle for the purpose

20  of trafficking narcotics, is not proof beyond a reasonable

21  doubt.  Think about it.  It's like you're getting a ride from

22  one of your friends.  You get in his car or her car.  The car

23  gets pulled over.  There is a gun in the trunk.  You are the

24  passenger.  It's not your car.  Should you be responsible for

25  that?

1          Mr. Gomez had absolutely no knowledge that by agreeing

2     to deliver the vehicle to someone he believed was the owner,

3     based on the information provided to him by Jorge, that Jorge

4     was in the business of buying and selling vehicles and that the

5     confidential source who goes by many names, whether it's

6     Samuel, Daniel, that he was the mechanic who was responsible

7     for repairing these vehicles.  Sandy Gomez had no knowledge and

8     the government must prove that he knew.  There is no evidence

9     that he knowingly joined this conspiracy.

10          As the Court will remind you and instruct you when he

11    gives the instruction, the government must prove each and every

12    element of the crime charged beyond a reasonable doubt.  They

13    must do that.  Not may, not more likely.  They must.  And you

14    must hold them to that burden of proof.  The evidence is clear,

15    Sandy Gomez is not guilty and the government has failed to

16    prove beyond a reasonable doubt that he is.  I'm asking you to

17    return the only fair and just verdict in this case and return a

18    verdict of not guilty.  Thank you.

19          THE COURT:  Ladies and gentlemen, we will now hear the

20    government's rebuttal.

21          MS. CROWLEY:  Your job as jurors is to find the truth,

22    to listen to the witnesses who testified, to review the

23    exhibits, to listen to the arguments of the attorneys, and to

24    find the truth.  And here is the thing about the truth.  It's

25    simple.  It makes sense.  It adds up.  It's supported by the

1    facts.  You just heard Ms. Todd's summation.  And what she

2    tried to do was focus you away from the truth, to distract you

3    and ask you to ignore nearly all of the evidence that you heard

4    throughout this short trial and to believe something that just

5    does not make sense.  Don't let her do that.  You know what

6    happened in this case.  You listened carefully to the witnesses

7    and you paid close attention to the evidence.  You know that

8    Sandy Gomez, the defendant, was dealing cocaine and he got

9    caught.

10          Now, as Mr. Cooper explained to you, the government

11   bears the burden of proof in this case and we embrace that

12   burden.  A defendant has absolutely no obligation to testify.

13   He doesn't have to put on a single witness or say a single

14   word.  But when he does, when he testifies and calls witnesses

15   and when his lawyer makes arguments as Ms. Todd did today, the

16   government can respond and we can ask you to scrutinize that

17   testimony and those arguments and ask yourself if they make any

18   sense.

19          Now, I want to talk for just a minute about what the

20   defense is asking you to believe happened back in November and

21   December of 2014.  Before I do that, I am just going to ask you

22   to remember that before the defendant took the stand yesterday

23   and today, he had seen all of the government's evidence in this

24   case.  As he testified earlier today, he had listened to the

25   calls.  He had reviewed the transcripts.  He had seen the

1    flight records, the text messages.  He had gone through the

2    notes that the prosecutors took of our meetings with the

3    witnesses, and then he sat through this trial and he listened

4    to the testimony of every single witness.  And I submit to you

5    that the story he told, the story Ms. Todd is asking you to

6    believe makes no sense.  It is something he made up two years

7    after it happened and contorted and twisted to fit around the

8    facts that the defendant couldn't run away from.  It makes no

9    sense.

10        What is she asking you to believe?  That this was all

11   a big setup?  That the defendant had no idea that there was any

12   cocaine in the car that he was driving the night he got

13   arrested, that he went down to New Orleans because he was a

14   good guy doing his brother a favor, that the drugs had been

15   secretly stashed in the trap at some point when the defendant

16   wasn't looking and then, unluckily for him, the police pulled

17   him over and found the cocaine?  That is ridiculous.  You know

18   it's not right.

19        You know that because Caronlay Ramon-Baez told you so.

20   You know that because all of the evidence in this case told you

21   so.  But you also know that because it makes no sense.  Think

22   about what the defense is asking you to believe, that the

23   defendant went down to New Orleans twice within the span of one

24   week because Jorge told him to.  The first time?  Because Jorge

25   and Caronlay had just broken up and they needed some space.  So

GBAMGOM3          Rebuttal - Ms. Crowley

1    the defendant agreed to get on a plane, fly to New Orleans with

2    her because he was a good guy who wanted to do his brother a

3    favor.

4              Now, according to the defendant, he did that despite

5    the fact that he wasn't close with Jorge, that he didn't really

6    trust him and that he hadn't really spoken with him in several

7    years.  That's transcript, page 373, the defendant's testimony.

8    But for some reason he decided to get on a plane, fly down to

9    New Orleans, and hang out with Ms. Ramon-Baez, a person he had

10   just met the day before.

11             And then a few days later the defendant agreed to go

12   back down to New Orleans again with Ramon-Baez again, this time

13   to deliver a car to one of his brother's customers.  That's

14   what the defense is asking you to believe.  And, by the way,

15   what was the defendant's explanation for why he made this

16   second trip?  Because he wanted to get back to Texas but

17   couldn't afford a plane ticket from New Jersey to Texas.

18   Instead, he decided he would drive to Louisiana and get on a

19   plane from there to Texas.  You'll recall that he testified he

20   couldn't afford plane tickets from New Jersey directly to Texas

21   because it was so close to the holidays the plane tickets cost

22   $600.  He couldn't afford that.  But, wait a minute.  You heard

23   Debbie Erickson testify and you saw in the ARC flight records

24   that the tickets that were purchased the week before, actually

25   right after Thanksgiving, they were only about $230.

1              By the way, you didn't see any records in those ARC

2    flight records of the defendant booking a trip from New Orleans

3    to Texas, the trip that he said he was going to make.  But the

4    defense is asking you to believe that he agreed to drive down

5    for 40 hours to New Orleans because he wanted to make it home.

6    Nonsense.  That's a story he made up, a story he twisted and

7    contorted in an attempt to explain away the evidence in this

8    case.  The flight records, the text messages, the fact that he

9    was the one driving the car.  But this doesn't make any sense.

10   The defendant went to New Orleans to get the drugs, drugs that

11   he had arranged to pick up.

12             And then what about the defendant's first call to

13   Antonio Jimenez Baez, the confidential source?  We have heard a

14   lot about that, the call where the defendant complains about

15   the back seat of the car.  Why does he make that call?  How

16   does the defense explain it?  Because he couldn't fold down the

17   back seat to fit all three pieces of luggage in the trunk or

18   was it because he might stop along the way and buy toys for his

19   kids and he was worried that he wouldn't fit everything in the

20   trunk of the GMC Denali SUV?  Or was it because he was afraid

21   the buyer of the car wouldn't like the back seat and he didn't

22   feel safe?  His words.  That's what Ms. Todd is asking you to

23   believe.  That's what she says was the purpose of that call.

24             She is also asking you to believe, by the way, that

25   the defendant is incredibly unlucky.  What a terrible

1    coincidence that the part of the SUV that the defendant notices

2    and calls the CS about, the confidential source, happens to be

3    the exact part of the car covering the secret compartment, the

4    compartment, by the way, that both Jimenez-Baez and Trooper

5    Whittaker said they immediately noticed when they opened the

6    back door of the vehicle.  That's transcript pages 103 and 336.

7    You can take a look at that.

8         But the defendant didn't notice that trap.  He didn't

9    notice that compartment even though he owned the same car and

10   used to work for the company that made it.  He didn't notice it

11   even though he was a professional driver and he inspected every

12   piece of that car.  He noticed the fact that the seat wouldn't

13   fold down and he was worried he wouldn't be able to fit his

14   luggage inside it.  That's what Ms. Todd is asking you to

15   believe.  That's nonsense.  That's a story the defendant made

16   up to try to explain away that phone call, and the explanation

17   makes no sense.

18        And then what about the license plate cover.  The

19   defense wants you to believe that the defendant noticed the

20   license plate was loose in Louisiana.  By the way, I guess he

21   didn't notice it back in New Jersey when he carefully inspected

22   every part of it with his brother, but he noticed it was loose

23   in Louisiana, so he went to a store, he bought a frame, and he

24   put it on to make sure that the plate stayed put, a car that he

25   was about to give to someone else.  And the frame just happened

CRAMGOM3   Rebuttal - Ms. Crowley

1   to cover one part of the license plate.  Which part?  The part

2   that said New Jersey.  The part you knew the defendant was

3   concerned about because you saw it in Ms. Ramon-Baez's text

4   messages, what bad luck for the defendant, what a terrible

5   coincidence.

6            Ladies and gentlemen, you know why the defendant put

7   the license plate cover on the car.  It is because he didn't

8   want the police to see that it said New Jersey and pull him

9   over because he was transporting cocaine.

10           The defendant could not run away from these facts.  He

11  could not ignore this evidence, so he made up a story designed

12  to explain them away.  Now, again, the defendant bears no

13  burden in this case.  But when he takes the witness stand and

14  testifies, you should scrutinize his testimony the same way you

15  would any other witness and ask yourself if it makes any sense,

16  if it is supported by the evidence.  You know that it's not.

17           I just want to talk for a second about other evidence

18  in this case, evidence that you didn't hear the defendant talk

19  about and you didn't hear Ms. Todd talk about, evidence that

20  was ignored.  Why was it ignored?  Because he couldn't explain

21  it and because it was absolutely devastating evidence of his

22  guilt.  Like the fact that the defendant drove to New Orleans

23  only during the night and slept during the day so his New

24  Jersey license plates wouldn't be so obvious to the police.

25  You didn't hear anything about that during Ms. Todd's

1   summation.

2          Or like Caronlay's text messages to Jorge on the trip

3   down to New Orleans, Government Exhibit 402T.  December 5,

4   2014.  He wants to go at 5:00 because the license plate is from

5   New Jersey.  She is reporting to Jorge that the defendant

6   wanted to wait to drive at night.  December 7, 2014.  Man, I

7   don't believe with all that work they called.  She is reporting

8   to Jorge that they were waiting for the people to call and tell

9   them that they had the cocaine.  And then a little while later

10  he already left to see the people, after the defendant had left

11  the hotel to pick up the drugs.

12         What about Detective Garcia's testimony that he saw

13  the defendant alone in the car on December 7, that he saw the

14  defendant pick up another man, drive him around, and drop him

15  off?

16         You just heard Ms. Todd talk for a while about how no

17  one actually saw the defendant get handed cocaine.  She spent a

18  long time telling you about that.  Well, first of all, you

19  heard Detective Garcia say that they weren't watching the

20  defendant all the time.  There were times that they lost track

21  of him.  And, second, even under Ms. Todd's version of events,

22  she undermines her own theory.  The drugs got in the car

23  somehow, right.  There is no dispute about that.  They were

24  found there when Trooper Whittaker pulled the defendant over on

25  December 7, 2014.  Those drugs got in the car without the agent

1    seeing it and without the trap alarm going off.  But apparently

2    the fact that they didn't see this happen means that Sandy

3    Gomez didn't put them there.  You know that's ridiculous.

4          What else did Ms. Todd ignore today?  The defendant's

5    statements to Trooper Whittaker after he got pulled over on

6    December 7, that he had come from North Carolina, that he had

7    been to a football game.  Ms. Todd just stood up here and said

8    that the defendant's behavior when he was pulled over was not

9    consistent with that of a guilty man because he didn't run

10   away, because he didn't claim he was sick or try to bribe the

11   police officer, because he signed the consent form.

12         First of all, you know why he signed that consent

13   form.  That was the whole purpose of the trap.  They didn't

14   think that the police would find it, so he was fine with

15   letting them search.

16         But you know what behavior was consistent with that of

17   a guilty man, the defendant's lies.  Why did he tell those

18   lies?  Why didn't he just tell the truth?  The same thing he

19   told you on the witness stand today.  He didn't tell you what

20   he told you on the witness stand because that wasn't true and

21   he lied to Trooper Whittaker because he was guilty, because

22   there were drugs in the trap in his car.

23         Ladies and gentlemen, what Ms. Todd is asking you to

24   believe happened back in December of 2014 makes no sense.  It

25   is undermined by all of the actual evidence in this trial and

1    it ignores the key pieces of evidence that are absolutely

2    devastating to the defendant.

3             I just want to say one more thing about the story that

4    the defense is asking you to believe.  Think about this.  If

5    this story is true, if Ms. Todd's version of events actually

6    happened, then that would mean that Jorge Gomez is the absolute

7    worst drug dealer in the world.  That's what she is asking you

8    to believe, right.  She must be.  Because who else would send

9    someone across the country to pick up drugs who had no idea

10   that he was picking up drugs?  Keep in mind, Jorge Gomez had

11   several employees who worked for him in his house every day

12   packaging heroin, but for some reason he decides to send his

13   brother, who he hardly spoke to, who he didn't really know,

14   without telling him what he actually wanted him to do.  That's

15   crazy.  Only the world's worst drug dealer would do that.

16            Also, Jorge had to believe that the defendant wouldn't

17   notice the trap.  The defendant, a professional driver, the

18   defendant, who had the same car, who worked for the company

19   that made the car.  A trap that, despite what Ms. Todd just

20   told you, two defendants told you they noticed right away.  And

21   then once the defendant gets down to New Orleans, Jorge has him

22   pick up the drugs, again, without the defendant knowing what

23   he's doing.

24            And, remember, Jorge's plan also relies on the

25   defendant disappearing for a while after he met the drug

1    supplier, the guy the defendant supposedly believed would be

2    taking the car so that the supplier could sneak the drugs into

3    the trap without the defendant knowing.

4         Finally, Jorge had to count on the defendant feeling

5    sorry enough for Ms. Ramon-Baez that he would agree to drive

6    her back up to New Jersey; again, without him knowing that

7    there were drugs in the car.  Who would come up with a plan

8    like that, a plan that would fail in so many ways, a plan that

9    relied completely on someone who supposedly wasn't even in on

10   it?  The world's worst drug dealer.  Jorge must have been the

11   world's worst drug dealer.  That's what Ms. Todd is asking you

12   to believe.

13        Actually, she is really not.  You listened carefully

14   and you realize that defense counsel doesn't actually think

15   that Jorge was a bad drug dealer.  In fact, she thinks he's a

16   really, really good one.  She spent a long time on

17   cross-examination of Ramon-Baez and in her summation talking

18   about what a great drug dealer Jorge Gomez was, how he was

19   moving all of that heroin, how he bought all those Mercedes,

20   how he had all those customers.  Yet she is asking you to

21   believe that despite his years of experience, despite his vast

22   success as a prolific heroin dealer -- heroin, by the way, not

23   cocaine -- Jorge sent a guy he didn't like and didn't trust to

24   deliver five kilos of cocaine without knowing.  That's

25   ridiculous.  It doesn't make sense.  If Jorge had wanted to

1    pick up cocaine in New Orleans, he would have sent one of his

2    employees or he would have sent Ramon-Baez by herself.  The

3    truth, ladies and gentlemen, is simple.  It makes sense.  That

4    cocaine wasn't for Jorge.  It was for the defendant.  He drove

5    down to New Orleans to get it and he got caught.

6          I want to talk very briefly about another argument

7    that you just heard from Ms. Todd that Caronlay Ramon-Baez is a

8    liar.  She needs you to believe that because Caronlay's

9    testimony alone is enough to convict the defendant.  You don't

10   need to believe another witness or see another piece of

11   evidence to find him guilty if you believe her and defense

12   counsel knows that, so she needs to convince you that

13   Ramon-Baez is a liar.

14         Ladies and gentlemen, you know that Ms. Ramon-Baez was

15   not lying when she testified.  You know she was telling the

16   truth.  How do you know?  Three reasons.  First, everything she

17   said is totally consistent with the other evidence in this

18   case.  Second, she has every incentive to tell you the truth.

19   And, third, if she wanted to lie, she could have done a much

20   better job.

21         Let's start with the first one.  You know

22   Ms. Ramon-Baez testified truthfully because every single thing

23   she said was completely backed up by other evidence in this

24   case.  Mr. Cooper went through that evidence with you.  I am

25   not going to go through it again now.  Flight records, text

513

1    messages, transcripts of recorded calls, DEA agent

2    surveillance, the license plate cover, the lies the defendant

3    told to Trooper Whittaker when he was pulled over.  Ladies and

4    gentlemen, every single thing Ramon-Baez told you was backed up

5    by the other evidence in this case.

6         How does defense counsel explain that?  That she just

7    got lucky, that she just so happened to pick the right lies, to

8    say the right things that were consistent with what every other

9    witness and every other piece of evidence in this case told

10   you?  Of course not.  Ramon-Baez's testimony was consistent

11   with the other evidence because she was telling the truth.  She

12   told the story that actually happened, not the one that it was

13   twisted and contorted to explain away all the facts in this

14   case.

15        Now, there is no question that Ms. Ramon-Baez has

16   committed serious crimes.  She was a drug dealer.  She

17   possessed guns and she lied on her tax returns.  We are not

18   saying that she is a good person and we are not asking you to

19   approve of what she has done in the past.  The question for you

20   is whether she told the truth on the witness stand.  I want you

21   to think about her incentive, think about what happens to her

22   if she lies.  She explained to you how her cooperation

23   agreement with the government works.  You can read it.  It's in

24   evidence.  If she testifies truthfully on the stand, the

25   defendant writes a letter to the judge explaining that he may

1   but doesn't have to sentence her below the 15-year mandatory

2   minimum.  But if she lies, if she tells a single lie, that

3   agreement gets ripped up.  She goes to jail for a minimum of 15

4   years.  And remember, that letter from the government, the

5   letter that allows the judge to go below the mandatory minimum,

6   that does not depend at all on whether defendant is guilty.  It

7   depends on whether Ms. Ramon-Baez told the truth.  Ask yourself

8   why would she lie.  It would be totally crazy for her to lie in

9   this situation.  She has nothing to gain and everything to

10  lose.

11              THE COURT:  You need to wrap it up, Ms. Crowley.

12              MS. CROWLEY:  OK.

13              Finally, if Ramon-Baez really was lying, as Ms. Todd

14  wants you to believe, then she is a really bad liar.  If she is

15  lying to save her own skin to get out of jail earlier, couldn't

16  she have done a better job at it?  Think about it.  You heard

17  from her.  When she met with prosecutors, she told them every

18  single crime she has committed in her past.  She told them

19  about her own conduct, about Jorge Gomez's conduct, about her

20  family members' conduct.  She told you about the year she spent

21  packaging guns, she told you about the drugs, she told you

22  about the fraudulent tax returns, and she told you that the

23  government didn't know any of that until she told them.  If she

24  were lying wouldn't she admit to all of that?  Why would she

25  implicate herself, her former boyfriend, her family, just to

1   pin everything on Sandy Gomez?  She wouldn't.  She wouldn't do

2   that and she didn't do that because she wasn't lying.

3          I am just going to talk about one more thing that

4   Ms. Todd mentioned during her summation and that's venue.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1

 2              MS. CROWLEY:  She said that the government didn't

 3   prove that any of this conspiracy happened in the Southern

 4   District of New York.  Judge Gardephe's going to instruct you

 5   that that's a legal requirement of this crime.  But what

 6   Ms. Todd told you was wrong.  First, you heard this

 7   confidential source, Jimenez-Baez, was in Yonkers during the

 8   time that he made the calls to Sandy Gomez and Jorge Gomez.  He

 9   was in Yonkers.  That's Government Exhibits 205 and 2062T.

10   That is enough to satisfy venue.  And what did he say to Jorge

11   during that call?  That he was in the towers.  He told you what

12   that meant, Manhattan, New York City.  That's Mr. Jimenez-Baez

13   Baez's testimony.  That's enough to satisfy venue.  And what

14   did they discuss during that call?  Jimenez-Baez tells Jorge

15   he's crossing -- over what -- the George Washington Bridge into

16   New Jersey.  That's enough to satisfy venue.

17              But you also have Ms. Ramon-Baez's testimony.  Where

18   did she say the drugs that she and the defendant went down to

19   pick up were headed?  To New York.  That's her testimony.

20   Remember, you only have to find that one piece of this act, of

21   this conspiracy happened in the Southern District of New York.

22              Listen to the judge's instructions on venue.  The

23   calls from the Southern District of New York, the drugs

24   intended for the Southern District of New York, that's enough

25   for venue.

1   I'm done talking to you now.  It's finally time for

2   you to go back to the jury room and deliberate.  No more

3   witnesses.  No more lawyers arguing.  It's time for you to

4   decide the outcome of this case, and I want to take a second

5   before you do that to thank you for paying close attention

6   throughout this trial.  Both parties appreciate the care and

7   consideration you've given each witness.  This case is

8   important.  Every case is important, but this case is not hard.

9   You know that.

10       You heard the testimony, you saw the evidence.  Sandy

11  Gomez made an agreement to distribute more than five kilos of

12  cocaine, a lot more, and he went down to New Orleans to get it.

13  He picked up five kilos and stashed it in the trap in his car,

14  and he got caught.  You know that.

15       You heard the testimony, you saw the evidence.  You

16  know it's the only story that makes sense, and when you go back

17  there and think about it and talk through the facts of this

18  trial, you will find that there is only one conclusion

19  consistent with the evidence and consistent with your common

20  sense: that the defendant is guilty as charged.

21       Thank you.

22       THE COURT:  Mr. Ruocco, would you please distribute

23  the jury instructions to the jury.

24       Ladies and gentlemen, I will now instruct you as to

25  the law that governs this case.  You have been handed a copy of

1     the instructions I will read.  You should feel free to read

2     along with me or to just listen to me, whichever you prefer.

3     You will be able to take a copy of the instructions back into

4     the jury room, and you will be able to consult these

5     instructions during your deliberations.

6          There are three parts to these instructions.  First

7     I'll give you general instructions about your role, and about

8     how you are to decide the facts of the case, that is, what

9     happened.  Second, I'll give you instructions as to the

10    specific charge in this case.  Third, there are concluding

11    instructions about such matters as communications with the

12    Court, about deliberations, and about returning a verdict.

13         It is important that you listen carefully.  I am

14    reading these instructions from a prepared text because the law

15    is made up of words that are very carefully chosen.  This is

16    not a time to ad lib.  When I tell you what the law is, it's

17    critical that I use exactly the right words.

18         My duty at this point is to instruct you as to the

19    law.  It is your duty to accept these instructions of law and

20    to apply them to the facts as you determine them.  With respect

21    to legal matters, you must take the law as I give it to you.

22    If any lawyer has stated a legal principle different from any

23    that I state to you in my instructions, you are to follow my

24    instructions.

25         You are to consider these instructions together as a

whole; in other words, you're not to isolate or give undue
weight to any particular instruction.  You must not substitute
your own notions or opinions of what the law is or what it
ought to be.

As members of the jury, you are the sole and exclusive
judges of the facts.  You decide what happened.  It is your
sworn duty to determine the facts based solely on the evidence
received in this trial.  Any opinion I might have regarding the
facts is of absolutely no consequence.

The personalities and the conduct of counsel in the
courtroom are not in any way at issue.  If you formed an
opinion of any kind as to any of the lawyers in the case,
whether favorable or unfavorable, whether you approved of or
disapproved of their behavior as advocates, that should not
enter into your deliberations at all.

The lawyers and I have had conferences at the bench
and other conferences out of your hearing.  These conferences
involve procedural or evidentiary matters that are the
responsibility of the judge.  They should not enter into your
deliberations at all.

A lawyer has a duty to object when the other side
offers testimony or other evidence that the other lawyer
believes is not admissible.  It is my job to rule on those
objections.  Why an objection is made or how I ruled on it is
not your concern.  You should not draw any inference simply

from the fact that a lawyer objected to a question, or that I

sustained or overruled an objection.

You must evaluate the evidence calmly and objectively,

without prejudice or sympathy.  You must be completely fair and

impartial.  Your verdict must be based solely on the evidence

developed at this trial, or the lack of evidence.  Our system

of justice cannot work unless you reach your verdict through a

fair and impartial consideration of the evidence.  Under your

oath as jurors, you are not to be swayed by sympathy or

prejudice.  You are to be guided solely by the evidence in this

case, and the crucial, bottom-line question that you must ask

yourselves as you sift through the evidence is:  Has the

government proven each element of the charge against Mr. Gomez

beyond a reasonable doubt?

It is for you alone to decide whether the government

has proven that Mr. Gomez is guilty of the crime charged, and

you are to do so solely on the basis of the evidence, and

subject to the law as I explain it to you.  If you let fear or

prejudice, or bias or sympathy, interfere with your thinking,

there is a risk that you will not arrive at a true and just

verdict.

If you have a reasonable doubt as to Mr. Gomez's

guilt, you should not hesitate for any reason to reach a

verdict of not guilty.  But on the other hand, if you should

find that the government has met its burden of proving beyond a

1    reasonable doubt that Mr. Gomez is guilty, you should not

2    hesitate because of sympathy or any other reason to reach a

3    verdict of guilty.

4              The question of possible punishment must not enter

5    into or influence your deliberations in any way.  The duty of

6    imposing a sentence rests exclusively upon me.  Your function

7    is to weigh the evidence in the case and to determine whether

8    or not Mr. Gomez has been proven guilty beyond a reasonable

9    doubt, solely on the basis of such evidence or lack of

10   evidence.  Under your oath as jurors, you cannot allow a

11   consideration of the punishment that may be imposed on

12   Mr. Gomez, if he is convicted, to influence your verdict in any

13   way, or in any sense, to enter into your deliberations.

14   Similarly, you cannot permit any feelings you might have about

15   the nature of the crime charged to interfere with your

16   decision-making process.  Your verdict must be based

17   exclusively upon the evidence or the lack of evidence in this

18   case.

19             In reaching your verdict, you must remember that all

20   parties stand equal before a jury in the courts of the United

21   States.  The fact that the government is a party and that the

22   prosecution is brought in the name of the United States does

23   not entitle the government or its witnesses to any greater

24   consideration than that accorded to any other party.  By the

25   same token, you must give it no less consideration.

1          In reaching your decision as to whether the government

2     has sustained its burden of proof, you may not consider any

3     personal feelings you may have about Mr. Gomez's race,

4     religion, ethnicity, national origin, sex, or age.  All persons

5     are entitled to the same presumption of innocence.

6          Mr. Gomez has pleaded not guilty.  In doing so, he has

7     denied the charge in the indictment.  As a result, the

8     government has the burden of proving the charge against him

9     beyond a reasonable doubt.  This burden of proof never shifts

10    to a defendant for the simple reason that the law never imposes

11    upon a defendant in a criminal case the burden or duty of

12    testifying, of calling any witness, or of locating or producing

13    any evidence.

14         A defendant does not have to prove his innocence.  To

15    the contrary, Mr. Gomez is presumed innocent until such time,

16    if ever, that you as a jury are satisfied that the government

17    has proven him guilty beyond a reasonable doubt.

18         Mr. Gomez began the trial here with a clean slate.

19    This presumption of innocence alone is sufficient to acquit a

20    defendant unless you as jurors are unanimously convinced beyond

21    a reasonable doubt of his guilt, after a careful and impartial

22    consideration of all the evidence.  If the government fails to

23    sustain its burden, you must find Mr. Gomez not guilty.

24         I will now address reasonable doubt.  What is

25    reasonable doubt?  It is a doubt founded in reason, as opposed

1    to a doubt based on speculation, emotion, sympathy, or

2    prejudice.  It is a doubt that arises out of the evidence in

3    the case, or the lack of evidence.  It is a doubt that a

4    reasonable person has after carefully weighing all the

5    evidence.  Reasonable doubt is a doubt that arises from your

6    own judgment, life experience, and common sense when applied to

7    the evidence.

8         If, after a fair and impartial consideration of all

9    the evidence, you are not satisfied of the guilt of

10   Mr. Gomez -- that is, if you do not have an abiding conviction

11   of his guilt -- you must find him not guilty.  In other words,

12   if you have such a doubt as would cause you, as a prudent

13   person, to hesitate before acting in matters of importance to

14   yourself, then you have a reasonable doubt, and it is your duty

15   to find Mr. Gomez not guilty.

16        On the other hand, if after a fair and impartial

17   consideration of all the evidence, you do have an abiding

18   conviction of Mr. Gomez's guilt -- in other words, a conviction

19   you would be willing to act upon without hesitation and in an

20   important matter in your own life -- then you have no

21   reasonable doubt, and it is your duty to find Mr. Gomez guilty.

22        Reasonable doubt is not whim or speculation.  It is

23   not an excuse to avoid the performance of an unpleasant duty.

24   Reasonable doubt also does not mean beyond all possible doubt.

25   It is practically impossible for a person to be absolutely and

completely convinced of any disputed fact that by its nature is not susceptible to mathematical certainty.  As a result, the law in a criminal case is that it is sufficient for the government to establish the guilt of a defendant beyond a reasonable doubt, not beyond all possible doubt.

In determining the facts, you must rely on your own recollection of the evidence.  The evidence in this case is the testimony of the witnesses, the exhibits received in evidence, and the stipulations or agreements as to certain facts entered into by the parties.  When I sustained an objection to a question, the answer that the witness may have given in response to that question is not part of the evidence in this case and may not be considered by you.  You are likewise not to consider a lawyer's questions as evidence.  It is the witness's answers that are evidence, not the questions.

When I ordered that testimony be stricken from the record, you may not consider that testimony during your deliberations.

The only exhibits that are evidence in this case are those that were received in evidence.  Exhibits marked for identification but not admitted are not evidence, nor are materials that were used only to refresh a witness's recollection.

Witnesses sometimes have a failure of recollection when testifying.  In such circumstances, it is proper for the

lawyer questioning the witness to attempt to refresh his or her
recollection.  Where a document is used to refresh
recollection, that document does not have to have been prepared
by the witness, nor does it have to have been made
contemporaneously with the events described in it.  Where a
witness states that a writing has refreshed the witness's
memory, then the witness may proceed to testify as to the
matters on which his or her memory was refreshed.  That
testimony is evidence.  However, where a witness states that
his or her recollection is not refreshed, any statements the
lawyer may have made about the document used in the attempt to
refresh the witness's recollection are not evidence.

          As I told you at the outset of this case, arguments by
lawyers are likewise not evidence, because the lawyers are not
witnesses.  The lawyers have no personal knowledge of what
happened here.  What they have said to you in their opening
statements and in their closing arguments is intended to help
you understand the evidence to reach your verdict.  However,
where your recollection of the evidence differs from what a
lawyer has argued, it is your recollection of the evidence that
controls.  You must determine the facts based solely on the
evidence received in this trial.  In determining the facts, you
must rely on your own recollection of the evidence.  What the
lawyers said in opening statements, in closing arguments, in
objections, or in questions is not evidence.

1          I remind you also that nothing I have said during the

2     trial, or will say in instructing you on the law, is evidence.

3     Similarly, the rulings I have made during the trial are not any

4     indication of my views of what your decision should be.

5          It is for you alone to decide what weight, if any, to

6     give to the testimony of the various witnesses and to the

7     exhibits that have been received in evidence.

8          Generally, there are two types of evidence that you

9     may consider in reaching your verdict: direct evidence or

10    circumstantial evidence.

11         Direct evidence is testimony by a witness about

12    something he or she knows by virtue of his or her own senses --

13    something seen, felt, touched, or heard.  For example, if a

14    witness testified that when he left his house this morning, it

15    was raining, that would be direct evidence about the weather.

16    Direct evidence may also be in the form of an exhibit.

17         Circumstantial evidence is evidence from which you may

18    infer the existence of certain facts.  For example, assume that

19    when you came into the courthouse this morning, the sun was

20    shining and it was a nice day.  Assume that the courtroom

21    blinds were drawn and you cannot look outside.  As you're

22    sitting here, someone walks in with an umbrella, which is

23    dripping wet.  A few minutes later, another person enters with

24    a wet raincoat.  Now, you can't look outside the courtroom to

25    see whether it's raining, so you have no direct evidence of

1    that fact, but based on the facts that I have asked you to

2    assume, you could conclude that it had been raining.

3         That is all there is to circumstantial evidence.  On

4    the basis of reason, life experience, and common sense, you

5    infer from one established fact the existence or nonexistence

6    of some other fact.

7         The matter of drawing inferences from facts in

8    evidence is not a matter of guesswork or speculation.  An

9    inference is a logical, factual conclusion that you might

10   reasonably draw from other facts that have been proven.  Many

11   material facts, such as what a person was thinking or

12   intending, are rarely easily proven by direct evidence.  Often

13   such facts are established by circumstantial evidence.

14        Circumstantial evidence may be given as much weight as

15   direct evidence.  The law makes no distinction between direct

16   and circumstantial evidence, but simply requires that before

17   convicting a defendant, the jury must be satisfied of the

18   defendant's guilt beyond a reasonable doubt, based on all the

19   evidence in the case, whether direct or circumstantial.

20        There are times when different inferences may be drawn

21   from the evidence.  The government may ask you to draw one set

22   of inferences, while the defendant asks you to draw another.

23   It is for you, and for you alone, to decide what inferences you

24   will draw.

25        What is important here is the quality and

1   persuasiveness of the evidence relied on by a party, and not

2   the number of witnesses, the number or variety of exhibits that

3   a party introduced, or the length of time that that party spent

4   on a particular subject.

5          You should draw no inference or conclusion of any

6   kind, whether favorable or unfavorable, with respect to any

7   witness or party in the case, by reason of any question I posed

8   to a witness.

9          There is no legal requirement that the government

10  prove its case through any particular means.  You're not to

11  speculate as to why the government used the techniques it did,

12  or why it did not use other techniques.  Law enforcement

13  techniques are not your concern.  Your concern is to determine

14  whether or not, based on the evidence or lack of evidence, the

15  government has proven Mr. Gomez's guilt beyond a reasonable

16  doubt.

17         The government has introduced evidence in the form of

18  transcripts of tape recordings of telephone conversations and a

19  meeting.  These recordings were made in a lawful manner and did

20  not violate anyone's rights.  You may consider the

21  conversations reflected in the transcripts along with all the

22  other evidence in the case.  Whether you approve or disapprove

23  of the recording of these conversations may not enter into your

24  deliberations.

25         Because English is the language of court proceedings

in this country, it was necessary for the government to obtain

an English translation of each tape-recorded Spanish-language

conversation.  The government has introduced transcripts

showing both the Spanish conversation and the English

translation.  The transcripts of these conversations were the

subject of a stipulation that was read to you during the trial.

In the stipulation, the parties agreed that the English

translation set forth in the transcripts is accurate, and you

must rely on that translation in considering this evidence.

Some of the testimony you have heard was provided

through interpreters.  As I told you at the outset of the

trial, where a witness's testimony was translated from Spanish

into English, you must base your decision on the testimony as

presented through the interpreter.

You should evaluate the credibility, believability,

and reliability of the witnesses by using your common sense.

Common sense is your greatest asset as a juror.  Ask yourself

whether the witness appeared honest, open, candid, and

reliable.  Did the witness appear evasive or as though he or

she was trying to hide something?  How responsive was the

witness to the questions on direct examination in comparison to

the questions posed on cross-examination?  You should also

consider the witness's ability to recall past events.

If you find that any witness has lied under oath at

this trial, you should review the testimony of that witness

1   cautiously and weigh it with great care.  It is, however, for

2   you to decide how much of the witness's testimony, if any, you

3   wish to believe.  Few people recall every detail of every event

4   precisely the same way.  A witness may be inaccurate,

5   contradictory, or even untruthful in some respects and yet

6   entirely believable and truthful in other respects.  It is for

7   you to determine whether such inconsistencies are significant

8   or inconsequential, and whether to accept or reject all, or to

9   accept some and reject the balance of, that witness's

10  testimony.

11          In sum, it is up to you to decide whether the

12  testimony of a witness is truthful and accurate, in part, in

13  whole, or not at all, as well as what weight, if any, to give

14  to that witness's testimony.

15          In evaluating the testimony of any witness, you may

16  consider, among other things:

17          The witness's intelligence;

18          The ability and opportunity the witness had to see,

19  hear, or know the things that the witness testified about;

20          The witness's memory;

21          Any interest, bias, or prejudice the witness may have;

22          The manner of the witness while testifying, and

23          The reasonableness of the witness's testimony in light

24  of all the evidence in the case.

25          You should judge the defendant's testimony in the same

1    way that you judge the testimony of any other witness.

2          The government is not required to prove the essential

3    elements of the offense by any particular number of witnesses.

4    The testimony of a single witness may be sufficient to convince

5    you beyond a reasonable doubt of the existence of the essential

6    elements of the offense if you believe that the witness has

7    truthfully and accurately related what he or she has told you.

8    Similarly, the testimony of a single witness may provide the

9    basis for reasonable doubt if you believe that that witness has

10   testified truthfully and accurately.

11         You have heard argument that at some earlier time,

12   witnesses said or did something that is inconsistent with their

13   trial testimony.

14         Evidence of prior inconsistent statements was

15   introduced for the purpose of helping you decide whether to

16   believe a witness's testimony.  If you find that a witness made

17   an earlier statement that conflicts with the witness's trial

18   testimony, you may consider that fact in deciding how much of

19   the witness's trial testimony, if any, to believe.

20         In making this determination, you may consider whether

21   the witness intentionally made a false statement or whether it

22   was an innocent mistake; whether the inconsistency concerns an

23   important fact, or whether it had to do with an insignificant

24   detail; whether the witness had an explanation for the

25   inconsistency; and whether that explanation accords with your

1    common sense.

2          It is exclusively your duty, based upon all the

3    evidence and your own good judgment, to determine whether the

4    prior statement was inconsistent, and if so how much, if any,

5    weight to give to the inconsistent statement in determining

6    whether to believe all, part of, or none of the witness's

7    testimony.

8          In deciding whether to believe a witness, you should

9    consider whether the witness has an interest in the outcome of

10   this case, or is biased in favor of or against one side or the

11   other.  You should also consider evidence of any interest or

12   motive that the witness may have in cooperating with a

13   particular party.  It is your duty to consider whether any

14   witness has permitted bias or interest to color his or her

15   testimony.  If you find that a witness is biased, you should

16   view his or her testimony with caution, weigh it with great

17   care, and subject it to close and searching scrutiny.

18         Of course, the mere fact that a witness has an

19   interest in the outcome of this case does not mean that he or

20   she has not told the truth.  It is for you to decide from your

21   observations, and applying your common sense, life experience,

22   and all the other considerations I have mentioned, whether the

23   possible interest of a witness has -- intentionally or

24   otherwise -- colored or distorted his or her testimony.  You

25   are not required to disbelieve an interested witness; you may

1   accept as much of his or her testimony as you deem reliable and

2   reject as much as you deem unworthy of acceptance.

3          You heard testimony from Caronlay Ramon-Baez and

4   Antonio Jimenez-Baez, both of whom entered into cooperation

5   agreements with the government.  These witnesses entered into

6   cooperation agreements with the government in hopes of

7   receiving a lesser sentence.

8          You cannot draw any conclusion or inferences of any

9   kind about the guilt of Mr. Gomez merely from the fact that

10  Mr. Jimenez-Baez and Ms. Ramon-Baez entered into cooperation

11  agreements with the government and pleaded guilty to crimes

12  that may be similar or related to the crimes with which

13  Mr. Gomez is charged.  These witnesses decided to cooperate

14  with the government based on their evaluation of what was in

15  their best interest.  Their decision to plead guilty and to

16  cooperate with the government is not evidence that Mr. Gomez

17  committed a crime.

18         A defendant may not be found guilty simply because he

19  associated with someone who decided to plead guilty and to

20  enter into a cooperation agreement with the government.

21  Moreover, you may not infer that Mr. Gomez is guilty of the

22  charged offense merely because he associated with or spoke with

23  others who committed crimes.

24         Let me also say that the government is entitled to

25  call as witnesses people who have committed crimes and who have

1   entered into cooperation agreements with the government.

2   Indeed, you may convict Mr. Gomez on the basis of such

3   testimony if you find that it is credible and that it proves

4   Mr. Gomez guilty beyond a reasonable doubt.

5          You should also be aware that it is not unusual for

6   the government to rely at trial on the testimony of witnesses

7   who admit to participating in criminal activity.  The

8   government must take its witnesses as it finds them, and

9   frequently must use such testimony in criminal prosecutions

10  because otherwise it would be difficult or impossible to detect

11  and prosecute wrongdoers.  For this reason, the law permits the

12  use of testimony from cooperating witnesses, and you may

13  consider such testimony in determining whether the government

14  has met its burden of proving Mr. Gomez's guilt beyond a

15  reasonable doubt.

16         You must scrutinize the testimony of a cooperating

17  witness with special care and caution, however.  The fact that

18  a witness has stated that he or she participated in criminal

19  conduct and entered into a cooperation agreement with the

20  government may be considered by you as bearing on that

21  witness's credibility.  It does not follow, of course, that

22  simply because a person has admitted committing crimes and has

23  entered into a cooperation agreement with the government, that

24  he or she is incapable of giving a truthful account of what

25  happened.  Moreover, it is of no concern of yours why the

 1    government made an agreement with such a witness.  Your sole

 2    concern is whether the witness has given truthful testimony.

 3         The testimony of a cooperating witness should be given

 4    such weight as it deserves in light of all the facts and

 5    circumstances before you, taking into account the witness's

 6    candor, the strength and accuracy of the witness's

 7    recollection, the witness's background and demeanor, and the

 8    extent to which the witness's testimony is or is not

 9    corroborated by other evidence in the case.  As with other

10    witnesses, you may consider whether a cooperating witness has

11    an interest in the outcome of this case, and, if so, whether

12    that interest has affected the witness's testimony.

13         In this regard, you should bear in mind that a witness

14    who has entered into a cooperation agreement with the

15    government has an interest and motives different from those of

16    other witnesses.  In evaluating the testimony of such a

17    witness, you should ask yourself whether the witness would

18    benefit more by lying or by telling the truth.  Was the

19    witness's testimony influenced in any way by a belief or a hope

20    that he or she would receive favorable treatment by testifying

21    falsely, or did the witness believe that his or her interests

22    would be best served by testifying truthfully?  If you believe

23    a witness was motivated by hopes of receiving a lesser

24    sentence, was the motivation one that would cause the witness

25    to lie, or was it one that would cause the witness to tell the

1    truth?

2           In sum, you should consider all the evidence in

3    deciding what weight, if any, to give to the testimony of a

4    cooperating witness.  If you find that the testimony of a

5    cooperating witness was false, you should reject it.  However,

6    if -- after a cautious and careful examination of the testimony

7    of a cooperating witness in light of all the evidence -- you

8    conclude that the witness told the truth, you may accept the

9    testimony as credible and act upon it accordingly.

10          As with any witness, the issue of credibility may not

11   be decided on an all-or-nothing basis.  Even if you find that a

12   witness testified falsely in one part, you may still accept his

13   or her testimony in other parts, or you may disregard all of

14   that witness's testimony.  That is a determination entirely for

15   you, the jury, to make.

16          You have heard testimony from witnesses employed by

17   law enforcement agencies.  The fact that a witness is employed

18   by a law enforcement agency does not mean that the witness's

19   testimony deserves more or less consideration, or greater or

20   lesser weight, than that of any other witness.  It is up to you

21   to decide, after reviewing all the evidence, what weight to

22   give the testimony of law enforcement witnesses.

23          Your verdict must be based solely upon the evidence

24   developed at trial, or the lack of evidence.  It would be

25   improper for you to consider, in reaching your decision as to

whether the government sustained its burden of proof, any

personal feelings you may have about the defendant's race,

religion, national origin, sex, or age.  Similarly, it would be

improper for you to consider any personal feelings you may have

about the race, religion, national origin, sex, or age of any

witness or anyone else involved in this case.  Both sides are

entitled to a trial free of prejudice, and our judicial system

cannot work unless you reach your verdict through a fair and

impartial consideration of the evidence.

You may not draw any inference, whether favorable or

unfavorable, as to either side from the fact that no person

other than Mr. Gomez is on trial here.  You may not speculate

as to the reasons why other persons are not on trial.  These

matters are wholly outside your concern and have no bearing on

your function as jurors.

There are persons whose names you heard during the

trial but who did not appear to testify.  You should not

speculate as to what these persons would have testified to had

they been called.  Their absence should not affect your

judgment in any way.  You should keep in mind my instruction,

however, that the law does not impose on a defendant the burden

or duty of calling any witnesses or producing any evidence.  It

is the government's burden to prove beyond a reasonable doubt

each element of the crime charged in the indictment.

There has been evidence that witnesses discussed the

1  facts of this case and their testimony with lawyers before

2  appearing in court.

3          Although you may consider that fact when you are

4  evaluating a witness's credibility, you should be aware that

5  there's nothing unusual or improper about a witness meeting

6  with lawyers before testifying.  Indeed, it would be unusual

7  for a lawyer to call a witness to testify without such

8  preparation.  The weight you give to the fact or the nature of

9  the witness's preparation for his or her testimony and what

10  inferences you draw from such preparation are matters

11  completely within your discretion.

12          The indictment in this case refers to various dates.

13  It does not matter if the indictment states that specific

14  conduct is alleged to have occurred on or about a certain date

15  and the evidence indicates that, in fact, it was on another

16  date.  The law only requires a substantial similarity between

17  the dates alleged in the indictment and the dates established

18  through evidence at trial.

19          You have heard evidence in the form of stipulations,

20  or agreements, as to certain facts.  Where the parties have

21  entered into an agreement as to certain facts, you must regard

22  the agreed-upon facts as true.

23          I will now turn to the law applicable to the specific

24  charge in this case.

25          As you know, the charge against Mr. Gomez is contained

in an indictment.  An indictment is not evidence of the guilt

of a defendant.  It is merely an accusation, a statement of

charge made against a defendant.  It gives the defendant notice

of the charge against him, and it informs the court and the

public of the nature of the accusation.  Given.

That an indictment is proof of nothing, a defendant

begins trial with an absolutely clean slate and without any

evidence against him.

The indictment here reads as follows:

"From at least in or about August 2014, up to and

including on or about December 7, 2014, in the Southern

District of New York and elsewhere, Sandy Gomez, the defendant,

and others known and unknown, intentionally and knowingly did

combine, conspire, confederate, and agree together and with

each other to violate the narcotics laws of the United States.

"It was a part and object of the conspiracy that Sandy

Gomez, the defendant, and others known and unknown, would and

did distribute and possess with intent to distribute controlled

substances, in violation of 21 U.S.C. Section 841(a)(1).

"The controlled substances Sandy Gomez, the defendant,

conspired to distribute and possess with the intent to

distribute was five kilograms and more of mixtures and

substances containing a detectable amount of cocaine, in

violation of 21 U.S.C., Section 841(b)(1)(A).

Mr. Gomez denies the charge in the indictment and

contends that the government has failed to prove this charge

beyond a reasonable doubt.  As I have said, the indictment

itself does not constitute evidence that he committed this

crime.

    In a moment, I will instruct you in detail on the

charge contained in the indictment.  You must determine whether

the government has met its burden of proving Mr. Gomez's guilt

beyond a reasonable doubt.

    As I just mentioned, the indictment charges Mr. Gomez

with participating in a conspiracy to violate the narcotics

laws of the United States.

    A conspiracy is the kind of criminal partnership -- an

agreement of two or more persons to join together to accomplish

some unlawful purpose.

    The crime of conspiracy to violate the narcotics laws

is an independent offense, separate and distinct from the crime

of actually distributing narcotics or possessing narcotics with

the intent to distribute them.  Indeed, a defendant can be

found guilty of the crime of conspiracy to violate the federal

narcotics laws even where the substantive crime that was the

object of the conspiracy -- here, distributing and possessing

with intent to distribute cocaine -- was never actually

committed.

    Conspiracy is a separate, stand-alone crime, and guilt

may be established even where the conspiracy is not successful

1    and no drugs are ever actually distributed or possessed with

2    the intent to distribute.  The crime of narcotics conspiracy is

3    complete once the government has proven beyond a reasonable

4    doubt the existence of the charged conspiracy and that the

5    defendant willfully joined that conspiracy.

6           To meet its burden of proving the narcotics conspiracy

7    charged in the indictment, the government must prove the

8    following elements beyond a reasonable doubt:

9           First, the government must prove the existence of the

10   conspiracy charged in the indictment; in other words, that

11   between August 2014 and December 7, 2014, there was, in fact,

12   an agreement or understanding between two or more persons to

13   violate those provisions of the law that make it a crime to

14   distribute cocaine or to possess cocaine with the intent to

15   distribute it.

16          Second, the government must prove that Mr. Gomez

17   knowingly became a member of that conspiracy; that is, that he

18   knowingly associated himself with the conspiracy and

19   participated in the conspiracy to distribute cocaine, or to

20   possess cocaine with the intent to distribute it.

21          A conspiracy is a combination, agreement, or

22   understanding between two or more people to accomplish, by

23   concerted action, a criminal or unlawful purpose.  Here, the

24   government claims that Mr. Gomez and others entered into an

25   unlawful agreement, the purpose of which was to distribute

 1    cocaine or possess cocaine with the intent to distribute it.

 2    The government contends that Mr. Gomez's coconspirators

 3    included his brother, Jorge Gomez, and Caronlay Ramon-Baez.

 4    You should be aware that Antonio Jimenez-Baez and the

 5    government's source referred to as "Giovanni" cannot be

 6    regarded as conspirators, because they were acting on behalf of

 7    the government.

 8         The gist, or essence, of the crime of conspiracy is an

 9    unlawful agreement between two or more people to violate the

10    law.  The first element of the crime of conspiracy thus has two

11    parts: the unlawful agreement, and the object of the

12    conspiracy.

13         To establish a conspiracy, the government is not

14    required to show that two or more people sat down around a

15    table and entered into a solemn pact, orally or in writing,

16    stating that they have formed a conspiracy to violate the law

17    and spelling out all the details of the plans and the means by

18    which the unlawful project is to be carried out, or the part

19    that each of the persons who is a party for conspiracy is going

20    to play.

21         When people undertake to enter into a criminal

22    conspiracy, much is often left to the unexpressed

23    understanding.  Conspirators do not usually reduce their

24    agreements to a formal writing.  They don't typically publicly

25    broadcast their plans.  By its very nature, a conspiracy is

1   almost always secret in its origin and execution.

2           It is enough if two or more people, in some way or

3   manner, impliedly or tacitly, come to an understanding to

4   violate the law.  Express language or specific words are not

5   required to indicate the assent or agreement to the conspiracy.

6   You need only find that two or more people entered into the

7   unlawful agreement alleged in the indictment to find that a

8   conspiracy existed.  What the government must prove is that

9   there was a mutual understanding, either spoken or unspoken,

10  between two or more people to cooperate with each other to

11  violate the law and to accomplish an unlawful act.

12          In determining whether the government has proven the

13  unlawful agreement alleged in the indictment, you should

14  consider the proven acts and conduct of the alleged

15  coconspirators undertaken to carry out the apparent criminal

16  purpose.  The adage "actions speak louder than words" is

17  applicable here.  Often, the only evidence that is available is

18  that of disconnected acts that, when considered in connection

19  with one another, show a conspiracy or an agreement to secure a

20  particular result just as satisfactorily and conclusively as

21  more direct proof.  As I have said, it is not necessary that

22  the conspiracy actually succeed for you to conclude that it

23  existed.

24          In deciding whether the conspiracy charged in the

25  indictment existed, you may consider all the evidence of the

1    acts, conduct, and statements of Mr. Gomez along with all the

2    evidence of the acts, conduct, and statements of those you

3    determine the government has proven were coconspirators of

4    Mr. Gomez, and the reasonable inferences to be drawn from that

5    evidence.  When people enter into a conspiracy to accomplish an

6    unlawful deed, they become partners of one another in carrying

7    out the conspiracy.  Accordingly, the reasonably foreseeable

8    acts or statements of any member of the conspiracy, committed

9    in furtherance of the common purpose of the conspiracy, are

10   deemed, under the law, to be the acts and statements of all the

11   of the members of the conspiracy, and all of the members of the

12   conspiracy are responsible for such acts or statements.  This

13   rule applies even though such acts or statements were not made

14   or committed in Mr. Gomez's presence or were made and committed

15   without his knowledge.

16          Before you may consider the acts or statements of a

17   coconspirator in deciding the guilt of Mr. Gomez, however, you

18   must first determine that the acts were committed or statements

19   were made during the existence of, and in furtherance of, the

20   alleged unlawful scheme.  If the acts were done and the

21   statements were made by someone whom you did not find to have

22   been a member of the conspiracy, or if they were not in

23   furtherance of the charged conspiracy, they may not be

24   considered by you in deciding whether Mr. Gomez is guilty.

25          It is sufficient to establish the existence of the

1    charged conspiracy that you find, beyond a reasonable doubt,

2    that the minds of at least two alleged conspirators met in an

3    understanding way, and that they agreed, as I have explained,

4    to work together to accomplish the objective of the conspiracy

5    charged in the indictment.

6          The second part of the first element relates to the

7    object, or objective, of the alleged conspiracy.  Here, the

8    indictment charges that the object of the conspiracy was to

9    distribute cocaine or possess cocaine with the intent to

10   distribute it.

11         The government need prove only that the objective of

12   the conspiracy was either to distribute cocaine or to possess

13   cocaine with the intent to distribute it.  The government need

14   not, but may, prove both.  To convict Mr. Gomez, however, you

15   must be unanimous as to which objective was proven --

16   distribution of cocaine or possession of cocaine with the

17   intent to distribute it.

18         The quantity and purity of the drugs involved in the

19   alleged conspiracy are not elements of the crime charged, so

20   you need not be concerned with the quantity or purity in

21   determining whether Mr. Gomez is guilty.

22         However, as I will instruct you later, should you find

23   Mr. Gomez guilty of conspiracy to distribute cocaine or possess

24   cocaine with the intent to distribute it as charged in the

25   indictment, you will be asked to determine whether the

1   government has proven beyond a reasonable doubt that the

2   conspiracy involved five kilograms or more of cocaine, or if

3   not, proven by beyond a reasonable doubt that the conspiracy

4   involved 500 grams or more of cocaine.

5           I will now define the terms "distribute" and "possess

6   with intent to distribute."

7           The word "distribution" means the actual,

8   constructive, or attempted transfer of a drug.  To "distribute"

9   simply means to deliver, to pass over, to hand over something

10  to another person, or to cause it to be delivered, passed on,

11  or handed over to another.  Distribution does not require a

12  sale.

13          What does "possess with intent to distribute" mean?

14          I will begin with the concept of "possession."  The

15  legal concept of possession is different from the everyday

16  usage of the term.  Actual possession is what most of us think

17  of as possession; that is, having physical custody or control

18  of an object.  A person need not have actual, physical

19  possession -- that is, physical custody of an object -- to be

20  in legal possession of it, however.  If an individual has the

21  ability to exercise substantial control over an object, even if

22  he does not have the object in his physical custody, and that

23  person has the intent to exercise such control, then he is in

24  possession of that article.  This is called constructive

25  possession.

1     Control over an object may be demonstrated by the

2  existence of a working relationship between the person having

3  such control and the person with actual physical custody.  The

4  person having control possesses the object because he has an

5  effective working relationship with the people who have actual

6  physical custody of the object, and because he can direct the

7  movement or transfer or disposition of the object.  In this

8  manner, a businessman may possess things that are scattered

9  throughout a number of stores or offices or installations

10  around and about a city or a country.

11     More than one person can have control over the same

12  quantity of drug.  The law recognizes that possession may be

13  sole or joint.  If one person alone has actual or constructive

14  possession of a thing, possession is sole.  If more than one

15  person has possession of it, as I have defined possession for

16  you, then possession is joint.

17     "Possess with intent to distribute" simply means the

18  possession of a controlled substance with the intention or

19  purpose to "distribute" it to another person or persons.  As I

20  explained, to "distribute" means simply to transfer to another.

21     Sometimes it is possible to determine whether someone

22  had an "intent to distribute" from the quantity of drugs that

23  were possessed, although the possession of a large quantity of

24  narcotics does not necessarily mean that an individual intended

25  to distribute them.  On the other hand, an individual may have

 1    intended to distribute a controlled substance even if he did

 2    not possess a large amount of it.

 3              As I mentioned earlier, the ultimate success of the

 4    conspiracy, or the actual commission of the crime that is the

 5    object of the conspiracy, is not required.  The offense alleged

 6    here is simply the conspiracy, or unlawful agreement, to

 7    distribute cocaine, or to possess cocaine with the intent to

 8    distribute it.

 9              If you conclude that the government has proven beyond

10    a reasonable doubt that the charged conspiracy existed, and

11    that the conspiracy had as its object one or more of the

12    illegal purposes alleged in the indictment, then you must next

13    determine whether Mr. Gomez participated in the conspiracy with

14    knowledge of its unlawful purpose and in furtherance of its

15    unlawful objectives.

16              The government must prove beyond a reasonable doubt

17    that Mr. Gomez willfully and knowingly entered into the

18    conspiracy with criminal intent -- that is, with a purpose to

19    violate the law -- and that he agreed to take part in the

20    conspiracy to promote and cooperate in its unlawful objectives.

21              The terms "knowingly" and "willfully" are intended to

22    ensure that if you find that Mr. Gomez joined the conspiracy,

23    you also conclude beyond a reasonable doubt that, in doing so,

24    he knew what he was doing; in other words, that he took the

25    actions in question deliberately and voluntarily, and that he

1    was aware of the generally unlawful nature of his acts.

2           The key question is whether Mr. Gomez entered into the

3    alleged unlawful agreement with an awareness of at least some

4    of its basic aims and purposes.  Mr. Gomez's participation in

5    the conspiracy may be established by evidence of his own acts

6    or statements, as well as by the acts or statements of those

7    you find to be coconspirators and the reasonable inferences

8    which may be drawn from their acts and statements.

9           It is not necessary for the government to show that

10   Mr. Gomez was fully informed as to all the details of the

11   conspiracy in order for you to infer knowledge on his part.  To

12   have guilty knowledge, a defendant need not know the full

13   extent of the conspiracy or all of the activities of all of its

14   participants.  It is not even necessary for a defendant to know

15   every other member of the conspiracy.  In fact, an individual

16   may know only one other member of a conspiracy and still be a

17   coconspirator.  Nor is it necessary for a defendant to receive

18   any monetary benefit from his participation in a conspiracy, or

19   that he have a financial stake in the outcome.  It is enough if

20   he participated in the conspiracy willfully and knowingly, as I

21   have defined those terms for you.

22          The duration and extent of a defendant's participation

23   in a conspiracy has no bearing on his guilt.  A defendant need

24   not have joined the conspiracy at the outset.  If an individual

25   joins a conspiracy at any time in its progress, he will be held

1    responsible for all that was done before he joined and all that

2    is done during the conspiracy's existence while he is a member.

3    Moreover, each member of a conspiracy may perform separate and

4    distinct acts.  Some conspirators play major roles, while

5    others play minor roles in a scheme.  An equal role is not what

6    the law requires.  In fact, even a single act may be sufficient

7    to draw a defendant within the scope of a charged conspiracy.

8         I want to caution you, however, that a person's mere

9    association with a member of a conspiracy does not make that

10   person a member of the conspiracy, even when that association

11   is coupled with knowledge that a conspiracy exists.  In other

12   words, knowledge without agreement and participation is not

13   sufficient.  You may not find that Mr. Gomez is a member of the

14   conspiracy merely because of a friendship ora business

15   association with alleged coconspirators.  Similarly, mere

16   discussion of common aims and interests does not necessarily

17   establish membership in a conspiracy.  What is necessary is

18   that Mr. Gomez joined in the charged conspiracy with knowledge

19   of its unlawful purpose, and with an intent to aid in the

20   accomplishment of its unlawful objective.

21        In sum, a defendant, with an understanding of the

22   unlawful character of the conspiracy, must have intentionally

23   engaged, advised, or assisted in the purpose of furthering an

24   illegal undertaking.  A defendant thereby becomes a knowing and

25   willing participant in the unlawful agreement -- that is to

1    say, a conspirator.

2         A conspiracy, once formed, is presumed to continue

3    until either its objective is accomplished or there is some

4    affirmative act of termination by its members.  So, too, once a

5    person is found to be a member of a conspiracy, he is presumed

6    to continue his membership in the venture until its

7    termination, unless it is shown by some affirmative proof that

8    he withdrew and disassociated himself from it.

9         The indictment alleges that the narcotics conspiracy

10   took place between August 2014 and December 7, 2014.  The

11   government is not required to prove that the alleged conspiracy

12   started and ended on any specific date.  It is sufficient if

13   you find that the conspiracy was formed and that it existed for

14   some time within or around the dates in the indictment.

15        In addition to the elements of conspiracy that I have

16   discussed, you must also consider the issue of venue -- namely,

17   whether any act in furtherance of the conspiracy occurred in

18   the Southern District of New York.  The Southern District of

19   New York includes the Bronx, Manhattan, Yonkers, and

20   Westchester County.

21        As to the conspiracy charged in the indictment, it is

22   sufficient to find venue in the Southern District of New York

23   if you find that Mr. Gomez or any coconspirator committed any

24   act in furtherance of the conspiracy in this district during

25   the existence of the conspiracy.

1        As to venue, and as to venue alone, the government's

2   burden is not proof beyond a reasonable doubt.  Instead, venue

3   may be established by a preponderance of the evidence.  A

4   preponderance of the evidence means more likely than not.

5   Thus, the government has satisfied the venue requirement if you

6   conclude that it is more likely than not that any act in

7   furtherance of the charged conspiracy took place in the

8   Southern District of New York.  If you find that the government

9   has not proven venue by a preponderance of the evidence, then

10  you must find Mr. Gomez not guilty.

11       If you conclude that the government has met its burden

12  of establishing Mr. Gomez's guilt beyond a reasonable doubt,

13  you will be asked to indicate on the verdict form the quantity

14  of controlled substances that you have concluded was involved

15  in the conspiracy.  Accordingly, you will be asked to make

16  findings whether the government proved beyond a reasonable

17  doubt that the charged conspiracy involved five kilograms or

18  more of cocaine, and if not, whether the government proved

19  beyond a reasonable doubt that the charged conspiracy involved

20  500 grams or more of cocaine.

21       The jury must be unanimous as to the quantity

22  determinations.

23       The purity of the controlled substance does not

24  matter, however.  Any mixture or substance containing a

25  detectable amount of a controlled substance may be considered

1   by you in determining the type and quantity of drugs involved

2   in the offense.

3        In making your determination about the quantity of

4   cocaine involved in the charged conspiracy, you should include

5   cocaine that was involved in any act or acts in which Mr. Gomez

6   personally and directly participated.  In making this

7   determination, you should also include any other controlled

8   substance involved in the conspiracy so long as the type and

9   quantity of the controlled substance was either known to

10  Mr. Gomez or was reasonably foreseeable to him, and was within

11  the scope of the criminal activity that he jointly undertook.

12  "Reasonably foreseeable" means that the defendant could have

13  reasonably anticipated the type and quantity of drugs involved

14  in the conspiracy.

15       That concludes my instructions concerning the specific

16  charge at issue in this case.

17       Ladies and gentlemen, before I proceed to the final

18  instructions, I'm going to take a brief recess and ask you to

19  return to the jury room.  Please leave your instructions on the

20  seat.  We'll resume very shortly.  Don't begin discussing the

21  case yet.  You can follow the deputy.  Thank you.  Please leave

22  the instructions on your seat.  Thanks.

23       (Jury not present)

24       THE COURT:  Please be seated.  I have been concerned

25  today at several points about juror No. 1, Mr. Del Los Santos,

 1    and that is because he has had great difficulty staying awake.

 2    You may recall at one point during the summations I asked the

 3    jury to stand and stretch and we took a break, and that was

 4    because of my concerns about him.  Later, I took a recess in

 5    the middle, not the middle, towards the end of Ms. Todd's

 6    summation, again because of the same concern that juror No. 1

 7    was falling asleep.

 8              Now, during the final instructions, he fell asleep

 9    again.  In fact, I don't know if you noticed, but one of his

10    colleagues, one of the other jurors had to wake him up when I

11    announced that we were taking a recess.  Given his inability to

12    remain awake, despite the fact that I've tried to take steps to

13    allow him to refresh himself, I'm concerned at this point that

14    it's necessary to excuse him.  But I'll hear from the parties.

15              MR. COOPER:  The government has no objection, your

16    Honor.

17              THE COURT:  Ms. Todd.

18              MS. TODD:  Your Honor, Mr. Gomez objects on the basis

19    that he has sat through the entire trial, heard all the

20    evidence, and we're at the very end where the Court is going

21    through the instructions.  I haven't seen him sleeping.  I

22    can't see from where I'm at because of the monitor, of course,

23    but, Judge, we're at the very end.

24              THE COURT:  I've already told you what I observed

25    during the summations.

1          MS. TODD:  Right.

2          THE COURT:  Obviously I've been focused on him all day

3    because of concerns that I've mentioned, and during the charge,

4    I noticed that initially he was bent over, very slumped, and so

5    that raised concerns on my part, but initially, he was turning

6    the pages of the charge, and that gave me comfort that he was

7    following along.  But at some point in the process, I noticed

8    that the pages were no longer turning and there was no evidence

9    that he was awake, and that's why I took the recess just now.

10   As I said, when I told the jurors that we were taking a brief

11   recess, he was dead asleep, and juror No. 7 had to nudge him to

12   wake him up, so that's how deep his sleep had become.

13          I don't believe that I can permit someone who has

14   slept through portions of the summations and a significant

15   amount of the charge to remain on the jury.  I certainly agree,

16   it's unfortunate, because he has sat through the trial, but on

17   the other hand, he's going to be asked to decide a case based

18   on certain instructions of the law, and he has slept through a

19   good part of it, including the part of it that deals with the

20   specific charge in this case; in other words, the second

21   section of the charge, which is focused on the specific charge

22   brought against Mr. Gomez.  That's the part we just completed,

23   and that's the part that it's obvious to me he was dead asleep,

24   and by the end of it, had to be woken up by a colleague on the

25   jury.  I don't see how I can proceed with him as a member of

```
 1     the jury at this point.

 2               MS. TODD:  A moment to confer?

 3               THE COURT:  Sure.

 4               MS. TODD:  I have conferred with Mr. Gomez, your

 5     Honor.  We do not object to the Court's decision.

 6               THE COURT:  All right.  Mr. Ruocco, would you explain

 7     to juror No. 1 he's excused.

 8               By the way, we had distributed a verdict sheet.  Are

 9     there any objections to the verdict sheet?

10               MR. EGAN:  No, your Honor.

11               MS. TODD:  No, your Honor.

12               THE COURT:  Are we prepared to proceed?

13               (Jury present)

14               THE COURT:  Please be seated.

15               Ladies and gentlemen, I'm going to turn to the final

16     instructions, which begin on page 28 of the charge that you

17     have been handed.

18               If, during your deliberations, you have any doubt as

19     to any of the testimony, you will be permitted to request that

20     portions of the trial transcript be sent back to you in the

21     jury room.  If you want any testimony, please remember that it

22     is not always easy to locate what you might want, so be as

23     specific as you possibly can be in requesting portions of the

24     testimony.

25               All of the exhibits that have been received in
```

1    evidence will be sent into the jury room, except for the

2    dashcam video and the drug evidence.  If you want to see the

3    video or you want to see the drug evidence, all you have to do

4    is ask.  We'll bring you into the courtroom and we'll show it

5    to you here in the courtroom.

6         If you want any further explanation of the law as I

7    have explained it to you, you may also request that.  As I

8    noted earlier, however, you may all take into the jury room

9    your copy of these instructions.

10        Any communications to me should be in writing, signed

11   by your foreperson, include the date and time, and be given to

12   one of the marshals.  Please make any notes as clear and

13   precise as possible.  Do not tell me or anyone else how the

14   jury stands on any issue until after a unanimous verdict is

15   reached.

16        Your function is to weigh the evidence in this case

17   and to decide whether the government has proven beyond a

18   reasonable doubt each of the essential elements of the crimes

19   with which the defendant is charged.  It should say each of the

20   essential elements of the crime with which the defendant is

21   charged.  If the government has succeeded in meeting its

22   burden, your verdict should be guilty; if it has failed to do

23   so, it should be not guilty.  You must base your verdict solely

24   on the evidence and these instructions as to the law, and you

25   are obligated under your oath as jurors to follow the law as I

1    instruct you, whether you agree or disagree with the particular

2    law in question.

3            It is your duty as jurors to consult with one another

4    and to deliberate with a view toward reaching an agreement.  As

5    you deliberate, please listen to the opinions of your fellow

6    jurors and ask for an opportunity to express your own views.

7    Every juror should be heard.  No one juror should hold center

8    stage in the jury room and no one juror should control and

9    monopolize the deliberations.

10           Each of you must decide the case for yourself, but you

11   should do so only after a consideration of the case with your

12   fellow jurors, and you should not hesitate to change an opinion

13   when convinced that it is erroneous.  Discuss and weigh your

14   respective opinions dispassionately, without with regard to

15   sympathy or to prejudice or favor for either side.

16           Your verdict must be unanimous.  However, you are not

17   bound to surrender your honest convictions concerning the

18   effect or weight of the evidence for the mere purpose of

19   returning a verdict or solely because of the opinion of other

20   jurors.  Each of you must make your own decision about the

21   proper outcome of this case based on your consideration of the

22   evidence and your discussions with your fellow jurors.  No

23   juror should surrender his or her conscientious beliefs solely

24   for the purpose of returning a unanimous verdict.

25           Remember at all times, you are not partisans.  You are

1    judges -- judges of the facts.  Your sole interest is to

2    determine whether the government has proven the defendant's

3    guilt beyond a reasonable doubt.

4            If you are divided, do not report how the vote stands,

5    and if you have reached a verdict, do not report what it is

6    until you are asked in open court.

7            A number of you have taken notes during the trial.

8    Your notes are to be used solely to assist you and are not to

9    substitute for your recollection of the evidence in the case.

10   Any notes that you may take are not evidence.  The fact that a

11   particular juror has taken notes entitles that juror's views to

12   no greater weight than those of any other juror, and your notes

13   are not to be shown to any other juror during your

14   deliberations.

15           I have prepared a verdict form for you to use in

16   recording your decision.  Please use that form to record your

17   verdict.

18           I referred a moment ago to a foreperson.  It is

19   customary for juror No. 1 to serve as the foreperson, and that

20   is what we will do here.  The foreperson doesn't have any more

21   power or authority than any other juror, and his vote or

22   opinion doesn't count for any more than any other juror's vote

23   or opinion.  The foreperson is merely your spokesperson to the

24   Court.  The foreperson will send out any notes, and when the

25   jury has reached a verdict, the foreperson will notify the

marshal that the jury has reached a verdict, and you will come

into open court and deliver your verdict.

After you have reached a verdict, your foreperson will

fill in the form that has been given to you, sign and date it

and advise the marshal outside your door that you're ready to

return into the courtroom.

Each of you must be in agreement with the verdict that

is announced in court.  Once your verdict is announced by your

foreperson in open court and officially recorded, it cannot

ordinarily be revoked.

During your deliberations, all the rules of conduct

concerning outside influences remain in effect.  As I have

instructed you a number of times, your verdict must be based

solely on the evidence presented in this courtroom.

Accordingly, you are still not permitted to discuss this case

with anyone but your fellow jurors, and you may not read

anything in the newspapers, over the Internet, or elsewhere

about this case.  Also do not listen to or watch any reporting

about this case if it should be broadcast on TV or over the

radio.

Members of the jury, that concludes my instructions to

you.  I ask you to remain seated for just a minute while I

confer with the lawyers to see whether there are any additional

instructions they wish me to give.

(At sidebar)

```
 1              THE COURT:  Are there any exceptions to the charge?

 2              MR. EGAN:  Not from the government.

 3              MS. TODD:  No, your Honor.

 4              THE COURT:  OK.

 5              (In open court)

 6              THE COURT:  Mr. Ruocco, would you swear in the

 7    marshal.

 8              (Marshal sworn)

 9              THE COURT:  Members of the jury, you may begin your

10    deliberations.

11              (At 2:30 p.m., the jury retired to deliberate upon a

12    verdict).

13              THE COURT:  Please be seated.  Have the exhibits been

14    gathered up to send to the jury room?

15              MS. CROWLEY:  Almost, your Honor.

16              THE COURT:  OK.  And we'll send the verdict form in as

17    well.  I have an extra copy of Defense Exhibits C, D, E, F, and

18    G, if necessary.

19              You're not required to remain in the courtroom.  As

20    long as we can reach you right away, you're welcome to wait

21    wherever you're comfortable.

22              MS. TODD:  Mr. Gomez has to run across the street to

23    meet with his pretrial service officer.  I guess he wanted to

24    do that yesterday, but we left late, so I got an email from Mr.

25    Ruocco that he needs to see him.  Is he permitted to do that,
```

1    or no?

2            THE COURT:  As long as there's a way to reach him

3    quickly so that he can return immediately if we get a note.

4    Often we get a note right at the beginning, so I'm reluctant to

5    have him go.

6            MS. TODD:  Personally, I'd rather just have him here.

7            THE COURT:  That might be best.

8            MS. TODD:  Thank you, your Honor.

9            (Recess pending verdict)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Please be seated.  We received a note from

3     the jury, which I am marking as Court Exhibit 1.  It's dated

4     today.  It reads as follows:

5          "Judge Gardephe.

6          "1.  We have a question about the quantity being five

7     kilos versus the measured amount being approximate 4.85 kilo.

8     Is it the intent to bring five kilos or more or actual amount

9     that matters?"

10         Second question, "Can we get the transcript of the

11    prosecutor's first witness, Detective Garcia?"

12         And then there's a No. 3, which is crossed out.  I'll

13    read it to you just so you know what I know.  It's crossed out,

14    however.  It says, "As to proving venue, we want to see the

15    witness transcript of the --" and then it ends, and the whole

16    sentence is crossed out.  It appears that they were thinking

17    about asking a question about venue and then they crossed it

18    out.

19         Back to the first question:  "We have a question about

20    the quantity being five kilos versus the measured amount being

21    approximate 4.85 kilo.  Is it the intent to bring five kilos or

22    more or actual amount that matters?"

23         And then the second question is the transcript of

24    Detective Garcia's testimony.  I assume that would not be

25    difficult to pull together, both the direct and cross of

G6aBgom5

1    Detective Garcia.

2              As to the first question about quantity, my initial

3    sort of reaction to their question about quantity is to focus

4    them on the fact that conspiracy is about an agreement.  The

5    response to their quantity question, seems to me, is to bring

6    them back to the idea that Mr. Gomez is charged with a

7    conspiracy, and so the question that they need to focus on is

8    whether there was a conspiratorial agreement that involved five

9    kilograms or more of cocaine.  But what do the lawyers think?

10             MR. COOPER:  That's fine for the government, your

11   Honor.  One other point for consideration is the reasonable

12   foreseeability standard, which was part of the Court's charge

13   on conspiracy.  Under Second Circuit law with respect to

14   quantity, a conspirator is responsible for the reasonably

15   foreseeable amount of narcotics involved in a conspiracy, so

16   the Court may want to consider including that concept as well.

17             THE COURT:  All right.  The language that Mr. Cooper

18   is referencing is on page 27, toward the bottom, and it reads

19   as follows:

20             "In making your determination about the quantity of

21   cocaine involved in the conspiracy, you should include cocaine

22   that was involved in any act or acts in which Mr. Gomez

23   personally and directly participated.  In making this

24   determination, you should also include any other controlled

25   substance involved in the conspiracy so long as the type and

1  quantity of the controlled substance was either known to

2  Mr. Gomez or was reasonably foreseeable to him, and was within

3  the scope of the criminal activity that he jointly undertook.

4  'Reasonably foreseeable' means that the defendant could have

5  reasonably anticipated the type and quantity of drugs involved

6  in the conspiracy."

7          It does seem to me that that paragraph at the bottom

8  of 27 should be read to them.  The other thing that I'm

9  proposing to do is to remind them that the crime that Mr. Gomez

10  is charged with is conspiracy to distribute narcotics or

11  possess narcotics with the intent to distribute them, and that

12  for purposes of their question, the issue is whether Mr. Gomez

13  entered into a conspiracy to distribute more than five

14  kilograms of cocaine.

15          Does that seem like it makes sense, Ms. Todd?

16          MS. TODD:  Yes, your Honor.

17          THE COURT:  There will be two components to the

18  response.  The first component would be reminding them that

19  he's charged with a conspiracy, and then also to respond to

20  their question, the issue is whether the government has proven

21  beyond a reasonable doubt that Mr. Gomez entered into a

22  conspiracy to distribute or possess with intent to distribute

23  five kilograms or more of cocaine.  And then I will read the

24  bottom paragraph on page 27.

25          Is that acceptable to the government?

1          MR. COOPER:  Yes, your Honor.

2          THE COURT:  Acceptable to you, Ms. Todd?

3          MS. TODD:  Yes, your Honor.

4          THE COURT:  OK.  You can bring in the jury.

5          (Jury present)

6          THE COURT:  Please be seated.

7          Ladies and gentlemen, I have your note, which I've

8     marked as Court Exhibit 1.  It reads as follows:

9          "Judge Gardephe.

10         "1.  We have a question about the quantity being five

11    kilos versus the measured amount being approximate 4.85 kilo.

12    Is it the intent to bring five kilos or more or actual amount

13    that matters?"

14         And then there's a second question, which reads:  "Can

15    we get the transcript of the prosecutor's first witness,

16    Detective Garcia?"

17         And then there's a third question about venue, which

18    is crossed out.  I'm assuming that you were initially thinking

19    about asking a question about venue but changed your mind, and

20    you crossed that out.  We are pulling together the transcript

21    of Detective Garcia's testimony, and when we have those pages,

22    we'll send them directly into the jury room.

23         The first question about quantity, first of all, I

24    want to remind you, as I'm sure you're aware, that Mr. Gomez is

25    charged with conspiracy here and specifically with having

1    entered into an unlawful agreement to distribute cocaine or

2    possess cocaine with the intent to distribute it.  To respond

3    to your question about quantity in your first query there, the

4    issue would be whether the government has proven beyond a

5    reasonable doubt that Mr. Gomez entered into a conspiracy, or

6    unlawful agreement, to distribute or possess with intent to

7    distribute five kilograms or more of cocaine.

8         I would also direct your attention to page 27 of the

9    instructions, which you have, which addresses the issue of

10   quantity as follows:

11        "In making your determination about the quantity of

12   cocaine involved in the charged conspiracy, you should include

13   cocaine that was involved in any act or acts in which Mr. Gomez

14   personally and directly participated.  In making this

15   determination, you should also include any other controlled

16   substance involved in the conspiracy so long as the type and

17   quantity of the controlled substance was either known to

18   Mr. Gomez or was reasonably foreseeable to him, and was within

19   the scope of the criminal activity that he jointly undertook.

20   'Reasonably foreseeable' means that the defendant could have

21   reasonably anticipated the type and quantity of drugs involved

22   in the conspiracy."

23        That is my response to your questions.  As I said,

24   with respect to the request for the transcript, we're working

25   on that, and as soon as we have the pages together, we'll send

1   them into the jury room.  Thank you very much.

2              (Jury deliberations resumed at 3:45 p.m.)

3              THE COURT:  All right.  You'll put together the pages?

4              MR. EGAN:  What's your preference on how we redact the

5   parts that are nonresponsive?  Should we run back to our

6   computer?  Is there a pen in here we can use?

7              THE COURT:  You can put yellow stickies over it and we

8   can xerox the page for you.  That works.  And whenever both

9   sides have; agreed on the pages, my deputy will give them to

10  the marshal and he'll give them to the jurors.  OK?

11             (Recess pending verdict)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                THE COURT:  So the time now is a little after 5:20.

2     My inclination at this point is to bring the jury out, tell

3     them that we are prepared to stay as late as they want to stay,

4     so we are at their disposal.  If they want to continue

5     deliberating, they are welcome to do so.  On the other hand, if

6     they want to go home, that's OK, too.  We will tell them that

7     and ask them to send us out a note telling us what their

8     preferences are.

9                (Jury present)

10               THE COURT:  Ladies and gentlemen, it has been our

11    practice to break at 5:00.  The time now is a little after

12    5:20.  I wanted to bring you out to tell you that we are at

13    your disposal and we will stay as late as you wish this

14    evening.  It's entirely up to you.  On the other hand, if the

15    jury decided they preferred to go home and come back tomorrow,

16    that's fine, too.  It's entirely up to you.  We will stay as

17    late as you want us to stay.  Just send us out a note and tell

18    us what you want to do.  Thank you all very much.

19               (Jury deliberations resumed; time noted:  5:25 p.m.)

20               THE COURT:  We will await their note and do whatever

21    it is they want to do.

22               (Recess pending verdict)

23               THE COURT:  I have received a note from the jury which

24    I'm marking as Court Exhibit 2.  It reads as follows:  Judge,

25    we are close to reaching a verdict tonight.  Foreman."

```
1              They will be staying and their expectation is they
2   will be able to reach a verdict this evening.  We will await
3   their next note.
4              (Recess pending verdict)
5              THE COURT:  We have a received a note from the jury.
6   I'm marking it as Court Exhibit 3.  It reads as follows:  Judge
7   Gardephe, we have reached a verdict, signed by the foreperson.
8              (Jury present).
9              THE COURT:  Mr. Foreperson, has the jury reached a
10  verdict?
11             THE FOREPERSON:  It has.
12             THE COURT:  How do you find as to the charge,
13  conspiracy to distribute or possess with intent to distribute
14  cocaine, guilty or not guilty?
15             THE FOREPERSON:  Guilty.
16             THE COURT:  With respect to question 1A, did the
17  government prove beyond a reasonable doubt that the conspiracy
18  in which the defendant participated involved five kilograms or
19  more of a mixture or substance containing a detectable amount
20  of cocaine, yes or no?
21             THE FOREPERSON:  Yes.
22             THE COURT:  Mr. Ruocco, would you please poll the
23  jury.
24             THE DEPUTY CLERK:  Yes, your Honor.
25             (Jury polled; each juror answered in the affirmative)
```

1         THE COURT:  Ladies and gentlemen, I want to thank you

2    for your jury service.  It was a short trial but it was an

3    important case, obviously, both for the government and for the

4    defendant.  It was obvious to everyone here in the courtroom

5    the close attention that you paid to the evidence as it came

6    in.  I hope you take enormous satisfaction in your jury service

7    because, as I said at the outset of the case, without people

8    like you willing to serve this important function, our system

9    of justice could not be what it is.  Thank you very much and I

10   hope you take pride in your jury service.  You are discharged

11   with the thanks of the Court.  Thank you.

12        (Jury discharged)

13        THE COURT:  Are there any applications with respect to

14   the jury's verdict?

15        MS. TODD:  Yes, your Honor. Move for a directed

16   verdict.

17        THE COURT:  Do you wish to brief the issue?

18        MS. TODD:  Exactly, your Honor.  I'd like an

19   opportunity to submit it in writing.

20        THE COURT:  How long do you wish?

21        MS. TODD:  Your Honor, can I have three weeks?

22        THE COURT:  Today is November 10.  Three weeks would

23   bring us to December 1.

24        How long does the government wish?

25        MR. COOPER:  Two weeks, your Honor.

GRAMGOM5

 1          THE COURT:  That would bring us until December 15.

 2          Ms. Todd, I'll give you a week for reply, if you wish,

 3    December 22.  We will enter an order with those dates later

 4    today.

 5          Is there an application with respect to bail?

 6          MR. COOPER:  There is, your Honor.  This is a

 7    mandatory remand case under the Bail Reform Act.  The

 8    government seeks remand at this time.

 9          THE COURT:  Ms. Todd, anything you wish to say?

10          MS. TODD:  Your Honor, I would ask that Mr. Gomez

11    continue to remain on bail until at least the Court decides the

12    Rule 29 motion or, if the Court is contemplating incarcerating

13    him, to at least give him an opportunity to get his affairs in

14    order.  There are some young children at his home at the

15    moment.  Kids came up from Texas.  And at least so he can get

16    his affairs in order.  I understand it's a mandatory remand

17    because he is convicted of a 10-year mandatory minimum

18    sentence.

19          THE COURT:  Yes.  In order for me not to remand

20    Mr. Gomez, there would be certain findings that I would have to

21    make under the Bail Reform Act.  If my memory is correct, I

22    would have to find that there is a substantial likelihood that

23    a motion for acquittal or new trial would be granted or that

24    the prosecutor intends to recommend that no sentence of

25    imprisonment be imposed on the person.  And I further would

1    have to find that by the standard of clear and convincing

2    evidence that Mr. Gomez is not likely to flee or pose a danger

3    to any other person or the community.

4         Without having read your motion, Ms. Todd -- it was a

5    short trial -- I carefully listened to all the evidence and I

6    cannot find that there is a substantial likelihood that a

7    motion for acquittal for a new trial will be granted.  I'm

8    quite confident the government is not going to be recommending

9    a sentence of no imprisonment, but, Mr. Cooper, perhaps you can

10   address that aspect of the statute.

11        MR. COOPER:  That's correct, your Honor.  In fact, we

12   can't.

13        THE COURT:  Ms. Todd, the status is that under the

14   applicable statute, which is 18, United States Code, Section

15   3143(a), which deals with the release or detention of a

16   defendant pending sentence or appeal, these are the types of

17   findings that I would have to make under 3143(a)(2).  I'd have

18   to find that there is a substantial likelihood that a motion

19   for acquittal and new trial would be granted.  I would have to

20   find that the prosecutor intends to recommend no sentence of

21   imprisonment.  And I would have to then go on to find by clear

22   and convincing evidence that Mr. Gomez is not likely to flee or

23   pose a danger to the community.  I cannot make the findings

24   necessary under either 3143(a)(2)(a)(i) or (a)(2).  I cannot

25   find that there is a substantial likelihood that a motion for

1    acquittal or a new trial will be granted or that the prosecutor

2    intends to recommend a sentence of no imprisonment.  Because

3    the statute is not satisfied, I am going to be remanding

4    Mr. Gomez pending sentencing.

5            MS. TODD:  Before you do that, your Honor, just one

6    more thing.  I believe, under the same statute, the Court can

7    find under exceptional circumstances -- I am trying to find

8    where that is -- to allow him to remain on bail.

9            And the circumstances are that there are young

10   children that came up from Texas yesterday.  There is no adult

11   there at the moment and they are left there with the home

12   attendant until Mr. Gomez would need or I would need to get up

13   in the Bronx and try to sort that out.

14           He has been on pretrial supervision with a bracelet.

15   He has been in full compliance.  There hasn't been any

16   incidences of violation.  So I would ask the Court to consider

17   that and give him that short amount of time at least to take

18   care of his children and get them --

19           THE COURT:  I'm happy to look at any provision that

20   you wish to direct my attention to.  I've been looking at 3143

21   which deals with release or detention of a defendant pending

22   sentence or appeal.

23           MS. TODD:  Can I have just like five minutes, your

24   Honor?  I need to get my computer up.

25           THE COURT:  Sure.  I suspect that the provision you

1    are referencing is 3145 of Title 18.

2           MS. TODD:  It sounds familiar.  I'm just waiting for

3    my computer to boot up.  I'm sorry, your Honor.  My computer is

4    taking a little longer than it normally --

5           THE COURT:  That's OK, Ms. Todd.

6           MS. TODD:  Your Honor, my computer is apparently

7    updating.  I think under Section 18 U.S.C. Section 3145, which

8    I don't have with me --

9           THE COURT:  I can read it to you.  I think I know the

10   provision that you are referencing.  It's Section 3145, which

11   is entitled review an appeal of a release or detention order.

12   And paragraph C of Section 3145 reads as follows:  An appeal

13   from a release or detention order or from a decision denying

14   revocation or amendment of such an order is governed by the

15   provisions of Section 1291 of Title 28 and Section 3731 of this

16   title.  The appeal shall be determined promptly.  A person

17   subject to detention, pursuant to Section 3143(a)(2) or (b)(2),

18   and who meets the conditions of release set forth in Section

19   3143(a)(1) or (b)(1) may be ordered released under appropriate

20   conditions by the judicial officer, if it is clearly shown that

21   there are exceptional reasons why such person's detention would

22   not be appropriate.  Given your reference to exceptional

23   reasons, I suspected that this was the provision you had in

24   mind.

25          MS. TODD:  Yes, your Honor.

1        THE COURT:  So the exceptional reasons that you are

2   referencing are that Mr. Gomez's children are in the vicinity

3   and appropriate arrangements have not been made for their

4   custody.

5        MS. TODD:  That is true, your Honor.

6        THE COURT:  I guess you've also cited the fact that he

7   has been out on bail for some time and he has been compliant,

8   right?

9        MS. TODD:  That is correct, your Honor.  There hasn't

10  been any violations.

11       THE COURT:  I'll hear from the government.

12       MR. COOPER:  Your Honor, under the statute and the

13  case law it does not appear that those are exceptional

14  circumstances.

15       As a preliminary matter, the decision to bring minor

16  children into the area from out of state the week of a trial

17  and not arrange for child care is frankly baffling,

18  particularly in a case which carries with it such mandatory

19  minimum penalties like this one.

20       In terms of exceptional circumstances, your Honor,

21  under the statute, there are those preconditions from 3143 that

22  first have to be satisfied.  And even assuming that they are,

23  it is only at that point that the Court turns to whether there

24  are exceptional circumstances.  Family issues, although we have

25  not researched this exhaustively, exceptional circumstances in

1   cases that we are familiar with are situations, for example,

2   where there is a proactive cooperator who is going to be

3   closely monitored with the government and with the defense both

4   propose a bail package subsequent to a plea to a cooperation

5   agreement.

6          There is a Southern District reported case that we

7   just found.  It's a case, 175 F.Supp.2d 537.  It's a 2001 case

8   which looks like it's from Judge Sweet who appears to have

9   considered a situation analogous to this one where the argument

10  was that work and family commitments were exceptional

11  circumstances under the statute.  Judge Sweet there held that

12  it would be inequitable to apply the exceptional circumstances

13  provision differently for drug traffickers convicted of

14  offenses who had family and who did not have family, and Judge

15  Sweet denied bail.

16         For those reasons, we believe that this isn't

17  exceptional circumstances.

18         I should also note, your Honor, that whatever

19  incentive the defendant had to flee prior to today, that

20  incentive goes up considerably now that he stands convicted,

21  now that he has heard all of the evidence, now that he has seen

22  from the stand a cooperator who testified against him, now that

23  he knows that he's facing a mandatory minimum 10 years in jail.

24         THE COURT:  Have you calculated the guidelines range

25  that applies for Mr. Gomez?

1           MR. COOPER:  It's somewhere around 10 years, your

2    Honor.

3           THE COURT:  I guess based on what quantity of drugs?

4    There was discussion here of as much as 50 to 100 kilograms,

5    wasn't there?

6           MR. COOPER:  Yes, your Honor.  I think there was

7    evidence that it was 50 to a hundred kilos.  That was from

8    Ms. Ramon-Baez.  I believe the guidelines calculation, which

9    was a preliminary one that we did, was based on the 50 to

10   150-kilo weight for cocaine and that gets somewhere around 10

11   years.  Of course, there is the potential that we need to

12   investigate for obstruction of justice based on the affidavits

13   submitted in connection with the suppression motion.  We have

14   not taken a position yet on that, but that could increase the

15   guidelines.

16          THE COURT:  I will say that I am concerned about the

17   potential applicability of a couple different enhancements.

18   One for perjury and, secondly, for witness tampering.  I'm

19   putting counsel on notice that I'm concerned about the

20   potential applicability of those enhancements.

21          One of the things that troubles me here, Ms. Todd, is

22   that it was entirely foreseeable, at least in my view, that

23   Mr. Gomez might be convicted here.  It was an extraordinarily

24   strong case and it was obvious to me it was an extraordinarily

25   strong case before the trial started based on the exhibits that

GBANGOM5

1    had been provided to me, particularly the taped transcripts, my

2    knowledge that someone directly involved in the conspiracy was

3    going to be testifying against Mr. Gomez.  In my view, at

4    least, it was extremely foreseeable that Mr. Gomez would be

5    convicted.

6          So the question comes up, why weren't appropriate

7    arrangements made with respect to the children?  You are

8    knowledgeable about the statute and the mandatory nature of the

9    remand and you were aware of the proof that was arrayed against

10   your client.  So it has the feel of trying to create a

11   situation that would justify a bail application in a

12   circumstance where it was very foreseeable that we would be

13   where we are today, which is to say that Mr. Gomez would stand

14   convicted of this very serious crime in which he faces a

15   10-year mandatory minimum sentence.  And no thought was given

16   as to what was going to happen to the children?

17         MS. TODD:  With all due respect, your Honor, that's

18   not entirely the case.  We discussed it.  It was a significant

19   amount of thought given into the possibility that the jury

20   could come back with a verdict.  That's always a part of the

21   discussion.  I might have overestimated where we would end up

22   today, thinking that this might have gone through tomorrow.

23         While we were out in the hallway I tried reaching out

24   to his oldest son, the one that lives in New Jersey, trying to

25   coordinate the children.  That's not been satisfied as of yet.

1    It certainly wasn't our intention to thwart the possibility

2    that the Court might put him in because I'm fully aware, having

3    done this before, that even under any drug conviction, even a

4    (b)(1)(c), and I've had a situation in front of Judge Kaplan

5    which is why I was trying to recollect how the statute applies,

6    that he would be facing possible remand.  And this is a far

7    more serious offense obviously.  It's a (b)(1)(A).  So I wasn't

8    trying to be clever or --

9             THE COURT:  I'm in no way criticizing you and I want

10   to make that clear.  It's not intended to be critical of you at

11   all.  My only point was that the place where we find ourselves

12   this evening could have been anticipated, in my view, and given

13   that it could have been anticipated, I guess what I'm saying

14   is, it should have been anticipated.  Whether or not it should

15   have been anticipated, my situation is that I have to find that

16   these prerequisites are met under 3143.  Assuming that 3145(c)

17   applies, it is still my conclusion that a remand is

18   appropriate.

19        My finding is that exceptional reasons do not exist

20   that would justify not remanding Mr. Gomez, and then with

21   respect to the provisions of Section 3143, they are not

22   satisfied here because I do not believe that there is a

23   substantial likelihood that a motion for acquittal or new trial

24   will be granted, and the government has represented it will

25   seek at least the 10-year mandatory minimum sentence.

1                    I'm ordering Mr. Gomez remanded pending sentencing.

2                    MS. TODD:  If I can make one last application, your

3     Honor.

4                    THE COURT:  Yes.

5                    MS. TODD:  I would ask the Court to take a look at

6     *United States v. Disomma*, 951 F.2d 494, which allows some

7     discretion, at least overnight.

8                    THE COURT:  You wish me to look at the case now?

9     Because I will.

10                   MS. TODD:  Yes, your Honor.

11                   THE COURT:  I will take a brief recess.  I will look

12    at the case.  Any other authority you want to cite to me?

13                   MS. TODD:  Under *United States v. Lea*, 360 F.3d, 401

14    (2d Cir. 2004) where the circuit holds that the statute is

15    necessarily a flexible one and, in combination with other

16    factors, including family circumstances, may warrant release

17    pending sentencing.  *United States v. Lippold*, 175 F.Supp.2d.

18    537 (2001).  And *United States v. Sabhnani*, 529 F.Supp.2d, 377

19    (2007).

20                   THE COURT:  I will look at this authority now and come

21    back down.

22                   MS. TODD:  Thank you.

23                   (Recess)

24                   THE COURT:  I have had an opportunity to review the

25    authorities cited by defense counsel and those cases, just for

GBAMGOM5

1   the record, are *United States v. Lea*, 360 F.3d 401 (2d Cir.

2   2004; *United States v. Disomma*, 951 F.2d 494 (2d Cir. 1991);

3   *United States v. Lippold*, 175 F.Supp.2d, 537 (S.D.N.Y. 2001);

4   finally, *United States v. Sabhnani*, 529 F.Supp.2d, 377

5   (E.D.N.Y. 2007).

6           Those cases make clear that despite the mandatory

7   language in 3143(a)(2), the Court has discretion under 3145(c)

8   to nonetheless order that a defendant remain on bail even after

9   having been convicted of an offense under Title 21 in the

10  following circumstances:  First, that the conditions of release

11  set forth in Section 3143(a)(1) have been met.  Those

12  conditions are that a judicial officer finds by clear and

13  convincing evidence that the person is not likely to flee or to

14  pose a danger to the safety of any other person or the

15  community if released, so that's the first condition.  The

16  second is that "it is clearly shown that there are exceptional

17  reasons why the defendant's detention would not be

18  appropriate."  And that's a cite to 18, United States Code,

19  Section 3145(c).

20          Now, the first condition requires me to find by clear

21  and convincing evidence that Mr. Gomez is not likely to flee or

22  to pose a danger to the community if he's released.  My

23  recollection is that Mr. Gomez has previously been convicted of

24  a serious drug offense; in fact, one that involved five kilos

25  of cocaine.  Mr. Cooper, could you refresh my memory on the

1    details of that case.

2          MR. COOPER:  Yes, your Honor.  It was a conviction in

3    New York state court in 1998.  I think it was criminal

4    possession of a controlled substance and the circumstances, to

5    our understanding, he was arrested in the back of a livery car

6    with five kilos of cocaine.  I believe that his sentence there

7    was one to three years, or something in that range.

8          THE COURT:  And unless I am mistaken, that was tied to

9    cooperation?

10         MR. COOPER:  That's what he told Ms. Ramon-Baez.  We

11   have not researched the issue.  We are not sure whether that's

12   correct or not.

13         MS. TODD:  I can enlighten the Court.

14         THE COURT:  My question to you, Ms. Todd, is, assuming

15   that the assistant is correct, that Mr. Gomez was previously

16   convicted of a drug trafficking offense that involved five

17   kilograms of cocaine and given the fact that he has just been

18   found guilty by a jury here of a drug trafficking offense

19   involving five kilos of cocaine, how is it that you believe I

20   could find by clear and convincing evidence that he does not

21   pose a danger to the community?

22         MS. TODD:  Your Honor, because the conviction in '98

23   is more than 10 years old.  It's been quite a while.  He has

24   been living a law-abiding life, meaning he has been working for

25   a number of years, stayed out of trouble for a number of years.

1            I recognize that this is a very serious crime.  There

2    is no doubt about it, and we understand that.  And, your Honor,

3    I don't believe that he is going to go out and commit another

4    crime within the next few days.  I think he has done everything

5    that is required of him while he's been on release, and he's

6    been under very strict supervision, meaning he has got a

7    curfew.  He can only go to work and home or to come see me or

8    any other circumstance that must be specifically worked out

9    with his pretrial services officer, and he has complied with

10   all of those during the entire time that he's been on release,

11   which has been more than a year with not one single infraction

12   of any violation whatsoever.

13           I think, your Honor, his past, while he's being

14   supervised on the instant case, indicates that he certainly can

15   comply with the rules, and I'm simply asking the Court, based

16   on the circumstances right now, to give him a little time to

17   sort everything out, and he can self-surrender at a time

18   designated by the Court.

19           THE COURT:  The second part of the test is under

20   3145(c), and that directs me to consider whether there are

21   exceptional circumstances.  Assuming that the provisions of

22   3143(a)(1) could be satisfied, the next question would be

23   whether there are exceptional circumstances within the meaning

24   of Section 3145(c).

25           In the *Lea* case, which is the most recent Second

1   Circuit authority on the point, the circuit said as follows:

2   Exceptional circumstances exist where there is a unique

3   combination of circumstances giving rise to situations that are

4   out of the ordinary.  That's *U.S. v. Lea*, 360 F.3d at 403,

5   quoting *Disomma*, 951 F.2d at 497.  The Court in *Lea* also cites

6   to *United States v. Lippold*, 175 F.Supp.2d 537 (S.D.N.Y. 2001)

7   and gives the following parenthetical:  Collecting cases and

8   noting that circumstances that are purely personal do not

9   typically rise to the level of exceptional warranting release.

10          I've also looked at *U.S. v. Sabhnani* where the Eastern

11   District of New York repeated the statement in both *Lea* and in

12   *Lippold* to the effect that circumstances that are purely

13   personal do not rise to the level of exceptional circumstances

14   that would warrant release pursuant to Section 3145(c).  In the

15   *Lippold* case the defendant sought continued release after

16   having been convicted at trial, arguing that he was the father

17   of three young children whom he supported financially and that

18   his seven-month-old son had recently been diagnosed with Bell's

19   Palsy.  The Court in that case found that bail was not

20   appropriate, noting that incarceration "always is associated

21   with severe familial inconvenience." Citing *Sabhnani*, 529

22   F.Supp.2d at 382.

23          In the *Lea* case, the Second Circuit reversed a

24   district court judge who had granted a release, finding that

25   the circumstances in that case which involved a first offender.

1   So someone who had no criminal record, someone who was a

2   student and who was lawfully employed at the time, the Court

3   found that none of those factors qualified as exceptional.

4          My conclusion here, after having read the cases and

5   factored in Mr. Gomez's prior conviction, which was quite

6   serious in nature, is that none of the provisions of the key

7   provisions here that I must look to are satisfied.

8          First of all, given the fact that Mr. Gomez was

9   previously convicted of criminal possession of a controlled

10  substance in a case that involved five kilograms of cocaine, I

11  cannot find by clear and convincing evidence that he does not

12  pose a danger to the community if he's released.  Understanding

13  that he has responsibilities with respect to his children, what

14  the cases teach me is that those circumstances are personal in

15  nature.  They are not out of the ordinary and they don't meet

16  the standard of exceptional circumstances within the meaning of

17  Section 3145(c).

18         I do not find that a release would be appropriate.

19         Mr. Gomez will be remanded pending sentencing.

20         Is there anything else?

21         MR. COOPER:  Not from the government.  Thank you, your

22  Honor.

23         MS. TODD:  Not from the defense.  Thank you, your

24  Honor.

25                            o0o

INDEX OF EXAMINATION

Examination of:                                    Page

SANDY GOMEZ

Cross By Mr. Cooper   . . . . . . . . . . . . 408